1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    KATHY AITKEN, et al.,              )

5            Plaintiffs,               ) Case No.

6              vs.                     ) 19-520C

7    THE UNITED STATES OF AMERICA,     )

8            Defendant.                )

9

10

11

12        William J. Nealon Federal Courthouse

13           235 North Washington Avenue

14             Scranton, PA  18501

15            Monday, March 13, 2023

16                 9:30 a.m.

17              Trial Volume 1

18

19

20      BEFORE:  THE HONORABLE STEPHEN S. SCHWARTZ

21

22

23

24

25    Reporter: Kayla Keating

2

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                    A P P E A R A N C E S

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4            MOLLY A. ELKIN, ESQ.

 5            SARAH M. BLOCK, ESQ.

 6            McGillivary Steele Elkin, LLP

 7            1101 Vermont Avenue, NW

 8            Suite 1000

 9            Washington, DC  20005

10            (202) 833-8855

11            mae@mselaborlaw.com

12

13    ON BEHALF OF THE DEFENDANT:

14            BRET R. VALLACHER, ESQ.

15            LAUREN SPRINGER-MOORE, ESQUIRE

16            JOSHUA W. MOORE, ESQ.

17            DAVID M. KERR, ESQ.

18            U.S. Department of Justice

19            Post Office Box 480

20            Ben Franklin Station

21            Washington, D.C. 20044

22            (202) 616-0465

23            bret.r.vallacher@usdoj.gov

24

25
```

3

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1              A P P E A R A N C E S (Continued)

 2

 3   ALSO PRESENT:

 4           LISA AIKEN

 5           ADAM BOYER

 6           NATHAN ATKINSON

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                    I N D E X

 2

 3

 4   WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VOIR

 5   C. Conklin          17      128      199

 6   M. Juenger         207      283      301

 7   R. McPhillips      312

 8

 9

10   EXHIBITS              MARKED          ADMITTED

11   Joint

12   JX-1                   319              322

13   JX-2                    28               29

14   JX-4                   261              262

15   JX-56                   62               63

16   JX-57                   63               64

17   JX-58                   38               41

18   JX-67                   65               67

19   JX-68                   66               67

20   JX-73                  329              331

21   JX-74                  329              332

22   JX-84                   95               --

23

24

25
```

5

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                    I N D E X (Continued)
 2
 3    EXHIBITS                 MARKED              ADMITTED
 4    Plaintiff
 5    PLX-1                      86                  89
 6    PLX-7                     161                 162
 7    PLX-9                      98                 100
 8    PLX-13                    158                 159
 9    PLX-24                    271                 272
10    PLX-49                    236                 238
11    PLX-50                    242                 243
12    PLX-51                    239                 240
13    PLX-52                    246                 246
14
15    Defendant
16    DX-46                     191                 192
17
18
19
20
21
22
23
24
25
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                  P R O C E E D I N G S
 2                    (9:30 a.m.)
 3   JUDGE:
 4   Please be seated.  Good morning,
 5     everyone.  We're here for the first day of trial in
 6     Aitken versus United States Number 19-520C.  Can
 7     Counsel please identify yourselves, starting with
 8     Plaintiffs?
 9   ATTORNEY ELKIN:
10   Good morning, Your Honor.  Molly Elkin,
11     for the Plaintiff.
12   ATTORNEY BLOCK:
13   And good morning.  Sarah Block, for the
14     Plaintiff.
15   ATTORNEY ELKIN:
16   And then sitting with me is Richard
17     McPhillips, who is a Plaintiff.
18   JUDGE:
19   For the Government?
20   ATTORNEY VALLACHER:
21   Good morning, Your Honor.  Brett
22     Vallacher, on behalf of the United States.
23   ATTORNEY JOSHUA MOORE:
24   Good morning, Your Honor.  Adam Boyer,
25     on behalf of the Bureau of Prisons.
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    ATTORNEY JOSHUA MOORE:

2    Good morning, Your Honor.  Josh Moore,

3       on behalf of the United States.

4    MS. AIKEN:

5    Lisa Aiken, paralegal for the United

6       States.

7    MR. ATKINSON:

8    Nathan Atkinson, on behalf of the Bureau

9       of Prisons.

10   ATTORNEY KERR:

11   Good morning, Your Honor.  David Kerr,

12      on behalf of the United States.

13   JUDGE:

14   Very good.  Pleased to see you all of

15      you again.  Now, I'll note for the record that this is

16      a sealed proceeding per the pre-trial order.  So in

17      lieu of open court testimony, there will be a redacted

18      transcript made public later.  I want to confirm with

19      the parties that everybody in the courtroom is a

20      party, or a party representative, or Counsel for

21      parties, or attorney for the parties, or an assistant

22      for the attorneys.

23   ATTORNEY ELKIN:

24   Yes, Your Honor.

25   ATTORNEY VALLACHER:

8

Trial

Kathy Aitken, et al. v. USA                                     3/13/2023

```
 1    Yes, Your Honor.
 2    ATTORNEY BLOCK:
 3    Yes, Your Honor.
 4    JUDGE:
 5    Very good.  Now, Counsel, you made your
 6      clients and witnesses who are in the courtroom aware
 7      that this is a sealed proceeding and that testimony
 8      isn't to be disclosed outside the courtroom?
 9    ATTORNEY ELKIN:
10    We have, Your Honor.
11    ATTORNEY VALLACHER:
12    Yes, Your Honor.
13    JUDGE:
14    Very good.  All right.
15    I issued a Pretrial Order on Friday in
16      the evening.  Do you have any questions about it or
17      any housekeeping matters related to trial procedure to
18      talk about before we get started?
19    ATTORNEY ELKIN:
20    Your Honor, the only housekeeping matter
21      is that we did provide a copy of the exhibit
22      listing ---
23    JUDGE:
24    Yes.
25    ATTORNEY ELKIN:
```

9

Trial

Kathy Aitken, et al. v. USA                                         3/13/2023

```
 1    --- that you wanted.  Okay.
 2    JUDGE:
 3    Yeah.  I saw it over there.  Thank you
 4      very much.  For the Government, anything to talk
 5      about?
 6    ATTORNEY VALLACHER:
 7    No, Your Honor.
 8    JUDGE:
 9    Okay.
10    So I had planned to read my observations
11      of the site visit into the record, as we discussed
12      earlier.  And you can comment on that if you would
13      like, and then you can also obviously, tailor your
14      presentation of evidence to what I observed and didn't
15      observe, et cetera.  In any case, we talked about that
16      before.  But any issues with that you want to raise,
17      either side?
18    ATTORNEY ELKIN:
19    No, Your Honor
20    ATTORNEY VALLACHER:
21    Sounds good, Your Honor.
22    JUDGE:
23    All right.
24    So I attended a site visit on
25      February 28th, 2023.  The visit took just over two
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    hours from about 9:15 to about 11:30 a.m., and the
2    following are my observations.
3  The main entrance at the prison gate
4    house leads to a lobby with a guard in a booth.  To
5    the left of the booth is the exit for people leaving
6    the prison, and to the right is a metal detector with
7    a conveyor belt running through a scanner.  When one
8    passes through the metal detector, there's a small
9    seating area for visitors to put SHUs and other items
10   back on.  The A1 sally port is just past the seating
11   area.  I observed one prison employee put her belt on
12   before going through the A1 sally port.  I observed
13   another carry his belt past that area through the A1
14   sally port and into the administration building.
15   Later inside, I did not personally see any officers
16   carrying their belts.
17



Trial
Kathy Aitken, et al. v. USA                                3/13/2023



1    ███████████████████████████████

██ ███████ ████████████████████████████

██ ██████████████████████████████

██ ███████████████████████████

██ ██████████████████████████████

██ ██████████ ███████████████████████

██ █████████████████ ███████████████████

██ ██████████████████████████████████

██ ███████████████████ ████████████████

██ ██████████████████ ██████████████████

██ ██████████████████████████. The tour

12    met with the prison Warden, toured the inside of the

13    command center, and then proceeded into the prison

14    yard.

15   Inside the command center, an officer

16    monitors cameras and performs other tasks.  Another

17    officer manages equipment, including checking the

18    equipment in and outside the command center and

19    elsewhere.  Equipment was mounted on shadow boards

20    showing what devices belong where and which devices

21    belong on which peg.  Outside the command center, the

22    shadow boards and other stations of the prison were

23    secured behind blocked grates.  ███████████████

██ ████████████████████████████████████

██ ████████████████████████████   The

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023



1

There were

7  area planted with bushes.

12

The

16  Lieutenant's Office is a room with two desks.

Many

20  of the cubbies seem to contain the same packet,
21  packages that had not been picked up yet.
22

Trial
Kathy Aitken, et al. v. USA                                3/13/2023



1
2
3
4
5
6    We entered one housing unit.
7
8
9
10                                                        Inmates
11    were walking freely in the common area.  There was one
12    officer on duty.  His office is located on a hallway
13    off the common area.
14    One of the housing units contains the
15    SHU, the Special Housing Unit.
16
17
18
19
20    We entered the medical building.  Inside
21    the doors of the medical building,
22
23
24                                                        The
25    tour was present for inmate lunch.  The transfer began

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1     at about ███████████      Because the day was cold and
2     snowy, it was hard to make generalizable observations
3     about activity on the compound yard.  That concludes
4     my observations.
5     Counsel, feel free to comment if you
6     would like.  Otherwise, I'll head into presentation of
7     evidence.
8     ATTORNEY ELKIN:
9     Just two comments, Your Honor.  You
10    referred to the command center multiple times.  When
11    the witnesses are talking about that same area,
12    they'll probably be calling it the control center.
13    JUDGE:
14    Oh, I'm sorry.  That's my error.  I
15    should have called it the control center.
16    ATTORNEY ELKIN:
17    That's okay.
18    JUDGE:
19    I'll retroactively correct all of that.
20    ATTORNEY ELKIN:
21    And then I would also say given the time
22    of our tour, which was ███████████, whatever workers
23    you saw put on or not put on belts, those were not
24    custody workers, because those custody workers would
25    have already had their ---.

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    JUDGE:
2    I will leave that one to the
3      presentation of evidence.
4    ATTORNEY ELKIN:
5    Okay.
6    JUDGE:
7    See what the witnesses say.  Mr.
8      Vallacher, anything that you'd like to comment on?
9    ATTORNEY VALLACHER:
10   Your Honor, I just wanted to clarify one
11     thing about the chits.  I think that you said that
12     they're on a ring, but that they might be attached to
13     a chain.
14   Is that right?
15   JUDGE:
16   That was my observation.  But if any
17     witness wants to correct me on that or elaborate on
18     it, I would defer to the witness.
19   ATTORNEY VALLACHER:
20   Okay.
21   JUDGE:
22   If my eyes deceived me.
23   ATTORNEY VALLACHER:
24   Okay.  Sounds good, Your Honor.  Nothing
25     further.

16

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    JUDGE:

2    All right.

3    Anything else before we head into the

4      presentation of evidence?

5    ATTORNEY ELKIN:

6    Nothing from Plaintiffs, Your Honor.

7    ATTORNEY VALLACHER:

8    Nothing from Defendant.

9    JUDGE:

10   All right.

11   Plaintiffs, call your first witness.

12   ATTORNEY ELKIN:

13   Your Honor, the Plaintiffs call

14     Christian Conklin.

15   JUDGE:

16   Mr. Conklin, raise your right hand.

17                      ---

18                      CHRISTIAN CONKLIN,

19   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

20   HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

21   FOLLOWS:

22                      ---

23   JUDGE:

24   Please be seated.  Counsel?

25   ATTORNEY ELKIN:

17

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Thank you, Your Honor.
2                        ---
3                   DIRECT EXAMINATION
4                        ---
5    BY ATTORNEY ELKIN:
6    Q. Good morning.
7    Can you please state your name for the record?
8    A. Morning.  Christian Jason Conklin.
9    Q. Where are you currently employed?
10   A. FCI Danbury, Connecticut.
11   Q. And when did you start working at FCI Danbury?
12   A. Approximately May 2021.
13   Q. And have you worked at any other Bureau of Prison
14   institutions?
15   A. Yes.
16   Q. Which one?
17   A. FCI Otisville, New York.
18   Q. When did you work at FCI Otisville?
19   A. Approximately January 2011 to May of 2021.
20   Q. And what is your current job at Danbury?
21   A. I'm a Materials Handler Supervisor.
22   Q. Is that a custody position or non-custody?
23   A. It's a non-custody position.
24   Q. Can you just briefly describe your job duties as
25   a Material Handler Supervisor?

18

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1      A. There are separate duties, the first being that
 2      work in FCI Laundry, which does clothing issue and
 3      laundering.  Second would be commissary, which sells
 4      goods and products to inmates.  And the third would be
 5      the warehouse, which handles any purchases or
 6      transport of basically logistics.
 7      Q. When you were at --- thank you.  When you were at
 8      Otisville, were you in custody or non-custody?
 9      A. I was in custody for ten years.
10      Q. What was your position for those ten years?
11      A. Correctional Officer and Senior Officer.
12      Q. Okay.
13  Is a Senior Officer a level of a Correctional
14      Officer?
15      A. Yes.
16      Q. Okay.
17  So were you a Correctional Officer the entire
18      time you were at FCI Otisville?
19      A. Yes.
20      Q. Are you married?
21      A. I am.
22      Q. Do you have any kids?
23      A. Yes, just had a boy.
24      Q. When?
25      A. February 7.
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      Q. Congratulations.

2      A. Thank you.

3      Q. Did you ever serve in the military?

4      A. Yes.

5      Q. Can you --- what did you --- what was your

6      position and when did you retire?

7      A. I was active duty in the United States Air Force

8      from August 2003 to October 2008.  I was honorably

9      discharged medically, and I served in the logistics

10     readiness squad and deployment distributions

11     operator/dispatcher.

12     Q. And prior to getting to Otisville and prior to

13     your position with the military, did you have any

14     other jobs?

15     A. Yes.

16     Q. What did you do?

17     A. Prior to the military, I worked at Kmart, and I

18     worked at Bons Secours Community Hospital as a dietary

19     aid.  And after the military I worked at Sunrise,

20     which is a factory that makes the raw ingredients for

21     hygiene and antiperspirants, soaps, things of that

22     nature.

23     Q. All right.

24   Today, the focus of your testimony is going to be

25     at FCI Otisville, not your job at Danbury.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Okay?

2        A. Yes.

3        Q. And if I say BOP, what do you understand BOP to

4        be?

5        A. Bureau of Prisons.

6        Q. If I say institution, I'm talking about the FCI

7        Otisville.

8    Okay?

9        A. Yes.

10       Q. When you started working for BOP in 2011, did you

11       receive any training to become a Correctional Officer?

12       A. Yes.

13       Q. What kind of things did you learn?

14       A. The first was institution familiarization, and I

15       believe that that was either three or five days

16       initially.  And then you receive your federal law

17       enforcement in Glynco, Georgia for approximately three

18       weeks.

19       Q. Okay.

20    Is that FLETC to you, the Federal Law

21       Enforcement ---

22       A. Correct.

23       Q. --- Training Center?

24       A. Yes.

25       Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    And at FCI Otisville, after you finish your
 2    training and you became a Correction Officer, during
 3    your career there, did you --- have you worked all of
 4    the 24-hours posts within the institution?
 5    A. Yes.
 6    Q. And where --- on those 24-hours posts, where does
 7    BOP require you to be at the start of your scheduled
 8    shift?
 9  ATTORNEY VALLACHER:
10  Objection.  Vague.
11  JUDGE:
12  Overruled.
13  THE WITNESS:
14  It requires you to be on post.
15    BY ATTORNEY ELKIN:
16    Q. Okay.
17  I want to talk a little bit just about the
18    general population housing units.
19  Can you just describe the layout of a housing
20    unit?
21    A. Yes. ███████████████████████
   █  ████████████  ███████████████
   █  █████████████████████████████████
   █  ███████████████████████████
   █  ██████████████████████████████
```

Trial
Kathy Aitken, et al. v. USA                                3/13/2023

1    ████████████████████████████████████  ████████

█    ████████████████████████████████████████████

█    ██████████  █████████████████████████████████

█    ███████████████████████████████████████████

█    ████████████████████████

6    Q. You said to the right of the station.  Would that

7    --- right of the entrance.

8    Would that be on the ███████████████████?

9    A. I'm sorry.  Yes, that's the ██████████████.

10   Q. For the 24-hours housing unit on the ████████,

11   where is the officer station?

12   A. ███████████████████████████████  ██████████

█    ███████████████████████████████████  ███████

█    ████████████  █████████████████.

15   Q. Okay.

16   ██████████████████████?

17   A. Correct.

18   Q. All right.

19   How many inmates, approximately, are assigned to

20   a housing unit?

21   A. Approximately 130.

22   Q. And how many officers are assigned to a housing

23   unit?

24   A. One.

25   Q. Is it fair to say that officers are outnumbered

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    100 --- at least 130 to 1 on a shift?

2    A. Yes.

3    Q. Have you ever heard of a general popular, sorry,

4    a population report?

5    A. Yes.

6    Q. What is that?

7    A. That's a report that shows the --- how many

8    inmates are assigned to the institution.

9    Q. And is it something that members of the public

10    can view on the internet?

11    A. Yes.

12    Q. When's the last time that you looked at a

13    population report for FCI Otisville?

14    A. I believe it was last Thursday.

15    Q. And approximately how many inmates are housed as

16    of last Thursday at FCI Otisville?

17    ATTORNEY VALLACHER:

18    Objection.  Best evidence.

19    JUDGE:

20    Explain.

21    ATTORNEY VALLACHER:

22    The document would speak for itself.

23    He's testifying as to the contents of a document for

24    the truth of the matter asserted.

25    JUDGE:

24

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Ms. Elkin?

2    ATTORNEY ELKIN:

3    I mean, I think that it's just --- this

4      is just background.  He looked at the document.  We

5      can bring the document up if that's how we want to do

6      it.  He knows the answer.  It's general knowledge.  I

7      mean, Your Honor can look at it.

8    JUDGE:

9    If he knows what the prison population,

10     he can testify to the prison population.

11     BY ATTORNEY ELKIN:

12     Q. Do you know what the prison population was

13     approximately last Thursday?

14     A. Approximately between 1,000 and 1,100 inmates.

15     Q. Now, ███████████████████████████

   ███     █████████████

17     A. Yes.

18     Q. And the ██████, what's your understanding of how

19     that one is staffed?

20     A. That is staffed 16 hours of the day.

21     Q. Okay.

22     So there's no --- do what watch is not manned on

23     the ██████?

24     A. Yes.  On morning watch, ██████████████

   ███     ██████████     ████████████████████████

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1     Q. ████████████████████████████████████
█     ████████████████████████████ ---?
3     A. ████████
4     Q. Sorry. ██████████████████████████████
█     ███████████████████████████████████████████
█     ███████████████████
7     A. Correct.
8     Q. Between those hours, the ██████ would be
9     responsible for approximately 260 inmates?
10    A. Correct.
11    Q. Okay.
12        What is a daily assignment roster?
13    A. A daily assignment roster is a schedule of all
14    staff and they're assigned close of the day.
15    Q. And is there a daily assignment roster issued for
16    every day of the year at FCI Otisville?
17    A. Yes.
18    Q. And based on that roster, based on that, your
19    experience, has there ever been a scheduled overlap on
20    any of the shifts on the 24-hour post at FCI
21    Otisville?
22    A. Not to my knowledge.
23    Q. Well, since you've been work --- since 2011, is
24    it fair to say you have never seen a scheduled
25    overlapping shift on a 24-hour post since you got
```

26

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    there?

2    A. Yes.

3    Q. So this case concerns the time period from April

4    2016 until --- for you, when you left Otisville.  So

5    and it also only concerns 24-hour post.  Can you limit

6    your testimony to 24-hour posts within the institution

7    and the time period at issue?

8    A. Yes.

9    Q. Okay.

10   Based on your training and experience that you

11   received in FLETC and at the institution, what is your

12   most important job duty as a Correctional Officer?

13   A. Safety and security of the institution, staff and

14   inmates.

15   Q. And is that same important duty of safety of the

16   institution, staff, and inmates that you just

17   described, is that the same regardless of the 24-hour

18   custody post that you're assigned to at Otisville?

19   A. Yes.

20   Q. At what location in the institution do you start

21   carrying out the job duty of maintaining safety and

22   security?

23   A. The minute you arrive at the institution.

24   Q. And at what point in the institution do you stop

25   performing your safety and security job function?

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
1      A. The minute you leave.
2      Q. And we're talking about the 24-hour post.
3   Can you tell us what the shifts are on 24-hour
4      post?
5      A. Yes.  ███████████    ████████████████████
    █    ██████  ████████████████████████████  ████
    █   ██████████████████████████████████████
8      Q. Okay.
9   And are you familiar with when the SHU-2 post
10     became a 24-hour post?  Do you know what the watches
11     were on the SHU-2 post?
12     A. Can you repeat the question?
13     Q. The SHU-2 post, at some point it was a 16-hour
14     post.  And then in 2018, it became a 24-hour post.
15  Do what the hours on the SHU post are ---
16     A. Yes.
17     Q. --- when it became 24 hour?
18     A. Yes.  ██████████████████████████████████
    █   ███████████████████████████████████████████████
    █   ██████████████████████████
21     Q. I'm going to show you --- and I think you have a
22     binder in front of you.  You have a lot of binders in
23     front of you.  It's going to have a green cover, I
24     believe, and it's joint exhibits.  And it should be
25     the first one, 1 to I don't know how many are there.
```

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1    Do you have it in front of you?
 2    A. Yes.  JX-22.
 3     Q. I didn't hear what you said.
 4    A. JX-1 to JX-22.
 5     Q. Yes.  That would be --- yes.
 6   ATTORNEY ELKIN:
 7   Okay.  You can turn to JX-2, please.
 8                        ---
 9   (Whereupon, Joint Exhibit JX-2, Position
10   Description - Correctional Officer
11   (GS007-07), was marked for
12   identification.)
13                        ---
14   JUDGE:
15   Oh.  Counsel, are you going further?  I
16     asked for a kind of table of --- do you have a copy
17     for me?
18   ATTORNEY ELKIN:
19   Yes, I do, Your Honor.  May I approach?
20   JUDGE:
21   Yes.
22     BY ATTORNEY ELKIN:
23     Q. Mr. Conklin, you're looking at what we've marked
24     previously as JX-2.
25   Is this the position description for the job that
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

    1      you held as a Senior Officer?

    2      A. Yes.

    3      Q. Okay.

    4   I want to go over --- and do you recognize this

    5      document?

    6      A. Yes.

    7      Q. I want to go over some of these --- some of the

    8      requirements and job responsibilities and ask you some

    9      questions.

   10   Okay?

   11   JUDGE:

   12   Counsel, are you moving it into

   13      evidence?

   14   ATTORNEY ELKIN:

   15   I can do it now, yes.  I'd like to move

   16      in JX-2 into evidence.

   17   ATTORNEY VALLACHER:

   18   No objection.

   19   JUDGE:

   20   It's admitted.

   21                            ---

   22   (Whereupon, Joint Exhibit JX-2, Position

   23   Description - Correctional Officer

   24   (GS007-07), was admitted.)

   25                            ---

30

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    BY ATTORNEY ELKIN:

2      Q. Okay.

3    Can you go under major, look under major duties

4      and responsibilities, the second sentence.   Incumbent

5      is concerned with maintenance of institutional

6      security.

7    Is that your understanding of your job?

8      A. Yes.

9      Q. And at what point do you start performing that

10     job?

11     A. The minute you arrive.

12     Q. And when do you stop performing it?

13     A. The minute that you leave.

14     Q. The second paragraph, the incumbent is subject to

15     arduous, adverse, and stressful working conditions and

16     environments.

17   Does that accurately describe the working

18     environment?

19     A. Yes.

20     Q. And at what point are you subject to that kind of

21     environment?

22     A. The minute that you arrive.

23     Q. And when are you free from that environment?

24     A. The minute that you leave.

25     Q. Enforces rules --- the next paragraph.   Enforces

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1       rules and regulations governing facility security,
2       inmate accountability, and inmate conduct.
3    Is that your understanding of your major job
4       responsibilities and duties?
5       A. Yes.
6       Q. And when do you start enforcing rules and
7       regulations governing facility security and inmate
8       accountability?
9       A. The minute you enter the institution.
10      Q. And would your answer be you perform that until
11      you leave as well?
12      A. Yes.
13      Q. Second to last paragraph on that page.  Is
14      subject to being in hostile, in such hostile or
15      life-threatening situations as riots, assaults, and
16      escape attempts.
17   At what point in your day could you be subject to
18      being in those kind of situations?
19      A. At any given time.
20      Q. The second page under nature of assignment, the
21      second paragraph, first sentence.  Must maintain the
22      control and discipline of inmates.  If you encounter
23      inmates ---?
24   Are you with me?  Are you there?
25      A. You said the second page?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. Yes.  I'm not sure if those are copied front to
 2      back.
 3      A. Yes, I see.  Under nature of assignment?
 4      Q. Yes.
 5      A. Yes.
 6      Q. Under the second paragraph, must maintain the
 7      control and discipline of inmates.
 8   Do you understand that to be one of your --- the
 9      nature of your assignment?
10      A. Yes.
11      Q. And if you are encountering an inmate on your way
12      to a post or on your way back from a post at the end
13      of your shift, do you still have to maintain and
14      control and discipline inmate?
15      A. Yes.
16      Q. Then skip the next paragraph.  And then the
17      paragraph starting with incumbent.  It is in the
18      middle of that paragraph.
19   When conditions warrant, the employee may enter
20      into hostile or life-threatening situations and may be
21      required to make decisions affecting the life,
22      wellbeing, civil liberties, and/or property of others.
23   Is that your understanding of the nature of your
24      assignment?
25      A. Yes.
```

33

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And again, when may you be required to enter into

2      a hostile or life-threatening situation?

3      A. The minute you enter the institution.

4      Q. Can you go to the third page?  The first full

5      paragraph, second sentence.  Work within a prison

6      environment requires a special ability for alertness,

7      requiring keen mental and physical effort.

8   Do you agree with that?

9      A. Yes.

10     Q. And at what point in your day do you become ---

11     start becoming alert and being keenly aware to what's

12     around you?

13     A. The minute you enter the institution.

14     Q. Must be aware of group or individual tensions,

15     alert to unpredictable behavior, and generally

16     sensitive to signs of trouble.

17  Is that your understanding of the nature of your

18     assignment?

19     A. Yes.

20     Q. And again, at what point in your day are you

21     becoming aware of these types of things?

22     A. The minute that you enter in the institution.

23     Q. Initiate --- next paragraph.  Initiates and

24     participates in the searching of inmates.

25  Do you see that?

34

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      A. Yes.

2      Q. And at what point --- are you permitted --- when

3      you were a Correctional Officer, did you initiate and

4      participate in the searching of inmates?

5      A. Yes.

6      Q. And did you ever search for or --- yeah.  Do you

7      ever search an inmate on your way to a post prior to

8      your shift or after you've left your post after being

9      released?

10     A. Yes.

11     Q. And can you just give us an example of that?

12     A. Yes.  I and another officer witnessed an inmate

13     stealing latex gloves from Health Services Department,

14     our medical staff.  And we brought the inmate over to

15     compound Lieutenant's Office when it was Joint Office,

16     and pat-searched him, and I let the Compound Officer

17     handle it from there.  But yes, I addressed it with

18     the inmate.

19     Q. Okay.

20    And did you understand that to be your job?

21    Would it have been acceptable for you just to walk

22    past the inmate stealing the gloves?

23    A. No, it wouldn't.

24    Q. And this was prior to your work or after work?

25    A. This was prior to.

35

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       Q. Prior to your shift?

2       A. Prior to my shift, yes.

3       Q. Okay.

4    Going down to the second to last paragraph.

5       Again, remains constantly alert and reporting

6       observations regarding inmate identification,

7       attitudes.

8    Do you perform this?  When do you perform this

9       type of job duty?

10      A. The minute you enter the institution.

11      Q. Okay.

12   Are there ever inmates in that front lobby when

13      you enter the institution?

14      A. Yes, sometimes.

15      Q. And what would those inmates be doing?

16      A. They would either be camp orderlies, camp inmate

17      orderlies or it would be inmates returning from a

18      medical trip, an escorted medical trip, because the

19      A-2 building was condemned.  So that was the entrance

20      and exit point for inmates.

21      Q. And what about --- well, the Judge, you heard him

22      describe the location.  We'll go over that as well.

23      But the space between the A1 sally port and the

24      building where the control center is, are there ever

25      inmates in that area?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. Yes.

2    Q. What would those inmates be doing?

3    A. Those would be inmates assigned to landscaping

4    detail.  The landscape foreman would be escorting and

5    supervising those inmates.  Immediately supervising.

6    Q. Okay.

7    And if something were to happen while that

8    landscape foreman were supervising those inmates, and

9    it's prior to your job duty and you're making a job,

10   and you're making your way to your post, would you

11   have any obligations with respect to whatever was

12   happening with those inmates that was not right?

13   A. Yes.  I would be required to respond to the

14   incident.

15   Q. And would you respond?

16   A. Absolutely.

17   Q. Okay.

18   Then going down to the last paragraph in sort of

19   the middle sentence.  Required to respond promptly to

20   any emergency situation, such as escape, log patrol,

21   riots, major disturbances, et cetera.

22   What is your understanding of that requirement

23   with respect to the times that are prior to you

24   getting to your post before your paid time and after

25   you've left your post after you've been relieved?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1     When are you required to respond promptly to
2     emergencies during those periods?
3     A. At any time.  Any time during your shift.
4     Q. Would that include those times that I just talked
5     about?
6     A. Yes.
7     Q. Okay.
8  ATTORNEY VALLACHER:
9  Your Honor, it's not about that.  I just
10    wanted to note for the record that Captain O'Kane is
11    with us.  I know it's a sealed proceeding.  So I just
12    wanted to be clear that this is someone who is part of
13    the case.
14 JUDGE:
15 Okay.  Yes.  I observed Captain O'Kane
16    in the proceeding.  You represented earlier that
17    everybody present was presented to you.
18 ATTORNEY VALLACHER:
19 Okay.
20 JUDGE:
21 Thank you for noting.
22    BY ATTORNEY ELKIN:
23    Q. Going to the last page, last paragraph, in the
24    middle of that paragraph.  Daily stress and exposure
25    to potentially dangerous situations such as physical
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    attack are an inherent part of this position.

2    Do you agree with that?

3        A. Yes.

4        Q. And do you know when you're coming to work at any

5    point what time of the day that you would be subject

6    to a physical attack in the institution?

7        A. At any time.

8        Q. What are post orders?

9        A. Post orders are general description of your

10   duties.

11       Q. Okay.

12   And are there general post orders as well as

13   specific post orders for the different posts?

14       A. Yes.

15       Q. Okay.

16   And are you familiar with the general post orders

17   at SCI Otisville?

18       A. Yes.

19   ATTORNEY ELKIN:

20   All right.  I'm going to show you in a

21   different binder, I think, but same green --- it

22   should have a green cover on it.  I believe it's

23   JX-58.

24                              ---

25   (Whereupon, Joint Exhibit JX-58, General

39

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    Orders 2019, was marked for

2    identification.)

3                                    ---

4    THE WITNESS:

5    You said 58 as in 5-8?

6      BY ATTORNEY ELKIN:

7      Q. 5-8, yes.

8      A. Excuse me.

9      Q. Let me know when you get there.

10     A. Okay.  I have that page in front of me.

11     Q. Okay.

12   If you want to go ahead and flip through that to

13     page --- you know, take your time, but flip through it

14     to the page 43 of 43.  And it's signed by Matt

15     Whinnery, Captain, 1/30/2019.

16   JUDGE:

17   Okay.  Counsel, I do like it when you

18     would move it into evidence before you start asking

19     the witness about it.

20   ATTORNEY ELKIN:

21   Oh, I will.  I wanted to him --- did he

22     say he was --- I haven't asked him if he's familiar

23     with it.  I was going to ask him.

24   JUDGE:

25   How about we do it this way?  Show him

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

40

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    the exhibit.  Ask him to look over it.  Make sure he's

2    familiar with it.  Make sure it's authentic.

3    ATTORNEY ELKIN:

4    Okay.

5    JUDGE:

6    Then move it into evidence.

7    ATTORNEY ELKIN:

8    Okay.

9    JUDGE:

10   Then I'll admit it into evidence, ---

11   ATTORNEY ELKIN:

12   Got it.

13   JUDGE:

14   --- unless there's objections.  Let's

15   follow it by the book.

16   ATTORNEY ELKIN:

17   Okay.

18   BY ATTORNEY ELKIN:

19   Q. Are you familiar with this document?

20   A. Yes.

21   Q. Okay.

22   And does it appear to be the post order signed by

23   Captain Whinnery on 1/30/2019?

24   A. Yes.

25   ATTORNEY ELKIN:

41

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Okay.  I'd like to move this into

2      evidence.

3    ATTORNEY VALLACHER:

4    No objection.

5    JUDGE:

6    It's admitted.

7                          ---

8    (Whereupon, Joint Exhibit JX-58, General

9    Orders 2019, was admitted.)

10                         ---

11    BY ATTORNEY ELKIN:

12    Q. Okay.

13   So we're going to do the same thing we just did

14     with the position description.

15   Do you want to go to page 3 of 43?  Let me know

16     when you get there.

17    A. I have it in front of me.

18    Q. Okay.

19   So paragraph three at the bottom, manner of

20     professionalism, an officer assigned to a post is

21     expected to demonstrate alertness, promptness, tact,

22     and good judgment when handling all situations.

23   Do you see that?

24    A. Yes.

25    Q. And what is your understanding of when you are

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    required to handle all situations with promptness and
2    alertness?
3    A. The minute that you arrive in the institution.
4    Q. And these general post orders, do they apply to
5    all custody workers?
6    A. Yes.
7    Q. Okay.
8  You can turn to page 4 of 43 in the fifth
9    paragraph down.  Tardiness will not be tolerated.  It
10    is the responsibility of the officer to be on their
11    post at the beginning of the designated shift.
12  Is that your understanding of when you have to be
13    on your post on a 24-hour post?
14    A. Yes.
15    Q. It is also the employee's responsibility to make
16    his or her presence known to the Shift Lieutenant
17    after assuming the post.
18  Is that your practice?
19    A. Yes.
20    Q. Do you ever let the Lieutenant know that you were
21    there on your way to the post?  When do you stop by
22    Lieutenant's Office?
23    A. Not to my knowledge, no
24    Q. You don't stop by the Lieutenant's Office --- on
25    the way going to, when you walk to a housing unit

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      post, do you ever stop by Lieutenant's Office and

2      check in with the Lieutenant?

3      A. Yes, I have.

4      Q. Okay.

5      So in that sense, on those days, do you make your

6      presence known prior to even assuming the post?

7      A. Yes.

8      Q. Okay.

9      The paragraph under this is for your own

10     protection.  Do not become engaged in lengthy

11     conversations with inmates.  This may be a trap to

12     distract you from your regular duties.  However, you

13     are expected to converse with them when there is an

14     obvious need.  You are expected to maintain a

15     professional relationship at all times.

16     Do you see that?

17     A. Yes.

18     Q. And what is your understanding?  How does that

19     apply, if at all, when you're walking to your post and

20     there are inmates on the ground or you're walking away

21     from your post back out of the institution?

22     A. What that means to me is if an inmate is doing

23     something that they're not supposed to do, then I have

24     to correct it on the spot.

25     Q. And what if an inmate just asks you a question?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

44

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Would you --- while you're walking to your post, would
2    you answer the question?
3    A. I would try to the best of my ability, yes.
4    Q. Okay.  And is that part of maintaining
5    professionalism at all times?
6    A. Yes.
7    Q. Okay.
8    If you turn to the next page, page 5 of 43, the
9    second paragraph under personal appearance.  The last
10   sentence describes uniform and it says the prescribed
11   uniform will be worn at all times when on duty.
12   Do you see that?
13   A. Yes.
14   Q. And what is your understanding of when you have
15   to be in uniform at the institution?
16   A. The minute that you clear the metal detector.
17   Q. Okay.
18   So are you required to be in uniform when you're
19   walking to your post?
20   A. Yes.
21   Q. And are you required to be in uniform when you
22   leave the post at the end of your shift after you've
23   been relieved and you're walking out of the
24   institution?
25   A. Yes.

45

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1     Q. Okay.
 2    If you turn to page 7 of 43, at the very bottom.
 3     Ensure that --- sorry.  Ensure that a freshly-charged
 4     battery is installed in the radio at the beginning of
 5     a tour of duty.
 6    Do you see that?
 7     A. Yes.
 8     Q. And then is that your practice?
 9     A. Yes.
10     Q. So if you're relieving an officer on a housing
11     unit, for example, what is he --- is he handing you a
12     radio?
13     A. Yes.
14     Q. What do you do to make sure there's a fresh
15     battery in there?
16     A. I visually inspect the radio, look at the screen,
17     take a look at the battery icon to make sure that it's
18     a fully-charged battery.
19     Q. And if it's not, what is your practice?
20     A. If not, I exchange it.  I remove the old one and
21     replace it with a new fully-charged battery.
22     Q. And are you doing that as part of --- we'll talk
23     about your equipment exchange in a bit.
24    But are you doing that as part of the equipment
25     exchange with the other officer?
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Yes.

2      Q. And it's your understanding that that is required

3      by the post order?

4      A. Yes.

5      Q. Okay.

6   The next page, page 8 of 43, second to last

7      paragraph.  Radios are assigned to a specific post,

8      not a person.  The radio will be worn on your person

9      throughout the entire shift.

10  Is that your understanding of what is required by

11     the post order?

12     A. Yes.

13     Q. And where do you wear your radio on your shift?

14     A. I wear my radio on my duty belt, clipped over my

15     duty belt.

16     Q. Okay.  And --- all right.

17  Go to page 9 of 43, paragraph 13.  Keys are vital

18     to the custody and security of this institution.

19  Do you agree with that statement?

20     A. Yes.

21     Q. And the following procedure will be strictly

22     adhered to at all times.  ██████████   ██

    ██ ████████████████████████████████████

    ██ ████████████████████████████████████

25  Do you have your own chits?

47

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. Yes.

2    Q. We'll talk about those in a minute.  Number two,

3    any ---.

4    ATTORNEY VALLACHER:

5    Your Honor, Rule 106.  She omitted the

6    second half, that sentence.  It's incomplete.

7    ATTORNEY ELKIN:

8    Sorry.

9    BY ATTORNEY ELKIN:

10    Q. All employees will be provided with brass chits,

11    which will be used as receipts for keys and equipment,

12    with the exception of a 24-hour post.

13    For the 24-hour post, do you sign for your keys

14    on the post?

15    A. Could you elaborate on that?

16    Q. ███████████████████████████████

     ███████████████████████████████████████

     ████████████████████

     ██████████████████████.

20    Q. Okay.

21    But you do have metal chits for other equipment.

22    Correct?

23    A. Correct.

24    Q. All right.

25    Paragraph two, any time keys are issued or

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1        exchanged, the receiving staff member will count the
2        keys on the ring to ensure the key count is correct.
3    Is that your understanding of what you're
4        required to do pursuant to the post order?
5        A. Yes.
6        Q. Are you required to do anything else with respect
7        --- not just counting it, are there anything else with
8        respect to the keys?
9        A. You have to visually and physically inspect the
10       keys to make sure that they're functional, they don't
11       have any damage to them.  If they have any damage,
12       then you have to report it.
13       Q. And you do that as part of the exchange when
14       you're coming on shift?  You do that with the outgoing
15       officer also present?
16       A. Yes.
17       Q. And why is it important to have the officer ---
18       the outgoing officer present while you're doing the
19       inspection?
20       A. So you need to be aware that there's damage to
21       the keys throughout --- maybe it happened throughout
22       his shift.
23       Q. How many keys, approximately, are there on a ring
24       in a housing unit?
25       A. ███████████████

49

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1     Q. And are any of those called ████████████?
 2     A. Yes.
 3     Q. ████████████████████████
 4     A. ██████████████████████████████████
      ██████████████████  ██████████████████████
      █████████████████████████████████████
      ████████████.
 8     Q. Okay.
 9   And what --- is there anything notable on that
10     key that other keys don't have?
11     A. ████████  █████████████████████
   ██████████████████████.
13     Q. Is the actual key part protected in any way?
14     A. Yes. ████████████████████.
15     Q. Okay.
16   And what's the purpose of that shield?
17     A. To protect the pattern of the key so there's no
18     damage to the key and it's functional inside the lock.
19     Q. Is there any other purpose of hiding the pattern
20     of the key, that you're aware of?
21     A. █████████████████████████████
   ██████████████████████████████████
   ████████████████████.
24     Q. Okay.
25   You can turn to page 10 of 43, handling of keys,
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    paragraph two.  Keys should be securely fastened to
2    the belt with the use of a chain.
3    Do you see that?
4        A. Yes.
5        Q. Now, the keys, when you're given the keys on a
6    24-hour post, are they already attached to a chain?
7        A. Yes.
8        Q. But do you bring in your own chain anyway?
9        A. Yes.
10       Q. Why?
11       A. Because the chains that are on the key rings at
12    FCI Otisville aren't long enough to reach locks.
13       Q. So can you explain what that means in terms of
14    how that would inhibit your job duties if you just
15    relied on the prison chain?
16       A. Yes.  It would fail to maintain the two points of
17    contact that we're required to have it for the key
18    rings.  We would have to remove the key ring from our
19    belt and use the key ring by holding it in our hand by
20    itself.
21       Q. Okay.
22    And so your practice is to bring in a longer
23    chain that would allow you to maintain the two points
24    of contact at all times?
25       A. Correct.

51

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And that longer chain, is that attached to your

2      duty belt?

3      A. Yes.

4      Q. When you come into the institution?

5      A. Yes.

6      Q. The number of keys on a key ring should always be

7      checked when keys are passed from one employee to

8      another.

9    Do you comply with this post order?

10     A. Yes.

11     Q. If you can turn to page 11 of 43, paragraph 15,

12     enforcement of rules and regulations.  All staff

13     members must be familiar with Program Statement

14     52-70.07 titled Inmate Discipline.  The inmate rules

15     and regulations must be adhered to firmly and fairly.

16     At times, you may be able to correct an inmate without

17     writing an incident report.  However, you must not let

18     the inmate get control of the situation.  If the

19     violation is of a serious nature, an incident report

20     must be written.

21   Is that your understanding of the times that

22     you're supposed to write incident reports?

23     A. Yes.

24     Q. So are there other times when you correct inmate

25     behavior where you don't have to write an incident

52

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       report?

2       A. Yes.

3       Q. Can you explain what that would involve?

4       A. It could possibly be the inmate's failing to keep

5       his cell tidy or failing to maintain sanitation

6       standards.

7       Q. Okay.

8       Are there any inmate infractions that you have

9       observed prior to your paid start time of the shift

10      when you're walking to a post or when you're leaving a

11      post that would not require an incident report, but

12      would require immediate correction?

13      A. Yes.

14      Q. Can you give some examples?

15      A. Yes.

16      A. Inmates being in an area they're unauthorized to

17      be in.  If a controlled movement was announced and the

18      inmates are lingering on the compound once the move

19      has ended, they're out of bounds or in an area where

20      they're not supposed to be, then tell them go back to

21      your unit or get back to where you need to be.

22      Q. Okay.

23      And have you, in fact, corrected that kind of

24      inmate's infraction on your way to a post prior to

25      paid time or after being released from a post?

53

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023



1       A. Yes, I have.

2       Q. Next paragraph.  Staff accountability. ██████

7    Is that your understanding of where the secure

8       perimeter of the institution is, at the ████████?

9       A. Yes.

10      Q. Okay.

21

25      Q. Okay.

54

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    And if you go to the second paragraph there, ████

██    ████████████████████████████████████████████

██    ████████████████████████████████████████████

██    ██████████████████████████████████

5    Is that your understanding?

6        A. Yes.

7        Q. ████████████████████████████████████████

██    ██████████████████████████████████████████

██    ██████████████████████

10   That's showing that you are no longer within the

11       secured perimeter?

12       A. Yes.

13       Q. ██████████████████████████████████████

██    ████████████████████████████████████████████

██    ████████████████████████████████████████████

██    ██████████████████████████

17       A. Could you --- I'm sorry.  Could you ---?

18   ATTORNEY VALLACHER:

19   Objection.

20   ATTORNEY ELKIN:

21   Let me --- yeah.  I can withdraw that?

22   JUDGE:

23   Yes.

24   ATTORNEY ELKIN:

25   Okay.

55

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1       BY ATTORNEY ELKIN:

2       Q. Can management at any time of the day know who's

3       inside the institution by looking at ███████████?

4       A. If they decide to do an audit, yes.

5       Q. Okay.

6    So they can.

7    Is that correct?

8       A. It's possible, yes.

9       Q. Has any manager ever said to you, hey, Conklin, I

10      was doing an audit at 7:40 a.m.  Your shift doesn't

11      start until 8:00.  I noticed that you were inside.

12      That's not appropriate.

13      A. Not that I recall.

14      Q. Okay.

15   If you can turn to page 13 of 43, paragraph 19,

16      searches.  In order to provide safeguards to prevent

17      the introduction of contraband, routine and

18      unscheduled searches of inmate's person must be

19      initiated.  Inmate's person, housing units, work

20      areas, or facilities used or frequented by inmates

21      must be initiated.

22   Is that your understanding of the necessity of

23      searches?

24      A. Yes.

25      Q. And I believe you already testified it would be

56

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      appropriate to search an inmate prior to your case,

2      start time or after you leave in order to prevent

3      introduction of contraband?

4      A. If it's required, yes.

5      Q. Paragraph 20, searches of inmate's person.  All

6      staff may at any time initiate a search of an inmate's

7      person if they suspect contraband to be in the

8      possession of that inmate or group of inmates and is

9      part of routine security procedures.

10   Is that your understanding of what gives you

11      authority to search an inmate under the post order

12      prior to your pay time or after your pay time?

13      A. Yes.

14      Q. Okay.

15   Page 16 of 43, paragraph 24 at the bottom, inmate

16      clothing.  Each inmate is responsible for the proper

17      wearing and reasonable care and upkeep of the clothing

18      issued to him.

19   Are there rules about what the proper wearing of

20      the inmate uniform is?

21      A. Yes.

22      Q. Can you explain that?

23      A. Yes.  Inmates typically during --- from fall to

24      spring are required to wear a ███████████████████

███   ██████████████████████████████████████████

57

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    ██████████████████████████████████████

2    Q. Okay.

3    ████████████████████████████████

█    █████████████████████████████████████

█    ███████████████████████?

6    A. Yes.

7    Q. And would it be appropriate to do that prior to

8    the start of your pay time or after your shift has

9    ended?

10   A. Yes.

11   Q. As you're walking on the compound?

12   A. Yes.

13   Q. And have you done that?

14   A. Yes.

15   Q. Do inmates regularly misuse or fail to wear their

16   uniforms correctly?

17   A. It's fairly typical, yes.

18   Q. And in your mind, is it important, as a

19   Correctional Officer, to correct these types of

20   violations?  Just tuck your shirt, button your top

21   button, or whatever the rule is, is it important to

22   correct those as you see them, even if it's on your

23   way to the post prior to your daytime?

24   A. Yes.

25   Q. Why?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. Because you're enforcing small rules.  So if they
 2      don't follow small rules, they typically tend to push
 3      the issue for bigger rules.  So it's important that
 4      they follow.
 5      Q. Has anybody in management ever trained you to go
 6      seek overtime pay for correcting rule violations on
 7      your way to a post or after you left your post?
 8      A. No.
 9      Q. Okay.
10   You can go to page 26 of 43.
11      A. Okay.
12      Q. In paragraph 46, official counts.  ██████████████
██   ████████████████████████████████████████████
██   ████████████████████████      ████████████████████████
██   ██████████████████████████████████████████████████████
██   ████████████████████████████  ---
17      A. Yes.
18      Q. --- when you're working at 24-hour post?
19   Yes?
20      A. Yes.
21      Q. Which count would those be?
22      A. The ████████████████████████████.
23      Q. Okay.
24   And do you know whether there's still a ██████████
██   ████████████████  or did that change at some point?
```

59

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. I believe it changed to ████████

2    A. Okay.

3    Q. So by the time these post orders were in effect,

4    it was ████████

5    A. Yes.

6    Q. Okay.

7    Is it possible to start doing a count at ████████

8    if you're coming onto a ████████████, if you

9    are at the screening side collecting your duty belt at

10   ████████ ?

11   A. No.

12   Q. Is it possible to do a ████████████ if

13   you're coming on to an ████████████ to a

14   housing unit or to the SHU if you are in the front

15   lobby collecting your duty bell at ████████

16   A. No.

17   Q. Page 28 of 43, paragraph 50.   Institution

18   security, second paragraph.   Officers should be alert

19   for irregular or unusual incidents to evaluate changes

20   in mood or behavior, patterns of inmates under

21   supervision, and to initiate contract, sorry,

22   corrective control measures or report to the proper

23   authority.

24   We talked about this a little bit with your

25   position description.   Is it your understanding that

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     you are required to be alert for irregular or unusual
2     situations, even on your way to your post and after
3     you've been relieved?
4     A. Yes.
5     Q. And then the second sentence.  Officers must
6     exercise constant vigilance to observe unusual group
7     or individual movements indicative of escape attempts,
8     riots, strikes, et cetera.
9   Again, is that your understanding that you have
10    to do that even as you're walking to or from a post on
11    your unpaid time?
12    A. Yes.
13    Q. Sorry.  Okay.  We can turn to 43 of 43 where
14    Captain Whinnery signs the documentary.  Right above
15    the signature --- tell me when you get there.
16    A. I have it in front of me.
17    Q. Okay.
18  Retention awareness.  Well, let me --- before I
19    ask you to reset, do you use or do you have when
20    you're on your post getting exchange of equipment, one
21    of the things exchanged OC spray?
22    A. Yes.
23    Q. And that's for all the 24-hour posts inside the
24    institution?

61

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      A. Yes.

2      Q. Okay.  All right.

3   So that paragraph at the bottom there, ensure the

4      OC air cell dispenser is properly fastened to your

5      duty belt and firmly secured inside the holster.

6   Would it be possible to fasten your OC aerosol

7      dispenser to your duty belt if you did not wear a duty

8      belt?

9      A. No.

10     Q. Okay.

11  And the aerosol dispenser, was that issued to you

12     by the Government?

13     A. The ---?

14     Q. The holster.

15     A. The holster?

16     Q. The holster.

17     A. Yes.

18     Q. Sorry.  That was a bad question.  So the aerosol

19     dispenser, you're getting from the outgoing officer.

20  Right?

21     A. Right.

22     Q. The holster that it goes into --- that has to go

23     onto your duty belt, was that holster issued to you by

24     the United States?

25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1    ATTORNEY ELKIN:
 2    Okay.  Those were post orders from 2019.
 3      I'd like to pull up Joint Exhibit 56.
 4                        ---
 5    (Whereupon, Joint Exhibit JX-56, General
 6    Post Orders 2015, was marked for
 7    identification.)
 8                        ---
 9      BY ATTORNEY ELKIN:
10      Q. You flip through this.
11    Do you recognize it as the post orders that were
12      in place from 2015 until the next issue?
13      A. I'm sorry, I don't have the exhibit.
14      Q. Oh ---.
15      A. 56, you said?
16      Q. Yes.  It might be in a different binder.
17      A. Section 56, page ---.
18      Q. I'm sorry.  Joint Exhibit JX-56.
19    Are you in that?
20      A. Yes.
21      Q. Okay.
22    So if you want to flip through that and let me
23      know if these are the post orders that were in place
24      from 2015, when they were signed, until the next set
25      of post orders were issued.
```

63

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Yes.

2    ATTORNEY ELKIN:

3    Okay.  I would like to move to admit

4      Joint Exhibit 56 into evidence.

5    ATTORNEY VALLACHER:

6    No objection.

7    JUDGE:

8    It's admitted.

9                          ---

10   (Whereupon, Joint Exhibit JX-56, General

11   Post Orders 2015, was admitted

12                          ---

13     BY ATTORNEY ELKIN:

14     Q. Okay.

15   To the extent any of the language that we went

16     over just now with a Joint Exhibit 58 are present in

17     the Joint Exhibit 56, would your answers be the same?

18     A. Yes.

19   ATTORNEY ELKIN:

20   Okay.  And then I'd like to show you

21     Joint Exhibit 57.

22                          ---

23   (Whereupon, Joint Exhibit JX-57, General

24   Post Orders 2017, was marked for

25   identification.)

64

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                              ---
 2     BY ATTORNEY ELKIN:
 3     Q. And let me know when you get there.
 4   And the question is, were those 2015 post orders
 5    in effect until Joint Exhibit 57?
 6     A. Yes.
 7     Q. Okay.
 8   What went into place?  And does Joint Exhibit 57
 9    appear to be to you the post orders that were in
10    effect from 2017 through 2019?
11     A. It appears that way.
12   JUDGE:
13   Okay.  I'd like to move to admit Joint
14    Exhibit 57.
15   ATTORNEY VALLACHER:
16   No objection.
17   JUDGE:
18   It's admitted.
19                              ---
20   (Whereupon, Joint Exhibit JX-57, General
21   Post Orders 2017, was admitted.)
22                              ---
23     BY ATTORNEY ELKIN:
24     Q. And to the extent that any of the language
25    appears in Joint Exhibit 57 that we've already gone
```

65
Trial
Kathy Aitken, et al. v. USA                                3/13/2023

1      over, would your answers be the same?

2      A. Yes.

3    ATTORNEY ELKIN:

4    Okay.  I'd like to show you Joint

5      Exhibit 66 and 67.

6                          ---

7      (Whereupon, Joint Exhibit JX-67, Conklin

8      Assignment Cards 2016 - 2019, was marked

9      for identification.)

10                         ---

11   THE WITNESS:

12   I have them.

13     BY ATTORNEY ELKIN:

14     Q. Okay.

15   Do you recognize these documents as your daily

16     assignment card from April 9th, 2016 until you left

17     Otisville?

18     A. Yes.

19   ATTORNEY ELKIN:

20   I'd like to move to admit Joint Exhibits

21     67 and 68 (sic).

22   JUDGE:

23   I'm sorry.  I thought you said 66 and

24     67.

25   ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    There's no 66.  I said, Your Honor, I'd
2      like to move to admit 66 and 67.
3    ATTORNEY VALLACHER:
4    No objection.
5    JUDGE:
6    You said 66 and 67?
7    ATTORNEY ELKIN:
8    Hold on one second.  I said it right.
9    JUDGE:
10   Sixty-six (66) is just some daily sign
11     in.
12   ATTORNEY ELKIN:
13   Okay.
14   JUDGE:
15   And 67 and 68 would say Conklin.
16   ATTORNEY ELKIN:
17   Okay.  So that's what I wanted to admit
18     was 67 and 68.
19                        ---
20   (Whereupon, Joint Exhibit JX-68, Conklin
21   Assignment Cards 2019 - 2021, was marked
22   for identification.)
23                        ---
24   JUDGE:
25   Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    So to clarify, there's been no motion
2      about 66?
3    ATTORNEY ELKIN:
4    That's correct, Your Honor.
5    JUDGE:
6    We've had motions about 67 and 68.
7    And both --- there's no objection either
8      one of those?
9    ATTORNEY VALLACHER:
10   Correct, Your Honor.
11   JUDGE:
12   Okay.  So both of those are admitted.
13                          ---
14   (Whereupon, Joint Exhibit JX-67, Conklin
15   Assignment Cards 2016 - 2019, was
16   admitted.)
17   (Whereupon, Joint Exhibit JX-68, Conklin
18   Assignment Cards 2019 - 2021, was
19   admitted.)
20   ATTORNEY ELKIN:
21   Okay.
22   JUDGE:
23   And 66 isn't into evidence yet.
24   ATTORNEY ELKIN:
25   Okay.

68

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1    BY ATTORNEY ELKIN:
 2    Q. Do these daily assignments that are set forth at
 3    Joint Exhibits 67 and 68, do these exist for every
 4    Correctional Officer who works custody posts?
 5    A. Yes.
 6    Q. Okay.
 7   And if you know, who has access to review these
 8    assignments?
 9    A. The Lieutenants, the supervisors, Lieutenants,
10    Captain Horton, and the Union as well.
11    Q. Since April 2016, have you been assigned to work
12    based on your daily assignments to all the 24 hour
13    housing units on day watch, evening watch, and morning
14    watch?
15    A. Yes.
16    Q. And have you worked SHU-1 on morning watch and
17    day watch?
18    A. Yes.
19    Q. Have you worked SHU-2 on evening watch when it
20    was a 24-hour post?
21    A. Yes.
22    Q. Have you worked compound one on morning watch?
23    A. Yes.
24    Q. And compound two when it was a 24-hour post on
25    morning watch?
```

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

```
 1     A. Yes.
 2     Q. And have you worked control one on all three
 3     shifts?
 4     A. Yes.
 5     Q. And for purposes of your testimony, can you agree
 6     to limit your answers and your experiences to the
 7     times that you've been assigned to the post that we
 8     just discussed?
 9     A. Yes.
10     Q. Okay.
11  Can you just describe briefly the uniform that
12     the Correctional Officer wears?
13     A. Yes. ███████████████████████████████████
    ███    ████████████  ███████████████████████████████
    ███    ████████
16     Q. And does anything --- does the uniform have your
17     name on it?
18     A. Yes.
19     Q. Where's your name?
20     A. It's on the ██████████████████████.
21     Q. Okay.
22  Does the uniform identify you as an FCI
23     Correctional Officer to the inmates?
24     A. Yes.
25     Q. Do you wear a duty belt as a Correctional
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Officer?

2    A. Yes.

3    Q. And what is a duty belt and how --- just describe

4    your duty belt.

5    A. Duty belt is equipment that I use to hold

6    officer's equipment and attach it to my person so I

7    can hold it securely in my body.

8    Q. And in your experience, do all Correctional

9    Officers who work at FCI Otisville wear a duty belt?

10   A. Most of them do, yes.

11   Q. What do you mean by that?  Is there a position

12   where you don't have to wear a duty belt?

13   A. ███████████  typically doesn't wear one.

14   Q. Okay.

15   Other than ███████████, do the custody

16   officers wear duty belts when they're working posts

17   inside the institution?

18   A. Yes.

19   Q. Could you safely and effectively perform your

20   security and safety duties if you didn't wear a duty

21   belt, you just wore a regular belt?

22   A. No.

23   Q. Why not?

24   A. Because there have been times where I've

25   responded to emergencies and the equipment has gone

Trial

Kathy Aitken, et al. v. USA                    3/13/2023

```
 1      flying off my person, off my belt.
 2      Q. If you didn't wear it?
 3      A. If I didn't wear a duty belt.
 4      Q. Okay.
 5      A. Yes.
 6      Q. So is a duty belt more secure than a regular
 7      belt?
 8      A. It's more secure.
 9      Q. Do you wear belt keepers?
10      A. Yes.
11      Q. Can you describe what those are?
12      A. Yes.  Belt keepers are a little piece of nylon
13      orange leather that has snap closures.  And you place
14      them over the duty belt, over your waist belt, and it
15      fixes the duty belt to your waist belt.
16      Q. Why do you wear the belt keepers over the duty
17      belt?
18      A. To hold everything in place.
19      Q. And did the agency either issue you the duty belt
20      when you came on board or give you an allowance to buy
21      one?
22      A. They gave me an allowance.
23      Q. What is attached to your duty belt when you ---
24      well, let me ask you this.  Do you send your duty belt
25      through x-ray screening when you go through the
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      upright metal detector when you come on duty?

2      A. Yes.

3      Q. Okay.

4      What is attached to the duty belt when you send

5      it through the x-ray machine at the screening site in

6      the front lobby?

7      A. ███████████████████████████

██      ███████████████████████████████████

██      ███████████████████████████████████████

██      ██████████████████

11     Q. Okay.

12     I want to talk about each of those items.

13     The █████ that you described or that you said

14     attached to your duty belt, what are those?

15     A. ████████████████████████████   ██████████

██      ██████████████████████████████████

██      ██████████████████   ██████████████████

██      ██████████████████████████████████

██      ██████████████████

20     Q. And are those █████████████?  Who are they issued

21     by?

22     A. They're issued by the ███████████████.

23     Q. At BOP?

24     A. Yes.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

73

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    And are they required by the BOP?  Are you
 2    required to have them on your person at all times?
 3    A. Yes. ████████████████████████████████████████
      █ ███████████████████████████████████████████████
      █ ██████
 6    Q. And what would a housing unit officer use his
 7    █████ for once he's on his post?
 8    A. Typically the ██████████████████████████████
 9    Sometimes the █████████████████ used for bar taps.
10    █████████ used for searches.  ████████████ used to
11    search the walls.
12    Q. And so if you were using --- I think you said ███
13    █████████, what is that?
14    A. Yes. ████████████████████████████████████████
      █ █████████████ █████████████████████████████████
      █ ███████████████████████████████████████████████
      █ █████████████████████████
18    Q. And would that --- do you carry that on your
19    person once you get to the post?
20    A. Yes.
21    Q. So where is your ████████ in order to account for
22    that piece of equipment when you're carrying it?
23    A. Inside the inventory cage.
24    Q. Okay.
25    So when you get to your post, should there either
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      be the other officer's ███ on that cage or the actual
 2      ███████████████?
 3      A. Correct.
 4      Q. Okay.
 5   So when you are doing your exchange, ████████
     █ ████████████████████████████████████
     █ ████████████████████████████
     █ ██████████████████████████████████████
     █ ████████████████████████████████████
     ██ ████████████████████████████████████████
     ██ ██████
12      Q. Okay.
13   Could you safely and effectively do your job on
14      the custody post at issue in this case without your
15      ████?
16      A. No.
17      Q. Why not?
18      A. Because you have to use most of that equipment
19      throughout your shift.
20      Q. And why is it important to have the equipment
21      accounted for at all times?
22      A. So you know that it's present and ██████████
     ██ ██████████████████████████████.
24      Q. You mentioned clips --- metal clips that are
25      attached to your duty belt.
```

75

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1   What are those?

2   A. The metal clips have the --- there are hooks that

3   have the --- that allow the key rings to snap into

4   place on your belt and fixed to your person.

5   Q. And are they required equipment?

6   A. Yes.

7   Q. Why is that?

8   A. Hold the keys in place and it's required by the

9   post orders.

10  Q. And if you were not --- could you safely and

11  effectively do your job on housing unit posts, or

12  compound posts, or SHU posts without your metal clips?

13  A. No.

14  Q. Why not?

15  A. Because you would have keys in your hand, or in

16  your pocket, or somewhere that's not secure.

17  Q. And did the Agency issue you your metal clips or

18  did they give you an allowance to buy them?

19  A. Both.  They issued me two and I purchased

20  additional.

21  Q. Okay.

22  And why did you have to purchase or why did you

23  purchase additional?

24  A. Because two wasn't enough to get the job done.

25  Q. You mentioned the OC holster.

76

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Can you describe it?
2        A. Yes.  The OC holster is, it's a holder that you
3        put the OC canister inside and you snap the enclosure
4        over the top of the OC canister to hold it in place.
5        Q. Okay.
6    And the holster is required by the post orders?
7        A. Yes.
8        Q. And is it required by the nature of the work, the
9        holster?
10       A. Yes, required by laws.
11       Q. And did the Agency issue your holster?
12       A. They issued me a holster.  They didn't issue me
13       the one that I currently use.
14       Q. Did you use Government allowance to buy a new
15       holster?
16       A. Yes.
17       Q. And why did you do that?
18       A. Because the one that they gave me was nylon and
19       it fell apart very quickly.  It wasn't adequate
20       equipment,
21       Q. And are you required by institutional rules, I
22       think we just saw in the post orders, to carry your OC
23       spray on your person attached to your duty belt?
24       A. Yes.
25       Q. Flashlight holder.

77

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    What do you use that for?  You said that was
 2       attached to your belt.
 3       A. I use the flashlight holder to carry the mag
 4       light flashlight.  That's in the officer's inventory
 5       cage.
 6       Q. Okay.
 7    And when you get the flashlight, do you do
 8       something with your ████?
 9       A. I hang the ████████████      --- excuse me, ████
██ ██████████████████████████
11       Q. What is the flashlight used for during the course
12       of a tour?
13       A. You use it for searches and you use it to count
14       inmates.
15       Q. Okay.
16    Can you describe that a little bit, about
17       counting the inmates with the flashlight?
18       A. Yes. ████████████████████████
██ ████████████████████████████████████
██ ██████████████████████  █████████████
██ ████████████████████████████████████
██ ██████████████████████████.
23       Q. And what are you looking for when you are
24       counting the inmates?
25       A. You're looking for living, breathing flesh.
```

78

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       Q. And are you looking for living, breathing flesh
2       out of the kindness of your heart, or is there some
3       other reason to be looking for living, breathing flesh
4       as well?
5       A. No.  You're looking to make sure that there's a
6       live person inside the cell ███████████████████
        █ ████████████████████████████████████.
8       Q. Okay.
9   We already talked about the metal chains.  You
10      bring those in because in order to do your job on your
11      post, locking and unlocking doors.
12  Is that right?
13      A. Yes.
14      Q. All that stuff is attached to your duty belt when
15      it goes through the screen site.
16  Is that right?
17      A. Yes.
18      Q. Could you wear that duty belt as you walk through
19      the upright metal detector?
20      A. No.
21      Q. Why not?
22      A. Because it would activate the metal detector.
23      Q. So where do you collect your duty belt with all
24      of that equipment on?
25      A. After it's been scanned by the x-ray machine.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. And is there a table there for the purpose of
 2      gathering your stuff and, you know, putting it back
 3      on?
 4      A. Yes.  Once it passes the conveyor belt, it's
 5      collected on a table.
 6      Q. Okay.
 7   Where do you put your duty belt on?
 8      A. I put my duty belt on the A1.
 9      Q. Why do you do that?
10      A. To be prepared.
11      Q. Is part of your training to be prepared to be in
12      the state of readiness?
13      A. Yes.
14      Q. We talked about the things that are on your duty
15      belt as you're putting it on.  What things do you get
16      when you arrive to one of the 24-hour posts?  Let's
17      leave control out of it for now.  One of the other
18      24-hour posts that we mentioned, what things you get
19      from the post once you get there or from the officer?
20      A. ███████████████████████████████████████████
     ██ ███████████████████████████████████████████
     ██ ██████████████████
23      Q. What are --- does the radio have any security
24      function on it?  Is it just for communication or is
25      there something else that it alerts?
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1      A. There's a body alarm button.

 2      Q. And when would that body alarm button be used?

 3      A. It would be used in the event that staff are

 4      assaulted or staff have an emergency for personal use.

 5      Q. And why --- I believe we've looked at the post

 6      order that says the radio has to be attached to your

 7      person at all times.

 8    Why is it important to have it attached?

 9      A. So it doesn't go missing.  So an inmate doesn't

10      get a hold of your radio.

11      Q. And if you had an emergency, could you press your

12      body alarm if you didn't have your radio?

13      A. No.

14      Q. And what are the handcuffs used for?

15      A. They're used to restrain inmates.

16      Q. Could you safely and effectively do your job on

17      your post without the handcuffs?

18      A. No.

19      Q. How about without the radio?

20      A. No.

21      Q. And the OC spray.

22    What's the purpose of the OC spray?

23      A. For self-defense.

24      Q. And can you safely and effectively do your job on

25      the post or can you do it as safely and effectively
```

81

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    without OC spray?

2    A. Not as safely, no.

3    Q. And the keys?  I believe you said there were ■

4    keys on the ---

5    A. The cross.

6    Q. --- key rings for the housing unit.  How many

7    keys are in key rings for the compound post or how

8    many key rings are there and then how many keys?

9    A. There, I believe, are ■■■■■■■

10   ■ ■■■■■■■

11   Q. And would all those keys, when you're working the

12   compound post have to be inspected, counted,

13   Et cetera?

14   A. Yes.

15   Q. And then how many keys are on the key ring for a

16   SHU-1 post?  And how many key rings?

17   A. SHU-1 has ■■■■■■■

18   ■ ■■■■■■ .

19   Q. Total?

20   A. Total, yes.

21   Q. And again, would you have to inspect and count

22   the key rings, all the key rings and the keys on SHU

23   post?

24   A. Yes.

25   Q. For all Correctional Officers assigned to a post

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1      inside the institution, they have to clear the
2      screening site prior to proceeding to the A1 side.
3   Is that correct?
4      A. Yes.
5      Q. If you're assigned to a 24-hour post, let's do a
6      housing unit to start off with, inside the institution
7      on day watch, what time do you begin to clear the
8      metal detector in the front lobby?
9      A. Approximately ███.
10     Q. Okay.
11  And you say ███.
12  Is that because there might be someone in front
13     of you or why ---?
14     A. █████████.
15     Q. Okay.
16     A. It takes a ████████.
17     Q. All right.
18  And then would your answer be the same for the
19     other watches?  Say it's a morning watch shift.  What
20     time would you start clearing for a ████████?
21     A. Same thing.  ████████.
22     Q. And for the evening watch, is it fair to say
23  ████████
24     A. Yes.
25     Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1    Do you recall you gave a range during your
2       deposition on when you started clearing the morning
3       watch shift?
4       A. Yes.
5       Q. What was the range that you gave?
6       A. For clearing?
7       Q. Sorry.  Clearing the screening site when you're
8       assigned for a morning watch shift?
9       A. Approximately ███████████████, I believe.
10      Q. Not how much time.
11   What time do you say that you came into the
12      institution for a morning watch shift?  Did you give a
13      range?  If a morning watch shift starts at ████████,
14      did you provide a range during a deposition?
15      A. I believe so.
16      Q. Do you recall what the range you provided was?
17      A. I believe it was --- could you give clarification
18      on that, please?
19      Q. Yes.  Okay.
20   You said you just testified that for morning
21      watch shift, you normally come in and start clearing
22      around ███████████.
23      A. Yes.
24      Q. During your deposition, did you provide a range?
25      Was it between ██████████████████    Do you
```

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1      recall?  You don't recall, that's fine.
 2      A. I don't know.
 3      Q. Okay.
 4   So is it your practice to generally come in ---
 5      no matter which post you're working inside the
 6      institution, is it your practice to start the clearing
 7      site ██████████████████████████████████████
        ██      ████████████████?
 9      A. Yes.
10      Q. And have there ever been Lieutenants present in
11      the front lobby when you started clearing ████████████
        ██      ████████████████████████████?
13      A. Yes.
14      Q. And has a Lieutenant ever said to you, Conklin,
15      your shift doesn't start until ████████████████, ████████
        ██      ████████████, et cetera, you shouldn't be here so early?
17      A. No.
18      Q. Has a Lieutenant ever told you to go put in an
19      overtime slip for coming in early?
20      A. No.
21      Q. When you come to the screening site, can you
22      bring in your cell phone with you?
23      A. No.
24      Q. Why not?
25      A. It's considered hard contraband.  Communications
```

85

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1    device, you're in breach.
2    Q. So is it fair to say that because of the
3    screening site, the upright metal detector, that you
4    always collect your duty belt with the chains, the
5    chits, the clips, the pouches, you always collect that
6    on the Agency premises?
7    A. Yes.
8    Q. Do you wear a staff cut vest ---
9    A. Yes.
10   Q. --- as a custody worker?  And who provided you
11   with a staff vest?
12   A. The Captain's office, I believe.
13   Q. And is it required by the BOP?
14   A. Yes.
15   Q. And is it required to be worn in certain places
16   in an institution?
17   A. Yes.
18   Q. Where?
19   A. At any point past the control lobby.
20   Q. Okay.
21   So you have to wear the staff cut vest as you're
22   walking to your post prior to your shift.
23   Is that right?
24   A. Yes.
25   Q. And you have to wear the staff cut vest when

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       you're leaving your post after you've been relieved?

2       A. Yes.

3       Q. And do you recall that there is a ---.

4    ATTORNEY ELKIN:

5    Let me just show you Plaintiff's Exhibit

6       1.

7                              ---

8    (Whereupon, Plaintiff's Exhibit PLX-1,

9    FCI Otisville All-Staff Memo Re: Vest

10   Procedures 1/16/20, was marked for

11   identification.)

12                             ---

13      BY ATTORNEY ELKIN:

14      Q. That's in the --- do you have the Plaintiff's

15      exhibit binder up there?  Yellow.

16      A. I do not.

17      Q. It's the yellow one.  I can give you one.

18   ATTORNEY ELKIN:

19   Your Honor, may I approach?

20   JUDGE:

21   Yes.

22      BY ATTORNEY ELKIN:

23      Q. Plaintiff's Exhibit 1, are you there?

24      A. What section?

25      Q. Are you looking at Plaintiff's Exhibit 1?  It's a

87
Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1    one-page document.

2    A. Yes.

3    Q. Okay.

4    And this appears to be a memo from Captain Chase

5      from 2020, regarding the protective vest orders.

6    A. Yes.

7    Q. Okay.

8    And are you familiar with this memo?

9    A. Yes.

10   ATTORNEY ELKIN:

11   Your Honor, I'd like to move to admit

12     Plaintiff's Exhibit 1

13   ATTORNEY VALLACHER:

14   Objection.  We would just inquire as to

15     relevance and foundation.  He didn't write this.  I'm

16     not sure what the foundation would be or the

17     relevance.

18   JUDGE:

19   Could you lay some foundation?

20   ATTORNEY ELKIN:

21   Sure, Your Honor.  It's a memorandum for

22     all staff.  He was staff at the time --- from the

23     Captain.

24   JUDGE:

25   Okay.  Can you lay foundation?

Trial

Kathy Aitken, et al. v. USA                                  3/13/2023

```
1    ATTORNEY ELKIN:
2    Oh, sorry.  Yes.
3    JUDGE:
4    As in ask him questions.
5      BY ATTORNEY ELKIN:
6      Q. Were you staff at the institution in 2020?
7      A. Yes.
8      Q. Okay.
9    And did you see a copy of this memorandum when
10     Captain Chase was the Captain?
11     A. Yes.
12     Q. Okay.
13   I don't know if you familiar with --- does it
14     describe what you just described, which is that the
15     vests are required to be worn ---?
16   JUDGE:
17   Before we do that, Mr. Vallacher, does
18     that result your foundation objections?
19   ATTORNEY VALLACHER:
20   I guess the only thing to clarify is
21     whether he saw it in the course of his duties or maybe
22     in preparation for this litigation alone.
23   JUDGE:
24   Can you ask that?
25     BY ATTORNEY ELKIN:
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1    Q. When you worked at Otisville, did you see a copy
2    of this document?
3    A. Yes.
4    JUDGE:
5    Okay.  The objection's overruled.
6    ATTORNEY VALLACHER:
7    With that, Your Honor, no objection.
8     BY ATTORNEY ELKIN:
9     Q. Okay.
10   If you look at the ---.
11   JUDGE:
12   The objection's withdrawn.  There's a
13    motion to admit and it's admitted.
14                         ---
15   (Whereupon, Plaintiff's Exhibit PLX-1,
16   FCI Otisville All-Staff Memo Re: Vest
17   Procedures 1/16/20, was admitted.)
18                         ---
19   ATTORNEY ELKIN:
20   Okay.  Thank you, Your Honor.
21    BY ATTORNEY ELKIN:
22    Q. And does the bullet point --- the first bullet
23    point reflect your understanding of when the vests
24    have to be worn?  The point the vests are required to
25    be worn is identified as any area within the secure

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    perimeter past FCI control center sally port to

 2    include correctional systems and the visiting room.

 3    A. Yes.

 4    Q. Okay.

 5  You testified that there are sometimes

 6    Lieutenants in the front lobby when you come in.

 7  Have any of those Lieutenants ever told you that

 8    you are not to select your duty belt at that point

 9    after you screened it?

10    A. No.

11    Q. And have they ever stopped you from putting the

12    duty belt on at that location?

13    A. No.

14    Q. You testified that you have to be on your post at

15    the start of the shift.

16  Are you required to have all your assigned

17    equipment, let's say for day watch by███████████

18    A. Yes.

19    Q. And are you required to have all pertinent

20    information from the prior shift by██████████

21    A. Yes.

22    Q. And are you subject to discipline if you are not

23    on your post with all your required equipment and

24    pertinent information by the start of the scheduled

25    shift?
```

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    A. Yes.

2    Q. And your answer would be the same for each of the

3    starting points of the shift for evening watch and

4    morning watch?

5    A. Yes.

6    Q. So when you're working a post inside the

7    institution, how are the units?  For example, where do

8    you go after you put on your duty belt?

9    A. Could you repeat the question?

10   Q. Can you describe what you do immediately after

11   putting on your duty belt?  What's your --- how do you

12   get to your post?

13   A. I put the belt keepers on to keep my belt secure.

14   ██████████████████████████████████████████████████

     ██   ████████████████████████   ████████████████████████

     ██   ██████████████████   ██████████████████████████████

     ██   ████████████████████████████████████████████

     ██   ██████████████████   ██████████████████

     ██   ████████████████████████████   ██████████████

     ██   ████████████████████████████████████████████

     ██   ██████████

22   Q. Okay.

23   A. ████████████████████████████████████████

     ██   ██████████████████████████████████████████████

     ██   ████████████████████████████   ██████████████████

92

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    ███████████████████████████████████████

██   ████████████████████████████████████████████

██   ███████████████████████████████

4    Q. And what is your state of mind as you're walking

5    across a compound when you're coming on to a day watch

6    shift or an evening watch shift or a morning watch

7    shift?

8    A. Just being aware of my surroundings, doing, you

9    know, just a visual security search.

10   Q. █████████████████████████████████████

██   ███████████████████████████████████████████

██   ██████████

13   Q. Okay.

14   So what are you looking for, if anything, as you

15   make your way to a housing post prior to ████████?

16   A. Making sure that doors are secure.  Sometimes

17   lights might be left on or --- basically if there's

18   anything on the compound or --- there shouldn't be any

19   inmates out, but there have been at times.

20   Q. Are you looking to make sure there are no inmates

21   out?

22   A. Yes.

23   Q. Okay.

24   And when you say inmates have been out at times

25   coming down to a morning watch shift, what are you

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    referring to?
 2    A. I'm referring to sometimes inmates have been
 3    placed on an out count for the Lieutenant's Office,
 4    and they have been assigned as orderlies to wax floors
 5    or do sanitation in the Lieutenant's Office.
 6    Q. So there could be an inmate out.  That inmate, it
 7    would be okay for him to be out if he's been ---?
 8    A. If he's been placed on an out count, yes.
 9    Q. All right.
10    But you would be observing and making sure
11    there's nothing out of the ordinary with respect
12    to ---?
13    A. Correct.
14    Q. Okay.
15    Now, during those times of day when you're coming
16    on post for a ███████████████████████████████
      █ ████████████████████████████████████████
      █ ██████████████████████████
19    A. Yes.
20    Q. Okay.
21    And what --- I think you've already described
22    this.  But briefly, what, if anything, is your
23    responsibility with respect to those inmates as you
24    make your way to a day watch shift or you're leaving
25    from a morning watch shift?
```

94

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Constantly telling them to get where they need to
2      be.  The move is over.  Just making sure that they are
3      following the rules.
4      Q. Are they allowed to be on the grass?
5      A. No.
6      Q. Have you ever seen inmates on the grass during
7      your moves?
8      A. Yes.
9      Q. When you're moving to a post or they're moving?
10     A. I've told them keep off the grass, yes
11     Q. Okay.
12     And I think you already testified that if they're
13     not wearing their uniforms properly, would that be a
14     common sort of rule infraction that you correct during
15     that hour?
16     A. Yes.
17     Q. And then coming on to an evening watch shift, if
18     you're going through the screening around ███████████
19     what is going on in the institution during your time
20     that you are getting out onto the compound coming onto
21     an evening watch shift?
22     A. ███████████████████████.
23     Q. Okay.
24     ████████████████████████████████████████████████?
25     A. ██████

95

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1        Q. Okay.

2    And would you do the same thing if you saw

3        something out of the ordinary?

4        A. Yes.

5        Q. Okay.

6    So once you get to a post, and let's just do a

7        housing post.  How --- what happens when you get

8        there?  What happens?  How do you get in?  It might

9        depend on the time of day, but why don't you describe

10       what happens once you get to a housing unit.

11       A. ████████████████████████████████████

     ██  ████████████████████████████████████

     ██  ████████████████████    ████████████████

     ██  ████████████████████████████████

     ██  ██████████████████████████████████

     ██  ████████████████████

17   ATTORNEY ELKIN:

18   Okay.  I'm going to show you what's been

19       marked as JX-84.

20                              ---

21   (Whereupon, Joint Exhibit JX-84, Housing

22   A-Side Specific (2021), was marked for

23   identification.)

24                              ---

25       BY ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Let me know when you get there.  Okay.  This is a
2      housing unit --- A-side housing unit specific post
3      order.
4    Do you recognize this document as that?
5      A. Yes.
6    ATTORNEY ELKIN:
7    I would move to admit JX-84, Your Honor.
8    ATTORNEY VALLACHER:
9    Objection, Your Honor, on the grounds I
10     think foundation would be pretty much impossible given
11     that he left the institution before this was published
12     or after this was --- yeah, before this was issued.
13   JUDGE:
14   Counsel?
15   ATTORNEY ELKIN:
16   Well, I think he left the institution at
17     the end of May.
18   JUDGE:
19   Why don't you ask him as you did ---
20   ATTORNEY ELKIN:
21   Okay.
22   JUDGE:
23   --- with the last one, if he saw it in
24     the course of his duties about the work?
25     BY ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. Have you seen this document in the course of your
 2      duties assigned in May 14, 2021?  And to the extent
 3      that you haven't seen it, have you seen something
 4      similar?
 5      A. Yes.
 6      Q. Okay.
 7   ATTORNEY VALLACHER:
 8   Objection.  Compound.
 9   ATTORNEY ELKIN:
10   All right.
11   JUDGE:
12   Yeah.  And I'm not following.
13      BY ATTORNEY ELKIN:
14      Q. Do you know whether you've seen this document
15      prior to leaving the institution?
16      A. I don't recall completely, no.
17      Q. Okay.  I won't move to admit it.  I'm just going
18      to read one part of it.
19   JUDGE:
20   No.
21   ATTORNEY ELKIN:
22   No?
23   JUDGE:
24   No.  If it's not being admitted, I don't
25      care for you ---
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

98

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    ATTORNEY ELKIN:

2    Okay.

3    JUDGE:

4    --- to read it into evidence as to what

5      it is about.

6    ATTORNEY ELKIN:

7    Court's indulgence.

8    JUDGE:

9    Of course.

10   ATTORNEY ELKIN:

11   I'm going to have you look at

12     Plaintiff's Exhibit 9.

13                         ---

14   (Whereupon, Plaintiff's Exhibit PLX-9,

15   Housing Unit D, E, F & G Specific Post

16   Orders (2019), was marked for

17   identification.)

18                         ---

19   JUDGE:

20   Incidentally, to the extent that the

21     motion of JX-84 is still pending, objection sustained.

22     It's not admitted at this time.  If you want to admit

23     it through another witness, you have that ability.

24   ATTORNEY ELKIN:

25   We will do that, Your Honor.  Thank you.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    JUDGE:

2    Continue with your Direct Testimony.

3    BY ATTORNEY ELKIN:

4    Q. Plaintiff's Exhibit 9.

5    A. I have it in front of me.

6    Q. Okay.

7    So does this appear to be a post order ---

8    specific post order for housing units, the ███████

9    housing units for a period of time that you were with

10   the institution dated February 2019?

11   A. Yes.

12   Q. And have you seen this document?

13   A. Yes.

14   Q. And do you have to sign for the post order, that

15   you've read the post orders on the post?

16   A. Quarterly, yes.

17   Q. Quarterly?

18   A. Quarterly.

19   ATTORNEY ELKIN:

20   Okay.  All right.  Your Honor, I move to

21   admit Plaintiff's Exhibit 9.

22   ATTORNEY VALLACHER:

23   No objection, Your Honor.

24   JUDGE:

25   It's admitted.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                          ---
 2    (Whereupon, Plaintiff's Exhibit PLX-9,
 3    Housing Unit D, E, F & G Specific Post
 4    Orders (2019), was admitted.)
 5                          ---
 6     BY ATTORNEY ELKIN:
 7     Q. Okay.
 8    You can turn to page 8 of 13.
 9     A. I have it in front of me.
10     Q. Okay.
11    At ███████████████████████████████
      █    █████████████████████
13    Is that correct?
14     A. Yes.
15     Q. Okay.
16    Pass on keys and equipment to the relieving
17     officer.  Once properly relieved, your tour of duty
18     ends and you are to proceed directly out of the
19     institution.
20    Do you see that?
21     A. Yes.
22     Q. What is your understanding, based on your
23     training and experience, of what a proper relief
24     includes?
25     A. A proper relief would include exchange of
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    equipment, inspection of equipment and exchange of

2    information.

3    Q. Okay.

4    So why don't we talk about the exchange of

5    information first?  What type of information do you

6    expect to receive from the outgoing officer when you

7    come onto a post, as part of a proper relief?

8    A. ████████████████████████████████████████

    ████████████████████████████████████████████████

    ██████████████████████████████████████████

    ████████████████████████    ████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ██████████████████████████████████████████████

    ██████████████████████████████████████

16   Q. And how would an inmate become intoxicated inside

17   a prison?

18   A. They make their own homemade intoxicants ---

19   Q. Okay.

20   A. --- through fruits and bread and water

21   fermentation.

22   Q. Is that considered contraband?

23   A. Yes.

24   Q. All right.

25   And when you are being relieved after a shift,

102

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    what type of information --- do you pass on the same

2    type of information to the oncoming officer?

3    A. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

9    Q. Okay.

10   A. --- that's important.

11   Q. And as part of your training, were you trained to

12   do an information exchange when you --- as part of

13   being a good Correctional Officer?

14   A. Yes.

15   Q. Could you safely and effectively do your job on

16   your post without pertinent information being passed

17   on?

18   A. No.

19   Q. There is a log on the post.

20   Correct?

21   A. Yes.

22   Q. So why can't you just rely on the truth of those

23   logs say coming onto a ██████████████████?

24   A. Because there's always a possibility that an

25   officer or staff member may have forgotten something

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    that they didn't mention.  Something may have happened
2    throughout the course of the shift.
3    Q.



11   Q. Okay.
12   Now, why don't you tell me about the equipment
13   exchange?  We know what equipment is there, but
14   describe the process.
15   A. So the first thing that I typically get is the
16   radio.  Again, I inspect the radio, make sure that
17   it's fully charged and functional, make sure that the
18   knob is functional, that it's not loose.



25   And if the battery needs to be replaced, I take

Trial
Kathy Aitken, et al. v. USA                                3/13/2023

1       the old one out, put the new one in, and then I move
2       on to the next item, which might be the OC.  I make
3       sure that that's functional, that the nozzle isn't
4       broken or anything, and it's intact, nothing leaking.
5       And then I place that into the OC holster, snap it
6       into place.
7   And then I move on to the next item, which might
8       be the keys.  So I inspect each individual key
9       visually and physically, and then hook that onto my
10      chain, and then place the key ring onto the metal
11      clips. ████████████████████████████████
        ██ ██████████████████████████████████████
        ██ ████████████████████████████████████
        ██ ██████████████████████████████████ If
15      there's anything --- I think that's basically it.
16      Q. Okay.
17  And then you also do this information exchange.
18      Approximately how long --- and include both, how long
19      does the equipment exchange, along with the
20      information exchange generally take on a 24-hour post?
21      A. Approximately ████████████████████████.
22      Q. And is it usually more like ███████████████████
        ██ ████████████████████████?
24      A. It's typically ███████  If there's more
25      information, then it runs into ██████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Are there certain posts where the information

2      exchange would take longer?

3      A. Typically ████████████████████████████

4      Q. Okay.

5   And since we're talking about control, can you

6      just describe what your process is coming out?  You

7      work all the watches there under the control center.

8   ███████████████████████████████████████

    █   ███████████████████

    █   █████████████████████████

11     Q. Okay.

12  ████████████████████████████████████████████

    █   ██████████████

14     A. Correct.

15     Q. All right.

16  Is there any equipment that's exchanged hand to

17     hand in the control center for the control one

18     officer?

19     A. No.

20     Q. ████████████████████████████████

    █   ████████████████████

22     Q. Okay.

23  So --- but you still have to go through the

24     screening site.

25  Correct?

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    A. Yes.

2    Q. You have to get through A1?

3    A. Correct.

4    Q. ███████████████████████████████████

     ████████████████████████████████████████

     ███████████

     ████████████████████████████████

     █████████████████████████

9    Q. Okay.

10   So how do you get into that first door, then?

11   A. That's controlled by ██████████████.

12   Q. So they have to let you in?

13   A. Correct.

14   Q. █████████████████████████████

     █████████████████████

16   Q. Yeah.

17   A. It should be okay.

18   Q. Okay.

19   And then is there --- so is it an actual sally

20   port?

21   A. █████████████████████    ██████████████████████

     ████████████████████████████████████████

     ███████████████████████████████

24   Q. Okay.

25   A. ████████████████████████████████████.

```
 1      Q. Okay.
 2      A. ███████████████████.
 3      Q. ██████████████████████████████
        ████████████████████████████████████████
        ██████████████
        █████████████████████████████
 7      Q. Yes.
 8      A. Control inner, yes, in that one.
 9      Q. Oh, no.  I'm talking about getting into the
10      control center, not the --- to get into --- I don't
11      know.  Are there --- I don't remember.
12      Are there two doors to get into the control
13      center?
14      A. Yes.
15      Q. Okay.
16      █████████████████████████████████████████
        █████████████████
        ████████████    ████████████████████████
        ██████████████████████████████████████████████
        ████████████████████████████████████
        ██████████████████████████
22      Q. Okay.
23      And so once you get into the control center, tell
24      us about the information and equipment exchange for a
25      control one officer, let's say coming onto an evening
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    watch.
 2    A. ███████████████████████████████████
      ███████████████████████████████
      ████████████████████████████████████████
      ███████████   █████████████████████
      ███████████   ██████████████████████
      ██████  ████████████████████████████
      ██████████████████████████████████████
      ████████████████████   █████████████
      ██████████████████████████████████
      ████████████████████████████████
12    Q. Okay.
13    And that's the --- you're not exchanging
14    equipment.
15    Is there anything that you're required to do with
16    respect to the equipment that's maintained in the
17    control center during that exchange while the outgoing
18    officer is still there?
19    A. Could you repeat that, please?
20    Q. Is there anything --- ████████████████████
      ███████████████████████████████████████████
      ██████████████████████   But is there anything
23    you're supposed to do with respect to the keys, and
24    the radios, and the batteries, and whatever else is in
25    the control center as part of the equipment --- a part
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      of the exchange between the officer?

2      A. You're making sure that they're accounted for,

3      that there's ███████████████████████████

       █  ███████

5      Q. Okay.

6   So you do a sort of inventory of that equipment,

7      making sure there's either equipment or a ████████

8      A. Yes, correct.

9      Q. And do you try to do that part of your job

10     carefully?

11     A. Yes.

12     Q. Why?

13     A. So I can be accurate and make sure that

14     everything's present and accounted for.

15     Q. And do you want to do that before the guy you're

16     leaving leaves?

17     A. Yes.

18     Q. And is that important for accountability as well?

19     A. Yes.

20     Q. If you had any questions, can you just ask him

21     about it while you're both there?

22     A. Yes.

23     Q. Would that information and equipment inventory,

24     would that take place, whether you're coming on to a

25     day watch shift, a morning watch shift or a ████████

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1     shift?

2     A. That happens on all shifts.

3     Q. Okay.

4   And when you're coming out to a morning watch

5     shift, I'm sorry, coming out to a day watch shift,

6     what's going on in the institution around that time?

7     A. ███████████████████████████████████

    ███████████████████████████████████████████

    ███████████████████████████████

10    Q. So during that --- and are there doors that have

11    to be opened by the control center as well?

12    A. Yes.

13    Q. So during the exchange of information and the

14    accounting of the inventory of the equipment, are you

15    doing something else as an oncoming control one

16    officer during that time that you're both outgoing and

17    oncoming?

18    A. Yes.

19    Q. What are you doing?

20    A. ███████████████████   ███████████████

    ███████████████████████████████████████████

    ███████████████████████████████████████████

    █████████████████████████████████████████

    ██████████████████████████████████

25    A. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. And is it your testimony that the control center

2    exchange takes at least ███████████

3    A. Yes.

4    Q. The SHU exchange, when you work SHU-1, is there

5    anything different about how you get into the SHU unit

6    as opposed to how you got onto the housing or the

7    control center?

8    A. ████ ████████████████████████████████

███    █████████████████████████████████████

███    ███████ ████████████████████████████████

███    ██████████████████████████████████████

███    ████████ ███████████████████████████

███    ██████████████████ ████████████████████

███    █████████████████████████████████████

███    ████████████████████████████

16   Q. Okay.

17   A. ████████████████████████████████

███    ██████████████

19   Q. ███████████████████████ ████████████████

███    ███████████████████████████████████████

███    ██████████████████████████████████████

███    ████████████████████████████████████████

███    █████████████ █████████████████████████

███    █████████████████████████████████████

███    ████████████ ███████████████████████████

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

    1       Q. Okay.
    2    And so you go into the office, both the outgoing
    3    and you.
    4       A. Uh-huh (yes).
    5       Q. And is it the same type of thing?  You're passing
    6    out information and equipment?
    7       A. Yes.
    8       Q. And you said that the SHU exchange might take
    9    longer.
   10    Why is that?
   11       A. ████████████████████████████████████████
         ██    ████████████████
   13       Q. Okay.
   14    And you're doing the same thing?  ██████████
         ██  ████████████████████████████████████████████
         ██    ████████████████
   17       A. Correct.
   18       Q. All right.
   19    And is there more --- the same type of
   20    information that's being passed on out in the SHU?
   21       A. As?
   22       Q. As the housing unit?
   23       A. The housing unit?  There's more information.
   24       Q. Why is that?
   25       A. ████████████████████████████████████ .

Trial
Kathy Aitken, et al. v. USA                        3/13/2023



1

6    Q. So you pass on whatever information you feel
7    pertinent or you get that information, and then the
8    offgoing officer can leave?
9    A. Yes.
10   Q. And how does he get out of SHU?
11   A.
14   Q.                                                    ?
15   A. Correct.
16   Q.
21   Q. Okay.
22   So when you're working the SHU post, either
23   oncoming or offgoing, is it fair to say that you have
24   to go through,

114
Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      ███████████████████████████████████████████
2  █  ████████████████
3      A. Correct.
4      Q. Going back to the housing units.
5  Are there inmates on the housing units while
6      you're doing the exchange?
7      A. During what hours?
8      Q. During all hours.  Like if you're coming on, are
9      they in there?
10     A. Yes.  There's always inmates on the housing unit.
11     Q. Okay.
12  And if something should kick off during the
13     exchange --- you're the oncoming.  The offgoing is
14     going to be leaving once the exchange is over.  ██
15 █  █████████████████████████████████████████
16 █  ███████████████████████████████████████████████
17 █  ██████████████████████████████████████████████
18     A. No.
19     Q. What would you have to do?
20     A. You have to respond.
21     Q. Okay.
22  So on a housing unit --- you talked to us about
23     what time you start donning your duty belt ████████
24 █  ████████████████████████████████████.  At the
25     end of the shift after you've done your proper relief

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      to the oncoming officer when you're working a housing,
2      it's the end of, let's just do day watch for now.
3   What time is it that you're approximately that
4      you're leaving the A1 secured confines of an
5      institution?
6   ATTORNEY VALLACHER:
7   I would object to a question on the
8      grounds that it mischaracterizes testimony.   ███████
█   ███████████████████████████████, but I believe
10     that's not what he said.  He said that's when he
11     walked into the lobby.
12  ATTORNEY ELKIN:
13  I think he said that's when he started
14     screening.  He went and started through the screening
15     metal detector.
16  JUDGE:
17  I thought he said that was when he got
18     through the screening.
19  ATTORNEY ELKIN:
20  That's my understanding.
21  JUDGE:
22  Okay.  Objection overruled.  You can
23     answer the question.
24     BY ATTORNEY ELKIN:
25     Q. Okay.

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

1    So you've gotten through screening in the

2    morning, ███████████████████████    You're putting

3    your duty belt on.  Approximately what time are you

4    leaving the A1 secure confines of institution at the

5    end of a day watch shift, on average?  I understand

6    sometimes people are late, but on average, what time

7    are you leaving?

8    A. If you arrive at ███████?

9    Q. Yes.  What time are you leaving the A1 sally port

10    on your way out?

11    A. I'm not sure I understand the question.

12    Q. Okay.

13    But you've ---.

14    A. I'm sorry.

15    Q. So you've come in.  ████████████████████

██  ████████████████  ████████████████████

██  ██████████████████████  ████████████████

██  ██████████████  ██████████████████████████

██  ████████████  ██████████████████████████

██  ████████████████████████████  ████████████

██  ██████████████████████████████████████████

██  ████████  ████████████████████████████████

██  ████████.

24    So I'm asking you approximately what time is it

25    that you are exiting the secured confines of

117

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    institution, which would be at the outer A1 door?
2    A. Approximately ███████████
3    Q. Have you ever been paid for the ███████████
█    ██████ we're talking about of the pre-shift time that
5    you've been testifying about?
6    A. No.
7    Q. And that's true regardless of whether you work a
8    housing unit post, a SHU post, or we haven't talked
9    about compound, we'll talk about it briefly, or a
10   compound post?
11   A. Correct.
12   Q. Are your practices the same in terms of
13   information exchange and equipment exchange on the
14   compound post?  And if they're not the same, how are
15   they different?
16   A. They're typically the same.
17   Q. Okay.
18   ███████████████████████
█    ████████████████████████████████████
█    ████████████████
21   Q. ██████████████████████████████████
█    ██████████
23   A. Yes.
24   Q. And when you work a compound ---?
25   JUDGE:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Mr. Vallacher?

2    ATTORNEY VALLACHER:

3    Your Honor, I've been pretty lax about

4      the whole leading thing, but I just want to put that

5      on the radar that going forward, I think I'm going to

6      start objecting to it, because as far as his

7      background and then it slowly slipped into ---.

8    JUDGE:

9    That's fair, Mr. Vallacher.  Let's be a

10     little more careful about questions.

11   ATTORNEY ELKIN:

12   Okay.

13     BY ATTORNEY ELKIN:

14   Q. On the compound post --- before we start talking

15     about what the exchange is with respect to equipment,

16   ████████████████████████████████████████████████

     ████████████████████████████████    ████████████

     ████████████████████████████████

19   A. ██████████████████████████████████████████████

     ████████████████████████████████  ██████████████████

     ██████████████████████  ████████████████████████████

     ████████████████████████████████████████████████

     ██████████  ████████████████████████████████████

24   Q. Okay.

25   When it was in the Lieutenant's Office, was it

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    your practice to still arrive when you said you were

2    arriving and get to the post prior to the start of

3    your shift and conduct the exchange?

4    A. Yes.  I always tried to be ███████████████

5    Q. On the post?

6    A. On the post.

7    Q. And did a Lieutenant ever say to you, Conklin,

8    it's ████████ your shift doesn't start until ███,

9    you shouldn't be here doing this exchange?

10   A. No.

11   Q. And the Lieutenant seen the exchange when it was

12   in that Lieutenant's Office?

13   A. Yes.

14   Q. Has the Lieutenant ever said to you put in an

15   overtime slip for assuming the duties of the post

16   early?

17   A. No.

18   Q. Okay.

19   At the side --- ████████████████████████



23   A. ████████████████████████████████████████

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023



7    Q. And are those types of equipment types you would
8    use during the course of your work on the compound
9    post?
10   A. Yes.
11   Q.
15   Q. Does the Compound Officer use ▮▮▮▮?
16   A. Not typically, no.
17   Q. But you do an information exchange then, a verbal
18   on the compound?
19   A. Yes, ▮▮▮▮▮▮▮▮.
20   Q. Okay.
21   Have you ever worked the perimeter control post?
22   A. Yes.
23   Q. On a morning watch shift or evening watch shift?
24   A. Yes.
25   Q. And what is the perimeter control post?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. Perimeter control is basically security.  You're
 2      patrolling, circling the institution, and that
 3      includes the camp and seg unit.
 4      Q. Okay.
 5      A. Also, you're just patrolling, making sure that no
 6      inmates have escaped.  All gates, doors, tunnels are
 7      secure.
 8      Q. So you're doing that while you're driving your
 9      vehicle?
10      A. Yes, while you're driving the vehicle.
11      Q. So what does the patrol --- perimeter patrol, is
12      that staffed 24 hours a day?
13      A. Yes.
14      Q. ███████████████████████████████████████████████
        ██  ██████████████████████████████████?
16      A. Yes.
17      Q. What are they doing during the hours of ██████████
        ██  ████████████████, approximately, when all the inmates are
19      locked in their cells?
20      A. They're ensuring that no inmates have escaped.
21      There's counts going on.
22      Q. And when you work the post, the post on the
23      inside during these hours --- well, let me ask you
24      that.  When you work perimeter patrol posts, were you
25      still performing your primary job duty of safety and
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1      security when you're making sure there are no inmates
2      out during the hours of ████████████████████ .?
3      A. Yes.
4      Q. And how is that different from what you've
5      described that you do when you walk to a post during
6      --- coming on to a ████████████████████
       ██  ████████████████████████████████████████████████
       ██  ████████████████████ ?
9      A. It's not different.
10     Q. Is there any difference?  I mean, one guy's in a
11     car.  Are you in a car?
12  ATTORNEY VALLACHER:
13  Objection.  Leading.
14  ATTORNEY ELKIN:
15  Withdrawn, Your Honor.
16  JUDGE:
17  Sustained.
18     BY ATTORNEY ELKIN:
19     Q. Withdrawn.
20  When we spoke earlier about the radios, you said
21     there was a body alarm on the radio.
22  What is your expectation as an officer if you
23     press the body alarms?  What would your expectation be
24     of other officers?
25     A. I would expect them to respond immediately.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. Okay.

2    And what is expected of you if you hear a body

3    alarm go off or you know of a body alarm?

4    A. To respond to that area immediately.

5    Q. Have you ever in the last --- since 2016, have

6    you responded to a body alarm prior to your paid time

7    on your shift?

8    A. Yes.

9    Q. And can you give us an example?

10   A. Yes.  I was walking into the institution to my

11   post. ███████████████████████████████████

██    █████████    ██████████████████    ████████████

██    ███████████████████████    ██████████████

██    ██████████████████████████████    █████

██    █████████████████████████████████████████

██    █████████████    █████████████████████████

██    ████████████████████████████████████████

██    ████████████████████████████████████

██    ████████████████    █████████████████████

██    █████████████████████████████████████████.

21   Q. And did you have your duty belt on as you ran?

22   A. Yes.

23   Q. Did anybody tell you to put in an overtime slip

24   for responding to that emergency?

25   A. No.

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

1      Q. Did the Lieutenant put in an overtime slip for
2      you for responding to that emergency?
3      A. No.
4      Q. Have you --- withdrawn.
5  Have you ever responded to an emergency after
6      you've been relieved from post on your way out of the
7      institution?
8      A. Yes.
9      Q. And can you give us an example of that?
10     A. Yes.  I was exiting the institution. █████



it
18  was --- I believe, it was false activation.
19     Q. Did any Lieutenant tell you to put in an overtime
20     slip for responding from the --- I think you said you
21     were between on a ████████████████████████████.
22  Is that where you were?
23     A. That's where I was, yes.
24     Q. Did anybody tell you to put in an overtime slip
25     for responding to that ---?

125

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    A. No.

2    Q. You said some staff had radios.  What staff would

3    have radio either coming onto a shift walking to their

4    assignments or leaving a shift after their

5    assignments?

6    A. Leaving, sometimes it's non-custody, whether it

7    be program areas.  It can be religious services or

8    recreation, going outside to camp or other areas.

9    Q. Do you know where they collect their radios and

10   keys?

11   A. Control center.

12   Q. Okay.

13   And do you know where they return their radios

14   and keys?

15   A. Control center.

16   Q. ████████████████████████████████████████

     ████████████████████████████████████████████

     █████████████████████████████████████████████████

     ███████████████████████████████████████████████?

20   A. Yes.

21   Q. And that's how you were able to hear that there

22   was, in fact, a problem?

23   A. Yes.

24   Q. Okay.

25   I'm just about done here.  If you can --- and I

Trial

Kathy Aitken, et al. v. USA                                         3/13/2023

1    know that sometimes things --- well, let me just ask

2    you.

3  On average, how long does it take you to collect

4    the duty belt and to properly put it on with the belt

5    keepers?

6    A. Approximately ███████████████████.

7    Q. Okay.

8  How long does it take you to ████████████████

█    ███████████████████████████████████████████████

█    █████████████████████████████████████████████████

█    ███████    █████████████████████, I should say?

12   A. Approximately another ████████████████.

13   Q. And how long does it take you to walk ████████

█    ███████████████████████████████████████

█    ██████████████████████████████████████████████

█    ██████████████████████████?

17   A. I would say between ████████████████.

18   Q. Would that be the same amount of time leaving the

19    post and going back to the control center sally port?

20   A. Yes.

21  ATTORNEY ELKIN:

22  And how --- I think you already talked

23    about exchanges.  Just one moment.

24  Your Honor, I pass the witness, but can

25    we have a comfort break?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    JUDGE:

2    Yes, absolutely.

3    ATTORNEY ELKIN:

4    Okay.

5    JUDGE:

6    Let's take a five-minute break.  Mr.

7       Conklin, you will remain under oath from the Pretrial

8       Order.  No conversations about the substance of the

9       testimony with anybody.  We'll take a five-minute

10      break.  I'll be back at, on my watch, 11:41.

11   Mr. Vallacher, you have something to

12      ask?

13   ATTORNEY VALLACHER:

14   Could I actually request the break be

15      ten minutes, so I can just organize my thoughts?

16   JUDGE:

17   Okay.  Absolutely.  Ten minutes.  We'll

18      back at on --- on the courtroom clock we'll be back at

19      11:45, then.

20   Sound good to everybody?  Great.

21   ATTORNEY ELKIN:

22   Thank you, Your Honor.

23   COURT CRIER:

24   All rise.

25                                ---


For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1      (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 2                          ---
 3   COURT CRIER:
 4   All rise.  The United States Court of
 5     Federal Claims is now in session.  Judge Stephen
 6     Schwartz presiding.
 7   JUDGE:
 8   Mr. Conklin?
 9   ATTORNEY ELKIN:
10   Your Honor, another Plaintiff is here.
11     Matthew Bunting.
12   JUDGE:
13   Very good.  Mr. Conklin, you understand
14     you're still under oath?
15   THE WITNESS:
16   Yes, sir.
17   JUDGE:
18   Very good.
19   Mr. Vallacher?
20                          ---
21                  CROSS EXAMINATION
22                          ---
23   BY ATTORNEY VALLACHER:
24   Q. Good morning, Mr. Conklin.  So on Direct, I think
25     you were asked whether housing unit officers were
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    outnumbered on the post.
 2   Is that right?
 3    A. Yes.
 4    Q. And I think there was a ratio of somewhere in the
 5    hundreds, something like that?
 6    A. Yes.
 7    Q. But isn't it true that there's also unit team
 8    members for each housing unit?
 9    A. It depends on shift.
10    Q. Okay.
11   And so what shifts would housing team members be?
12    A. Typically day watch.
13    Q. Okay.
14   And how many housing team members are there?
15    A. Typically anywhere between one to four.
16    Q. One to four.
17   And so that would be the unit counselors?
18    A. Yes.
19    Q. And the case managers?
20    A. Yes.
21    Q. And a unit manager?
22    A. Yes.
23    Q. Okay.
24   And isn't it true that they also --- you know,
25    they work, ██████████████████, right, the unit
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1       team?

2       A. Yes.

3       Q. But they could also do ███████████████.

4       A. Yes.

5       Q. And they also interact with inmates.

6   Correct?

7       A. Yes.

8       Q. Can they answer questions for inmates?

9       A. Yes.

10      Q. And they sometimes stand at the entrance of chow

11      for questions during meals with inmates?

12      A. Yes.

13      Q. In main line, it functions as a kind of open

14      house to ask any questions of them.

15  Correct?

16      A. They typically have assigned open house hours.

17      Q. Okay.

18  And that would correspond with chow?

19      A. With their prerogative.  It depends.

20      Q. Okay.

21  It's really whenever their open house is

22      available, what time it is.

23      Q. So are you saying that main line is not an open

24      house for inmates?

25      A. No, it is.  I'm saying that the correctional

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     counselors typically develop their own open house
2       hours that accommodate their schedule.
3       Q. Which would include main line?
4       A. Yes.
5       Q. Okay.
6     And that open house occurs every day?
7       A. Typically, yes.
8       Q. Okay.
9     Well, when you say typically, what do you mean by
10      that?
11    JUDGE:
12    Ms. Elkin, if you have an objection ---
13      otherwise sit down.
14    ATTORNEY ELKIN
15    Okay.  Sorry.  Objection to the use of
16      open house foundation is my objection.
17    ATTORNEY VALLACHER:
18    I'm using words he spoke in the
19      deposition.
20    JUDGE:
21    Overruled.
22      BY ATTORNEY VALLACHER:
23      Q. All right.  So I'm sorry.
24      A. So typically the open house is --- it depends on
25      basically the staff member's schedule, whether they

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    have the open house or not.

 2    Q. Okay.

 3    But that occurs every day?

 4    A. Typically, yes.

 5    Q. Okay.

 6    So do you remember being --- taking a --- being

 7    deposed in this case?

 8    A. Yes.

 9    Q. And a deposition is when you ask questions under

10    oath?

11    A. Yes.

12    Q. And I asked you questions and Ms. Elkin also

13    asked you some questions.

14    Do you remember that?

15    A. Yes.

16    Q. And before we started, a Court Reporter swore you

17    in to tell the truth?

18    A. Yes.

19    Q. And the whole truth?

20    A. Yes.

21    Q. And nothing but the truth?

22    A. Yes.

23    Q. And that's the same oath you took today?

24    A. Yes.

25    Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Do you have your deposition transcript in front
 2       of you or do you ---?
 3       A. I don't believe so.
 4    ATTORNEY VALLACHER:
 5    Permission to approach?
 6    ATTORNEY ELKIN:
 7    Objection.  Are you trying to impeach
 8       him before you ask a question?
 9    JUDGE:
10    You can direct your question ---.
11    ATTORNEY ELKIN:
12    I'm sorry, Judge.  I would say this is
13       improper impeachment, until there is some kind of
14       question that ---.
15    JUDGE:
16    Mr. Vallacher, I assume you're trying to
17       impeach him on his answer to one of your previous
18       questions?
19    ATTORNEY VALLACHER:
20    That's right.
21    JUDGE:
22    Overruled.
23    ATTORNEY VALLACHER:
24    Permission to approach with the
25       transcript?
```

134

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    JUDGE:

2    Yes.  As long as you have copies of the

3      exhibits.

4    ATTORNEY VALLACHER:

5    I do.

6      BY ATTORNEY VALLACHER:

7      Q. So if we turn to page 25.  All right.

8    Are you there?

9      A. I'm on page 25.

10     Q. Okay.

11   So starting at line five, I'm going to just read

12     them.  At the end, I'm going to ask you if I said it

13     correctly.

14   Does that sound good?

15     A. Sure.

16     Q. And when you say sometimes, are you referring to

17     lunch?  Answer, typically staff are required to stand

18     mainline at each meal.  Question, when you say staff,

19     what do you mean by that?  Answer, basically

20     administrative staff or unit team.  Just

21     administrative staff in general.  Question, who are

22     administrative staff?  Typically it's --- answer,

23     typically it's executive staff.  It could be unit

24     team.  That mainline is the inmate's open house to ask

25     any questions of relatively any department.  Question,

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1     and does that open house occur every day?  Answer,

2     yes.

3  Did I read that correctly?

4     A. Yes.

5     Q. Okay.

6  And I think you were asked about your most

7     important job duty.

8  Did I remember that?

9     A. Yes.

10     Q. And that was --- I think you said was to maintain

11     safety and security.

12  Is that right?

13     A. Yes.

14     Q. Okay.

15  And that's the purpose behind almost everything

16     you do.

17  Right?

18     A. Yes.

19     Q. Okay.

20  And that's carried out through a series of

21     activities that vary, depending on post?

22     A. Yes.

23     Q. And I think that you were also asked a question

24     about inmates being in the front lobby.

25  Do you remember that?

136

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. Yes.
 2      Q. And I think you said they would be camp orderlies
 3      or inmates returning from a medical trip?
 4      A. Yes.
 5      Q. So in both those cases, they would be supervised
 6      by the front lobby officer.
 7   Correct?
 8      A. No.
 9      Q. Okay.
10   How not?
11      A. The inmate that is on the escorted medical trip
12      would be escorted by the BPT officer, the basic
13      prisoner transport officer, or hospital officer.
14      Q. Okay.
15   So you're saying that the inmate on the medical
16      trip is also escorted by somebody.
17   Is that right?
18      A. Yes.
19      Q. That would be the medical escort officer?
20      A. Yes.
21      Q. Okay.
22   And is that also a Correctional Officer?
23      A. It's a BOP staff member.
24      Q. Okay.
25   But not a Correctional Officer?
```

137

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1      A. Not always.
 2      Q. Okay.
 3   Campers working detail, would those be supervised
 4      by the CMS format?
 5      A. Campers working details?  I'm sorry.
 6      Q. Yeah.  So just outside the front lobby.  If they
 7      were cutting grass or anything like that, would they
 8      be supervised by facilities foremen?
 9      A. They're typically supervised every ████████.
10      They have to check in ████████████.
11      Q. Okay.
12   Because they're community custody?
13      A. Correct?
14      Q. That's right.  Okay.
15   And so these are --- ████████████████████
████      ████████████████████████████.
17   Right?
18      A. Correct.
19      Q. Okay.
20   And any campers in the front lobby would be
21      supervised by the front lobby officer?
22      A. Yes.
23      Q. And isn't it correct that there are generally no
24      inmates in the front lobby?
25      A. Typically, yes.
```

138

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. And so after you put on the duty belt, it takes

2    you approximately ████████████████ to get through

3    the A1 sally port?

4    A. Approximately, yes.

5    Q. And then you go to the ████████████████████████

6    ██  ████████████████████████████████ .

7    Is that right?

8    A. Yes.

9    Q. And that takes you about a ██████████████?

10   A. Approximately --- ████████████████████████

11   ██    ████    Is that your question?

12   Q. Yes.

13   A. Approximately ████████████████ .

14   Q. Okay.

15   And typically there are no inmates on that

16   sidewalk.

17   Correct?

18   A. Typically, yes.

19   Q. And if they were, they would be on detail and

20   already supervised?

21   A. Yes.

22   Q. And I think that you were asked a question about

23   if something were to happen while you're walking on

24   that sidewalk.  Something, I think the phrase was kick

25   off.  Something were to kick off.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Do you recall that question?
 2      A. Yes.
 3      Q. Okay.
 4    Has that ever happened?
 5      A. Not to my knowledge, no.
 6      Q. Okay.
 7    And while we're on the topic, I think you were
 8      also asked at ████, if you're in the housing unit, if
 9      something were to kick off, would you be required to
10      respond.
11    Do you recall that question?
12      A. Yes.
13      Q. And you said you would respond.
14    Is that right?
15      A. Yes.
16      Q. But at ██████████ where are the inmates?
17      A. They're in the housing unit.
18      Q. Where, specifically?
19      A. In the common area, in cells.  They're in several
20      areas.
21      Q. Okay.
22    And let's say at ██████████ right before you come
23      on, so the ██████████ folks, where are the inmates?
24      A. They should be locked in cells.
25      Q. Okay.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1    And at ████████ before the ███████████
      ██    ██████, where are the inmates?
 3    A. They should be locked in cells.
 4    Q. Okay.
 5    And I think that you were asked a question about
 6    when --- that you would sometimes stop by the
 7    Lieutenant's Office to make your presence known.
 8    A. Yes.
 9    Q. But that --- you would agree that that's not
10    required in the post orders.
11    Correct?
12    A. Correct.
13    Q. Okay.
14    And you would also agree that you don't often
15    stop by the Lieutenant's Office?
16    A. Correct.
17    Q. You would usually just go straight to your post?
18    A. Correct.
19    Q. And stopping by the LT's office --- Lieutenant's
20    Office, sorry, would take --- should ██████████
      ██  ████████████████████████?
22    A. Correct.
23    Q. And during your deposition, do you remember that
24    I asked you what type of mail you received in those
25    cubbies?
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. In the staff mailbox?

2      Q. Yes.

3      A. Yes.

4      Q. Okay.

5   And you told me that you received roster

6      adjustments?

7      A. Yes.

8      Q. Overtime slips?

9      A. Yes.

10     Q. And a staff calendar/planner?

11     A. Yes.

12     Q. And the roster adjustments would also be

13     communicated to you over email.

14  Correct?

15     A. Yes.

16     Q. And the overtime slips, if you don't sign those,

17     you're still paid overtime.

18  Correct?

19     A. Yes.

20     Q. And the staff calendar and planner, that doesn't

21     contain any information that isn't already found in

22     another document or policy.

23  Correct?

24     A. Yes.

25     Q. And the Lieutenants can address any important

142

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       information they thought Correctional Officers should
2       know through a conference calls with the threes.
3    Correct.
4       A. Should they choose to have one, yes.
5       Q. Okay.
6    But that would be correct?
7       A. That's correct.
8       Q. And you were asked some questions about whether
9       you were expected to converse on the compound and you
10      said you would on your way to and from post.
11   Do you remember that?
12      A. Yes.
13      Q. Isn't it true, though, that when you walk across
14      the compound, you do at times at least keep walking
15      while answering questions?
16      A. Not always.
17      Q. Okay.
18   Not always, but at least some of the times?
19      A. Sometimes.
20      Q. Okay.
21   And you have never stopped for over
22      Seven-and-a-half minutes to respond to a question
23      before or after your post.
24   Correct?
25      A. I believe so, yes.  Correct.

143

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    Q. And you do not know how many times per year

2    you've stopped to respond to a question before, after

3    your shift?

4    A. I do not.

5    Q. And has it ever taken you over seven-and-a-half

6    minutes to issue a correction to an inmate before or

7    after your shift?

8    A. Not to my recollection.

9    Q. So I think that you were asked about --- if you

10   could go to JX-58, which was an exhibit that I believe

11   Ms. Elkin was just talking with you about.

12   This would be the 2019 general post orders?

13   A. Yes.  I have it in front of me.

14   Q. Okay.

15   Turn to page 7 of 43.

16   A. I have it in front of me.

17   Q. Okay.

18   And you see at the bottom there it says ensure

19   that a freshly-charged battery is installed in the

20   radio at the beginning of your tour of duty?

21   A. Yes.

22   Q. Do you see anything in there that says that you

23   are required to install a battery before your shift?

24   A. No.

25   Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     And on --- we're done with that exhibit, by the
2     way.  So you were also asked a bunch of questions
3     about your duty belt.
4     Do you remember those?
5     A. Yeah.
6     Q. And I think that you readily admitted that the
7     Bureau of Prisons did not issue you your duty belt.
8     Correct?
9     A. Correct.
10    Q. And Correctional Officers are free to buy
11    whatever duty belt they want.
12    Is that right?
13    A. Correct.
14    Q. And you bought yours, I believe, from ████
15    A. Correct.
16    Q. Is that right?
17    A. Yes.
18    Q. And that's a vendor for whom you don't need to be
19    military or law enforcement to buy from?
20    A. Not to my knowledge.
21    Q. And in terms of a requirement, the only pertinent
22    requirement regarding a duty belt --- let me ask it
23    this way.
24    Have you ever seen a policy requiring you to put
25    on a duty belt ██████████████████████?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     A. Not that I recall, no.

2     Q. And there is a requirement, however, that the

3     keys be affixed to a Correctional Officer's person by

4     two points.

5     Correct?

6     A. Yes.

7     Q. ████████████████████████████████████

   ██ ████████████████████████████.

9     Correct?

10    A. Correct.

11    Q. And your belt alone with nothing attached would

12    go through the metal detector.

13    Is that right?

14    ATTORNEY ELKIN:

15    Objection.  Mischaracterizes his

16    testimony.  I think he's testified there are a lot of

17    things attached to it.

18    JUDGE:

19    I think he's asking a hypothetical

20    question about what the duty belt by itself would have

21    been, would do in a metal detector.

22    Is that right, Mr. Vallacher?

23    ATTORNEY VALLACHER:

24    That's right, Your Honor.

25    JUDGE:

146

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
1    Okay.  I understand.  The objection's
2      overruled.
3    THE WITNESS:
4    The duty belt without any attachments,
5      just to be clear?
6    BY ATTORNEY VALLACHER:
7    Q. Yes.
8    A. That's correct.
9    Q. It would go through the metal ---?
10   A. The metal detector.  It would go through, yes.
11   Q. So ostensibly you could wear that from the other
12     side of the metal detector?
13   A. Through the metal detector into the prison, yes.
14   Q. Okay.
15   And you don't put on a duty belt if you're
16     working ███████████.
17   Is that right?
18   A. Correct.
19   Q. And putting on the duty belt would take less than
20     a minute.
21   Right?
22   A. Yes.
23   Q. And belt keepers, you were asked about those a
24     little bit.
25   Do you remember that?
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       A. Yes.

2       Q. And just to be clear, those are also not required

3       by the BOP.

4    Correct?

5       A. Correct.

6       Q. And they're not issued by the BOP.

7    Correct?

8       A. Correct.

9       Q. So you asked about the 24-hours posts what

10      equipment you get from the officer that you're

11      relieving.

12   Do you recall that?

13      A. Yes.

14      Q. And I think you said, quote, typically handcuffs.

15      A. Yes.

16      Q. What do you mean typically?

17      A. I don't recall if it's required to have the

18      handcuffs on your person or not.  As I said

19      previously, I believe that it was something that was

20      trying to be implemented and, you know, encouraged for

21      staff to carry their handcuffs on them because it's

22      unsafe for staff to carry --- to not carry handcuffs.

23      Q. Okay.

24   But you don't recall whether that was the policy?

25      A. I don't recall, no.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1       Q. Okay.

2   And you know, it has been 22 months since you

3       worked at FCI Otisville.

4   Correct?

5       A. Correct.

6       Q. Okay.   Understandable.

7   So you were asked a question about if you're

8       assigned to a 24 hours housing post day watch, what

9       time do you clear the metal detector in the front

10      lobby?  Do you remember that question?

11      A. Yes.

12      Q. And I think you said ████████████.

13      A. Yes.

14      Q. That's pretty precise.   I'm wondering how

15      that ---.

16  ATTORNEY ELKIN:

17  Objection.

18  JUDGE:

19  Overruled.

20      BY ATTORNEY VALLACHER:

21      Q. So do you remember during the deposition what

22      time you told me that you walked into the front lobby

23      for that post for a --- I'm sorry.  ████████████

████  ████████████████████, do you remember what you said?

25      A. I believe it was ████████████
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1      Q. Okay.
 2   Just to be clear, for morning watch?
 3      A. Excuse me?
 4      Q. For morning watch.
 5      A. Oh, I'm sorry.  For morning watch, ████████
 6   ████    .
 7      Q. Okay.
 8   And if you --- and I asked if you walk in at that
 9      time, you know --- I'll ask you now, when would you
10      typically arrive at your post?
11      A. Between ████████████████    .
12      Q. Okay.
13   And is that true that it's usually about 15
14      minutes early?
15      A. Correct.
16      Q. Okay.
17   And so going through the ██████████████████
18   ██    ████████████████████    ?
19      A. Approximately.
20      Q. And the line to be screened-in varies.
21      A. Correct.
22      Q. It could take ████████████████    person in that
23   line to be processed through screening?
24      A. Possibly, yes.
25      Q. Well, when you say possible, are you saying that
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      that's not your understanding?
2      A. No, that is my understanding.
3      Q. And I think you were also asked a lot of
4      questions about Lieutenants being in the front lobby.
5   Do you remember those?
6      A. Yes.
7      Q. Lieutenants, you know, in the front lobby saying
8      oh, don't come this early.
9   Do you remember that type of question?
10     A. Yes.
11     Q. Lieutenants in the front lobby saying you should
12     submit overtime.  You're here too early.
13  Do you remember that?
14     A. Yes.
15     Q. Okay.
16  But there's typically no Lieutenant in the front
17     lobby.
18  Correct?
19     A. Unless they're --- not assigned, but unless
20     they're coming onto shifts, yes.
21     Q. Okay.
22  So there's no Lieutenant posted to the front?
23     A. Not posted, correct.
24     Q. I see.
25     A. But if they were relief, as I would be, there

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1    would be a Lieutenant present.

2    Q. I see.

3    So if they happen to be coming in at the time?

4    A. Correct.  Yes.

5    Q. Okay.

6    And I think that on Direct you testified that

7    you're required to be on post with pertinent

8    information and required equipment by the start of

9    your shift.

10   Do you recall that?

11   A. Could you repeat that question, please?

12   Q. Yes.  So I believe that you testified on Direct

13   that you were required to be on your post with

14   pertinent information and required equipment by the

15   start of your shift?

16   A. Correct.

17   Q. Okay.

18   On a 24-hour post, do you know --- and I think

19   you said you'd be subject to discipline if you were

20   not.

21   Is that right?

22   A. If I were not what exactly?

23   Q. If you were not on post with pertinent

24   information and required equipment by the start of

25   your shift?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. Correct.

2    Q. Okay.

3    On a 24-hour post, do you know of any instance in

4       which someone has been disciplined for not receiving

5       equipment before the start of their shift?

6    A. Not that I recall.

7    Q. And on 24-hour post, do you know of any instance

8       in which someone has been disciplined for not

9       receiving pertinent information before the start of

10      their shift?

11   A. Not that I recall.

12   Q. And we've seen post orders, and, you know, I'd be

13      happy to pull them up again, but, you know, we've gone

14      through them.  Just say the word and I'll pull it up.

15   Can you point me to where in any of them it

16      requires you to receive equipment before the start of

17      your shift?

18   A. I don't recall that, no.

19   Q. So you can't?

20   A. I can't.

21   Q. And looking at the same post orders, can you

22      point me to anywhere in them that requires you to

23      receive pertinent information before the start of your

24      shift?

25   A. I can't recall.

153

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Okay.

2   So you can't?

3      A. I can't.

4      Q. And I think you were asked some questions about

5      the equipment exchange process.

6   Do you remember those?

7      A. Yes.

8      Q. And you said that you walk into the ████████████

9      and then go to the ████████████ to complete the shift

10     exchange.

11     A. Correct.

12     Q. And that ████████████ has doors.

13  Right?

14     A. Correct.

15     Q. And those doors have locks?

16     A. Correct.

17     Q. Have you ever used those locks?

18     A. When I'm leaving the office, yes.

19     Q. Okay.

20  What about to perform an exchange?

21     A. Never.

22     Q. And why is that?

23     A. I just wouldn't feel comfortable securing myself

24     in an isolated area.

25     Q. Okay.

154
Trial
Kathy Aitken, et al. v. USA                                3/13/2023

```
 1    You'd feel more comfortable if the door was open
 2      to the housing unit?
 3      A. I suppose.
 4      Q. Okay.
 5    And is that a matter of preference?  The
 6      Correction Officers can decide whether to close that
 7      door and lock it?
 8      A. I don't recall.  I don't know if that's
 9      preference or requirement.
10      Q. Okay.
11    You were also asked what proper relief includes.
12    Do you remember that?
13      A. Yeah.
14      Q. And you were asked what information do you expect
15      to receive from the outgoing officer.
16    Do you recall that?
17      A. Yes.
18      Q. And the first item you mentioned was how many
19      inmates are in the base count.
20    Do you recall that?
21      A. Yes.
22      Q. That would also be information available in
23      ███████.
24    Correct?
25      A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And the second item you mentioned was whether
2    ████████████████████████████████████████████.
3      A. Yes.
4      Q. That would also go in ██████████.
5    Correct?
6      A. It should.
7      Q. Okay.
8    And if an ████████████████████, that was
9      another item that you said would be exchanged
10     verbally.
11   Correct?
12     A. Yes.
13     Q. And that would also go on ██████████, and I
14     imagine a host of other places.
15   Correct?
16     A. I don't know if an ████████████████████
██     ████████████████████, but, I mean, that should
18     definitely --- that's pertinent information, in my
19     opinion.
20     Q. And so pertinent information is actually what is
21     required to be put on ██████████.
22   Correct?
23     A. I would say that it's pertinent in passing on the
24     information and communicating it.
25     A. Yes.

156

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Yes.  But there's also a requirement to put
2      permanent information on ████████ .
3   Correct?
4      A. Yes.
5      Q. And another item you gave was ████████████
██      ██████████ , that you would pass that on verbally.
7   Correct?
8      A. Yes.
9      Q. And that would also be reflected on ████████ .
10     A. Yes.
11     Q. Right?
12  And the final item you gave was any pertinent
13     information throughout the shift, which, as we just
14     discussed, should also go on ██████ .
15     A. Yes.
16     Q. And to your knowledge, Otisville started using
17     ████████ in approximately 2015.
18  Correct?
19     A. Correct.
20     Q. And ████████ would also have the results of bar
21     taps.
22     A. Yes.  With in addition to that, a bar tap form
23     was also required.
24     Q. Okay.
25  And ████████ would also have the results of

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      counts?

2      A. Yes.

3      Q. And it would have the results of rounds?

4      A. Yes.

5      Q. And what are rounds?

6      A. Rounds are an inspection of all areas and the

7      complete security check of all inmates ---

8      Q. Okay.

9      A. --- and fire and security.

10     Q. And ███████ would also have the results of an

11     area search?

12     A. Yes.

13     Q. And the results of a shakedown?

14     A. Yes.

15     Q. And if there were a fight in the unit?

16     A. Yes.

17     Q. And if there was hard contraband like a cell

18     phone or a weapon?

19     A. Yes.  The fight would have to be written in them.

20     And there isn't any category in ███████ that says it

21     makes we're in a fight.  And the officer, you have to

22     rely on them to type that information in themselves.

23     Q. Right.  That would be pertinent information?

24     A. Correct.

25     Q. And so they should put that on ███████?

158

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Correct.

2      Q. All right.

3    So you were also asked --- I believe, on Direct,

4      you testified that on various posts you conduct a

5      joint inventory of equipment.

6    Do you recall that?

7      A. Yes.

8    ATTORNEY VALLACHER:

9    Okay.  So I want to pull up Plaintiffs

10     Exhibit 13.

11                           ---

12   (Whereupon, Plaintiff's Exhibit PLX-13,

13   SHU#1 Officer Specific Post Orders

14   (2019), was marked for identification.)

15                           ---

16     BY ATTORNEY VALLACHER:

17     Q. And what does this document appear to be?

18     A. Are you referring to the SHU-1 post orders?

19     Q. Yes.

20     A. Okay.

21     Q. And do you recognize this document?

22     A. Yes.

23   ATTORNEY VALLACHER:

24   Okay.

25   I believe it's not yet been admitted, so

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

        1      I would like to move this time.

        2    ATTORNEY ELKIN:

        3    No objection.

        4    JUDGE:

        5    It's admitted.

        6                              ---

        7    (Whereupon, Plaintiff's Exhibit PLX-13,

        8    SHU#1 Officer Specific Post Orders

        9    (2019), was admitted.)

       10                              ---

       11    BY ATTORNEY VALLACHER:

       12    Q. So if we look at page 105, do you see where it

       13    says ██████████

       14    A. Yes.

       15    Q. And that's the beginning of the morning watch

       16    officer's post.

       17    Correct?

       18    A. Yes.

       19    Q. And I'm wondering if it's anywhere in that ██████

       ██  ████████.  You see where it says at the very bottom,

       21    none of these activities are to take place until the

       22    evening watch officer is relieved?  Do you see that?

       23    A. Yes.

       24    Q. And then the next sentence there says it should

       25    be noted that not all of the above will be

160

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1     accomplished by or before the institution count.
2     A. Yes.
3     Q. Do you have any reason to believe that this post
4     order is lying in some way?
5     ATTORNEY VALLACHER:
6     Objection.  Vague.
7     JUDGE:
8     Overruled.
9     THE WITNESS:
10    No.
11     BY ATTORNEY VALLACHER:
12     Q. Okay.
13    And then at page 205, which, frustratingly, is
14     not the next page.  Page 205, do you see where it says
15     at ████████
16     A. Yes.
17     Q. It says pass on keys and equipment to the
18     relieving officer.  Once properly relieved, your tour
19     of duty ends and you will depart the institution.
20    Do you see that?
21     A. Yes.
22     Q. Do you see any requirement there for a joint
23     inventory?
24     A. No.
25    ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1    So I'm going to turn to PLX-7, which I
 2       believe has already been admitted.
 3                          ---
 4    (Whereupon, Plaintiff's Exhibit PLX-7,
 5    Control Center 1 Specific Post Orders
 6    (2019), was marked for identification.)
 7                          ---
 8    THE WITNESS:
 9    Which one?
10       BY ATTORNEY VALLACHER:
11       Q. Plaintiff's Exhibit 7.
12    ATTORNEY ELKIN:
13    It has not been admitted, Your Honor.
14    JUDGE:
15    It hasn't been admitted yet.
16    ATTORNEY VALLACHER:
17    Okay.
18       BY ATTORNEY VALLACHER:
19       Q. In that case, let's turn to PLX-7 and get
20       foundation built.
21    Do you have it front of you?
22       A. Yes, sir.
23       Q. Do you recognize this document?
24       A. Yes.
25       Q. What is it?
```

162
Trial
Kathy Aitken, et al. v. USA                          3/13/2023

1    A. The control one post, excuse me, post orders.
2    Q. Okay.
3  And so here, ██████████ it says report to the
4    control center.  Receive ---.
5    A. I'm sorry.  You haven't put it into evidence.
6  ATTORNEY VALLACHER:
7  Oh, that's right.  I'm sorry.  At this
8    time, the Defendant would like to move Plaintiff's
9    Exhibit 7 into evidence.
10 ATTORNEY ELKIN:
11 No objection, Your Honor.
12 JUDGE:
13 It's admitted.
14                        ---
15 (Whereupon, Plaintiff's Exhibit PLX-7,
16 Control Center 1 Specific Post Orders
17 (2019), was admitted.)
18                        ---
19 BY ATTORNEY VALLACHER:
20   Q. So with ██████████, you see where it says report
21   to the control center, receive equipment from the
22   evening watch officer, and assume responsibility for
23   the post?
24   A. Yes.
25   Q. Okay.

Trial
Kathy Aitken, et al. v. USA                                3/13/2023

1    And then at that point it says ████████████

██      ████████████████████████████████████

██      ██████

4    Do you see that?

5      A. Yes.

6      Q. And then, I guess, two more sentences down, it

7    says make a physical check of all equipment.

8      A. Yes.

9      Q. This sentence takes place after the sentence

10    telling you to assume responsibility for the post.

11    Correct?

12      A. Correct.

13      Q. And then if we go to page two of seven, you see

14    where it says ████?

15      A. Yes.

16      Q. It instructs to close all log books at ████.

17    Right?

18      A. Yes.

19      Q. And at ████████  once properly relieved, your

20    tour duty ends.  Depart the institution.

21      A. Yes.

22      Q. Do you have any reason to believe that there's

23    some unwritten requirement here regarding a joint

24    inventory?

25      A. No.

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1    Q. And if you're working a 24-hour post, there's no
2    need to get equipment or anything from control.
3    Correct?
4    A. Correct.
5    Q. And on the walk across the compound, ███████████
██    ████████████████████████████████████████
██    ████████████████████████████████████████████?
8    A. Correct.
9    Q. And that equipment is vital to you performing
10   your job.
11   Correct?
12   A. Yes.
13   Q. You were a member of the union at FCI Otisville.
14   Correct?
15   A. Yes.
16   Q. And in fact, you were a union steward for a
17   period of time.
18   Correct?
19   A. Yes.
20   Q. And as such, you attended some labor management
21   relations meeting?
22   A. Yes.
23   Q. What are those meetings?
24   A. Labor management relations are meetings between
25   the union and management to resolve any issues or

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    bring forth any discrepancies with any issues in the
2    institution.
3        Q. Okay.
4    So it would be to resolve issues between
5    employees and management.
6    Is that right?
7        A. Yes.  One of the issues, yes.
8        Q. Okay.
9    And you don't remember the union ever advocating
10    for time clocks in those meetings.
11    Correct?
12        A. I don't recall.  I don't.
13        Q. And during your deposition, do you remember we
14    discussed the camera system at FCI Otisville?
15        A. Yes.
16        Q. And you said that there was a camera issue at
17    some point between 2016 to 2019.
18    Do you remember that?
19        A. Yes.
20        Q. But to be clear, when there's talk of a camera
21    issue at FCI Otisville, we're talking about the
22    ability to record, not to see.
23    Is that correct?
24        A. Correct.
25        Q. So at all times, control officers could at least

166

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      see the cameras with a live view?

2     ATTORNEY ELKIN:

3     Objection.  Foundation.

4     JUDGE:

5     Overruled.  Overruled.  You can answer

6       the question.

7     THE WITNESS:

8     Most of them.  Sometimes there were

9       discrepancies with the cameras.  And if there were, it

10      would be noted.

11     BY ATTORNEY VALLACHER:

12      Q. Okay.

13    So let's go to your definition on page 43.  Let

14      me know when you're there.

15      A. I have it in front of me.

16      Q. And at line six, the question is, but to your

17      knowledge, at all points, control officers could at

18      least see the cameras with like a live view.  Answer,

19      correct.

20    Did I read that correctly?

21      A. Yes.

22      Q. And right now you're a correctional worker.

23    Is that right?

24      A. Correct.

25      Q. And you're not a Correctional Officer?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Correct.

2      Q. Okay.

3    What's the difference?

4      A. The difference being the department that I work

5      in.  I work in trust fund as a Materials Handler

6      Supervisor.  So the schedule is a little different and

7      I don't work 24 hours shifts as Correctional Officers

8      do.

9      Q. Okay.

10   Any other differences come to mind?

11     A. Not to my knowledge.

12     Q. And you would agree that Correctional Officers

13     are generally trusted to do the right thing?

14     A. Yes.

15     Q. And that would include showing up for their shift

16     on time?

17     A. Yes.

18     Q. And the front lobby officer does not log or

19     report people for coming in late.

20   Correct?

21     A. Correct.

22     Q. And there's also typically no Lieutenant in the

23     front lobby.

24     A. Correct.

25     Q. And I believe that you testified that you worked

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    every 24-hour post at FCI Otisville?

2    A. Correct.

3    Q. And those posts would be under the same position

4    description?

5    Correct?  Your position description doesn't

6    change, depending on the post?

7    A. Correct.

8    Q. And that would include front lobby officer?

9    A. Correct.

10    Q. ███████████?

11    A. Yes.

12    Q. Control center?

13    A. Yes.

14    Q. And perimeter?

15    A. Yes.

16    Q. And to be clear, ████████████████

    ██     ███████████████████████

    ██     ████████████████████.

19    Correct?

20    A. Correct, yes.

21    Q. And those posts are, to be clear, still

22    Correctional Officer posts?

23    A. Yes.

24    Q. And Correctional Officers do not correct inmate

25    misbehaviors themselves, but pass the information off

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1      to housing unit officers to correct it.

2   Is that right?

3      A. Which officers are you ---?

4      Q. Control one.

5      A. Control one?

6      Q. Yes.

7      A. In some circumstances, not all.

8      Q. In what circumstances would a control one officer

9      on post be correcting an inmate's misbehavior

10     directly?

11     A. So for example, if --- ████████████████████

████  ██████████████████████████████████████████████████

████  ████████████████████████████████████████

████  ████████████████    ████████████████████████████

████  ██████████████████████████████████████████

16     Q. Okay.

17     A. ██████████████████████████████████

████  ████████████████████████████████████████████

████  ██████████████████████    We had called the unit officer

20     and said, hey, these inmates are doing this.  We're

21     observing them on the monitor.

22     Q. So you were working control at that time?

23     A. Yes.

24     Q. But you don't remember which, if it was one or

25     two?

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1      A. I don't recall which position.

2      Q. Okay.

3    And the control one and two, they have a lot of

4      overlap.

5    Right?  They can assist each other?

6      A. Control --- yes, they assist each other.  But two

7      mainly assist one, yes.

8      Q. Okay.

9    ████████████████████████████████████

     ██  █████████████████████████████████████████

     ██  █████████████████

12   Right?

13     A. No.

14     Q. You phoned the housing unit and then the housing

15     officer issued the correction?

16     A. That's correct.

17     Q. Okay.

18   And likewise, perimeter officers would also have

19     another officer do the actual corrections, if they saw

20     an inmate misbehaving?

21     A. Yes.

22     Q. In your current role as not a Correctional

23     Officer, would you still be required to pat search

24     somebody if there was something suspicious about them

25     and you happen to be walking in the compound?

171

Trial

Kathy Aitken, et al. v. USA                    3/13/2023

1      A. Yes.

2      Q. Okay.

3    So in fact, it'd be fair to say that all staff

4      are required to do that, whether they're Correctional

5      Officers or not.

6      A. That's correct.

7      Q. Okay.

8    You've been a hospital officer.

9    Is that right?

10     A. Are you referring to BPT, the basic prisoner

11     transporter also?

12     Q. Yes.  The one that requires ---

13     A. Yes.

14     Q. --- BPT training.

15     A. Correct, yes.

16     Q. And what's the proper name for that post, so I

17     don't ---?

18     A. Basic --- well, I believe on the roster it might

19     be, it's either hospital or medical escort.  But for

20     the position description, it's basic prisoner

21     transport.

22     Q. Okay.

23    But you served as a hospital officer?

24     A. Yes.

25     Q. Correct?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

172

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1        A. Correct.
2        Q. And the hospital officer provides security for
3     inmates that are admitted to a hospital or have a
4     scheduled procedure?
5        A. Correct.
6        Q. In the hospital, Correctional Officers do not
7     have access to [REDACTED]
8   Correct?
9        A. Right.
10       Q. Because there's no [REDACTED] at the hospital,
11    it's especially important to verbally pass along
12    information to the outside hospital officer relieving
13    you?
14       A. Correct.
15       Q. And I think that you indicated that you would
16    perform the equipment exchange first and then the
17    information exchange.
18   Do you recall that?
19       A. Yes.
20       Q. But you don't --- to be clear, you don't know
21    whether that sequence, instead of simultaneously
22    whether that sequence is specified by any policy or
23    any other document.
24       A. Correct.  I don't recall that.
25       Q. You also have not been instructed to perform them
```

173

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      sequentially.

2      Correct?

3        A. Not my recollection, no.

4        Q. In fact, it's possible to conduct an information

5      exchange and an equipment exchange at the same time.

6      Correct?

7        A. It's possible, but I prefer not to.

8        Q. Right.

9      It's your preference not to?

10       A. It's my preference.

11       Q. Understood.

12     And the time it takes you to get into the

13     ████████████████████████████████████████████████

       ██    ████████████████████████████?

15       A. From the ████████████████████████████████?

16       Q. From --- oh, sorry.  From walking into the A1

17     lobby to get all the way to having foot on the

18     compound.

19       A. I would say that takes approximately ██████████.

20       Q. So let's go to page 112 of the deposition.

21     JUDGE:

22     For the record, 112, the deposition?

23     ATTORNEY VALLACHER:

24     Of the deposition.  Thank you.

25       BY ATTORNEY VALLACHER:

174

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       Q. So line four.  See where it says question, yeah.

2       So I think we're talking about a morning watch post.

3       I think were using GA.  Do you know what time or if

4       you want to give a range, you know, typically, you are

5       done with the compound sally port and you're on the

6       compound?  Answer, boy, possibly maybe around ███████

███ ████████████████ .  Around that time.  I'm not sure.

8       Question, what do you mean by that?  Answer, by the

9       time you get inside the compound?  Question, yeah.

10      Answer, yeah.  Approximately I would say between ████

███  ████████████████ .

12      Did I read that correctly?

13      A. Yes.

14      Q. So one thing we did not talk about today was the

15      ███████ .

16      And to get into the --- so what is ███████████ ?

17      A. ████████████████████████████ .

18      Q. Okay.

19      ████████████████████████████████ .

20      A. Correct.  ████████████████████████████ .

21      Q. Okay.

22      And ███████████████████████████████████████

███  ████████████████████████████ ?

24      A. Yes.

25      Q. ████████████████████████████ ?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. Yes.
 2      Q. ███████████████████████████████████
        ████████████████████████████████████████
        ███████████ .
 5   Correct?
 6      A. Approximately.
 7      Q. And if there were ever inmates in that hallway, a
 8   counselor would be supervising them.
 9   Correct?
10      A. Yes.
11      Q. ████████████████████████████████████
        ██████████████ ?
13      A. Yes.
14      Q. ████████████████████████████████
        ████████████
16      A. Yes.
17      Q. You were asked questions about when counts
18   occurred.
19   Do you recall that?
20      A. Yes.
21      Q. I think you said it was ████████████████
        █████████████████    ███████████████
        ████████████████████████████████████
        ██████████████████████████ .
25   Is that right?
```

Trial

Kathy Aitken, et al. v. USA                                   3/13/2023

```
 1      A. That's correct.
 2      Q. All right.
 3    Thanks for bearing with me on that.
 4      A. No problem.
 5      Q. And during all of those counts, inmates would be
 6      secured in their cells.
 7    Correct?
 8      A. They should be.  Some inmates have been on
 9      outcounts.
10      Q. Okay.
11    And an outcount means that the inmates are under
12      the supervision of somebody else at the prison?
13      A. Correct?
14      Q. Usually working at detail.
15      A. Typically, yes.
16      Q. Okay.
17    So that would be Facilities?
18      A. Yes.
19      Q. Okay.
20    And to the extent the inmates are on the
21      compound, they would also be supervised by the
22      Compound Officer?
23      A. Yes.  If it's a Lieutenant's Office outcount.
24      Q. Okay.
25    And then when it comes to the SHU, isn't it true
```

Trial
Kathy Aitken, et al. v. USA                                  3/13/2023

1      that the SHU inmates are locked in their cells ▮

▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3      A. Yes.

4      Q. And when they come out of their cells, ▮▮▮▮▮

▮       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are they not?

6      A. Yes.

7      Q. And isn't it true that inmates are never supposed

8      to be hanging out of a compound unsupervised?

9      A. Yes.

10     Q. And in fact, if inmates are in the compound, it

11     would be part of a move, recall, escort or work

12     detail?

13     A. Yes.

14     Q. In all these cases, the inmates are supervised by

15     at least Compound Officers?

16     A. Yes, they should be.

17     Q. And controlled movement is a scheduled time for

18     inmates to move from one area of the institution to

19     another.

20     Correct?

21     A. Yes.

22     Q. And it's controlled as to when the inmates are

23     going and where they're going.

24     Correct?

25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And the Compound Officer is in charge of

2      starting, monitoring and ending the moves?

3      A. Yes.

4      Q. ████████████████████████████████████████

█      ████████████?

6      A. Yes.

7      Q. And during a move, inmates have ████████████

█      ████████████████████████████████████████.

9      Correct?

10     A. Yes.

11     Q. And the move does, in fact, ████████████████

█      ████████████████?

13     A. Yes.

14     Q. And ████████████████████████████████████████

█      ████████████

16     A. Yes.

17     Q. Okay.

18     And it would be against the rules for inmates to

19     loiter on the compound?

20     A. Yes.

21     Q. And the moves are supervised by the Compound

22     Officer?

23     A. Yes.

24     Q. As are the recalls?

25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. And the Compound Officer supervises work details
 2      on the compound
 3      A. Their own, yes.  Meaning work pool assigned to
 4      Compound Officer.
 5      Q. Okay.
 6   And if there's going to be facilities work on the
 7      compound, CMS would also generally be supervising
 8      those inmates performing that work?
 9      A. Unless the inmates are on work pass.
10      Q. And what's work pass?
11      A. ███████████████████████████████████████
     ███ ██████████████████████████████  ████████
     ███ ███████████████████████████████████
     ███ ████████████████  █████████████████████████
     ███ ████████████████  ████████████████████████
     ███ ████████████████████████████████████████
     ███ █████████████████████████
18      Q. Okay.
19   Are you referring to the ██████████?
20      A. Yes.
21      Q. Okay.
22   Let's go back to JX-56.  And I believe that this
23      was already admitted and I think ---.
24   Do you have it in front of you?
25      A. Yes, I have it in front of me.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                  3/13/2023

1      Q. Go to page 20.

2   So you see paragraph 28, where it says path

3   system?

4      A. Yes.

5      Q. It says █████████████████████

█   ████████████████████████████████████

█   ████████████

8   Do you see that?

9      A. Yes.

10     Q. It says during the ██████████████

█   ███████████████████████████████████████

█   ████████████████████████████████.

13   Do you see that?

14     A. Yes.

15     Q. ████████████████████████████.

16   You see that?

17     A. Correct.

18     Q. ███████████████████████████

█   ████████████████.

20   Correct?

21     A. ██████████████████████ █

█   ████████████████████████████████████████

█   ███████████████████████.

24     Q. Right.

25     A. ████████████████████████

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                              3/13/2023

1 ████████████████████████████████  ████████
█ ████████████████████████████████████████
█ ████████████████████████████████████████
█ ████████████████████████████████

5    Q. Okay.

6    A. --- without staff supervision.

7    Q. So in that circumstance, the inmate would be ---

8    the supervising officer would reach out to the housing

9    unit officer and say I'm sending one back, right, to

10   the housing unit?

11   A. Correct.

12   Q. And that inmate would have no more than ████
█    ████████ to get there.

14   Correct?

15   A. To my understanding, yes.

16   Q. Okay.

17   And isn't it true, though, that Compound Officers

18   supervise inmates when they're walking across the

19   compound at all times, unless a detailed supervisor or

20   staff provides direct escort?

21   A. They should be.  Some exceptions might be, again,

22   work pool.  They're assigned by compound.  But

23   inmates, you know, meet their housing units by callout

24   or if they're called up to Lieutenant's Office on

25   their own.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. Okay.
 2   Let's turn to page 29.  So if we go to line 20,
 3      it says the question, and is it the case that the
 4      Compound Officer supervises inmates when they're
 5      walking across the compound at all times?  If we go to
 6      the next page, answer, typically yes.  Question, when
 7      is that not the case?
 8      A. I'm sorry.  This isn't JS-50?
 9      Q. Oh, I'm back to the deposition.  I apologize.
10      A. All right.
11      Q. I should be more clear.
12      A. I'm sorry.  So what page are you on?
13      Q. Page 29.
14      A. Okay.  I'm there.
15      Q. Okay.
16   So on line 20, the question is, and is it the
17      case that the Compound Officer supervises inmates when
18      they're walking across the compound at all times?
19      Answer is typically yes.  Question, and when is that
20      not the case?  Answer, if a detailed supervisor
21      provides or staff provides direct escort.
22   Do you see that?
23      A. Yes.
24      Q. And did I read that correctly?
25      A. Yes.
```

183
Trial
Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1       Q. And so if an inmate needs to go to get called to
 2       a specific area like health or education, they'd be
 3       required to have a staff escort.
 4   Correct?
 5       A. Yes.
 6       Q. And when inmates are not in their housing units,
 7       they can go to recreation, education, medical, work,
 8       religious services, commissary and chow?
 9       A. ███████████████████████, yes.
10       Q. And when they're on their way to those places or
11       when they're at those places, inmates would be
12       supervised by some combination of Compound Officers
13       and the staff at those places.
14   Correct?
15       A. That's correct.
16       Q. Okay.
17   And when you're walking to your morning shifts at
18       housing on the compound, there shouldn't be any
19       inmates out.
20   Correct?
21       A. What shift?
22       Q. Morning watch.
23       A. Morning watch, there shouldn't be none.
24       Q. And walking to day watch, you've seen inmates,
25       but you couldn't estimate the number of times that
```

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1    you've seen inmates.
 2  Is that right?
 3    A. That's correct.
 4    Q. And when you're walking evening watch, you've
 5    seen inmates, but you also couldn't estimate the
 6    number of times?
 7    A. I can't estimate, no.
 8    Q. And for morning watch, the requirement is that
 9    Correctional Officers must be at the housing unit at
10    ███████ .
11  Correct?
12    A. Yes.
13    Q. And at that time, the inmates are secured in
14    their cells?
15    A. Yes.
16    Q. And for evening watch, the requirement is that
17    the Correctional Officer must be at the housing unit
18    at ███████
19    A. Yes.
20    Q. And at ███████     the inmates are secured in
21    their cells?
22    A. Yes.
23    Q. And you were also asked questions about
24    Lieutenants telling you you're performing relief too
25    early.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Do you recall that?

2       A. Yes.

3       Q. And there's typically no Lieutenant in a housing

4    unit to watch you perform relief.

5    Correct?

6       A. Correct.

7       Q. Or listen to what conversations are being had

8    between the incoming officer and the outgoing officer.

9       A. Correct.

10      Q. Do you remember during your deposition I asked

11   you to tell me about any emergencies that you remember

12   since April 1st of 2016 in which you've responded to

13   an emergency before your shift?

14      A. Yes.

15      Q. And you recalled one incident?

16      A. Yes.

17      Q. And during your deposition you also remembered

18   one incident in you which responded to an emergency

19   since April 1st, 2016?

20      A. Yes.

21      Q. And it's not just Correctional Officers that are

22   required to respond to emergencies.

23   Correct?

24      A. Correct.

25      Q. It's all staff.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       A. Correct.

2       Q. So that would also be food services?

3       A. Correct.

4       Q. And educational?

5       A. Correct.

6       Q. And psychology?

7       A. Correct.

8       Q. And commissary?

9       A. Correct.

10      Q. Do you remember at any times in which you've

11      submitted for overtime compensation and it was denied?

12      A. I don't recall, no.

13      Q. And during your deposition, do you remember I

14      asked you when you first learned of the case?

15      A. I recall you asking me.  I don't recall the

16      answer.

17      Q. Okay.

18      Would it surprise you to learn that you said

19      approximately 2021?

20      A. No.

21      Q. Do you have a different understanding today?

22      A. No.

23      Q. Okay.

24      But you don't --- sitting here today, do you

25      recall when you first learned of this case?

187

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     A. I don't recall the exact time, no.

2     Q. I'd like to show you a document, if I could, to

3     refresh your recollection.

4     A. Sure.

5   JUDGE:

6   And Mr. Vallacher, I'm not sure this is

7     the proper way to refresh recollection.  The way to do

8     it is to say if I showed you such and such, would that

9     refresh your recollection.

10  ATTORNEY VALLACHER:

11  I'm getting to that.

12  JUDGE:

13  Okay.

14  ATTORNEY VALLACHER:

15  But I appreciate it.

16  JUDGE:

17  I want to make sure.

18    BY ATTORNEY VALLACHER:

19    Q. So with me, I have a request to become a party

20    Plaintiff form.  If I were to show you that and it had

21    a date on it, would that refresh your recollection?

22  ATTORNEY ELKIN:

23  Can I approach, Your Honor?

24  JUDGE:

25  Yes.

188

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

         1    ATTORNEY VALLACHER:
         2    I have copies for everybody.   Permission
         3     to approach?
         4    BY ATTORNEY VALLACHER:
         5    Q. Do you recognize this document?
         6    A. Yes.
         7    Q. What is it?
         8    A. It's a request to become a party Plaintiff.
         9    Q. Okay.
        10    Is that your handwriting on it?
        11    A. Yes.
        12    Q. Okay.
        13    And do you see the date at the top?
        14    A. It says April 9th, 2019.
        15    Q. Okay.
        16    If I were to represent that's when this document
        17     was actually filed in this case, would that surprise
        18     you in any way or does that inform you?
        19    A. No, that --- inform me, yes.
        20    Q. Okay.
        21    A. That's accurate.
        22    Q. So do you now have a different understanding of
        23     when you first started this case?
        24    A. Yes.
        25    Q. Okay.

189

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Would it be fair to say that at the time of your
2      deposition, you just didn't remember?
3      A. I didn't recall.  Correct.
4      Q. Okay.  All right.  We're done with that document.
5    So today you were asked some questions about the
6      time it took you to do certain activities.
7    Do you recall that?
8      A. Yes.
9      Q. And did you measure those times with a stopwatch?
10     A. No.
11     Q. Okay.
12   So this is more of an estimate?
13     A. Yes.
14     Q. Okay.
15   And it's been a while since you worked as a CO at
16     FCI Otisville.
17   Correct?
18     A. Yes.
19     Q. About 22 months?
20     A. Approximately.
21     Q. And right now, even though you're not a
22   Correctional Officer at FCI Danbury, you could be
23     augmented as one.
24   Correct?
25     A. Correct.

Trial

Kathy Aitken, et al. v. USA                    3/13/2023

1      Q. And in fact, you have been augmented as a

2      Correctional Officer at FCI Danbury?

3      A. I am currently for a week.

4      Q. Oh, you are?

5      A. Yes.

6      Q. Okay.

7      For what post?

8      A. For the female satellite load officer.

9      Q. Okay.

10     Did you have a firm understanding of how long

11      these activities take at FCI Danbury?

12     A. What activities?

13     Q. These, you know, exchange ---.

14     ATTORNEY ELKIN:

15     Objection, Your Honor.  Relevance.

16     JUDGE:

17     Overruled.

18     THE WITNESS:

19     Yes.

20     BY ATTORNEY VALLACHER:

21     Q. Okay.

22     And in fact, you've been augmenting in those

23      posts for 22 months.

24     Right?  Correctional officer post at FCI Danbury?

25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1   ATTORNEY VALLACHER:

 2   Okay.  If I can just have a moment to

 3     confer with my client?

 4   JUDGE:

 5   Yes.

 6                        ---

 7    (WHEREUPON, A PAUSE IN THE RECORD WAS HELD.)

 8                        ---

 9   ATTORNEY VALLACHER:

10   Okay.  I'd like to check out document

11     DX-46.

12                        ---

13   (Whereupon, Defendant's Exhibit DX-46,

14   Outside Hospital (2020), was marked for

15   identification.)

16                        ---

17    BY ATTORNEY VALLACHER:

18    Q. Do you have that binder in front of you?

19    A. Yes.

20    Q. Okay.

21   I want you to take a look.

22    A. I have it in front of me.

23    Q. Okay.

24   What does DX-46 appear to be?

25    A. Outside hospital officer.
```

192
Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Okay.
2    Do you recognize this document?
3      A. Yes.
4      Q. Okay.
5    And if you look at ███████ ---.
6    JUDGE:
7    Are you going to move it in as evidence?
8    ATTORNEY VALLACHER:
9    Oh, yes.  At this time, Defendant moves
10     DX-46 into evidence.
11   ATTORNEY ELKIN:
12   No objection, Your Honor.
13   JUDGE:
14   It's admitted.
15                        ---
16   (Whereupon, Defendant's Exhibit DX-46,
17   Outside Hospital (2020), was admitted.)
18                        ---
19   BY ATTORNEY VALLACHER:
20     Q. So at ███████ do you see where it says end
21     tour of duty?
22     A. Yes.
23     Q. It says you will be relieved by the day watch
24     officers.
25   Do you see that?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. Yes.

2    Q. Do you see where it says pass on any pertinent

3    information and equipment you have in your possession?

4    A. Yes.

5    Q. So I'm happy to pull up whatever post order you

6    want.

7    Have you seen the requirement to pass on

8    pertinent information on the post orders for the post

9    at issue in this case?

10   A. Not that I recall.  Not the word pertinent.

11   Q. Mr. Conklin, if a Correctional Officer assigned a

12   SHU forgot to do rounds, that'd be a very serious

13   problem, wouldn't it?

14   A. Yes.

15   Q. And in fact, under the standards of employee

16   conduct, that could be charged as an inattention to

17   duty or a breach of security.

18   Correct?

19   A. Yes.

20   Q. Both of which could carry penalties, which

21   include removal?

22   A. Yes.

23   Q. And Mr. Conklin, isn't it true that you have made

24   incorrect misrepresentations on Government documents?

25   ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Objection, Your Honor.  This is outside

2      the scope.  And also, if he's going to be referring to

3      something that's never been produced to us, I don't

4      think it's appropriate.  I'm not sure what he's doing

5      here.  The witness --- he can ask him if he's ever

6      been disciplined, but otherwise this is --- they're

7      using something that I've never seen.  That's just not

8      right.

9    JUDGE:

10   So credibility is always an issue, even

11     if it's outside the scope.

12   Mr. Vallacher, are you going to be

13     impeaching something the Plaintiff ---?

14   ATTORNEY VALLACHER:

15   Yes.

16   JUDGE:

17   Is it something that Plaintiff's asked

18     for?

19   ATTORNEY VALLACHER:

20   No.

21   ATTORNEY ELKIN:

22   I believe we asked for discipline on

23     this case.

24   ATTORNEY VALLACHER:

25   It's not discipline.  So under Rule 608,

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    this goes to a character witnesses, character for

2    truthfulness under 608B, specific instances of

3    conduct.  And it says, quote, but the Court may, on

4    Cross Examination, allow them to be inquired into if

5    they're probative of the character, truthfulness or

6    untruthfulness of the witness.

7    JUDGE:

8    Well, if the Plaintiff --- that's true.

9     But if the Plaintiff asked for it and you didn't

10    produce it, that's a separate problem.  That would be

11    a Rule 37 issue.

12    ATTORNEY VALLACHER:

13    Right.

14    JUDGE:

15    Did they ask you to ---?  So I'm asking

16     again.  Did they ask for it?

17    ATTORNEY ELKIN:

18    Well, we certainly asked for anything

19     that we're going to be relying on at trial.  We also

20     asked for disciplinary actions.  I'm not sure what

21     he's using right now, but if he wants to ---.

22    JUDGE:

23    Mr. Vallacher, why don't you show it to

24     Ms. Elkin.

25    ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Well, there will be no Mr. ---.
 2    JUDGE:
 3    Mr. Vallacher, why don't you show it to
 4      Ms. Elkin.
 5    ATTORNEY VALLACHER:
 6    There's no document unless he denies it
 7      because there'd be a non-collateral matter.
 8    JUDGE:
 9    Okay.  Now, I see.
10    So you're --- so you aren't going to
11      show on the documents ---?
12    ATTORNEY VALLACHER:
13    Unless he denies.
14    JUDGE:
15    You may or may not be able to impeach
16      with evidence specific incidences of conduct are not
17      --- you can't necessarily bring out intrinsic
18      evidence.  Okay.  Except for criminal conviction to
19      Rule 6, nonexpert --- not admissible for specific
20      instances when this is conduct or attack or support
21      the witness's character from truthfulness.
22    So I take it what you're going to do is
23      you're going to ask about these specific incidents,
24      but you won't have intrinsic evidence?
25    ATTORNEY VALLACHER:
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    I will not be using evidence of a

2       disciplinary record.

3    JUDGE:

4    Okay.

5    You can ask your question and then we

6       can go from there.  So the objection's overruled for

7       now.  And now pay attention to what you do.

8    ATTORNEY VALLACHER:

9    Okay.

10      BY ATTORNEY VALLACHER:

11      Q. So Mr. Conklin, isn't it true that you've made

12      incorrect misrepresentations on Government documents

13      as a Correctional Officer at FCI Otisville?

14      A. Yes.

15      Q. And as a Plaintiff, do you understand that you

16      would stand to gain monetarily if this Court were to

17      rule in your favor?

18   ATTORNEY ELKIN:

19   Objection.

20   JUDGE:

21   Overruled.

22   THE WITNESS:

23   Could you repeat the question, please?

24      BY ATTORNEY VALLACHER:

25      Q. As a Plaintiff, do you understand that you would

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     stand to gain monetarily if this Court were to rule in

2     your favor?

3     A. Yes.

4     Q. In fact, are you going to be compensated extra

5     for testifying?

6   ATTORNEY ELKIN:

7   Same objection.

8   JUDGE:

9   Overruled.  He's inquiring to his

10    credibility.

11  THE WITNESS:

12  Not to my knowledge, no.

13  ATTORNEY VALLACHER:

14  Okay.  No further questions for this

15    witness.

16  JUDGE:

17  Thank you.  Mr. Conklin, you're done.

18  ATTORNEY ELKIN:

19  Briefly, Your Honor.

20  JUDGE:

21  Oh, I'm sorry.  Redirect.

22  ATTORNEY ELKIN:

23  Yes.

24  JUDGE:

25  Proceed.

199

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1                        ---
 2               REDIRECT EXAMINATION
 3                        ---
 4     BY ATTORNEY ELKIN:
 5     Q. Mr. Conklin, have you, in your 12 years now or 13
 6     years of service at BOP ever been disciplined for
 7     anything?
 8     A. No.
 9     Q. Mr. Conklin, can a fight occur in a cell when the
10     cells are locked?
11     A. Yes, and they have.
12     Q. Okay.
13  And is there any rule against more than one
14     correctional worker supervising inmates when inmates
15     are on the compound?
16     A. No.
17     Q. And in fact, when you work compound, what is your
18     expectation if you're working compound, there's a move
19     going on during a shift change hour?  What is your
20     expectation of the Correctional Officers coming on and
21     the Correctional Officers leaving?
22     A. I would expect support from my fellow staff.
23     Q. Are you required to sign overtime slips in order
24     --- as part of the pay system at FCI Otisville?
25     A. Yes.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1      Q. And are those overtime slips maintained in the
2      Lieutenant's Office?
3      A. Yes.
4      Q. Have you ever been relieved from your post in
5      order to go and sign overtime slips during the hours
6      of the schedule shift?
7      A. Yes.
8      Q. You have?  When was that?
9      A. Yes.  I don't recall.  Some very minimal times.
10     Q. But normally what is your practice?
11     A. Normally my practice would be to sign them once
12     being relieved or incoming.
13     Q. Okay.
14   Is a duty belt --- we saw it at ---.  Is it fair
15     --- is it required by the nature of the work to wear a
16     duty belt as a Correctional Officer post that we
17     discussed, is it required by the nature of the work?
18     A. Yes.
19     Q. You were asked some questions on Cross about
20     Lieutenants being in the front lobby.
21   I think you test --- did you testify that
22     Lieutenants are sometimes coming in with you at ███,
23     well, ███████?
24     A. Yes.
25     Q. And have those Lieutenants ever said, hey, you're
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1       not supposed to be here now, you're too early?

2       A. No.

3       Q. And have you --- do you what an ID check is?

4       A. Yes.

5       Q. Do Lieutenants ever stand as part of their job in

6       the front lobby as officers are coming in to check ID?

7       A. Yes.  I've been stopped by Lieutenants to verify

8       my credentials.

9       Q. Okay.

10      And so would that be prior to the start of your

11      shift?

12      A. Yes.

13      Q. And has a Lieutenant let you just go on in even

14      though it was in your normal practice, arriving

15      approximately half an hour before your shift started,

16      after they checked your credentials?

17      A. Yes.

18      Q. You were asked some questions about ██████████

19      Do you recall that?

20      A. Yes.

21      Q. Can you immediately check ██████████ when you're

22      coming onto a shift?

23      A. No.

24      Q. And for example, when you're coming onto a ████

██  ████████ shift, what's happening at ██████████?

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    A. ███.
 2    Q. And when you're coming on to a ██████ shift,
 3    what's happening at ██████?
 4    A. ████████████
 5    Q. So as part of ensuring safety and security, is
 6    the verbal pass down on these posts required?
 7    A. Yes.
 8    Q. And I think you already testified, is it your
 9    understanding that the verbal pass down is part of
10    proper relieving?
11    A. Yes.
12    Q. I want to turn your attention to Plaintiff
13    Exhibit 13.
14    A. I have it in front of me.
15    Q. Okay.
16  So at the very top it says --- well, not the very
17    top.  Where it says ████████ relieve the evening
18    watch officer as the equipment is issued on a 24-hour
19    basis.  It says to relieve the evening watch officer
20    at ██████
21  Do you see that?
22    A. Yes.
23    Q. And if you go to the third paragraph for ████,
24    none of these activities are to take place until the
25    evening watch officer is relieved.
```

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1   Do you see that?

2      A. Yes.

3      Q. Can you relieve the evening watch officer when

4      you are coming onto a morning watch shift if he's

5      already left?

6      A. No.

7      Q. And you were asked a couple of questions about

8      --- actually, also, this is on 13.  This is the SHU

9      post order.  If you go to ███████ where it has the

10     words properly relieved.  ████████████████████████

       ██  ████████████████████████ Once properly relieved,

12     your tour of duty ends and you will depart the

13     institution.

14  As part of the proper relief in SHU, is it

15     necessary to do a joint --- I think you described it

16     as joint inventory, making sure all the equipment is

17     in the cages before the guy leaves that you're

18     relieving?

19     A. Yes, so I can be sure that I have all the

20     information and equipment.

21     Q. And can you ask ██████████ questions?

22     A. No.

23     Q. So if you had a question about something that

24     happened on the shift, where do you get the answer to

25     that question during your relief?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. From the officer.

2    ATTORNEY ELKIN:

3    I have nothing further, Your Honor.

4    JUDGE:

5    Do you have any Recross?

6    ATTORNEY ELKIN:

7    We never talked about that, Your Honor.

8      Is that going to be the process?  Is it going to be a

9      Direct, Cross, Redirect and a Recross or ---?

10   JUDGE:

11   This is your opportunity.  Do you want

12     to do a Recross?

13   ATTORNEY VALLACHER:

14   I'm happy to stay completely within the

15     scope.

16   ATTORNEY ELKIN:

17   But ---.

18   JUDGE:

19   Let's just do a Recross and Redirect.  I

20     think that will be enough.

21   ATTORNEY ELKIN:

22   Thank you, Your Honor.  Thank you, Mr.

23     Conklin.

24   THE WITNESS:

25   Thank you.

Trial

Kathy Aitken, et al. v. USA                                                3/13/2023

```
 1    JUDGE:
 2    All right.  So everybody's done with Mr.
 3      Conklin now?
 4    ATTORNEY ELKIN:
 5    Yes, Your Honor.
 6    JUDGE:
 7    All right.  Mr. Conklin, thank you, sir.
 8    THE WITNESS:
 9    Thank you, Your Honor.
10    JUDGE:
11    All right.
12    It's now after 1:00.
13    Is this a good time to break for lunch?
14    ATTORNEY ELKIN:
15    Yes, Your Honor.
16    JUDGE:
17    Okay.  Mr. Vallacher, a good lunch time?
18    ATTORNEY VALLACHER:
19    That sounds great, Your Honor.
20    JUDGE:
21    Okay.  Great.  Let's be back here at ---
22      two o'clock sound good to everybody?  All right.
23    COURT CRIER:
24    All rise.
25                              ---
```

Trial
Kathy Aitken, et al. v. USA                          3/13/2023

```
 1      (WHEREUPON, A LUNCH BREAK WAS TAKEN.)
 2                      ---
 3  COURT CRIER:
 4  All rise.  The United States Court of
 5    Federal Claims is now in session.  Judge Stephen
 6    Schwartz is presiding.
 7  JUDGE:
 8  Please be seated.  Everybody have a nice
 9    lunch?
10  ATTORNEY ELKIN:
11  Subway.
12  JUDGE:
13  Who do we have next, your Honor?
14  ATTORNEY ELKIN:
15  Your Honor, Plaintiff calls Michelle
16    Juenger.
17  JUDGE:
18  Raise your right hand.
19                      ---
20                      MICHELLE JUENGER,
21    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
22    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
23    FOLLOWS:
24                      ---
25  JUDGE:
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Ms. Elkin?

 2    ATTORNEY ELKIN:

 3    Thank you, Judge.

 4                         ---

 5                 DIRECT EXAMINATION

 6                         ---

 7    BY ATTORNEY ELKIN:

 8    Q. Ms. Juenger, can you please state your full name

 9    for the record?

10    A. Michelle Lynn Juenger.

11    Q. Juenger, okay.  And how do you spell Juenger?

12    A. J-U-E-N-G-E-R.

13    Q. Okay.

14    You were the Human Resources Manager at FCI

15    Otisville from November 2016 until at least

16    September 11, 2020, when I took your deposition.

17    Is that correct?

18    A. Correct.

19    Q. I understand you no longer work at FCI Otisville.

20    So why don't you just tell us about your BOP career

21    since September 11th, 2020.

22    A. I transferred out of FCI Otisville in December of

23    2020 and transferred to USP Thompson, Illinois as

24    their Human Resource Manager.

25    Q. So have you been the Human Resources Manager at
```

208
Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      USP Thompson since December 2020?

2      A. Yes.

3      Q. And is that currently your position?

4      A. Yes.

5      Q. Now, you started with the Bureau of Prisons in

6      2004 at FMC Rochester as a Psychiatric Practical

7      Nurse.

8    Is that correct?

9      A. Yes.

10     Q. And then after about four-and-a-half years, you

11     transferred to FCI El Reno in Oklahoma.

12     A. Yes.

13     Q. Oklahoma.  And you were the Captain Secretary

14     there.

15   Is that correct?

16     A. Yes.

17     Q. And at El Reno, you promoted from the Captain

18     Secretary to an HR Specialist.

19   Is that correct?

20     A. Yes.

21     Q. And from El Reno, you transferred to is it AFP or

22     AUSP Thompson?

23     A. It was AUSP Thompson.  It is now USP Thompson.

24     Q. Okay.

25   And what --- is USP United States Penitentiary.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1      A. Yes.

2      Q. What is AUSP?

3      A. AUSP stood for Administrative United States

4      Penitentiary.

5      Q. And you went to Thompson as HR Specialist and

6      then were promoted to HR Manager when you came to FCI

7      Otisville in 2016.

8   Is that correct?

9      A. Yes.

10     Q. Now, the United States designated you as what we

11     discussed in your deposition called a Rule 36 witness

12     to testify on its behalf with regard to topics related

13     to the Government's efforts to comply with the Fair

14     Labor Standards Act.

15   You recall that?

16     A. Yes.

17     Q. And when you testify, you understood that your

18     testimony would bind the United States with respect to

19     the covered topics.

20   Correct?

21     A. Yes.

22     Q. And at your deposition on September 11, 2020, in

23     this case, you agreed that you were competent to

24     testify on behalf of the United States about each of

25     the subtopics listed in the Deposition Notice.
```

210

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Correct?

2       A. Yes.

3       Q. And those topics included time studies or time

4    and motion studies undertaken by the United States

5    regarding activities performed by the Plaintiffs prior

6    to and after their paid shift.  You recall that.

7    Correct?

8       A. Yes.

9       Q. Another topic that you said you testified you

10   were competent to testify about was efforts Defendant

11   had undertaken to determine whether its policies and

12   practices of not paying the Plaintiff's overtime pay

13   for working overlapping shifts complied with the FLSA.

14   You agreed to be --- you were competent to testify

15   about that topic.

16   Right?

17      A. Yes.

18      Q. And you were designated to provide binding

19   testimony and agreed that you were competent to

20   testify on the guidance and advice the Defendant

21   sought, received or relied on with regard to the

22   application of the Fair Labor Standards Act and

23   related regulations of the Department of Labor and or

24   the Office of Personnel Management to the Plaintiff.

25   Can you recall that you testified you were

211

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    competent to discuss that topic?

2    Correct?

3       A. Yes.

4       Q. You were also designated to provide testimony on

5    the impact of Arbitrator Margot Newman's November 4th,

6    2012 award in FMCF Case Number 1004502 on the

7    Defendant's practices of calculating and paying FLSA

8    overtime pay to the Plaintiff.

9    You recall that?

10      A. Yes.

11      Q. And you recall that you confirmed that you were

12   competent to testify on that topic?

13      A. Yes.

14      Q. And you confirmed that you were competent to

15   testify as to all efforts Defendant has undertaken to

16   determine how much time the Plaintiffs spend from the

17   time they begin collecting their duty belt and other

18   metal equipment in the front lobby after screening the

19   equipment through the mandatory staff screening site

20   until their paid shift begins.

21   Do you recall that?

22      A. Yes.

23      Q. And you also confirmed that you were competent to

24   testify on all efforts the Defendant has undertaken to

25   determine how much time the Plaintiffs spend from the

212

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      time their paid shift ends until the time they exit
2      the secured confines of the institution and/or return
3      equipment to the control center.
4   Do you recall that?
5      A. Yes.
6      Q. And finally, you agreed that you were competent
7      to provide binding testimony on the training provided
8      by the Defendant at FCI Otisville to employees,
9      including the Plaintiffs and their supervisors,
10     concerning portal to portal issues and FLSA
11     compliance.
12  Correct?
13     A. Yes.
14     Q. As HR Manager at FCI Otisville, what were your
15     job duties?
16     A. As the HR Manager, you oversee HR Specialists
17     that work in the office, time and attendance, health
18     benefits, any type of leave, such as military leave,
19     if somebody needs a reasonable accommodation, if they
20     need a temporary job modification.
21     Q. How about --- I think you also testified that you
22     were in charge of training as well?
23     A. Yeah, training now has been taken over.  They
24     brought back EDMs.
25     Q. What is EDM?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. It's employee development.

2      Q. And you also testified, I believe, that one of

3      your job duties was to ensure that people's pay was

4      done correctly.

5      A. That's correct.

6      Q. Okay.

7    And as head of the HR human resources shop, you

8      had the ultimate responsibility to ensure FLSA

9      compliance with respect to the correctional workers'

10     pay.

11   Correct?

12     A. I wouldn't say that I have the ultimate

13     responsibility under the FLSA.  I would say I have

14     limited.

15     A. Okay.

16     Q. I'd like to hand you your deposition.  So I have

17     it somewhere.  And you recall you were under oath when

18     you provided your testimony.

19   Correct?

20     A. Correct.

21   ATTORNEY JOSHUA MOORE:

22   Your Honor, I have to object here.  This

23     deposition was given, as Ms. Elkin just pointed out,

24     in the capacity as a 30(b)(6) witness.  Ms. Juenger is

25     here in her capacity --- in her personal capacity to

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      testify to things within her personal knowledge.  So
2      regardless to what she testified in her deposition, as
3      a corporate representative, I don't think that's
4      bearing on her personal knowledge here.  She's
5      testifying in front of the Court today.  She's not
6      here as a 30(b)(6), Your Honor.
7      ATTORNEY ELKIN:
8      Your Honor, may I approach and hand you
9      a copy of the transcript?
10      BY ATTORNEY ELKIN:
11      Q. Could you turn to page 22 of the transcript?  Let
12      me know when you get there.
13      A. I'm there.
14      Q. Okay.
15      Line four.  Question, and you, as the head of the
16      HR shop, would have the ultimate responsibility to
17      ensure FLSA compliance with respect to, in this case,
18      correctional workers?  And your answer was yes.
19      A. My answer was yes.
20      A. Okay.
21      Q. Okay.
22      I read that correctly.
23      Correct?
24      A. Yes.
25      Q. You agree that you had no formal training with

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    respect to the FLSA.

2    Correct?

3    A. We are not given formal training, no.

4    Q. You looked through the complaint in this case

5    sometime after it was filed in April of 2019.

6    Is that correct?

7    A. Can you repeat that?

8    Q. You looked through the complaint.  I don't know

9    that you read the whole thing, but you looked through

10    the complaint in this case sometime after it was filed

11    in 2019.

12    Is that correct?

13    A. Yes.

14    Q. You agree that the complaint, once you looked at

15    it, did not prompt the agency to investigate whether

16    any of the pre-shift or post-shift activities that

17    Plaintiffs alleged they performed were, in fact,

18    compensable.

19    Correct.

20    A. Did I testify to that?

21    Q. No.  You don't need to be looking at your --- I

22    don't know if you're still looking at your deposition

23    transcript.  You don't need to.

24    A. If you can repeat that, please.

25    Q. Sure.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1   You agree that once you looked at the complaint,
2       that the complaint did not prompt the agency to
3       investigate whether any of the pre-shift or post-shift
4       activities that Plaintiffs alleged they performed were
5       in fact compensable?
6       A. At the time, yes, I did say yes to that question.
7       Q. That you did not investigate.
8   Correct?
9       A. I did not investigate, no.
10      Q. And no one at the agency, as far as you know,
11      investigated whether the pre-shift and post-shift
12      activities were, in fact, compensable, once that
13      complaint was filed.
14  Correct?
15  ATTORNEY JOSHUA MOORE:
16  Your Honor, objection.  She hasn't
17      established a foundation whether or not Ms. Juenger
18      knows that anyone else in the agency has researched
19      whether or not, you know, the question that she's
20      asking.
21  JUDGE:
22  Ms. Juenger can testify to her own
23      knowledge.
24  ATTORNEY JOSHUA MOORE:
25  Thank you, Your Honor.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    BY ATTORNEY ELKIN:

2    Q. To your knowledge, as far as you know, is anybody

3    else in the agency investigate whether any pre-shift

4    or post-shift activities that were alleged in the

5    complaint were, in fact, compensable after the

6    complaint was filed?

7    A. I can't speak for the agency.  I can speak for

8    FCI Otisville.

9    Q. And you don't know of anybody.

10   Correct?

11   A. I'm not aware.  I was not.

12   Q. Okay.

13   As the person who was in charge of FLSA

14   compliance, you knew that Correctional Officers were

15   required to come in prior to their shift in order to

16   be on their post by the start of their shift.

17   Correct?

18   A. Yes.

19   Q. You knew that officers had to clear the screening

20   site prior to the scheduled shift.

21   Correct?

22   A. Everyone clears it, yes.

23   Q. And you knew that they had to collect their duty

24   belts, clips, chits, chains from the x-ray belt after

25   they cleared the upright metal detector.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1   Correct?
2     A. Yes.  Everyone does that.
3     Q. And you knew that they would have to don their
4     duty belts before receiving any equipment like keys or
5     radios.
6   Correct?
7     A. You would put your belts on, yes.
8     Q. And you were aware that officers are expected to
9     and do correct inmate behavior on the way to their
10    assigned posts after they clear the A1 sally port and
11    the control center sally port.
12  Correct?
13    A. Everyone would correct inmate behavior.
14    Q. So that includes the Correctional Officers.
15  Correct?
16    A. Yes, everyone.
17    Q. Okay.
18  Well, if I'm a visitor, would you expect a
19    visitor to correct inmate behavior on the way to a
20    post?
21    A. Well, inmates know better than to be speaking
22    with visitors.
23    Q. Okay.
24  So you would agree that visitors are not expected
25    to correct inmate behavior, inmate infractions.
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Correct?
 2    A. No.  A visitor would not, no.
 3    Q. And you were aware that Correctional Officers
 4    interacted with inmates and answered questions as they
 5    walked to their posts.
 6    Correct?
 7    A. They can, yes.
 8    Q. And you agree that inmates frequently stop
 9    correctional staff to ask questions as staff walk to
10    their post and assignments.
11    Correct?
12    A. I don't know how frequently, no, because it would
13    depend on if there was a move going on.
14    Q. But you would agree that inmates frequently stop
15    correctional staff if they're out?  Obviously if
16    they're locked up █████, they're not going to be
17    out asking questions.  But if there are moves going
18    on, you would agree that inmates frequently stop
19    correctional staff to ask questions as staff walk to
20    their posts and assignments.
21    Correct?
22    A. Yeah.  It's not unlike them to stop a staff
23    member and ask their question.
24    Q. Again, frequently stopped.  That was your
25    testimony in the deposition.  I can show you.  We want
```

220
Trial
Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1    to look at page 28 starting at line 8.  Okay.  And
 2    they also, the inmates, interact --- sorry.  The
 3    officers interact with inmates.
 4  Correct?  An inmate might have a question about
 5    who knows what.  When does pill line open?  You know,
 6    I'm not going to main line, whatever.  They've got a
 7    question and they were expected to interact as well to
 8    the extent?  Answer, yes.  Anybody would be when
 9    you're walking across the compound.  Question, well, I
10    wouldn't be as a visitor.
11  Right?  But you're saying the Correctional
12    Officers?  Answer, I would hope they wouldn't approach
13    you as a visitor.  No.  Question, okay.  Answer, but
14    any staff members, yes, they do stop us frequently and
15    ask questions.  Yes.  That was your testimony in 2020.
16  Correct?
17    A. Yes, it was.
18    Q. And you testified truthfully at that deposition.
19  Correct?
20    A. Yes.
21    Q. You also knew that Correctional Officers were
22    required to be prepared to respond to body alarms on
23    the way to their post prior to their shift and on
24    their way back to the A1 lobby after their shift.
25  Correct?
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. Yes, all staff would be.
 2      Q. You were also aware, as HR Manager in charge of
 3      FLSA compliance, that the oncoming officer and the
 4      offgoing officer on 24-hour housing units actually
 5      engaged in an information, sorry, equipment and
 6      information exchange prior to the offgoing officer
 7      departing the post and the oncoming officer assuming
 8      his duties.
 9   Correct?
10      A. They would swap equipment, yes.
11      Q. And no one in the agency, not the Warden or
12      anyone else in the BOP asked you, as the person in
13      charge of FSLA compliance at Otisville, to explore
14      whether any of the time that we just talked about was
15      compensable work.
16   Correct?
17      A. No, they have not.
18      Q. Okay.
19   And you never, on your own, as HR Manager, did
20      any kind of study about whether any of the time that
21      we just talked about was compensable work time?
22      A. No, I did not.
23      Q. And you do not know of any person before your
24      arrival at FCI Otisville who conducted a study about
25      whether any of the time that we just discussed was
```

222

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    compensable work time?

2    A. I am not aware of that, no.

3    Q. And you agree that the officers do these things,

4    exchange information, equipment, and walk across the

5    compound, interact with inmates, they do these things

6    after their shifts as well, once they're relieved on

7    their post.

8    Correct?

9    A. They would have to walk back across the compound

10   to get out, yes.

11   Q. And they would have to engage in an exchange with

12   the oncoming officer before they can leave their post

13   one of the 24-hour posts.

14   Correct?

15   A. Yes.

16   Q. And you never --- you agree that you never did

17   any studies about whether the post-shift time where

18   officers are being relieved and they make their way

19   out of the institution and may interact with

20   inmates --- no studies were done about whether any of

21   that post-shift time is compensable.

22   Correct?

23   ATTORNEY JOSHUA MOORE:

24   Objection, Your Honor.  She asking the

25   witness whether she did any studies or if she knows

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      whether any studies were done there?

2    JUDGE:

3    Can you ask the question again?

4      BY ATTORNEY ELKIN:

5      Q. You agree that you never did any studies?  Should

6      I continue asking it?

7    ATTORNEY JOSHUA MOORE:

8    My apologies, Your Honor.  I withdraw

9      the objection.

10   JUDGE:

11   Okay.  Withdrawn.  Go ahead.

12   THE WITNESS:

13   I have never done any studies, no.

14     BY ATTORNEY ELKIN:

15     Q. And no one in BOP asked you to do any studies

16     about whether the post-shift time, any of it was

17     compensable.

18   Correct?

19     A. I have not been asked, no.

20     Q. And as far as you know, none of your

21     predecessors, as far as you know, were asked to do any

22     studies about whether the post-shift time was

23     compensable?

24     A. I am not aware of any of them being asked, no.

25     Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1    And if there were any studies, presumably they'd
2      be in some kind of file in the HR Office?
3      A. I would assume, yes.
4      Q. And you've never, in your history at FCI
5      Otisville from 2016 to 2020, came across any such
6      files.
7    Correct?
8      A. I personally did no, no.
9      Q. And you don't know of anybody else who did
10     either.
11   Correct?
12     A. I wouldn't have that knowledge, no.
13     Q. Prior to this lawsuit being filed in 2019, did
14     the Bureau of Prisons seek any advice from attorneys
15     about whether any of the pre-shifts or post-shift time
16     should be paid time?
17   ATTORNEY JOSHUA MOORE:
18   Objection, Your Honor.  Personal
19     knowledge.
20     BY ATTORNEY ELKIN:
21     Q. As far as you know.
22   JUDGE:
23   She can answer as far as her personal
24     knowledge.
25   ATTORNEY JOSHUA MOORE:

225

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1     Okay.  I just wanted to make sure that
2       was clear.  She asked whether the Bureau of Prisons
3       had done any analysis.  Again, she's testifying to her
4       personal knowledge.  I just want to make that clear.
5     JUDGE:
6     Okay.
7     THE WITNESS:
8     To my personal knowledge, no.
9       BY ATTORNEY ELKIN:
10      Q. And when you testified in your deposition, you
11      were testifying on behalf of the Government.
12    Correct?  And you agreed you were competent to
13      testify on behalf of the Government?
14      A. I was testifying on what I know from FCI
15      Otisville.
16      Q. On behalf of the Government, to bind the
17      Government.
18    Correct?
19    ATTORNEY JOSHUA MOORE:
20    Your Honor, objection as to legal
21      conclusion.  Whether or not she was testifying to
22      buying the Government or not, that's a legal matter.
23      I don't think --- she's not a lawyer.
24    JUDGE:
25      That objection is sustained.  You can't

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     testify to the legal effects of her testimony.
2     BY ATTORNEY ELKIN:
3     Q. Just so I'm clear, the Government designated you
4     as its 30(b)(6) witness to testify about the topics
5     that went over at the beginning of the testimony
6     today.
7     Correct?
8     A. I was asked to testify, yes.
9     Q. Okay.
10    About those topics?
11    A. About the FLSA, yes.
12    Q. And as far as you know, prior to this lawsuit
13    being filed, did anybody, as far as you know, from the
14    BOP or FCI Otisville seek any advice from any
15    attorneys about whether the pre-shift and post-shift
16    activities should be paid time?
17    A. Did I seek any or anybody at Otisville?
18    Q. You already answered that you did not seek
19    advice.
20    A. I am not aware of what anyone before myself did.
21    Q. And while you were there, while you were at the
22    Otisville as the HR Manager with the ultimate
23    responsibility for FLSA compliance, are you aware of
24    anybody else at Otisville seeking advice from counsel
25    about whether the pay practices were compliant with

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    the FLSA?

2    ATTORNEY JOSHUA MOORE:

3    Your Honor, I have to object.  This

4        calls for privilege information.  Any communications

5        occurring between, you know, client, counsel, and Ms.

6        Juenger or anybody else, that notice of it would be

7        attorney client privilege.

8    ATTORNEY ELKIN:

9    And Your Honor, they need to confirm on

10       the record that they are not relying on an advice of

11       counsel defense to liquidated damages.  Otherwise, I

12       get to ask all sorts of questions about what questions

13       they asked, when they ask them.  I mean, right now

14       she's testified that she doesn't know if anybody asked

15       any questions of an attorney.  But I need confirmation

16       from the United States that they're not going to have

17       an advice of counsel defense to liquidated damages.

18   JUDGE:

19   I'm terrible at remembering name.

20   Can you remind me?

21   ATTORNEY JOSHUA MOORE:

22   Josh Moore, Your Honor.

23   JUDGE:

24   Mr. Moore, do you have a response?

25   ATTORNEY JOSHUA MOORE:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    You Honor, we are not intending to put

2      on any evidence regarding any privileged

3      communications in this case.

4    ATTORNEY ELKIN:

5    That's not the question.

6    JUDGE:

7    I don't think that's the question.

8    ATTORNEY ELKIN:

9    I need confirmation that the United

10     States is not going to be relying on an advice of

11     counsel defense to liquidate damages.  In other words

12     --- well, that's the question, but ---.

13   JUDGE:

14   Well, Mr. Moore, is the United States

15     going to be relying on an advice of counsel defense or

16     against liquidated damages?

17   ATTORNEY JOSHUA MOORE:

18   Your Honor, actually we will withdraw

19     the objection privilege here.  She can ask the

20     question.

21   ATTORNEY ELKIN:

22   Good.  Okay.  So thank you.

23     BY ATTORNEY ELKIN:

24   Q. Ms. Juenger, did anybody, as far as you know,

25     from the BOP, seek advice from any attorneys about

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    whether any of the pre-shift or post-shift activities
2    are compensable?
3    A. Anybody from the BOP in general or FCI Otisville?
4    Q. Anybody that you know of.  Anybody at BOP in
5    general or the FCI at Otisville, did they seek advice
6    from counsel about whether the pay practices with
7    respect to the pre and post-shift duties are
8    compensable?
9    A. Again, I can't speak for everybody.  I only
10   worked at Otisville.  I can't speak for the other BOP
11   institutions.  So at Otisville, I am not aware of
12   anybody doing that.  But again, I wouldn't have any
13   knowledge of those that were HR Manager before myself.
14   Q. But as far as you know, you never come across an
15   opinion letter from an attorney in your files at FCI
16   Otisville about whether any of the pre and post-shift
17   activities are compensable.
18   Correct?
19   ATTORNEY JOSHUA MOORE:
20   Objection, Your Honor.  That is
21   certainly privileged information, right, whether she
22   actually came across any legal memorandum from any
23   attorney within BOP.
24   ATTORNEY ELKIN:
25   About whether this stuff is compensable.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     They even ---.

2    JUDGE:

3    Overruled.  Overruled.  You can answer

4      the question.

5    THE WITNESS:

6    I have not seen anything, no.

7      BY ATTORNEY ELKIN:

8      Q. Okay.

9    And prior to the lawsuit being filed, are you

10     aware of anybody from BOP seeking advice of counsel

11     about whether or not its pay practices regarding the

12     pre and post-shift duties are compliant with the FLSA?

13   ATTORNEY JOSHUA MOORE:

14   Objection, Your Honor.  Same objection.

15   JUDGE:

16   You withdrew an earlier objection to

17     this line of questioning and we've been going down

18     this route for a while.

19   What's the difference between this

20     objection and the objection you withdrew?

21   ATTORNEY JOSHUA MOORE:

22   Withdrew the objection to the prior

23     question.  I have to have the prior question repeated,

24     Your Honor, to fully answer the Court's question.  I

25     just wanted to put on the record, and I know the Court

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    has overruled previous objection by the Government,
 2    that the Government is objecting to the disclosure of
 3    privileged information by Ms. Juenger.
 4  JUDGE:
 5  Could the Court Reporter read back the
 6    question that was subject to the original privilege
 7    objection that was withdrawn?  Obviously this
 8    privileged stuff is extremely important.
 9  ATTORNEY JOSHUA MOORE:
10  Your Honor, may I just speak briefly?
11  ATTORNEY ELKIN:
12  She can't type and read at the same
13    time.
14  ATTORNEY VALLACHER:
15  This may resolve the issue, Your Honor.
16    I think the Government is not going to put on an
17    affirmative defense of advice of counsel in this case.
18  ATTORNEY ELKIN:
19  I can move on, Your Honor.
20  JUDGE:
21  Okay.  If that settles things for Ms.
22    Elkin's purposes, let's move on.
23  ATTORNEY JOSHUA MOORE:
24  Thank you, Your Honor.  My apologies.
25  JUDGE:
```

232

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

```
1    It's all right.  You represent your
2    clients.
3    BY ATTORNEY ELKIN:
4    Q. You agree that as far as you know, the Bureau of
5    Prison did not seek advice from OPM about whether the
6    pre-shift and post-shift activities performed by the
7    Correctional Officers are compensable?
8    A. Again, to the best of my knowledge --- I can only
9    testify for what I know.  I can't speak for everyone
10   else.
11   Q. I'm asking what you know.
12   As far as you know ---?
13   A. I am not aware of who or anyone that has reached
14   out to OPM.  I wouldn't have that information.
15   Q. Okay.
16   Well, you certainly never reached out.  As the
17   person in charge of compliance with the FLSA at FCI
18   Otisville, you never went to OPM to ask advice about
19   whether the pre-shift and post-shift activities
20   performed by the Correctional Officers are
21   compensable.
22   Correct?
23   A. I myself did not, no.
24   Q. And as you say here today, you're not aware of
25   anybody else at FCI Otisville or otherwise going to
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    OPM to ask for advice about whether the pre-shift and
2    post-shift activities at FCI Otisville are compensable
3    for the Correctional Officers?
4    A. Not that I'm aware of.  But I, again, can't speak
5    for those that were HRMs before me.
6    Q. As the person responsible for FLSA compliance for
7    the Correctional Officers at FCI Otisville, you never
8    reviewed any Court Decision to determine whether the
9    agency's decision not to pay the workers for going
10    through the screening, collecting equipment, donning
11    the duty belt, walking down the compound, engaging in
12    information and equipment exchange, you never reviewed
13    any Court Decisions to determine or question whether
14    the prison's practice of not paying these workers was
15    legal?
16    A. I did not, no.
17    Q. And you're not aware of anybody else who reviewed
18    Court Decisions that you did here today.
19    Correct?
20    A. Again, I can't speak for other people.
21    Q. I'm not asking to speak for other people.  I'm
22    asking you to tell me whether you're aware of
23    whether ---?
24    A. I am not aware of anyone, no.
25    Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

 1    So it's fair to say that you never reviewed the
 2    10th Circuit's Decision in Aguilar versus MTC issued
 3    in 2020 prior to your deposition?
 4    A. I did not, no.
 5    Q. And you've never reviewed the Missouri Appellate
 6    Court's Decision in Hootselle versus Missouri
 7    Department of Corrections.
 8    Correct?
 9    ATTORNEY JOSHUA MOORE:
10    Objection, Your Honor.  Asked and
11      answered.  She just said she didn't review any legal
12      Decisions.
13    How can you ---?
14    JUDGE:
15    Overruled.  Overruled.
16    THE WITNESS:
17    I did not, no.
18    BY ATTORNEY ELKIN:
19    Q. And at the time of your deposition, the Missouri
20    Supreme Court had not yet issued a Decision.  Is it
21    fair to say that you never reviewed that Decision when
22    the Supreme Court of Missouri issued it?
23    A. I did not review it, no.
24    Q. And you were never in any meetings with other
25    bureau employees, management officials where they

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1    discussed any of these court cases and questioned

2    whether FCI Otisville should be paying the

3    correctional workers for pre and post-shift time that

4    we discussed?

5    A. No meetings, no.

6    Q. And no one, as far as you know, at FCI Otisville

7    reviewed any arbitration Decisions from other BOP

8    institutions in which Arbitrators held that all time

9    on agency premises, including walking and conducting

10   shift exchanges and collecting equipment is

11   compensable?

12   A. I myself did not, no.

13   Q. And you're not aware of anybody else.

14   Correct?

15   A. I'm not aware of it, but I can't, again, speak

16   for them.

17   Q. I'm not asking you to speak for them.

18   I'm asking you to tell me whether you're aware of

19   any other BOP employees who read any of these

20   Decisions in these arbitration cases?

21   A. I am not.

22   Q. So I believe I showed you what Plaintiff marked

23   as Plaintiff's Exhibit 48.

24   Do you have it in front of you?

25   ATTORNEY JOSHUA MOORE:

236

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    What exhibit?

2    ATTORNEY ELKIN:

3    Sorry.

4    What?

5    ATTORNEY JOSHUA MOORE:

6    What exhibit?

7    ATTORNEY ELKIN:

8    Forty-eight (48).

9    ATTORNEY JOSHUA MOORE:

10    Plaintiff's 48?

11    THE WITNESS:

12    Yes.

13    JUDGE:

14    I'm sorry, Ms. Elkin.  This is the video

15      footage.

16    ATTORNEY ELKIN:

17    Okay.  Again, I'm sorry.  It's going to

18      be 49.

19                         ---

20      (Whereupon, Plaintiff's Exhibit PLX-49,

21      Arbitrator's Decision in AFGE Local 420

22      and FCC Hazleton, FMCS No. 13-01944, was

23      marked for identification.)

24                         ---

25    JUDGE:

237

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Arbitrator's Decision?

2    ATTORNEY ELKIN:

3    Yes.

4      BY ATTORNEY ELKIN:

5      Q. Do you have that in front of you?

6      A. I do.

7      Q. So it's a Decision from FCC Hazleton from 2010 in

8      which the Arbitrator found that any time officers are

9      on the premises where they could be required to

10     interact with inmates, they should be paid.

11   Did you read that Decision?

12   JUDGE:

13   I'm sorry.  This isn't in evidence yet.

14     Do you need to ---

15   ATTORNEY ELKIN:

16   Oh, sorry.

17   JUDGE:

18   --- mark it into evidence?

19     BY ATTORNEY ELKIN:

20     Q. Do you recall that --- you recognize this

21     Decision as something I presented to you to review in

22     your deposition?

23     A. I do.

24   ATTORNEY ELKIN:

25   Okay.  I'd like to move Plaintiff's

Trial

Kathy Aitken, et al. v. USA                                     3/13/2023

1      Exhibit 49 into evidence.

2    ATTORNEY JOSHUA MOORE:

3    Objection.  I'm not sure what evidence

4      we're trying to put in here.  I'm not sure what the

5      relevance is to the witness who just testified.  I

6      don't know if she testified she has personal knowledge

7      of this decision.  So I guess I'm just objecting on

8      foundation and relevance grounds.

9    JUDGE:

10   Well, on foundation, she's testified

11     that she recognized it.

12   And on relevance, what's the relevance?

13   ATTORNEY ELKIN:

14   I think when we're going for a negative

15     that they did not do anything to establish good faith

16     or objective reasonableness, I can sort of put on

17     things that are relevant to what they didn't do.

18   JUDGE:

19   Objection's overruled.  It's admitted.

20                         ---

21     (Whereupon, Plaintiff's Exhibit PLX-49,

22     Arbitrator's Decision in AFGE Local 420

23     and FCC Hazleton, FMCS No. 13-01944, was

24     admitted.)

25                         ---

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

239

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    BY ATTORNEY ELKIN:
2    Q. So looking at Plaintiff's Exhibit 49, you did not
3    review this Arbitrator's Decision at FCC Hazleton in
4    which he found that any time the officers were on the
5    premises where they could be required to interact with
6    inmates, they should be paid?
7    A. I did not.
8    ATTORNEY ELKIN:
9    And I'd like to also show you
10   Plaintiff's Exhibit 51, which is in that same binder.
11                        ---
12   (Whereupon, Plaintiff's Exhibit PLX-51,
13   Arbitrator's Decision in AFGE Local 525
14   and FCI Williamsburg, FMCS No. 08-56529,
15   was marked for identification.)
16                        ---
17   BY ATTORNEY ELKIN:
18   Q. This is an arbitration Decision between AFGE
19   Local 525 and FCI Williamsburg.
20   Do you recall that I showed you this Arbitrator's
21   Decision during your deposition?
22   A. Yes.
23   ATTORNEY ELKIN:
24   Okay.  Your Honor, I'd like to move to
25   admit 51.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    ATTORNEY JOSHUA MOORE:
 2    Same objection on relevance.  Although,
 3      I assume the Court's going to rule the same way.  But
 4      I would just say this Decision from 2012 from a prison
 5      in South Carolina, Ms. Juenger is the HR Manager at
 6      Otisville.  I'll also note this Decision was prior to
 7      integrity staffing.  So I guess I'm not sure the
 8      relevance it has to the case today.
 9    JUDGE:
10    I take it, Ms. Elkin, that you weren't
11      trying to admit this as part of --- as a kind of legal
12      argument here.  You're trying to get it admitted as
13      evidence of what the FCI Otisville staff did or didn't
14      do as part of FLSA compliance.
15    ATTORNEY ELKIN:
16    That's exactly right, Your Honor.
17    JUDGE:
18    Okay.  And it's admitted for that
19      limited purpose.
20                              ---
21    (Whereupon, Plaintiff's Exhibit PLX-51,
22    Arbitrator's Decision in AFGE Local 525
23    and FCI Williamsburg, FMCS No. 08-56529,
24    was admitted.)
25                              ---
```

241

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    ATTORNEY JOSHUA MOORE:

2    Thank you, Your Honor.

3        BY ATTORNEY ELKIN:

4        Q. So you never reviewed this Decision at FCI

5        Williamsburg from 2012, in which the Arbitrator held

6        that donning the duty belt after screening was the

7        first compensable activity in the continuous workday?

8        A. I did not, no.

9    JUDGE:

10   And simply, just to make perfectly

11       clear, my point about the limitation of Exhibit 51

12       applies equally to Exhibit 49.

13   ATTORNEY ELKIN:

14   Forty-nine (49)?

15   JUDGE:

16   Forty-nine (49).  The previous one that

17       you moved into evidence.  The Hazleton exhibit.

18   ATTORNEY ELKIN:

19   Understood.

20       BY ATTORNEY ELKIN:

21       Q. And your answer would be the same about another

22       decision that Hazleton had issued five years after the

23       2010 one that was marked as Exhibit 48.  You never

24       considered that Decision in any of the pay

25       determinations you made at FCI Otisville.

242

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Correct?

2      A. No, I did not.

3    ATTORNEY ELKIN:

4    And if you look to Plaintiff's Exhibit

5      50.

6                              ---

7    (Whereupon, Plaintiff's Exhibit PLX-50,

8    Arbitrator's Decision in AFGE Local 1034

9    and USP Pollock, FMCS No. 06-56529, was

10   marked for identification.)

11                             ---

12   ATTORNEY JOSHUA MOORE:

13   I'm sorry.  What exhibit?

14   ATTORNEY ELKIN:

15   Fifty (50).

16   ATTORNEY JOSHUA MOORE:

17   Fifty 50.

18     BY ATTORNEY ELKIN:

19     Q. Do you recall that I provided you a copy of this

20   Arbitrator's Decision at --- I believe it was at

21   Pollock --- at the Federal Bureau of Prisons at USC

22   Pollock?  Do you recall I provided you with a copy of

23   this Arbitrator's Decision during your deposition back

24   in 2020?

25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    ATTORNEY ELKIN:

2    And you never reviewed --- oh, sorry.

3      I'd like to move to admit for the limited purpose of

4      making the record Exhibit 50.

5    ATTORNEY JOSHUA MOORE:

6    No objection.

7    JUDGE:

8    So ordered, admitted.  Admitted for that

9      limited purpose can be discussed.

10                           ---

11   (Whereupon, Plaintiff's Exhibit PLX-50,

12   Arbitrator's Decision in AFGE Local 1034

13   and USP Pollock, FMCS No. 06-56529, was

14   admitted.)

15                           ---

16     BY ATTORNEY ELKIN:

17     Q. And you never reviewed this Arbitrator's Decision

18     at Exhibit 50 where the Arbitrator concluded that

19     because CO Correctional Officers must maintain

20     alertness and vigilance when they're inside the secure

21     confines of institution, that all that time is

22     compensable as they're inside?

23     A. I did not review it, no.

24     Q. And as the person in charge of the FLSA

25     compliance, you never reviewed any Department of Labor

244

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1    regulations to determine whether FCI Otisville pay
2    practices are compliant with the Fair Labor Standards
3    Act?
4    A. No, I did not.
5    Q. And you're not aware of anybody else reviewing
6    them as well.
7    Correct?
8    A. I'm not aware of it, no.
9    Q. And your answer would be the same with respect to
10   OPM regulations?  You never looked at the OPM
11   regulations to make a determination about whether any
12   of the pre-shift or post-shift work should be credited
13   and paid?
14   A. I personally did not, no.
15   Q. And nobody ordered you to, not the Warden, no
16   Regional Director.  Nobody asked you to do that.
17   Correct?
18   A. No.
19   Q. And you're not aware of anybody reviewing the OPM
20   regulations to determine whether this work time ---
21   whether this time should be considered work and
22   compensable?
23   A. I am not.
24   Q. So you never reviewed the OPM regulation at
25   550.112(a)(1) that says an employee shall be

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1      compensated for every minute of regular overtime work?

2      A. I did not, no.

3      ATTORNEY JOSHUA MOORE:

4      Objection, Your Honor.

5      Is that --- were you quoting from the

6      regulation or were you summarizing it?  I guess 106,

7      whether she was ---.

8      ATTORNEY ELKIN:

9      I was quoting from it.

10     ATTORNEY JOSHUA MOORE:

11     Quoting from the whole regulation, the

12     whole sentence.  Is there another --- there's not

13     another sentence?

14     JUDGE:

15     Overruled.

16     BY ATTORNEY ELKIN:

17     Q. You never reviewed or considered the Department

18     of Labor, sorry, Labor Wage and Hour Advisory

19     Memorandum issued in 2006 to determine whether the pre

20     and post-shift activities at issue in this case,

21     whether any of those activities are compensable.

22     Correct?

23     A. No, I did not.

24     ATTORNEY ELKIN:

25     And you recall that I showed you the

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Wage and Hour Memorandum, which is Plaintiff's Exhibit
 2      52, ---
 3                              ---
 4      (Whereupon, Plaintiff's Exhibit PLX-52,
 5      Wage and Hour Advisory Memo 2006-2 Re:
 6      Alvarez, was marked for identification.)
 7                              ---
 8      BY ATTORNEY ELKIN:
 9      Q. --- at your deposition.
10      Correct?
11      A. Yes.
12      ATTORNEY ELKIN:
13      Your Honor, I move to admit Plaintiff's
14        Exhibit 52, for the limited purpose of establishing a
15        factual record.
16      ATTORNEY JOSHUA MOORE:
17      No objection, Your Honor.
18      JUDGE:
19      Exhibit 52 is admitted.
20                              ---
21      (Whereupon, Plaintiff's Exhibit PLX-52,
22      Wage and Hour Advisory Memo 2006-2 Re:
23      Alvarez, was admitted.)
24                              ---
25      BY ATTORNEY ELKIN:
```

247

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. You didn't consider the part of this Department
2      of Labor Wage and Hour Memorandum that says --- it's
3      on page four at the bottom of the page, last full
4      sentence.  Since like donning, obtaining the gear as
5      opposed to waiting obtain the gear, quote, is always
6      essential if the worker is to do his job, end quote,
7      compensable day starts once the employee has obtained
8      the gear required to be stored on the premises by
9      taking an item out of a bin, a locker, or another
10     designated area, storage area.
11   You didn't review that part?
12     A. I did not, no.
13     Q. And you didn't review the part in the first
14     paragraph under de minimis activity, last sentence of
15     the first paragraph.  The Supreme Court reversed and
16     remanded to the First Circuit for further proceedings,
17     concluding that, quote, during a continuous workday,
18     any walking time that occurs after the beginning of
19     the employee's first principle activity and before the
20     end of the employee's last principle activity is
21     excluded from the Portal Act and thus is compensable.
22   Did you review that?
23     A. No, I did not.
24     Q. And as a person in charge of FLSA compliance, you
25     never had any training or you never heard of a

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     continuous workday.

2     Is that correct?

3         A. Correct.  I have not received training, no.

4         Q. And you've never heard of it?

5         A. No.

6         Q. Agree that --- you do agree that the Agency does

7     not pay for any of the pre-shift or post-shift

8     activities that we discussed, coming in early, getting

9     the duty belt on, walking, exchanging information,

10    etcetera?  It's not scheduled into the eight-hour

11    shift.

12    Correct?

13        A. No, it's not.

14        Q. And you agree that even if the Correctional

15    Officers asked to be paid for the time that they spent

16    collecting and donning the duty belt, walking to the

17    post, engaging on post exchange, walking out of the

18    institution, FCI Otisville would not approve such

19    overtime because the Agency does not believe that the

20    time is work.

21    Is that correct?

22    ATTORNEY JOSHUA MOORE:

23    Objection as to what the Agency

24    believes.  She testifies to her ---.

25    JUDGE:

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    She can testify to her knowledge.

2    ATTORNEY JOSHUA MOORE:

3    Thank you.

4    JUDGE:

5    So overruled to that extent.

6    THE WITNESS:

7    The officers would be compensated if it

8        went beyond their time.  Like if they were, got

9        relieved late.

10    BY ATTORNEY ELKIN:

11    Q. Okay.

12    A. They would ask for overtime.

13    Q. Okay.

14    So other than, let's say an officer's shift ends

15        at ████████████    and his relief doesn't get there to

16        ████████, that example.

17    So in that example, is it your understanding that

18        the officer could ask to be paid for those 15 minutes

19        of extra time?

20    A. Yes.

21    Q. Okay.

22    Going back to a date --- a regular day when the

23        officer's relief arrives prior to the start of the

24        shift on the post, you would agree that if a

25        Correctional Officer ---?  Let me back up.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    The Correctional Officer arrives at ████████ at

2      the front lobby to start the screening process for an

3      ████████ shift, and he does all the things he needs

4      to do, and he does his relief on the post, he's not

5      going to get paid for any of the time between ████████

6 █  ████████

7    Correct?

8      A. No, he's not.

9      Q. Okay.

10   And at the end of the shift, if the officer's

11     release for a day watch shift arrives ████████ and

12     the officer makes his way out of the institution,

13     let's say by ████████, he's not going to get paid

14     for anything beyond ████

15   Correct?

16     A. Well, if it's past the seven-and-a-half minutes,

17     he can ask for that 15 minutes of overtime.

18     Q. That's only if his relief arrives after ████

19 █  ████████

20   Correct?

21     A. If he's relieved late, yes.  If it's on his own,

22     no.

23     Q. Okay.

24   So if the officer's relief, he just finished his

25     day watch shift, and the officer's relief arrives

251

Trial

Kathy Aitken, et al. v. USA                                 3/13/2023

```
 1      before the ████████████ time, and the officer,
 2      let's say, departs the post at exactly ██████ but
 3      it takes them seven-and-a-half minutes to get out of
 4      the institution, get popped through the doors, maybe
 5      correct some inmates on his way out.  I don't know.
 6      It takes more than seven-and-a-half minutes.  You
 7      would not pay for that time, for the time that, you
 8      being the agency, the time that from when he left his
 9      post until he got out of the secure confines of the
10      institution.
11      Correct?
12      JUDGE:
13      Is there any objection?
14      ATTORNEY JOSHUA MOORE:
15      Yes, Your Honor.  I object.  She's
16      asking whether you, the agency.  Clearly, Ms. Juenger
17      is not the agency.  She's Ms. Juenger.  So she can ask
18      whether Ms. Juenger knows if the agency would pay, but
19      she can't ask whether the agency can pay, would pay
20      for that.
21      JUDGE:
22      Ms. Juenger can testify to her knowledge
23      on the subject.
24      ATTORNEY JOSHUA MOORE:
25      Thank you, Your Honor.
```

252

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
1    THE WITNESS:
2    In my personal opinion, again, that
3       would be --- the officer would need to speak with his
4       supervisor and let him know if he did get stopped, or,
5       you know, to correct an inmate, or if there was an
6       emergency, he would have to let his supervisor know as
7       to why he's getting out of there late.
8    BY ATTORNEY ELKIN:
9       Q. Okay.
10   So is it your testimony now that the agency is
11      supposed to be paying these officers, if they're
12      relieved from their post at ███████████  they're
13      supposed to be paid for the time that it takes to walk
14      out of the institution, even if they're not stopped,
15      walk out of the institution at that time before the
16      seven-and-a-half minutes?
17      A. No.
18   ATTORNEY JOSHUA MOORE:
19   Object.  I was going to object, Your
20      Honor, for based on a legal conclusion.  Whether or
21      not the agency's required to do so, legal conclusion
22      that the Court is going to make today, so ---.
23   JUDGE:
24   That's true.  She can't testify to legal
25      conclusions.  She can testify to her knowledge and to
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     the agency's practices for compensation.

2     ATTORNEY JOSHUA MOORE:

3     Thank you.

4      BY ATTORNEY ELKIN:

5      Q. And so with respect to that time when the

6      officer's relieved on his post at the end of his

7      shift, it's the agency's practice not to pay for the

8      walk time out of the institution.

9     Correct?

10    ATTORNEY JOSHUA MOORE:

11    Objection, Your Honor.  Again, she's not

12     testifying for the agency.  She's testifying of her

13     personal knowledge.

14    ATTORNEY ELKIN:

15    Well, she testified that she was in

16     charge of pay and timekeeping.  So she should have

17     personal knowledge about this.

18    JUDGE:

19    Yeah, I kind of agree.  It seems like

20     you're objecting to her having to testify about her

21     knowledge.

22    Is it more than that?  Is there

23     something about these objections that I'm not

24     understanding, Mr. Moore?

25    ATTORNEY JOSHUA MOORE:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Well, no, Your Honor.  She's asking Ms.
2      Juenger whether or not the agency does something, does
3      the agency pay.  She's not the agency.  All I'm just
4      asking is that the Court limit her responses to her
5      personal knowledge of whether or not, you know, the
6      agency would compensate or whether or not she believes
7      based on her knowledge and information that the agency
8      would compensate these Correctional Officers for, you
9      know, pre or post-shift work.
10   JUDGE:
11   I understand that that's what you're
12     asking, isn't it?
13   ATTORNEY ELKIN:
14   Yes, but I --- she --- you know, if I
15     were asking the janitor at the institution what the
16     practice was, I don't think that's an appropriate
17     question for the janitor.  But for this person who is
18     in charge --- I think she testified at the beginning
19     of today that she was in charge of timekeeping.  She's
20     in charge of making sure they get paid correctly.
21   She should know, based on her job in her
22     official capacity, whether the agency would pay these
23     officers if they're relieved from the post at exact
24     end of their shift, ███████████████, et cetera,
25     if they get paid for the walk to the outside the

Trial

Kathy Aitken, et al. v. USA                           3/13/2023

1    secured confines of institution.

2    JUDGE:

3    Mr. Moore, it kind of feels like you're

4       objecting to the foundation of her knowledge about the

5       agency's practice, but I think Ms. Elkin has laid that

6       foundation by going over her role as HR Manager.

7    Is there more foundation that you think

8       needs to be laid?

9    ATTORNEY JOSHUA MOORE:

10   Your Honor, I think --- so yes, Your

11      Honor.  I am objecting to foundation, whether or not

12      she has personal knowledge about that.  I also object

13      on whether or not --- I think in Ms. Elkin's question

14      she asked whether or not the officers were paid

15      correctly.  And so that's vague and ambiguous what it

16      means to be paid correctly.

17   JUDGE:

18   Well, let's do this one topic at a time.

19      That question's --- that ship has sailed.  Now we're

20      talking about the foundation issue.  You keep on

21      objecting to these questions about Ms. Juenger's

22      knowledge about the agency practice.

23   What exactly is your foundational

24      objection to that?

25   ATTORNEY JOSHUA MOORE:

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1    Your Honor, sorry.  Let me collect my
 2       thoughts for a second.  I think that when I heard the
 3       question that was asked, it was whether or not that
 4       the agency believes that these officers should be paid
 5       correctly.  And I think that goes --- it sounds like
 6       she's asking Ms. Juenger as a 30(b)(6) witness, as
 7       someone who's representing the agency, does the agency
 8       believe X or Y.
 9    But Ms. Juenger's not here to testify to
10       what the agency believes.  She can testify as to her
11       personal knowledge of whether or not based on her
12       experience as an HR Manager, you know, she believes
13       that ---.
14    JUDGE:
15    This is going on much too long.  I will
16       take --- you can lodge a continuous ---.
17    ATTORNEY JOSHUA MOORE:
18    I can just --- yeah.  Continuing
19       objection.
20    JUDGE:
21    You can lodge a continuing objection, if
22       you'd like.
23    ATTORNEY JOSHUA MOORE:
24    Thank you, Your Honor.
25    JUDGE:
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    But given the foundation and given the
2       nature of the questions so far, I will take these
3       questions as asking the witness about her personal
4       knowledge, about her former practices, and about the
5       agency's practices.
6    Do you want to leave --- you know, given
7       that, do you want to lodge a continuous ---?
8    ATTORNEY JOSHUA MOORE:
9    I'll lodge a continuing objection.
10   JUDGE:
11   Okay.
12   ATTORNEY JOSHUA MOORE:
13   Thank you.
14   JUDGE:
15   Ms. Elkin, does that give you what you
16       need to move on?
17   ATTORNEY JOSHUA MOORE:
18   I appreciate it and I will continue.  I
19       will move on.  But I would also point out that she was
20       designated and she agreed that she was confident to
21       testify on behalf of the agency, on behalf of the
22       Government and I --- you know ---.
23   JUDGE:
24   In the interest of moving on, to the
25       extent that there's disagreement about the precise

258

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     significance of her testimony with regard to the
2     United States, as she had been a 30(b)(6) witness,
3     deal with it in the post-trial briefing.  Obviously,
4     30(b)(6) is about depositions.  It's not about trial
5     testimony, or at least as I understand that.  If you
6     two want to --- if the parties want to argue about
7     precisely how Ms. Juenger's testimony today binds the
8     United States or not, you can address it in post-trial
9     briefing.
10    But for now, we've got a continuing
11    objection of her ability to testify about, I guess,
12    her knowledge of the agency.  And we've got a pending
13    issue about whether or not she's binding the United
14    States right now.
15    ATTORNEY JOSHUA MOORE:
16    Thank you.
17    JUDGE:
18    With that, we can go on?
19    ATTORNEY ELKIN:
20    Yes, Your Honor.
21    JUDGE:
22    Okay.  Ms. Elkin, go ahead.
23    BY ATTORNEY ELKIN:
24    Q. So I don't know that I ever got an answer to the
25    question of this.

Trial

Kathy Aitken, et al. v. USA                                                    3/13/2023

1    Let me ask my colleague.

2    Ms. Juenger if in my hypothetical, the officer is

3      relieved from a housing unit post at ████████████ .

4      or ████████ . after the end of a day watch and he's

5      walking out of the institution, you would agree that

6      that walk, the agency does not consider compensable

7      work time and the agency does not pay for that time.

8    Correct?

9      A. Yes.

10     Q. And you would agree that, as far as you know, the

11     agency has done nothing to ensure that its refusal to

12     credit any of its pre-shift or post-shift activities

13     as work time was in compliance with the FLSA?

14   ATTORNEY JOSHUA MOORE:

15   Objection, Your Honor.  Calls for a

16     legal conclusion.

17   JUDGE:

18   Can you restate the question?

19   ATTORNEY ELKIN:

20   I mean, I would want ---.

21   JUDGE:

22   Can you restate it again?

23   ATTORNEY ELKIN:

24   Yes, I would like to do that.

25     BY ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     Q. You would agree that the agency did nothing to
2        ensure that its refusal to credit any of these pre and
3        post-shift activities that we discussed as work time
4        was in compliance with the FLSA?
5     JUDGE:
6     Objection overruled.  I don't think
7        she's asking about a legal conclusion.  I think she's
8        asking about compliance measures.
9     THE WITNESS:
10    So?
11    JUDGE:
12    So you can answer.
13    THE WITNESS:
14    Okay.  In my personal knowledge, again,
15       I can't say what other Bureau of Prisons have done.  I
16       mean, things have been implemented at Otisville since
17       some of these rulings to change things.
18    BY ATTORNEY ELKIN:
19    Q. I'm asking you whether you personally know of
20       anything that has been done to ensure that the --- to
21       credit any of this pre and post-shift time is
22       compensable work time, the time that I've been talking
23       about; putting on the duty belt, walking to the post,
24       exchanging information and equipment, walking back to
25       the outside the secured conflicts.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Has the agency done anything to ensure that its
 2       refusal to credit the time of work is compliant with
 3       the FLSA?
 4       A. Again, I can't speak for the whole agency, but
 5       for Otisville, I am not aware of anything.
 6       Q. Okay.
 7    Now, you are responsible for making sure that the
 8       supervisors and timekeepers follow the time and
 9       attendance reporting handbook.
10    Is that correct?
11       A. Yes.
12    ATTORNEY ELKIN:
13    Okay.  I'm going to show you Joint
14       Exhibit 4
15                              ---
16    (Whereupon, Joint Exhibit JX-4, Time and
17    Attendance Reporting Handbook, was
18    marked for identification.)
19                              ---
20       BY ATTORNEY ELKIN:
21       Q. Let me know when you get there.
22    Ms. Juenger, do you have Joint Exhibit 4 in front
23       of you?
24       A. Yes.
25       Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Do you recognize this document as the time and
2       attendance employee handbook for Bureau of Prisons'
3       employees?
4       A. Number 4, you said?
5       Q. Yes.
6    Does your binder have a green cover on it?
7       A. No.  Yes.  That is the time and attendance
8       handbook.
9    ATTORNEY ELKIN:
10   Your Honor, I moved to admit Joint
11      Exhibit 4.
12   ATTORNEY JOSHUA MOORE:
13   No objection.
14   JUDGE:
15   Admitted.
16                              ---
17   (Whereupon, Joint Exhibit JX-4, Time and
18   Attendance Reporting Handbook, was
19   admitted.)
20                              ---
21      BY ATTORNEY ELKIN:
22      Q. Do you agree that Joint Exhibit 4 is the document
23      that controls how BOP employees are paid?
24   Is that right?
25      A. BOP employees, yes, but Department of Justice

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      altogether.

2      Q. Okay.

3    But Department --- you would agree that the

4      Department of Justice includes the Bureau of Prison?

5      A. Yes.  The BOP falls under the DOJ, yes.

6      Q. So again, does this handbook control how BOP

7      employees are paid?

8      A. Yes.

9      Q. If you can turn to page 110.

10    ATTORNEY ELKIN:

11    Court's indulgence.

12    JUDGE:

13    Of course.

14      BY ATTORNEY ELKIN:

15      Q. Okay.  I'm sorry.  I sent you to the wrong page.

16      If you can turn to page 31.

17    Are you on 31?

18      A. Yes.

19      Q. Okay.

20    The rounding of overtime minutes.

21    Does the agency round the overtime minutes on a

22      weekly basis or a daily basis?

23      A. On a daily basis, due to the roster program.

24      Q. Okay.

25    So if --- do you agree that it's the policy of

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1       FCI Otisville to round seven-and-a-half minutes of

2       overtime up to 15 minutes?  Anything more than seven

3       minutes?

4       A. Yes and no, because they would have to, again,

5       let their supervisor know.

6       Q. I'm talking about approved overtime.  If the

7       overtime was approved, is it your understanding that

8       this policy is to round minutes of seven and a half or

9       more up to 15?  Between seven and a half and 15 would

10      be rounded to 15.

11   Right?

12      A. Yes.

13      Q. And anything seven minutes or below would be

14      rounded to what?

15      A. Zero.

16      Q. And anything from 15 minutes to 22 minutes, I

17      believe, would be rounded to what?

18      A. Fifteen (15).

19      Q. And anything above 22 minutes would be rounded to

20      what?

21      A. Thirty (30).

22      Q. Okay.

23   And you would do that through the hourly clock.

24   Correct?

25      A. Yes.

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1      Q. So under this policy, if the time that we're
2      talking about at issue here is compensable and it
3      takes at least seven-and-a-half minutes to perform
4      this work, you would agree that under the agency's pay
5      practices that seven-and-a-half minutes would actually
6      be 15 minutes.
7    Correct?
8      A. For work time, yes.  Not for what you were
9      referring to as their walk time.
10     Q. Right.  We're here --- I mean, it's more than
11     walk, but we're here to decide whether it's work time.
12     But you would agree that if it's determined that it is
13     work time, seven-and-a-half minutes would equal 15
14     minutes under the agency's own policy.
15   Correct?
16     A. Yes, under this policy.
17     Q. And you were the person responsible for ensuring
18     that Lieutenants correctly reported overtime work.
19   Correct?
20     A. That they reported it?
21     Q. Yeah.  They reported the overtime work, the
22     overtime work by their Correctional Officers.  It's
23     their job to --- let me back up.
24   Is it your understanding that the Lieutenants are
25     the ones who fill out the overtime slips for

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Correctional Officers?

2      A. Yes.  The Correctional Officer would let the

3      Lieutenant know and they would then put it on the

4      roster and do an overtime slip.

5      Q. Okay.

6      So the Correctional Officers don't complete

7      overtime slips.  It's completed by their supervisors.

8      Correct?

9      A. Yes.

10     Q. All right.

11     And you agree that you've never provided any

12     training to any of the Lieutenants about this rounding

13     rule that were just talking about today?

14     A. No.  We have not discussed that.  We just give an

15     overall TNA training.

16     Q. Okay.

17     So you've never --- as far as you know, the

18     Lieutenants may or may not know about this rounding

19     from seven-and-a-half minutes to 15 minutes?  You've

20     never done training on that.

21     Correct?

22     A. Not formal training, no.

23     Q. Any informal training?  Has any informal training

24     to Lieutenants, who are the ones who complete the

25     overtime list --- has any informal training been done?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       A. No.

2       Q. As a person in charge of FLSA compliance, you

3       have never recommended that any of the 24-hour posts,

4       all of which require release, should have scheduled

5       paid overlapping shift?  You've never made that

6       recommendation.

7       Correct?

8       A. I personally have not, no.

9       Q. And you're not aware of anybody else at FCI

10      Otisville or the BOP who has made that recommendation.

11      Correct?

12      A. I am not aware of that, no.

13      Q. And you agree that the Government has never

14      conducted a study or an analysis regarding the amount

15      of time that each pre-shift activity takes.

16      Correct?

17      ATTORNEY JOSHUA MOORE:

18      Objection, Your Honor.  Personal

19      knowledge.

20      JUDGE:

21      She can testify to the extent of her

22      personal knowledge about what the Government has done.

23      The question is has the Government ever and she can

24      testify about her knowledge, bearing in mind that she

25      was prepared as a 30(b)(6) witness.

268

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    THE WITNESS:

2    I am not aware, no.

3        BY ATTORNEY ELKIN:

4        Q. And as far as you know, the agency has never done

5        any study or analysis of what kind of interaction

6        takes place between the Correctional Officers and the

7        inmates when the Correctional Officers are walking to

8        their post prior to their shift or returning to the

9        control center after they've been relieved.

10   Correct?

11       A. No, I am not aware.

12       Q. And so you agree that the agency has never

13       actually, as far as you know, analyzed how much time

14       employees engage in those types of interactions either

15       prior to their shift or after they've been released?

16       A. I am not aware of anyone doing that, no.

17       Q. So it's fair to say that the Government has never

18       conducted a time or motion study regarding the

19       Correctional Officers pre-shift activities?

20       A. I can't say that the Government has never done

21       one.

22       Q. As far as you know.

23       A. I can say I'm not aware of one.

24       Q. And nobody has made you aware of one.

25   Right?

269
Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       A. No.  I have not been made aware of one.

2       Q. And your answer would be the same with respect to

3       post-shift activities?  No study --- you're not aware

4       of any study done about how long this stuff takes?

5       A. I am not personally, no.

6       Q. The Government has never made a determination, as

7       far as you know, as to whether the type of pre and

8       post-shift activities, donning the belt, the exchange

9       of the shift, and the walking, and the information,

10      equipment exchange, whether those activities are

11      closely related to the safety and security function

12      performed by the Correctional Officers?

13      A. Of study on that?  I am not aware of that, no.

14      Q. And you never reviewed the post order to

15      determine whether they were compliant with the Fair

16      Labor Standards Act.

17      Correct?

18      A. I did not compare post orders to FLSA, no.

19      Q. And you knew that there were face-to-face shift

20      exchanges taking place between an oncoming officer and

21      an outgoing officer every time an officer reports to a

22      shift on a 24-hour post.

23      Correct?

24      A. Yes, they would swap equipment.

25      Q. And you would agree that during the face-to-face

270
Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    exchange, only one officer is being paid by the United
2    States.
3    Correct?
4    A. Can you repeat that?
5    Q. You would agree that during the face-to-face
6    exchange between the oncoming and outgoing officer,
7    only one officer is being paid by the United States
8    during that exchange.
9    Correct?
10   Either the oncoming or the outgoing officer.
11   Only one of them is being paid?
12   A. I guess you could say that, yes.
13   Q. Because there's no scheduled overlapping shifts.
14   Correct?
15   A. Not at Otisville, that I'm aware of, no.
16   Q. And you would agree that there is, in fact, to
17   some extent an overlap during this exchange time.
18   Correct?
19   A. If the incoming officer came in early, then yes.
20   Q. Okay.
21   If the incoming officer came in late, there's
22   still an overlap between the shifts?
23   A. Yes.
24   Q. As the person in charge of FLSA compliance at
25   Otisville, you never read the Margot Newman

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Arbitration Award all the way through.

2    Is that correct?

3      A. No, I did not.

4    ATTORNEY ELKIN:

5    I'm going to show you Plaintiffs Exhibit

6      in front of you in a yellow cover, Plaintiff's Exhibit

7      24.

8                        ---

9    (Whereupon, Plaintiff's Exhibit PLX-24,

10   Arbitrator's Decision, FCI Otisville and

11   AFGE Local 3860, FMCS No. 10-04502-8,

12   was marked for identification.)

13                       ---

14     BY ATTORNEY ELKIN:

15     Q. Are you there?

16     A. Yes, I'm there.

17     Q. Okay.

18   And you recall that I showed you a copy of what's

19     been marked as Plaintiff's Exhibit 24 at your

20     deposition in September 2020.

21   Correct?

22     A. Yes.

23   ATTORNEY ELKIN:

24   Your Honor, I move to admit Plaintiff's

25     Exhibit 24.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    ATTORNEY JOSHUA MOORE:

2    No objection.

3    JUDGE:

4    Admitted for limited purpose that we

5       discussed earlier for Arbitrator Decisions.

6                            ---

7    (Whereupon, Plaintiff's Exhibit PLX-24,

8    Arbitrator's Decision, FCI Otisville and

9    AFGE Local 3860, FMCS No. 10-04502-8,

10   was admitted.)

11                           ---

12   BY ATTORNEY ELKIN:

13   Q. So I know that you didn't read it all the way

14      through.  My understanding is you've read parts of it.

15   Is that correct?

16   A. Yes.

17   Q. Okay.

18   No one at the Bureau of Prisons ever told you, as

19      the manager of HR, that it's your responsibility to

20      actually read this Decision, understand this Decision,

21      and to determine whether FCI Otisville had to make

22      changes to comply with the Decision?  No one ever

23      directed you to do those things?

24   A. No, I was not directed to.

25   Q. I want you to turn to page 44 of the Decision,

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

273

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1        please.

2    Okay.  In the second full paragraph, the second

3        sentence.  On the fact of this case, I am unable to

4        find that the agency met its burden of establishing

5        that it acted in good faith on a reasonable belief

6        that it was not violating the FLSA.  First, it refused

7        to consider instituting overlapping shifts despite the

8        plethora of precedent between, I'm sorry, within the

9        BOP indicating that 24-hour post by their nature and

10       the nature of the position requires some overlap to

11       accomplish, at the very least, an adequate shift

12       exchange.

13   Did you read that portion of the opinion?

14       A. I did, yes.

15       Q. Okay.

16   But still you didn't ever consider implementing

17       overlapping shifts?

18       A. I read it recently, not before.

19       Q. Okay.  All right.

20   So then let's go back.

21   Did you read that part that I just read, did you

22       read that at any time prior to this lawsuit being

23       filed in 2019?

24       A. No, I did not.

25       Q. Its --- next sentence.  Its cavalier attitude

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      that such shift exchange takes only seconds belies any

2      contention that it was operating under a good faith

3      belief that its actions were appropriate.

4    Did you read that portion at any point prior to

5      the lawsuit being filed?

6      A. No.

7      Q. Next sentence.  Additionally, despite the fact

8      that the overwhelming applicable precedent at the time

9      agreements were filed in this case supports the

10     existence of integral and indispensable activities

11     prior to arriving at post, Otisville management chose

12     not to read or become aware of that precedent.

13   Did you read that portion of the Decision prior

14     to the lawsuit being filed?

15     A. I did not.

16     Q. That didn't prompt anybody at the agency to tell

17     you that you should be reading precedent to ensure

18     compliance with the LLC?

19     A. I don't know that it prompted anyone.  No, I was

20     never told to read it.

21     Q. In fact, the labor relations manager, who was in

22     charge of assuring compliance with the FLSA was

23     unfamiliar with either the past award or current

24     grievance at the facility and had made no effort to

25     educate himself about the requirements in this area by

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    reading other portal cases.

2    Did you read that portion of the award prior to

3        the case?

4    ATTORNEY JOSHUA MOORE:

5    Objection.  Your Honor, I think maybe we

6        can get past reading this entire exhibit into the

7        record and just ask whether or not she's read prior to

8        this case and filed any of this exhibit.  I think she

9        previously answered that she had not read it, so I'm

10       not sure we're going line to line here.

11   JUDGE:

12   Okay.

13   ATTORNEY ELKIN:

14   I think her testimony was actually that

15       she had read portions of the Decision prior to her

16       deposition in this case.  I was just asking if she's

17       read these particular portions, and it sounds like she

18       has, and I can move on.

19   JUDGE:

20   Okay.  So I'll overrule the objection

21       for now.  Just move on.

22   ATTORNEY ELKIN:

23   Okay.

24       BY ATTORNEY ELKIN:

25       Q. At the time of your deposition in 2020, you were

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       not aware that this instant litigation, this court
2       case, was the fourth case at FCI Otisville where
3       Correctional Officers have sought overtime pay for
4       performing preemption work?
5       A. I was not, no.
6       Q. You became aware of that at your deposition.
7   Correct?
8       A. Yes.
9       Q. If you look at 43, I know we discussed it in your
10      deposition, page 43 on the same we were looking at,
11      which was 24, middle of the page.  The Arbitrator
12      makes findings about the appropriate compensable
13      overtime for each post.
14  You see that?  There are 16 minutes for compound,
15      17 for control, 19.5 for housing units.
16  Do you see that?
17      A. Yes.
18      Q. Is it fair to say that the agency, as far as you
19      know, has done nothing to ensure since this award,
20      that officers assigned to compounds one and two, for
21      example, are being paid for 16 minutes, not 8 hours
22      each day?
23      A. I am not aware of anything, no.
24      Q. Would your answer be the same with respect to
25      those other posts that are listed in this?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      A. Yeah.

2      Q. You would agree that nothing about the employee's

3      job duties have changed since 2012 when Arbitrator

4      Newman issued this award.

5      Correct?

6      ATTORNEY JOSHUA MOORE:

7      Objection, Your Honor.  Foundation.

8      Whether or not she knew what the employees job duties

9      were in 2012.  She was not at Otisville at that time.

10     JUDGE:

11     Can you lay the appropriate foundation?

12     BY ATTORNEY ELKIN:

13     Q. Do you know whether anything about the job duties

14     --- do you know whether the job duties have changed

15     since 2012, when the Arbitrator's award was issued

16     until you left Otisville?

17     ATTORNEY JOSHUA MOORE:

18     Same objection, Your Honor.  She hasn't

19     established she knew what the job duties were.

20     So how could she testify on how they

21     have changed?

22     BY ATTORNEY ELKIN:

23     Q. Do you know what the ---?

24     JUDGE:

25     So lay a little more foundation.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    ATTORNEY ELKIN:

2    Okay.

3    BY ATTORNEY ELKIN:

4    Q. Do you know what the Correctional Officer's job

5    duties were at Otisville in 2012, '13, '14, et cetera?

6    A. I do not.  I was not working there.

7    Q. Okay.

8    Well, you were --- you worked at other

9    institutions.

10   Were you ever augmented as a Correctional

11   Officer?

12   A. I have been, but it depends on the institution

13   and the post.  All of your job duties are different at

14   different posts and depending on if you're working at

15   an FCI low, a medium, a maximum security.

16   Q. Have you --- do you know why you were able to

17   answer that question back in 2020?

18   A. I probably ---.

19   ATTORNEY JOSHUA MOORE:

20   Objection.  Argumentation.  I'm not sure

21   --- what are you asking?  I guess I'm not sure of the

22   question.

23   JUDGE:

24   It's a peculiar question.

25   ATTORNEY ELKIN:

279

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1   I would like ---.

2   JUDGE:

3   Are you trying to impeach her deposition

4     testimony?

5   ATTORNEY ELKIN:

6   Yes.

7   JUDGE:

8   If you're trying to impeach her with

9     your deposition testimony, impeach her with the

10    deposition testimony.

11  ATTORNEY ELKIN:

12  Okay.

13    BY ATTORNEY ELKIN:

14    Q. Can you look at --- do you have your deposition

15    transcript in front of you?

16    A. I do.

17    Q. Okay.

18  Can you turn to page 73, please?  Let me know

19    when you're there.

20    A. I'm there.

21    Q. Line eight.  Question, and you would agree that

22  nothing about the employees' job duties have changed

23  since 2012, since the 2012 award?  They're still

24  required to be on the compound prior to their shift in

25  order to get to their shift by the start of the shift?

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

1    Correct?  And your answer was correct.  Question, and
2    nothing about their job duties has changed since the
3    issuance of this award.  Correct?  And your answer was
4    correct.
5    Did I read that accurately?
6    A. You did read it accurately.
7    Q. You would agree that there are no time clocks for
8    the employees to punch when they start either going
9    through the screening side or collecting their duty
10   belt at FCI Otisville.
11   Correct?
12   A. There is not a time clock.
13   Q. And there's no time clock at the A1 sally port
14   for them to punch when they exit the secured confines
15   of the institution after their shift.
16   Correct?
17   A. No, ---
18   Q. And there ---.
19   A. --- no timeclocks.
20   Q. Sorry.
21   And there was nothing preventing the agency from
22   putting in time clocks into the institution.
23   Correct?
24   A. I am not aware of anything preventing them, no.
25   Q. You agree that if the agency had put time clocks

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      in this location where they pick up their duty belts
2      when they leave the A1 sally port after their shift,
3      the time that we're talking about would have been
4      accurately recorded?
5    ATTORNEY JOSHUA MOORE:
6    Objection, Your Honor.
7    I'm sorry.  Could you read the question
8      back, Court Reporter?  My apologies.
9    JUDGE:
10   Well, what's the objection?
11   ATTORNEY JOSHUA MOORE:
12   Well, there's something objective about
13     the question.  I'D just like the question read back.
14   JUDGE:
15   Overruled.
16   ATTORNEY JOSHUA MOORE:
17   My apologies, Your Honor.
18   THE WITNESS:
19   I'm sorry.  Can you repeat it?
20     BY ATTORNEY ELKIN:
21     Q. You would agree that had the agency put time
22     clocks in the institution at the location where the
23     employees collect their duty belts after they've been
24     screened and at A1 secure perimeter when they leave
25     the secure perimeter after their shift, had they put

Trial

Kathy Aitken, et al. v. USA                           3/13/2023

1      time clocks in the institution, this time that we're
2      here talking about could have been accurately
3      reported.
4    Correct?
5    ATTORNEY JOSHUA MOORE:
6    Objection, Your Honor.  Calls for
7      speculation.
8    JUDGE:
9    Overruled.
10   THE WITNESS:
11   It would have gave an accurate reading
12     of what time they came in and what time they left,
13     yes.
14     BY ATTORNEY ELKIN:
15     Q. From the place they collect their duty belt
16     before their shift to the time that they are exiting
17     the secured confines of the institution after their
18     shift.
19   Correct?
20     A. Well, they don't collect their duty belt when
21     they come on duty.  They have their duty belt.
22     Q. Well, you would agree that they have to put the
23     duty belt on the x-ray?  We talked about this before
24     in the beginning, I believe, of your ---.
25     A. Yes.  It has to be x-rayed.

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And so the place that they pick it up to put it
2      on them is in the front lobby of the institution.
3    Correct?
4      A. It is in the front lobby, yes.
5      Q. As far as you know, the agency never made it
6      somebody's job to deliver the duty belts with the
7      chains, and the chits, and the clips and the pouches
8      to the officers on the post.
9    Correct?
10     A. No, they do not do that.
11   ATTORNEY ELKIN:
12   Just one moment.  Your Honor, I pass the
13     witness.
14   JUDGE:
15   Mr. Moore?
16                        ---
17                 CROSS EXAMINATION
18                        ---
19   BY ATTORNEY JOSHUA MOORE:
20     Q. Good afternoon, Ms. Juenger.
21     A. Good afternoon.
22     Q. How are you doing?
23     A. Good.  Thank you.
24     Q. Good to see you.
25   Now, Ms. Juenger, can you --- you testified as to

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     what your HR responsibilities, what your primary job
2     responsibilities were as an HR Manager at Otisville.
3  Can you let me know specifically related to the
4     FLSA, what your job responsibilities are at Otisville?
5     A. Under the FLSA, I would say my job duties are
6     limited when it comes to time and attendance.  And the
7     reason I say that is because the officers are the ones
8     that are telling their supervisors, like a Lieutenant
9     or the Captain, about their overtime.  The HR Office
10    itself is not chasing down the officers to see if
11    they're actually turning the overtime slip in.
12    Q. And so when does the HR Office come in or when
13    does their role start in terms of ensuring FLSA
14    compliance?
15    A. So time and attendance gets keyed, and then it
16    gets validated, and it gets sent off in what's called
17    the Web TA system, and that goes to NFC, which is the
18    National Finance Center.  So that's, again, why I say
19    that we're limited.  We don't really do a lot directly
20    with the FLSA.
21    Q. And so do you have a role or --- well, do you
22    have a role, as the HR Manager, in filling out
23    overtime slips for Correctional Officers?
24    A. I do not have a role, no.
25    Q. Do you, as the HR Manager, have a role in

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    determining who gets overtime or whether or not

2    Correctional Officers get overtime?

3    A. I do not, no.

4    Q. Okay.

5  So it's fair to say that in your role in regards

6    to the FLSA and your role as an HR Manager, it's

7    limited to ensuring the time and attendance forms

8    properly filled out, individuals get paid according to

9    the time and attendance forms?

10   A. Yes.

11   Q. Okay.

12  And so when said you had --- you previously

13   testified that you had the ultimate responsibility to

14   ensure FLSA compliance.  I think Ms. Elkin said that

15   many times during her direct review.

16   What did you mean by that?

17   A. I have the responsibility of the time and

18   attendance, ensuring that everyone does get paid and

19   that it's submitted in a timely manner.

20   Q. And so it's fair to say that your role, again, is

21   that each employee is paid in accordance with their

22   time and attendance sheets?

23   A. Yes.

24   Q. Okay.

25  And so Ms. Juenger, you were asked whether you

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    personally, as the HR Manager, would have reviewed
 2    several different arbitration Decisions, a DOL
 3    memorandum, an OPM memorandum.
 4  Would reviewing those be a part of your daily job
 5    duties as an HR Manager?
 6    A. No.
 7    Q. And why not?
 8    A. Those were cases that were done years ago, and
 9    the majority of them even before I was even in HR or
10    became an HR Manager.  So it's not something that
11    would be given to us as a daily task as an HR Manager
12    to read these cases that happened from years prior.
13    Q. And would you ever, as the HR Manager, review an
14    arbitration Decision?
15    A. If it happened at the institution that I was
16    working at, most likely, yes, but not one from another
17    institution.
18    Q. And so --- well, let me ask this.  Have you ever
19    been in an institution as the HR Manager where there
20    has been an arbitration Decision related to specific
21    FLSA?
22    A. No.
23    Q. No, okay.
24  Not at Otisville?
25    A. No.
```

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

1    Q. And I'd like to turn now to the time and

2    attendance handbook, which I think is JX-4 under the

3    green --- I think it's a green binder.  I know there

4    are a lot of binders up there.  And if you turn to I

5    think it's Roman Numeral Four.  Remember how to read

6    that.  I think it should say little I-V at the bottom.

7    JUDGE:

8    I'm sorry.  Which page number?

9    ATTORNEY JOSHUA MOORE:

10   Little --- well, Roman numeral IV, I-V,

11    Your Honor.  I am.  Am I saying that right?  It's at

12    the beginning of the handbook.  I think it's the sixth

13    page, if you turn ---.

14   JUDGE:

15   It might be easier to navigate using

16    Bates numbers.

17   ATTORNEY JOSHUA MOORE:

18   Excellent idea, Your Honor.

19   JUDGE:

20   Page 78.

21   ATTORNEY JOSHUA MOORE:

22   Yes.

23    BY ATTORNEY JOSHUA MOORE:

24    Q. So Ms. Juenger, do you see at the bottom right

25    hand of the document that says RFP 1- and then a bunch

288

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1       of zeros?

2       A. Uh-huh (yes).

3       Q. So if you turn to number 78.

4       A. Yes.

5       Q. Are you there?

6       A. Yes.

7       Q. Okay.

8    And you see where it says right in the middle of

9       the page, individuals who would benefit from the use

10      of this guide?

11      A. Yes.

12      Q. Okay.

13   So you're on the right page.  Okay.  And it says

14      there that this handbook is to be used by DOJ

15      timekeepers, TNA application coordinators, supervisors

16      who approve leave and overtime and certified TNA

17      reports, trainers for time and attendance reporting

18      workshops, payroll staff, and human resources

19      officers.

20   This is a supplemental guide used with other

21      procedural guidance for workshops pertaining to

22      specific TNA applications.

23   Is it --- do you understand that?  I guess what

24      do you understand that paragraph to mean?

25      A. It's a guidance that we can use, yes.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. Does that paragraph --- do you understand that
2    paragraph to say that the Bureau of Prisons has to
3    follow this document precisely?
4    A. I don't think precisely, no.
5    Q. Okay.
6  And if we turn to now RP1, and it should be 110.
7    This is the page that Ms. Elkin had previously pointed
8    you to.  It says at the top rounding OT minutes.  Let
9    me know when you're there.
10   A. Yes.
11   Q. Okay.
12 And so at the top there it says rounding OT
13   minutes.  Now, this is a little bit, I'll admit,
14   confusing even to me.  But I'm going to try to go with
15   it, with it over you.  It's the second sentence.  If
16   we start at the second sentence here, it says, for
17   example, at the end of the week, an accumulated total
18   of seven-and-a-half minutes or greater is rounded to
19   one quarter of an hour, and an accumulated total of
20   seven minutes or less is dropped.  It goes on to say
21   the process must be accomplished by accumulating odd
22   minutes, 1 to 14 minutes each overtime day of the
23   week, assuming the total odd minutes at the end of the
24   week, and applying the nearest quarter hour to the
25   last day of the week in which the employee worked the

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1    overtime.

2    Do you understand what it's referring to there?

3    A. It's referring to the overtime, but adding it in

4    a daily basis and by the minutes.  And that's not what

5    we do.

6    Q. That's not what you do at FCI Otisville?

7    A. No.

8    Q. And so can you explain again what exactly you do

9    at FCI Otisville in terms of overtime?

10    A. Overtime is calculated on a daily basis, so it

11    can be added into the roster by the Lieutenant.

12    Q. Okay.

13    And so if we go down to that chart below, the

14    next sentence says an example of weekly overtime

15    tracking and reporting is shown below.  And it's

16    referring, I believe, to that chart.

17    Do you see that chart there?

18    A. Yes.

19    Q. Okay.

20    And so if I understand this chart correctly, you

21    can correct me if I'm wrong, it looks like the top row

22    is Sunday through Saturday.  That's the days of the

23    week.  There's a blank row.  And the next row after

24    that says hour, minute worked.  And I assume that's

25    the hours and minutes worked that day.

291

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Is that correct?

2       A. That's what it looks like to me, yes.

3       Q. Okay.

4    And so, for example, on Sunday, it says five

5       hours and ten minutes.  And then below that, it says

6       OT hours recorded, five hours.  And then on Monday, it

7       says ten minutes.  Tuesday, ten minutes.  Wednesday,

8       ten minutes.  Thursday, ten minutes.  And then Friday

9       is 1 hour and 20 minutes.  And so based on how this

10      guide explains how you should round overtime minutes,

11      can you explain or sort of walk through how the

12      overtime minutes would be rounded on this chart based

13      on this guide?

14      A. They would be rounded --- the ones that have the

15      ten minutes, they would be rounded upward to the 15

16      minutes.  Like I said, we at Otisville don't use any

17      system like this chart.

18      Q. Now, so would each day be rounded to ten minutes

19      or would it be rounded --- would the minutes be added

20      and then rounded at the end?

21   ATTORNEY ELKIN:

22   Objection.  Confusing.  Are we talking

23      about what they do in the chart or what they do at

24      Otisville?

25   ATTORNEY JOSHUA MOORE:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     What they do in the chart.

2     JUDGE:

3     Does that answer your question, Ms.

4       Elkin?  Okay.  You can answer about the chart.

5     THE WITNESS:

6     It looks to me like that's what they

7       would do is round them up and then add them up at the

8       end of the week.

9     BY ATTORNEY JOSHUA MOORE:

10    Q. Are they rounding them up on a daily basis here

11    or at the end of the week?  In other words ---?

12    A. It looks to me like they're doing it on a daily

13    basis on the chart, and then adding them --- and then

14    I suppose adding them at the end of the week, yes.

15    Q. Is that right?  So if you look at, for example,

16    look at Monday.  It says ten minutes, hours, ten

17    minutes of worked overtime.  And then below, it says

18    OT hours reported at zero.

19    A. Uh-huh (yes).

20    Q. So are they rounding it by the day there?  Did

21    they round it that day?

22    A. By the looks of it, yes.

23    Q. Where do you see where they rounded it?

24    A. Under the Monday ten minutes.

25    Q. But that's the hours overtime worked.

Trial

Kathy Aitken, et al. v. USA                    3/13/2023

1    Right?

2    A. Yes.

3    Q. The hours they work, not the --- they didn't

4    round that to 15 minutes, did they?

5    A. No, not on any of them.

6    Q. No.  So it looks like they added them up, and

7    then at the end of the week, the total amount of hours

8    minutes worked overtime, they rounded that to the

9    nearest 15 minutes.

10   Is that right?  Is that how this chart works?

11   A. That's what it looks like to me, yes.

12   Q. But Otisville doesn't do that.

13   Is that correct?

14   A. We do not use the chart, no.

15   Q. Okay.

16   So Otisville, these ten minutes would be rounded

17   to 15 minutes every day.

18   Is that right?

19   A. Yes.

20   Q. Okay.

21   So if we were to --- just walk through this

22   exercise with me briefly.  So on Sunday, five hours

23   and ten minutes worked.

24   How much overtime would Otisville give for that

25   day?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     A. For the 10 minutes, they would give 15 minutes.

2     Q. Okay.

3     So Sunday would be 5 hours and 15 minutes.

4     Is that right?

5     A. Yes.

6     Q. Okay.

7     And then Monday, they work ten minutes overtime.

8     How much overtime would Otisville give them on

9        Monday?

10     A. They would give them 15 minutes.

11     Q. Okay.

12     So now we're Sunday is 5 hours and 15 minutes.

13        Monday is 15 minutes.

14     And then would your answer be the same Tuesday

15        through Thursday?

16     A. Yes.

17     Q. So Tuesday would be 15 minutes, Wednesday, 15

18        minutes.  See if I can do my math here.  Monday,

19        Tuesday, Wednesday, Thursday.  So it looks like we

20        have 5 hours and 15 minutes Sunday, plus 15 minutes on

21        Monday is 5 hours and 30 minutes.  Plus 15 minutes on

22        Tuesday is --- excuse me.  The 15 minutes on Tuesday

23        would be 45 minutes.  Fifteen (15) minutes on

24        Wednesday would be an hour.  Fifteen (15) minutes on

25        Thursday would be an hour and 15 minutes.

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1     And then Friday, what does it say?  An hour and
2        20 minutes.  What would Otisville pay for that?
3        A. An hour and 15 minutes.
4        Q. An hour and 15 minutes.  And so if you added all
5        those up, make sure my math is right.  Fifteen (15),
6        30, 45, hour, hour 15, 2 hours and 30 minutes.  So
7        under Otisville system, someone who worked this amount
8        of time would get paid overtime, 2 hours and 30
9        minutes.
10    Is that right?
11       A. Yeah.
12       Q. But under the Bureau, under the Department of
13       Justice time book regulations, what does it say for
14       Friday, for overtime hours reported?
15       A. Two and a quarter.
16       Q. Two and a quarter, which is what would that be in
17       common language, if it's two and a quarter?
18       A. Two hours and 15 minutes.
19       Q. Under Otisville's, the way that the Bureau of
20       Prisons and the way that Otisville, to your knowledge,
21       pays overtime, they actually pay more overtime than
22       what this handbook would suggest.
23    Is that right?
24    ATTORNEY ELKIN:
25    Objection, Your Honor.  If they were

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

1    seven minutes of each of these things, they wouldn't

2    get any overtime.  So ---.

3    JUDGE:

4    Overruled.  He can ask the question for

5    what it's worth and for whatever its relevance and

6    probative value might be.

7    ATTORNEY JOSHUA MOORE:

8    Thank you, Your Honor.

9    BY ATTORNEY JOSHUA MOORE:

10    Q. So is that true?

11    A. Yes.

12    Q. Okay.  Thank you.  Okay.

13    Ms. Juenger, I'd like to turn to the --- I guess

14    the Arbitrator Newman Decision, which I believe is

15    Plaintiff's 24.  And if you would turn to page 36 at

16    the top.

17    ATTORNEY JOSHUA MOORE:

18    Just one moment, Your Honor.

19    BY ATTORNEY JOSHUA MOORE:

20    Q. Okay, Ms. Juenger.

21    And on the second paragraph there, it says that

22    the document says I'm agreeing that the situation

23    Otisville requires a similar finding.  Prior to March

24    2011, there were no battery chargers on the units.

25    When you arrived at Otisville in 2016, where were

297

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

1    the battery --- do where the battery chargers were

2    placed specifically for the 24-hour posts?

3    A. In the unit.

4    Q. In the unit.  So while you weren't around when

5    this decision was issued, it states here that there

6    were no battery units on the units.  No battery

7    chargers on the units in March 2012, 2011.  But by the

8    time you arrived, there had been a change and there

9    were battery charges on the units.

10   Is that right?

11   A. Yes.

12   Q. Do of any other changes the Bureau of Prisons has

13   made to --- you know, regarding any pre or post-shift

14   work that Correctional Officers have to do?

15   A. Besides putting battery chargers in the housing

16   units, they've made changes to try to speed up key

17   line.  They might throw an additional officer in there

18   and that makes the key line go a little faster.

19   They've implemented what's called Truescope that has

20   roll call on it.  So anything of importance that the

21   Lieutenant wants to put in there, or the SIA, or the

22   Captain can all go under that role call button.

23   Q. Do you have an understanding of why the Bureau of

24   Prisons made those changes?

25   A. I think for better logging, better

Trial

Kathy Aitken, et al. v. USA                                     3/13/2023

```
 1    accountability.  Again, it can be a time saver,
 2    because anything of importance, the officer has access
 3    to it in███████████.
 4    Q. And so it's fair to say that your testimony is
 5    the Bureau of Prison has taken action?  You just said
 6    that it's a time saver.
 7    Right?
 8    A. Yes.
 9    Q. And so it's fair to say that the Bureau of Prison
10    has taken action to reduce the amount of time
11    Correctional Officers spend before their shift.
12    Is that correct?
13    A. Yes.
14    Q. And then you were talking also about the key
15    line.
16    Can you explain that?
17    A. For those that have to go key line and obtain
18    keys or a radio, sometimes that line can get long.  I
19    mean, it's mainly your Monday through Friday office
20    people that have to stop by there and check out
21    equipment. ████████████████████████████████
      ████████████████████████████████████████
      ████████████████████████████████████████
      ████████████████████
25    Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    And so would that be another example of the
2    Bureau of Prisons taking action to reduce the amount
3    of time Correction Officers spend in the institution
4    before their shift?
5    A. Yes.
6    Q. And Ms. Juenger, you were asked if you would ever
7    augment before.
8    Is that right?
9    A. Yes.
10   Q. Actually, before I go there, I want to talk about
11   the time clock.  You were asked if there were time
12   clocks at Otisville.
13   Is that correct?
14   A. Yes.
15   Q. And as the HR Manager, did you ever attend labor
16   management relations meetings, often referred to LMR
17   meetings?
18   A. I have attended those, yes.
19   Q. And do you recall time clocks was ever raised at
20   an LMR meeting?
21   A. I do not recall it, no.
22   Q. Do you have an understanding as to why time
23   clocks are not in the institution, in your
24   personal ---?
25   A. I don't know why they have not been installed,

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1      no.
 2      Q. Okay.
 3   And so finally, Ms. Juenger, so you testified
 4      that you augmented at --- I believe you testified you
 5      augmented at Otisville.
 6   Is that right?
 7      A. Yes, I have.
 8      Q. Okay.
 9   What posts have you augmented to?
10      A. Housing unit, mobile patrol.
11      Q. Mobile what?
12      A. Mobile patrol.
13      Q. Patrol.  Okay.
14      A. Visiting room.
15      Q. Okay.
16   And when you augmented to a post, how did you
17      know what to do on your post?
18      A. There's post orders there that you can read, and
19      then you need to sign them.
20      Q. So you reviewed the post orders?
21      A. Yes.
22      Q. And what told you what to do on whatever post you
23      were working?
24      A. Yes.
25      Q. And were those posts orders for each of the posts
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    different?
 2    A. They would be, yes, depending on the post that
 3    you're working.
 4    Q. Okay.
 5  And when you augmented, were you required to wear
 6    a belt?
 7    A. Yes.
 8    Q. What kind of belt did you wear?
 9    A. Just my regular belt.
10    Q. You didn't wear --- okay.
11  Is there a specialized duty belt or wet belt?
12    A. No.
13    Q. No.  And do if the institution requires anything
14    other than wearing a regular belt when you're working
15    on post?
16    A. I'm not aware of anything for a specific belt.
17  ATTORNEY JOSHUA MOORE:
18  I'll pass the witness.  Excuse me.  I'll
19    pass the witness.
20  JUDGE:
21  All right.  Ms. Elkin, any Redirect?
22  ATTORNEY ELKIN:
23  Just a little bit, Your Honor.
24                          ---
25                          REDIRECT EXAMINATION
```

302

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                          ---
 2      BY ATTORNEY ELKIN:
 3      Q. Isn't it true that the battery chargers were
 4      already on the housing units by the time that the
 5      Arbitrator issued this award in 2012?
 6      A. I am not aware of what year they went to the
 7      housing units.
 8      Q. You can turn to Plaintiff's Exhibit 24 and go to
 9      page 14.
10  You're there?
11      A. Yes.
12      Q. Okay.
13  The first sentence on the top.  Prior to March
14      2011, there were no battery chargers on the housing
15      units or SHU, and the only place batteries were
16      charged was in the control center.  In March 2011,
17      battery chargers were installed in the housing unit
18      Security Office and in the SHU.
19  Do you see that?
20      A. Yes.
21      Q. Okay.
22  So according to the facts that were put on this
23      case, the case in 2012, battery chargers were already
24      on the housing units when an Arbitrator issued their
25      award.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Correct?
2        A. If they're referring to all of the housing units,
3        then yes.
4        Q. Yes.  So the Arbitrator issued the award in 2012,
5        there were already battery chargers on the unit.  You
6        can turn to page 38 of the award.  We went over this,
7        I believe, in your deposition as well in that footnote
8        74.  If a Correctional Officer on a 24-hour post fails
9        to pick up a charged battery in the control center, I
10       am in accord with the cases that hold that passing
11       through the sally port and entering the compound while
12       in uniform but unarmed and vulnerable places the CO in
13       a dangerous work environment where he's required to be
14       constantly alert and vigilant in observing and
15       responding to potentially unsafe situations, and
16       exercise a sound judgment in making instantaneous
17       decisions affecting life, well-being, and civil
18       liberties.  And that such activities are integral and
19       dispensable to its primary function of ensuring safety
20       and security of the institution staff and inmates.
21   You recall we went over that footnote in your
22       deposition.
23   Correct?
24       A. Yes.
25       Q. And nothing about reading that footnote prompted

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    any changes in terms of paying the workers, the

2    Correctional Officers assigned a 24-hour post for the

3    time that they're on the compound prior to their shift

4    or after the compound after their shifts.

5    Correct?

6    ATTORNEY JOSHUA MOORE:

7    Objection, Your Honor.  What time frame

8    are we referring to here?

9    ATTORNEY ELKIN:

10   After this award was issued.

11   ATTORNEY JOSHUA MOORE:

12   And you're asking Ms. Juenger ---.

13   JUDGE:

14   I'll ---.

15   ATTORNEY JOSHUA MOORE:

16   Well, if she's speaking to her personal

17   knowledge of what happened after 2012, I don't

18   think ---.

19   JUDGE:

20   As usual, she can testify to her

21   personal knowledge.

22   ATTORNEY JOSHUA MOORE:

23   Okay.

24   THE WITNESS:

25   I am not aware of it, no.

305

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    BY ATTORNEY ELKIN:

2    Q. Okay.

3    And key line, key line is the line of the control

4    center.

5    Is that right?

6    A. Yes.

7    Q. And as a non-custody person, the rule is that as

8    long as a non-custody person, let's say an education

9    specialist, that's a non-custody worker.

10   Right?

11   A. Yes.

12   Q. So an educational specialist, do you know what

13   their tour of duty could be?

14   A. They're usually ████████████

15   Q. Okay.

16   So if they're at key line by ████ around time.

17   Correct?

18   A. Yes.

19   Q. If they're returning their radio and their

20   equipment at ██████████ at the control center,

21   that's what they're supposed to be doing is returning

22   everything by ██████████?

23   A. Yes.

24   Q. And they're paid from the time from ██████████

25   Correct?

306

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1        A. Yes.

2        Q. So they are paid for the time that they're

3        walking on the compound.

4     Correct?  Both prior to or during their shift, I

5        guess.  They're paid for that time.

6        A. They're paid from ███████████ .

7        Q. And as long as they collect their equipment at

8        ███████████ , they will be on the compound.  They get

9        paid as part of their paid tour of getting to their

10       post or getting to their assignment.

11    Correct?

12       A. So you're saying grab their equipment and go to

13       their post?

14       Q. Right.  They can be at the control center at

15    ███████████ .

16    Right?

17       A. Yes.

18       Q. And they can be back at the control center at the

19       end of their shift, ███████████ ?

20       A. Yes.

21       Q. And that's, in fact, what they're expected to do.

22    Correct?

23       A. Yes.

24       Q. And so they are paid for the time that they are

25       on the compound because it occurs during ███████████ .

307

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Correct?

2     A. Yes.

3     Q. And adding more people to the key line --- I'm

4     sorry.  Adding more people to the control center to

5     reduce how long the key line took, that doesn't

6     benefit in any way the Correctional Officers assigned

7     to a 24-hour post.

8    Correct?

9     A. Those assigned to 24-hour posts that would have

10    their equipment at the housing unit.

11    Q. Right.

12   So adding more workers into the control center

13    didn't do anything to make the time spent by officers

14    assigned to 24-hour post prior to their shift any

15    better for them?  It didn't make it any less.

16   Correct?

17    A. Not for 24-hour post, no.

18    Q. And you said they put in ███████ on the

19    computer?

20    A. Yes.

21    Q. An electronic log.

22   Right?

23    A. Yes.

24    Q. Prior to the electronic log being in place, isn't

25    it true that they had actual log books that they used

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     in the housing units in the SHU, and that's basically

2     it?

3     A. Yes.

4     Q. And we were doing a lot of math with that

5     document.  Just so I'm clear, the testimony is that

6     anything above 7 minutes, any overtime that's

7     considered work above 7 minutes is rounded by the

8     Bureau of Prisons to 15 minutes.

9     Correct?

10    A. Anything over seven and a half, yes.

11    Q. That's on a daily basis.

12    Correct?

13    A. As long as that officer reports it to a

14    supervisor.

15    Q. As long as the supervisor knows about it.

16    Correct?

17    A. Yes.

18    Q. And anything under seven-and-a-half minutes or

19    under seven minutes is put down to zero.

20    Correct?

21    A. Yes.

22    Q. And that's done on a daily basis?

23    A. Yes.

24    ATTORNEY ELKIN:

25    I have no further questions.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    JUDGE:

2    Okay.  Ms. Juenger, thank you very much.

3    THE WITNESS:

4    Thank you.

5    JUDGE:

6    So Counsel, you have another witness to

7      call today.

8    Right?

9    ATTORNEY ELKIN:

10   Yes.

11   JUDGE:

12   How long do you think that examination

13     would take?

14   ATTORNEY ELKIN:

15   Shorter than the two-hour exam.  I think

16     I had two hours with Mr. Conklin, if I recall.  It's

17     going to be less than that.

18   JUDGE:

19   Okay.

20   So if we take a five-minute break now,

21     we'd be able to get the Direct Examination done by

22     5:30?

23   ATTORNEY ELKIN:

24   Yes.

25   JUDGE:

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1   Okay.  And then we could have the Cross
 2     starting first thing tomorrow?
 3   ATTORNEY VALLACHER:
 4   Sounds good, Your Honor.
 5   JUDGE:
 6   Is everybody comfortable doing the
 7     direct this afternoon and the Cross in the morning
 8     just to keep things rolling as fast as we can?
 9   ATTORNEY ELKIN:
10   Yes, Your Honor.
11   JUDGE:
12   Great.  Okay.
13   In that case, let's take a five-minute
14     break.  We'll resume again at 3:50.
15   COURT CRIER:
16   All rise.
17                          ---
18   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19                          ---
20   COURT CRIER:
21   All rise.  The United States Court of
22     Federal Claims is now in session.  Judge Stephen
23     Schwartz presiding.
24   JUDGE:
25   Please be seated.  Plaintiffs, next
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    witness.

2    ATTORNEY BLOCK:

3    We are going to call Richard McPhillips.

4      But Ms. Elkin is not yet back in the courtroom.

5    JUDGE:

6    Okay.

7    ATTORNEY BLOCK:

8    I believe she went to the restroom.

9    JUDGE:

10   I am in the courtroom.

11   ATTORNEY BLOCK:

12   I'm happy to begin.

13   JUDGE:

14   Ms. Block, your witness.

15   ATTORNEY BLOCK:

16   Thank you.

17   JUDGE:

18   Okay.  Go ahead.

19   ATTORNEY BLOCK:

20   So the Plaintiffs would like to call

21     Richard McPhillips.

22   JUDGE:

23   Raise your right hand.

24                        ---

25                   RICHARD MCPHILLIPS, III,

312

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

2      HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

3      FOLLOWS:

4                              ---

5      JUDGE:

6      You may be seated.  Counsel?

7                              ---

8                         DIRECT EXAMINATION

9                              ---

10     BY ATTORNEY BLOCK:

11      Q. All right.  Good afternoon.

12     Can you please state your name for the record?

13      A. Richard Barry McPhillips, III.

14      Q. And are you currently employed by the Bureau?

15      A. Yes, I am.

16      Q. And if I today say today BOP, what do you

17     understand that to mean?

18      A. Bureau of Prisons.

19      Q. Okay.

20     And where are you currently employed?

21      A. Otisville, New York.

22      Q. Is that the Federal Correctional Institution

23     Otisville?

24      A. Yes.

25      Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    And how long have you been employed there?

2    A. It will be eight years in May.  So about seven

3    years, eight months.

4    Q. And what is your current title?

5    A. My current title is Senior Officer Specialist.

6    Q. Have you held any other position title at FCI?

7    A. Yes.

8    Q. Which ones?

9    A. Senior officer and Correctional Officer.

10   Q. And starting with Correctional Officer, when were

11   you in the position of Correctional Officer?

12   A. From May 31, 2015 to May 31, 2016.

13   Q. And then what position did you hold immediately

14   following that Correctional Officer?

15   A. Senior officer.

16   Q. And then when you obtain the title Senior Officer

17   Specialist?

18   A. Sometime last year, like summertime 2022.

19   Q. Okay.

20   And are the positions of Senior Officer and

21   Senior Officer Specialist both Correctional Officer

22   titles?

23   A. They are.

24   Q. Has the Bureau of Prisons provided you with any

25   training on your job duties as a Correctional Officer?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. Yes.

2    Q. What training is that?

3    A. When I was first employed, the first two weeks

4    was about was pretty much classroom training.  And

5    after that, we had about three weeks in Glynco,

6    Georgia.

7    Q. Is Glynco the Federal Law Enforcement Training

8    Center.

9    A. That is correct.

10   Q. And do you do any type of annual or other regular

11   training as a Correctional Officer?

12   A. Yes.

13   Q. What training is that?

14   A. We have annual --- ART, that's done on a yearly

15   basis.  And then we also have --- I mean, I have

16   collateral duty, which is DCT, which stands for

17   disturbance consulting member.  And we normally have

18   training either a monthly or biquarterly.

19   Q. And that's monthly or biquarterly training for

20   your collateral duty?

21   A. Correct.

22   Q. Based on all of your training and experience as a

23   Correctional Officer at FCI Otisville, what is your

24   most important job duty?

25   A. Ensuring safety and security of the institution.

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1      Q. And does that most important job duty that you
 2      just described require you to maintain any particular
 3      state of mind?
 4      A. Yes.
 5      Q. And what is that?
 6      A. Pretty much a state of awareness.  Be aware of
 7      any of your surroundings, of anything that's going on.
 8      Q. And why is that your state of mind?
 9      A. Excuse me?
10      Q. Why is that your state of mind?
11      A. Just to ensure that nothing is out of the
12      ordinary.
13      Q. And is --- the most important job you just
14      described of ensuring safety and security of the
15      institution, is that the same regardless of the
16      custody post to which you are assigned at?
17      A. Yes.
18      Q. And what location in the institution do you start
19      carrying out that job duty?
20      A. From the second I walk into the A1 lobby.
21      Q. And based on your experience and training, at
22      what point in your day are you on duty?
23      A. From the second I walk into the A1 lobby.
24      Q. At what point in your day do you stop performing
25      that most important job duty of ensuring safety and
```

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

1    security?
2    A. From the second I depart of the A1 lobby.
3    Q. Are you expected to perform that job duty
4    regardless of whether any inmates are present?
5    A. Yes.
6    Q. And do you perform that job duty regardless of
7    whether inmates are present?
8    A. Yes.
9    Q. And do you perform that job duty before and after
10   your scheduled shift if you are between the two points
11   that you just mentioned, entering and exiting the A1
12   lobby?
13   A. Yes, I am.
14   ATTORNEY VALLACHER:
15   Objection.  I'm not really following
16   anymore what that --- quote, that job duty is.
17   JUDGE:
18   I think it's actually clear in the
19   context.  So overruled.
20   Ms. Block, once you clarify it and ---
21   repeat your question ---.
22   BY ATTORNEY BLOCK:
23   Q. And do you understand that this case involves the
24   24-hour post at FCI Otisville?
25   A. Yes.

317

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1      Q. Okay.

2    And have you worked all the 24-hour posts at the

3      institution?

4      A. Yes.

5      Q. Okay.

6    And for any of the 24-hour posts that are issued

7      in this case, where do you have to be physically at

8      the start of your scheduled tour?

9      A. At the A1 lobby.

10     Q. And when I say start of your scheduled tour, what

11     do you understand?

12     A. Arriving at the institution.

13     Q. Okay.

14   What is the scheduled shift on --- where are the

15     scheduled shifts on the 24-hour post?

16     A. You have housing units.  Sorry.  I'm sorry.  The

17     A5 housing units.

18     Q. What are the shifts ---?

19     A. I'm sorry, I got confused by the question.

20     Q. No problem.

21   What are the scheduled shift hours of the 24-hour

22     post?

23     A. So you have midnight to █████████████████████

     █    █████████████ .

25     Q. Okay.

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1      And if you are working a post on the ███████ to
 2        ████████, where are you expected to be at ████████?
 3      A. At my side spot that I am scheduled to work.
 4      Q. And where would you be expected to be if you're
 5        working the ████████ shift at ████████?
 6      A. Same answer.  The assigned post that I was
 7        assigned to work that particular dayshift.
 8      Q. And is your answer the same for the ████████
 9        shift?
10      A. It is.
11      Q. Okay.
12      Do you carry equipment with you on a 24-hour
13        post?
14      A. I do.
15      Q. Okay.
16      And do you need to have all of that equipment on
17        your person at the start time of the scheduled shift?
18      A. Yes.
19      Q. Okay.
20      And do you wear a uniform, as a Correctional
21        Officer?
22      A. I do.
23      Q. And where --- do you need to be in uniform at the
24        start of your scheduled shift?
25      A. Yes.
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And when are you expected to be in uniform?

2      A. From the second I enter the A1 lobby.

3      Q. And would you be expected to be in uniform while

4      walking to your post, even if it is prior to the start

5      of your scheduled shift?

6      A. Yes.

7      Q. Okay.

8    And are you expected to be in uniform while after

9      you have been relieved from your post while exiting

10     institution, even if it's after your scheduled shift?

11     A. Yes.

12   ATTORNEY BLOCK:

13   I'm going to have you turn to the binder

14     that has a green cover on it and look at the document

15     that marked as JX-1.

16                           ---

17   (Whereupon, Joint Exhibit JX-1, Position

18   Description - Correctional Officer

19   (GS0007-08), was marked for

20   identification.)

21                           ---

22     BY ATTORNEY BLOCK:

23     Q. Please let me know when you have it.

24     A. I have it in front of me.

25     Q. And do you recognize this document?

320

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1      A. I apologize.  I have the binder in front of me.

2      Q. Okay.

3      A. I don't know what number.

4      Q. Turn to the tab that is marked as JX-1.  It

5      should be the first tab.  I believe there are two or

6      three binders of green covers, and you need to make

7      sure you have the correct one.

8      A. The binder says JX-1 to JX-22.

9      Q. Yes, that's correct.

10     A. Okay.

11     Q. So the tab that's marked JX-1.

12     A. Yes.

13     Q. The first tab.

14   Do you have it open?

15     A. The first page?

16     Q. Do you have the document that is JX-1 opened in

17     front of you?  What are you looking at?

18     A. I have the binder in front of me.  It says Joint

19     Trial Exhibits JX-1 to JX-22 with the green binder in

20     front of me.

21     Q. You can open the binder.

22     A. Okay.

23     Q. And go to the tab that's marked as JX-1, the

24     first tab.

25     A. Okay.  So okay.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      Q. Do you have that document open in front of you?

2      A. I have the very first page.

3      Q. Okay.

4    It should say position description, Correctional

5      Officer Senior Officer Specialist GS007-08.

6    Is that what you're looking at?

7      A. Yes, I am.

8      Q. Okay.

9    Do you recognize this document?

10   JUDGE:

11   I'm sorry, Ms. Block.  He's looking at

12     the table of contents.

13   ATTORNEY BLOCK:

14   Okay.  Thank you.

15     BY ATTORNEY BLOCK:

16     Q. Do you see the tabs on the side of your binder?

17     A. Yes.  There's like different numbers.

18     Q. Yes.  There should be one number one.

19     A. Okay.  I got it now.

20     Q. Now, are you looking at the document that says

21     position description?  It should have a JX-1 green

22     sticker on the bottom.

23     A. Yes.

24     Q. Okay.

25   Do you recognize this document?

322

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1       A. Yes.

2       Q. Okay.

3    And is this the position description that applies

4       to you in your current position as Senior Officer

5       Specialist?

6       A. Yes.

7    ATTORNEY BLOCK:

8    All right.  I request that this document

9       be admitted.

10   ATTORNEY VALLACHER:

11   No objection.

12   JUDGE:

13   It's admitted.

14                          ---

15   (Whereupon, Joint Exhibit JX-1, Position

16   Description - Correctional Officer

17   (GS0007-08), was admitted.)

18                          ---

19   ATTORNEY BLOCK:

20   Okay.

21   JUDGE:

22   We got there eventually.

23   ATTORNEY BLOCK:

24   Yes.  I appreciate your assistance.

25       BY ATTORNEY BLOCK:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1      Q. Okay.
2  If you could look to the paragraph, the first
3      paragraph under where it says major duties and
4      responsibilities.
5  Do you see that heading?
6      A. Yes.
7      Q. Okay.
8  The first paragraph below that says provide
9      supervision, care, and correctional treatment of
10     inmates, and guidance to lower graded Correctional
11     Officers.  Incumbent is concerned with the maintenance
12     of institution security, contributing to the health
13     and welfare of the inmates, and the promotion of the
14     public relations.
15 Is that one of your major duties and
16     responsibilities as a Correctional Officer?
17     A. Yes.
18     Q. Okay.
19 And when are you expected to perform that job
20     duty?
21     A. At all times on duty.
22     Q. All right.
23 Does that include time that you are inside the
24     institution before and after your scheduled shift?
25     A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      Q. And the paragraph right below that, it says, as
 2      an employee in federal correctional facility, the
 3      incumbent is subject to arduous, adverse and stressful
 4      working conditions and environments.
 5   Do you agree with that statement?
 6      A. Yes.
 7      Q. Okay.
 8   And when are you subject to such arduous, adverse
 9      and stressful working conditions and environments?
10      A. At any given time.
11      Q. At any given time when?
12      A. At any given time that I am on duty.
13      Q. And is that in the time before and after your
14      scheduled shift?
15      A. Yes.
16      Q. Paragraph right below that one.  It says enforces
17      rules and regulations governing facility security,
18      inmate accountability, and inmate conduct to ensure
19      judicial sanctions are carried out and inmates remain
20      in custody.
21   Is that one of your duties and responsibilities
22      as a Correction Officer?
23      A. Yes.
24      Q. And when are you expected to perform that job
25      duty?
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       A. At all times that I am on duty.

2       Q. Does that include times before and after your

3       scheduled shift?

4       A. Yes.

5       Q. I'm going to jump two paragraphs below that.  The

6       first sentence says is subject to being in such

7       hostile or life-threatening situations as riots,

8       assaults and escape attempts.

9    Do you agree with that statement?

10      A. Yes.

11      Q. Okay.

12   And when are you subject to such conditions?

13      A. At all times that I am on duty.

14      Q. Okay.

15   Does that include times before and after your

16      scheduled shift?

17      A. Yes.

18      Q. Okay.

19   You can flip to the next page and there's a

20      heading that says nature of sign-in.

21   Do you see that?

22      A. Yes.

23      Q. Okay.

24   Two paragraphs down.  The paragraph starts must

25      maintain the control and discipline of inmates in such

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      areas such as the auditorium, housing units,
2      segregation, recreation areas, dining room, et cetera.
3   Is that part of the nature of your assignment as
4      a Correctional Officer?
5      A. Yes.
6      Q. And when are you expected to maintain control and
7      discipline of inmates?
8      A. At all times that I am on duty.
9      Q. Does that include times before and after your
10     scheduled shift?
11     A. Yes.
12     Q. You can flip to the next page.  The first full
13     paragraph at the top starts --- the second sentence
14     says maintain strict control over hazardous tools,
15     locks, keys, and other items that could be used to
16     affect an escape or cause injury to staff and or
17     inmates.
18   Do you see that sentence?
19     A. Yes.
20     Q. Okay.
21   And do you agree that that is part of the nature
22     of your assignment as a Correctional Officer?
23     A. Yes.
24     Q. And when are you expected to maintain strict
25     control over these items?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       A. At all times that I am on duty.

2       Q. Okay.

3    Does that include times before and after your

4       scheduled shift?

5       A. Yes.

6       Q. The next paragraph from the second sentence says

7       work within a prison environment requires a special

8       ability for alertness, requiring keen mental and

9       physical effort.

10    Do you agree with that statement?

11       A. Yes.

12       Q. And when are you required to have --- to be alert

13       and utilize key mental efforts?

14       A. The second I walk into the A1 lobby.

15       Q. And the next sentence immediately following that

16       says must be aware of group or individual attention,

17       alert to unpredictable behavior, and generally

18       sensitive to signs of trouble which would result

19       injury.

20    Do you see that?

21       A. Yes.

22       Q. And is that part of the nature of your

23       assignment?

24       A. Yes.

25       Q. And when are you expected to be aware of such

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    tensions and alert to unpredictable behavior?

2    A. At any given time.

3    Q. Does that include times before and after your

4    scheduled shift?

5    A. Yes.

6    Q. The paragraph below that says initiates and

7    participates in the searching of inmates, inmate

8    housing units, or inmate work areas to prevent the

9    introduction of contraband.

10   Is that one of your job duties as a Correctional

11   Officer?

12   A. Yes.

13   Q. And when are you expected to search inmates?

14   A. At any given time.

15   Q. Could that include times before and after your

16   scheduled shift?

17   A. Yes.

18   Q. And if you flip to the next page, at the very ---

19   which is the page that says level of responsibility,

20   but we're going to go to the very bottom of the page.

21   The final paragraph says the work performed is within

22   federal prison incumbent and subject to possible

23   hostage and assault situations.

24   Do you agree with that statement?

25   A. Yes.

329

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1      Q. And when are you subject to possible hostage and
2      assault situations?
3      A. Any given time.
4      Q. Does that include times before and after your
5      scheduled shift?
6      A. Yes.
7      Q. And then flip to the next page two sentences
8      later.  It says daily stress and exposure to
9      potentially dangerous situations such as physical
10     attacks are an inherent part of this position.
11 Do you agree with that statement?
12     A. Yes.
13     Q. And when could you be exposed to potentially
14     dangerous situations, such as physical attacks?
15     A. At any given time.
16     Q. Does that just be times before and after your
17     scheduled shift?
18     A. Yes.
19 ATTORNEY BLOCK:
20 Okay.  You can set that binder --- or
21     that document aside, but I'm going to have you flip to
22     JX-65.
23 You know what?  That's the wrong number.
24     I apologize.  I believe it's actually JX-73 and JX-74.
25                              ---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

```
 1    (Whereupon, Joint Exhibit JX-73,
 2    McPhillips Assignment Cards 2016 - 2019,
 3    was marked for identification.)
 4    (Whereupon, Joint Exhibit JX-74,
 5    McPhillips Assignment Cards 2019 - 2022,
 6    was marked for identification.)
 7                              ---
 8    BY ATTORNEY BLOCK:
 9    Q. So it may be in a different binder, but it's ---.
10    A. I have JX-71 to JX-110.
11    Q. Okay.
12    That's the correct binder.
13    If you could flip to the tab marked JX-73.
14    A. I'm there.
15    Q. Okay.
16    And do you recognize this document?
17    A. Yes.
18    Q. Is this a list of all of the daily assignments
19    that you have worked between the days of April 9th,
20    2015 and October 8th, 2019?
21    A. Yes.
22    ATTORNEY BLOCK:
23    I move to admit JX-73.
24    ATTORNEY VALLACHER:
25    No objection.
```

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1   JUDGE:
 2   I notice that it's been modified in some
 3     way.  There's highlighting and writing in pen.
 4   I assume that you weren't objecting to
 5     authenticity on that basis?
 6   ATTORNEY VALLACHER:
 7   I have no idea what that handwriting is,
 8     but I don't think that it's relevant to either
 9     party's ---.
10   JUDGE:
11   Okay.  Just making sure.  It's admitted.
12                           ---
13   (Whereupon, Joint Exhibit JX-73,
14   McPhillips Assignment Cards 2016 - 2019,
15   was admitted.)
16                           ---
17   ATTORNEY BLOCK:
18   And just for clarity, my understanding
19     is that's how the document was produced to us.
20   JUDGE:
21   All right.
22     BY ATTORNEY BLOCK:
23     Q. Okay.
24   Ms. McPhillips, if you could turn to the next
25     tab, which is JX-74.
```

332

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Do you recognize this document?

2     A. Yes.

3     Q. And is this a similar daily assignment document

4     to the one you just looked at as JX-73, but for

5     different dates?

6     A. Yes.

7     Q. Does this document cover your daily assignments

8     from the dates of October 9th, 2019 through

9     October 20th, 2022?

10    A. Yes.

11   ATTORNEY BLOCK:

12   Okay.  I'd request that JX-74 be

13    admitted.

14   ATTORNEY VALLACHER:

15   No objection.

16   JUDGE:

17   It's admitted.

18                          ---

19   (Whereupon, Joint Exhibit JX-74,

20   McPhillips Assignment Cards 2019 - 2022,

21   was marked for identification.)

22                          ---

23    BY ATTORNEY BLOCK:

24    Q. Since April of 2016, have you been assigned to

25    work on the 24 hour housing unit post on morning watch

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1       and evening watch?

2       A. Yes.

3       Q. Have you been assigned to work in the unit called

4       the ██████ on morning watch?

5       A. Yes.

6       Q. And since 2016, have you been assigned to work at

7       the Special Housing Unit or SHU-1 post on day watch?

8       A. For day watch?

9       Q. Yes.

10      A. I honestly don't recall if it was for a day watch

11      shift.

12      Q. Okay.

13  If there was a day watch shift for SHU-1 listed

14      in the daily assignment documents, would you agree

15      that you had worked that day watch shift?

16      A. Yes.

17      Q. Okay.

18  And have you --- since 2016, have you worked the

19      Special Housing Unit 2 post when it has been a 24-hour

20      post?

21      A. Just for a specific shift or just in general?

22      Q. I'll ask about a specific shift.  Have you worked

23      on the SHU-2 post as a 24-hour post on day watch and

24      evening watch?

25      A. Yes.

334

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    Q. And have you worked since 2015 on the compound
2    one post on morning watch and evening watch?
3    A. Yes.
4    Q. And you worked as control one on the morning
5    watch?
6    A. Correct.
7    Q. So for purposes of your testimony today, will you
8    agree to limit your answers to the experiences of the
9    times that you've been assigned to these posts I just
10   asked you about unless I ask you about something
11   specific?
12   A. Yes.
13   Q. I already asked if you wear a uniform, but could
14   you describe the uniforms that you wear as a
15   Correctional Officer?
16   A. Yes.  So we have a ███████ and ███████ uniform.
17   ██████ is supposed to be used for specifically
18   certain posts.  Generally that involves the public
19   having eyes on you. ████████████████████████
██   ████████████████████████████████████
██   ████████████████. ████████ is more inside an
22   institution or specific post. ███████████████ █
██   ████████████████████████████
24   Q. Do the ████████ and ██████████████ include your
25   name on them?

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1      A. They do.

2      Q. Okay.

3   Do they have a Bureau of Prisons logo on them?

4      A. Yes.

5      Q. Do both versions of the uniform identify you to

6      inmates as a Correctional Officer?

7      A. Yes.

8      Q. Do you wear a duty belt as a Correctional

9      Officer?

10      A. Yes.

11      Q. And what is a duty belt?

12      A. A duty belt is a belt that you put over your

13      regular belt to help you.  Excuse me.  It would pretty

14      much help you secure any items you have while you're

15      on duty.

16      Q. And how, if at all, is it different from your

17      regular belt?

18      A. It's slightly stronger than a typical belt.  It's

19      probably about three times the size.  Just in general,

20      it's just a fatter belt in general.  It's stronger.

21      It really wouldn't be able to do your job without it.

22      I really don't know really what to say.

23      Q. In your experience, do all Correctional Officers

24      who work custody posts wear duty belts at FCI

25      Otisville?

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

```
 1    A. Yes.
 2    Q. And are you aware of any Correctional Officer at
 3    Otisville who does not wear a duty belt when working
 4    on a custody post?
 5    A. Yes.
 6    Q. While working a custody post?
 7    A. ████████ .
 8    Q. Oh.  Other than ██████  are you aware of any
 9    Correctional Officer at FCI Otisville who does not use
10    a duty belt while working a custody post?
11    A. ██████  and██████████
12    Q. Does everyone else on a custody post wear a duty
13    belt?
14    A. Yes.
15    Q. I believe you just testified that you couldn't do
16    your job without wearing a duty belt.
17  Is that accurate?
18    A. Yes.
19    Q. And why do you say that?
20    A. Because we're required to have a certain amount
21    of equipment on us at all times.  It would be
22    impossible for us to have those items on us without
23    the duty belt.
24    Q. Do you wear belt keepers?
25    A. I do.
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. And can you just briefly describe what those are?

2    A. Sure.

3    So belt keepers is like a little like strap that

4    you would secure your duty belt with your regular

5    belt.  And primarily it's used to help support the

6    weight of the equipment that you have on the duty belt

7    to ensure that the duty belt does not fall to the

8    ground.

9    Q. Where did you get your belt keepers?

10   A. I purchased them online.

11   Q. Did the agency give you an allowance to purchase

12   them?

13   A. They gave me a uniform allowance.  I used that

14   money to purchase them.

15   Q. Did you purchase your duty belt?

16   A. Yes.

17   Q. Did you use the uniform allowance for that as

18   well?

19   A. Yes.

20   Q. And when you arrive to the front lobby to report

21   for a shift, do you bring your duty belt with you?

22   A. Yes.

23   Q. And what is attached to the duty belt at that

24   point you're arriving in the front lobby?

25   A. I have my cup holster, my radio holster.  I have

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1     a flashlight, OC holster, and gloves.  I also have
 2     these metal --- not sure I'm saying the word right,
 3     like clips.  You know the clips that's used to hold
 4     the keys.
 5     Q. Do you use metal chits as a Correctional Officer?
 6     A. Yes.
 7     Q. Do you carry those on your duty belts?
 8     A. Yes.
 9     Q. Do you have those on your duty belt when you're
10     arriving in the front lobby?
11     A. Yes.
12     Q. And I just mentioned the chits.  What are the
13     chits?
14     A. ███████████████████████████████████
       ████████████████████████████████████████████████
       ██  ████████████
17     Q. Do you use it to chit out equipment on a 24-hour
18     post?
19     A. Yes.
20     Q. Which equipment do you use that for?
21     A. In certain situations where we may be required to
22     do so.  I'll give you an example.
23     Q. Sure.
24     Q. So actually it's actually happening right now if
25     an inmate is on suicide watch.  So the compound one
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1   officer is ███████████████████████████████████████
██  █████████████████████████████████████████████████████
██  ██████████████████████████████████████.  So
 4   if that situation arises, compound has to stop by
 5   control and chit out the chit that the other officer
 6   currently has keys to.  In order to relieve that
 7   officer properly, you're supposed to stop by control,
 8   get his chit, put your chit on that side of keys.
 9   Then you walk down, relieve the Compound Officer
10   that's currently on duty. █████████████████████████
██  ██████████████████████████████████████████
██  ██████████████████████████████████████████
██  ██████████████████████████████████████  That is doing the
14   release.
15   Q. █████████████████████████████████████
██  ████████████████████████████████████████████████████
██  ███████████████████████████████████████████████████
██  ████████████████████.
19   Is that right?
20   A. Yes.
21   Q. Do you use the chits for any other equipment on a
22   24-hour post?
23   A. At this moment I can't think of anything as a
24   possibility.  I really have to, you know, think hard
25   on that.  But at this very moment I can't think of
```

340

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    anything.
2    Q. Is there equipment maintained on the post that
3    isn't exchanged person to person during a relief?
4    A. I'm sorry, can you repeat the question?
5    Q. Sure.  You work housing units.
6  Right?
7    A. Yes.
8    Q. In a housing unit, is there equipment that is
9    maintained on the post?
10   A. Yes.
11   Q. Is that something called shadow board?
12   A. Yes.
13   Q. Do you need your chits to do anything in
14   relationship to the equipment in the shadow board?
15   A. Yes.
16   Q. And what is that?
17   A. So in order to use that equipment, you're
18   supposed to put one of your chits on that item to be
19   accountable for that should you accidentally take it
20   home or they go missing.
21   Q. And are those the chits that you bring in with
22   you on your duty belt?
23   A. Yes.
24   Q. Are the chits issued to you by the Bureau of
25   Prisons?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1     A. Yes.
 2     Q. Is accountability of equipment important at FCI
 3     Otisville?
 4     A. Yes.
 5     Q. Why?
 6     A. It's part of the safety and security of the
 7     institution.  If something where you go missing, which
 8     has actually happened, you know, we need to find that
 9     item and ensure it's not possession of an inmate.
10     Q. Could you safely or effectively do your job on a
11     custody clip without the chit?
12     A. No.
13     Q. Why not?
14     A. Because we wouldn't be technically allowed to use
15     any of this equipment that we're required to use to do
16     our job properly.
17     Q. You also mentioned key clips.
18  What are those?
19     A. So key clips is something we have on our duty
20     belt and it's --- so we have one set of keys.  You're
21     supposed to have two --- what was the word?  Sorry.
22     Key clips.  Is that what you were saying?  Metal
23     clips.  I'm sorry.
24  Zoning out a little bit.  So the metal clips is
25     used to pretty much holding your keys to points of
```

342

Trial

Kathy Aitken, et al. v. USA                           3/13/2023

1     contact on your duty belt.

2     Q. And are the metal clips or the keys required by

3     the Bureau?

4     A. The keys are required, yes.

5     Q. Are the clips required?

6     A. Yes.  In order to be in possession of those keys,

7     yes.

8     Q. And is accountability of keys important at FCI

9     Otisville?

10    A. Yes.

11    Q. Why?

12    A. You need --- without the keys, you wouldn't be

13    able to probably open any doors in prison.  You

14    wouldn't be able to respond.  You really wouldn't be

15    able to do your job properly without any keys.

16    Q. You also mentioned an OC holster.

17    Was that issued to you by the Bureau?

18    A. I'm sorry, a what?

19    Q. The OC holster.

20    A. Yes.

21    Q. Was that issued to you by the Bureau of Prisons?

22    A. Yes, it was.

23    Q. Can you do your job safely or effectively by

24    carrying the OC spray not in your holster?

25    A. No.

343

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. Why not?

2    A. If you were responding to an emergency situation

3       and you don't have that OC probably secure, it could

4       fall off on your way to responding to emergency.  And

5       not just that.  Just in general.  If you're just

6       walking around and you don't have that OC secure, it

7       falls around or somebody could try to --- you know, if

8       they see part of the OC maybe in your pocket or

9       something, they could try to grab it and don't have

10      access to that item anymore.

11   Q. I believe you also mentioned a radio holster.

12   Is that right?

13   A. Yes.

14   Q. And where did you get that from?

15   A. It's been so long.  I believe I purchased it

16      online.  It's possible I purchased this from some type

17      of law-enforcement store.

18   Q. Did the agency give you an allowance to purchase

19      that item?

20   A. I used part of the uniform allowance to help

21      purchase the item.  So I would say yes.

22   Q. And why do you carry the radio holster?

23   A. To hold my radio.

24   Q. Why is it important that it's carried in a

25      holster?

Trial
Kathy Aitken, et al. v. USA                              3/13/2023

1        A. Because you don't want it to fall off. 

            This is one of a

11       handful of reasons.
12    I think one other reason would be if you're
13       responding to an emergency situation and you need to
14       start running, there's a possibility of that radio
15       falling off.  I've actually seen officers who don't
16       have the radio holster where they ran to a body alarm
17       or whatever situation was at the time, and the radio
18       just fell to the ground.
19       Q. You just mentioned a body alarm.
20    What is a body alarm?
21       A. A body alarm is when control gets notified of a
22       certain staff member hitting a red button in the radio
23       and it pretty much is used for staff to notify control
24       that they're in need of some sort of assistance.
25       Q. Is the radio with the body alarm and the man down

345

Trial

Kathy Aitken, et al. v. USA                                  3/13/2023

1       function important to your job as a Correctional
2       Officer?
3       A. Yes.
4       Q. Why?
5       A. Protects safety of the institution.  We don't
6       know really what's going on that particular staff
7       member and we don't know if the inmate is starting to
8       do something that they're supposed to do, so ---.
9       Q. When you --- is there equipment that you obtain
10      through the relief process on a post on a 24-hour
11      post?
12      A. I'm sorry.  Could you repeat that?
13      Q. Sure.
14  When you're working a 24-hour post, is there
15      equipment that you obtain through the process of
16      relieving another officer?
17      A. Yes.
18      Q. And what equipment is that?
19      A. Primarily it's ███████████████████████████
    ███  ████████████████████████████████████████████
    ███  ██████████████████████████  I'm sorry.  There's also
22      something called the MK9, which is a bigger version of
23      the small OC, which is primarily used for compound.
24      That's something additional we're required to carry.
25      Q. So I know I asked you about the OC holster, but

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1     do you carry --- so the OC --- you obtain OC spray on
2     your hooks.
3  Correct?
4     A. Yes, when we're making the relief.
5     Q. Okay.
6  And is the OC spray important to your job as a
7     Correctional Officer?
8     A. Yes.
9     Q. Why?
10    A. It's a tool that pretty much keeps us safe if we
11    need to use it.  If there was something going on, like
12    an inmate was attempting to cause self-harm, we can
13    use that to save his life.  You know, it's just
14    something that would help us keep the institution
15    safe.
16    Q. And when you obtain the keys on your post through
17    the release process, what, are the keys covered in any
18    way?
19    A. Yes.
20    Q. Why are they covered?
21    A. To my understanding, ███████████████████
   ██ ████████████████████████████████████████████████
   ██ ██████████████████████████████████████████████
   ██ ████████████████  ████████████████████████████
   ██ ████████████████████████████████████████████████
```

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    ████████████████████████████████████

2    ██  ████████████████████████████████████

3    ██  ████████████████████████████████████

4    ██  ████████████████████████████

5    Q. And you testified that there are multiple key

6    rings that you can post.

7    Is that right?

8    A. Yes.  Depending on the post.

9    Q. Approximately how many keys does an officer carry

10   on a housing duty post?

11   A. I believe right now it's typically ████

12   Q. And are --- how many keys would an officer carry

13   on a SHU post?

14   A. Are you talking SHU-1 or SHU-2?

15   Q. Let's start with SHU-1.

16   A. SHU-1, are you talking about different sets of

17   keys or all the keys added combined?

18   Q. The actual keys.

19   A. Sorry.  I'm so confused.

20   Q. How many keys are there when you're working a

21   SHU-1 total?  Not the ring, the actual key.

22   A. ████████████████████████████████

██   ██████████████

24   Q. Yeah.

25   And you can give me an approximate number.

348

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1      A. It's been a while since I worked there.  I would
2         probably guess at least ▮, maybe a little under,
3         maybe a little over.
4      Q. Are there more than ---?
5      A. Yes.
6      Q. And does compound carry more keys than housing as
7         well?
8      A. Yes.
9      Q. All Correction Officers assigned to a post inside
10        the institution must clear a security screening site
11        in the front lobby.
12    Correct?
13     A. That is correct.
14     Q. If you are assigned to a 24-hour custody post
15        inside the main institution on a day one shift,
16        approximately what time do you begin to clear the
17        metal detector on average?
18     A. You want a certain time or like how long it
19        takes?
20     Q. The time.
21     A. How do I clear the metal detector?  Is that what
22        you just asked?
23     Q. About what time is it when you are clearing the
24        metal detector if you're coming on for a day watch
25        shift?

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1        A. It could be anywhere from ███████████ .

2        Q. And is your practice as to when you begin

3        clearing the metal detector the same regardless of the

4        shift to which you're assigned?  So for example, it

5        would be ███████████ on an evening watch shift and

6        ███████████ on a morning watch shift?

7        A. Not necessarily. ███████████████████████

█        ███████████████████  So there's a possibility of

9        more inmate traffic --- I'm sorry, staff traffic in

10       the lobby that also need to get screened before I

11       arrive.  It's also possible that the lobby officer is

12       preoccupied with another situation and he has to deal

13       with that before he can get to the staff that's going

14       to be screened.

15    I would say it's, you know, even if it's evening

16       watch or morning watch, it's a possibility of lobby

17       officer, you know, he has to focus on doing certain

18       things prior to, I'm sorry, prior to him being able to

19       continue to process the staff member through the x-ray

20       machine.  So it's hard to really answer that question.

21       Q. When do you aim to be through this training site

22       in relation to your scheduled shift?

23       A. You want the time or like how --- I'm sorry.  I'm

24       confused by the question.

25       Q. Sure.

Trial

Kathy Aitken, et al. v. USA                           3/13/2023

1    Are there typically other Correctional Officers
2    assigned to your same scheduled shift going through
3    the screening process at approximately the same time
4    as you?
5    A. Yes.
6    Q. At that time, were there ever Lieutenants or
7    Captain present in the front lobby?
8    A. There has been certain situations where that has
9    happened.
10   Q. Is one of the situations an ID check?
11   A. Yes.
12   Q. And what does that ID check consist of?
13   A. So when we arrive inside institution, there has
14   been staff, I'm sorry, there's been a Lieutenant
15   occasionally in the lobby station where he'll ask us
16   to provide our credentials to verify who we are.
17   Q. And in any of these occasions where a Lieutenant
18   has been conducting an ID check in the lobby, have
19   they ever instructed you to wait until the start of
20   your scheduled shift to process through the screening
21   site?
22   A. No.
23   Q. Have they ever prevented you from going through
24   the screening site and proceeding to your post if it's
25   before the start of your scheduled shift?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     A. No.
2     Q. Is there a conveyor belt x-ray machine as part of
3     the screening process?
4     A. Yes.
5     Q. And what, if anything, did you put on that x-ray
6     belt when you are clearing through?
7     A. Usually my book bag, any additional jacket or
8     something that I'm wearing over my regular hoodie,
9     my duty belt, and any food I might have on me that
10    might be in the bag or something like that.
11    Q. Why do you put your duty belt on the conveyor
12    belt?
13    A. That's a requirement, to my knowledge.
14    Q. And are there metal items on your duty belt at
15    the time that you're proceeding through the screening
16    site?
17    A. Yes.
18    Q. And when do you secure your duty belt onto your
19    person?  Where do you put it on?
20    A. So once I've been screened through the lobby and
21    once my equipment --- all my personal belongings I put
22    in my duty belt have been screened through that
23    conveyor belt, once it gets to the other side,
24    assuming there's other staff in my way, I would then
25    proceed to put on my duty belt.

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. And why do you put it on ---?
2    A. I would say we're expected to.  It's easier for
3    us to respond to any situation that may arise on our
4    way to other posts.
5    Q. And just to be clear, is the location that you
6    put your duty belt on the A1 lobby?
7    A. Yes.
8    Q. And in your experience, is it the general
9    practice of Correctional Officers at FCI Otisville who
10   are working custody post to put the duty belt on in
11   the A1 lobby?
12   A. Yes.
13   Q. Do you wear a protective vest when you're
14   assigned to a custody post inside the institution?
15   A. Yes, with the exception of ███████ .
16   Q. And was that vest issued to you by the Bureau of
17   Prisons?
18   A. Yes.
19   Q. And when are you required to be wearing the vest?
20   A. From the second I --- I would say from the second
21   I arrive at the institution.
22   Q. And does that include times when you are walking
23   to your post prior to the start of your scheduled
24   shift?
25   A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. Are you required to be wearing the vest after
2    you've been relieved from post, but are returning back
3    to the lobby?
4    A. Yes.
5    Q. Have any of the Lieutenants that have been in the
6    lobby when you are also in the lobby arriving for a
7    shift instructed you not to put your duty belt on in
8    that location?
9    A. No.
10   Q. If you're working a 24-hour post in a housing
11   unit SHU compound inside the institution, other than
12   ███████, what do you do after you put your duty belt
13   on?
14   A. I'm sorry.  Could you re-ask the question?
15   Q. Sure.
16   When you're working a 24-hour post, for example,
17   housing unit SHU or compound, what do you do next
18   after you put your duty belt on?
19   A. ████████████████████████████████████
██   ████████████████████████████████████
21   Q. Actually, do you do that as well when you're
22   working closely to the control center?
23   A. Do I do what?
24   Q. Go through that.
25   A. The A1 lobby?

354
Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. To A1, the A1 door?
2    A. Yes. ████████████████.
3    Q. And I think you may have said this, but how do
4    you --- who opens the doors to that A1 door?
5    A. ████████████████████████████████████
█    ████████████████████████████████
7    Q. You as a Correctional Officer coming on for a
8    shift, do you have the ability to open the door?
9    A. No.
10   Q. And once you're through that first door in the A1
11   sally port, what do you do next?
12   A. ████████████████████████████████
█    ████████████████    ████████████████████████
█    ████████████████████████████████████
█    ████████████████████████████████
█    ██████    ████████████████████████████████
█    ████████████████████████████████    ██
█    ████████████████████████████████████
█    ████████████████████████████████
20   Q. And what does it signify when you flip your
21   accountability chit?
22   A. That you're inside the institution.
23   Q. Is the accountability chit board accessible to be
24   viewed by staff at any time of the day?
25   A. Yes.

Trial

Kathy Aitken, et al. v. USA                          3/13/2023

1    Q. And approximately --- if you're working at day
2    watch shift, approximately what time is it when you
3    are finished clearing through the A1 sally port on
4    average?
5    A. Somewhere between I'd say ██████████.
6    Q. And once you have walked out of that A1 sally
7    port, where do you go next?
8    A. I make my way down towards control.
9    Q. ████████████████████████
██   ████████████████████████████████?
11   A. That is correct.
12   Q. And where do you go from there if you are working
13   in post other than control?
14   A. ████████████████████████████
██   ████████████████████████████.
16   Q. If you're working a 24-hour post, do you have to
17   stop at the control center, for instance?
18   A. Yes, sometimes.
19   Q. And what are those occasions where you might have
20   to stop at the control center?
21   A. I mentioned it earlier with the suicide companion
22   scenario.  I can go over it again, if you want.
23   Q. And just to make sure I'm clear, are you
24   referring to what you testified about earlier where
25   you may need to obtain an extra set of keys if you're

Trial
Kathy Aitken, et al. v. USA                                   3/13/2023

1   working a compound post if there is an inmate on

2   suicide watch?

3   A. That is correct.  You would not have to actually

4   obtain the keys.  You would just be swapping out chits

5   with the officer that currently has those keys.

6   Q. The chits would be in the control center?

7   A. Correct.

8   Q. And if you --- what do you do after that, if

9   you're working on a post other than control?

10  A. I would then wait.  I would then stand by that

11  first compound door and wait for control to open it.

12  Q. ███████████████████████████████████████

    ███ ██████████████?

14  A. Yes.

15  Q. Does the control center operate both sets of

16  doors?

17  A. I'm sorry, what?

18  Q. Does the control center operate both sets of

19  doors ---?

20  A. Yes.

21  Q. And once you are through that sally port, are you

22  on compound?

23  A. Yes.

24  Q. And what is your state of mind as you walk across

25  the compound?

357

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1     A. A state of alertness.  Just being mindful of my
2     surroundings.
3     Q. And do you walk across the compound to your post
4     if you're working in a housing unit, in a Special
5     Housing Unit or as a Compound Officer?
6     A. Yes.
7     Q. And are you doing anything while you are walking
8     to your post?
9     A. Yes.
10    Q. And what are you typically doing?
11    A. Just pretty much, you know, as I'm walking, just
12    looking around to make sure that nothing's out of the
13    ordinary, being alert.
14    Q. Do you do that on all three of the shifts,
15    evening watch, morning watch, and day watch?
16    A. Yes.
17    Q. Do you ever interact with inmates on your walk to
18    a post?
19    A. Yes.
20    Q. And when would you do that?
21    A. If an inmate is doing something they're not
22    supposed to be doing.
23    Q. Like what, for example?
24    A. You know, they're on the grass, tell them to get
25    out of the grass.  If they're maybe improperly wearing

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      the uniform some way, maybe they have their hat
2      backwards.  Just doing small, out of pocket things
3      they're not supposed to be doing.
4      Q. And how often do you interact with inmates to
5      correct behavior like that?
6      A. It's not something I really keep track of, but it
7      happens occasionally.
8      Q. And why is it important to make those
9      corrections?
10     A. Because inmates try to get away with things, and
11     they start off with the small things.  And then if you
12     let the inmates get away with the small things, then
13     the topic goes from bad to worse, and then they start
14     doing worse --- way worse than what the small
15     infractions that I mentioned earlier.
16     Q. And you mentioned that one of the things you're
17     doing on your walk to your post is scanning your
18     surrounding and looking for things that are out of the
19     ordinary.
20   Is that accurate?
21     A. Yes.
22     Q. And do you do that on your walk to your post,
23     even if there are no inmates typically near you?
24     A. Yes.
25     Q. Are you expected by the Bureau of Prisons to do

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1    the things that you just mentioned, scanning your
2    surroundings, interacting with inmates, correcting
3    behavior while you are walking to your post?
4    A. Yes.
5    ATTORNEY VALLACHER:
6    Objection.  Foundation.  Speculation.
7    JUDGE:
8    I'm not sure why --- what foundation do
9      you think is missing?
10   ATTORNEY VALLACHER:
11   Are you expected by whom?  How do we
12     know who's expecting?
13   JUDGE:
14   Overruled.
15   ATTORNEY VALLACHER:
16   Okay.
17      BY ATTORNEY BLOCK:
18      Q. Do you need me to re-ask the question?
19      A. Yes, please.
20      Q. Are you expected by the Bureau of Prisons to do
21      the things you just mentioned, scanning your
22      surroundings, interacting with inmates, correcting
23      their behavior on your walk to post?
24      A. Yes.
25      Q. Has a supervisor ever instructed you not to do

Trial

Kathy Aitken, et al. v. USA                                   3/13/2023

1      these things on your walk to or from a post?
2      A. No.
3      Q. When is a Correctional Officer assigned to a
4      24-hour post allowed to leave their post?
5      A. Once they've been properly relieved.
6      Q. And what does it mean to be properly relieved?
7      A. The officer that's scheduled to work the next
8      shift arrives the institution from the lobby, makes
9      his way down to the assigned post. ██████████████

██    ██████████      ████████████████      ██████

██    ████████████████      ████████████████

██    ██████████  ██████████████████████

██    ████████████████████████

██    ██████████████████████████████████

██    ████████████████████

16     Q. Does proper relief require an information and
17     equipment exchange?
18     A. Yes.
19     Q. And do all 24-hour posts require a proper relief?
20     A. Yes.
21     Q. If you're working a housing unit post --- and now
22     let's talk about evening watch.
23     If you're working on a housing unit post on
24     evening watch, approximately what time is it on
25     average when you are arriving at the entrance of the

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      housing unit?
2      A. I would say probably ███████, something like
3      that.  It could be a little bit earlier, could be a
4      little bit later.
5      Q. On average, how long does it take for you to walk
6      from the moment you step onto the compound to the
7      direct housing unit?
8      A. It's going to depend on the housing unit.  Some
9      are further away from the door. ████████████████
10 █      ██████████████████████████████
11     Q. And what is the furthest housing unit?
12     A. Either ███████    I'm guessing it's the ██
13     housing unit.
14     Q. And how long does it take you to walk to the
15     Special Housing Unit?
16     A. From?
17     Q. From the moment you stepped onto the compound
18     after you cleared the sally port.
19     A. I'm sorry.  Can you ask the question because I'm
20     little a confused.
21     Q. Sure.
22  I just asked you about how long the walk from the
23     moment you step on the compound to a housing unit.
24     A. Yeah.
25     Q. How long is that walk if you were going to the

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

```
1     Special Housing Unit instead of a regular housing
2     unit?
3     A. ████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████  ████████████████████  ---
6     Q. Yes.
7     A. --- inside the Special Housing ---?
8     Q. ████████████████████████████████████████.
9     A. Okay.
10    So I would say about ████████████.  ██████████████
      ██  ████████████
12    Q. And where is the post location for a compound
13    post?
14    A. ████████████████████████████.
15    Q. Has it always been at ████████████████?
16    A. No.
17    Q. Where was it before that?
18    A. Prior to that, it was located in Lieutenant's
19    Office.
20    Q. And you can give me a range, but how long does it
21    take for you to walk from that same point where you're
22    entering, just stepped onto the compound to the place
23    where you do your compound ---?
24    A. I'd say ████████████████████████.
25    ATTORNEY VALLACHER:
```

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

    1    Objection.  Could we just get
    2      clarification on at what time period, because he just
    3      mentioned two different locations?
    4    ATTORNEY BLOCK:
    5    Sorry.
    6    JUDGE:
    7    That's a fair point, because he talked
    8      about Lieutenant's Office location or the ---.
    9    THE WITNESS:
   10    Oh, yeah.  I'm sorry.
   11    JUDGE:
   12    Or the ███████████ location.
   13    ATTORNEY BLOCK:
   14    I will ask two separate questions.
   15      A. I'm sorry to interrupt everyone.  Can you re-ask
   16      that question now, because I wasn't even paying
   17      attention ---
   18    BY ATTORNEY BLOCK:
   19      Q. Yes.
   20      A. --- to that?  Sorry.
   21    JUDGE:
   22    Yes.  So that objection's sustained.
   23      Let's clarify what the exact pinpoints he's talking
   24      about.
   25    BY ATTORNEY BLOCK:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. So when the compound post was located in the
2      Lieutenant's Office, how long would it take you to
3      walk from stepping onto the compound to the door of
4      the Lieutenant's Office?
5      A. Okay.
6    So that would probably be, you know, ████████████
   ██      ████████ , because I'm just guessing, because I don't
8      actually time it.
9      Q. And how long on average would it take me to walk
10     from the compound, stepping onto the compound to the
11     ████████ ?
12     A. ████████████████ .
13     Q. And now let's talk about the inside housing
14     units.
15     What do you do once you arrive at the unit?
16     A. Once I arrive inside the unit?
17     Q. Once you arrive at the door to the unit, what
18     happens next?
19     A. So at that point I will try to make contact with
20     the officer currently inside ████████████████████
   ██      ████████████████████ .
22     Q. How do you do that?
23     A. I kind of really just look for him through the
24     office window or the common areas, and I just kind of
25     knock on the glass or the door just to get his

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      attention.

2      Q. Do you have a radio at that point?

3      A. I do not.

4      Q. And once you have his attention and he sees you

5      there, what happened next?

6      A. ███████████████████████████████████████████

7  █   ███

8      Q. And do you relieve him once you're inside?

9      A. Yes.

10     Q. And what does that relief consist of?

11     A. So once I'm inside the office, after they let me

12     in, I usually go over anything that might be --- has

13     happened during his shift or anything that he wants me

14     to be aware of.  And then at the same time we'll be

15     exchanging equipment and I'll just verify that I have

16     everything.  And I take a look at the cage to make

17     sure there's no equipment from the cage missing.  And

18     I'll look at the battery and ensure that the battery

19     is properly charged.

20     Q. Is it important for you ---?  Well, I guess, let

21     me ask this first.  What type of information do you

22     discuss as a part of the exchange?

23     A. Just anything out of the ordinary.  I think that

24     might be a safety or security concern that we should

25     be aware of, something that might have happened or

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

```
 1    something that might happen. ███████████████████

 █   ██████████████████████    ███████████████████████

 █   ████████████████████████████████████████████████

 █   ██████████████████████████████████████████████

 █   ██████████████████    Be aware that something like

 6    this, something might happen throughout your shift.

 7    So just, you know, be aware.

 8    Q. Is that type of information important for you to

 9    have when you arrive on post?

10    A. Yes.

11    Q. Why?

12    A. Safety and security of the institution.

13    Q. Is there --- there's a computer log called

14    ██████████████

15    Right?

16    A. Yes.

17    Q. Are you always able to check ████████████ at the

18    start of the scheduled tour?

19    A. It's not possible.

20    Q. Why not?

21    A. Because I have to arrive early in order for me to

22    be able to log into the computer in a timely manner,

23    and then I have to log into ████████████, and then I have

24    to go through it and see if anything has, you know,

25    happened throughout that earlier shift.
```

367

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       Q. And if you're working a housing unit post on
2       evening watch, that shift starts at ████████.
3   Is that right?
4       A. Yes.
5       Q. Is there anything else going --- is there
6       anything going on as you are coming on to an evening
7       long shift in a housing unit?
8       A. Yes, ███████████████████████.
9       Q. Do all Correctional Officers have access to
10      ████████, if you know?
11      A. No.
12      Q. No, they don't?
13      A. They eventually probably do, but not right away.
14      Q. So just to be clear, who does not have access to
15      ████████, if you know?
16      A. I can give you some scenarios that have happened
17      throughout ---. ████████████████████
██      ██████████████████████████████
██      ████████████████████████████████
██      ████████████████████████████████ ██
██      ██████████████████████████ ████████
██      ████████████████████
23      ████████████████████████████████
██      ████████████████████████████
██      ████████████████. Like I said, it comes down to

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    the computer service being able to do their job
2    properly, I would assume, to provide access to those
3    staff.
4  Additionally, you might have, you know, custody
5    staff on overtime, and some staff just don't know how
6    to use it properly, because they don't use it
7    frequently or they might be locked out because they
8    never used it in a certain amount of time.
9  It's also possible where staff members forget to
10   bring in the ████████ where I believe they would not
11   be able to access ████████ without their ████████
12   Q. And is all of the information that you just said
13   during your verbal exchange that you described, is
14   that information available in ████████?
15   A. Sorry.  Could you ask me that?
16   Q. Sure.
17 So you just described the type of information
18   that you discussed during the verbal exchange.
19 Right?
20   A. Yes.
21   Q. Is all of that information typically in
22   ████████?
23   A. No.
24   Q. What type of information would not be typically
25   found in ████████

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    A. So I mentioned earlier how an officer might

2    relieve another officer and the one that was currently

3    on duty that's about to go home will pass on

4    information of stuff that might --- that he might want

5    to be aware of.  That's something that wouldn't be

6    logged in ███████ , ████████████████████████

     █ ████████████████████████████████████████████

     █ ████████████████████████████████████████████

     █ ████████████████████████████████████████████

     █ ██████████████████████████████████ .

11   Q. And you mentioned that you transfer equipment on

12   post as well.

13   Right?

14   A. Yes.

15   Q. And I think earlier you testified that those

16   items that you transfer, that's the keys, radio, OC

17   and handcuffs potentially.

18   Is that right?

19   A. Yes.

20   Q. Do you transfer those items one at a time?

21   A. Yes.

22   Q. Why do you do that?

23   A. Because that's what transferring equipment ---

24   don't want to like throw it all at the officer at one

25   point.  I mean, it's very unlikely, but it's a

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1       possibility where something could happen.  An alert
2       from the control to all staff on the radio could be,
3       hey, we got a fight in another part of the
4       institution.
5   One of those staff members that is doing the
6       relief should go respond to that situation because
7       they're going to need all staff until told otherwise
8       by Lieutenant or control.
9   Additionally, as you're passing the equipment to
10      the officer that's relieving, you want to ensure that
11      he's able to hold all that equipment accountable and
12      verify that he has everything.
13      Q. And you also mentioned that you do an inventory
14      of the equipment in the cages as a part of the relief
15      process.
16  Is that right?
17      A. Can you repeat that?
18      Q. Yes.  I believe you testified that you also do an
19      inventory of the equipment in shadow boxes or cages as
20      a part of the relief process.
21  Is that right?
22      A. Yes, I verify that --- usually it's the handcuff
23      or the metal detector, or I'm sorry, the wand.  Pretty
24      much just verifying that either the officer has an
25      automatic passing to me or that's inside that cage.

371
Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Do you do that inventory while the outgoing
2      officer is still there?
3      A. Yes.
4      Q. And why do you do that?
5      A. Because I want to make sure that we know where
6      that item is if it's not in the cage or if he doesn't
7      have possession of it.
8      Q. In a housing unit, on average, how long does the
9      information and equipment inspection and exchange
10     take?
11     A. Inside the housing unit?
12     Q. In the housing unit.
13     A. It could be anywhere from two to five minutes.
14     Like I said, I don't actually time it, so I'm just
15     guessing.  It could be longer.  It could be a little
16     bit less.
17     Q. But is that estimated two to five minutes, based
18     on your experience?
19     A. Yes.
20     Q. Are there inmates in the housing unit during the
21     exchange, regardless of the shift that you're coming
22     onto?
23     A. Yes.
24     Q. Turning to the end of your shift, do you get
25     relieved when you're working on ███████████████

372
Trial
Kathy Aitken, et al. v. USA                                3/13/2023

1      A. Yes.

2      Q. And what time does your relief typically arrive

3      to the door of the housing unit, approximately?

4      A. I would answer that anywhere from like ████o

5      ████.  There's a big range on that, you know.

6      There's a lot of different factors having influence on

7      that.

8      Q. When you say --- you just said████.  Are you

9      referring to when you are working on an evening watch

10     shift?

11     A. Yes, I was saying ████.  And then it

12     was ████.  Now, it's ████.

13     Q. And to get to the housing unit to relieve you,

14     does that oncoming officer have to go through the same

15     process that you described about how you get to your

16     house, to the post when you are oncoming?

17     A. Yeah.  That's the best case scenario that I

18     discussed earlier.

19     Q. Once the officer arrives and relieves you, what

20     do you do?

21     A. I start to make my way outside the institution.

22     Primarily head towards compound and to the lobby.

23     Q. Do you do an equipment and information exchange

24     like you described for when you come onto your post?

25     A. Oh, yes.  So if I'm getting relieved, I ensure

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1      that the officer has all the equipment that I have on
2      me in my possession and I make sure that it was all
3      passed on to him.
4      Q. And does the relief information and equipment
5      exchange at the end of your shift typically take about
6      the same amount of time as the one when you're on ███
7      A. Yes, yes.
8      Q. And on average, what time are you able to leave
9      your housing unit and start heading back to the
10     compound sally port?
11     A. Like I said, it's --- every day is different.  So
12     typically I'd say anywhere from --- this is evening
13     watch.
14   Right?
15     Q. Sure.  Yes.
16     A. Anywhere from like ███████████.  Sometimes
17     could be a little bit earlier, sometimes a little bit
18     later.
19     Q. And does the walk --- do you then walk back from
20     the post to the compound sally port?
21     A. Yes.
22     Q. And does the walk take approximately the same
23     amount of time going in the opposite direction as it
24     did when you were walking to your post?
25     A. It's a yes or no question, because every day

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    could be different. ████████████████████
██  ███████████████████████████████████████████
██  ███████████████████████████    So it's kind of hard for
4    me to answer that.  Like I said, every day it's going
5    to be different.  There's no such thing as like a
6    consistency, really.
7    Q. Sure.
8    So actually I'm just asking about the walk from
9    once you've been let out of housing unit or until you
10   get back to the compound sally port.
11   A. Okay.
12   A. Is that time the same as when you walked in the
13   opposite direction going to the compound?
14   A. I understand that, yes.  I actually haven't gone
15   inside the sally port yet.  So I'm just in front of
16   that door.  Then yes, it is.
17   Q. And sticking with an evening watch shift,
18   approximately what time are you typically exiting the
19   A1 sally port back into the lobby?  You can give me a
20   range.
21   A. Exiting the A1 lobby into the sally port?
22   Q. The A1 sally port back into the lobby.
23   A. I'm sorry.  Could you re-ask the question?
24   Q. Sure.
25   On average, approximately what time are you

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    typically exiting the A1 sally port back into the
2    front lobby when you're coming off of an evening watch
3    shift?
4    A. So you want like what time is it?  Is that what
5    you're asking?
6    Q. What time is it typically when you're back at the
7    compound?
8    A. Okay.
9    So it's anywhere from like ████████████████.
10   Q. And have your practices been consistent since at
11   least April 2015 when you worked on a post in a
12   housing unit?
13   A. Yes.
14   Q. So when you are working on an ████████████████
15   post, approximately how long are you on duty on an
16   average day?
17   A. I would say at least ████--- I'm sorry.  At least
18   ████████████████.
19   Q. Now, let's talk about the Special Housing Unit.
20   Once you get to pick up, once you've gotten to the
21   door of the Special Housing Unit, how do you get into
22   the Special Housing Unit?
23   A. So once ████████████████████████████████
24   that's what you're asking me?
25   Q. Yes.

Trial
Kathy Aitken, et al. v. USA                                  3/13/2023

1    A. 

10   Q. And once you are inside the SHU, do you relieve
11   the outgoing officer?
12   A. Eventually, yes.
13   Q. And where do you make that relief inside the
14   Special Housing Unit?
15   A. The SHU-1 Office, as we call it.
16   Q. And what do you do as a part of that relief
17   process in the Special Housing Unit?
18   A. It's pretty much the same as the housing unit.
19   There's a little bit more information to pass on
20   normally because usually we have inmates coming and
21   going.  So we'll just pass on any information that
22   needs to be passed on.  Pretty much the same.  Passing
23   equipment, verifying that, you know, I passed all the
24   equipment that I had on me.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    At the same time, you might have to be opening
2    doors inside a special housing, so the other SHU
3    officers can conduct their rounds.
4    Q. Do you exchange the same equipment that you
5    described exchanging in a housing unit when they're
6    working on Special Housing Unit?
7    A Yes.
8    Q. Do you --- is there also a shadow board with
9    equipment at issue?
10   A. Yes.
11   Q. Do you inspect the item in the shadow board as a
12   part of your release process?
13   A. Yes.  It's a little bit harder because you have
14   multiple staff down there who also have chits on the
15   shadow board.
16   Q. When in a Special Housing Unit, about how long on
17   average does the equipment and information --- the
18   equipment exchange inventory and information exchange
19   take?
20   A. Probably anywhere from like four to ten minutes.
21   Like I said, I don't actually keep track of all these
22   estimates.  I'm guessing.  I'm just guessing.
23   Q. And what is that guess based on?
24   A. Just personal experience.
25   Q. And at the end of the shift in the Special

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1     Housing Unit, when you're working 24-hour posts, does
2     an officer come to relieve you?
3     A. Yes.
4     Q. And you're working evening watch, approximately
5     what time is it when the officer arrives to the door
6     of the Special Housing Unit to be let in on average?
7     A. So like what time he arrives?
8     Q. Yes.
9     A. I'd say probably like ████.  You want a range
10    or ---?
11    Q. Sure.  A range is fine.
12    A. Like ████████████, something like that.
13    Q. And once that officer arrives, do you then have
14    to let them into the Special Housing Unit?
15    A. Yes.
16    Q. And it's the same process you described for you
17    getting into the housing unit?  It's just that you are
18    now the officer inside?
19    A. Yes. ████████████████████████
      ██ ████████████████████████████████
21    Q. And do you do an information and equipment
22    exchange inventory at the end of your shift with the
23    oncoming officer at that point?
24    A. Yes.
25    Q. Does it take approximately the same amount of

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1     time as it did when you were arriving to your post?

2     A. Yes, I'd say so.

3     Q. And about what time is it typically if you're

4     working in the evening launch shift that you are able

5     to leave the Special Housing Unit and head back

6     towards the control sally port?

7     A. So you're asking what time I actually walk out of

8     the sally port doors from the Special Housing ---?

9     Q. Yes.

10    A. I would say anywhere from like ██████████

██       ██████     I mean, it could be a little bit less or a

12    little bit more that time frame.  Something I just

13    don't pay attention to, to be honest.

14    Q. Does it depend on the time that your release

15    arrives to the post?

16    A. That's one factor, yes.  It could also have ---

17    could also be control not pressing the sally port

18    button in the lobby compound issue, because they could

19    be dealing with other stuff that they have to focus on

20    before they can pop those doors.

21    Q. And have your practices been consistent since at

22    least April 2016 every time you've worked a 24-hour

23    post in a Special Housing Unit?

24    A. Yes.

25    Q. And on average on a typical day, about how long

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    are you on duty in the Special Housing Unit?
 2    A. At least ███████████████, I'd say.
 3    Q. Based on your experience, would it be possible
 4    for you to arrive at the institution and begin the
 5    staff screening process at the start --- right at the
 6    start of your scheduled shift and timely relieve
 7    another officer in the housing unit ---?
 8    A. No, that's impossible.
 9    Q. Why is it impossible?
10    A. Because you --- we just talked about the entire
11    process, and there's whole a bunch of different
12    factors that have and influence on how long it takes
13    you to get from point A to point B.  If you would
14    arrive in the lobby at ███████, I would say
15    best-case scenario, when you arrive to any post it's
16    probably at least an additional ██████████.
17    Like I said, that's my personal experience, my
18    personal opinion, best-case scenario.
19    Q. Have you ever been disciplined or reprimanded for
20    arriving before the start of your scheduled shift and
21    making an early exchange?
22    A. No.
23    Q. You mentioned you worked the compound post that
24    were 24-hours.
25    Right?
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1      A. Correct.

2      Q. And is there anything different about the process

3      of getting to your post in the compound than what you

4      just described just now for getting to the housing

5      unit or to the Special ---?

6      A. So I mentioned a couple of times already about

7      the suicide scenario, which is actually currently

8      happening.  Like I worked compound yesterday.  I had

9      to stop by control.  So that situation, we'd have to

10     go control first and then make our way down to the

11     side gate.

12     Q. Other than that, is there anything different

13     about how you proceed to your post?

14     A. So certain shifts, compound has to provide ---

15     has to submit a UA throughout the shift.

16     Q. What is the UA?

17     A. It's pretty much urinalysis test for certain

18     inmates to make sure there's no --- that they're not

19     on any type of drugs.  It's pretty much to ensure that

20     inmates haven't been taking any drugs.  It's kind of a

21     way to verify that inmate was in possession of a type

22     of drug that they're not allowed to have.  I can

23     provide for clarification, if you want.

24     Q. That's okay.

25     A. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1    Q. When you're working at 24 hour compound post and
2    you arrive at your post, ███████████████████████
     █ ████████████████████████████████████████, do you relieve
4    another officer?
5    A. Yes.
6    Q. And how, if at all, is that relief process
7    different than the relief in the housing area, the
8    Special Housing Unit?
9    A. There could be something going on in the compound
10   where the current officer is currently on duty and is
11   dealing with that situation.  So I might arrive and
12   I'm just waiting for the officer to appear from
13   whatever he's dealing with.  And then we could begin
14   the process of, you know, passing information and
15   transferring the equipment.
16   There could be a move going on.  There's a
17   handful of different factors that can have an
18   influence on that.  But I would say it typically takes
19   a little bit longer.
20   Q. So do you do a verbal pass-down and equipment
21   exchange on the compound post?
22   A. Yes.
23   Q. And you said it takes a little bit longer.  How
24   long on average does the exchange --- the information
25   and equipment exchange process take on this compound
```

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1     post?

2     A. So once I arrive at the ███████, assuming that

3     the officer is actually there, that I have to leave.

4     I would say once that happens, I would say anywhere

5     from three to six minutes.

6     Q. And at the end of your shift on a compound post,

7     does an officer come to relieve you?

8     A. Yes.

9     Q. And do you undergo an information exchange like

10    you did at the beginning of your shift, it's just that

11    you are now the outgoing officer?

12    A. That is correct.

13    Q. Does it take approximately the same amount of

14    time at the end of your shift as it does at the

15    beginning?

16    A. For the evening watch shift or just in general?

17    Q. Just in general.

18    A. I would say yeah.

19    Q. And if you're working at evening watch shift,

20    what time are you typically able to leave the compound

21    post location to head back to the building ---?

22    A. So I can give you an estimated range, if that's

23    okay.

24    Q. Yeah.  Sure.

25    A. I would say anywhere from like ██████████

Trial

Kathy Aitken, et al. v. USA                           3/13/2023

1    actually, I'm sorry.  Can I ask you a question ---
2    Q. Not really.
3    A. --- to answer that question?  I'm just a little
4    confused.  I'm sorry.
5    Q. Let me ask you the question.
6    A. All right.
7    Q. Once you were relieved on a compound post, do you
8    walk back to the control center sally port?
9    A. Yes.
10   Q. And about what time are you typically able to
11   start heading back to the control center sally port
12   for a compound post on average?
13   A. So you want times.  So I'd say anywhere from
14   ███████████████████, something like that.
15   Q. And earlier today you testified about the things
16   you're doing as you are walking to your post.  I
17   believe you said looking for anything out of the
18   ordinary, interacting with inmates.
19   Do you recall that?
20   A. Yes.
21   Q. Do you also do that on your walk from the post
22   inside the institution?
23   A. Yes.
24   Q. And have your practices been consistent at least
25   in April 2016 when you worked a post as a Compound

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Officer?

2    A. Yes.

3    Q. And when you work a 24 hour compound post, how

4    long are you on duty on average on a typical day?

5    A. At ████████████████████.  Could be a

6    little bit more.

7    Q. You worked in the ██████

8    Correct?

9    A. Yes.

10   Q. Is the ████████████████████████

11   A. ████████

12   Q. Okay.

13   How do you get to ████████████████?

14   A. ████████████████████████████████



Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. What about the ███████████████████?
2    A. Yes.
3    Q. And if you're working as a ████████████, once
4    you've gone through screening, what do you do next?
5    A. ██████████████████████████████████████
     ██████████████████████████████████████████
     █████████████████████████████████████  █
     ██████████████████████████████████████
     ████████████████
10   Q. Does the ████████████████████████████?
11   A. Yes.  To some degree, yes.
12   Q. If you were working a post █████████████,
13   do you need to stop at the control center on your way
14   to the post?
15   A. ███████████████████  ████████████████████
     ██████████████████████████████████████
     ████████████
18   Q. Okay.
19   So you were describing that sally port.
20   Do you get the key before or after the sally
21   port?
22   A. You get it after.  Normally it's after that.
23   Q. ████████████████████████████████
24   A. ████████████████████████████
     ██████████████████████████████████████

Trial
Kathy Aitken, et al. v. USA                                      3/13/2023

1      ██████████████████████████████████████████████

       ██  ████████████████████████████████████████████

       ██  ███████████████████████████    ████████████████████

       ██  ██████████████████████████████████████████████

       ██  ███████████████████████████████████████

6      Q. And do you relieve another officer on the ████████

       ██  ████?

8      A. Yes.

9      Q. Okay.

10     And what --- do you do an information and

11     equipment exchange on that post as well?

12     A. Yes.

13     Q. And what equipment is exchanged on the ████████?

14     A. I haven't really been there that often, but it

15     was pretty much the same as a regular housing unit.  I

16     believe it's only one set of --- no, I think it's two

17     set of keys, OC, and a radio at the bare minimum.

18     Obviously you have cuffs and a cut-down tool.  Hand

19     metal detector might be issued.

20     Q. ███████████████████████████████████████████████

       ██  ███████████████████████

22     A. I pass it onto the officer I'm going to relieve.

23     Q. Does that officer take it out for you?

24     A. Yes.

25     Q. And on the ████████████████████████████

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

    1    approximately how long does the equipment and
    2    information exchange take?
    3    A. So once I arrive inside the office?
    4    Q. Yes.
    5    A. I'm just guessing anywhere from like two to five
    6    minutes.  Could be a little bit longer.  I don't work
    7    there that often.  So it's really hard for me to
    8    answer that, but I'm guessing.
    9    Q. And is that guess based on your experience?
   10    A. Yes.
   11    Q. At the end of your shift as the ███████████,
   12    does someone come to relieve you?
   13    A. Yes.
   14    Q. Do you do the same thing with that officer that
   15    he did when you were oncoming that you are now the
   16    outgoing officer?
   17    A. That is correct.
   18    Q. Okay.
   19    Does it take about the same amount of time?
   20    A. Yeah.
   21    Q. Okay.
   22    And about how long is the walk from the ███████
  ███  █████████████████████████████████████████████████
  ███  ███████
   25    A. So this is after I've been ---?

Trial
Kathy Aitken, et al. v. USA                                        3/13/2023

```
1      Q. Actually, let me ask you a different question.   I
2   apologize.
3      A. Okay.
4      Q. About how long is the walk from where the ███
█   ████████████████████████████████████████████
█   ████████████████████████
7      A. Like ██████████████.
8      Q. ████████████████████████████████████
█   █████████████████████████
10     A. To get there or to get through?
11     Q. Once you're through --- ████████████████
█   ██████████████████████████████████████████████
█   █████████
14     A. Correct.
15     Q. Okay.
16  How long does it take on average from the time
17   you clear through the screening and you're picking up
18   your duty belt until you are at the control center
19   picking up the key?
20     A. Like ██████████████████, I'd say.
21     Q. ██████████████████████████████████
█   ████████████████████████████████
█   ██████████████████████████  ███████████
█   ████████████████████████████
25     Q. You worked in the control center on evening
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                      3/13/2023

1      watch.

2    Right?

3      A. The main control center, yes.

4      Q. And how do you get into the control center?

5      A. From where?

6      Q. You're working in control center post.

7    How do you physically get into the control

8    center?

9      A. ████████████████████████████████████████

██    ████████████████████████████████████████████

██    ███████████████████████      █████████████████

██    ██████████████████████████████████████████████

██    ██████████████████████████      ███████████████

██    ████████████████████████████████████████████

██    ██████████████████████████████████████

██    █████████████████      █████████████████████████

██    ████████████████████████████      █████████████

██    ██████████████████████████████████████████████

██    ████████████████████████████████████

██    ████████████████████████████████████

██    ██████████

22      Q. When you are the control one officer, do you

23    relieve somebody --- another officer when you're

24    coming out of an evening watch on a shift?

25      A. Yes.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    Q. What do you do as a part of that exchange as a
2    control one officer.
3    A. So control one is probably the most serious post
4    out there.  Definitely the busiest.  So pretty much
5    passing anything that's happened throughout the day,
6    even not just our shifts but other shifts prior
7    because that information might be relevant to his
8    shift also.  We're also just going through anything
9    that inmate's in the hospital.  We've got an inmate
10   suicide watch.
11  We go over the out counts, go over the count that
12   he's about to announce, assuming that he was ---
13   assuming that we arrived prior to ███████, because
14   if not, then I'm supposed to announce it.
15  It's just a lot of stuff.  I'm just going through
16   some stuff that I can think of currently, but there's
17   always something to talk about.
18   Q. Do you do an inventory of the equipment in the
19   control center that are part of the release process?
20   A. Yeah.
21   Q. And about how long on average does the
22   information and equipment inventory take on a control
23   post --- control one post?
24   A. Once I arrive inside, I'd say --- well, like I
25   said, I don't actually time it, but I'm guessing at

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

1    least five to eight minutes.
2    Q. And at the end of your shift, when you work in
3    control one, does someone come to relieve you?
4    A. Yes.
5    Q. Do you do an exchange of information and
6    equipment inventory like you did at the --- when you
7    arrived on the post?
8    A. That is correct, yes.
9    Q. Does it take about the same amount of time at the
10   end of your shift as it did at the beginning of your
11   shift?
12   A. Yes.
13   Q. And if you're working control one on evening
14   watch, about what time is it typically when you are
15   leaving the control center?
16   A. I'd say anywhere from like ███████████████ .
17   Q. And have your practices been consistent since at
18   least April 2016 every time you worked a post a
19   control one?
20   A. Yes.
21   Q. And when you work post in control one, on a
22   typical average day, how long are you typically on
23   duty?
24   A. Let's say at least ████████████████████
25   additional time.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/13/2023

1        Q. You mentioned count and I believe you mentioned
2     count at █████████
3   Is that right?
4        A. Yes.
5        Q. Is there also one at ████████
6        A. Yes.
7        Q. Okay.
8   Where do you need to be physically to conduct the
9     ████████████████?
10       A. If your control one, you'd be inside the control
11    center.
12       Q. What if you are working a post inside the
13    institution that's not control?
14       A. The same answer.  Oh, I'm sorry.
15       Q. On the ---.
16       A. Yes.
17       Q. You're working at housing unit ---
18       A. Yeah.
19       Q. --- on evening watch.
20   Where do you need to be to conduct the ████████
21    count?
22       A. You need to be in the assigned housing unit.
23       Q. Is that true for the ████████ count as well?
24       A. Yes.
25       Q. Talked a little bit earlier about the body alarm.

Trial

Kathy Aitken, et al. v. USA                                3/13/2023

1    When are you expected to respond to a body alarm?

2    A. At any given time.

3    Q. And are you expected to --- when, where --- from

4    where are you expected to respond to a body alarm?

5    A. At any part of when you're inside the

6    institution.

7    Q. Does that include if it is prior to --- you're on

8    the compound prior to your scheduled shift?

9    A. Yes.

10    Q. And have you done that since April 2016?

11    A. Yes.

12    Q. And what happened?  Can you describe what

13    happened?

14    A. I remember I was walking to an assigned housing

15    unit or an assigned area somewhere in the institution

16    and I didn't have a radio on me, but I saw all of a

17    sudden a whole bunch of staff from the Lieutenant's

18    Office just start running to a certain area.  So I

19    just took an assumption that something was going on.

20    So I just followed them to the same spot where they

21    were going.

22    Q. And that was prior to the start of your scheduled

23    shift?

24    A. Yes.

25    Q. Are you also expected to respond to a body alarm

Trial

Kathy Aitken, et al. v. USA                                              3/13/2023

1     if you are --- you've already been released from post
2     while you're walking out --- on your way out of the
3     institution?
4     A. Yes.
5     Q. Do you ever stop in the Lieutenant's Office on
6     your way to a post?
7     A. Yes.
8     Q. And for what purpose do you do that?
9     A. Different reasons.  Either we've been instructed
10    to sign up for overtime purpose via email.  Sometimes
11    we get emailed stuff at the Lieutenant's Office to
12    pick up boots that were issued to us.  Sometimes check
13    our mailbox.
14   Trying to think of what else.  There's other
15    situations.  I just want to know where.  So I
16    mentioned earlier how if you're a compound, you have
17    to stop by the Lieutenant's Office to get a UA form
18    because we --- I'm sorry.  Either SAS or somebody
19    above me assigns on a daily basis of what inmate they
20    want to be UA.  So compound on a morning watch and day
21    watch are required to conduct those UAs.
22   Occasionally evening watch has to do it also
23    depending on different factors.  So if that is a
24    situation where we have to conduct a UA, we know to
25    stop by office Lieutenant's Office and grab that form.

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. And you do that line or wait to your post prior
2      to the start of your scheduled shift?
3      A. Yes.  I mean, occasionally I've done it prior.
4      Q. And when you are in the Lieutenant's Office on
5      these occasions that you've mentioned, do you speak to
6      the Lieutenants that are there?
7      A. Yes, normally.
8      Q. And have those Lieutenants ever told you, if it's
9      before the start of your scheduled shift, that you
10     should not be signing in if your shift hasn't started
11     yet?
12     A. No, that's never happened.
13     Q. Have they ever refused to talk to you or give you
14     a briefing if your shift hasn't started?
15     A. No.
16     Q. Have you ever been relieved from a 24-hour post
17     late after the end of your scheduled shift?
18     A. Yes.
19     Q. On those occasions, were you able to leave your
20     post on time?
21     A. No.
22     Q. And are there any specific occasions that you can
23     recall where this has occurred in the last year?
24     A. Yes.
25     Q. Can you tell me about those times?

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1      A. So there's this one time where I can remember if
 2      I was forced to work mandatory overtime on the morning
 3      watch shift where I was signed.  But I was working it
 4      for a dry cell and that's located in the medical area.
 5      And my relief was also mandated or he volunteered for
 6      the overtime, but he was working further.  So after he
 7      got properly relieved and he had to get screened and
 8      stopped by control and get chits that he needed to get
 9      --- in order for me to pass on the equipment, he has
10      to stop by control and get chits.
11   And then eventually he made his way down to the
12      area that I was stationed at.  And I would say it's
13      probably like ██████████████ where I finally got
14      released.  And then I contacted the Lieutenant's
15      Office and I asked if I could get compensated for that
16      and they said no.
17      Q. Just to be clear, on that occasion that you just
18      mentioned, were you paid for the additional time above
19      your scheduled shift where you had to stay and you
20      were relieved late?
21      A. I did not get compensated for that time, no.
22      Q. Have you ever been relieved late because of
23      someone coming to relieve you from a post outside the
24      institution?
25      A. Yes.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1      Q. Can you describe a case where that happens?

2      A. Yeah.  It happened for like the last couple of

3      months.  I was compound on eating lunch and I was

4      waiting for my relief to come back from the hospital

5      trip.  I'm sorry.  He was --- the inmate was already

6      in the hospital for a certain amount of days, and he

7      was doing overtime, I believe, from ██████████████    So

8      then he got relieved sometime at██████ at the

9      hospital, which is like 20 something miles at least

10     from the institution.

11   So then he had to drive all the way from the

12     hospital to the institution, get screened to the

13     lobby, control, and all that, make his way to the side

14     gate, and that eventually I got released.

15     Q. On that occasion that you just mentioned, about

16     how late were you released?

17     A. ████████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████████████

20     A. Yeah.

21     Q. Does that mean that you left the --- you exited

22     into the A1 --- on that occasion, do you remember when

23     --- about what time is it when you were exiting back

24     into the A1 lobby?

25     A. I don't remember.  I just remember that it was at

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1    least ███    something when I was at the ███████.

2    Q. Okay.

3    A. So I would say add at least another five to ten

4    minutes.

5    Q. Were you compensated for that additional 45 plus

6    minutes that you were or 45 minutes --- withdraw.

7    Start over.

8    On that occasion, were you compensated for the

9    additional 45 minutes that you were on your post at

10   compound one?

11   A. Not at first, and eventually I got compensated

12   for part of it.

13   Q. So to this date, you were not compensated for the

14   full 45 minutes.

15   Is that right?

16   A. That is correct.

17   Q. One moment.  I think I'm about ---.

18   So I understand that the times may vary, but the

19   things that you've been discussing today, collecting

20   your duty bell after screening, with walking through,

21   clearing the sally ports, walking to your post, doing

22   the exchange, all those things, do those happen every

23   single shift?

24   A. Yes.

25   ATTORNEY BLOCK:

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1    Okay.  Pass the witness.
 2    ATTORNEY ELKIN:
 3    Very good.
 4    JUDGE:
 5    Mr. Vallacher, we look forward to your
 6      Cross tomorrow morning.
 7    ATTORNEY VALLACHER:
 8    Sounds good.  Sounds good, Your Honor.
 9    JUDGE:
10    Okay.  Mr. McPhillips, you're still
11      under oath.  No substantive conversations about the
12      facts of the case with anybody.  The Cross Examination
13      starts tomorrow morning.  Great.  All right.  Have a
14      good evening.
15    THE WITNESS:
16    Thank you.
17    JUDGE:
18    Counsel, can you stay for just a couple
19      minutes?  Let's make sure we don't have anything else
20      to talk about.  As a matter of housekeeping, can we go
21      over the exhibits that were admitted today, just so
22      we're on the same page?  I've got --- you all ready?
23    ATTORNEY ELKIN:
24    Yes.
25    JUDGE:
```

Trial

Kathy Aitken, et al. v. USA                                          3/13/2023

```
 1     I've got JX-1, JX-2, JX-4, JX-56, JX-57,
 2        JX-58, JX-67, JX-68, JX-73, JX-74.  JX-84 was not
 3        admitted.  PLX-1, PLX-7, PLX-9, PLX-13, PLX-24,
 4        PLX-49, PLX-50, PLX-51, PLX-52, and DX-46.
 5     Are you all lined up?
 6     ATTORNEY ELKIN:
 7     That is exactly what we have, Your
 8        Honor.
 9     ATTORNEY VALLACHER:
10     Same, Your Honor.
11     JUDGE:
12     Great.  Okay.  Good.  See, the thing's
13        working.
14     Oh, Ms. Elkin, I was hoping we would get
15        to hear from Ms. Block this week and I'm glad that we
16        are.
17     ATTORNEY ELKIN:
18     Me, too, Your Honor.
19     JUDGE:
20     All right.
21     Anything we need to talk about before we
22        break?
23     ATTORNEY ELKIN:
24     I would just ask about --- I mean, I've
25        heard some people being concerned about the weather.
```

Trial

Kathy Aitken, et al. v. USA                                        3/13/2023

1    If the court closes, are we out?

2  JUDGE:

3  Oh, I actually don't know.  But you're

4    staying at ---.

5  ATTORNEY ELKIN:

6  I'm fine, yes.

7  JUDGE:

8  I mean, we can all walk.

9  Right?

10 ATTORNEY VALLACHER:

11 That's right.  Our concern is if the

12   whole courthouse closes.

13 JUDGE:

14 Let me inquire about that and I'll let

15   you --- I'll try to keep you all informed, me and my

16   staff about what's going on.  I hope we're open,

17   obviously.

18 ATTORNEY ELKIN:

19 So do we, Judge.

20 JUDGE:

21 Yeah.  Okay.  In that case, adjourned

22   for the day.  See you all tomorrow, weather

23   permitting.

24 COURT CRIER:

25 All rise.

403

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

1                          * * * * * * * *

2                  HEARING CONCLUDED AT 5:29 P.M.

3                          * * * * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

404

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
 1                        CERTIFICATE
 2
 3    I hereby certify, as the stenographic
 4       reporter, that the foregoing proceedings were taken
 5       stenographically by me, and thereafter reduced to
 6       typewriting by me or under my direction; and that this
 7       transcript is a true and accurate record to the best
 8       of my ability.
 9       Dated the 5th day of April, 2023
10
11
12    s/Kayla Marie Keating
13    Kayla Marie Keating,
14    Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

405

Trial

Kathy Aitken, et al. v. USA                                  3/13/2023

```
 1                      ADMITTED EXHIBITS

 2

 3

 4    JX       PAGE    DESCRIPTION

 5    JX-1     322     Position Description Correctional

 6                     Officer GS0007-08)

 7    JX-2     29      Position Description Correctional

 8                     Officer (GS0007-07)

 9    JX-4     262     Time and Attendance Reporting

10                     Handbook

11    JX-56    63      General Post Orders 2015

12    JX-57    64      General Post Orders 2017

13    JX-58    41      General Post Orders 2019

14    JX-67    67      Conklin Assignment Cards 2016 -

15                     2019

16    JX-68    67      Conklin Assignment Cards 2019 -

17                     2021

18    JX-73    331     McPhillips Assignment Cards 2016 -

19                     2019

20    JX-74    332     McPhillips Assignment Cards 2019 -

21                     2022

22

23

24

25
```

Trial

Kathy Aitken, et al. v. USA                              3/13/2023

```
 1    PX     PAGE    DESCRIPTION

 2    PLX-1   89     FCI Otisville All-Staff Memo Re:

 3                   Vest Procedures 1/16/20

 4    PLX-7   162    Control Center 1 Specific Post

 5                   Orders (2019)

 6    PLX-9   100    Housing Unit D, E, F & G Specific

 7                   Post Orders (2019)

 8    PLX-13  159    SHU#1 Officer Specific Post Orders

 9                   (2019)

10    PLX-24  272    Arbitrator's Decision, FCI Otisville

11                   and AFGE Local 3860, FMCS No.

12                   10-04502-8

13    PLX-49  238    Arbitrator's Decision in AFGE Local

14                   420 and FCC Hazleton, FMCS No.

15                   13-01944

16    PLX-50  243    Arbitrator's Decision in AFGE Local

17                   1034 and USP Pollock, FMCS No.

18                   06-56529

19    PLX-51  240    Arbitrator's Decision in AFGE Local

20                   525 and FCI Williamsburg, FMCS No.

21                   08-56529

22    PLX-52  246    Wage and Hour Advisory Memo 2006-2

23                   Re: Alvarez

24

25
```

407

Trial

Kathy Aitken, et al. v. USA                                    3/13/2023

```
1    DX        PAGE      DESCRIPTION
2    DX-46     192       Outside Hospital (2020)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```