```
 1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3
 4    KATHY AITKEN, et al.,              )
 5            Plaintiffs,               ) Case No.
 6              vs.                      ) 19-520C
 7    THE UNITED STATES OF AMERICA,      )
 8            Defendant.                 )
 9
10
11
12          William J. Nealon Federal Courthouse
13             235 North Washington Avenue
14               Scranton, PA  18501
15              Tuesday, March 14, 2023
16                  10:32 a.m.
17               Trial Volume 2
18
19
20       BEFORE:   THE HONORABLE STEPHEN S. SCHWARTZ
21
22
23
24
25    Reporter: Kayla Keating
```

409

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                    A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFFS:
 4              MOLLY A. ELKIN, ESQ.
 5              SARAH M. BLOCK, ESQ.
 6              McGillivary Steele Elkin, LLP
 7              1101 Vermont Avenue, NW
 8              Suite 1000
 9              Washington, DC  20005
10              (202) 833-8855
11              mae@mselaborlaw.com
12
13    ON BEHALF OF THE DEFENDANT:
14              BRET R. VALLACHER, ESQ.
15              JOSHUA W. MOORE, ESQ.
16              DAVID M. KERR, ESQ.
17              U.S. Department of Justice
18              Post Office Box 480
19              Ben Franklin Station
20              Washington, D.C. 20044
21              (202) 616-0465
22              bret.r.vallacher@usdoj.gov
23
24
25
```

410

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1              A P P E A R A N C E S  (Continued)

 2

 3    ALSO PRESENT:

 4            LISA AIKEN

 5            ADAM BOYER

 6            NATHAN ATKINSON

 7            TIMOTHY HAGENBURG

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

411

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                    I N D E X

 2

 3

 4    WITNESS:           DIRECT   CROSS   REDIRECT   RECROSS   VOIR

 5    P. McPhillips               414     483

 6    M. Bunting        494       570     629

 7    E. Christensen    648       698     723

 8

 9

10    EXHIBITS               MARKED          ADMITTED

11    Joint

12    JX-63                  496             497

13    JX-64                  496             497

14    JX-65                  651             652

15    JX-66                  652             653

16    JX-84                  --              568

17    JX-103                 460             461

18

19    Plaintiff

20    PLX-5                  452             453

21

22    Defendant

23    DX-5                   504             505

24    DX-7                   501             502

25
```

412

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1              P R O C E E D I N G S
2                   (10:32 a.m.)
3    COURT CRIER:
4    All rise.  United States Court of
5      Federal Claims is now in session.  Judge Stephen
6      Schwartz presiding.
7    JUDGE:
8    Please be seated.  Here for the second
9      day of trial, Aitken versus United States Number
10     19-520C.
11   Can Counsel identify themselves for the
12     record?
13   ATTORNEY BLOCK:
14   Good morning, Your Honor.  Sarah Block,
15     for the Plaintiff.  And Molly Elkin is here as well.
16     She's just outside the courtroom right now.
17   JUDGE:
18   Okay.
19   For the Government?
20   ATTORNEY VALLACHER:
21   Good morning, Your Honor.  Brett
22     Vallacher on behalf of the United States.  And I'm
23     joined by Adam Boyer and Nathan Atkinson with the
24     Bureau of Prisons, and Josh Moore, and David Kerr, and
25     Lisa Aiken from DOJ.

413

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    JUDGE:

2    Very good.  So it's March 14.  So Happy

3      Pi Day, everyone.  I wonder, did any of you

4      happen to do one of those pi digit memorization

5      projects in school or did we all go to law school to

6      avoid that?  Nobody?

7    ATTORNEY VALLACHER:

8    Nobody.

9    ATTORNEY BLOCK:

10   Fortunately.

11   JUDGE:

12   So this is still a sealed proceeding.

13     Let's just make sure that everybody who's in the room

14     is a witness or a party or a party representative.

15   Counsel, confirm?

16   ATTORNEY BLOCK:

17   Yes, that is correct.

18   JUDGE:

19   Mr. Vallacher?

20   ATTORNEY VALLACHER:

21   That is correct, Your Honor.

22   JUDGE:

23   Very good.  All right.

24   Where we left off yesterday was between

25     the Direct and Cross Examination of Mr. McPhillips.

414

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is there any housekeeping to do or can

2      we jump in to Cross Examination?

3    ATTORNEY BLOCK:

4    Nothing from the Plaintiff.

5    ATTORNEY VALLACHER:

6    Nothing from the Defendant, Your Honor.

7    JUDGE:

8    Okay.

9    Then let's bring back Mr. McPhillips.

10     Now, Mr. McPhillips, you're still under oath.

11                         ---

12                 RICHARD MCPHILLIPS,

13     RECALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

14     HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AND SAID AS

15     FOLLOWS:

16                         ---

17   THE WITNESS:

18   Yes, sir.

19   JUDGE:

20   Understood.  Have a seat.

21   THE WITNESS:

22   Thank you.

23                         ---

24                 CROSS EXAMINATION

25                         ---

415

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      BY ATTORNEY VALLACHER:

2      Q. Good morning, Mr. McPhillips.

3      A. Good morning.

4      Q. I hope you're doing well.

5      A. Yes, I am.

6      Q. So yesterday I think you were asked a question

7      about whether Senior Officer and Senior Officer

8      Specialists are Correctional Officers.

9      A. That is correct.

10     Q. And the answer was yes.

11     Correct?

12     A. Yes.

13     Q. And officers working under your same --- and

14     those would both be position descriptions, Senior

15     Officer Specialist and Senior Officer?

16     A. Can you clarify?

17     Q. Would that --- are those --- is Senior Officer

18     Specialist a position description?  Is that a title

19     for the role?

20     A. That's a job title.

21     Q. Okay.

22     And officers working under that same job title

23     also work post at J Unit.

24     Correct?

25     A. That is correct.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                    3/14/2023

1    Q. And J Unit Control?

2    A. That is also correct.

3    Q. And control center?

4    A. That is correct.

5    Q. And front lobby, Front Lobby Officer?

6    A. That is correct.

7    Q. And none of those Correctional Officers would go

8    through the main compound before, during or after

9    their post.

10   Correct?

11   A. Sorry.  Could you repeat the post?

12   Q. Yes.  J Unit, J Unit Control, control center and

13   front lobby.

14   A. That's correct.

15   Q. And yesterday you were also asked about your most

16   important job duty.

17   Do you recall that?

18   A. Yes.

19   Q. And I believe you said it was ensuring the safety

20   and security of the institution?

21   A. That is correct.

22   Q. And I think you would agree that maintaining the

23   safety of the public and the institution is actually

24   the purpose behind almost everything you do in the

25   prison.

417

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Correct?
2      A. Yes.
3      Q. And keeping the public safe, that would be true
4      for any position at FCI Otisville.
5    Is that right?
6      A. What do you mean by any position?
7      Q. You know, custody or non-custody.
8      A. That is correct.
9      Q. And that's carried out through a series of
10     activities that vary depending on the post.
11   Correct?
12     A. Correct.
13     Q. And that includes counts.
14   Right?
15     A. Yes.
16     Q. Rounds?
17     A. I'm sorry, what?
18     Q. Rounds?
19     A. Yes.
20     Q. Bar taps?
21     A. Yes.
22     Q. Searches?
23     A. Yes.
24     Q. And you would agree that an activity is something
25     that you do.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

418

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Correct?

2    A. An activity would be something I choose to do.

3    That is correct.

4    Q. And the duty or the purpose of keeping everybody

5    safe would extend to non-custody positions?

6    A. Correct.

7    Q. Such as Food Services?

8    A. Yes.

9    Q. Recreation?

10   A. Yes.

11   Q. Health Services?

12   A. Yes.

13   Q. Religious Services?

14   A. Yes.

15   Q. And Education?

16   A. Yes.

17   Q. And fundamentally, the purpose of these employees

18   at FCI Otisville is to keep the public safe from

19   inmates.

20   Would you agree with that?

21   A. Yes.

22   Q. I think yesterday you were also asked a question

23   about where you were expected to be at ███████ when

24   you're assigned to a morning watch shift.

25   Do you recall that?

419

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. Yes.

2      Q. And you said at your assigned post.

3    Do you recall that answer?

4      A. I do.

5      Q. Is that accurate?

6      A. Yes.

7      Q. What do you understand the word post to mean?

8      A. Can I give an example?

9      Q. Sure.

10     A. So if you're assigned to be in a housing unit,

11     let's just say GA, you would be expected to be in the

12     GA Housing Unit.

13     Q. Okay.

14   So for example, you're not on your post while

15     you're walking to GA.

16     Is that correct, in your scenario?

17     A. In that scenario, I'm on my way to that post.  I

18     would not be inside the assigned area.

19     Q. Okay.

20   So assigned area also means at your post?

21     A. Yes.

22     Q. Is that correct?

23     A. Yes.

24     Q. Okay.

25   And so your post in that scenario would be the GA

420

Trial

Kathy Aitken, et al. v. USA                                  3/14/2023

1    housing unit.

2    Right?

3       A. That is correct.

4       Q. And so you wouldn't be on your post, for example,

5       while you're walking on the compound?

6       A. I wouldn't be at my post, but I would be in the

7       premises of the institution.

8       Q. Okay.

9    And you wouldn't be in your post when you're in

10      the control center lobby either.

11   Correct?

12      A. That is correct.

13      Q. And you're not in your post if you're in the

14      Lieutenant's Office.

15   Is that correct?

16      A. In the scenario that I mentioned, that is

17      correct.

18      Q. And you wouldn't be on your post anywhere other

19      than the 24-hour housing unit that you're assigned to.

20   Correct?

21      A. Yes.

22      Q. So your orders about --- you know, orders that

23      have to do with your post logically would apply to ---

24      would not apply to those non-post areas.

25   Correct?

421

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    A. That is not --- I'm not --- I'm sorry.  Could you
2    repeat that question?  I'm a little confused about
3    what you're asking me.
4    Q. I'll move on.  So on a 24-hour post, I think that
5    you testified that you have to have your equipment on
6    your person at the start of your scheduled shift?
7    A. Correct.
8    Q. On a 24-hour post, do you know of any instance in
9    which someone has been disciplined for showing up to
10    their shift on time and receiving equipment at that
11    point?
12    A. No.
13    Q. And yesterday you were shown a Senior Officer
14    Specialist position description, which I believe is
15    JX-1.
16  Do you still have that binder in front of you?  I
17    think it's JX-1 through --- one second.
18    A. I have it in front of me, first page.
19    Q. Okay.  Great.  Thank you.
20  JUDGE:
21  I'm sorry, Counsel, which exhibit?
22  ATTORNEY VALLACHER:
23  JX-1.
24    BY ATTORNEY VALLACHER:
25    Q. And so at this time, I'll ask you to turn to page

422

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1        four of the JX-1.

2        A. You said page four?

3        Q. Page four.

4        A. I'm there.

5        Q. And so you were asked about language that I think

6        begins with, quote, the work performed is within a

7        federal prison and can be incumbent and subject to

8        possible hostage and assault situations.

9      Do you see that?

10       A. I'm sorry.  What paragraph was that?

11       Q. It starts with the work performed, on page four.

12       A. Oh, the last one?

13       Q. Yes, the last one.

14       A. Yes.

15       Q. Now, on page five, do you see where it says daily

16       --- the first full sentence on page five.  Daily

17       stress and exposure to potentially-dangerous

18       situations, such as physical attack, are an inherent

19       part of this position.  Consequently, it has been

20       designated as a law-enforcement position.

21     Do you see that?

22       A. Yes.

23       Q. So to be clear, this position description applies

24       across the Bureau of Prisons.

25     Correct?

423

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1       A. What do you mean?

2       Q. Is this an Otisville-specific document?

3       A. I don't know.

4       Q. Sorry?

5       A. I don't know.

6       Q. You don't know?

7       A. Yeah.

8       Q. Okay.

9    Do you have any reason to believe that each

10      institution creates its own position descriptions ---

11      A. No.

12      Q. --- at the Bureau of Prisons?

13      A. No.

14      Q. Okay.

15   And so then you would not be surprised to learn

16      that this would also apply to ADX Florence, the

17      highest-security level in the entire Bureau of

18      Prisons, known as the super-max, where El Chapo is

19      housed?

20   ATTORNEY BLOCK:

21   Objection.  Foundation.  And this

22      witness has already said he doesn't know the answer.

23   JUDGE:

24   Well, he can bring up new facts on Cross

25      Examination.  So I'll let you answer the question.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      It's overruled.

2    THE WITNESS:

3    Can you repeat it?

4      BY ATTORNEY VALLACHER:

5      Q. So would you be surprised to learn that this

6      position description also applies to staff members

7      working at ADX Florence, a super-max, where El Chapo

8      is housed?

9      A. I would say I would not be surprised.

10     Q. Okay.

11    So it would be fair to say that these

12     descriptions are not based on BOP's assessment of the

13     specific circumstances of FCI Otisville?

14    ATTORNEY BLOCK:

15    Objection.  Again, foundation.  He

16     didn't write this position description.

17    JUDGE:

18    So he can bring up new facts on Cross

19     Examination to ask if a witness is aware of them, the

20     new facts that come from Counsel as opposed to a

21     witness on evidence.  That's the way Cross Examination

22     works.  So overruled.

23    THE WITNESS:

24    Sorry.  Can you repeat the question?

25      BY ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                      3/14/2023

```
1      Q. So would it be fair to say that these position
2      descriptions that we just looked over are not BOP's
3      assessment of the specific circumstances at FCI
4      Otisville?
5      A. Can you restate that question in another form?
6      I'm sorry.  I'm just --- I'm a little confused.
7      Q. Might I ask the source of your confusion?
8      A. The job description.  Are you basing that, the
9      job description, compared to what we're supposed to
10     do?  Like I'm just confused.
11     Q. The two paragraphs that we just read, ---
12     A. Yes.
13     Q. --- describing the potential hostage situations,
14     describing, you know, the daily stress.
15     A. I would say the daily stress of our institution
16     is different.
17     Q. Okay.
18 And isn't it true --- you know, these job
19     descriptions talk about, you know, these kind of
20     emergency situations.
21 Right?
22     A. Yes.
23     Q. Isn't it true that you have not responded to an
24     emergency before your shift in the last two years?
25     A. That's correct.  I don't recall any at this
```

426

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    point.
2    Q. And isn't it also true that non-Correctional
3    Officers would also respond if there were an
4    emergency?
5    A. At any given time, yes.
6    Q. Let's turn to page two of JX-1.
7    Do you see where --- you were asked about this
8    bottom paragraph here.  That would be the second
9    paragraph under nature of assignment, where it says
10    must maintain.
11    Do you see that?
12    A. Must maintain the control?
13    Q. Yes.  So it says must maintain the control and
14    discipline of inmates in such areas as the auditorium,
15    housing units, segregation, recreation areas, dining
16    room, et cetera.
17    Do you see that?
18    A. Yes.
19    Q. And to be clear, Otisville doesn't have an
20    auditorium, does it?
21    A. I'm honestly not really familiar with that
22    definition of what they consider to be an auditorium.
23    We have a Chapel, which we use sometimes as like an
24    auditorium-like purpose for certain events, I would
25    say, so ---.

427

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.
2      A. At the same time, we also use the business room
3        for a gathering of staff for a certain situation.  So
4        I honestly am not sure if that's a yes or no.
5      Q. Okay.
6    So you know, you were asked about this paragraph
7        and you said it applies at all times.
8    Do you recall that?
9      A. I don't recall saying it, but I would assume that
10       I said it.
11     Q. Okay.
12   And you said it applies before and after your
13       shift as well.
14   Do you recall that?
15     A. Yes.
16     Q. So this lists a bunch of places.  Let's take a
17       few of them here.  So when was the last time you
18       maintained the control and discipline of inmates on
19       your way out of the institution when you stopped by
20       the Otisville auditorium?
21     A. I do not recall ever doing that.
22     Q. Okay.
23   What about before your shift?
24     A. I don't recall.  I'm sorry.  I would have an
25       excuse for --- if you would like to hear it.

428
Trial
Kathy Aitken, et al. v. USA                                        3/14/2023

```
 1      Q. Sorry?
 2      A. I would say I have an excuse for that as to a
 3      reason why I don't, if you would like to hear it.
 4      Q. By all means.
 5      A. So the auditorium would be mainly for a day watch
 6      scenario, I would say.  I'm mostly as an evening watch
 7      person.  Usually more activities involving inmates
 8      happen during the daytime.  So I'm mostly an evening
 9      watch guy.  So I would say that just because I don't
10      have a scenarios doesn't mean it doesn't exist.
11      Q. I see.  So you're basing this off --- you're
12      saying it's at least theoretically possible for
13      someone other than you to have stopped by the
14      Otisville auditorium after your shift on your way out
15      of the institution?
16      A. It is possible.
17      Q. Okay.
18   So let's go to the next one here.
19   On your way out of the institution, when was the
20      last time you maintained the control and discipline of
21      inmates by stopping by, you know, a housing unit other
22      than the one that you may have just left?
23      A. So there was a situation where I was in an FB
24      Housing Unit ███████████████████████
     ███  ████████████ and I'm walking out.  And it was one of
```

429

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1        the Es.  I can't remember if it was E --- I would
2        assume it was EB, but I can't remember, where the
3        officer announced that there was a fight.
4        Q. Okay.
5     So it'd be an emergency situation.
6     Correct?
7        A. Yes.
8        Q. Okay.
9     That'd be an example of responding to an
10       emergency.
11    Correct?
12       A. Yes.
13       Q. Okay.
██    ███████████████████████████████████████████
██    ███████████████████████
16       A. It was a B-side.  So it's not a 24-hour post.  So
17    ████████████████████████████████████████████████████
██    ███████████████████████  on the way out.
19       Q. So that example would also only be for a 16-hour
20       post, the one that you just raised?
21       A. That is correct.  However, it is also possible
22       that if I was on the A side and I was getting relieved
23       that something like that could happen.
24       Q. Okay.
25       A. And at the same time there has been instances

430

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      where the B-side has been a 24-hour post.

2      Q. Okay.

3    So you're saying it's possible?

4      A. Yes.

5      Q. But it hasn't happened when you worked a 24 hour

6      A-side post?

7      A. That is correct.

8      Q. Has it worked --- has it happened when you worked

9      a SHU that you would stop by another housing unit to

10     maintain order and discipline on your way out of post?

11     A. I can't recall anything at the very moment, but

12     it is a possibility.

13     Q. What about control?  After you're leaving

14     control, would you go on the compound, go maintain

15     some order and control on your way out of post?

16     A. Like if something was announced, like an

17     emergency situation that I discovered because I

18     wouldn't be leaving until ---

19     Q. Okay.

20     A. --- I was sure that the situation was

21     deescalated.

22     Q. So you're saying in an emergency situation, you

23     would?

24     A. Yes.

25     Q. Okay.

431

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    But outside of one?
2     A. I'm sorry, what?
3     Q. Outside of an emergency.
4     A. I can't think of any other situation.  It's
5     possible, though.  I just can't think of any instance.
6     Q. All right.
7    Same question about, you know, say you're leaving
8     any post.  Would you just pass through the dining room
9     to maintain the order and control of the inmates after
10     your shift is over, outside of an emergency?
11     A. So if I was like leaving a certain area and I
12     would pass the dining hall, I would always make a
13     visual eye --- visual like, you know, contact in that
14     general area, so I could just see something happen.
15     Q. You would take a look?
16     A. Yeah. I would --- like on my way out, I would,
17     you know, just look to the right, look to the left
18     just to see anything out of the ordinary everywhere,
19     not just including the dining hall.
20     Q. Okay.
21    Same question, by the way, for the way in.
22    Do you have any examples on the way in where you
23     would, you know, stop by the Otisville auditorium to
24     the way to your post to go maintain order and control?
25     A. Well, you don't have to go to the compound if

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

432

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    you're on way to patrol.  So in that situation, no.  I
2    can't think of one.
3    Q. So if you're --- what if you're going to a
4    housing unit?  Would you swing by the auditorium on
5    your way out to go maintain order and control in
6    there?
7    A. Well, like I said, what I mentioned earlier about
8    the possibility of visiting, being in the area where
9    these inmates gather for other than visiting purposes,
10   it's a possibility of me having to go in that
11   direction.
12   Q. It's a possibility to go in the direction of
13   what, exactly?
14   A. Excuse me.  All right.  So I can give you a
15   possible scenario that could happen.  It has not
16   happened, but it could happen, if you'd like to hear
17   it.
18   Q. Okay.
19   But you're saying it has not happened?  You're
20   just speculating a scenario that could happen?
21   A. Correct.
22   Q. Okay.
23   I'm not interested in that.
24   A. All right.
25   Q. And then the last one here is the dining room.

433

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

    1      So let's turn to the dining room for a moment.  Isn't
    2      it true that the unit team stands at the entrance of
    3      the chow hall for questions from inmates during meals
    4      to make themselves available for inmate questions?
    5      A. Certain unit team and not always.
    6      Q. Okay.
    7      A. But occasionally it has happened.
    8      Q. And the unit team has a different job title than
    9      Correctional Officers.
   10   Correct?
   11      A. They have additional duties.  I can't really
   12   describe them.
   13      Q. I'm not asking about their job duties.  They have
   14      a different job title.
   15      A. Oh, I'm sorry.  Yes, that's correct.
   16      Q. And when you say that the unit team is not always
   17      there, what do you mean by that?
   18      A. Well, what I mean is I work Compound 1 and I know
   19      for a fact that most of the time they're not there.
   20      Q. Okay.
   21   And you work Compound 1 at what time?
   22      A. ███████████ .
   23      Q. ███████████ .  Okay.  So that would not be the
   24   midday meal.  That would not happen during your shift.
   25   Correct?

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

    1        A. That is correct.

    2        Q. Okay.

    3    And the unit team also has the responsibility of

    4        keeping the institution and the public safe.

    5    Correct?

    6        A. Yes.

    7        Q. And isn't it true that when inmates are out of

    8        their housing, they're supervised by some combination

    9        of Compound Officers, outside hospital officers,

   10        Education, Recreation and Food Services?

   11        A. Yes.

   12        Q. So let's turn to page three of this position

   13        description.  So on page three, you see the first full

   14        paragraph there.  It says supervisors can instruct.

   15        A. Yes.

   16        Q. So it says supervisors can instruct inmates on

   17        the proper use and care of tools and equipment.

   18    Do you see that?

   19        A. Yes.

   20        Q. When was the last time you specifically

   21        instructed inmates on the proper use and care of tools

   22        after your shift?

   23        A. So would a snow blower be considered a tool?

   24        Q. I'll accept that.  I would accept that as a tool.

   25        A. So you said on my way out?

435

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1    Q. Yes, after your shift.

2    A. It was within the last month.  I can't remember

3    the exact date, though.

4    Q. So what happened?

5    A. So I got relieved and we had inmates using the

6    snow blower.

7    Q. Okay.

8    A. And it was a fairly newer inmate who wasn't

9    really familiar with the machine, because it was

10   really new.  So I mean, I personally don't have much

11   experience using it myself, but I had practice using

12   it a couple of times prior to others using it.  So I

13   was able to help the inmate use it.

14   Q. Okay.

15   And what shift was this?

16   A. What shift?  It was me leaving evening watch.

17   Q. So you're leaving evening watch.  But I thought

18   you just said that you normally --- okay.

19   So that would be leaving --- evening watch be at

20   ████████?

21   A. Yeah.

22   Q. So there was an inmate on the compound at

23   ████████?

24   A. Yeah.  I just don't remember the exact date,

25   though.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

436

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       Q. Okay.

2   That inmate on the compound, were they

3       unsupervised?

4       A. So when they're on the compound, it's the

5       responsibility of the Compound Officer to supervise

6       them.  There's been occasions where the Lieutenant's

7       supervised them.

8       Q. Okay.

9   So there was nobody else around to instruct this

10      inmate how to use a snow blower at ███████ on the

11      compound when they were using it?

12      A. That's correct.  I don't remember the exact time,

13      but it was in that general time frame.

14      Q. When you say you don't remember the exact time,

15      is it possible that it occurred actually before

16      ██████?

17      A. Yes.

18      Q. So it's possible that it occurred on your shift?

19      A. That is correct.

20      Q. Okay.

21  Because the inmates are never supposed to be

22      hanging out on the compound unsupervised, are they?

23      A. That is correct.

24      Q. And if inmates are on the compound, it would be

25      part of a move, recall, escort or work detail?

437

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       A. Yes.

2       Q. In all of those cases, they would already be

3       supervised by an on-duty Correctional Officer,

4       wouldn't they?

5       A. Yes.

6       Q. Okay.

7    So you were also asked --- we're done with that

8       exhibit.  You were also asked some questions about

9       your uniform.

10   Do you recall those questions?

11      A. Yes.

12      Q. And you said they made you identifiable because

13      it had your name in the BOP logo.  It made you

14      identifiable as a Correctional Officer.

15   Is that right?

16      A. Yes.

17      Q. Isn't it true that the unit team also has

18      uniforms that have their name and the BOP logo?

19      A. What's your --- who would you refer to as unit

20      team?

21      Q. Case Counselors, Unit Managers, Unit Secretaries.

22      A. And what's your definition of uniform?

23      Q. What's your definition of the uniform?

24      A. So it's --- as I mentioned prior, it has a name

25      on it.  It's charcoal-colored shirt or --- I'm sorry.

438

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    There's another word I'm trying to find.  We have
2    Class A and Class B.  Class B is normally buttoned.
3    Class A short sleeve is buttoned, and then you also
4    have a different type of shirt that you will --- that
5    you wear.  Unit Team are not required to wear this
6    uniform.  So that's why I'm not sure if you're
7    referring to the uniform that I wear being the exact
8    same uniform that the Unit Team wears, because it's
9    very unlikely that they would wear it.
10   Q. Unlikely, you know, such as someone wearing their
11   hoodie over their uniform?
12   A. So it's hard to answer that, because we're
13   required to wear a vest now.  So I don't know if
14   they're wearing it over the hoodie or over the vest.
15   Q. But yesterday didn't you testify that you wear a
16   hoodie sometimes?
17   A. Yes.
18   Q. And do the Unit Team uniform does have their ---
19   the BOP logo on it.
20   Right?
21   A. If they're wearing that uniform, that I also am
22   required to wear, I would say yes, but it's very
23   unlikely that they wear it, in my opinion, in my
24   personal observation while employed by the Bureau.
25   Q. Okay.

439

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is it your testimony that Correctional Officers
2    always wear their uniform?
3    A. With the exception of a dress-down day, yes.
4    Q. And what is dress-down day?
5    A. Dress-down day is something that is sponsored by
6    the employees' club where you can pay a certain amount
7    of money per month to not have to wear a uniform a
8    certain amount of days per week.
9    Q. And how many days is the maximum?
10   A. Per week?  Honestly, I'm not sure.  I never
11   signed up for it.  I think it's three days, but I
12   honestly don't ---.
13   Q. Three days per week?
14   A. Yeah, but I'm just guessing.  I'm not officially
15   100 percent sure on that.  I never signed up for it.
16   I always wear my uniform while I'm on duty, so ---.
17   Q. Have you seen any policies saying that Unit Team
18   members don't have to wear uniforms?
19   A. I'm not aware of it.  Like I said, I don't know
20   what their job description is.  So it might be in
21   their job description.  So I honestly don't --- me
22   personally, like I don't recall it.  I'm not even ---
23   I wasn't even fully aware that they're required to
24   wear it, if that's what you're saying.
25   Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

440

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

 1    But I think, if I understand it correctly, are
 2      you saying that the Unit Team just wears it less than
 3      Correctional Officers do, less frequently?
 4      A. So we don't have a lot of Unit Team at Otisville.
 5      Q. You what?
 6      A. We don't really have a lot of Unit Teams employed
 7      at Otisville.  So you know, I've never seen a
 8      Secretary wear it.  I think I've seen one --- one to
 9      three Case Managers wear it occasionally.
10      Q. Okay.
11      A. I'm sorry.  I meant Counselors.  Case Managers,
12      I've never seen any Case Managers wear it, so ---.
13      Q. Okay.
14    When members of the Unit Team are wearing it, it
15      has their name and the BOP logo, same as yours.
16    Right?
17      A. I can only verify that prior to the time when the
18      vest was not a requirement, because I don't know if
19      they're wearing --- they could be wearing, you know,
20      the uniforms and they have the vest over it.  I can't
21      read which kind of vest, so ---.
22      Q. Okay.
23    And these vests you're referring to also have the
24      BOP seal and names on it.
25    Correct?

441

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. It's supposed to, yes.

2      Q. And what do you mean it's supposed to?

3      A. So you have the vest and then you have the name

4      of the staff member, but the staff member has the

5      option to remove it.  So they could be walking around

6      without their name tag on the vest.

7      Q. I see.  Okay.  All right.

8    So you --- let's move on to the duty belt.  You

9      got your duty belt off of Amazon.

10   Correct?

11     A. An online vendor through Amazon, yes.

12     Q. And the belt alone would take ten seconds to put

13     on?

14     A. I don't recall the exact time.  I mean, when you

15     say just the belt, is that the part with the straps

16     on?

17     Q. The belt alone would take ten seconds to put on.

18   Right?

19     A. Oh, yeah.  I would say probably at least ten,

20     maybe a little bit less, maybe a little bit more.

21     Q. And it would take between 30 seconds to a minute

22     to put the belt on properly with belt keepers.

23   Right?

24     A. Yes.

25     Q. And today --- yesterday you testified that you

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

442

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    bought your duty belt using allowance by the BOP.
2    A. Yes.
3    Q. And to be clear, this allowance is a $700 cash
4    payment from the BOP.
5    Correct?
6    A. Yes.  It recently went up.
7    Q. Okay.
8    But it's not a voucher that can only be redeemed
9    at certain retailers?
10   A. That is correct.
11   Q. Or a voucher redeemable only from certain items?
12   A. That I'm not aware of.
13   Q. Okay.
14   But it's cash?
15   A. Yes.
16   Q. And are you aware that this allowance is
17   something that the union negotiated with BOP as part
18   of a Master Agreement?
19   A. I believe I recall reading it in the Master
20   Agreement.  So I would say yes.
21   Q. So yesterday you were also asked about the
22   importance of keys to perform your job.
23   Do you recall that?
24   A. Yes.
25   Q. And you said you wouldn't be able to do your job

443

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    properly without keys.

2    Do you remember that?

3        A. Yes, with the exception of control.

4        Q. Okay.

5    ████████████████████████████████████████

█    ████████████████████████████████████████

█    ████████████████████████

8    Correct?

9        A. ██████████████████████████████████.

10       Q. And when you go on the sidewalk between the A1

11    building and to the control building, ████████████

█    ███████████████████.

13    Correct?

14       A. Correct.

15       Q. In that control lot, ████████████████████████

█    ████████████████████████████

17       A. That is not correct.

18       Q. Enlightenment me.

19       A. So I mentioned in certain situations where a

20    24-hour post have been created in B-sides.  Do you

21    remember that?

22       Q. Okay.

23    So you're referring to a point in the past where

24    the B-side post was 24 hours and the A-side was 16

25    hours.

444

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1    Is that correct?

2       A. No.  There was no A-side.

3       Q. Okay.

4    So when the A-side was closed, the B-side became

5       24 hours?

6       A. Correct.

7       Q. And that was on a temporary basis during a

8       mission change.

9    Correct?

10      A. Yes and no.

11      Q. Feel free to elaborate.

12      A. So years ago we were shutting down certain units.

13      Sometimes we start with the A-side, and then the

14      B-side would be 24 hour.  I don't recall the dates,

15      though.  I also have other situation instances where

16      other than the housing unit has been 24 hour.

17      Q. What has been 24 hour?

18      A. Dry cell, suicide watch.

19      Q. Dry cell and suicide watch.  Okay.  Let's ---.

20      A. That was ---.

21      Q. Yeah.  You mentioned that yesterday.  So

22      yesterday you were telling us about two instances in

23      which you were relieved late and you --- okay.  So

24      yesterday you were talking about you would stop by

25      ████████████████████████████████████████████████

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1          ███████████████          while an inmate's on suicide
2      watch.
3    Is that what you're talking about?
4      A. No.  No and yes, actually.  It's two different
5      situations.  So there's a possibility of an inmate
6      companion being responsible for supervising an inmate
7      on suicide watch.
8      Q. Okay.
9      A. In that scenario, Compound 1 is required to have
10     the suicide keys, because if that inmate were to
11     attempt to commit suicide, you cannot have the inmate
12     companion open that door.  Therefore, the Compound 1
13     is pretty much the first responder to that scenario if
14     the inmate were to attempt to do any self-harm on
15     himself.  So that's why Compound 1 has those keys when
16     an inmate companion is supervising the inmate on
17     suicide watch.
18     Q. Okay.
19     A. There's also the possibility of a staff member
20     supervising the inmate on suicide watch.  But that
21     staff member is supervising that inmate on suicide
22     watch, he's required to stop by control, get the
23     chits, bring it down to the officer who's going to
24     relieve, and the officer ---.
25     Q. Let's break this down a bit.

446
Trial
Kathy Aitken, et al. v. USA                                3/14/2023

1      A. Sure.
2      Q. Suicide watch is a post.
3   Right?
4      A. It is.
5      Q. It has its own post orders?
6      A. Yes.
7      Q. And that's different from the post orders for a
8      Compound Officer.
9   Correct?
10      A. Correct.
11      Q. It's an eight-hour post?
12      A. What is an eight-hour post?
13      Q. Suicide watch.
14      A. You're assigned to work 8 hours, but it's run
15      24/7.
16      Q. Okay.
17   When applicable?  When an inmate is in the
18      suicide watch observation cell.
19   Correct?
20      A. That is correct.
21      Q. And so you're not actually working the compound
22      post when you're working a suicide watch post, are
23      you?
24      A. If you're assigned to work suicide watch, you're
25      assigned a medical, supervise an inmate on suicide

447

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1        watch.

2        Q Correct?

3        A. Yes.

4        Q. And that's a different whole post than compound?

5        A. That is correct.

6        Q. It's a different post than any of the posts at

7        issue in this case?

8        A. I'm sorry, what?

9        Q. Suicide watch is not a covered post in this case.

10       Are you aware of that?

11       A. I'm not.

12       Q. In fact, ███████████████████████████████████████

         ██    ██████████████████████████████████████████,

14       shouldn't it?

15       A. No.

16       Q. It's ████████████████████████████████████.

17       A. Not to my knowledge.

18       Q. Okay.

19       A. I don't believe that's an accurate statement.  I

20       don't know where you got it from.

21       Q. Okay.

22       Are you saying as a Compound Officer, it's your

23       everyday practice to ████████████████████████████

         ██    █████████████████████ on your way to the compound block?

25       A. If an inmate is on suicide watch, yes.

448

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1      Q. Okay.
2    And how often does that happen?
3      A. I mean, we have an inmate on suicide watch right
4      now.  So I mean, it comes and goes.  Probably had the
5      last three months at least two or three inmates in
6      an ---.  So it happens.  I don't recall how often it
7      happens, but it definitely happens.
8      Q. Okay.
9      A. I would say it's actually happening more
10     frequently now than in the past.
11     Q. And they're there for, you know, maybe 24 hours
12     or something like that?
13     A. Well, the inmate that's on it right now has been
14     on it for at least a week, I think, so ---.
15     Q. As a Compound Officer, do you believe that you
16     could open up the suicide watch cell without a
17     Lieutenant being present?
18     A. I can't open the cell, but I can open something
19     called it's like a small little door like for feeding
20     the inmate.  You open that, if needed.
21     Q. Like the ---
22     A. Like the food slot.
23     Q. --- food slot?
24     A. Yeah.  I forget what the word is.
25     Q. Okay.

449
Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      A. Would you like me to explain that, why I would do
2      that?
3      Q. I think I understand.  So you would have a key to
4      open the suicide cell.
5  Is that what you're saying?
6      A. The key ████████████████ when the inmate's on
7      suicide watch opens the main door and opens the food
8      slot also.
9      Q. Okay.
10  But not the cell itself?
11     A. No, it opens the cell.
12     Q. Okay.
13  But you are not allowed to open that cell without
14     a Lieutenant there.
15  Correct?
16     A. Yes.  I just --- I'm confused why that's
17     relevant, though.
18     Q. Your having a key to do something you can't
19     legally do.
20     A. What's legal?  What are you ---?
21     Q. You're not permitted to open that cell without a
22     Lieutenant present.
23     A. Why would I need to open that cell?
24  JUDGE:
25  I'm sorry.  There's an objection.

450
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1       What's the objection?
2    ATTORNEY BLOCK:
3    Asked and answered.
4    JUDGE:
5    I'll overrule the objection, ---
6    ATTORNEY VALLACHER:
7    I'm ready to move on.
8    JUDGE:
9    --- but I'd like you to move on.
10      BY ATTORNEY VALLACHER:
11      Q. Okay.
12   So when it comes to on-duty Correctional Officer
13      searches, you would agree that that entails more than
14      visual observation.
15   Right?
16      A. To some degree, yeah.
17      Q. So for example, the security check of a Housing
18      Officer would require physically checking that the
19      doors are locked.
20      A. Yes.
21      Q. And that cannot be done simply by looking at the
22      door, for example?
23      A. Depends on the door.
24      Q. So it cannot be done just by looking at the door?
25      A. It can be done looking at some doors.

451

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      Q. Okay.

2    So if the door has a knob, you would have to

3      physically check it?

4      A. Yes.

5      Q. And area searches are performed by on-duty

6      Housing Officers.

7    Right?

8      A. Yes.

9      Q. And that entails looking underneath things?

10     A. Correct.

11     Q. And ceilings?

12     A. Yes.

13     Q. And sometimes opening doors?

14     A. Yes.

15     Q. And I think yesterday you were talking about

16     joint inventory on Compound 1.

17   Do you recall that?

18     A. I honestly don't, but I believe that's a good

19     possibility I talked about it.  If you could

20     elaborate.

21     Q. Okay.

22   Is it your testimony that Compound 1 officer

23     conducts a joint inventory before relieving the

24     outgoing officer?

25     A. Oh, yes.  That's correct.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1   ATTORNEY VALLACHER:
 2   Okay.  So at this time, I'd like to turn
 3     your attention to Plaintiff's Exhibit 5.
 4                         ---
 5   (Whereupon, Plaintiff's Exhibit PLX-5,
 6   Compound 1 Specific Post Orders (2019),
 7   was marked for identification.)
 8                         ---
 9   THE WITNESS:
10   Do I have a binder for this?  I'm sorry.
11     BY ATTORNEY VALLACHER:
12     Q. It's the yellow one.
13     A. You said tab five?
14     Q. Tab five, yes.  PLX-5.
15     A. PLX-5?
16     Q. Yes.
17     A. Yes.
18     Q. Do you see it?
19     A. I do.
20     Q. Do you recognize the document?
21     A. Yes, I do.
22     Q. And what does it appear to be?
23     A. It's the post orders from Compound 1 from
24     ██████████████████████████████.
25   ATTORNEY VALLACHER:
```

453

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

```
 1    Okay.  At this time, Defendant moves
 2      PLX-5 into evidence.
 3    ATTORNEY BLOCK:
 4    No objection.
 5    JUDGE:
 6    It's admitted.
 7                        ---
 8    (Whereupon, Plaintiff's Exhibit PLX-5,
 9    Compound 1 Specific Post Orders (2019),
10    was marked for identification.)
11                        ---
12    BY ATTORNEY VALLACHER:
13    Q. So if we look at page one there, you see where it
14    says ████████████?
15    A. Yes.
██    ████████████████████████████████████
██    ████████████████████
18  Do you see that?
19    A. Yes.
20    Q. Do you see anything in there that says you have
21    to do a joint inventory?
22    A. That specific sentence?  No.
23    Q. Okay.
24  Do you see anything anywhere else that says you
25    have to do a joint inventory before leaving, the
```

454
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1      outgoing Compound 1 officer?
2      A. I don't see any here, but it has a list of
3      equipment on the top.
4      Q. Yeah.
5      A. So common sense would dictate that make sure you
6      have all that.
7      Q. Okay.
8      So that's your common sense.
9      Is that right?
10     A. I would say anyone employed by the Bureau.
11     Q. Okay.
12     But you can only really speak to your own common
13     sense.
14     Is that correct?
15     A. Well, I can speak on my personal observation of
16     other staff that have done this.
17     Q. Okay.
18     And then let's go down to the page three of ten.
19     So that ---.
20     Q. Okay.
21     Page two of seven.  And that would be the time
22     that morning watch would be leaving post.
23     Correct?  ████████?
24     A. So on page two, ████████ to ---.
25     Q. Okay.

455

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      But in the middle of the page, do you see where

2        it says ████████?

3      A. Okay.  Yes.

4      Q. That's the end of the morning watch shift.

5    Correct?

6      A. According to this document, yes.

7      Q. And this document, it's your post orders.

8    Right?

9      A. Yeah.

10     Q. Which you are required to follow?

11     A. Yes.

12     Q. And do you see anything in here that talks about

13       doing a joint inventory at the end of your shift?

14     A. It says ████████████████████, so ---.

15     Q. Do you see any reference to a shadow board on

16       here?

17     A. Not in that specific paragraph, no.

18     Q. Okay.

19    So at this time, I direct your attention to

20       Plaintiff's Exhibit 9.

21     A. I'm sorry.

22     Q. Plaintiff's Exhibit 9.

23     A. I don't know.  Is that in the binder?

24     Q. It's still in the yellow binder and the tab

25       number.

456

Trial

Kathy Aitken, et al. v. USA                                   3/14/2023

1      A. Oh, the tab number.  I'm sorry.

2      Q. And do you recognize this document?

3      A. It's the post orders for certain housing units.

4    ATTORNEY VALLACHER:

5    Okay.  I believe this has already been

6      admitted.

7    JUDGE:

8    According to my records, yes.

9      BY ATTORNEY VALLACHER:

10     Q. And see where it says ███████?

11     A. Yes.

12     Q. That's when the morning officer would come on to

13     post.

14     A. Correct.

15     Q. And the first thing it says is report directly

16     Units DEA and GA.  Report directly to your assigned

17     housing unit --- relieve the evening watch officer.

18   Do you see that?

19     A. Yes.

20     Q. And then the very next sentence starts with after

21     you make your relief.

22   Do you see that?

23     A. Yes.

24     Q. Do you see anything on this page that says do a

25     joint inventory before making your relief?

457

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. I don't.
2      Q. Do you see any reference to doing a shadow board
3      check before you make your relief?
4      A. I do not.  In that specific paragraph, I do not.
5      Q. Are you aware of any post orders that require you
6      to do that?
7      A. Not to my knowledge, but there's other reasons
8      why we do it.
9      Q. Okay.
10   Let's go to page 4 of 13.
11     A. Four of 13?
12     Q. Yes.  Do you see where it says ████████?
13     A. Yes.
14     Q. And that says ███████████████████ to the
15     relief officer.  Once properly relieved, your tour of
16     duty ends and you are to proceed directly out of the
17     institution.
18   Do you see that?
19     A. Yes.
20     Q. Do you see anything in there that says at the end
21     of your shift you have to stay on and do a joint
22     inventory?
23     A. I do not.
24     Q. Do you see anything in there that says at the end
25     of your shift, before you leave, you've got to check

458
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1      the shadow board?
2      A. Not in that specific paragraph, I do not.
3      Q. Okay.
4  Do you see it anywhere else?
5      A. I don't see it anywhere else, but there's other
6      reasons why we do it besides the post order
7      outstanding.
8      Q. And then let's go to the control post orders.
9      That'll be tab seven, PLX-7.  And I think you also
10     were talking about a joint inventory and control
11     yesterday.
12  Do you recall that?
13     A. I do.
14     Q. So if you turn to page --- I believe this was
15     also admitted into evidence already.
16  If we turn to page one, do you see where it says
17     █████████████?
18     A. Yes.
19     Q. It says report to the control center, ████████
████  ████████████████████████████████████████, and assume
21     responsibility for the post.
22  Do you see that?
23     A. Yes.
24     Q. And then several lines down, after you've assumed
25     responsibility for the post, it says make physical

459

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1        check of all equipment.
2    Do you see that?
3        A. I'm sorry.  Where are you?  Are you in the same
4        paragraph?
5        Q. Same paragraph under ████████    I think two or
6        three sentences after you are to receive equipment and
7        assume responsibility for the post.
8        A. Yeah.  That says log your key ring number.
9        Q. Yes.  It says log your key.  Review the master
10       count sheet.  And then the third sentence after that
11       says make a physical check of all equipment.
12   Do you see that?
13       A. Make a physical check of all equipment.  Yes, I
14       see that.
15       Q. And that's --- that sentence, you would agree, is
16       after it says receive equipment ████████████████
██   ████████    and assume responsibility for the post?
18       A. Yes.
19       Q. And if you were to actually conduct a joint
20       inventory of all of the equipment and control, that
21       would take a very long time, would it not?
22       A. It would.
23   ATTORNEY VALLACHER:
24   Okay.  And then please now turn to Joint
25       Exhibit 103.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

```
 1                        ---
 2    (Whereupon, Joint Exhibit JX-103, J Unit
 3    Post Orders, was marked for
 4    identification.)
 5                        ---
 6    BY ATTORNEY VALLACHER:
 7    Q. That's a different binder.  It has 1023.  I think
 8    it's blue or green.
 9    A. You said JX?
10    Q. JX, yes.
11    A. Yes.  It's green.
12    Q. Okay.
13    Do you have it in front of you?
14    A. Yes, JX-103.
15    Q. Do you recognize this document?
16    A. It's the post orders for J Unit for morning
17    watch.
18    ATTORNEY VALLACHER:
19    Okay.  At this time Defendant moves to
20    admit JX-103 into evidence.
21    ATTORNEY BLOCK:
22    No objection.
23    JUDGE:
24    Admitted.
25                        ---
```

461

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    (Whereupon, Joint Exhibit JX-103, J Unit
 2   Post Orders, was admitted.)
 3                              ---
 4    BY ATTORNEY VALLACHER:
 5    Q. And you see where it says ██████?
 6    A. Yes.
 7    Q. And it says report directly to your assigned
 8   housing unit --- and relieve the evening watch
 9   officer.
10   Do you see that?
11    A. I do.
12    Q. And you see all the way down, not the next
13   paragraph, but the one after, it says ensure all tools
14   are present and prepare a tool accountability sheet
15   for your shift.
16   Do you see that?
17    A. Yes.
18    Q. You would agree that that requirement is several
19   sentences after it says to relieve the evening watch
20   officer.
21   Correct?
22    A. In the order of what it tells us to do, that is
23   correct.
24    Q. Okay.
25   And you're required to follow post orders.
```

462

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1    Correct?
2       A. We are required to follow whatever's written in
3       the post orders prior ---.
4       Q. Is it your understanding that post orders ---
5       that this no longer applies in the current post
6       orders?
7       A. I'm not aware if it does or does not, to be
8       honest.
9       Q. Okay.
10   You're not sure one way or the other?
11      A. That's correct.
12      Q. Okay.
13      A. I haven't really worked J Unit in a while,
14      so ---.
15      Q. Okay.
16   When was the last time you worked J Unit?
17      A. I think I worked it once on a roster adjust just
18      once or twice in the last six months.  But I'm just
19      guessing.  I honestly don't recall.
20      Q. Okay.
21   And so the sentence after it says to relieve the
22      evening watch officer, the very next sentence starts
23      with after you make your relief.
24   Do you see that?
25      A. Where are you?  Based on the ████████?

463

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1     Q. Yes.  It's under ████████, the second sentence.
 2     A. Second sentence in the first paragraph?
 3     Q. Yes.
 4     A. So after ---.
 5     Q. After you make your relief ---
 6     A. Yes.
 7     Q. --- the equipment is issued on 24-hour basis.
 8        You're required to indicate the key ring number,
 9        number of keys, and all other equipment assigned to
10        the post.
11     Do you see that?
12     A. Yes.
13     Q. Okay.
14     And then if we go to three of ten, page three of
15        ten.
16     A. I'm there.
17     Q. Do you see where it says ████████?
18     A. Yes.
19     Q. And it says ████████████████████
████ ████████████.  Once properly relieved, your tour
21        of duty ends and you are to proceed directly out of
22        the institution.
23     Do you see that?
24     A. I do.
25     Q. Do you see any requirement in there to conduct a
```

464

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      joint inventory before leaving?
2      A. Not in that paragraph, I do not.
3      Q. Do you see it anywhere else?
4      A. I'm not aware.
5      Q. Okay.
6      A. I'd have to really look at it to see if I could
7      find it.  But I would say that just because it doesn't
8      say doesn't mean you shouldn't do it.
9      Q. Okay.
10     So it's basically your judgment, not the post
11     orders?
12     A. Well, we're required to maintain the safety and
13     security of the institution.  So logic would dictate
14     we do this.
15     Q. Okay.
16     So your logic would dictate that that entails
17     things not written in the post orders?
18     A. Mine and other staff that I have observed also
19     doing this, yes.
20     Q. Okay.
21     Other Correctional Officers?
22     A. Correctional staff and my non-custody staff also.
23     Q. How about management?  Has management ever
24     disciplined you for not doing a joint inventory on
25     your way out of post?

465

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       A. Not to my knowledge.

2       Q. Has management ever disciplined you for not

3       conducting a joint inventory as you get on your shift?

4       A. No.

5       Q. Okay.

6   And so yesterday you were also asked about what

7       time you're back in the front lobby.

8   Do you recall that?

9       A. Back in the front lobby after my post?

10      Q. After you're relieved.

11      A. Yes.

12      Q. And I think the time you gave was from █████

13      ███ .

14  Do you recall that?

15      A. Yeah.  This is a range that I took a guess on.

16      Q. Okay.

17  So I'm curious about the █████ number, because I

18      think you repeatedly said that you were just

19      estimating all these times.

20  Is that right?

21      A. That is correct.

22      Q. Why is that number so specific?

23      A. █████ ?

24      Q. Yes.  Or █████ .  Yeah, ██████████ .  Sorry.

25      A. I just drew a number.  I wouldn't say it was that

466
Trial
Kathy Aitken, et al. v. USA                                      3/14/2023

1    specific time.  I just --- I honestly don't know.  I
2    just --- I don't know.
3    Q. And you were asked a question kind of guiding you
4    through the relief process at Housing, SHU, J Unit.
5    And then you were asked a question, how is compound
6    relief different?
7  Do you recall that?
8    A. Yeah.
9    Q. And I think you said that sometimes you have to
10   wait for the Compound Officer to arrive if there's a
11   move going on?
12   A. Or other situations.
13   Q. Or other situations.  But there's no ████████
14   ██ .
15  Correct?
16   A. Normally there isn't, no.
17   Q. Okay.
18  Because, in fact, there's a ██████████
19  Right?
20   A. Yeah.  But there's a possibility of the count
21   being delayed for situations.
22   Q. Okay.
23  And would that be pretty unusual, you would say?
24   A. Yeah.  It doesn't happen, but it has happened.
25   Q. And ████████ is also when the evening watch

467

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    officer would get to compound.  That's the beginning
2    of their shift.
3  Correct?
4    A. That is correct.
5    Q. And there's no ████████████████████.
6  Correct?
7    A. Correct.
8    Q. And that's the beginning of the morning watch
9    officer Compound Officer shift.
10  Correct?
11    A. Yes.
12    Q. And then the day watch officer gets on.  That
13    shift begins at ███████.
14  Correct?
15    A. Yes.
16    Q. And there's no █████████████ either.
17  Correct?
18    A. There is movement on the compound only anywhere
19    between ███████.  So it's possible because
20    there's inmates on the compound.
21    Q. Okay.
22  So do you remember that we discussed moves at
23    length during your deposition?
24    A. Yes.
25    Q. And we actually walked through all of the moves

468

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    that would happen in the morning.

2    A. Yes, I do remember that.

3    Q. Okay.

4    And I think your testimony then was that the

5    mainline █████████████████████

6    Does that sound right?

7    A. For day watch on the weekdays, yes.

8    Q. And that depended a bit on when Food Service was

9    ready to start mainline?

10   A. Correct.

11   Q. And it can vary by up to 10 or even 20 minutes?

12   A. Correct.

13   Q. So but 20 minutes past that time still is not

14   anywhere close to ████████

15   Correct?

16   A. That is correct.  We were talking weekdays only,

17   so ---.

18   Q. Okay.

19   So then next up is I think you said there's a

20   ███████████████████████████.

21   Do you recall that?

22   A. Yeah, I believe I said that.

23   Q. Okay.

24   And then the very next move after that was an

25   ███████████████████.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    Do you remember that?
 2       A. Yes.
 3       Q. So based on what we discussed, I'm a little bit
 4       surprised to hear you say that there's an ███████
 5       ███.
 6       A. Did I just say there's an ███████████?  I'm
 7       pretty sure I said there's inmates on the compound,
 8       so ---.
 9       Q. Okay.
10    And inmates would only be on the compound if
11       there's a move, recall, escort or work detail.
12    Correct?
13       A. Yes.
14       Q. Okay.
15    So --- and there's no move at that time?
16       A. If I was working in morning watch post and I got
17       released from morning watch from a housing unit, and I
18       was working my way back to the compound, there's
19       always an inmate somewhere that I have eyes on that's
20       usually on compound doing something.
21       Q. Okay.
22    But the question is whether you're waiting for
23       compound to come back so you can do relief.  And one
24       of the reasons you said that they couldn't is because
25       there might be a move.
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    A. That's one reason why they might not be on the
 2    compound.
 3    Q. Okay.
 4    A. But there's other reasons.
 5    Q. And you never kept --- you never measured the
 6    timing of moves.
 7  Isn't that right?
 8    A. Of how long it takes to conduct an inmate move?
 9    Q. Yes.
10    A. I've never personally like timed it, but I just
11    usually wait until the majority of the inmate are from
12    point A to point B and then I just add the ---.
13    Q. Okay.
14  And your educated guess would place it at seven
15    to nine minutes?
16    A. Yes.
17    Q. And you said recall could be in that range, but
18    it's normally a bit faster?
19    A. That is correct.
20    Q. So we're done with that exhibit.  Yesterday you
21    were also testifying about the J Unit.
22  Do you recall that?
23    A. J Unit?
24    Q. Yes.
25    A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
1      Q. And you were saying that the 24-hour J Unit
2      Officer ███████████████████████████████
██     █████████████████████████
4      Right?
5      ████████████████████████████████
██     █████████████████    ████████████████
██     ███████████  █████████████████████████
██     ████████████████████████████████
██     ██████████████████████████████████████
██     █████████████████████████████
11     Q. Okay.
██     ████████████████████████████████
██     ██████████████████████████████████████
██     █████████████████████
15     Q. Okay.
16     And you said that you need that ████████████
██     █████████████████████████████████
18     Is that right?
19     A. Yes.
20     Q. So just to be clear, ██████████████████████
██     ███████████████████
22     Correct?
23     A. Well, ████████████████████████████████
██     ██████████████████████████████████████████
██     ██████████
```

472

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.

2      ████████████████████████████████████████

3      A. No.

4      Q. ████████████████████████████████████████████

5      A. No.

6      Q. And you ████████████████████████████████

7 ██   ██████████████████████████

8      A. Again, me personally, that is correct.

9 ██   ████████████████████████████████████████████

10 ██  ████████████████████████

11 ██  ████████████████    ████████████████████████

12 ██  ██████████████

13     A. Yes.

14     Q. So it's safe to say that ████████████████████

15 ██  ████████████████████████████████████████████?

16     A. ████████████████, I wouldn't be able to get to my

17     assigned post.

18     Q. Sure.

19     It's necessary for you to travel to that post,

20     but it's not necessary once you're at that post to do

21     your job.

22     Correct?

23     A. That is correct.  If I didn't need ████████████

24 ██  ████████████████████████████████████

25     Q. Okay.

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1      So I think yesterday you were also asked about
 2        how the count times coincide with the start of shift
 3        times.
 4      Do you remember that?
 5        A. Yeah, for evening watch and morning watch.
 6        Q. So there's a ▇▇▇▇▇▇ count, and that's also the
 7        beginning of a shift.
 8      Correct?
 9        A. Correct.
10        Q. And I think you were saying that you needed to be
11        in the housing unit before, for example, ▇▇▇▇▇▇▇▇, in
12        order to do the count right at ▇▇▇▇▇▇
13      Is that right?
14        A. Yeah.
15        Q. Have you ever been disciplined for initiating a
16        count once you showed up right at ▇▇▇▇, assumed
17        responsibility, and then you did the count?
18        A. No.
19        Q. And have you ever even heard of anyone being
20        disciplined under those circumstances?
21        A. Not to my knowledge.  I know staff have been
22        disciplined for being late.
23        Q. Okay.
24      But not if they showed right up at ▇▇▇▇.
25      Right?
```

474

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1       A. Correct.

2       Q. And the same would be true about ████████?

3       A. Correct.

4       Q. Okay.

5   And then yesterday we were talking about the

6       Lieutenant's Office.

7   Do you remember that?

8       A. Yes.

9       Q. And I think you mentioned that you might pick up

10      mail there and alluded to other situations in which

11      you would go there.

12  Is that right?

13      A. Yes.

14      Q. Isn't it true that you have access to post orders

15      on an internet site called iGroupWise?

16      A. If I had access to log in --- yes.

17      Q. Okay.

18  And isn't it true that stopping by the

19      Lieutenant's Office is not an everyday occurrence?

20      A. I would say that's also correct.

21      Q. And stopping by the Lieutenant's Office is just

22      one way to make your presence known to the

23      Lieutenants, but it's not the only way?

24      A. That is correct.

25      Q. Okay.

475

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      And yesterday you were asked if you've ever been
2          relieved late.
3      Do you remember that?
4          A. Yes.
5          Q. And yesterday you were telling us about two
6          instances in which you were relieved late and did not
7          receive overtime.
8      Do you remember that?
9          A. Yes.
10         Q. In fact, those were the same two instances that
11         you told me about in our deposition.
12     Correct?
13         A. Yeah.  I actually think I talked about three, but
14         I don't call exactly.
15         Q. Three yesterday or three in the deposition?
16         A. Three in the deposition.  Two of them were
17         similar situations and one was the compound scenario,
18         and then there's two dry cells.
19         Q. Okay.
20         A. I can't remember if I --- I thought I talked
21         about two in the dry cell scenarios, where there was
22         two different occurrences where I believe I arrived
23         late, and one was the compound, but I honestly don't
24         recall if I talked about that.
25         Q. Okay.

476

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1     But yesterday, you only talked about those two?
 2     A. Yes.
 3     Q. And you also talked to me about them in the
 4     deposition?
 5     A. Yes.
 6     Q. And that's because at your deposition I asked you
 7     for all instances in which you've submitted for
 8     overtime and it was denied.
 9     A. I think you asked me for all instances, that I
10     can remember.
11     Q. Okay.
12     A. That's a little bit different.
13     Q. And you only gave me those instances in your ---
14     how long have you been at Otisville?
15     A. It's going to be eight years in May.  So I'd say
16     like seven years and eight months or ten months.
17     Q. Okay.
18     So you gave me two instances in your eight years
19     at Otisville.
20     A. I gave you the two most recent ones.
21     Q. Okay.
22     But I asked for all.
23     Do you recall that?
24     A. I recall you asking for all that I can remember.
25     Does not mean that I can --- I can't recall things
```

477

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    that happened in 2015.  Can you remember what you ate

2    in June 22 of 2015 for breakfast?  Because I can't.

3        Q. Okay.

4    But you've only remembered two in your eight

5    years?

6        A. No.  There's probably more I don't remember.

7        Q. Okay.

8    So yesterday you said that you go into the

9    Lieutenant's Office looking for compensation for

10   staying late working a dry cell and were told no.

11   Do you remember that?

12       A. Yes.

13       Q. And you said on another occasion, you were

14   relieved 45 minutes late and a Lieutenant did not

15   compensate you at first, but then you were paid some

16   portion of that 45 minutes.

17   Do you recall that?

18       A. Yes, eventually.

19       Q. So your testimony yesterday left out, in my

20   opinion, two key details.  First, it was just one

21   Lieutenant who denied you overtime on both occasions,

22   wasn't it?

23       A. And the two occasions were ---?

24       Q. That you discussed yesterday when you were denied

25   overtime.

478

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1        A. Yes.

2        Q. Same person?

3        A. Yes.

4        Q. And that unnamed Lieutenant was actually

5        Lieutenant Leimkuhler.

6    Correct?

7        A. He was the Operations Lieutenant on duty at the

8        time that I made the phone call.  That is correct.

9        Q. And he's a Plaintiff in this action, isn't he?

10       A. I don't have the list, so I don't know if that's

11       true or not.

12       Q. And the second fact is that isn't it true that

13       both of these instances happened in the past year?

14       A. Yes.

15       Q. And the complaint was filed well before either of

16       these instances in this action?

17       A. Could you clarify?

18       Q. Do you know when the complaint was filed in this

19       case?

20       A. You mean the lawsuit?

21       Q. Yes.

22       A. I think it was 2019.

23       Q. Okay.

24    And 2019, of course, is before 2022.

25       A. Yes.

479

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. And 2022 is when both of these denials happened?

2      A. Yes.

3      Q. So let's go back to your testimony yesterday

4      regarding the 45 minutes of late relief where you said

5      you only received a portion of it.

6      A. Sure.

7      Q. After Plaintiff Leimkuhler denied you overtime,

8      you escalated to Captain O'Kane.

9   Correct?

10     A. That is not correct.

11     Q. Okay.

12  Let's --- you had your deposition taken in this

13    case.

14  Correct?

15     A. Yes.

16     Q. And the deposition is when you're asked questions

17    under oath?

18     A. Correct.

19     Q. And I asked you questions and the lawyer for your

20    side also asked you questions.

21  Correct?

22     A. Yes.

23     Q. Before we started, a Court Reporter swore you in

24    to tell the truth, ---

25     A. Correct.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. --- the whole truth and nothing but the truth?

2    A. That is correct.

3    Q. And that's the same oath you took today in this

4    courtroom?

5    A. Yes.

6    Q. Okay.

7    ATTORNEY VALLACHER:

8    Permission to approach?

9    JUDGE:

10   Granted.

11   BY ATTORNEY VALLACHER:

12   Q. So you have in front of you a copy of your

13   deposition?

14   A. Yeah.

15   Q. Okay.

16   So I direct you to page 173.  Question is okay.

17   And what happened next?  Answer ---.

18   A. I'm sorry, 173, the top question?

19   Q. Line four.

20   A. Okay.  I'm there.

21   Q. It says question.  Okay.  And what happened next?

22   Answer, I explained what happened and went to the

23   Captain.  I eventually got 30 minutes mandate out of

24   me working an additional 45.  Question, so you got 30

25   minutes of overtime, but you said, I think you

481

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1      originally said you were relieved you got stuck for 40
 2      minutes.  Answer, yeah.  I probably departed the side
 3      gate like █████ and was only compensated for 30
 4      minutes.
 5   Do you see that?
 6      A. Yeah.
 7      Q. Did I read that correctly?
 8      A. Yes, you did.
 9      Q. And would it surprise you to learn that in your
10      deposition you actually said that you were stuck at
11      post for 40 minutes on several occasions?
12      A. I'm sorry, can you repeat that?
13      Q. Would it surprise you to learn that in your
14      deposition, you actually referred to the time you were
15      stuck at post as 40 minutes?
16      A. Yes.
17      Q. It would surprise you?
18      A. I mean, I'm sorry.  No.
19      Q. So you know, giving you the benefit of the doubt,
20      would it be fair to say that both the 45 minutes and
21      the 40 minutes numbers you provided were just an
22      estimate?
23      A. For this specific situation?
24      Q. Yes.
25      A. I just remember when I was on the side gate that
```

482
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    it was at least █████ something and my relief
 2    eventually appeared sometime after that or during that
 3    time frame.  So that's all I can say about that.
 4    Q. Okay.
 5    A. I mean, obviously, if you have cameras, I would
 6    encourage you to review it.
 7    Q. Okay.
 8 Do you know why you would have used the █████
 9    number in describing this to me?
10    A. Because when I'm waiting to get released, it's
11    like every ten minutes, it's █████, still here.
12    █████, still here.  █████ something, still here.
13    █████ something, still here.  So that's why I said 40
14    something.
15    Q. Okay.
16    A. Am I allowed to make a statement?
17    Q. No.  If you want to elaborate on something, by
18    all means, though.
19    A. Yeah.  So you talked about Wayne earlier.  You
20    were reading question line four, okay.  And what
21    happened next?  And I said I explained what happened.
22    I went to the Captain.
23    Q. Yes.
24    A. If you scroll a little bit higher to line two, it
25    said that's when I actually went to the union to
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

483

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    complain about it.

2    Q. Okay.

3    A. So I actually never went to the Captain directly.

4    I went to the Union and they went to the Captain.

5    Q. I see.  Okay.  Appreciate the clarification, sir.

6    When it comes to ---?  Okay.  And would you agree

7      that more often than not you're early to your post?

8    A. Yes.

9    ATTORNEY VALLACHER:

10    All right.  I have no further questions

11      for this witness.

12    JUDGE:

13    Okay.

14    ATTORNEY VALLACHER:

15    Thank you.

16    JUDGE:

17    Ms. Block, any Redirect?

18    ATTORNEY BLOCK:

19    Yes.

20                          ---

21                    REDIRECT EXAMINATION

22                          ---

23    BY ATTORNEY BLOCK:

24    Q. Mr. McPhillips, have you ever worked at any other

25    Bureau of Prisons' facilities besides FCI Otisville?

484

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. For TDYS.

2      Q. And for how long was that?

3      A. Either two or three weeks.

4      Q. And what other facilities?

5      A. MDC Manhattan and MDC Brooklyn.

6      Q. And other than those facilities, have you worked

7      in any other BOP facilities?

8      A. No.

9      Q. What did you say?

10     A. No, that's correct.

11     Q. Okay.

12  Where are you subject to institution rules?

13     A. I would say from the moment I arrive at the A1

14     lobby.

15     Q. Does that include the time when you are walking

16     to your post but are not yet on your post?

17     A. That is correct.

18     Q. Does it include time after you've been relieved

19     from your post and are in the process of walking back

20     towards the exit to your station?

21     A. Yes.

22     Q. And where are you subject to orders from your

23     supervisor, Lieutenant, Captains?

24     A. At any given time that I'm on the premises.

25     Q. Does that include time that you are on premises

485

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      but not on the post location?

2      A. Correct.

3      Q. Is responding to a fight between inmates part of

4      your job duty of maintaining control and discipline of

5      inmates?

6      A. Yes.

7      Q. And is responding to an emergency one of your job

8      duties?

9      A. Yes.

10     Q. Can more than one person be supervising an inmate

11     at any given time?

12     A. Yes.

13     Q. You were just asked by the Government's attorney

14     about an occasion where an inmate was using a snow

15     blower.

16     Do you recall that?

17     A. Yes.

18     Q. On that occasion, did you assist that inmate who

19     was using the snow blower after you'd been relieved

20     from your post?

21     A. Yes.

22     Q. And is a snow crew a work detail that is

23     available at FCI Otisville?

24     A. Yes.

25     Q. And are there sometimes snow crew work detail

486

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      crew out overnight if there's a storm?
2      A. Yes.
3      Q. You also just testified about dress-down days.
4    Do you recall that?
5      A. Yes.
6      Q. On a dress-down day, are Correctional Officers
7      still required to wear these separate vests?
8      A. Yes.
9      Q. When you are assigned to a 24-hour post on the
10     compound and there is also an inmate on suicide watch,
11     are you required to pick up the key to the suicide
12     areas on your way to the post?
13     A. Yes.
14     Q. You were also asked some questions about a
15     document labeled JX-103.  I'm going to have you turn
16     back to that.  It's in the green binder, tab 103.  Let
17     me know when you have it.
18     A. JX-103 is in front of me, first page.
19     Q. Okay.
20    And this is the Unit J officer post order.
21    Is that right?
22     A. Yes.
23     Q. Okay.
24    And if you look right at the ███████ line, it
25     says report directly to your assigned housing unit

487

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    wearing the prescribed uniform and relieve the evening
2    watch officer.
3  You see that?
4    A. Yes.
5    Q. And then if you look down about four paragraphs,
6    there's a bold section with two asterisks that says it
7    should be clearly understood that none of these
8    activities are to take place until the evening watch
9    officer is relieved.
10  Do you see that?
11    A. Yes.
12    Q. Is it possible to relieve the outgoing officer if
13    they have already been relieved?
14    A. I'm sorry, what?
15    Q. Based on this post order --- the post order
16    instructs that you should --- or that none of the
17    activities listed above that bold paragraph are to
18    take place until the evening watch officer is
19    relieved.
20  Do you see that?
21    A. Yes.
22    Q. And one of the activities listed above the first
23    paragraph is to relieve the evening watch officer.
24  Do you see that?
25    A. Yes.

488

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       Q. Is that possible?

2       A. Does not appear to be possible.

3       Q. I'm going to have you flip to the page --- I

4       think it's three of ten.

5       A. Page ten you said?

6       Q. Three of ten.

7       A. Oh, three.  I'm there.

8       Q. Are you on page three?

9       A. Yes.

10      Q. Okay.

11  And you see at the --- underneath the text, the

12      last line, there's a bold note that says at no time

13      will you depart the unit unless properly relieved.

14  Is that your practice?

15      A. That is correct.

16      Q. You were asked some questions about ████ to

17      the J Unit.

18  Do you recall that?

19      A. Yes.

20      Q. Is it necessary --- is ████ necessary to

21      secure the J Unit?

22      A. To secure the entrance to the J Unit, yes.

23      Q. And can you get to the J Unit post without ████

    ██   ████

25      A. No.

489

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. Is there a move before the ██████████?

2    A. Recall.

3    Q. And what's the purpose of that?

4    A. To recall all inmates back to their assigned unit

5    in preparation for the four o'clock count.

6    Q. And approximately when does that occur?

7    A. ████████████    ████████

8    Q. Is the recall --- have you been walking to your

9    post when you're coming on for an evening watch shift

10   when the recall is occurring?

11   A. Yes.

12   Q. How many individuals hold the position of

13   Operations Lieutenant at FCI Otisville at a given

14   time, if you know?

15   A. Anywhere from one.  I'm sorry.  Operations

16   Lieutenant only, it would just be one.

17   ATTORNEY BLOCK:

18   Okay.  I have no further questions.

19   JUDGE:

20   Great.  Mr. McPhillips, thank you very

21     much.

22   THE WITNESS:

23   No problem.

24   JUDGE:

25   Counsel, it's noon.  Would this be a

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

490

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1    good time to take a lunch break and then come back at
2    12:45 for the next witness or do you want to keep ---
3    press on?
4    ATTORNEY ELKIN:
5    I mean, I'm ready to press, but I'm also
6    --- I know if people are hangry.  I don't want to be
7    here for that either.
8    JUDGE:
9    Mr. Vallacher?
10   ATTORNEY VALLACHER:
11   I'm flexible.  No preference.
12   JUDGE:
13   Okay.  How long do you think the next
14   witness will take for the Direct?  It'll take an hour.
15   ATTORNEY ELKIN:
16   Yes.  It will take an hour.
17   JUDGE:
18   Okay.
19   ATTORNEY ELKIN:
20   So it's up to you, Your Honor.  Either
21   way is fine.
22   JUDGE:
23   Okay.  Would it take --- if it would
24   take an hour, let's press on.  If it would take an
25   hour and a half, let's ---.
```

491
Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    ATTORNEY ELKIN:
2    Your Honor, I don't want to make you
3      hangry.  You're the last person ---.  So I would say
4      let's just take a break.
5    JUDGE:
6    No, I'm actually doing all right.  Let's
7      press on.
8    ATTORNEY ELKIN:
9    Okay.
10   JUDGE:
11   Let's get the next witness.
12   ATTORNEY ELKIN:
13   I never mind a comfort break, if that's
14     what you want for five minutes.
15   JUDGE:
16   No, no, no.  Let's take a five-minute
17     break, then, and then let's come back for the next
18     witness in five minutes.
19   ATTORNEY ELKIN:
20   Okay.  Thank you, Your Honor.
21   COURT CRIER:
22   All rise.
23                         ---
24     (WHEREUPON, A SHORT BREAK WAS TAKEN.)
25                         ---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    COURT CRIER:

2    All rise.  The United States Court of

3      Federal Claims is now in session.  Judge Stephen

4      Schwartz presiding.

5    JUDGE:

6    Okay.  Pressing on.  Plaintiff's next

7      witness.

8    ATTORNEY ELKIN:

9    Your Honor, ---

10   JUDGE:

11   Not here?

12   ATTORNEY ELKIN:

13   --- he just went to the men's room.

14   JUDGE:

15   Okay.

16   ATTORNEY ELKIN:

17   So yes.  So while we're here, can I

18     bring up a little housekeeping?

19   JUDGE:

20   Of course.

21   ATTORNEY ELKIN:

22   And maybe it's not necessary, but in a

23     jury trial, the Judge usually reads the joint

24     stipulation of facts into the record.  I don't know

25     that we need to do that here, but I just wanted to

493

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    bring it to your attention.  That might be something
2    we do at some point or ---.
3    JUDGE:
4    I don't think that's necessary.
5    ATTORNEY ELKIN:
6    Okay.
7    JUDGE:
8    I'll take them and as stipulated without
9    reading into the record.
10   ATTORNEY ELKIN:
11   We can cite them in briefs.
12   JUDGE:
13   Unless Mr. Vallacher has any concern.
14   ATTORNEY VALLACHER:
15   No objection.
16   JUDGE:
17   Okay.
18   ATTORNEY ELKIN:
19   Okay.
20   JUDGE:
21   I'll take them as stipulated.
22   Ready?
23   ATTORNEY ELKIN:
24   Yes, Your Honor.  The Plaintiff calls
25   Matthew Bunting.

494

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    JUDGE:
 2    Step right up.  Raise your right hand.
 3                        ---
 4                      MATTHEW BUNTING,
 5    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
 6    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
 7    FOLLOWS:
 8                        ---
 9    JUDGE:
10    Have a seat.
11                        ---
12                    DIRECT EXAMINATION
13                        ---
14    BY ATTORNEY ELKIN:
15    Q. Good afternoon, Mr. Bunting.
16 Can you please state your name for the record?
17    A. Matthew Herbert Bunting.
18    Q. Where are you currently employed?
19    A. FCI Otisville.
20    Q. When did you begin working at FCI Otisville?
21    A. January 14th.
22    Q. Have you worked at any other BOP institutions?
23    A. Yes.
24    Q. Which one?
25    A. USP Canaan.
```

495

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1      Q. When did you work at USP Canaan?
2      A. 2012 to '14.
3      Q. Prior to USP Canaan, where did you work?
4      A. Pike County Correctional Facility.
5      Q. And prior to that, what did you do?
6      A. Construction.
7      Q. Okay.
8    And what is your current position at Otisville,
9      current position title?
10     A. Senior Officer Specialist.
11     Q. And that's a Correctional Officer position?
12     A. Yes.
13     Q. When you first began working as a Correctional
14     Officer, were you a Correctional Officer as USP Canaan
15     as well.
16     A. Yes.
17     Q. When you first began, what kind of training, if
18     any, did you receive to become a Correctional Officer?
19     A. There's --- I have class in the beginning for
20     about two weeks, on-the-job training, and classroom
21     training, and then went down to FLETC.
22     Q. Okay.
23   And based on your training and your experience of
24     being a Correctional Officer for some 11 years or so,
25     what is the most important job duty that you perform

496

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    at FCI Otisville as a Senior Officer Specialist?

2    A. Safety and security.

3  ATTORNEY ELKIN:

4  I'm going to show you what is in front

5    of you, I believe, in a green binder and it should be

6    three of three.  And it's going to be Joint Exhibit 63

7    and Joint Exhibit 64.

8                              ---

9  (Whereupon, Joint Exhibit JX-63, Bunting

10  Assignment Cards 2016 - 2019, was marked

11  for identification.)

12  (Whereupon, Joint Exhibit JX-64, Bunting

13  Assignment Cards 2019 - 2022, was marked

14  for identification.)

15                             ---

16  THE WITNESS:

17  Which JX is it?

18    BY ATTORNEY ELKIN:

19    Q. Sixty-three (63), to start off.  And you can

20    actually look at them simultaneously.

21  And my question is, do these appear to be your

22    daily assignments from April 2016 up through

23    October 19th of 2022?

24    A. Yes.  These are my assignments,

25  ATTORNEY ELKIN:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

497

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Okay.  Your Honor, I'd like to move to
2      admit Joint Exhibit 63 and Joint Exhibit 64.
3    ATTORNEY VALLACHER:
4    No objection.
5    JUDGE:
6    It's admitted, both of them.
7                              ---
8    (Whereupon, Joint Exhibit JX-63, Bunting
9    Assignment Cards 2016 - 2019, was
10   admitted.)
11   (Whereupon, Joint Exhibit JX-64, Bunting
12   Assignment Cards 2019 - 2022, was
13   admitted.)
14                             ---
15     BY ATTORNEY ELKIN:
16     Q. You can set that aside for now.  You talked about
17       your most important job duty being safe and security.
18   Is that your most important job duty regardless
19       of any of those custody posts that you were assigned
20       to?  Is that your most important job duty?
21     A. Yes.
22     Q. And at what location in the institution do you
23       start carrying out your most important job duty of
24       safety and security?
25     A. Whenever I'm on the property.

498

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       Q. And would that include, you know, as you're
2       walking to your post prior to your shift?
3       A. Yes.
4       Q. And as you're leaving your post after your shift?
5       A. Yes.
6       Q. So based on your experience and training, at what
7       point, location-wise, in the institution, are you on
8       duty?
9       A. Whenever I'm on the property, I'm, you know,
10      ready to respond to anything.  But screening site, I
11      would say.
12      Q. Okay.
13  So from the A1 lobby until you exit the A1 lobby
14      at the end of the day?
15      A. Yes.
16      Q. And for any of the 24-hour posts listed at 63 and
17      Joint Exhibit 64, where do you have to be at the start
18      of a scheduled shift?
19      A. On your scheduled post.
20      Q. And do you have to have all of your equipment
21      with you and to be in full uniform with the vest by
22      the time your actual scheduled shift starts?
23      A. Yes.
24      Q. Those daily assignments that you have, that ---
25      Joint Exhibits 63 and 64, do Lieutenants and Captains

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

499

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1       have access to those?

2       A. Yes.

3       Q. Based on those assignments, it appears that since

4       April of 2016 you have been assigned to work all of

5       the 24-hour housing units in the main institution on

6       evening watch.

7    Is that accurate?

8       A. Yes.

9       Q. And you have also worked ███████████████████,

10      on day watch, evening watch, and the morning watch.

11   Is that correct?

12      A. Yes.

13      Q. And you've also worked Compound 1 and SHU-1 on

14      evening watch during this time period?

15      A. Yes.

16      Q. And Compound 2 on evening watch when it was a 24-

17      hour post.

18   Is that correct?

19      A. Yes.

20      Q. So for purposes of your testimony, unless I ask

21      you about a different post, can you agree to limit

22      your answers to your experiences on the post that we

23      just talked about?

24      A. Yes.

25      Q. Where do you have --- I think I already said

500

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      this.  For those 24-hour posts that we discussed, you
2      have to be, if it's an evening watch shift, which do
3      you primarily work evening watch?
4      A. Yes.
5      Q. You have to be on the post ready to go by ███
6      ████████ .
7    Is that correct?
8      A. That is correct.
9      Q. And your scheduled pay is only from ████ until
10     what time?
11     A. ████████ .
12     Q. Okay.
13   Have you --- outside of --- it's not a case --- a
14     position at issue in this case, but have you worked
15     the SHU-3 post?
16     A. Yes.
17     Q. Okay.
18   And is that a 16-hour post?
19     A. Yes.
20     Q. Are the hours █████████████████████████?
21     A. Yes.
22     Q. Are you familiar with the post orders for SHU-3?
23     A. I am.
24   ATTORNEY ELKIN:
25   Okay.

501
Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    I'd like to have you look at the binder
2      that is blue, with a blue cover and go to DX-7,
3      please.
4                              ---
5    (Whereupon, Defendant's Exhibit DX-7,
6    SHU#3 (2021), was marked for
7    identification.)
8                              ---
9    THE WITNESS:
10   Seven?
11     BY ATTORNEY ELKIN:
12     Q. Yes.
13   Does this appear to be the post order for a SHU-3
14     officer with a tour from ████████, and on the next
15     page, ████████?
16     A. Yes.
17   ATTORNEY ELKIN:
18   Okay.
19   Your Honor, I'd like to move to admit
20     DX-7, please.
21   ATTORNEY VALLACHER:
22   No objection.
23   JUDGE:
24   It's admitted.
25                              ---

502

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    (Whereupon, Defendant's Exhibit DX-7,
 2    SHU#3 (2021), was admitted.)
 3                              ---
 4    BY ATTORNEY ELKIN:
 5    Q. Okay.
      So if you can turn your attention to the start of
 7    a ███████ shift on the SHU post.
 8    Do you see that on the first page of DX-7?  See
 9    that?
10    A. Yes.
11    Q. And where is a SHU Officer at SHU-3 post supposed
12    to be at ██████?
██    ███████████████████████████
██    █████████████████████████████████
██    ████████████████████████████
16    Q. All right.
17    And so where are they supposed to be at ████
18    ████?
19    A. On post.
██    ████████████████████████████
██    ██████████████████████████████████
██    ██████████████████████████████████
██    ███████████████████████████████████
██    ███████████████████████████████████
25    A. That is correct.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

503

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. And they would be on paid time during that time?

2    A. Yes.

3    Q. I'd like you to turn to the end of the evening

4    watch shift, which is on the next page.  And this

5    post, I believe, is from ███████████ , it looks like.

6    Where - what happened at ████ ?

7    A. You are permitted to leave your post for the post

8    orders and head to the control center.

██   ████████████████████████████████████████████████

██   █████████████████████████████████████

11   A. Yes.

12   Q. So is it fair to say that the institution gives

13   the officer working SHU-3, ██████████████ of pay time

14   to get from the control center to the SHU --- sorry.

15   To get from the SHU to the control center at the end

16   of the shift?

17   A. Yes.

18   Q. And is there a line at the control center to

19   return equipment at the ██████████ hour?

20   A. No.

21   Q. You also --- well, let me ask you, have you

22   worked the B-side of the housing unit during your

23   career at Otisville?

24   A. Yes, I have.

25   Q. And are you familiar with the post orders for the

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

504

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1      B-side housing unit?

2      A. Yes.

3    ATTORNEY ELKIN:

4    So in that same binder, if you would

5      turn to DX-5, please.

6                              ---

7    (Whereupon, Defendant's Exhibit DX-5,

8    Housing B-Side Specific (2021), was

9    marked for identification.)

10                              ---

11     BY ATTORNEY ELKIN:

12     Q. And let me know when you're there.

13     A. All right.

14     Q. And you can review it and let me know if this

15      appears to be a post order for SHU, sorry, B-side

16      housing unit on the ██████████████████ watch and

17      the ████████████████ watch?

18     A. It is.

19    ATTORNEY ELKIN:

20    Your Honor, I'd like to move to admit

21     DX-5, please.

22    ATTORNEY VALLACHER:

23    No objection.

24    JUDGE:

25    Admitted.

505
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                              ---
 2      (Whereupon, Defendant's Exhibit DX-5,
 3      Housing B-Side Specific (2021), was
 4      admitted.)
 5                              ---
 6      BY ATTORNEY ELKIN:
 7      Q. At ████████, if you're working a B-side housing
 8      unit, where are you supposed to be?
 9      A. At the control center window.
██      ███████████████████████████████████████████████████
██      ████████████████████
12    Is that what happens?
13      A. Yes.
14      Q. And so do --- the B-side officers, are they on
15      paid time when they're walking from the control center
16      to the housing unit?
17      A. Yes, they are.
18      Q. Okay.
19    I'd like you to go to the end of the p.m. shift,
20      which I believe is on page seven of eight.
21      A. Yes.
22      Q. You're there?
23      A. Yes.
24      Q. What happens --- just give me the last sentence,
25      at ███████ on the B-side housing unit.  Starts with
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

506

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1    proceed.
 ██    ████████      ███████████████████████████████
 ██    ████████████████████████████
 4    Q. Okay.
 5  So at  ████████   the B-side housing unit officers
 6    are permitted to leave the housing units to go and
 7    ████████████████████.
 8  Is that correct?
 9    A. Yes.
10    Q. And how much time does the --- FCI Otisville give
11    the officers to get to control ████████████
██    ████████?
13    ████████████.
14    Q. And would you agree that pursuant to the post
15    orders, the officers are on paid time during this
16    period?
17    A. Yes.
18    Q. Are you required to wear a uniform on ---?  You
19    can put that aside.  Are you required to wear a
20    uniform on duty?
21    A. Yes.
22    Q. And would that include on your way to a post and
23    on your way back from a post after a shift?
24    A. Yes.
25    Q. And does the uniform identify you as a
```

507

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Correctional Officer at FCI Otisville?
2      A. It does.
3      Q. Do you wear a duty belt as a Correctional
4      Officer?
5      A. Yes, I do.
6      Q. How is a duty belt different, if at all, from a
7      regular belt?
8      A. It's more secure, heavy duty, so you can hold all
9      your equipment efficiently and safely.
10     Q. In your experience, do all COs outside of a
11     control center post, do they, if they're working a
12     custody post within the institution, do they wear duty
13     belts?
14     A. Yes, they do.
15     Q. So could you safely and effectively perform your
16     safety and security duties that you described earlier
17     without a duty belt on your post?
18     A. Not as safely or as effectively, no.
19     Q. And why do you say that?
20     A. Because the belt is more secure than a regular
21     belt.  It's more heavy-duty.  It keeps all the stuff
22     secured to your body, to keep it out of reach of an
23     inmate.
24     Q. Do you wear belt keepers?
25     A. I do.

508
Trial
Kathy Aitken, et al. v. USA                                3/14/2023

1    Q. And how do those work?  What are those?
2    A. They are like mini belts.  They go around your
3    outer belt and inner belt to keep them together.  So
4    that way even if the buckle on your belt breaks, it's
5    still connected to your body.
6    Q. And are those required by the nature of your
7    law-enforcement work?
8    A. Yes.
9    Q. And you're familiar with the post orders that
10   require you to carry OC spray?
11   A. I am.
12   Q. And are you familiar that those post orders
13   require those --- that ███████████████████████████
     ██ ███████████████████████████████████████████?
15   A. Yes.
16   Q. Did you use an allowance to buy your duty belt or
17   was your belt issued to you?
18   A. I use the allowance to buy it.
19   Q. What is attached to the duty belt as you send it
20   through ---?  Well, first of all, do you go through
21   staff screening when you come to the institution?
22   A. I do.
23   Q. And the way your belt is configured with various
24   things on it that we're going to talk about, could you
25   get through the upright metal detector wearing your

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      duty belt?

2      A. I cannot, no.

3      Q. Okay.

4      So I want to talk about the things that are

5      attached to your duty belt as you are coming into the

6      front lobby at the start of one of your evening watch

7      shifts.

8      Okay?

9      A. ███████████████████████████████

       ████████████████████████████████████████████

       ██████████████████████████

12     Q. Okay.

13     We're going to go over these one at a time.

14     Chits.  Can you describe those for me, please?

15     A. ████████████████████████████  ██████████

       ████████████████  ████████████████████

17     Q. Are they required to be brought in by you every

18     day that you work?

19     A. Yes, they are.

20     Q. And that's requirements of the Bureau of Prison

21     that they put on you?

22     A. It is.

23     Q. And could you wear them on your person as you

24     walk through the screen site?

25     A. No.

510

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. And they're usually set to account for equipment?

2      A. Yes.

3      Q. Is accountability of equipment important inside a

4      medium-security institution?

5      A. It's extremely important.

6      Q. Are there murderers inside the medium-security

7      institution?

8      A. Yes.

9      Q. Gang members?

10     A. Yes.

11     Q. Rapists?

12     A. Yes.

13     Q. Could you safely do your job on a custody post

14     --- safely and effectively do your job on a custody

15     post without the chits?

16     A. No, I could not.

17     ███████████████████████████████████████████

██     ██████    ██████████████████████████

19     Is that right?

20     A. That's correct.

21     ██████████████████████████████████████████

██     ███████████████████████████████████

23     A. Yes.

24     Q. And what are those used for?

25     ███████████████████████████    ███████████████████

511

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     ████████████████████████

2     Q. And is that pursuant to post orders?

3     A. Yes.

4     Q. And is that required to maintain safety and

5     security of an institution?

6     A. It is.

7     ███████████████████████████████, could you do

8     your job of maintaining safety and security of

9     institution safely and effectively on your post?

10    A. Not within the policy, no.

11    Q. And why not?

12    ███████████████████████████████████████████

██    ██████████████████████████    ████████████████

██    ███████████████████████████████████████

██    ████████████████████

██    ████████████████████████████

17    A. Yes.

18    Q. Was that issued by the agency?

19    A. It was.

20    Q. And is it required by the Bureau of Prison?

21    A. It is.

22    Q. And can you do your job safely or effectively by

23    █████████████████████████████████████████████

██    ████████████████████████████████████

25    A. No, I cannot.

512

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1     Q. Why not?

2     A. Because the ███████████████████████

█     ███████████████████

█     ████████████████████████████████

█     ████████

█     ██████████████████████████

█     ██████████████     ████████████████

█     ████████████████████████████████████

█     ████████████

██    █████████████████████████

11    A. Yes.

12    Q. And can you describe what that is?

13    A. ██████████████████████████████

██    ███████████████████████████

15    Q. Okay.

16    And could you safely and effectively do your job

17    on your post █████████████████████████

██    ██████████████

19    A. I could not.

20    Q. Why not?

21    A. Because that's your lifeline.  You want your

22    radio on you at all times.

██    █████████████████████████████

24    A. Yeah.

25    Q. What is that?

513

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

8   A. It does.
9   Q. And I think you mentioned a flashlight?
10  A. Yeah. ████████████████████████████████.
11  ████████████████████████████████████████████████
    ██  ████████████████████████
13  A. It is.
14  Q. And who issued the flashlight?
15  A. I got that from the prison.
16  Q. And is there also a ████████████████
17  A. Yes.
18  Q. And could you effectively do your job on post
19  without the flashlight ████████████████████████
20  A. No.
21  Q. Why not?
22  A. When you're doing searches, spin the extra light
23  so you can see in the dark spots.
24  Q. And you have to do on the evening watch post ---
25  actually, you don't do ---.

514

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is the ████████████ conducted by the morning

2    watch officer?

3    A. The ████████████?

4    Q. Yes.

5    A. That's done by morning watch.

6    Q. Okay.

7    Do you do a count where you have to use the

8    flashlight on your post?

9    A. You use security checks after the ██████████

██    ██████.

11   Q. And the flashlight's used for that as well?

12   A. Yeah.  You use that to look in the windows, make

13   sure all the inmates are alive and there.

14   Q. I believe you mentioned ████████████████████

██    ████████████████████████████

16   A. Yes.

17   Q. It's my understanding that FCI Otisville issues

18   ████████████████████████████

19   A. They do.

██   █████████████████████████████████████████

██   ████████████████████████████  ██████████████████

██   ████████  ██████████████████████████████████████████

██   ███████████████████████████████████████████████████

██   ████████████████████████████

25   Q. Could you safely and effectively do your job on

515
Trial
Kathy Aitken, et al. v. USA                          3/14/2023

1    your post, opening doors, closing doors ████████
     █ ███████████████████████████████
3    A. I think mine are a lot safer.  I was told to get
4    them when I started at Canaan.
5    Q. Sorry?
6    A. When I started at USP Canaan, I was told to buy
7    ███████████████████ .
8    Q. Okay.
9    Now, those are the --- I think we went over all
10   this.
11   I know you said something about --- you said
12   something about ██████████████ .
13   A. Yeah.
14   █████████████████████████████████████
15   A. Yeah.
16   Q. Okay.
17   And what is that for?
18   A. Just in case there's a medical emergency.
19   Q. Now, on a housing unit post, a SHU post, other
20   posts that we talked about, you've been assigned to
21   24-hour post. ███████████████████████████
     █ █████████████████
23   A. On a 24-hour post?
     █ ███████████████████████████
25   A. Yeah.

516

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023



7    Q. And is it your practice to carry ---?  I think

8    you said you had ████████████.  Do you have ████████████

9    on your belt?

10   A. Yes.

11   Q. That's when you come into the institution?

12   A. Yes.

15   A. That's correct.

16   Q. Or when you get to your post, I should say.

17   A. Yes.

20   Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is that correct?

2        A. Yes.

3        Q. Can you do your job on your post safely without

4    ███████████████████████████████████████████████

     ██      ███████████    And if not, why not?

6        A. I cannot.

7        Q. Why not?

8        A. It keeps everything secured and available to me

9    at all times.

10       Q. Okay.

11   And you mentioned your ████████████   ████

██   ██████████████████████████████████████████████

██   ████████████████████████████████████████████

██   ████████████████████

15   Is that correct?

16       A. That's correct.

17       Q. What do you use your chits for on a compound

18   post, a SHU post or a housing unit?  Just some

19   examples.

██   ████████████████████████████████████████

██   ████████████████████████████████████████████████

██   ██████████████████████████████████

23       Q. And what is the rule there, as you understand it,

24   with respect to the chits and the equipment?

25       A. You ████████████████████████████████.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                              3/14/2023

 4    A. A chit.

 5    Q. And if there's not a chit there and the equipment

 6       is not there?

 7    A. It's missing.

 8    Q. And is that an issue?

 9    A. Yes.

10    Q. All right.

11   Is it fair to say that all Correctionals have to

12      go through the staff the screening site in front in

13      the A1 lobby before doing anything else and making

14      their way to the post?

15    A. Yes.

16    Q. If you're assigned to a 24-hour custody post

17      inside the main institution on the evening watch, what

18      time do you begin to actually walk through that

19      upright metal detector, clear the metal detector in

20      that front lobby?

21    A. Usually around ██.

22    Q. Okay.

23   And that's for a ████████ shift?

24    A. Yes.

25    Q. And would your practice --- to the extent that

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

519

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    you work the day watch and the morning watch shift on
2    any of these posts, what would your practice be in
3    terms of the time that you clear the metal detector in
4    the front lobby?
5    A. Whatever time I'm scheduled to work, I try to be
6    in the lobby 30 minutes prior.
7    Q. Okay.
8  And you said you try to be.  Are you ----
9    A. Yeah.
10   Q. --- regularly in the lobby ---
11   A. Yes.
12   Q. --- 30 minutes prior?
13   A. I am.
14   Q. And are there typically other Correctional
15   Officers going through --- either behind you or in
16   front of you, are there typically other Correctional
17   Officers around as you are going to the site?
18   A. Yes, usually.
19   Q. And are there ever Lieutenants in the front lobby
20   as you start coming through a half an hour before your
21   time?
22   A. Occasionally.
23   Q. And do they ever conduct ID checks?
24   A. Occasionally, yes.
25   Q. And has anybody --- any Lieutenant or anybody

Trial
Kathy Aitken, et al. v. USA                          3/14/2023

1      else in management ever said to you, hey, Bunting,
2      it's ███ or it's ███, your shift doesn't start
3      before.  You shouldn't be coming in here?
4      A. No.
5      Q. Have any of the Lieutenants ever instructed you
6      to wait until it's closer to the start of your shift
7      to proceed to your post?
8      A. They have not.
9      Q. Have any of the Lieutenants ever prevented you
10     from putting on your duty belt?
11   Well, let me ask you.  I didn't think I'd asked
12     you this.
13   Where do you put on your duty belt?
14     A. Once it goes through the x-ray machine, I take it
15     out of my bag, and I put it on there before going
16     through the sally port.
17     Q. Okay.
18   And so has any Lieutenant or Captain ever told
19     you you're not supposed to put on your duty belt in
20     the front lobby?
21     A. No.
22     Q. As a hypothetical --- well, just to be clear,
23     when your duty belt is screened, it has all these
24     things that we talked about are already attached to
25     it.

Trial
Kathy Aitken, et al. v. USA                                      3/14/2023

1    Right?

2       A. Yes.

3       Q. If you chose to wear your duty belt without any

4    of those things, ███████████████████████████████

    █   ██████████████████████████ --- if you choose

6    to wear your duty belt without any of those things on

7    it, could you clear the upright metal detector.

8       A. With the belt I currently have, it would.

9       Q. Okay.

██  ████████████████████████████████████████████████

██  ██████████████████████████████████

12   Is that right?

13      A. Yes.

14      Q. So if you put ██████████████████████████████

█   ████████████████████████████, would you have to still

16   put those on the conveyor belt to get x-rayed?

17      A. Yes.

18      Q. So because the --- is it fair to say that the

19   ████████████████████████████ would not clear the

20   upright metal detector?

21      A. No, it would not.

22      Q. And the ██████████ would not clear the upright

23   metal detector?

24      A. No.

25      Q. And the metal chits would not clear the upright

522
Trial
Kathy Aitken, et al. v. USA                                3/14/2023

1    metal detector?
2    A. No.
3    Q. And the █████████ would not clear the upright
4    metal detector?
5    A. No.
6    Q. And the belt keepers, do those also have metal
7    snaps?
8    A. They do.
9    Q. Would those clear the upright metal detector?
10   A. No.
11   Q. And so if, hypothetically, you just wore your
12   duty belt in, without any of the things attached, what
13   would you have to do with respect to those things that
14   you just screened through the x-ray?
15   A. I'd have to take my duty belt apart, and then put
16   everything on it one by one, and put it back together.
17   Q. Okay.
18   What would take longer, the way you do it where
19   everything's already attached to the belt, or the
20   hypothetical I just gave you, where nothing's attached
21   to the belt and you have to collect all these metal
22   items on the agency premises after you screen?
23   A. That way it would take longer.  I do it the more
24   effective way, which is how everyone else does.
25   Q. And has anyone in management ever told you that

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    you were not allowed to don your duty belt ████████
 █    ██████████████████████████████████████████████████
 █    ██████████████████████████████████████
 4    A. No.
 5    Q. Why do you put your duty belt on in the front
 6    lobby?
 7    A. So I have --- so I'm ready for shift, ready to
 8    receive equipment, ██████████████████████████████████
 █    ████████████████████████.
10    Q. Is it part of your effort to be in state of
11    readiness?
12    A. Yes.
13    Q. Do you wear a protective vest?
14    A. I do.
15    Q. Are you required to wear a protective vest?
16    A. Whenever you're inside the secure facility, you
17    are.
18    Q. So you're required to wear that vest on your way
19    to the post prior to your shift?
20    A. Yes.
21    Q. And you're required to wear that vest as you're
22    leaving a post after your shift?
23    A. Yes.
24    Q. If you did not go through that staff screening
25    process, and none of the Correctional Officers had to
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     go through the staff screening process, would it
2     affect your ability to safely and effectively perform
3     your job duties on the post?
4     A. Yes.
5     Q. Why do you say that?
6     A. It's not just to prevent like dirty staff.  It's
7     also to prevent staff from accidentally bringing
8     something in, like a cell phone.
9     Q. Okay.
10    A cell phone, that's considered contraband?
11    A. Yeah.  We can't have that.
12    Q. Are you aware of staff accidentally bringing in a
13    weapon, and if so, can you describe it?
14    A. Once that I'm aware of at Otisville.  The x-ray
15    machine prevented a weapon from coming in, yes.
16    Q. What was the weapon?
17    A. It was a pistol.
18    Q. Okay.
19    Had there been no --- and was it determined that
20    the --- I think it was your words, was it dirty staff
21    or was it an accidental ---?
22    A. Oh, this was accidental.  I just meant like the
23    x-ray machine is not just to stop dirty staff.  It's
24    also to prevent regular staff from accidentally
25    bringing in something.

525

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.

2    And so is it fair to say that x-ray machine

3      prevented a firearm from coming into the institution?

4      A. It did.

5      Q. And did that help promote the safety and

6      effectiveness of the institution?

7      A. It did.

8      Q. Okay.

9    So after you have put on your duty belt, where do

10     you go next if you're going to a housing unit,

11     compound post or a SHU?

12     A. After I put my belt on, I go through the sally

13     port in the lobby and I put my chit over.  Then I'll

14     proceed towards control.  I'll go through the other

15     sally port, and then I'll walk down the compound to

16     whichever post I'm assigned to that day.

17     Q. Okay.

18   And just so we're clear, who controls, well, the

19     --- you said you went to the sally port from the

20     lobby.

21   Is that the A1 sally port?

22     A. Yeah.

23     Q. Who controls the doors to the A1 sally port on

24     the control center side?

25     A. The control center controls both sets of doors.

526

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1    Q. So once you are on the compound on the other side

2    of the control center doors, is it fair to say that

3    you were locked inside the institution by two sets of

4    sally port doors over which you have no control?

5    A. That is correct.

6    Q. ████████████████████████████████████████

7    ██   █████████████████████████████

8    A. Yes.

9    Q. That's inside the A1 sally port?

10   A. It is.

11   Q. What does that ████████████████████████████

12   ██   ████████████████████████

13   A. It says if you're inside or outside of the fence,

14   such as the case of an emergency was to happen, they

15   have accountability of who is inside the institution.

16   Q. Okay.

17   And does management have access to know who,

18   based on the numbers, you know, bundling of number,

19   whatever, 125, do they know who's assigned each

20   number?

21   A. ██████████   ████████████████████████████

22   ██   █████████████████████

23   Q. And if you are clearing the screening site at

24   ██████ --- sorry.  I think ██████ is your normal shift.

25   A. Yes.

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1       Q. What time are you generally flipping that
 2    ███████████████████ to inside?
 3       A. ███████████ .
 4       Q. Okay.
 5    Has anybody in management ever come to you and
 6       said, hey, Bunting, your shift doesn't start until
 7       ██████ .  I see that you're already inside at ██████ ?
 8       A. No.
 9       Q. Did anybody in management ever tell you to put in
10       an overtime request upon noticing that you already
11       inside at ████████████████████████ ?
12       A. No.
13       Q. All right.
14    Once you have left the sally port, I think you
15       said you walk up the A1.  You walk down a sidewalk to
16       the control center lobby.
17       A. Yes.
18       Q. Okay.
19    And have you ever encountered inmates in that
20       area?
21       A. I have.
22       Q. And this is coming onto a post or leaving a post.
23    And what kind of inmates would be in that area?
24       A. There'll be inmates on like a work detail.
25       Q. And if anything happens --- they'll be supervised
```

528

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     by another officer?

2     A. Yes, they're supervised there.

3     Q. And if anything should happen with those inmates

4     on a work detail, could you just keep walking on your

5     way to the post?

6     A. If they need assistance, I'm going to give it to

7     them, yes.

8     Q. Okay.

9  So you could not keep walking, you would have to

10    help out?

11    A. That's correct.

12    Q. And so you're inside the compound after you've

13    been let in by the control center.

14  What's your state of mind as you are walking

15    inside the compound, inside the secure perimeter?

16    A. Just alert.  Paying attention to safety,

17    security.  Just being aware of your surroundings.

18    Q. Okay.

19  And at the time that you come on duty, when you

20    said you start doing everything around █████, are there

21    inmates on the compound when you are going to a shift

22    inside the institution?

23    A. A lot of the times, yeah.  Usually walking down

24    during the ████ call.

25    Q. Okay.

529
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1    And do you interact with inmates?
2    A. Yeah.  I'm walking down the compound.  Once you
3    walk through the control sally port, right in front of
4    you is the rec door.  So they're usually walking out
5    of there and I'm walking down next to them the entire
6    way to my post.
7    Q. Okay.
8    And so is that more often than not you're walking
9    to the post with inmates who are on call?
10   A. I would say yeah.  It's not every day, but it is
11   more often than not, yeah.
12   Q. And can you give us some examples of some of the
13   interactions you've had with inmates on your way to
14   your post prior to the ███████ paid time?
15   A. Just making sure they're in uniform, not walking
16   on the grass, not running, just basic things like
17   that.
18   Q. Is there a rule against running for the inmates?
19   A. Yeah.
20   Q. And is there a rule against staff running unless
21   something's ---?
22   A. Yeah.  Generally speaking, you don't run in
23   prison, because if you're running, that means you're
24   responding.  So if you see someone running, you're
25   going to just follow.

530

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1        Q. Okay.
2    So do you correct inmate behavior as you're
3        walking to post and you see someone on the grass or
4        you see the uniform not being worn properly?
5        A. If I do see it, I do correct it.
6        Q. Okay.
7    And have you, in fact, done that?
8        A. I have.
9        Q. And why do you correct, you know, the uniforms
10       not being more proper?  Is that important, and if so,
11       why?
12       A. Just basic rules.  Got to be on your toes.  Small
13       problems lead to big problems.
14       Q. So is it fair to say if you don't correct the
15       small problems, then the inmates will push the
16       envelope, for example, and try to break bigger rules?
17       A. Most likely.
18       Q. Are you expected by the agency to correct
19       inmates' infractions as you see them, even if it's
20       prior to the start of your shift?
21       A. I am.
22       Q. Has a supervisor ever instructed you not to do
23       that?
24       A. No.
25       Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

531

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    So once you get to a housing unit, what happens
2       in terms of you're coming on, somebody's going off?
3       Tell us about that.
4       A. A regular housing unit?
5       Q. A regular housing unit.
6       A. Shift change?
7       Q. Uh-huh (yes).
8       A. Well, usually if I'm walking down there and
9       recall, the front door will be open because the
10      inmates are going back to the unit.  The day watch
11      officer will secure the unit for the ████████████
██      ████████. So I usually just stay in the common area and
13      watch as they lock the unit down.  Then once they're
14      done, we'll go into the office.  We'll close the door
15      just as an extra barrier, because I don't want the
16      inmates hearing what we're talking about.
17   They'll give me a verbal pass-on of whatever
18      happened, and ████████████████████████████████
██      ██████████████  ████████████████████████████████
██      ████████████████████████████████████████████████████
██      ████████████████████████████████████████████████████
██      █████████████████. And then we're go around the front
23      door, I open it and I'll let him out.
24      Q. Okay.
25   Now, do you do all of those --- it sounds like

532

Trial
Kathy Aitken, et al. v. USA                                          3/14/2023

1    you do, because you let the guy out after you've

2    checked the shadow board.

3    A. Yeah.

███   ██████████████████████████████████████

███        ████████████████ while the outgoing officer is still

6    with you?

7    A. Yeah.

8    Q. And are you doing this prior to the ███████████

███      ███████

10   A. Yes.

11   Q. Who is on paid time during that time?

12   A. They are.

13   Q. And are you?

14   A. No.

15   Q. Okay.

16   Has anybody ever told you not to make an early

17   release, anybody in management?

18   A. No.

19   Q. If you didn't do all the things that we're

20   talking about, coming in at ████, making your way to

21   the post, making the release, could you conduct a ████

███      ████████████ on time?

23   A. It would be delayed.

24   Q. It would be?

25   A. Delayed.

533
Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. So if you started the screening process at ███
2      --- walking through the screening process at ███,
3      walking through just a metal detector, what time do
4      you generally arrive at the housing unit?
5      A. I'm usually on post ████████████.
6      Q. Okay.
7      A. Sometimes earlier.
8      Q. You talked about a verbal pass-on of information.
9  What kind of information is passed down to you at
10     the start of your shift, and what kind of information
11     do you pass down at the end of the shift, if at all
12     different?
13     A. It's basically just a summary of what happened
14     throughout the shift and if there's anything out of
15     the ordinary.  Like if you're in --- well, I usually
16     work SHU.  So it's usually like what was done, what
17     needs to be done, stuff like that.  Or if you're in a
18     housing unit, you're going to --- like if you're in a
19     unit and if you sense tension among certain inmates,
20     or if you suspect an inmate of something, you want to
21     pass it on to your relief for safety reasons.
22     Q. And have you heard of Truescope?
23     A. Yes.
24     Q. Are you always able to --- are you ever able to
25     look at ████████  right at the start of your ████

534

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1          ███████   shift?

2      A. No, not usually.

3      Q. Are you doing a count then?

4      A. Yes.

5      Q. Okay.

6   So is it important to you to have this verbal

7      pass-down right at the start of your shift?

8      A. It is.

9      Q. And why do you say that?

10     A. For safety reasons.

11     Q. At the end of the ███████████, once

12     there's a good count, are you unlocking all the doors

13     and letting the inmates out?

14     A. At clear count?

15     Q. At clear count.

16     A. Yes.

17     Q. And is it important to you to have this verbal

18     pass-down by the time you are unlocking the inmates

19     and they're coming out to the common area in the

20     general population housing?

21     A. It is.

535

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1          Q. Okay.



25         Q. Okay.

536

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. --- just to make sure it's not broken.

2    Q. And I believe you said you check --- the ████

     ████    to make sure everything is there?

4    A. That's correct.

5    Q. ████████████████████

6    A. Yes.

7    Q. And why do you do that while the other guy is

8    still there?

████  █████████████████████████████

████  █████████████████████████████

████  █████████████████████████████

████  █████████████████████     And that

13   way it solves that problem right then and there,

14   instead of trying to find out stuff later on.

15   Q. So is it for accountability purposes that you

16   have the verbal --- sorry, ████████████████

████  █████████████████ --- the outgoing officer is

18   still there?

19   A. Yeah.

████  █████████████████████████████

21   A. Yes.

22   Q. How long, on average, on a housing unit does the

23   information and ████████████  take?

24   A. Three to five minutes.  It depends on the day.

25   Q. And there are inmates on the housing unit.

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1      They're locked in their cells during the evening watch
2      exchange.
3   Correct?
4      A. Yeah.
5      Q. But if something should happen, a fight in a
6      cell, and it's prior to the start of your shift, would
7      you have any responsibilities with respect to that
8      fight?
9      A. Yeah.
10     Q. What would you have to do?
11     A. Respond.
12     Q. Is it fair to say at the end of the shift, you do
13     all of this in reverse order, except for going through
14     the screening site in the front lobby?
15     A. Yeah.
16     Q. Okay.
▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ information exchange.
18  Does it take about the same amount of time, which
19     I think you said was three to five minutes?
20     A. Yeah.
21     Q. And you walk back to the control center sally
22     port, through the A1 sally port, and out of the
23     institution?
24     A. Yes.
25     Q. And what time are you typically leaving the A1

538

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1    sally port after you have ended your shift, made your
2    █████████ information exchange, and done that walk,
3    any waiting that's involved in the sally port?
4    A. I would say an accurate guess or estimate would
5    be ████████. Sometimes --- there are times I'm
6    walking the compound when they're announcing the █
█  ████████████. But a normal time would be ████████
█  ████████
9    Q. Okay.
10   Have you ever been paid when you were on a
11   housing unit for those minutes, which are, it sounds
12   like 20 to 25 minutes in excess of 8 hours?
13   ATTORNEY VALLACHER:
14   Objection. Mischaracterizes testimony.
15   JUDGE:
16   In what way?
17   ATTORNEY VALLACHER:
18   He said that he was through the A1 sally
19   port at ██████, which is during the shift, and she's
20   implying that that is excess of the shift.
21   ATTORNEY ELKIN:
22   I'm counting the time he came in from
23   ████████████ (sic). I believe that is 20 minutes.
24   JUDGE:
25   ███████████████?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

539

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    ATTORNEY ELKIN:
2    Sorry.  ███ --- it'd be a half an hour
3      before, and he's leaving ten minutes prior.  Yeah, 20
4      minutes.
5    JUDGE:
6    I was going to ask --- so I'll overrule
7      the objection.
8    BY ATTORNEY ELKIN:
9    Q. Have you ever been paid for the 20 to actually 25
10     minutes beyond your eight hours that you're inside the
11     institution on duty?
12     A. I have not.
13     Q. Did anybody ever train you to ask for overtime
14       for this time period?
15     A. No.
16     Q. Is it your understanding that the Government does
17       not believe you are working during this time period?
18     A. Yes.
19     Q. I understand that sometimes things happen in a
20       prison and you are relieved late.
21     Is that fair to say that's happened to you?
22     A. It has.
23     Q. Okay.
24     And by late, I mean you're still on a post, a
25       housing unit SHU, a compound, and it is an evening

540
Trial
Kathy Aitken, et al. v. USA                                            3/14/2023

1       watch, which ends at ██████████ .

2   Right?

3       A. Yes.

4       Q. And you're still there ten minutes after

5       ██████████ .

6   Has that happened to you?

7       A. It has.

8       Q. Approximately how many times?

9       A. At least ten.  I don't have a number.

10      Q. But is it a fair estimate to say at least ten

11      times?

12      A. Yeah.

13      Q. And in those times, do you typically ask the

14      Lieutenant to get overtime for remaining on your post

15      at least ten minutes past the end of your shift?

16      A. I have asked, yes.  I don't ask every time, but I

17      have asked, yes.

18      Q. How many times, if you know, have you actually

19      been granted overtime pay for remaining on your post

20      after your shift?

21      A. Two, that I can recall.

22      Q. Okay.

23  And I think you still have JX-63 and 64 in front

24      of you?

25      A. Yeah.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1      Q. Okay.
 2   If you can turn to JX-63.  And I think you should
 3      go to page ten in that document.  JX --- we're looking
 4      for September 21st, 2017 in JX-63.
 5      A. What was the date?
 6      Q. September 21st, 2017.  Page 15 of JX-63.
 7      A. Okay.
 8      Q. Okay.
 9   So is this one of the occasions where you were
10      paid overtime for a late relief?
11      A. It appears to be, yes.
12      Q. So what post were you working on 9/21/2017?
13      A. Golf Alpha housing unit.
14      Q. Okay.
15   And it was an evening watch post that would go
16      from ███████████████?
17      A. Yes.
18      Q. And then what happened ██████████?
19      A. It looks like I went over to FA for 30 minutes.
20      Q. Okay.
21   And on this day, was it your regular practice to
22      arrive 30 minutes early?
23      A. Yes.
24      Q. Did you get paid for the 30 minutes prior to your
25      shift for this day?
```

542

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1     A. No.

2     Q. All right.

3   And then if you turn to Joint Exhibit 64, is that

4     one of the two occasions that you recall ever getting

5     paid for ---?

6     A. Yeah.

7     Q. Okay.

8   Go to Joint Exhibit 64, page ten.  And we're

9     looking for January 4th, 2021.

10  Do you see where you're working on January 4th,

11    2021?

12    A. SHU-1 evening watch ███████████████

13    Q. Okay.

14  And then ████████ comes around and it becomes

15    January 5, 2021 and what happened?

16    A. I have 15 minutes of overtime.

17    Q. And on that day, were you paid or was it your

18    practice on that day to come in 30 minutes prior to

19    the start of your shift to begin the screening, and

20    the donning, and the walking, and the waiting, and

21    whatever you also described?

22    A. Yes.

23    Q. Did you get paid for that 30 minutes?

24    A. No.

25    Q. And to the best of your knowledge, these are the

543

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    only two occasions out of the ten times or so that you

2    had a late relief on your post, you didn't even get

3    off your post until at least ten minutes after your

4    shift, that you were actually paid for overtime?

5    A. That I can recall, yes.

6    Q. Okay.

7    And again, this is for the period from April 2016

8    through when this was ---?

9    A. Yes.

10   Q. Okay.  I'm sorry.  All right.

11   Briefly, let's talk about the SHU, the Special

12   Housing Unit.

13   A. Okay.

14   Q. You said you regularly work that post?

15   A. Yeah.

16   Q. SHU-1.

17   A. Yeah.  SHU-1, ███████████.

18   Q. Okay.

19   And is there anything different about your

20   arrival practice and your donning practice when you

21   work SHU-1?

22   A. No.

23   Q. All right.

24   So let's get to the SHU-1 post.

25   What happens when you get to the SHU-1 post?

544

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1      A. When I first get to the --- when I'm on post or
2      when I get to the door?
3      Q. No, when you get to the outer door.
4      A. I press a button, which buzzes on the inside.
5      The SHU-1 day watch will call control to pop the
6      outer.  They check the camera, make sure I'm staff,
7      and then they'll let me in.  Then once I get inside
8      the sally port, they check my ID, and then they let me
9      in.  And then we do shift change.
10     Q. And where do you do the shift change on SHU-1?
11     A. In the combination of the SHU-1 Office and bubble
12     area.
13     Q. I didn't hear what you said.
14     A. Combination of the SHU-1 Office, and then there's
15     like a, it's like a kitchen bubble area you want to
16     call it.
17     Q. Okay.
18     And is there --- why would you have to go out to
19     that kitchen bubble area for part of the exchange?
20     A. Well, you walk through it to get to the office
21     and there's also two shadow boards out there that have
22     --- ███████████████████████.  You want to make
23     sure they're all there.  ████████████████████████
███    ████████████████████████████████████.
25     Then inside the SHU-1 Office is where the move board

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      is, and you have two more shadow boards, and the book,
2      and all that kind of stuff is there.
3      Q. What's the move board?
4      A. In the SHU-1 Office there is a board on the wall
5      that has little magnets that has pictures of all the
6      inmates and it has what cells they're in, so ---.
7      Q. All right.
8    So if you have any questions of the outgoing
9      SHU-1 officer about any of the moves, would you ask it
10     during that shift change time?
11     A. Yeah, yeah.  All this stuff is gone over then.
12     Q. And what are you looking for when you're looking
13     at the two shadow boards that you discussed, the one
14     in the kitchen area and the one inside the SHU Office?
15     A. Just that anything missing ██████████████ and
16     that everything is on the ███████ that's supposed to be
17     there.
18     Q. Okay.
19     Does the --- is there verbal pass-down for SHU-1?
20     A. Yes.
21     Q. Is it the same type of information, different
22     information, more information, less information ---?
23     A. There's usually more information than SHU.
24     Q. And why do you say that?
25     A. Well, ████████████████████████████

546

Trial

Kathy Aitken, et al. v. USA                               3/14/2023

```
 1          ████████.  So there's usually more stuff to pass
 2     on.
 3     Q. Okay.
 4     A. And there's more work that needs to be done down
 5     there than that regular housing unit.
 6     Q. Okay.
 7  And is it important to get that information just
 8     as it was on the housing unit from the outgoing
 9     officer?
10     A. It is.
██     ████████████████████
12     A. It does.
██     ████████████████████████
██     ████████████████████████
15     A. No.
16     Q. So if you have questions, who would you be asking
17     during this exchange?
18     A. The officer that I'm relieving.
██     ██████████████████████████████
██     ██████████████████████
21     A. It is.
22     Q. Why?  Why is the other guys still to be there
23     when you do that?
██     ██████████████████████████
██     ███████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

547

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    occasionally.

2    Q. All right.

3  And if it takes a little bit longer in the

4    housing unit, the exchange, and I'm including the

5    information exchange, the 

22    Q. All right.

548

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1        ███████    in the SHU, how long, approximately, does
2        that exchange take?
3        A. Maybe four to six minutes, roughly.
4        Q. Okay.
5    And is it the same situation where only the day
6        watch officer is being paid during this exchange, ---
7        A. That's correct.
8        Q. --- when you come on for evening watch?
9        A. Yeah, yeah.
10       Q. And at the end of a shift in SHU, are you doing
11       everything in reverse order, other than going to the
12       screen site ---
13       A. Yes.
14       Q. --- and putting on your duty belt?
15       A. Yes.
16       Q. Now, when you're walking across the compound at
17       the end of a morning watch shift, are there usually
18       inmates out of the compound?  I'm sorry.  At the end
19       of an evening watch shift?
20       A. At █████████?
21       Q. Yes.
22       A. Generally no.
23       Q. Okay.
24   Could there be Orderlies blowing snow or doing
25       something like that?

549

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. There could be if there's a storm or some type of
2    facilities' work detail.  But on a normal day, there's
3    not, no.
4    Q. So what are you doing, if anything, as you walk
5    from the SHU post or even a housing unit post at the
6    end of an evening watch shift when nobody's supposed
7    to be around?
8    A. Well, obviously, look to make sure the inmates
9    aren't where they're not supposed to be.  And then
10   when you walk up the sidewalk going to the control
11   sally port, you pass by the doors.  So I'm just making
12   sure they're secured and make sure nothing is out of
13   place.
14   Q. Okay.
15   So would your exit time from the A1 lobby be the
16   same, approximately, as you've described on the
17   housing unit, which would be, I think you said, ███
18   to ███?
19   A. Yeah.  They're all roughly the same, ---
20   Q. Okay.
21   A. --- within a few minutes.
22   Q. You've also worked compound posts?
23   A. Yes, I have
24   Q. And both Compound 1 and Compound 2 when it's a
25   24-hour post?

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1       A. Yes.

2       Q. And the area of responsibility of the Compound

3       Officer is?

4       A. The compound.

5       Q. Okay.

6   Anything different about your arrival time when

7       you work the compound post?

8       A. No.

9       Q. And is there anything different about the duty

10      belt, where you put that on?

11      A. No, it's all the same.

12      Q. Okay.

13  So let's get on the other side of the control

14      center sally port.  You've gone through the inner

15      door.  You're now in compound.

16  When you worked compound, where did you do the

17      release?

18      A. The side gate.

19      Q. Okay.

20  And so did you ever work compound while the

21      relief was done in the Lieutenants' Office since April

22      2016, if you know?

23      A. Yeah, I probably have.

24      Q. Okay.

25  Why don't you talk about the side gate.

551

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    What is your practice at the side gate, once you
 2      get there?
 3      A. Once you're in there, just the same as any other.
 4      They tell me what's going on. ███████████████████
 █  ████████████ ███████████████████████████████████ █
 █  ████████████████████████████████████████
 █  ████████████████  I'm not a hundred percent.  I
 8      haven't worked that post since last summer. ██████████
 █  ███████████████████████████████████████ and then
10      they go home and I get ready for the count.
 █  ████████████████████████████    ██████████████████████
 █  ████████████████████████████
 █  █████████████████████████████████
 █  ████████████████████████████████████    ████████████████
 █  ███████████████████████████████████████████████████████
 █  ████████████████████████████████  I'm not a hundred
17      percent.
18      Q. Okay.
 █  ██████████████████████████████████████████████
 █  █████████████████████████████████████████████████
 █  █████████████████
22      A. Yes.
 █  █████████████████████████████████████████████████
 █  ████████████████████████████████████████
 █  ████████████████  █████████████████████████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

552

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

■　　　████████████████
2　　Q. Okay.
3　So is that part --- the SHU-1 Officer also ---?
4　　A. SHU rep.
5　　Q. Oh, sorry.
■　████████████████████████████████
■　████████████████
■　████████████████████████████████████████████
■　████████████████████████████████████████████
■　████████
■　████████████████████████
■　████████████████████████████
■　████████
■　████████████████████████████████████████████
■　████████████████████
■　████████████████████████████████████████
■　████████
■　████████████████████████████
■　████████
■　████████████████████████████████████████
■　██████████████████████████████████████████
■　████████████████████████████████████████████
■　████████████████████
24　　A. No, no.  It's all done the same.
25　　Q. And at the end of your shift on the compound

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

553

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1     post, is it the same process in reverse order?  ████
 ██   █████████████████████████████████████████████
 ██   ███████████████████████████████████████████████████████
 ██   █████████████████████████████████  you're talking about inmate
 5     information?
 6     A. Yes.
 7     Q. All right.
 8  And then how do you get out of the side gate?  Is
 9     it locked?
10     A. If it is, they have the key to let you out.
11     Q. Okay.
12  And then you make your way past the ---?
13     A. Chow hall.
14     Q. Okay.
15  And are you doing anything --- are you doing the
16     same types of thing as when you're coming off the
17     evening watch shift on compound you described for SHU?
18     A. And post that I leave, I'm doing the same
19     routine.  I'm just being aware and looking for
20     anything out of the ordinary, making sure everything
21     is secure.
22     Q. And so what time are you exiting the A1 sally
23     port into the inner --- no, outer door into the front
24     lobby on an evening watch post after you've been
25     relieved?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

554

Trial

Kathy Aitken, et al. v. USA                          3/14/2023

1      A. Usually by █████.
2      Q. Have your practices been consistent that you've
3      described here today with respect to the compound
4      post, the SHU post, and the ---?
5      A. Yeah.
6      Q. Okay.
7   Now, the J Unit post, you've also worked at.
8   Is that right?
9      A. Yes.
10     Q. And it looks like you've worked on it all three
11     shifts during the recovery period?
12     A. Yes.
██  ████████████████████████████████████
██  ████████
██  ██████████████████████████████████████
██  ██████████████
██  ██████████████████████████████████████
██  ████████████████████
19     A. No.
20     Q. All right.
21   So why don't you tell us about what happens to
22     the J Unit once --- is there a security screening site
23     there?
24     A. Yeah.
25     Q. So tell us --- you've gone through the security

555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      screening site on an evening watch shift.

2   Approximately what time are you doing that if

3      you're working J Unit?

4      A. The same as inside.  ▇, I show for work ---

5      Q. Okay.

6      A. --- and then I'll screen my bag in and then go

7      in.

8      Q. All right.

9   So you put your duty belt on right there as

10     well, ---

11     A. Yes.

12     Q. --- after you get screened?

13     A. Yes.

14     Q. And then do you have to stop at the J Unit

15     control ▇▇▇▇▇▇▇▇▇▇?

16     A. Yeah.  After the screen site, there's one sally

17     port, two doors you go through. ▇▇▇▇▇▇▇▇▇▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  ▇▇▇▇▇▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇   ▇▇▇▇▇▇▇▇▇▇▇▇ And

22     then right there to the left is the officer station.

23     Q. Okay.

24  And then do you make the same kind of relief that

25     you did on the housing units inside the main

556

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1    institution, do you do that on J Unit?

2    A. That's correct.

11   Q. Okay.

12   And so if you arrive at ▮▮▮▮, approximately what

13   time is the outgoing J Unit officer leaving ▮▮▮▮▮

▮▮      ▮▮▮▮▮▮▮  to the control center from after your

15   exchange?

16   A. You mean when he's outside the institution?

17   Q. No, leaving the post.  Leaving the housing unit

18   post after the exchange has been ---.

19   A. Probably like 45.

20   Q. Quarter to the hour?

21   A. Yeah.

22   Q. Okay.

23   And have --- and that would be the same for you

24   as well at the end of your shift, you're leaving

25   approximately?

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1     A. Providing they come in the same time I came in,
2     yes.
3     Q. Okay.
4     And you exit the secure confines of the J Unit.
5     After you do that, ████████████████████████
      █ ██████████████████████████████████████.
7     Is that right?
8     A. Yes.
9     Q. And are you locking the door behind you as you
10    leave whatever door it is that you're opening before
11    you get on the compound?
12    A. Yeah, that door is always secure.
13    Q. Okay.
14    And is that for safety and security reasons?
15    A. Yeah.
█     ███████████████████████████████████████████
█     ████████████████████████████████████████████████
█     ████████████████
19    A. Yeah.
20    Q. So if you come in at ██████, approximately what
21    time are you exiting after you ---? ██████████████
```



```
█     ██████████████████████████████████████████
█     ██████████████
24    A. When I'm leaving at the end of my shift?
25    Q. At the end of your evening watch shift, what time
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1  █    ████████████████████████████████

2  A. Probably between ███████████████.

3  Q. On any of these posts, have you been paid for the

4  time beyond the hours for the type of activities that

5  you've been describing?

6  A. No.

7  Q. Are you expected to respond to emergencies prior

8  to the start of your shift as you're making your way

9  to the post and after you've been relieved?

10  A. Yes.

11  Q. Have you ever worked in the perimeter control

12  position?

13  A. Yes.

14  Q. And that --- that post is manned during the

15  morning watch and evening watch hours.

16  Correct?

17  A. Yes.  It's a 24-hour post.

18  Q. And are the inmates locked in their cells?  Well,

19  you tell me, what time are the inmates generally

20  locked in their cells?

21  A. Evenings after the ███████████, they lock in

22  around ███████████, and then they're in until ███████████

23  Q. Okay.

24  So during the time --- during those hours between

25  ███████████████████ the perimeter patrol is going

559

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      around the institution making sure what?
2      A. There's no inmates out trying to escape.
3      Q. And when you perform the perimeter patrol post
4      during those hours, are you still performing your
5      primary job doing safety and security?
6      A. Yes.
7      Q. And how, if at all, is that different than the
8      safety and security work that you do when you are
9      walking from A1 lobby to a post on the inside of the
10     main institution?
11     A. Well, in the perimeter, you have a pistol, a
12     shotgun and a rifle.  You don't have that inside.
13     Q. Okay.
14   But are you still performing safety ---?  How is
15     it the same, then, if at all?
16     A. Well, you're just being alert, looking for
17     anything out of the ordinary.
18     Q. Have you ever been stopped in the front lobby?
19     We're back in the main institution.  Stopped in the
20     front lobby of the main institution after you've been
21     relieved from your post by the Front Lobby Officer or
22     Lieutenant asking you to stay?
23     A. Very, very, very rarely.  Like I'm EPT-qualified.
24     So like there has been a time or two that there's a
25     possible med trip going out.  So a lot of times if we

560

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

```
1     don't have a lot of EPT staff on that people be asked
2     like just to hang by to find out if they are going out
3     on the trip, because you may have take a trip out.
4     But it doesn't happen too often, but it does happen,
5     yes.
6     Q. Okay.
7   And are you still subject to the institution
8     rules while --- the time prior to your pay time as
9     you're making your way to the post and after you've
10    been relieved from the post on your way out to the
11    front lot?
12    A. Yes.
13    Q. And are you still subject to --- well, let me ask
14    you this.  Is there a chain of command?
15    A. Yes.
16    Q. And is a Lieutenant above you?
17    A. Yes.
18    Q. Who's above him?
19    A. Captain.
20    Q. Okay.
21  Are you subject to the orders of those above you
22    in the chain of command prior to your pay time and
23    after you've already been relieved from your post on
24    your way out of the station?
25    A. Yes.
```

561

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Are Correctional Officers required to search or
2      pat down inmates as part of their primary job duty of
3      safety and security?
4      A. Yes.
5      Q. And why would you pat them down, pat down an
6      inmate?
7      A. Search for contraband or sometimes it's a
8      compliance check.
9      Q. Is it a deterrent to ---?
10     A. Yes.
11     Q. Do they know that they can be randomly patted
12     down?
13     A. Yes, they know this.
14     Q. Okay.
15     Have you ever patted down an inmate on your way
16     to a post prior to your pay time or after you were
17     relieved from your duties on a post?
18     A. Post prior to, yes.  It's very far and few
19     between.  But yes, I have done it on multiple
20     occasions.
21     Q. Okay.
22     And why have you done it on multiple occasions?
23     What prompted you to do it?
24     A. Walking down during recall a lot of times.  You
25     know, you just --- sometimes you see something

562

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    suspicious, you got to act on it.  You can't just
2    ignore it.
3    Q. Okay.
4    And does anybody --- did anybody train you to put
5    in an overtime slip for patting down an inmate prior
6    to your --- or requesting somebody, the Lieutenant to
7    put in an overtime slip for you for patting down an
8    inmate prior to your pay time?
9    A. No.
10   Q. And do you ever stop in the Lieutenant's Office
11   prior to your shift paid start time on your way to a
12   post inside the main institution?
13   A. Occasionally.
14   Q. And what is the purpose of that?
15   A. Mail, check the mailbox, overtime slips.  Once in
16   a while there will be like paperwork you have to take
17   down.  But once in a while, yeah.
18   Q. So when you say paperwork to take down, what are
19   you talking about there?
20   A. Well, sometimes there's just paperwork that has
21   to get in route to LT's Office.  You're walking that
22   way anyways.  It's not really --- you know what I
23   mean, just carry with you.
24   Q. So that would be after your post, after you've
25   been relieved from the shift?

563

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1     A. Well, are you talking about going to my shift or
2     leaving?
3     Q. Well, I'll do both.  I was talking about going to
4     your post.
5     A. Yeah.  Going to, yeah, there will be times.  You
6     walk past the Lieutenant's Office to go to your post.
7     So there's been times like you just carry it with you.
8      You just pop in real quick and hand it to him.
9     Q. Okay.
10   That would be prior to your shift or after your
11    shift.
12    A. Oh, prior.
13    Q. What kind of paperwork would you be told to take
14    to attend?
15    A. Inventories, memos, anything from the outside has
16    to go in usually.
17    Q. Would that be from the control center?
18    A. It could be.  It could be control or lobby or
19    perimeter that has its own lobby.
20    Q. Okay.
21   If you can, based on your experience, can you
22    tell us approximately how much time it takes to don
23    your duty belt?  Collect.  Don means put on.
24    A. Okay.
25    Q. Okay.

564

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1    So how long does it take you to collect your duty
2       belt with the attachments on it and put it on and
3       fasten your belt safely so that it's properly on,
4       after it's been screened?
5       A. One to two minutes.
6       Q. And approximately how much time passes from the
7       time that you put on your duty belt until you go --- I
8       want you to go through the A1 sally port, whether you
9       got to wait or not, walk up that path, get into the
10      control center sally port.  How much time passes
11      between those from the time you put on your duty belt
12      until you get to the control one sally port?
13      A. Roughly two minutes.
14      Q. And if you had to wait at the A1 sally port,
15      could it be three minutes?
16      A. It could be.
17      Q. And have you had to wait at the A1 sally port?
18      A. I have.
19      Q. All right.
20   How much time does it take to get from the ---
21      now, we're waiting to get into the control center
22      sally port.  To get into the control sally, control
23      center sally port and get to a post either housing
24      unit SHU.  On average, how much time does it take to
25      get through the control center and to your post on the

565

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     compound?
2     A. Probably like two to three minutes.
3     Q. Okay.
4     Are some housing units further away?
5     A. Some are.
6     Q. So could it take more than two to three minutes?
7     A. It's possible, yes.
8     Q. Okay.
9     And approximately --- I think you said the shift
10    exchange was roughly four to five minutes.
11    How long does the shift exchange take on average?
12    A. It depends on the post, but I'd say a safe
13    average of all of them would be like three to six.
14    Q. Okay.
15    And then approximately how long does it take you
16    to get from the post out to the --- through the outer
17    door of the A1 sally port?
18    A. Three to five minutes.
19    Q. Have you ever timed it?
20    A. I have not, no.
21    Q. But you know that you get to the institution and
22    start clearing the screening site at approximately
23    ██.
24    Is that right?
25    A. Yeah.  I know what time I show up.  I just don't

566

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1    really time to walk and stuff like that.
2    Q. Got it.  One moment.  The green binder in front
3    of you, can you look at the volume three of three.
4    A. Which number?
5    Q. Three.  We're going for the tab at JX-84, which I
6    don't think was admitted.
7    ATTORNEY VALLACHER:
8    84?
9    JUDGE:
10   I have that as admitted.
11   ATTORNEY ELKIN:
12   It's admitted?
13   JUDGE:
14   84, JX-84?
15   ATTORNEY ELKIN:
16   I thought we didn't get it admitted.
17   JUDGE:
18   Oh, yeah.  You're right.  You're right.
19     Not admitted.  You're right.
20   ATTORNEY ELKIN:
21   Okay.  I'm going to try to get it
22   admitted now.
23   BY ATTORNEY ELKIN:
24   Q. Okay.
25   Are you at JX-84, Mr. Bunting?

567

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1      A. This is for the OC post orders?
2      Q. It's for the housing units D, E, F and G on the
3      A-side.
4      A. Oh, yeah.  It is.
5      Q. Okay.
6      A. On the ---.
7      Q. And if you can flip through it, you can see that
8      it's signed by, I believe, Captain O'Kane in May of
9      '21?
10     A. Yes.
11     Q. And you were working there then.
12  Right?
13     A. Yes.
14     Q. Are you familiar with this document?
15     A. Yes.
16     Q. Does it appear to be the post orders for the
17     A-side housing unit on the D, E, F and G post?
18     A. It does.
19  ATTORNEY ELKIN:
20  Your Honor, I'd like to move to admit
21     JX-84.
22  ATTORNEY VALLACHER:
23  No objection.
24  JUDGE:
25  Admitted.
```

568

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                          ---
 2     (Whereupon, Joint Exhibit JX-84, Housing
 3     A-Side Specific (2021), was admitted.)
 4                          ---
 5     BY ATTORNEY ELKIN:
 6     Q. And then just briefly, if you go to page three of
 7     ten.  This will be the end of a ███████ watch.
 8  You see ██████ there?  It's sort of almost
 9     three-quarters of the way down the page.
10     A. Yeah.
11     Q. Okay.
12  At ██████ pass on keys and equipment to the
13     relieving officer.  Once properly relieved, your tour
14     of duty ends and you are to proceed directly out of
15     the institution.
16     What does properly relieved mean?
17     A. Properly means you've got your verbal pass-on and
18     all of your signed equipment to that post and
19     everything's accounted for.
20     Q. Okay.
21  So everything accounted for.
22  Would that include doing the joint inventory or
23     making sure ████████████████████
██  ██████████████ that you discussed?
25     A. Yes.
```

569

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

```
 1    ATTORNEY ELKIN:
 2    Okay.  I have nothing further, Your
 3       Honor.
 4    JUDGE:
 5    Let's see.  Mr. Vallacher, are you going
 6       to be doing the Cross or one of your colleagues?
 7    ATTORNEY VALLACHER:
 8    I'm sorry?
 9    JUDGE:
10    Which of you will be doing Cross?
11    ATTORNEY VALLACHER:
12    I will.
13    JUDGE:
14    Okay.  Do you want to go ahead now or
15       would this be a good lunch break?
16    ATTORNEY VALLACHER:
17    Be a quick lunch break.
18    JUDGE:
19    Okay.  Lunch, everybody?  Okay.  Mr.
20       Bunting, you will remain under oath.  Please don't
21       have any conversations about your testimony, the case,
22       substance of your case with anybody.  When you come
23       back, come back at 2:00, we can resume.  All right.
24    COURT CRIER:
25    All rise.
```

570

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                         ---
 2     (WHEREUPON, A LUNCH BREAK WAS TAKEN.)
 3                         ---
 4   COURT CRIER:
 5   All rise.  United States Court of
 6     Federal Claims is now in session.  Judge Stephen
 7     Schwartz presiding.
 8   JUDGE:
 9   Please be seated.
10   Ready to bring Mr. Bunting back?
11   ATTORNEY ELKIN:
12   Yes, Your Honor.
13   JUDGE:
14   Have a seat.
15   Mr. Vallacher?
16                         ---
17                   CROSS EXAMINATION
18                         ---
19   BY ATTORNEY VALLACHER:
20     Q. All right.
21   Welcome back, Mr. Bunting.  Hope you had a good
22     lunch.
23   JUDGE:
24   Mr. Bunting, I remind you, you're still
25     under oath, obviously.
```

571

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    THE WITNESS:
2    Yes, sir.
3    JUDGE:
4    Very good.
5    ATTORNEY VALLACHER:
6    Point of order.  I don't know that the
7       witness's microphone is on.  I have difficulty
8       hearing.
9    THE WITNESS:
10   Can you hear me now?
11   ATTORNEY VALLACHER:
12   I think your speaker's out.
13   THE WITNESS:
14   I'll just try to talk louder.
15   ATTORNEY VALLACHER:
16   Okay.  Thanks.  I appreciate that.
17   JUDGE:
18   As long as the Court Reporter can hear
19      him.
20    BY ATTORNEY VALLACHER:
21    Q. So I think on Direct before launch, you were
22       asked about the SHU-3 post orders.
23   Do you remember that?
24    A. Yeah.
25    Q. I'm going to actually ask you to pull that back

572

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      up.   That's DX-7.

2      A. Which JX is that?

3      Q. DX.

4      A. Oh, DX.

5      Q. So you recognize this to be the SHU-3 post

6      orders?

7      A. Yes, sir.

8      Q. And you worked SHU-3.

9   Right?

10     A. Yes.

11     Q. And you were asked a question about where you're

12     supposed to be at ███████████

13  Do you remember that?

14     A. Yes.

15     Q. And you said it was at the control center?

16     A. Yes, control window.

17     Q. Control window.

18  Would you be considered not on time if you were

19     in the key line at control?

20     A. If you're in the --- you mean in the line at the

21     control window?

22     Q. Yeah.

23     A. That would be on time.

24     Q. Okay.

25  If at ███████████  you were in line to get your

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      equipment, that would also be considered on time.

2   Correct?

3      A. Yeah.

4      Q. Okay.

5   And then we see here that this is set at 

6   ███   ███

7   Do you see that?

8      A. Yes.

9      Q. And that --- it says arrive at the Special

10     Housing Unit.

11  Do you see that in that paragraph?

12     A. Yes.

13     Q. So I think that on Direct you were asked whether

14     this post order meant that BOP is giving you seven

15     minutes to get from the moment you get your equipment

16     to the moment you're at SHU-3.

17  Do you remember that question?

18     A. Yes.

19     Q. But given that you could be on line at ███ and

20     still be on time, wouldn't that also include that time

21     in the line?

22     A. It could.

23     Q. Okay.

24  And then you were also asked about page two.

25     Actually, on page JX-5 now.  Same binder.

574
Trial
Kathy Aitken, et al. v. USA                              3/14/2023

1    Do you have it in front of you?
2    A. That would be Site Officer?
3    Q. Yes.
4    A. Yes.
5    Q. And you were directed to, I believe, page seven
6    of eight.  And I think that you were directed to the
7    ███████████ paragraph?
8    A. Yes.
9    Q. And I think that you were asked whether that the
10   difference between the ███████████ and the ███████████
11   being in the control center meant that BOP provided
12   you ten minutes to get to control and return your
13   equipment?
14   A. Yes.
15   Q. But that ███████████ paragraph also includes
16   another sentence, doesn't it?  Other than proceed to
17   control?  In fact, two other sentences.
18   Did you see that?
19   A. I'm reading it now.
20   Q. Okay.
21   I'll do you the inconvenience.  So it says, use
22   ███████████████████ to document that 30 minute
23   irregular round are complete and make end shift entry.
24   That's one sentence.  And then the second is secure
25   outgoing mail in the office.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1      Do you see that?
2        A. Yes.
3        Q. What is meant by secure outgoing mail in the
4        office?
5        A. Lock the door behind you when you're walking out,
6        because the mail should already be in there.  Once you
7        lock the door to your office, the mail is secure.
8        Q. Okay.
9      So that would meet the --- what office are we
10       referring to?  Are we talking about the B-side housing
11       unit office?
12       A. Yes.
13       Q. Okay.
14     And then the sentence before the ███████████
   ███    ██████████  that requires you to log into a computer.
16     Input rounds are complete?
17       A. You should already be on the computer, but you
18       just --- ██████████████████████████.
19       Q. Okay.
20       A. ████████████████   ███████████████.
21       Q. Right.
22     And you leave your PIV card in the computer?
23       A. No, I pull it out.
24       Q. You pull it out.  Okay.
25     When you pull it out, what happens?
```

576

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1      A. I put the card in my pocket.
2      Q. Right.
3   What happens with the computer?
4      A. Oh, I --- I log off before I pull it out.
5      Q. Okay.
6      A. There's a little tab you click on.  It says log
7      off.  And then I pull it out.
8      Q. Right.
9   So in order ████████████████ , you actually
10     would need to log back onto the computer.
11  Right?
12     A. You need to be on the computer, yes, for
13     ███████████ .
14     Q. And you would need to log back on because your
15     PIV card cannot stay in the computer?
16     A. I take the PIV card with me when I leave, but
17     prior to that, the card is in the computer throughout
18     the entire shift.
19     Q. Throughout the entire shift?
20     A. Yes, sir.
21     Q. Even when you're not near the computer?
22     A. No, because the office door is secure when I'm
23     not in there.
24     Q. Okay.
25     A. It's secure.
```

577

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.
2    But it'd be fair to say that that time between
3      ███ and ███ includes tasks other than simply
4      walking.
5    Correct?
6      A. Well, locking up the computer and locking the
7      door behind you, yes, sir.
8      Q. Okay.
9    In both of these shifts that we've been
10     discussing, SHU-3 and B-side.  Could those be, when
11     you're walking, you actually take at the end of your
12     shift, for example, if you're working at p.m. shift in
13     this scenario, with the ███ to ███?
14     A. Yeah.
15     Q. When you're walking, you actually have your keys
16     and your radio?
17     A. Yes.
18     Q. And your OC spray?
19     A. Yes.
20     Q. And then when you're walking into a 16-hour post
21     on an a.m. shift, you had your --- when you're
22     walking, you have your radio?
23     A. After the control, yes.
24     Q. When you're walking?
25     A. Yes.

578

Trial

Kathy Aitken, et al. v. USA                                     3/14/2023

1      Q. Do you have radio, keys and OC spray?

2      A. Yes.

3      Q. And when you're working on a 24-hour post, you

4      don't have that equipment, do you?

5      A. No, that's correct.

6      Q. Okay.

7      And you also were asked some questions about

8      what's attached to your duty belt when you walk into

9      the one lobby.

10     Do you remember that?

11     A. Yeah.

12     Q. And one of the things you mentioned was ████

       ████ ████████████ ?

14     A. Yes, sir.

15     Q. That can be attached to a normal belt.

16     Right?

17     A. Yes and no.  It can't be attached to your regular

18     belt when you're wearing a duty belt, because your

19     duty belt covers your regular belt.  So if I have on

20     my regular belt, I couldn't wear my duty belt.

21     Q. Right.

22     But if you were just wearing a regular belt?

23     A. Then I could.

24     ATTORNEY ELKIN:

25     Objection, it assumes facts not in

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    evidence.
 2    JUDGE:
 3    I don't follow the objection.  He, I
 4      mean ---.
 5    ATTORNEY ELKIN:
 6    It assumes facts not --- it assumes that
 7      facts he always wears a duty belt.  So it's --- I
 8      think he's asking these questions as if he's been
 9      wearing a regular belt and could attach things to it.
10    JUDGE:
11    That really doesn't matter.  As I said
12      earlier, it's Cross Examination to ask about facts
13      that aren't in evidence.  That doesn't put them into
14      evidence, but you can ask about what the witness says
15      as long as you got a good-faith basis to do so.  As
16      far as I've heard on Cross Examination, that's been
17      happening.  So the objection's overruled, and you can
18      keep on asking this line of questioning.
19    ATTORNEY VALLACHER:
20    Thank you, Your Honor.
21      BY ATTORNEY VALLACHER:
22      Q. Do you need --- do you need the question again or
23      do you?
24      A. Yeah, if you could.
25      Q. The question was, can the ████████████ be
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    attached to a normal belt?
2    A. If you had your ████████ onto a regular belt,
3    you couldn't wear the duty belt.  And you can't
4    effectively and securely attach everything you have
5    onto a regular belt like --- because it's just not as
6    heavy-duty as a duty belt.
7    Q. Yeah.
8    A. Duty belt is like two to two and a half, usually
9    around two-and-a-quarter inches thick or wide, and
10   it's thick, heavy-duty and it holds everything on it.
11   A regular belt isn't strong enough to hold all that
12   securely.
13   Q. Sure, and we'll get into that.
14   But for now the question is, can an --- can an █
█████    ██████████     be attached to a normal belt?
16   A. Without --- it can just itself, yes.
17   Q. Okay.
18   And you mentioned that you also had a ████
██████    ████████?
20   A. Yes.
21   Q. And isn't it true that ██████████████████?
22   A. They do.
23   Q. And so the ████████████████████████████
██████    ████████?
25   A. It is.

581

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1      Q. Okay.

2      A. I'm not going to trust my life on ██████████

   ██  ███████████████████████  ████████████████████

4      Q. Okay.

5      A. So if you're running that ██████████████████

   ██  ████████████████

7      Q. Okay.

8   Has it broken for you?

9      A. Actually, yes, they have.

10     Q. Okay.

11  The ████████████████?

12     A. Yes.

13     Q. When you were running?

14     A. One of the times I was walking when it broke,

15     actually.

16     Q. Okay.

17  What was that circumstance?

18     A. I was just walking, and then I heard --- it

19     broke.  So I was walking and I was putting my hand

20     by ---.  This is prior to Otisville.

21     Q. Okay.

22  So this was not at Otisville?

23     A. No.  Not --- one did not break at Otisville, but

24     it has broke on me before.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

582

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. That's why I always make sure I have it.

2      Q. Okay.

3    When was this?

4      A. When I was at Canaan.

5      Q. What --- do you know what year, approximately?

6      A. I was at Canaan from '12 to '14.

7      Q. Okay.

8    But not --- you would agree that not everyone has

9    ████████████████.

10   Is that right?

11     A. I don't pay that much attention to whether people

12     have on them, but most people do, that I'm aware of.

13     Q. Okay.

14   And what about --- would you agree that not

15     everyone has ████████████████?

16     A. They should.  I don't know if they do or not.

17     Q. And they should, what's that based on?

18     A. It's --- you should --- you should have all your

19     tools necessary on you to provide your job to the full

20     aspect.

21     Q. Okay.

22   Is that ████████████ listed in an equipment

23     inventory?

24     A. No, because it's not on the pass-on.  You don't

25     pass it from one person to the next, just stuff you

583

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      carry on you.
2      Q. Okay.
3  Can you point me to any policy requiring you to
4      come in Otisville with a ████████████?
5      A. I cannot.
6      Q. Can you point me to any policy that requires you
7      to have a ████████████?
8      A. I cannot.
9      Q. And can you point me to any policy that requires
10     you to have a duty belt?
11     A. I cannot.
12     Q. And can you point me to any policy that requires
13     you to ███████████████████████?
14     A. I cannot.
15     Q. And would you agree that not everyone has ████████
██    ████████████ at FCI Otisville?
17     A. That is true.
18     Q. Okay.
19 And are they unable to do their job without those
20     ████████ that they brought in?
21     A. They can do them.
22     Q. Okay.
23 And you said you got ████████████ from USP Canaan.
24 Is that right?
25     A. I purchased it when I was working there, yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

584

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1    Q. And when you say you purchased it, what do you
2    mean by that?
3    A. I purchased ████████ from --- actually, I don't
4    recall where I bought them at this time.  That was a
5    while ago.
6    Q. Okay.
7    A. But I was told to buy them --- because everyone
8    bought them there.  At Canaan, the keys were not --- I
9    don't know if they are now, but at the time, ████████
     ██  ████████████████████████  ████████████
     ██  ████████
12   Q. Okay.
13   So you preempted my next question.
14   Isn't it true that the ████████████████████
     ██  ████████████████?
16   A. At the time, they were not.
17   Q. Okay.
18   So you would need  at USP Canaan?
19   A. There, yes.
20   Q. Okay.
21   And I think on Direct you said that your belt
22   itself would pass screening?
23   A. With the current buckle I have on it, yeah, it
24   will.
25   Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

585

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    But then you said in order to do that, you would
2       need to take off any metal components attached to it.
3    Right?
4       A. Yes, sir.
5       Q. And you said that would take longer to get
6       through security.  And that would --- that would be
7       pretty inconvenient, wouldn't it?
8       A. It'd be less effective, yeah.
9       Q. How would it be less effective?
10      A. Well, there's on the buckle of a duty belt that
11      folds around, and there's a plastic clip.  You have to
12      slide that off, take the buckle off, takes the sleeve
13      off, and then just slide everything back on and off
14      the belt.  There's just a lot of extra time for ---
15      just easier to leave everything on the belt.
16      Q. Okay.
17      A. And quicker.
18      Q. Got you.
19   Something being easier and quicker doesn't make
20      it necessary, though, does it?
21      A. It makes it more effective.
22      Q. Okay.
23   More efficient?
24      A. Otherwise I'd have to come in even earlier.
25      Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

586
Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1      So there's also some questions about that
2         accountability board.
3      Do you remember that question?
4         A. Is that the ██████████? Yeah.
5         Q. Yeah.  And isn't it true that that Board applies
6      to all BOP staff?
7         A. Yeah.  Every staff member at Otisville.
8         Q. Including non-custody?
9         A. Yes, every staff member.
10        Q. And the purpose of that board is to make sure no
11     one has disappeared inside the prison?
12        A. Yeah.
13        Q. For example, if they weren't responding with a
14     radio?
15        A. Yeah.
16        Q. But it's not used for the purpose of overtime?
17        A. That is an accountability.  If there was a
18     hostage situation or any type of out-of-the-ordinary
19     situation, that they know every staff member who was
20     inside the facility for safety reasons.
21        Q. Right.
22     So it's solely for that purpose?
23        A. Well, it could be used for other things, but that
24     is the main reason that I'm aware of.
25        Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    When you say it could be used for other things,
 2       is that based basically on your own speculation or is
 3       it something else?
 4       A. As far as I'm aware of, it's for staff
 5       accountability.
 6       Q. Okay.
 7    ████████████████████████████████████████████
      █  ████████████
 9       A. Not the one in Otisville, no.
10       Q. ████████████████████████
11       A. Yes, sir.
12       Q. And I think you were asked a question about when
13    ████████████████████████████████████████████
14       chit early, if anyone ever called you up and said,
15       don't be here so early.
16    Do you remember that question?
17       A. Yes.
18       Q. Do you know ██████████████ on that board,
19    ██████████████████████████?
20       A. No.
21       Q. Do Lieutenants?
22       A. I don't know what they know.
23       Q. Okay.
24    Do you --- is it when you --- is it your
25       understanding that Lieutenants should know everyone's
```

588

Trial

Kathy Aitken, et al. v. USA                        3/14/2023

1    ████████████████████████████
2    A. I don't know if they do or not.
3    Q. How many ███████ are on that board?
4    A. I know I'm ██████████
5    Q. Okay.
6    A. And there's more after me.  I don't know how many
7      total there are.
8    Q. Okay.
9    Would you be able to memorize, let's say, just
10     say you're the last one and you're not.
11   Right?  For the record?
12   A. No.
13   Q. And then there's probably about a hundred after
14     you?
15   A. I --- I honestly don't know how many are after
16     me.
17   Q. Okay.
18   But assuming that it's even 114, would you be
19     able to memorize ██████████████████████?
20   A. No, I cannot.
21   Q. Okay.
22   I couldn't either.
23   Is it your understanding that the Captain has
24     that type of memory?
25   A. I do not know.

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

```
 1      Q. In fact, there's a binder that  ███████████
 ██       ████████████████ .
 3   Correct?
 4      A. Yes.
 5      Q. And you're aware that that binder is used during
 6      an audit?  I think you were asked questions about an
 7      audit?
 8      A. Yeah, I know --- I know they have a binder, and I
 9      know they occasionally make sure everything's
10      up-to-date.
11      Q. And I think you were asked whether a Lieutenant
12      ever told you during an audit that you were too early
13      to put in an --- or to put in an overtime class.
14   Is that right?
15      A. Yeah, I was never told to put in overtime.
16      Q. And isn't it true that that audit is only
17      conducted once a month?
18      A. I --- I do not know the time frame to that.
19      Q. Okay.
20   You're saying that you don't ever observe this
21      audit happening?
22      A. I don't observe the audit, no.
23      Q. Okay.
24   You don't participate in it?
25      A. Well, they'll ask me about  ███████████ .  Like
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     sometimes when they do it, they'll ask me if I know
2     what my number is.
3     Q. Yeah.
4     A. But I don't really pay attention to like how
5     often that happens or anything like that.
6     Q. Okay.
7     And you were also asked whether you were trained
8     to submit overtime requests.
9     Do you remember that?
10    A. Yeah.
11    Q. And you answered no?
12    A. Prior to shifts?
13    Q. Whether you were trained to submit overtime
14    requests?
15    ATTORNEY ELKIN:
16    Objection.  Mischaracterizes the
17    testimony.
18    JUDGE:
19    He can say if that would, I --- he can
20    say if that is what his testimony was.  If he can
21    answer it then.
22    THE WITNESS:
23    What do you mean by trained to?  Like
24    --- like come in prior to shift or shift change?  For
25    that, I don't put overtime in, but I know how to put

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

591

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     in overtime slips ---
2     BY ATTORNEY VALLACHER:
3     Q. Okay.
4     A. --- or to ask for one.
5     Q. So you are aware, generally, that you can request
6     overtime?
7     A. It's not going to be approved, so no one asks for
8     it.
9     Q. What's not going to be approved?
10    A. If you come in 20 minutes early for --- 30
11    minutes early, you cannot get overtime for that.
12    Q. Right.
13    But the time is kind of the subject matter of
14    this case?
15    A. Yeah.
16    Q. Right.
17    But in general, you are aware that you can
18    request overtime?  For example, for late relief?
19    A. For what?
20    Q. For late relief.
21    A. You can, but it's not always going to be
22    approved.
23    Q. Okay.
24    Do you recall any instances in which it was not
25    approved?

592

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    A. Yes.

2    Q. And what would that be?

3    A. Well, if your relief shows up onto your post, say

4    if I'm working ████████████, if I get relieved, my

5    relief is on post at ████ and I walk out at ████.

6    From what they're saying, it's seven-and-a-half

7    minutes past.  You get 15 minutes.  If my relief is on

8    post at ████, he is only two minutes late, and if I'm

9    walking out at ████, I don't get the overtime because

10   for them to justify paying me the 15 minutes overtime,

11   they have to dock the other person's overtime or have

12   to take 15 minutes leave from my --- the guys who

13   relieve me, from him.  So they're not going to take 15

14   minutes of time from him for being two minutes late.

15   Q. Okay.

16   But when it's --- when it's over ten minutes,

17   it'll be corrected?

18   A. It depends on the situation.  If --- like I said,

19   if my relief shows up at ██████████, and I don't get

20   out until almost ██████, like they have to --- they

21   have to justify why I get overtime.

22   Q. Okay.

23   So I guess that brings up a good point.  So you

24   would define late relief as you leaving the entire

25   prison past your end of shift?

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1      A. If I'm walking out of the Otisville after --- out
 2      of the lobby after --- after ██████, yeah.
 3      Q. You consider that late relief?
 4      A. If I'm leaving after my shift, yes.
 5      Q. And to be clear, we're not talking about leaving
 6      your post.
 7   Right?
 8   So if you leave your post by the end of your
 9      shift ---?
10      A. Okay.
11   If someone shows up on my post, if you're on post
12      at --- on the dot or like two minutes late or two
13      minutes after the hour, is that what you're referring
14      to?
15      Q. Yes.
16      A. Then it's not --- if they show up on my post on
17      the dot, it's not possible for me to leave my post on
18      the dot.  So then yes, I am late.
19      Q. Okay.
20   So I'll try to be more specific.
21   When you get late relief, meaning someone shows
22      up to relieve you at your post and it's over seven-
23      and-a-half minutes ---
24      A. Okay.
25      Q. --- you can request relief for that?  Overtime
```

594

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

 1    for that.

 2  Right?

 3    A. Oh, yes.  If they show up to relieve me after ---

 4    at like, ███████

 5    Q. Yeah.

 6    A. If they show up on post, yes.

 7    Q. Okay.

 8  And I think you --- on Direct, you were

 9    testifying that often when you come into the prison,

10    it's around ████?

11    A. Yes.

12    Q. For a ████████  start shift?

13    A. That's correct.

14    Q. And so because you're there, I think --- what

15    time would you be on the compound if you showed up at

16    ██████ or stepping foot on the compound?

17    A. ████-ish.

18    Q. ████-ish.

19  And so if you're there at ████-ish, you're saying

20    that you could actually catch part of a recall back to

21    the housing unit?

22    A. A lot of the times, yes, I'm usually walking down

23    during recall.

24    Q. Okay.

25  And so some of the inmates are walking from

595

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    recreation towards the housing units while you're also
2    walking towards the housing units?
3    A. Yeah.  You also pass where like Education is,
4    Chapel, stuff like that.  But any inmates that's in
5    any program area will be going back to their assigned
6    housing units during recall.
7    Q. Okay.
8  And so to be clear, what you described, you're
9    actually continuing to walk and you're not stopping
10   when you're walking with the inmates to the housing
11   units?
12   A. If I need to stop, I will, but I don't just stop
13   for no reason.
14   Q. Okay.
15   A. But I'm walking with the inmates, yes.
16   Q. And typically you're not stopping.
17 Is that right?
18   A. Usually no.
19   Q. Okay.
20 And you say usually to imply that sometimes you
21   have?
22   A. What's that?
23   Q. You're saying usually to imply that sometimes you
24   have stopped?
25   A. I have stopped.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.

2    Have you ever stopped for over seven-and-a-half

3      minutes?

4      A. Not that I can recall.

5      Q. So I think you were asked about kind of the

6      relief process on post.

7    Do you remember that?

8      A. Yes, sir.

9      Q. And you were asked, do you make sure there's a

10     ██████████████████████████████████?

11   Do you remember that question?

12     A. Yes, I do.

13     Q. And you said, ████████████████████████████

14   ██    ███

15     A. ██████████████.

16     Q. Okay.

17   Is it your testimony today that you would not let

18     your relief leave until ████████████████?

19     A. I usually replace it while talking to them, yes.

20     Q. Okay.

21   So you're actually able to operate --- work with

22     the equipment while you're getting a verbal pass-down?

23     A. ████████████    ████████████████, I

24     look at it and --- to make sure it's good as part of

25     the inspection.  If it needs --- ████████████

597

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1       ████████████████████████████████████████

██      ████████████████████████████████████████████

██      █████████████████████████████████████.

4       Q. And to be clear, that's happening while someone's

5       giving you a verbal pass-down?

6       A. Not usually during the pass-down.  It's usually

7       afterwards.  Like you know ---.

8       Q. Okay.

9       So afterwards, what's happening?

10      A. Well, when I first ---.  Well, for shift change,

11      the real pass-on I usually do first.  We'll talk about

12      stuff, and then you'll hand me --- he'll hand me one

13      piece of --- he or she will hand me one piece of

14      equipment at a time.  Hand me ███████, I'll look at

15      it.  If it's good, I put it ██████████████.  If

16      it's not, ████████████   ████████████████████

██      █████████████████████████

18      Then they'll hand me the order --- ████████████

██      ███, whichever order ---.  And each piece of equipment

20      they hand me, I look at it to make sure it's in

21      working order before I put it ████████████.

22      Q. So it's your testimony that you arrive at the

23      post?

24      A. Yeah.

25      Q. And someone begins giving you a verbal

598

Trial

Kathy Aitken, et al. v. USA                                     3/14/2023

```
1      pass-down ---
2      A. Yeah.
3      Q. --- before you get into the equipment?
4      A. Normally.  It's not always like that, but
5      normally, normally the verbal pass-down's first.  It's
6      always one then the other.
7      Q. Okay.
8   And so what --- what are you doing when you're
9      getting this verbal pass-down?  Like, for example,
10     where are your hands?  Are they just like at your
11     side?
12     A. Usually, I guess.  I don't really think about
13     where my hands are, but ---.
14     Q. But you're sure that they're not working with the
15     equipment?
16     A. No, I do have separate ---.  I --- I'm not that
17     good at multitasking to be able to inspect my
18     equipment and listen and ask questions about what's
19     told to me.
20     Q. Okay.
21  But you would agree that it's possible to both
22     receive equipment and be having a conversation.
23  Correct?
24     A. Less effectively.  Some people can do it, yeah.
25     Q. Okay.
```

599

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    And why do you think it'd be less effective?
2    A. You can't give 100 percent of your attention to
3    everything while you're doing multiple things.  I
4    mean, maybe you can.  I'm not that talented.
5    Q. Okay.
6    Do you remember three weeks ago that Captain
7    O'Kane relieved you at SHU?
8    A. Yes.
9    Q. He was actually working SHU-1 about three weeks
10   ago.
11   Do you remember that?
12   A. I don't remember how long ago it was, but yes, I
13   do remember that he relieved me.
14   Q. And he was actually in morning watch ---
15   A. Yes.
16   Q. --- that day?  And it took about 30 seconds to
17   relieve you, didn't it, Mr. Bunting?
18   A. I do not recall.
19   Q. Okay.
20   Do you remember what you told the Captain?
21   A. I do not recall that day.  I remember he relieved
22   me.  I can't remember what was told during that
23   pass-on.
24   Q. Okay.
25   And do you remember if he relieved you early?

600
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1     A. I really don't remember the time that he showed
2        up, to be honest.  If I don't remember, that means it
3        was probably a normal relief coming ---.
4     Q. Twenty (20) up being a normal relief?
5     A. If I remember --- well, if I don't remember, I
6        consider it to be normal, because I usually remember
7        stuff that's out of the ordinary.
8     Q. Okay.
9     So would you say it's ordinary for you to be
10       relieved 20 minutes before the end of your shift?
11    A. Usually my relief's there by a quarter of.
12    Q. Okay.  Okay.
13    So when we were talking about SHU relief,
14       generally, you were asked about the shadow board.
15    Do you recall that?
16    A. Yes.
17    Q. And I think that --- correct me if I'm wrong, but
18       I think your testimony was that what you would do with
19       the shadow board is you would look at it to just see
20       if anything is missing.
21    Does that sound accurate?
22    A. For the most part, yes.
23    Q. Okay.
24    And so a shadow board is --- it's a cage on a
25       wall.

601

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1    Right?  And at the back of the cage, there's
 2    outlines of all the tools?
 3    A. Yes.
 4    Q. And the purpose of those outlines is to what?
 5    A. It's a shadow.
 6    Q. So ---?
 7    A. So when a tool's missing, you can see the shape
 8    of the tool, so you know what is missing.
 9    Q. Right.
10    And when you're looking at an outline of
11    something versus the thing itself, how long would it
12    take you to realize that what you're looking at is an
13    outline?
14    A. Not very long.
15    Q. Okay.
16    Would you say a couple of seconds?
17    A. Just to see if something's missing, yes.
18    Q. Okay.
19    And I think you were also asked questions about a
20    move board?
21    A. The --- the board for, yes.  In SHU?
22    Q. Yes.
23    A. Yes.
24    Q. And that basically commits to writing whether a
25    SHU inmate had been moved back to the general
```

602

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1    population or into SHU.
 2  Is that right?
 3    A. No.
 4    Q. What --- so what exactly does the move board
 5    show?
 6    A. It's a board on the wall where it has pictures of
 7    all the inmates, where they're at and what cells.
 8    Q. Okay.
 9  So it's kind of like a bed book, but it's up on
10    the wall?
11    A. Exactly.
12    Q. Okay.
13  And I think you were asked if you had questions
14    about it, you could ask during exchange time?
15    A. Yeah.
16    Q. When's the last time you had questions during an
17    exchange when you're looking at a move board?
18    A. If you look up and see there's a new inmate in,
19    if a new guy came in, say he's in cell 104.  Go over
20    and you look to see the inmate, see who he's with, ask
21    him why they may come down there, stuff like that.
22    Q. Okay.
23  And I guess my question specifically is, when's
24    the last time you had a question like that from the
25    move board?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    A. Almost daily.  Because we also have --- we would
 2    talk about cells that are broken.  A cell --- say,
 3    hey, you can't use this cell because the toilet
 4    doesn't work in here.  There's a lot of different
 5    reasons you can be asking questions.
 6    Q. And if the move board shows you they ---?
 7    A. The move board is --- yeah.  The move board ---
 8    as each cell is numbered on there.  Each cell you put
 9    the magnet has a picture taped to it of the inmates
10    that are in that cell.  If that cell's broken, we put
11    a different magnet on it and tell you why it's broken.
12    Q. Okay.
13  So far I'm hearing that the move board has a lot
14    of information on it?
15    A. It does.
16    Q. What information is it missing ---
17    A. It's not that ---.
18    Q. --- that would require you to inquire further?
19    A. Well, sometimes you want to know more information
20    on why it's like that.
21    Q. Like what?
22    A. Off the top of my head, I --- sometimes they'll
23    have the main store cards that turn sideways telling
24    you, you have to make a move during this shift.  We
25    have 21 day start rotations.  Usually they're done at
```

604

Trial

Kathy Aitken, et al. v. USA                          3/14/2023

1     day watch.  Sometimes they carry on in the evenings.
2   Sometimes we'll have it marked on there if day
3     watch didn't finish the showers, when --- sometimes
4     SHU can be very busy.  So they'll tell me what showers
5     have to be done on evening, because we have a two-man
6     hold plus Lieutenants.  Sometimes we have to do him on
7     evening watch, stuff like that.
8   So it's all on the move board.  They'll turn the
9     card sideways so that way you know something has to be
10    done.
11    Q. Okay.
12  If a cell was broken, would that be recorded
13    anywhere else?
14    A. We mark it on the board.  So that way when we're
15    trying to figure out where to house inmates, we know
16    where we can and cannot put them.  Work orders will
17    get put in.  You know, it's a different story if it
18    gets fixed.  And then we have a board, we'll write it
19    down, too, on what work orders are submitted.
20    Q. Okay.
21  So that information at least would be in writing
22    on some other document in the SHU bubble?
23    A. Yeah.  Well, the work order is all online.
24    Q. Okay.
25    A. But we'll write it down on a board.

605
Trial
Kathy Aitken, et al. v. USA                                3/14/2023

1      Q. Okay.
2   And in --- people being moved out, that would
3      also be on sentry, would it not?
4      A. People what?
5      Q. People being moved out of SHU back to gen pop.
6      A. Yeah.
7      Q. Okay.
8   And that's also something that you can access
9      during your shift?
10     A. Yeah.  I was referring to 21 day cell moves.
11     Sometimes we ask about that.
12     Q. Cell rotation?
13     A. Yeah.  I'm so sorry.
14     Q. Okay.
15     A. Yes, 21 day cell rotation.
16     Q. Every 21 days?
17     A. Yes, sir.
18     Q. Okay.
19  And that would also be ████████?
20     A. ████████.  That would be under, what is
21     it?  BOPWare I think it's called.
22     Q. Sorry?
23     A. I think it's called BOPWare, I think.  It's
24     available on --- it's available on the internet.
25     Q. The intranet?

606

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1       A. Well, the internal internet.  But you're working,
2       so it's available.
3       Q. Okay.
4       A. It's a SHU program.
5       Q. And so you could access that during your shift?
6       A. Yes, sir.
7       Q. And you asked a question that, can you ask
8       ████████    a question?
9    Do you remember that?
10      A. Yes, I do.
11      Q. Mr. Bunting, can you ask a newspaper a question?
12      A. No.
13      Q. Do you, nevertheless, get information from a
14      newspaper?
15      A. Not always information you want, but yes.
16      Q. Fair enough.
17   So --- and then you were asked at the end of an
18      evening watch shift at ████████ I think that on Direct
19      you said that generally there's no inmates around?
20      A. Usually.  Well, not out of their cells, normally.
21      On a normal day, they're secured in their cells.
22      Q. When you're leaving your post or the compound?
23      A. Yes.
24      Q. At ████████?
25      A. Normally, no.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. Okay.

2    But you are looking, at that time, to make sure

3        there's no inmates around.

4    Right?  I believe that's what your testimony was?

5    A. Yeah.  Whenever you're on the compound, you're

6        always looking for anything out of the ordinary.  An

7        inmate on the compound at that time would be out of

8        the ordinary.

9    Q. Okay.

10   And while you're doing that, are you continuing

11       to walk?

12   A. Yes.

13   Q. Okay.

14   And you were also asked questions about the J

15       Unit?

16   A. Yes, sir.

17   Q. And about --- specifically about the ███████

     ████████████████████████████████████████████████

     ████████████████████████? 

20   A. Yes.

21   Q. And isn't it true that ███████████████████

     ████████████████████████████████ to get

23   to your post?

24   A. ████████████████████████████ that separates

25   the --- keeps the █████████████ in the unit and

608

Trial

Kathy Aitken, et al. v. USA                                        3/14/2023

```
1     courtyard, so they can't get over to the hallway,
2     which is where counselors, medical, stuff like that
3     is.
4     Q. Okay.
5     But in terms of what you need it for, you need
6     ████████████████████████████?
7     A. Yes.
8     Q. And then you don't need ██████ once you're
9     actually on post?
10    A. You do.  You --- ████████████████████
██    ████████████████.
12    Q. What do you use ████████████, in J Unit?
13    A. After you count, you need to █████████████████
██    ██████████████████████████████████.
15    Q. Okay.
16    So it's ██████████████████████?
17    A. Any time you're █████████████████████████
██    ████████████.
19    Q. Okay.
20    But that's the only use ████████████, is it not?
21    A. ████████████████, yes.
22    Q. Okay.
23    ██████████████████████████████████████████
██    ████████████.
25    A. No, that'd be a security issue, having ████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

609
Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     ██████████████████████████.
2          Q. Right.  Okay.
3     And so you were also asked about what it means to
4        be properly relieved?
5          A. Yes.
6          Q. And I think that you said it was to receive
7        information, to receive equipment, and then conduct a
8        joint inventory.
9     Is that right?
10         A. Yeah.
11         Q. And I think you've been sitting here with the
12       other witnesses, is that right, with --- when they
13       were testifying?
14         A. I was here for part of the day yesterday, yes.
15         Q. Okay.
16    But not today?
17         A. Today, too, yeah.
18         Q. Okay.
19    Can you point me to anything in the post orders
20       that requires you to make a joint inventory before or
21       after your shift?
22         A. What do you mean, of the tools?
23         Q. To conduct a joint inventory, as --- as you're
24       coming on for the shift or as you're leaving the
25       shift.

610

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. You mean on the shadow board, that stuff?  Is
2      that what you're referring to?
3      Q. It's as you interpret the term.  So I guess we
4      should --- we should nail that down first.
5  When you've been saying joint inventory, do you
6      just mean looking at the shadow boards?
7      A. Any of the stuff that's the equipment that's
8      passed on to me, that obviously has to be done before
9      my relief can leave.
10     Q. Yeah.
11     A. And then technically, the stuff on the shadow
12     board, which is ███████████, that falls under
13     category of equipment, which is in the post orders to
14     do your equipment exchange.
15     Q. Okay.
16     A. Make sure it's all accounted for.
17     Q. So if I understand you correctly, the joint
18     inventory, the proper relief is receiving the
19     equipment?
20     A. Yes.
21     Q. Hearing about pertinent information, and then
22     just looking at the shadow board and seeing if
23     anything's missing.
24  Is that right?
25     A. Basically.

611

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.

2   You also have some questions about shifts.

3   Do you remember those questions?

4      A. Yes, sir.

5      Q. Isn't it true that shifts are issued to all staff

6   assigned to an institution?

7      A. Yes, sir.

8      Q. So that includes non-custody as well as custody?

9      A. Yes.

10     Q. HR?

11     A. As far as I'm aware of, yes.

12     Q. The Business Office?

13     A. As far as I'm aware of, yes.

14     Q. The Commissary?  Isn't it true that shifts could

15  be for anything that might be necessary for any of

16  those people?

17     A. Yes.

18     Q. So that would include a screwdriver?

19     A. Yes.

20     Q. It would include even a car E-ZPass?

21     A. Yes.

22     Q. And a cell phone?

23     A. Yes.

24     Q. And you've worked at the camp at FCI Otisville.

25  Correct?

612

Trial

Kathy Aitken, et al. v. USA                                              3/14/2023

1       A. Yes, I have.

2       Q. And are you aware that there's actually a ██████

3 ██        ████████████████████████████

4       A. I did not know that.  Yes, I did know that.  Yes,

5       I did.  Yes.

6       Q. Okay.

7   And who would that inmate be?

8       A. That's the Orderly.

9       Q. What's his function?

10      A. At that times he'll have that for the

11      side-by-side or the trash or release, they have that

12      --- driving that around, ---

13      Q. Okay.

14      A. --- a key for that.

15      Q. Okay.

16  So that ████████████████████ the same as,

17      you know, ████████ that Correctional Officers have?

18      A. It's different, but yes.

19      Q. Same function?

20      A. Yes.

21      Q. And that would be the Town Driver?

22      A. Yes.  Him also, yes.

23      Q. Okay.

24  You drive to FCI Otisville, do you not?

25      A. Yes.

613

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      Q. And do you have car keys?

2      A. I do.

3      Q. And when you arrive to FCI Otisville, after you

4      go through the security screening, do you pick up your

5      car keys from the conveyor belt?

6      A. No.  They're in my bag.

7      Q. They're in your backpack?

8      A. Yeah.  I --- when I go to the lobby, I put

9      anything that won't pass the metal detector into my

10     duffle bag, and then they stay in the bag until I

11     leave.

12     Q. Okay.

13  And that would also make it quicker and easier?

14     A. Yeah.  It's just so I know I have everything.

15     Q. Okay.

16  By the same token, ███████████████████████

█   ███████████████████

18     A. ███████████████████.  Because I don't

19     carry my bag around my entire shift.  I put it down in

20     the kitchen area.

21     Q. But for the purposes of A1 lobby, you know, ████

█   ███████████████████████████████████████

█   ████████████████

24     A. I could put them in there.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

614

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    And then where do you put your chits after they
 2      go through the conveyor belt?
 3      A. The ████████████████████, which is in my
 4      bag ---
 5      Q. Okay.
 6      A. --- at the screening site.
 7      Q. Got you, okay.
 8    Are you aware that some people ███████████
      █  ████████████
10      A. I did not, and they should not do that.
11      Q. Okay.
12    Do you know of any policy or document prohibiting
13      that?
14      A. That is equipment.  It █████████████████.
15      That's why I keep ███████████████████.
16      Q. Okay, but are you aware of any policy?
17      A. I am not.
18      Q. You --- at some point you were a member of the
19      Union at FCI Otisville.
20    Correct?
21      A. Yes.
22      Q. And you are not anymore.
23    Right?
24      A. No.
25      Q. And you actually dropped out of the Union due to
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     the management of the Union, in your opinion, focusing
2     too much on non-custody?
3     A. Yes.
4     Q. Would it surprise you to learn that the vast
5     majority of your fellow Plaintiffs in this case are
6     non-custody?
7     A. No.
8     Q. And earlier you were talking about morning watch
9     and day watch shifts.
10    Do you remember that with the --- on Direct?
11    A. Yes.
12    Q. But isn't it true that 99 percent of your time at
13    Otisville you've been on evening watch shift?
14    A. That is true.
15    Q. And in fact, you've only worked one quarter of
16    day watch at FCI Otisville?
17    A. That is correct.
18    Q. And in fact, you've only worked one quarter of
19    morning watch at FCI Otisville?
20    A. Yes.
21    Q. And you've actually never worked J Unit control.
22    Correct?
23    A. Not a hundred percent.
24    Q. Okay.
25    But would it be fair to say you don't think you

616

Trial

Kathy Aitken, et al. v. USA                    3/14/2023

1    have?
2    A. Not that I'm aware of.  I could have.  I'd ---
3    I'd have to look through my roster.
4    Q. Okay.
5    And you've also never worked compound day watch?
6    A. I do not recall.
7    Q. Okay.
8    So you had your deposition taken in this case.
9    Do you recall that?
10   A. Yes, about a month ago.
11   Q. And a deposition is when you are asked questions
12   under oath?
13   A. Yeah.
14   Q. And that's the same oath that you're under today?
15   A. Yes.
16   Q. And well ---.
17   ATTORNEY VALLACHER:
18   Permission to approach?  I'm handing you
19    now a copy of your deposition.
20   JUDGE:
21   I'm sorry, Mr. Vallacher.  Are you
22    impeaching or are you refreshing recollection?
23    Because I think his last answer was that he didn't ---
24    that he doesn't recall.
25   ATTORNEY VALLACHER:

617

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    That's right.

2    JUDGE:

3    So I think ---.

4    ATTORNEY VALLACHER:

5    I think it's one of those borderline

6      cases.  Because it was ---.

7    JUDGE:

8    Well, I want to know which one you're

9      doing, because those --- there are right and wrong

10     ways to do it.

11     BY ATTORNEY VALLACHER:

12     Q. So your testimony is that you don't recall

13     whether you've worked a compound day watch at FCI

14     Otisville?

15     A. I know of --- I know for a fact I've worked in

16     evenings and mornings.  I'm assuming I did.  I can't

17     remember every single post that I've worked.

18     Q. Okay.

19     Would it --- would it refresh your recollection

20     if I showed you deposition testimony in which you've

21     discussed this topic?

22     A. Sure.

23     Q. Okay.

24     So if you turn now to page 42.  And if you go to

25     line 12, it says question, okay.  So you've never

618

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     worked compound day watch?  Answer, no, not here.
2     Do you see that?
3       A. Yes.
4       Q. Does that refresh your recollection as to whether
5       you ever worked day watch compound?
6       A. Yeah.  Unless I was referring to recently,
7       because of the move schedule.  I might have been ---
8       misunderstood with the question, but I'm not a hundred
9       percent if I worked it here or not, but I know I
10      haven't worked it here lately.
11      Q. Okay.
12      A. Because remember, we're talking about how they
13      have new schedules since COVID's over.
14    JUDGE:
15    So Mr. Vallacher, if you've refreshed
16      his recollection, now you can ask the question again
17      and see what answer you get now that his recollection
18      has been refreshed.
19    ATTORNEY VALLACHER:
20    It seems like it's exhausted, but ---.
21    JUDGE:
22    Well, let's close the door here.
23      BY ATTORNEY VALLACHER:
24      Q. So Mr. Bunting, did you have --- did that refresh
25      your recollection as to what ---?

619
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. Yeah.

2    Q. Okay.

3    And so asking the question again, have you ever

4    worked a day watch compound?

5    A. I'm not a hundred percent if I have or not, but

6    lately I have not.  I know that.

7    Q. Okay.

8    And you're a Senior Officer Specialist?

9    A. Yes, sir.

10   Q. And you've worked perimeter patrol, I believe?

11   Is that correct?

12   A. Yes, sir.

13   Q. All right.

14   And when you worked perimeter patrol, you

15   operated under the same position description as Senior

16   Officer Specialist?

17   A. Yeah.

18   Q. And do officers working in the control center

19   also operate under that position description?

20   A. Yeah.

21   Q. And officers working J Unit also operate under

22   that same position description?

23   A. Yeah.

24   Q. And none of those officers that I just mentioned

25   go through the compound before, during or after their

620

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    posts.
2    Correct?
3       A. No.  They'll go to the lobby, but not to the
4    compound.
5       Q. Okay.
6    And there's no Lieutenant posted to the front
7    lobby.
8    Correct?
9       A. That's correct.
10      Q. And FCI Otisville inmates are never supposed to
11   be hanging out unsupervised on the compound.
12   Correct?
13      A. That's correct.
14      Q. And in fact, if inmates are on the compound, they
15   would be part of a move, recall, escort or work
16   detail?
17      A. Yes.
18      Q. And in all those cases, they are already being
19   supervised by on-duty Correctional Officers.
20   Correct?
21      A. Yes.
22      Q. In fact, Compound Officers are responsible for
23   everything on that compound.
24   Is that right?
25      A. Yes.

621

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Everything that happens?

2      A. Yes.

3      Q. And Compound Officers do a lot of other

4      activities other than just supervising the compound.

5   Correct?

6      A. Yes.

7      Q. And that would include calling the move?

8      A. Yes.

9      Q. Conducting fence checks?

10     A. Yes.

11     Q. Conducting trash calls?

12     A. Yes.

13     Q. Bringing equipment to housing units when

14     requested?

15     A. Yes.

16     Q. And that --- and by the way, that equipment could

17     include a ██████████████ , could it not?

18     A. It could.

19     Q. ██████████████████████████████████████████

    ██    ██████████████████████████

21   Is that right?

22     A. I do not know.

23     Q. All right.  Okay.

24   So you --- but I'm sorry, you started off at

25     Otisville in January 2014?

622

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. Yes, sir.

2    Q. And when you started off, █████████████████

█   ███████████████████████

4    A. I don't think so.  I'm not a hundred percent.

5    Q. Okay.

6    But you have --- you have a recollection of

7    █████████████████████████████  around that time.

8    Right?

9    A. Yes.  Yes, I do remember that.

10   Q. Okay.

11   And --- but at this point, █████████████

█   ████████████████████████

█   ██████████████████████████████████

█   ███████████████████

15   Q. Okay.

16   In January of 2014?

17   A. Yeah.  Now that I think about it.

18   Q. Okay.

19   And now,██████████████████████████

█   ████████████████████████████████████████

█   ████████████████████████████████

█   █████████   █████████████████████████

█   ███████████████████████████

24   A. Yes.

25   Q. ████████████████████████████

623

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     this point?

2     A. Yeah.

3     Q. And at FCI Otisville, the inmates were moved on a

4     schedule.

5   Correct?

6     A. Yeah.

7     Q. And the --- at the evening watch shift, how many

8     Lieutenants are on duty?

9     A. Two.

10    Q. And how many Correctional Officers are on duty?

11    A. Roughly 12.

12    Q. Okay.

13    A. I don't know the exact number.

14    Q. And on morning watch, how many Lieutenants are

15    there?

16    A. One.

17    Q. And how many Officers are on morning watch?

18    A. I don't have that answer for you.

19    Q. Okay.

20  Do you have an estimate?

21    A. Maybe eight to ten.  I'm not really sure.

22    Q. Okay.

23  And I think you were also asked some questions

24    about what you had when you went through screening.

25    But I think you might have mentioned a vest.

624

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is that right?
2        A. Yeah.  Everyone's required to wear their vest
3        inside the fence.
4        Q. And to be clear, that vest would go through the
5        metal detector.
6    Right?
7        A. Yeah, I wear it through it.
8        Q. Okay.
9    When do you put on that vest?
10       A. In the parking lot before walking in.
11       Q. Okay.
12   Is there anything stopping you from putting it on
13       at home?
14       A. I mean, did you wear one when you were there?
15       Q. I did.
16       A. They're not that comfortable.  I wouldn't want to
17       wear it more than I have to.
18       Q. But they are cool, are they not?  You're under
19       oath.
20       A. They lose the cool factor very quickly.
21       Q. Actually, I should say I did one time and not the
22       other.  So at the end of your shift, you put your duty
23       belt in your bag.
24   Is that correct?
25       A. Yes.

625

Trial

Kathy Aitken, et al. v. USA                          3/14/2023

1      Q. And that's still while you're on post?

2      A. I do, once I'm properly relieved.

3      Q. Okay.

4    So once you give up your equipment, ---

5      A. Yeah.

6      Q. --- you know, and you consider yourself relieved,

7      you'll actually take off your duty belt while you're

8      still on post.

9    Correct?

10     A. Yes.

11     Q. And you'll put the duty belt in your backpack?

12     A. In my --- I have a --- it's like a duffle bag,

13     yeah.

14     Q. Okay.

15   And then you'll walk across the compound?

16     A. Yes.

17     Q. With the duty belt in the backpack (sic)?

18     A. Yes.

19   ATTORNEY ELKIN:

20   Objection.  He said backpack.  You said

21     duffle.

22     BY ATTORNEY VALLACHER:

23     Q. Duffle bag.

24     A. Oh, yeah.  I'm sorry, yes.  Duffle bag.

25   JUDGE:

626

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Resolve --- did that resolve it?
2    ATTORNEY ELKIN:
3    Yes, Your Honor.
4    JUDGE:
5    Okay.
6      BY ATTORNEY VALLACHER:
7      Q. And in fact, I think you called it a force of
8      habit, that you would take off the duty belt as soon
9      as you're relieved?
10     A. Yeah.
11     Q. When --- when you're walking across the compound
12     after your shift, do you consider your practice to be
13     very dangerous to have your duty belt in your duffle
14     bag?
15     A. I usually put it in my bag after I'm relieved,
16     because I work ████ to ██████, and the inmates are
17     all secured in their cells.
18     Q. Okay.
19     A. So ---.
20     Q. So you would not consider that to be dangerous?
21     A. There's a chance anything can happen at any time.
22     I mean, I'm still alert.
23     Q. Okay.
24     A. If I was working ████ to ████, I would leave my
25     belt on until I walked out.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

627

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      Q. Okay.

2    But 99 percent of the time, you were evening

3      watch.

4    Right?

5      A. Yes, sir.

6      Q. And so 99 percent of the time you actually walked

7      across the compound at the end of your shift not

8      wearing your duty belt?

9      A. Yes.

10     Q. And while we're talking about the belt, isn't it

11     true that it takes about a minute or two to put it on?

12     A. Under two minutes, yes.  Probably roughly around

13     a minute, minute and a half.

14     Q. Okay.

15     A. Only because the belt keepers takes actually time

16     to position.

17     Q. Okay.

18   And your duty belt was not issued by the Bureau

19     of Prisons.

20   Correct?

21     A. No.

22     Q. And in fact, you bought it online?

23     A. I bought some stuff online.  Some stuff I bought

24     right down the street at Star Uniform.  I don't recall

25     if I bought it online or there.

628

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. Okay.

2    A. But it was at two spots as you go to.

3    Q. Okay.

4    Would I, a non-law enforcement officer, be able

5    to buy it from either of those places?

6    A. Yes.

7    Q. And you mentioned the belt keepers just now?

8    A. Yes.

9    Q. Those were also not issued by the Bureau of

10   Prisons.

11   Correct?

12   A. That is correct.

13   Q. And during your deposition, do you mind if I ask

14   you --- do you remember that I asked you the last time

15   you could recall that you personally responded to an

16   emergency outside of being at your post?

17   A. You mean prior to being relieved or after?

18   Q. Prior to or after.

19   A. Not at Otisville, that I can recall.

20   Q. Okay.

21   That has not happened at Otisville?

22   A. Not that I can recall, to me.

23   Q. And you stopped by the Lieutenant's Office

24   approximately 20 percent of the time on your way

25   before going to SHU?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

629

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1       A. I stop there occasionally, yes.

2       Q. Okay.

3    And isn't it true that people working a 24-hour

4       post would have no reason to stop by the control

5       window?

6       A. Depends.  On a normal --- on a normal day, no.

7       Q. Okay.

8       A. It's prison.  You know, things change a lot.

9       Q. Okay.

10   And from the time that you walk out of the SHU to

11      the time you are fully out of the prison, would that

12      take just about ██████████?

13      A. Roughly, yes.

14      Q. Okay.

15   ATTORNEY VALLACHER:

16   I have no further questions.

17   JUDGE:

18   Any Redirect?

19   ATTORNEY ELKIN:

20   Just a little bit, Your Honor.

21                       ---

22                   REDIRECT EXAMINATION

23                       ---

24   BY ATTORNEY ELKIN:

25      Q. Under --- on Cross, you were just asked about

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

630

Trial

Kathy Aitken, et al. v. USA                                     3/14/2023

1      whether there are post orders that talk about having
2      to have a duty belt.  I'd like you to turn to Joint
3      Exhibit 58, which is in volume two of three.  And if I
4      showed you this exhibit, would it help refresh your
5      recollection about whether, in fact, there is a post
6      order requirement?
7    JUDGE:
8    You need to establish that his memory's
9      exhausted before you go straight to refreshing
10     recollection.
11   ATTORNEY ELKIN:
12   Okay.
13   THE WITNESS:
14   Where ---?
15   JUDGE:
16   You ask him a question to establish that
17     he doesn't remember something.  You ask if such and
18     such a document would help refresh his recollection,
19     and we go from there.
20   ATTORNEY ELKIN:
21   Okay.
22     BY ATTORNEY ELKIN:
23     Q. Do you recall on Direct --- I'm sorry, Cross Mr.
24     Vallacher asked you a question about whether there
25     were any post orders that required the wearing of a

631

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    duty belt, and your answer was you didn't know?

2    A. Not that I'm aware of.

3    Q. Okay.

4    Would it help refresh your recollection if I

5    showed you a post order that discusses the duty belt?

6    A. Yes.

7    Q. Okay.

8    Joint Exhibit 58, which has been previously

9    admitted.  If you go to page 43 of ---.

10   JUDGE:

11   Happens to everyone.

12   ATTORNEY ELKIN:

13   Not, it's not happening to me.  They're

14   just so big.

15   BY ATTORNEY ELKIN:

16   Q. Page 43 of 43, right above Captain Whinnery's

17   signature.  And you were --- this is a poster from

18   2019.  You were working at FCI Otisville.

19   Correct?

20   A. Yes.

21   Q. Now I want you to read under Retention Awareness

22   when you get there.

23   Are you there?

24   A. Page 43 of 43?

25   Q. Yes.  And it's --- do you see Captain Whinnery's

632

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      signature at the bottom with the date?

2      A. Yes.

3      Q. If you read that first sentence, ensure that █

█        ████████████████████████████████████████████

█        ██████████████████████████████████████████ .

6    Do you see that?

7      A. Yes.

8      Q. Does that refresh your recollection about whether

9      there's any post orders about whether you have to have

10     a duty belt?

11     A. Yes.

12     Q. And do you have to have a duty belt?

13     A. Yes.

14     Q. And ████████████████████████████████████████

██        ██████ if you did not have a duty belt?

16     A. No.

17     Q. Mr. Bunting, is there any rule against more than

18     one Correctional Officer supervising inmates at the

19     same time?

20     A. No.

21     Q. And in fact, is it expected for officers --- all

22     officers who are on a compound, if there's a move

23     going on or inmates are out for any reason, to have

24     their alertness --- eyes on their observations going

25     and to supervise inmates?

633

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. Yes.
2    Q. You testified about --- on Cross that the B-side
3    Housing Unit Officers would have █████████████████
     ██ ██████████████████████████ as they walk across, ██
     ██ ████████████ as they walk across the compound to their
6    post.
7  Is that correct?
8    A. Yes.
9    Q. Now, you coming onto an A shift --- sorry, A-side
10   housing unit or it's a compound 24-hour post, you
11   don't have those things, correct, as you walk across
12   the compound?
13   A. That's correct.
14   Q. Does the fact that ████████████████████████ in
15   any way impact the level of vigilance and alertness
16   that you have when you are walking across the compound
17   ███████████████████████?
18   A. I am more alert then.  I'm actually not just
19   watching inmates, I'm looking for other staff.  So if
20   I need to wave for assistance.  I'm obviously not
21   going to stop and pat down an inmate ████████████ if
22   there's no staff around me.
23   Q. Okay.
24  Is there a --- but you have patted down an inmate
25   on your way to your post?

634

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      A. I have.

2      Q. Okay.

3   Because the safety and security of institutions

4      requires it.  Is there any reason for the Captain and

5      the Lieutenant to actually have to memorize ███████

   ███ ████████████████████████████████ on the

7      accountability board in order to know which person is

8      inside the institution?

9      A. I don't see why.  There's that binder that has

10     all the names readily-accessible.

11     Q. And that those binders are available to a

12     Lieutenant?

13     A. Yeah.

14     Q. There was some testimony about late relief.  If

15     --- and I believe your testimony on Direct was that

16     when your relief arrives at the post at ten minutes

17     after ██████, you have asked to get overtime pay on

18     those occasions.

19   Was that your testimony?

20     A. If I get relieved like ten minutes after, yes,

21     and they'll usually grant it.

22     Q. Okay.

23   But I thought you testified that there were only

24     two occasions when they granted it?

25     A. It depends on what time I get relieved.

635

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.  So for getting relieved at ten minutes ---
2      approximately when they relieve you on the post at ten
3      minutes after, has that happened?
4      A. Yes.
5      Q. Okay.
6   And you have asked for overtime?
7      A. Yes.
8      Q. And has that overtime ever been denied, when you
9      asked for it?
10     A. If they showed up on the post ten minutes after,
11     I will get it.  If they show up and then by the time
12     shift change is done and I don't leave until ten
13     minutes after, then I probably will not.  Because as
14     long as they're on post ---.
15     Q. Okay.
16   So if you were done with the shift changes at ten
17     minutes after and you've asked for overtime pay for
18     that, you have not gotten it?
19     A. Yeah.
20     Q. Mr. Bunting, can you walk and work at the same
21     time?  As you're walking across the compound?
22     A. Yes and no.
23     Q. Okay.
24   So when you're walking across the compound and
25     you're correcting inmates, can you walk and correct

636

Trial

Kathy Aitken, et al. v. USA                              3/14/2023

1      inmates at the same time, depending on the issue?
2      A. Yes.  I have walked while telling an inmate to
3      tuck in his shirt or to slow down or keep off the
4      grass.  I've done that while walking.
5      Q. Okay.
6      And do you consider that walking and working at
7      the same time?
8      A. Yeah.
9      Q. Okay.
10     And you said yes and no.
11     Are there times where you've actually had to stop
12     to correct inmate behavior on your way to post?
13     A. Yes.
14     Q. Okay.
15     But is it fair to say you can walk and work at
16     the same time as you are walking to a post prior to
17     your shift?
18     A. Yes.
19     Q. And after you've been relieved on your post
20     leaving the institution?
21     A. Yes.
22     Q. And even if there are no inmates around, if
23     you're leaving a morning watch shift, are you walking
24     and working at the same time, and if so, how?
25     A. Walking and looking around the compound.  Make

637

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    sure there's no inmates present, anything out of the
2    ordinary, and when I'm just making sure doors are
3    locked, there's no broken windows, anything out of the
4    ordinary.
5    ATTORNEY ELKIN:
6    Okay.
7    I have no further questions, Your Honor.
8    JUDGE:
9    All right.
10   Mr. Bunting, thank you very much.
11   THE WITNESS:
12   Thank you.
13   JUDGE:
14   So --- Ms. Elkin, so it'll be up to you
15     to call another --- another witnesses.  But can we
16     talk briefly about the pacing of things?  So we've had
17     three officers who, at least to my ear, have testified
18     about similar things.  Lots of overlap in the
19     testimony.  And as I look at the order of the
20     witnesses, the next few witnesses have very similar
21     description for what they're going to testify about.
22   Is there any way to streamline what we
23     have coming up?
24   ATTORNEY ELKIN:
25   Your Honor, we can make a proffer.  And

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    we would proffer that they would testify --- I mean,

2    that's one way.  That's, frankly, what we did in

3    arbitration after the Arbitrator heard, I don't know

4    how many witnesses, four or five more.  She was like

5    let me just --- tell me what these witnesses are going

6    to say.  And that the Government agreed to it, and we

7    moved on.

8  I mean, the witnesses are going to

9    testify to the work.  They're all going to testify

10   that they wear a duty belt.  They're going to testify

11   it's required by the nature of the work.  They're

12   going to testify that they're not on the front line.

13   They're going to testify about how much time this

14   stuff takes, why it's all necessary.  And I don't want

15   to burden the record either.

16  JUDGE:

17  Do you have any --- any question for the

18   next few witnesses before we get to Defendant's video

19   and the timekeeping and time keeping stuff?  Do you

20   have any questions for --- do you have any witnesses

21   that are unique to those witnesses?

22  ATTORNEY ELKIN:

23  Do we?  I don't think so.  For example,

24   Mr. Vallacher said, oh, you never heard day watch.

25   Well, perhaps one of these next witnesses will fill in

639
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1     the gap.  But it actually turned out that I guess Mr.
2     Bunting did work day watch.
3   So we had a cross section as to cover
4     all the shifts on all the things that are ---.  But
5     it's not --- it's going to be redundant.  They're
6     going to say the same thing, because they do the same
7     things every single day, day in and day out.
8   JUDGE:
9   Okay.
10  Well, if it's going to be --- going to
11    be redundant, then I mean we're starting to get into
12    what they're for, and I certainly want to combine my
13    list and the people talk about the same --- the same
14    posts, and the same --- the same duty belts over and
15    over again.
16  ATTORNEY ELKIN:
17  So well, we want to make sure that we
18    put on our proof.
19  JUDGE:
20  Of course.
21  ATTORNEY ELKIN:
22  That the testimony is representative.  I
23    mean, maybe we could streamline it to the extent that
24    there are, you know, any differences about responding
25    to emergencies or patting down inmates prior to or

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

640

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      after post or just asking about the time that these
2       things take.
3    JUDGE:
4    Are there any posts that haven't been
5       covered yet?
6    ATTORNEY ELKIN:
7    No.
8    JUDGE:
9    Okay.  Okay.
10   So I don't want to get in the way of you
11      presenting your --- your evidence the way you want to
12      and representing clients the way you would think it be
13      best.  My --- my suggestion would be that to the
14      extent that you find yourself asking about what a duty
15      belt is like over and over, over and over again ---.
16   ATTORNEY ELKIN:
17   I think we can skip that.  I think we
18      can skip the --- what it's for and what the chits are
19      for.
20   I think Your Honor knows at this point
21      what they're for?
22   JUDGE:
23   Yeah, it's the same chits.
24   ATTORNEY ELKIN:
25   It's the same chits.  So I think we can

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     probably --- and why everything's important and all
2     that.  I think we can move on.
3   JUDGE:
4   Mr. Vallacher, any objection to doing it
5     that way?
6   ATTORNEY VALLACHER:
7   So in other words, it would be about
8     streamlining the inquiries?
9   JUDGE:
10  Yes.
11  ATTORNEY ELKIN:
12  And the Cross, Your Honor.  I think the
13    Cross has been taking as much time as the, if not more
14    than the Direct.
15  ATTORNEY VALLACHER:
16  I don't know if ---.
17  JUDGE:
18  It'll streamline the Direct, it'll
19    streamline the Cross, because the Cross will be
20    staying within the scope of the Direct.
21  ATTORNEY ELKIN:
22  But didn't we have a rule here that
23    they're allowed to go beyond the scope, because they
24    were going to call these witnesses, too?  So I don't
25    want to be in a situation where I give you a

642

Trial

Kathy Aitken, et al. v. USA                                     3/14/2023

1      ten-minute Direct and he's there with them for an hour
2      and a half.
3   ATTORNEY VALLACHER:
4   I don't foresee that being the case.
5   JUDGE:
6   Okay.
7   What exactly did we say in the Pretrial
8     Order about this particular thing?  Does it matter?
9   ATTORNEY ELKIN:
10  I believe that --- I don't know.
11  JUDGE:
12  I mislaid it.
13  ATTORNEY ELKIN:
14  We're going to find it, Judge.
15  JUDGE:
16  Okay.
17  ATTORNEY VALLACHER:
18  What was the question?
19  JUDGE:
20  There it is.  There it is.  It says, to
21    the extent witnesses are on both parties' witness
22    list, the parties intend to have each witness testify
23    only once.  After Direct Examination by the party
24    offering the witness, the other party may perform a
25    Cross Examination and a Direct Examination.  That's

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    what we've covered.  And so far, Mr. Vallacher has
2      availed himself of that.
3  So --- so we're still within the world
4      of the Cross Examination that needs to, needs to stay
5      within the scope of a --- of the Direct Examination.
6  Right?
7  ATTORNEY ELKIN:
8  Your Honor, I think he has gone outside
9      the scope several times.  And maybe I can just raise
10      an objection, if that happens, if we're going to
11      streamline these procedures.
12  JUDGE:
13  Mr. Vallacher, what do you think?
14  ATTORNEY VALLACHER:
15  What --- about what specific part of the
16      proposal?
17  JUDGE:
18  Well, have you been intending to go
19      beyond the scope of the --- the scope of the Direct
20      and do a Direct Examination while you've been
21      performing your Cross?  Or have you been --- have you
22      intended to perform just a Cross?
23  ATTORNEY VALLACHER:
24  Well, I think that so far I have been
25      sticking within the scope of the Direct.  But it's ---

Trial

Kathy Aitken, et al. v. USA                                     3/14/2023

1       I would say that it's not maybe intentional.  It's
2       that the Direct has been so expansive that I've been
3       able to do it kind of without trying.
4    Does that make sense?
5    JUDGE:
6    Okay.  Okay.
7    ATTORNEY VALLACHER:
8    And I think if --- if the Direct were
9       narrowed, you know, the Cross would obviously have to
10      be narrowed as well.
11   JUDGE:
12   Okay.
13   I don't want to --- so for both sides, I
14      don't want to tell --- tell you what to do with your
15      --- with your examinations.  I'll just tell you right
16      now that it strikes --- it strikes me that it's
17      getting a little bit cumulative on both sides.  And it
18      strikes me we can --- we can streamline what's coming
19      up.
20   I don't want to dictate exactly how we
21      do it, though, especially since we do have this issue
22      of different --- of witnesses both sides might want to
23      --- might want to examine.  So can we leave it at
24      that, as opposed to me trying to tell you what to do
25      in more detail?

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1   ATTORNEY ELKIN:
2   Yes, Your Honor.
3   ATTORNEY VALLACHER:
4   Yes, Your Honor.
5   ATTORNEY ELKIN:
6   I think we've heard your message, and
7     we'll ---
8   JUDGE:
9   Okay.
10  ATTORNEY ELKIN:
11  --- try not to ask what a duty belt is.
12  JUDGE:
13  Okay.
14  And I --- I know you --- I know you
15    have, but again, it's your --- it's your case.  I
16    don't want to get in the way of your representing your
17    clients.
18  So who's next?
19  ATTORNEY ELKIN:
20  Your Honor, can we have a small break,
21    comfort break?  And offer --- Ms. Block is going to
22    take the next witness since she wants to sort of
23    streamline things?
24  JUDGE:
25  Yeah, absolutely.  Absolutely.  Do you

646

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    want to come back at 3:30?  Give you --- give you
 2    enough time to make it through your outline?
 3  ATTORNEY ELKIN:
 4    Yeah.
 5  JUDGE:
 6    Okay.  Wonderful.
 7    Let's --- let's reconvene at 3:30.
 8  COURT CRIER:
 9    All rise.
10                       ---
11    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
12                       ---
13  COURT CRIER:
14    All rise.
15  The United States Court of Federal
16    Claims is now in session.  Judge Stephen Schwartz
17    presiding.
18  JUDGE:
19    Be seated.
20    Plaintiffs, ready for your next witness?
21  ATTORNEY ELKIN:
22    We are, Your Honor.  But a short little
23    matter.
24  JUDGE:
25    Of course, of course.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

647

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    ATTORNEY ELKIN:
2    That we have taken you to heart.  I
3     remember a pretrial conference we had about three
4     pretrial conferences ago, and I think you actually
5     said at times you really need more than five
6     representative Plaintiffs.  And I said, I don't think
7     we do.  And so we're going to go with that and talk to
8     Bret.  We're going to eliminate one of the --- not
9     eliminate him, but eliminate him from the witness
10    list.
11   JUDGE:
12   Okay.
13   Which one?
14   ATTORNEY ELKIN:
15   So our next witness is Eric Christensen.
16    Mr. Hagenburg is going to be --- he can stay and
17    watch, but he's not going to be called.
18   JUDGE:
19   Okay, okay.
20   That's very, very good.
21   So you aren't going to be calling, Mr.
22    Hagenburg, and we're going to be going to Mr.
23    Christensen?
24   ATTORNEY ELKIN:
25   That's correct, Your Honor.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

648

Trial

Kathy Aitken, et al. v. USA                                   3/14/2023

1    JUDGE:

2    Very good.  Afternoon.  Raise your right

3      hand.

4                            ---

5                      ERIC CHRISTENSEN,

6      CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

7      HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

8      FOLLOWS:

9                            ---

10   JUDGE:

11   Have a seat.

12                           ---

13                    DIRECT EXAMINATION

14                           ---

15     BY ATTORNEY BLOCK:

16     Q. Good afternoon.

17   Can you please state your full name for the

18     record?

19     A. Eric Christensen.

20     Q. And are you currently employed by the Bureau of

21     Prisons?

22     A. Yes.

23     Q. And what is it you do and where are you employed

24     at?

25     A. USP Canaan.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

649

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    Q. And how long have you been employed at USP
2    Canaan?
3    A. I started on February 13th.
4    Q. Of this year?
5    A. Yes.
6    Q. And what is your current position at USP Canaan?
7    A. Lieutenant.
8    Q. And when did you become a Lieutenant?
9    A. February 13th.
10   Q. And did you work for the Bureau of Prisons prior
11   to your position at USP Canaan?
12   A. Yes.
13   Q. And did you work at FCI Otisville?
14   A. Yes.
15   Q. And how long did you work at FCI Otisville?
16   A. From May 31th, 2015 until February 13th of this
17   year.
18   Q. And when you left FCI Otisville, what was your
19   position?
20   A. Senior Officer Specialist.
21   Q. And did you hold any other titles at Otisville?
22   A. Senior Officer, Correctional Officer.
23   Q. And Senior Officer Specialist and Senior Officer,
24   are they both Correctional Officer positions?
25   A. Yes.

650

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
1    Q. And prior to working at FCI Otisville, did you
2    work at any other BOP facility?
3    A. No.  I worked in Brooklyn and Manhattan on TDYs,
4    but my duty station was always FCI Otisville.
5    Q. And today we agreed to limit your testimony to
6    the time that you worked at FCI Otisville?
7    A. Yes.
8    Q. Has the Bureau of Prisons given you any training
9    on your job duties as a Correction Officer?
10   A. Yes.
11   Q. And what training is that?
12   A. Institution familiarization, basic armed prisoner
13   transport.  ICT phase two in Glynco, Georgia.
14   Disturbance control instructor, disturbance control
15   team training.
16   Q. And based on all of your training and experience,
17   what do you understand to be the most important job
18   duty of a Correctional Officer at FCI Otisville?
19   A. Institutional security.
20   Q. And is that most important job duty of
21   institutional security, is that the same regardless of
22   the post to which you're assigned at Otisville?
23   A. Yes.
24   Q. And I'm going to have you turn in the green
25   binder to the tab, tab 65 through 71 at ---.  It's
```

651

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1      going to be one of the three.

2                              ---

3      (Whereupon, Joint Exhibit 65,

4      Christensen Assignment Card 2016 - 2019,

5      was marked for identification.)

6                              ---

7      BY ATTORNEY BLOCK:

8      Q. Let me know when you have JX-65.

9      A. Yep.

10     Q. And do you recognize this document?

11     A. Yeah, it's my roster.

12     Q. And is it a roster of all the posts and shifts

13     that you worked from April 9th, 2015 through

14     October 8th, 2019?

15     A. Yes.

16     ATTORNEY BLOCK:

17     I --- and do you object to this

18     document?

19     JUDGE:

20     Mr. Vallacher?

21     ATTORNEY VALLACHER:

22     No objection.

23     JUDGE:

24     Okay.

25     Exhibit 65 is admitted.

652
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                          ---
 2        (Whereupon, Joint Exhibit 65,
 3        Christensen Assignment Card 2016 - 2019,
 4        was admitted.)
 5                          ---
 6    ATTORNEY BLOCK:
 7    Okay.
 8    And Mr. Christensen, if you can turn to
 9        the next tab, which is JX-66.
10                          ---
11        (Whereupon, Joint Exhibit 66,
12        Christensen Assignment Card 2019 - 2022,
13        was marked for identification.)
14                          ---
15        BY ATTORNEY BLOCK:
16        Q. And once you're there, please let me know if you
17        recognize those documents?
18        A. Yeah, it's my daily roster.
19        Q. And is this a daily roster reflecting all of the
20        posts and shifts you worked at FCI Otisville from
21        October 9th, 2019 through October 19th, 2022?
22        A. Yes.
23    ATTORNEY BLOCK:
24    And I move JX-66 into the record.
25    ATTORNEY VALLACHER:
```

653

Trial

Kathy Aitken, et al. v. USA                          3/14/2023

1    No objection.
2    JUDGE:
3    Admitted.
4                              ---
5    (Whereupon, Joint Exhibit 66,
6    Christensen Assignment Card 2019 - 2022,
7    was admitted.)
8                              ---
9    BY ATTORNEY BLOCK:
10   Q. At what location in the institution do you start
11   carrying out your most important job duty of
12   institutional security?
13   A. When you're inside the fence line.
14   Q. And where is the fence line?
15   A. In --- once you come through the A1 sally port
16   and start walking towards the control center, you're
17   within the fence line.
18   Q. And at what point in your day are you assigned
19   duties?
20   A. When you're inside the fence line.
21   Q. And at what point in your day do you stop
22   performing your most important job duty of
23   institutional security?
24   A. When you exit the security confines.
25   Q. And is that when you are off duty?

654

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. Yes.

2    Q. Are you expected to perform this job duty of

3    institutional security regardless of whether inmates

4    are present?

5    A. Yes.

6    Q. And do you perform the job duty regardless of

7    whether inmates are present?

8    A. Yes.

9    Q. And by present, I should say do you perform this

10   job duty regardless of whether inmates are in your

11   line of sight?

12   A. Yes.

13   Q. And do you perform this job duty of institutional

14   security before and after your scheduled shift if you

15   are within the secured perimeter?

16   A. Yes.

17   Q. And are you subject to institution rules when you

18   are within the secure perimeter of the institution?

19   A. Yes.

20   Q. Does that include times when you are walking to

21   and from a post?

22   A. Yes.

23   Q. And for any of the 24-hour posts that you have

24   worked at FCI Otisville, where do you have to be

25   physically at the start of the scheduled shift?

655

Trial

Kathy Aitken, et al. v. USA                                   3/14/2023

1      A. On post.

2      Q. And do you carry equipment while you're on post?

3      A. Yes.

4      Q. And are you required to have all --- do you need

5      to have all of that required equipment on your person

6      at the start of the schedule shift?

7      A. Yes.

8      Q. And do you wear a uniform?

9      A. Yes.

10     Q. And do you need to be in your full uniform at the

11     start of your scheduled shift?

12     A. Yes.

13     Q. And where are you required to be in your uniform?

14     A. On entry to the building.

15     Q. Are you in a uniform while walking to your post?

16     A. Yes.

17     Q. And are you wearing uniform if you're walking

18     back towards the A1 sally port after you've been

19     released?

20     A. Yes.

21     Q. And since April 2016, have you been --- when you

22     worked at Otisville, have you been assigned to work in

23     the 24-hour housing units, the A-side housing units,

24     on morning watch and evening watch?

25     A. I believe so, yes.

656

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. And have you been assigned to work with J Unit on
2      the morning watch?
3      A. Yes.
4      Q. And have you worked SHU-1 on day watch?
5      A. Yes.
6      Q. And have you worked Special Housing Unit 2 when
7      it was a 24-hour post on day watch and evening
8      watches?
9      A. Yes.
10     Q. And have you also worked on Compound 1 on morning
11     watch and day watch?
12     A. Yes.
13     Q. And have you worked the control on morning watch?
14     A. Yes.
15     Q. okay.
16   For purposes of your testimony, can you agree to
17     limit your answers to your experience of the times
18     you've been assigned to these posts I've just listed,
19     unless I specifically ask you about something else?
20     A. Yes.
21     Q. Okay.
22   Do you wear a duty belt as a Correctional
23     Officer?
24     A. Yes.
25     Q. And in your experience, do all Correctional

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

657

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1      Officers who work custody posts wear duty belts at FCI
2      Otisville?
3      A. Yeah, for the most part.  I can't speak for every
4      single officer, but it would be a rare exception if
5      they didn't wear a duty belt.
6      Q. And why do you wear a duty belt?
7      A. I wear a duty belt for retention of my equipment,
8      for my own safety, for the other staff members'
9      safety.  It's much heavier duty.  It holds the gear.
10     The belt keepers help hold the belt to you.
11   Mostly it's just for retention of equipment.  A
12     regular belt is not heavy enough on a daily basis.  A
13     Compound Officer, SHU Officer probably has 10 to 12
14     pounds worth of gear on them.  So wearing a regular
15     belt is not really feasible to carry the gear.
16     Q. Could you safely and effectively perform your
17     institutional security duties without your duty belt?
18     A. No.
19     Q. And while you are inside the secured perimeter of
20     the institution, are you subject to dangerous
21     situations?
22     A. Yes.
23     Q. And do inmates ever attack each other?
24     A. Yes.
25     Q. Has that happened?  And are there any situations

658

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1      that you're aware of where that's happened?
2      A. In the last three years, just at Otisville,
3      there's been a homicide.  There has been multiple
4      inmates involved in altercations.  We have 12 inmate
5      altercation on our housing unit.  We've had, like I
6      said, the homicide.  We've had assaults with weapons.
7      I mean, it's prison.  Regardless where you're at, it
8      has the potential to be violent.
9      Q. And are Correctional Officers obligated to
10     respond to situations like the one you just mentioned?
11     A. Yes.
12     Q. Does that include times when you are inside the
13     secured perimeter but may not be on a post yet?
14     A. Yes.
15     Q. And would that include times after you've been
16     released from a post but haven't exited the compound?
17     A. Yes.
18     Q. When you --- when you arrive to the front lobby
19     at FCI Otisville for a shift, do you bring your duty
20     belt with you?
21     A. Yes.
22     Q. And what is attached to your duty belt at that
23     time when you're arriving at the compound?
24     A. I have ████████████████████████
       ███████████████████████████████████████████
```

659

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1     ███████████████████████.
2     Q. And do you also carry chits with you?
3     A. Yes.
4     Q. And are your chits --- the chits that you carry,
5     are they ██████████████████████
6     A. Yes.
7     Q. And are they issued to you by the Bureau of
8     Prisons?
9     A. Yes.
10    Q. Do any inmates at the Medium Federal Correctional
11    Institution have chits?
12    A. No.
13    Q. Do any camp inmates have chits that are like the
14    ones that you carry?
15    A. No ██████████████████████████████
██    ████████████  ███████████████████████
██    ███████████████████████████.  If the
18    Camp Orderly or the Town Driver needs to chit-out
19    equipment, the officer will take the chit out of the
20    cage, put it on the piece of equipment that they are
21    drawing, and then give the equipment to the inmate.
22    The inmate also signs out any equipment that they're
23    issued when they're in the camp.
24    Q. And do your chits look different than those
25    chits?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

660

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. ████████████     ████████████████████

     ██  ██████████████  ████████████████  ████████████████

     ██  █████████████████████████  ██████████████████████████████

     ██  █████████████████████

5    Q. Are chits used --- are --- █████████████████

     ██  ████████████████████, are they used for accountability of

7    equipment?

8    A. Yes.

9    Q. And why is that important at FCI Otisville?

10   A. Accountability of equipment is one of the main

11   aspects of institutional security.  If you don't have

12   accountability for ████████████████████████████

     ██  ████████████████, it could facilitate an escape or a

14   hostage situation.

15   Q. So is accountability ███████ important as well?

16   A. Yes.

17   Q. And I believe you mentioned █████████████   I don't

18   know if anyone else has spoken about that yet.

19   So what is ████████████

20   A. I just keep the ████████████████████ for personal

21   protection.  It's █████████████████████████████.

22   They were issued to us when I started at Otisville in

23   2015.

24   Q. And when you are arriving to a post or arrive ---

25   when you're arriving to report for a shift, are you

661

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1      required to enter through a security screen site in
 2      the front lobby?
 3      A. Yes.
 4      Q. And if you've been assigned to a shift on day
 5      watch, about what time is it typically when you are
 6      clearing the metal detector in the front lobby?
 7      A. Depending on the day, between ████ and ████.
 8      Q. And for day watch, that schedule shift starts at
 9      ████████████.
10   Is that right?
11      A. Yes.
12      Q. And is your practice to arrive for a day watch
13      shift at that time, regardless of the post to which
14      you're assigned?
15      A. Yes.
16      Q. And at that time are there typically other
17      Correctional Officers assigned to the same shift as
18      you going through the screening process about the same
19      time as you?
20      A. Yes.
21      Q. And are there ever Lieutenants present in the
22      front lobby at that time?
23      A. Not typically.  There could be.
24      Q. And do they --- are there ever Lieutenants
25      conducting ID checks in the lobby?
```

662

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    A. Yeah.  Lieutenants are required to conduct a
2    monthly ID check on the staff entering or exiting the
3    building.  But you don't know what day it's going to
4    be.
5    Q. On any of the occasions where there's been a
6    Lieutenant in the lobby as you're turning through or
7    they're conducting an ID check, have any of them ever
8    instructed you to wait until the start of your
9    scheduled shift to continue to proceed through?
10   A. No.
11   Q. And have any of the Lieutenants ever prevented
12   you from clearing the screening say prior to the start
13   of your scheduled shift?
14   A. No.
15   Q. And is a --- part of the staff screening process,
16   does that involve an x-ray and conveyer belt?
17   A. Yes.
18   Q. And what do you put on the conveyer belt?
19   A. My duty belt, my bag, my jacket.  That's pretty
20   much it.
21   Q. And why do you put your duty belt through the
22   conveyer belt?
23   A. So the lobby officer has reasonable assurance
24   that I don't have anything in my duty belt that can be
25   contraband.  Also because there's metal on it.  It's

663

Trial

Kathy Aitken, et al. v. USA                                         3/14/2023

1     not going through the metal detector.

2     Q. And are some of the items that you mentioned that

3     are on the duty belt, ███████████████████████████████

█  ███████████████████

5     A. Yes.

6     Q. Okay.

7     And is that --- is that one of the reasons why

8     you ---?

9     A. Yeah.

10    Q. And where do you put your duty belt on?

11    A. As soon as it clears the x-ray machine, I'll

12    simply put the duty belt on, grab my bag and walk to

13    my post.

14    Q. And why do you put your duty belt on in that

15    location in the lobby?

16    A. It's habit.  It's an extra thing to carry.  If

17    I'm walking down the compound and I have to pat an

18    inmate down or respond to an emergency, having the

19    duty belt in my hand is just in the way.  If I have it

20    on, it's not in the way.  I can respond.  I can pat

21    inmates down.  I can pretty much do anything.

22    Q. And in your experience at FCI Otisville, is it

23    the general practice of Correctional Officers to put

24    the duty belt on in the lobby?

25    A. Yeah.

664

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1     Q. Are there ever inmates in the lobby when you are
2     coming through?
3     A. Yeah.
4     Q. And who --- who would those inmates be?
5     A. It could be Camp Orderlies that are cleaning the
6     lobby.  It could be escorted medical trips, entering
7     or leaving the facility.  It could be bus trips
8     leaving or coming.  I mean, it's not every day that
9     you go into the lobby and see inmates, but it does
10    happen.
11    Q. Okay.
12  And what, if anything, are your obligations with
13    respect to any inmates in the lobby as you're coming
14    through?
15    A. It's just like any other interaction with an
16    inmate looking for anything out of the ordinary, but
17    typically they're just conducting their duties when
18    they're in there.
19    Q. Has anyone ever instructed you that you should
20    not be monitoring any inmates in the lobby?
21    A. No.
22    Q. Okay.
23  So continuing to talk about a day watch shift
24    starts at --- so scheduled to start at ██████     If
25    you're working a 24-hour post, where do you go after

665

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1        you put on your duty belt?

2        A. I go through the A1 sally port and then I walk

3        down the sidewalk towards control center.

4        Q. And do you flip an accountability chit while

5        you're in the A1 sally port?

6        A. Yes.

7        Q. And does that signify that you're inside the

8        secured perimeter?

9        A. Yes.

10       Q. And then once you are, if you're working a post,

11       a 24-hour post inside the institution other than

12       control, where do you go once you have reached the

13       control center building or the administration

14       building?

15       A. I go through the compound's sally port, and then

16       I walk down the compound to whichever post I'm

17       assuming.

18       Q. And approximately what time is it when you are

19       heading to one of those posts inside the institution

20       other than control and you are on --- so you're

21       standing on the compound to clear the sally port?

22       A. Standing on the compound clear of the sally port,

23       it's depending on how quick control gets you through

24       the doors, but typically three minutes from the time

25       you clear the metal detector and the x-ray machine,

666

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    take you 30 seconds to a minute to put your belt on.
2    You can be in the compound within three minutes.
3    Q. And you're walking to a --- you're coming onto a
4    day watch shift and you're walking across the compound
5    to a post.
6    What, if anything, is going on in the compound at
7    the time?
8    A. At ███? There's probably medical call-outs.
9    There's going to be inmates in recreation, there's
10   going to be inmates in Education, leisure. I don't
11   know the move schedule because it's changed so often,
12   but prior to COVID, the moves were on --- ███████████
███    ███████████████. So the ██████████████████████████
███    ████████████████████████████████████████████████████
15   But with the COVID the different levels, I mean,
16   it changed so much that I wouldn't be able to tell you
17   the schedule that we had.
18   Q. Well, since 2016, when you've been coming on to a
19   day watch shift, are there typically inmates moving
20   around on the compound when you're walking to your
21   post?
22   A. Yes.
23   Q. And are you doing anything while you're walking
24   to post?
25   A. Yeah. You're always observing, looking for

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    anything out of the ordinary.  A big problem with
2    federal prisons is inmates getting high on synthetic
3    narcotics.  You're looking for people not walking
4    normal, you're looking for people running, people out
5    of uniform.
6    Q. If you saw any of these situations that you just
7    mentioned, and an inmate looks like they're
8    intoxicated or somebody's running or something like
9    that, what would you --- what would you do?
10   A. You'd address it.
11   Q. And why is it important to do that?
12   A. You don't --- in prison running is like something
13   that immediately would grab your attention.  You see
14   an inmate walking with an unsteady gait, they're ---
15   seem to be dizzy, they could be high, they could be
16   having a medical emergency.  So things like that
17   you're going to address regardless if you're walking
18   to post or if you're working your post.
19   Q. And are you looking for anything out of the
20   ordinary while you're walking to post even if there
21   are no inmates within your line of sight?
22   A. Yes.
23   Q. And are you expected by the Bureau of Prison,
24   based on your experience, to do these things that you
25   just mentioned that you do while on your walk to or

668
Trial
Kathy Aitken, et al. v. USA                                        3/14/2023

1      from the post?

2      A. Yes.

3      Q. Has a supervisor ever instructed you not to do

4      any of these things on a walk to or from a post?

5      A. No.

6      Q. And when is a Correctional Officer who is

7      assigned to a 24-hour post allowed to leave their

8      post?

9      A. When they're properly --- properly relieved.

10     Q. And what does properly relieve mean?

11     A. They've exchanged all equipment and information.

12     Q. And what equipment is exchanged on a 24-hour

13     post?

14     A. It would be ███████████████████████████████.

15     And then you're going to verify that all the equipment

16     on the chitboard is there, ████████████████████

██     ████████████████████████████

18     Q. And let's --- let's just focus on a housing unit

19     and a site housing unit for now.  We'll come back to

20     the exchange.

21  So when you are working in a site housing unit

22     post, approximately what time is it, in relation to a

23     scheduled shift, when you are arriving at the entrance

24     to the housing unit?

25     A. If I arrive at work at ██████  for an ████████████

669
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1      shift, probably anywhere between ███ and ███ I'd be
2      at the housing unit.
3      Q. And do you have to be let into the housing unit
4      at that time by the officer that you are relieving?
5      A. Yes.
6      Q. And once you're let in, what --- do you do the
7      proper relief that you just discussed?
8      A. Yes.
9      Q. And you mentioned a verbal pass-down is a part of
10     that proper relief.  So what type of information are
11     you discussing during that verbal pass-down?
12     A. If any groups are acting --- if any major group
13     up --- ████████████████████████████████████
       ████████████████████████████████████████████
       ███████████████. ███████████████████████████
       ████████████████████████████████████████████
       ███████, you'd want that passed onto you.
18     Your base count, you're going to want to know
19     your base count.  You have to verify it ██████
       ███████████████████ with control after they leave.  But
21     you want to know what they think their base count is.
22     Q. And why do you want to know that?
23     A. Because the care, custody and control of the
24     inmates is our main job, along with institutional
25     security.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

670

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1   ███████████████████████████████████

█   ██████████████████

█   █████████████████████████████████████

█   ████████████████████████████████

5   A. No.

6   Q. And why not?

7   A. ██████████ and █████████████, if you're working

8   ████ to █████ or ███████ to ████, and you're counting

9   right away, you're doing your daily fire and security

10  check. █████████████, you might be able to, depending

11  on what's going on, █████████████████████████████

█   █████████████████, and you still have to conduct

13  that daily fire and security check.

14  Q. And is it important for you to have the

15  information that you talked about during the verbal

16  pass-down right when you are relieving these ---?

17  A. Yes.

18  Q. In the --- you listed the equipment that you

19  transfer as a part of a relief exchange.

20  Do you transfer these items one at a time?

21  A. Yes.

22  Q. And why do you do that?

23  A. For accountability, and to be able to inspect

24  them.

25  Q. And why do you inspect the equipment?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

671

Trial

Kathy Aitken, et al. v. USA                                   3/14/2023

1     A. You look for deficiencies.  You want to make sure
2     that everything is good.  I mean, ███████████████
      ████████, those are like safety features.  If you have a
4     defective ███████████████████████████████
      ██████, that can directly affect your safety and other
6     staffs' safety.  ████████████, that's a huge thing.  If
7     you're missing ████████████████ and you don't check the
8     ████████ before you're relieved, then you don't know what
9     happened to ████████████.
10    Q. So do you inspect these items while the other
11    officer is still there with you?
12    A. Yes.
13    Q. And the reason why you --- why is that important
14    to do while they're still there?
15    A. Because if anything's not right, I'm not going to
16    be the one that's accountable for it.
17    Q. And I believe you also mentioned that as a part
18    of proper relief, you inspect the additional equipment
19    that's available in the cages.
20  Is that right?
21    A. Yes.
22    Q. And do you do that while the officer is still
23    present?
24    A. Yes.
25    Q. And why do you do that?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

672
Trial
Kathy Aitken, et al. v. USA                                     3/14/2023

1    A. Accountability.

2    Q. And in A-side housing unit on a 24-hour post,

3    approximately how long, on average, does the equipment

4    exchange inspection and any verbal pass-down take?

5    A. Three to five minutes tops.

6    Q. And turning to the end of your shift, when you're

7    working a 24-hour post in a housing unit, does someone

8    come to relieve you?

9    A. Yes.

10   Q. And does --- that relief process at the end of

11   your shift, is that similar to the one at the

12   beginning of your shift?

13   A. Yes.

14   Q. Do you exchange equipment and information at that

15   point?

16   A. Yes.

17   Q. And does it take the same amount of time as the

18   exchange when you are coming on to the post?

19   A. Yes.

20   Q. And when are you typically able to leave your

21   housing unit to head back towards the control center

22   sally port?

23   A. Probably between ████ and ████ .

24   Q. And your --- while you're walking across the

25   compound to get back to the control center sally port,

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1      do you do the same thing that you were doing on your

2      way to post?

3      A. Yes.

4      Q. And at approximately what time are you exiting

5      the A1 sally port to head back into the lobby?

6      A. Between ▮▮▮ and ▮▮▮.

7      Q. And your practice has been consistent since at

8      least April 2016 at FCI Otisville when you worked a

9      post in A-side housing unit?

10     A. Yes.

11     Q. So when you work in A-side housing unit post, on

12     an average day, about how long are you on duty?

13     A. Probably eight hours and ten minutes.

14     Q. And have you ever been paid for that regular

15     recurring ten minutes of on-duty time over eight hours

16     that you've worked in A-side housing unit?

17     A. No.

18     Q. Have you ever been disciplined or reprimanded for

19     arriving before the start of your scheduled shift and

20     making an early exchange in a housing unit?

21     A. No.

22     Q. You've also worked in the Special Housing Unit.

23     Correct?

24     A. Yes.

25     Q. And how, if at all, is the process of getting to

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

674

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    the Special Housing Unit different from the process
2    that you just described with respect to getting to the
3    General Population Housing Unit?
4    A. When you get to the Special Housing Unit, you
5    have to buzz the door and you have to be called in by
6    the OIC in SHU.  And then control has to verify that
7    your staff on camera and then buzz the door open.
8    Q. About how long does it take to walk to the
9    Special Housing Unit --- to the door of the Special
10   Housing Unit from the compound sally port?
11   A. ███████████████ .
12   Q. And then once you arrive, you go through the
13   Special Housing Unit, where you just described.
14   Right?
15   A. Yeah.
16   Q. Okay.
17   And if you're working Special Housing Unit 1 or
18   SHU-2 when there's a 24-hour post, do you relieve
19   another officer?
20   A. Yes.
21   Q. And what is the relief --- the process of
22   relieving the outgoing officer in a Special Housing
23   Unit, is it any different from the process of
24   relieving the outgoing officer in a housing unit?
25   A. Yes and no.  I mean, it's going to take about the

675
Trial
Kathy Aitken, et al. v. USA                                      3/14/2023

1    same amount of time, probably three to five minutes.
2    SHU is just a different animal in itself.  You have to
3    provide everything for the inmates.  So you're passing
4    on what happened during the day, what you got
5    accomplished.  So that way the relieving shift can
6    handle anything that wasn't done.
7    Q. Okay.
8    And is that --- do you exchange that information
9    verbally?
10   A. Yes.
11   Q. And is it important for you, as the oncoming
12   Special Housing Officer, to have that information
13   right when you are arriving at a post?
14   A. Yes.
15   Q. And meeting the outgoing officer?  Yes?
16   A. Yeah.
17   Q. And the equipment that you exchange hand in hand
18   on a SHU post, is that the same as that as a housing
19   unit?
20   A. Yeah, for the most part.  It's ███████████████
     ████████████.  In SHU you carry ██████████ than you
22   would on an A-side housing unit.
23   Q. And ██████████████ do you carry in SHU?
24   A. In SHU I would carry --- ██████████████████
     ████████████████████████████████, while I'm

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

676

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    on SHU.

2    Q. And do you exchange ███████████████████

███  ████████████████████████████████████

4    A. You chit them off of a --- off the chitboard.

5    Q. Okay.

6    But during --- during your shift, ████████████████

███  ███████████████████████        on your person?

8    A. Yeah.

9    Q. And so when --- when do you get those things?

10   A. At shift change, you'll go in there and you'll

11   swap your chits out with whoever you're relieving and

12   then you █████████████████████████████.

13   Q. I see.  Are there other items in cages or shadow

14   boards in the Special Housing Unit?

15   A. Yes.

16   Q. And do you inspect that equipment as part of your

17   exchange in the SHU?

18   A. If I'm SHU number one, yes.

19   Q. And what would be about the time that you

20   typically --- when you are arriving to the door of the

21   Special Housing Unit to relieve an outgoing officer?

22   A. On day watch?  Probably 20, 20 minutes of,

23   regardless of what shift.

24   Q. So on day watch, would that be ████?

25   A. █████.

677

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.
2    And at the end of your shift in Special Housing
3    Unit on a 24-hour post, does someone else come to
4    relieve you?
5      A. Yes.
6      Q. And is the process --- the relief process at the
7    end of your shift any different than the process that
8    you underwent when you arrived at post?
9      A. No.
10     Q. Does it take about the same amount of time?
11     A. Yes.
12     Q. And approximately what time are you typically
13    able to --- are you walking onto the compound after
14    exiting the SHU sally port after you're relieved if
15    you're working a day watch shift?
16     A. Between ███ and ███.
17     Q. And then do you need to walk back across the
18    compound towards the compound sally port to exit the
19    institution?
20     A. Yes.
21     Q. Do you do the same thing during that walk as you
22    were doing on your walk to the post?
23     A. Yes.
24     Q. And at approximately what time would it be when
25    you are exiting the A1 sally port and heading back

678

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    into the front lobby when you worked a day watch post
2    in the Special Housing Unit?
3    A. Between ██ and ██.
4    Q. Have your practices been consistent at least
5    since April --- 2015 when you worked a post in the
6    Special Housing Unit --- a 24-hour post in the Special
7    Housing Unit?
8    A. Yes.
9    Q. Okay.
10   And when you have worked on a SHU post, is it
11   --- is your practice to arrive and clear the screening
12   site at the same time you testified to earlier, the
13   ██████ prior to your shift?
14   A. Yeah.
15   Q. All right.
16   And have you ever been paid for the regular
17   recurring on duty time above eight hours that you
18   worked on a SHU post, which I believe is between eight
19   hours and ten minutes and eight hours and 20 minutes?
20   A. No.
21   Q. You've also worked post as a Compound Officer.
22   Correct?
23   A. Yes.
24   Q. And is there anything different about your
25   arrival time and your time for the site when you work

679

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    compound and when you describe the housing unit or the
2    Special Housing Units?
3    A. No.
4    Q. Okay.
5   And is there anything different about the process
6    of getting to your post as the Compound Officer than
7    how you described you get to a post in a housing unit
8    or in the Special Housing Unit?
9    A. No.
10   Q. And where do you make the exchange with the ---
11   when you work compound, where do you make the exchange
12   with the outgoing 24 hour Compound Officer?
13   A. Inside gate.
14   Q. And about how long does it take to walk from the
15   compound sally port to the side gate where you make
16   the relief?
17   A. ████████████████.
18   Q. And when you arrive to side gate, do you relieve
19   another officer?
20   A. Yes.
21   Q. And is the relief process for compound any
22   different than what you described for SHU and a
23   regular housing unit?
24   A. Compound has a little more equipment in there
25   with the shadow boards.  You're just going to verify

680

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    that everything's there.  Other than that, it's pretty
2    much the same shift change, minus the fact that you
3    ███████████████████████████.
4    Q. So when you're working a compound post, you also
5    ███████████████████████████
6    A. Yes.
7    Q. ████████████████████████████████████████
8    █ ██████████████████████
9    A. Yes.
10   Q. And do you inspect ████████████ as part of the
11   exchange?
12   A. Yes.
13   Q. Do you also have a verbal exchange with the
14   Compound Officer?
15   A. Yes.
16   Q. And so how long on average does the verbal
17   exchange and equipment exchange inventory take when
18   you're working a compound post?
19   A. Three to five minutes.
20   Q. Okay.
21   And when you are working a compound post, does
22   someone come relieve you at the end of your shift?
23   A. Yes.
24   Q. And is the process, the relief process on the
25   back end of your shift the same as at the beginning

681

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      that you're now the outgoing officer?
2      A. Yes.  As long as you're the day watch, the
3      evening watch or the morning watch Compound 1.  If
4      you're the p.m. in Compound 2, you have no relief.
5      Q. But you worked --- have you worked on Compound 2
6      when it was 24-hour post?
7    Is that right?
8      A. Yes.
9      Q. And when it was a 24-hour post, was it the same
10     as a Compound 1 post?
11     A. Yes.
12     Q. Is it the same as a Compound 1 post in terms of
13     the relieve process involved with it?
14     A. Yes.
15     Q. And when you are --- did the exchange take about
16     the same amount of time at the end of your shift as it
17     did in the beginning?
18     A. Yes.
19     Q. And when you're working a 24-hour compound post
20     --- and we can stick with day watch --- approximately
21     what time is it when you are able to leave the side
22     gate to head back to the sally port?
23     A. Between ███████████████ typically.
24     Q. And do you walk across the compound to get back
25     to the sally port?

682
Trial
Kathy Aitken, et al. v. USA                                3/14/2023

1    A. Yes.
2    Q. And are you doing the same things during that
3    walk that you described earlier with respect to what
4    you do as you are walking to post on the compound?
5    A. Yes.
6    Q. And when you are being relieved from a day watch
7    compound post, at approximately what time is it when
8    you are typically exiting the A1 sally port down into
9    the front lobby?
10   A. Between ██████████████.
11   Q. And in your practice has that been consistent, at
12   least in April 2016, when you worked a post on a
13   compound at FCI Otisville?
14   A. Yeah.
15   Q. And so based on what you described, your practice
16   is to arrive at about --- so begin screening at around
17   ██████████ and end it back at the --- through the A1
18   sally port between ██████████, have you ever been
19   paid for that regular, recurring additional 10 to 20
20   minutes of on-duty time above eight hours working on
21   post?
22   A. No.
23   Q. And you've also worked in the J Unit on morning
24   watch and evening watch.
25   Is that right?

683

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. Yes.

2    Q. And is the J Unit inside the main entryway?

3    A. No.

4    Q. Does it have its own lobby and screen site?

5    A. Yes.

6    Q. And do you wear a duty belt when you work the J

7    Unit post?

8    A. Yes.

9    Q. Is it the same one you wear on the other posts

10   that you've discussed today?

11   A. Yes.

12   Q. And when you're working the J Unit officer post,

13   24-hour post, do you relieve someone?

14   A. Yes.

15   Q. And are your practices with respect to when you

16   arrive and begin screening at the J Unit when you're

17   working a J Unit post, are they the same or similar to

18   your practices when you're working a post inside the

19   main medium FCI?

20   A. Yes.

21   Q. And when you are --- can you describe how you get

22   to your post as a J Unit officer?

23   A. You clear the metal detector, you put your stuff

24   through the scanner.  The control center will open the

25   sally port door, ███████████████████████████████ J

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
 1    Unit.  Then they allow you in the J Unit.  You let
 2    yourself in, you go conduct your relief, ███████████
 █    ██████████████████████████████████.
 4    Q. And what --- ████████████████████████████
 █    ████
 6    A. ██████████████████████████████████████████
 █    ███████████████
 █    ████████████████████████████████████████████████
 █    ████████████████████
 █    ██████████████████████████████████████████
 █    ████████████████████████████████████████████████
 █    ██████████████████████████████    ████
 █    █████████████████████████████████████████████████
 █    ██████████████████████████████████████████████
 █    ██████████████████████████
 █    ████████████████████████████████████████████████
 █    █████████████████████████████████████
 █    ██████████████
19    Q. And when you arrive to the post to relieve the
20    outgoing officer on the J Unit, is that process
21    similar to the relief process you had described in the
22    other posts?
23    A. Yes.
24    Q. Do you exchange equipment?
25    A. Yes.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

685

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    Q. Is it the same equipment or is it different?

2    A. It's pretty much the same equipment.

███  ██████████████████████████████████████████████████████

███  ██████████

███  ████████████

6    Q. J Unit, correct?

7    A. Yep.

8    Q. Okay.

9    And you also do a verbal exchange?

10    A. Yes.

11    Q. So when you're working the J Unit, approximately

12    how long does the equipment and information exchange

13    take?

14    A. ██████████████████████████

15    Q. And at the end of your shift, does someone come

16    relieve you in the J Unit?

17    A. Yes.

18    Q. Is the process the same as it was for you on your

19    way in just you're now going out?

20    A. Yeah.

21    Q. And do you take --- do an information and

22    equipment exchange at the back end of your shift?

23    A. Yes.

24    Q. Does it take the same ██████████████████████ on

25    average?

686
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1       A. Yes.

2       Q. And at approximately what time is it when you're

3       working a post in the J Unit on --- let's talk about

4       evening watch?  I believe you work evening watch.

5   So approximately what time is it when you are

6       heading back towards the J Unit control center after

7       you relieve the evening watch J Unit officer?

8       A. After I've relieved the evening watch?

9       Q. To relieve your --- what time is it when you're

10      walking away from the post location, after evening

11      watch has relieved you?

12      A. So I work day watch.  Evening watch is relieving

13      me.

14      Q. I'm sorry, you're right.

15      A. If I'm working ---.

16      Q. Let me, hold on.  Let me --- let me clarify.

17  I think you actually were answering the question

18      I thought I was asking.

19  If you are working the evening shift and someone

20      comes to leave you at the end of evening watch, about

21      what time is it when you are leaving the post location

22      for J Unit?

23      A. Between ████████████████ .

24      Q. Okay.

█    ████████████████████████████████████████

687

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1 ████    ████████████

2   A. Yes.

3   Q. And approximately what time is it typically when

4   you are finished ████████████ to the J Unit

5   control center?

6   A. If I leave --- if I leave the office at ████ ,

7   ████████████████████████████████████ .

8   Q. So if you were leaving the office later, you

9   would be ████████████████ ?

10  A. Yeah.

11  Q. I think I believe when I asked you what time it

12  is when you arrived to, and clear the screening for J

13  Unit, you gave me the time for day watch and you said

14  it was approximately ████ .

15  Would that be true for evening watch, it would

16  just be ████████████████████████████ ?

17  A. Yeah.  Regardless of what shift I work, I was

18  pretty much showing up between ████████████████

19  for any shift.

20  Q. Okay.

21  So when you are --- when you are working a 24

22  hour J Unit post, have you ever been paid for the

23  regular recurring eight hours and 10 to 20 minutes

24  that you have been on duty on that post?

25  A. No.

688

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. And you also have worked in the control center on
2      the morning watch.
3    Is that right?
4      A. Yes.
5      Q. How do you get into the control center if you're
6      working a control center post?
7      A. Control center has to buzz you through a secured
8      door and then they have to open an additional door to
9      allow you to exit.
10     Q. And is it --- where is the control center?
11     A. The control center is in the lobby, pretty much
12     enter --- after you come through the A1 sally port,
13     you walk down the sidewalks directly from you.
14     Q. So to get to a post in the control center, are
15     your practices the same through --- up until the point
16     that you have described earlier where you'd be going
17     through the compound sally port?
18     A. Yeah.
19     Q. And you're working a morning watch control one
20     post.
21   What is typically going on in a control center at
22     that time?
23     A. You're preparing for counts.  You're printing out
24     the rosters for the entire institution.  At █████████
     █    ██████████████████████████████████ .

Trial

Kathy Aitken, et al. v. USA                                        3/14/2023

1      Q. So what time is it typically when you are
2      arriving to the door at the control center to be let
3      in?
4      A. If I'm working morning watch control, I typically
5      would like to get there around ███, so I can get all
6      my paperwork situated, ready to go, and make sure
7      everything's in there that should be there.
8      Q. So when you work Control 1 on morning watch, are
9      you --- are you testifying that you are typically in
10     the control center by ████?
11     A. Between ███████████.
12     Q. And once you are in the control center, do you
13     relieve another officer?
14     A. Yes.
15     Q. And do you do a relief exchange like you
16     described for the other posts?
17     A. Yes.
18     Q. How, if at all, is it any different?
19     A. Control center is probably a way more detailed
20     pass-on than anywhere else would be. ████████
██     ████████████ log for control center, where you can
22     pass on information.  You're passing on information
23     from whoever you're relieving to you.  You're going to
24     want to know if there's any escort, medical trips.  If
25     you're working morning watch control, first thing

690

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    you're going to do is go in and ask evening watch if
2    there's any med trips for tomorrow.  They typically
3    will work out.  You're going to make sure that your
4    base count adds up to the log that you run through
5    the ---.  You're going to print out your PPE One,
6    which is the counts for all the units.  You're going
7    to prepare ███████████████████████████████████████
     █ ████████████████████████████████████████████████████
9    because there will be inmates from the camps that are
10   at the powerhouse.  There will be inmates from Food
11   Service --- from the FCI, there'll be a food service
12   from the ███████████████████
13 So you're --- you're going to make sure that you
14   have all the paperwork for that before you leave,
15   because typically the outcounts will get signed by the
16   Lieutenant the night before.  They'll get dropped off
17   in control, and then the evening watch patrol officer
18   will have everything ready for the morning watch
19   patrol officer.
20   Q. So all those things you just discussed, are they
21   part of the exchange process that you do while the
22   outgoing officer is still there?
23   A. Yeah.
24   Q. And how --- do you also do an inventory equipment
25   and control?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

691

Trial

Kathy Aitken, et al. v. USA                                   3/14/2023

1       A. Yes.

2       Q. And what equipment are you is --- does that

3       inventory consist of?

4       A. The ███████████████████████████████

        ██ ██████████████████████████████████ ██

        ██ ██████████ ████████████████████████████

        ██ ██████████

8       Q. And do you inventory that equipment while the

9       outgoing officer is still present?

10      A. I will go around and make sure anything that's

11      missing --- because once you've been there and worked

12      there frequently, you can tell if anything's not there

13      right away.  I'll check to ensure to make sure there's

14      chits.  And then once I've relieved him and I feel

15      good that everything's there, I'll do a more thorough

16      secondary inventory later on after I finish all my

17      paperwork and ███████████████████████.

18      Q. I understand.

19   When you're working a control post on morning

20      watch, approximately how long on average does the

21      verbal exchange and the shorter inventory that you

22      just described, how long does that take?

23      A. Probably seven to ten minutes.  It's longer than

24      any other relief being control.

25      Q. And turning to the end of your shift, if you're

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

692

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1        working morning watch control, Control 1, does someone
2        come to relieve you?
3        A. I'm sorry, can you repeat that?
4        Q. Yes, sure.
5    If you are working morning watch in Control 1,
6        does somebody come to relieve you at the end of your
7        shift?
8        A. Yes.
9        Q. And is that relief process similar to the process
10       when you were the oncoming officer, but now you're the
11       outgoing officer?
12       A. Yes.
13       Q. Do you do an equipment information exchange with
14       that officer?
15       A. Yes.
16       Q. And approximately how long does that take at the
17       end of your shift?
18       A. Around the same time.  It probably wouldn't take
19       as long with the day watch officer relieving you
20       because Control 2 comes in at ██████.  So you can
21       pass on things to them as well.  It won't take --- it
22       won't be as detailed going from morning watch to day
23       watch as it would from evening watch to morning watch.
24       Q. But you said it would take seven to ten minutes
25       on average.

693
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1    Is that correct?
2    A. Seven to ten minutes from --- if I'm going in a
3    morning watch, getting the pass-on from evening watch,
4    that's going to take seven to ten minutes.
5    Q. Okay.
6    A. Day watch relieving morning watch, it'll probably
7    be five minutes.  Because like I said, there's a
8    second control officer in there with you for the last
9    two hours of your shift.
10   Q. Has there --- when you're relieved on a morning
11   watch Control 1 post, has your relieving officer ever
12   arrived either right before --- right around the end
13   of your scheduled shift?
14   A. Yeah.
15   Q. Okay.
16   And on that --- in those situations, would you
17   still do the verbal pass-down?
18   A. Yeah.
19   Q. Okay.
20   And would you do that before you leave the
21   control center?
22   A. Yes.
23   Q. And typically, what time are you able to leave
24   the control center if you're working a morning watch
25   shift to head back to the A1 sally port?

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1      A. Between ███████████ .

2      Q. And have your practices been consistent since at

3      least April 2016 when you worked a post as Control 1?

4      A. Yes.

5      Q. And have you ever been paid when you worked a

6      Control 1 post for the regular and recurring

7      additional on-duty time of going between 10 and 25

8      minutes above eight hours on a post?

9      A. No.

10     Q. I think I asked you this about the housing units,

11     but just to make sure, I've asked it for everything.

12   Have you ever been disciplined or reprimanded for

13     arriving before the start of your scheduled paid shift

14     and making an early exchange on any of the posts that

15     we've talked about today?

16     A. No.

17     Q. Have you ever worked these perimeter patrol posts

18     on a morning watch or evening watch shift?

19     A. Yes.

20     Q. And what does the Perimeter Patrol Officer do

21     during these morning watch or evening watch hours when

22     inmates are or should be locked in their cells?

23     A. The Perimeter Patrol --- both of them make

24     constant rounds when the inmates are locked in.

25     Q. And when you are working that perimeter patrol

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    post during the overnight hours when inmates are
2    locked in their cells, are you performing your --- do
3    you perform your institutional security duties that
4    you described earlier?
5    A. Yes.
6    Q. And how is it all that different from what you
7    described that you do while you're walking to or from
8    a post inside the institution if you're working on a
9    shift when inmates are locked in their cells while
10   you're coming on or leaving?
11   A. It really isn't.
12   Q. Okay.
13   I believe you mentioned ████████████████████████
     ██   ████████████████████████
15   A. Yes.
16   Q. What is the expectation on you as a Correctional
17   Officer when you hear a body alarm?
18   A. To respond.
19   Q. Okay.
20   And are you expected to respond, even if it is
21   outside your scheduled shift hours?
22   A. Yes.
23   Q. And have you ever done that since 2016, if you
24   recall?
25   A. Respond to body alarms?

696

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    Q. Respond to a body alarm before or after your
2    scheduled shift.
3    A. Yeah, I'm sure I have at some point.  I can't
4    give a specific date or a time, but I've responded to
5    a lot of emergencies.
6    Q. Are Correctional Officers required to pat down
7    inmates as a part of your institutional security
8    duties?
9    A. Yes.
10   Q. And have you ever patted down an inmate on your
11   way to a post prior to the start of your scheduled
12   shift?
13   A. Yes.
14   Q. And why have you done that?
15   A. Spot checks, compliance checks, you see an inmate
16   run, you're going to stop and you're going to pat him
17   down.
18   Q. And has anyone ever instructed you to put in an
19   overtime request for that time you spent to give a
20   pat-down?
21   A. No.
22   Q. Do you ever stop in the Lieutenant's Office on
23   your way to a post?
24   A. Yeah.
25   Q. And how often do you do that?

697

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    A. Probably twice a week.

2    Q. And what kinds of things do you do while you're

3    in the Lieutenant's Office?

4    A. Sign overtime slips, sign post orders, basic

5    things.  You're not going in there to hang out for an

6    extended period of time, but you'll stop by and drop

7    off paperwork, things of that nature.

8    Q. Do you ever receive any briefing or instructions

9    from a Lieutenant while you're in the office?

10   A. On occasion.

11   Q. And has a Lieutenant ever told you while you were

12   in the office prior to the start of your scheduled

13   shift that you shouldn't be there yet because your

14   shift hasn't started?

15   A. No.

16   Q. Has a Lieutenant ever refused to talk to you or

17   give you a briefing because it's before your scheduled

18   shift?

19   A. No.

20   Q. Understanding that, you know, times may be ---

21   they may vary, but do you --- is it your practice to

22   do all of the things that you discussed today, sort of

23   donning your duty belt, clearing the sally port,

24   walking to your post, the verbal and equipment and

25   exchange --- verbal and equipment exchange on every

698
Trial
Kathy Aitken, et al. v. USA                                     3/14/2023

1       shift that you work a 24-hour custody?
2       A. Yeah.
3       Q. When you --- I believe you testified when you
4       work a housing unit or any housing unit, your practice
5       was to clearing the screens that you don your duty
6       belt at around ███████████ for morning watch shifts.
7    Is that accurate?
8       A. Yes.
9       Q. And I believe you've also testified that you are
10      typically exiting the A1 sally port and heading back
11      into the front lobby if you worked in a side housing
12      unit on a day watch between ███████████.
13    Is that accurate?
14      A. Yes.
15      Q. Have you ever been paid for that additional
16      on-duty time that you worked in A-side housing unit of
17      between 10 and 20 minutes above your eight hour
18      scheduled shift?
19      A. No.
20    ATTORNEY BLOCK:
21    I will pass the witness.
22    JUDGE:
23    Great.  Mr. Vallacher.
24                          ---
25                    CROSS EXAMINATION

699

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                          ---
 2    BY ATTORNEY VALLACHER:
 3      Q. Good afternoon, Lieutenant.
 4   How are you today?
 5      A. Good, how are you?
 6      Q. Pretty good.
 7   So when you walk into FCI Otisville, you often
 8     have a bag.
 9   Is that correct?
10      A. Yes.
11      Q. And that bag is a personal bag?
12      A. Yes.
13      Q. And what's --- what's typically in that bag?
14      A. My food, my drinks, my duty belt is around the
15     bag.  It's not in the bag.
16      Q. Okay.
17   It's kind of poked through the straps?
18      A. Yeah.
19      Q. Okay.
20   And when you are walking on the compound, after
21     you do the compound sally port, do you still have that
22     bag?
23      A. Yes.
24      Q. And is that bag slung over your shoulder?
25      A. Yes.
```

700

Trial

Kathy Aitken, et al. v. USA                                        3/14/2023

1      Q. Okay.

2    And if --- if you had to, if there were an

3      emergency, what would you do with that bag?

4      A. I would put the other strap on my other shoulder

5      and respond to the emergency.

6      Q. Okay.

7    Does your --- does your bag have a clip?

8      A. Yeah.

9      Q. Okay.

10   You were asked a question about Orderlies in the

11     front lobby.

12   Do you remember that?

13     A. Yeah.

14     Q. And isn't it true that there's a Front Lobby

15     Officer in the front lobby as well?

16     A. Yeah.

17     Q. Who's on duty?

18     A. They're also screening staff.

19     Q. Yeah.

20   And you also said that you would be looking for

21     anything out of the ordinary in the front lobby?

22     A. Yeah.

23     Q. Do you actually --- do you stop what you're doing

24     when you're looking for something out of the ordinary

25     or do you just proceed on your way and just kind of

701
Trial
Kathy Aitken, et al. v. USA                          3/14/2023

```
 1    keep your head on a swivel?
 2    A. Just keep on my way, keep my head on a swivel.
 3    Q. Okay.
 4   So it'd be --- would it be fair to say that that
 5    doesn't take you extra time?
 6    A. No, but in the event that something happened, it
 7    would.
 8    Q. Okay.
 9   And if something did happen, like an emergency,
10    you would --- it had took over seven-and-a-half
11    minutes, do you have any reason to think you wouldn't
12    be paid for that?
13    A. Before my shift or after the shift?
14    Q. Either.
15    A. Before my shift, probably not.  Because it's ---
16    most of the time, it's not even in anyone's brain to
17    ask for overtime before the shift if something was to
18    happen.
19    Q. Okay.
20   When you say it's not in someone's brain, are you
21    saying that you just ---?
22    A. Like I wouldn't even think about asking a
23    Lieutenant to pay me overtime for something that
24    happened prior to the start of my shift if I was
25    already at work.
```

702

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      Q. Okay.

2    But so you're saying that you wouldn't think to

3      ask?

4      A. No.

5      Q. Okay.

6    Do you know what would happen if you did ask?

7      A. In all honesty, no.  It typically does not

8      happen.

9      Q. Okay.

10    Typically, what does not happen?

11      A. Staff won't request overtime if it's before their

12      shift.

13      Q. Even in the case of an emergency?

14      A. Yeah.

15      Q. Okay.

16    Or are you also saying that emergencies before

17      shift don't happen frequently?

18      A. Emergencies happen before shift.

19      Q. Frequently?

20      A. I mean, it's prison.  Everything varies.  But

21      sometimes emergencies happen frequently.  Other times,

22      you can go months without having an emergency.

23      Q. Okay.

24    On Direct, I think you testified, and correct me

25      if I'm wrong, that you could be on the compound within

703

Trial

Kathy Aitken, et al. v. USA                               3/14/2023

1        ████████████ after screening.
2    Is that right?
3        A. Typically, yeah.
4        Q. Okay.
5    And at the point that you walked into the A1
6        lobby, you do not have your keys or equipment.
7    Correct?
8        A. Correct.
9        Q. And I heard you give a time on Direct about when
10       you walk into the A1 lobby, but I'm not sure I heard
11       it right.  To be clear, you walk into the A1 lobby
12       between ████████████, on average.
13   Correct?
14       A. Between ████████████.
15       Q. I'm sorry?
16       A. Between ████████████
17       Q. Okay.
18   And in this case you provided a deposition.
19   Correct?
20       A. Yeah.
21       Q. And your testimony in that deposition was under
22       oath?
23       A. Yeah.
24       Q. And that's the same oath that you're under today
25       in court?

704

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

 1     A. Yeah.
 2   ATTORNEY VALLACHER:
 3   Permission to approach the witness, Your
 4     Honor?
 5   JUDGE:
 6   Yes.
 7     BY ATTORNEY VALLACHER:
 8     Q. Mr. Christensen, I'm handing you your deposition.
 9     So I direct your attention to page 54.
10   Let me know when you're there.
11     A. I'm there.
12     Q. So on line six, question.  So let's say you have
13     an ███████████████     shift.  At what time would
14     you typically walk into the front lobby?  Answer,
15     probably █████   ███████████████.
16   Do you see that?
17     A. Yes.
18     Q. Okay.
19   And then if you walk into the front lobby at
20     ██████   you would arrive at a housing post at, I think
21     you said ███████████.
22   Is that correct?
23     A. Yeah.
24     Q. And if you arrived at █████, when would your
25     relief be exiting that post?

705

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    A. ███, approximately.

2    Q. Okay.

3    And isn't it true that it takes you about ███

███    ███████████    to get to the M, E and G housing

5    units?

6    A. Yes.

7    Q. And ████████    to get to SHU and Delta?

8    A. Yes.

9    Q. So would it stand to reason that when you relieve

10   the officer who's able to exit around ███    that they

11   would be off the compound by, you know, depending on

12   the post, ████████?

13   A. Yeah.

14   Q. Okay.

15   And putting on the duty belt takes you a minute

16   to fully put it on and get your gear situated.

17   Is that right?

18   A. Yeah.  Between 30 seconds and a minute, probably.

19   Q. Thirty (30) seconds to a minute.

20   And --- and your duty belt was not issued by BOP?

21   A. No.

22   Q. It came from a private vendor?

23   A. Yes.

24   Q. And you've seen other correctional officers carry

25   their duty belt over their shoulder while walking

706

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      across the compound.

2    Correct?

3      A. Yes.

4      Q. And you have not seen them being admonished for

5      doing so?

6      A. No.

7      Q. And there's --- you're not aware of any specific

8      policy that requires putting on a duty belt

9      immediately after screening?

10     A. No.

11     Q. And you've never been directed by a supervisor to

12     put on your duty belt right after screening?

13     A. No.

14     Q. And if you're working a 24-hour post, there's no

15     need to ███████████████████████████████████

██     ██████████ before going to your post.

17   Correct?

18     A. Correct.

19     Q. And in your --- in the past seven years,

20     emergencies before your shift, to your knowledge, have

21     only happened twice?

22     A. That I can remember, yes.

23     Q. And twice in seven years after your shift as

24     well?

25     A. Yeah.  I mean --- twice.  It depends on what you

707

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1    constitute as an emergency.  Because I've gone on
2    numerous emergency medical trips with inmates at the
3    end or right after my shift, but responding, running
4    to emergencies, probably two.
5    Q. Okay.
6    And what you're referring to, I guess, would be
7    like, mandatory overtime?  You know, you have BPT
8    training.
9    Right?
10   A. Yeah.  So I might say I'm working the Special
11   Housing Unit, and there's a medical emergency on both
12   --- Bravo and they're sending the inmate out on an
13   emergency medical trip.  I didn't respond to the
14   emergency, but technically I'm responding because I'm
15   the one taking him to the hospital.
16   Q. I see.  Because you are --- you have basic
17   prisoner transport training?
18   A. Yes.
19   Q. Which allows you to be a medical escort officer?
20   A. Yes.
21   Q. And speaking of emergencies, I think earlier you
22   referenced a homicide?
23   A. Yes.
24   Q. To be clear, that homicide did not occur during a
25   shift change.

708

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    Correct?

2    A. I can't remember the exact time that it happened,

3    but I don't think it happened during shift change, no.

4    Q. Okay.

5    And in fact, if on those two --- those, I guess,

6    four occasions in the past seven years in which you've

7    responded to emergencies before or after your shift,

8    do you remember if you were late to your shift or late

9    leaving the prison?

10    A. No.  But if I was late leaving the prison,

11    typically they would pay overtime.

12    Q. Okay.

13    And you're --- you're sure about that?

14    A. Yeah.

15    Q. And in fact, you don't recall any times in which

16    you've submitted for overtime and it was denied.

17    Isn't that correct?

18    A. That's correct.

19    Q. And if you were delayed in getting to your post

20    on time or responding to an emergency, the officer

21    who's stuck there could request overtime?

22    A. Yes.

23    Q. And all BOP employees at FCI Otisville have to

24    respond in the event of an emergency?

25    A. Yes.

709

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1        Q. You know, Education, Psychology?
2        A. I mean, anyone that is not supervising inmates
3        should respond to emergencies, yes.
4        Q. Okay.
5     For example, if a Food Service officer were in
6        the front lobby and an emergency happened, they would
7        also have to respond?
8        A. Yes.
9        Q. And there's no policy or regulation requiring
10       that Correctional Officers stop by the Lieutenant's
11       Office?
12       A. No.
13       Q. That means that's correct?
14       A. Correct.
15       Q. On Direct I think you were asked --- you said
16       that the control relief takes seven to ten minutes
17       coming on the morning watch?
18       A. Yeah.
19       Q. And you said the day watch relieving morning
20       watch.
21    So that would ---?
22       A. At ████████████.
23       Q. At ████████████.    Thank you.
24    That takes five minutes?
25       A. Yeah, because that's solely because the Control 2
```

710

Trial

Kathy Aitken, et al. v. USA                                          3/14/2023

1       comes in at ███████    And you can pretty much
2       complete 90 percent of your pass-on when Control 2
3       comes in.  And then you just pass on whatever you have
4       left to the Control 1 gets you.
5       Q. Okay, I see.
6   So the presence of Control 1 kind of smooths over
7       the exchange process?
8       A. The presence of Control 2.
9       Q. Control 2.
10      A. Yeah.
11      Q. Okay.
12  And so that --- would that also be true for
13      evening watch relieving day watch?  That's the missing
14      piece of the puzzle?
15      A. For the most part, yes.
16      Q. Okay.
17  Because Control 2 would still be there.
18  Right?
19      A. Yes.
20      Q. And in general, when we're talking about relief
21      times and let's start with control, that amount would
22      vary day to day.
23  Right?
24      A. Yeah, I mean, it could, but typically, if I was
25      working morning watch patrol, I'd try to be there by

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

```
 1          ████    in the control center.
 2       Q. Okay.
 3    But I guess what I'm referring to is the amount
 4       of information that has to be passed down.
 5       A. Yeah.
 6       Q. In control would vary day to day.
 7    Right?
 8       A. Yeah.
 9       Q. And then would also cause the length of time from
10       the verbal exchange to vary.
11    Correct?
12       A. Yeah.
13       Q. And so have you ever done a shift exchange at
14       Control 1 that took less than five minutes?
15       A. I mean I can't --- I never timed my shift
16       changes, so I can't say I have or haven't.
17       Q. Okay.
18       A. But I may have, yes.
19       Q. Okay.
20    And what about four minutes?
21       A. I mean, that's the same thing.
22       Q. Okay.
23    So you're saying it's possible that?
24       A. It's possible.  I've never timed every single
25       shift change that I've ever made.  That's why I've
```

712

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1    given the housing units three to five minutes, control
2    morning watch, seven to ten, day watch around five.
3    Q. Okay.
4    A. Could I have done one in four minutes and 20
5    seconds?  Maybe.  I don't know.
6    Q. Okay.
7    What about sub four?
8    A. Huh?
9    Q. Sub four?
10   A. Probably not.
11   Q. Okay.
12   But you've never timed it?
13   A. No.
14   Q. Okay.
15   And a lot of numbers flying around, and I think
16   you probably have a better grasp than I do at this
17   point.  But where all of the controls --- are all of
18   the exchanges, other than control, the same amount of
19   time, roughly?
20   A. For the most part, yeah.  Ten to five minutes.
21   Q. And was that time three to five minutes?
22   A. Yeah.
23   Q. Okay.
24   And Lieutenants are not stationed on every post
25   and monitor when the equipment exchange takes place.

713

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    Correct?
2      A. Correct.
3      Q. In fact, doing so would be impossible?
4      A. Yeah.
5      Q. It would be impossible because there's too many
6    areas and not enough Lieutenants?
7      A. Yes.
8      Q. And it would be impossible because the shift
9    change would take hours if a Lieutenant had to be
10   there for every post?
11     A. Yes.
12     Q. And so if Lieutenants aren't there, they
13   obviously also are not monitoring what's being
14   discussed during the exchanges.
15   Correct?
16     A. Correct.
17     Q. And during the exchange, do Correctional Officers
18   ever quickly chat about human things, like family and
19   sports?
20     A. I mean, they could, yes.
21     Q. Okay.
22   And there'd be no way of Lieutenants knowing
23   that.
24   Correct?
25     A. Correct.

714

Trial

Kathy Aitken, et al. v. USA                           3/14/2023

1     Q. Okay.
2   So do you remember in your deposition I asked you
3      what activities a Control 1 Officer does?
4     A. Yes.
5     Q. And I believe that what he says, doing all the
6      counts, announcing all the moves, doing inventories,
7      doing paperwork.
8   Do you recall that?
9     A. Yes.
10    Q. And to be clear, safety and security is the
11     purpose behind all of these activities?
12    A. Right.
13    Q. But you actually did not list safety and security
14     as an activity of a Control 1 Center Officer.
15  Correct?
16    A. What page are you on?  Are you sure?  There's 116
17     pages of it, so ---.
18    Q. I do appreciate that.
19  Are you saying that you don't remember?
20    A. I don't remember.
21    Q. Okay.
22  If I were to show you the page, would that
23     refresh your recollection?
24    A. Yeah.
25    Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                      3/14/2023

1    I direct you to page 34.

2    JUDGE:

3    Wait, wait, wait.  What are you

4      refreshing his recollection as to?  Are you asking

5      what he testified to earlier or are you asking --- or

6      are you asking best ---?

7    ATTORNEY VALLACHER:

8    As to whether he had listed safety and

9      security as an activity performed by a Control 1

10     Officer.

11   JUDGE:

12   You're asking --- you're asking him to

13     repeat what his --- ask him what the --- I don't know

14     if that's a proper reflection of recollection.

15   ATTORNEY VALLACHER:

16   Okay.

17   JUDGE:

18   I mean, ask him what the --- what the

19     --- you can ask him what the activities are of a

20     Control Officer, and then if he says something

21     different, you can impeach him.  But I don't know if

22     you can be asking him now to repeat what he said at

23     his deposition and then refresh his recollection on

24     that.

25   ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1   Okay.

2   JUDGE:

3   And the reason I bring it up is that

4     there's --- there's an evidentiary difference between

5     whether you're doing impeachment as a refreshment.  We

6     need to --- I want to make sure we --- I know from the

7     record which is which.

8   ATTORNEY VALLACHER:

9   I appreciate that, Your Honor.

10  JUDGE:

11  Okay.

12    BY ATTORNEY VALLACHER:

13    Q. Okay.

14  I'll --- I mean, I'll just ask you now, then.  So

15    safety and security is the purpose behind, you know,

16    we're going to stick with Control 1 for now, all of

17    the activities that Control 1 Officers do.

18  Correct?

19    A. Correct.

20    Q. But safety and security is not an activity that

21    they do.

22  Correct?

23  ATTORNEY BLOCK:

24  Objection, it calls for a legal

25    conclusion.

717

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    JUDGE:

2    Overruled.

3    THE WITNESS:

4    I mean, institutional security is the

5        main job function if anyone's Correctional Officer on

6        a correctional post.

7        BY ATTORNEY VALLACHER:

8        Q. Correct.

9        A. So I don't understand what angle you're trying to

10       take on it.  Control Center, you are monitoring all

11       radio traffic, you're monitoring all CCTV cameras.

12       Institutional security is your main function.

13       Q. Okay.

14   So are you saying that safety and security is an

15       activity for a task?

16       A. Yes.

17       Q. Okay.

18   So during your deposition, do you remember when I

19       asked you which one of the tasks performed by a

20       Control 1 Officer is most important?

21       A. Yes.

22       Q. What would you say that is today?

23       A. Institutional security.

24       Q. Okay.

25   So I'm going to direct your attention to page 43

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

718

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1      of your deposition.

2    Are you there?

3      A. Yeah.

4      Q. So on line ten, question.  Okay.  So we just

5      mentioned a bunch of tasks, bar tasks, counts,

6      searches, shakedowns.

7    And I apologize, this is about a Housing Officer.

8      A. Yeah.

9      Q. And I apologize for that.  Got my page wrong.

10   What would you say the most important task of an

11      on duty Housing Officer is?

12      A. Most important task of any Correctional Officer

13      on post is institutional security.

14      Q. Okay, great.

15   So now I direct your attention to page 43, line

16      ten.  Okay.  So we just mentioned a bunch of tasks,

17      bar tasks, counts, searches, shakedowns.  What would

18      you say is the most important task of an on-duty

19      Housing Officer?  Answer, Institutional Security.  And

20      so that's the question.  And so that's the purpose

21      behind almost all these tasks, right?  Answer, yeah.

22   Question, but of these tasks that we were

23      discussing, is there one that you would say is the

24      most important answer?  Answer, I mean, counting

25      inmates is the most important.

719

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1    ATTORNEY BLOCK:
2    Objection.  I --- this doesn't appear to
3      be proper impeaching.  This is consistent with Mr.
4      Christensen's testimony still.
5    ATTORNEY VALLACHER:
6    We're getting there.  To the next
7      answer.
8    JUDGE:
9    The answer to the next question that
10     you're about to read here?
11   ATTORNEY VALLACHER:
12   I --- I wanted to give the full context.
13     I could jump right to the ---.
14   JUDGE:
15   It's --- I'll let you finish what you're
16     going to read.  And then, and then --- and then we'll
17     see if the objection is still there.  It's overruled
18     for now.  Let's --- but you can finish what you're
19     doing.
20   ATTORNEY VALLACHER:
21   So the answer I mean, counting inmates
22     is the most important, but question, why is that?
23     Because our main job is to make sure we provide care,
24     custody and control of the inmates.  They're not
25     eating --- they're not dead for, one.  Two, they're
```

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

1    not escaped, and three, they haven't been assaulted.
2    Did I read that correctly?
3    ATTORNEY BLOCK:
4    I'm going to repeat my objection.  I
5      don't think this is the same question as what Mr.
6      Christensen was just asked.  I don't think this is
7      something that ---.
8    JUDGE:
9    Yeah.  Mr. Vallacher, I think Ms. Block
10     has a point here.
11   ATTORNEY VALLACHER:
12   He said counting inmates is the most
13     important.
14   THE WITNESS:
15   That's all a part of institutional
16     security.
17   ATTORNEY VALLACHER:
18   Correct, exactly.  That's the purpose
19     behind all of these tasks.
20   Correct?
21   JUDGE:
22   Wait, no, no, no.
23   ATTORNEY BLOCK:
24   No.  And --- and to respond, the
25     question that was asked during the deposition of the

Trial

Kathy Aitken, et al. v. USA                          3/14/2023

1    task that we were discussing, which is a follow-up
2    question to the original question of what is the most
3    important task, and he said institutional security,
4    which is what he just testified to today.  To that
5    exact question.
6    JUDGE:
7    Okay.
8    So I'm going to overrule the objection
9    simply because I think that Mr. Vallacher has tried to
10   contrast stand testimony with deposition testimony.
11   Whether there is actually a conflict will go to the
12   weight that I give the effort of each answer.
13   Make sense?
14   ATTORNEY BLOCK:
15   Thank you.
16   ATTORNEY VALLACHER:
17   Thank you, Your Honor.
18    BY ATTORNEY VALLACHER:
19    Q. Okay.
20   So similar question.
21   What is the most important activity done by a SHU
22   officer?
23    A. Rounds.
24    Q. Okay.
25   Thank you.  And an officer walking to or from his

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    post is not doing rounds at SHU.

2    Correct?

3    A. In SHU, no.

4    Q. Okay.

5    And in effect, rounds involve more than just a

6    visual inspection.

7    Correct?

8    A. What kind of round are you defining?  Like a

9    housing unit round?  I can walk all five ranges,

10   conduct my security check --- my 30-minute round, and

11   I don't have touch anything.  Just all --- it could be

12   all visual.

13   Q. Okay.

14   But if you're doing an area search, that would

15   not be all visual.

16   Correct?

17   A. No, but that's not a round.

18   Q. Okay.

19   ATTORNEY VALLACHER:

20   I've got --- I've got no further

21   questions.  Thank you for your time.

22   JUDGE:

23   Any Redirect?

24   ATTORNEY BLOCK:

25   Yes, briefly.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                          ---
 2                  REDIRECT EXAMINATION
 3                          ---
 4    BY ATTORNEY BLOCK:
 5    Q. Do you perform INSTITUTIONAL SECURITY duties when
 6    you're working on a post in the Special Housing Unit?
 7    A. Yes.
 8    Q. And do you perform those INSTITUTIONAL SECURITY
 9    duties when you're working a post as Control 1?
10    A. Yes.
11    Q. Has anyone ever instructed you that you should
12    not be donning a duty belt in the front lobby on the
13    other side of the screening?
14    A. No.
15    Q. Do you --- is it your practice to discuss
16    personal things like, you know, the weather and
17    vacations with an officer during a relieve exchange on
18    post?
19    A. Not typically.  I mean, yeah, you can, but it's
20    not --- typically when you relieve someone, they're
21    trying to go home.  So they're not really sitting
22    there with small talk.
23    Q. Do you mostly discuss work?
24    A. Yes.
25    Q. Have you --- have you been trained to request
```

724

Trial

Kathy Aitken, et al. v. USA                                3/14/2023

```
1    overtime for responding to an emergency that occurs
2    prior to start your scheduled shift?
3    A. No.
4    Q. And have you ever been paid for responding to an
5    emergency prior to the start of your scheduled shift?
6    A. No.
7    Q. Are staff outnumbered by inmates at FCI
8    Otisville?
9    A. Yes.
10   Q. Can more than one person be supervising an inmate
11   at any given time?
12   A. Yes.
13   Q. And to your knowledge, is there any rule that
14   you're aware of that prohibits more than one person
15   from supervising inmate at any given time?
16   A. No.
17   ATTORNEY BLOCK:
18   I have nothing further.
19   JUDGE:
20   All right.
21   Mr. Christensen, you're free to go.  All
22   right, that brings us to five o'clock.  And how do you
23   want to proceed?  I take it you don't have --- do you
24   have any other witnesses who you plan to talk to
25   briefly today or are we done?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1    ATTORNEY ELKIN:
 2    I mean I think he'll, is Mr. Buckingham
 3      here?  He's here, and he will probably take more than
 4      half an hour on Direct.  I don't know if you want to
 5      split a Direct.
 6    JUDGE:
 7    I don't want to split a Direct.  That
 8      doesn't sound like a great idea to me.
 9    Do you agree?
10    ATTORNEY ELKIN:
11    I think that's right, Your Honor.
12    JUDGE:
13    All right.
14    In that case, is there --- well let's
15      talk about the --- the exhibits that we got --- we got
16      in, and we can move on to Mr. Buckingham I guess first
17      thing in the morning?
18    ATTORNEY ELKIN:
19    That's correct, Your Honor.
20    JUDGE:
21    Great, okay.
22    So exhibits, not as busy a day today,
23      but we got in 63, JX-63, JX-64, JX-65, JX-66, JX-84,
24      JX-103, PLX-5, DX-5, DX-7, and that's what I have.
25    ATTORNEY ELKIN:
```

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1   I have them.

2   ATTORNEY VALLACHER:

3   Us, too, Your Honor.

4   JUDGE:

5   Okay.

6   All on the same page, good news.

7      Anything else that would be helpful to talk over ---

8      talk over this afternoon before we break?

9   ATTORNEY ELKIN:

10  Just one issue, Your Honor.  Even though

11     we are not calling Mr. Hagenburg for purposes of a

12     streamlined trial, he is still a representative

13     Plaintiff.  So to the extent that any exhibits apply

14     to him, we want him to be considered as a

15     representative Plaintiff still.  And if not, then

16     we'll call him.

17  JUDGE:

18  Do you want to call him just to

19     authenticate certain exhibits?

20  ATTORNEY ELKIN:

21  Your Honor, no.  It will come in through

22     the people who did the video review, where they looked

23     at his times, which would be part of the

24     representative.  He couldn't authenticate it.  The

25     people who are doing their video review, they did our

727
Trial
Kathy Aitken, et al. v. USA                                    3/14/2023

1      video review, will be discussing Buckingham as --- I'm
2        sorry, Hagenburg.
3    JUDGE:
4    Hagenburg, Hagenburg.
5    ATTORNEY ELKIN:
6    Hagenburg as a representative Plaintiff.
7    JUDGE:
8    Okay.
9    So when we talk about representative
10      Plaintiffs, what you mean is Plaintiffs whose video
11      comings and goings are being analyzed.
12    Right?
13    ATTORNEY ELKIN:
14    Yes, yes.
15    JUDGE:
16    Okay.
17    So what --- what you're asking is even
18      though he's not testifying, is it okay to treat him as
19      a representative for purposes of the video in that one
20      sense?
21    ATTORNEY ELKIN:
22    Yes, Your Honor.  And if not, I'm afraid
23      we would have to --- we want him to be a
24      representative Plaintiff, and we have to call him and
25      go through this exercise with him.

728

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    JUDGE:

2    Mr. Vallacher --- Mr. Vallacher, do you

3       have any objections to Mr. Hagenburg being treated as

4       a Representative Plaintiff for purposes of the video

5       analysis, even though he wouldn't be --- without

6       testifying?

7    ATTORNEY VALLACHER:

8    Your Honor, in the interest of time I

9       think we'll agree to that.

10   JUDGE:

11   Okay.

12   That --- that sounds like a reasonable

13      agreement.  And whether, I mean, everyone agrees that

14      he is --- he is a Plaintiff and a Correctional Officer

15      and so forth.  So it seems like you can analyze his

16      comings and goings independent of his testimony.

17   ATTORNEY ELKIN:

18   And Your Honor, moving --- his testimony

19      would have been the same as what you would have heard

20      in terms of, in other words a duty belt and he does an

21      exchange on the post.  And all that other stuff would

22      have been the same.  And that's why we're not calling

23      him, so as not to burden the record.

24   JUDGE:

25   Right.

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
1    ATTORNEY ELKIN:
2    And ---.
3    JUDGE:
4    What --- what exactly do you want me to
5      do with the proffer?
6    ATTORNEY ELKIN:
7    I don't think anything at this point.
8    JUDGE:
9    Okay.
10   ATTORNEY ELKIN:
11   If I think of anything overnight, I'll
12     let you know.
13   JUDGE:
14   Okay, okay.  If you --- if you think of
15     anything you want me to --- want me to do, we can talk
16     about that and we can figure out if there's a
17     stipulation or some kind of agreement we can reach on
18     --- reach on the subject.  But for now, let's just
19     keep on moving along to the video analysis.
20   ATTORNEY ELKIN:
21   Okay.
22   JUDGE:
23   Is that okay with everybody?
24   ATTORNEY VALLACHER:
25   Sounds good, Your Honor.
```

730

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

1    JUDGE:

2    Great.  Okay.

3    Thanks for working with me and with each

4       other.  Okay.

5    So nothing else?

6    ATTORNEY ELKIN:

7    Are we 8:30 tomorrow?

8    JUDGE:

9    8:30 in the morning, weather permitting.

10      Thank you all.

11   COURT CRIER:

12   All rise.

13                    * * * * * * * *

14               HEARING CONCLUDED AT 5:05 P.M.

15                    * * * * * * * *

16

17

18

19

20

21

22

23

24

25

731

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                        CERTIFICATE
 2
 3   I hereby certify, as the stenographic
 4      reporter, that the foregoing proceedings were taken
 5      stenographically by me, and thereafter reduced to
 6      typewriting by me or under my direction; and that this
 7      transcript is a true and accurate record to the best
 8      of my ability.
 9      Dated the 5th  day of April, 2023
10
11
12   s/Kayla Marie Keating
13   Kayla Marie Keating,
14   Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

732

Trial

Kathy Aitken, et al. v. USA                                    3/14/2023

```
 1                      ADMITTED EXHIBITS

 2

 3

 4    JX      PAGE    DESCRIPTION

 5    JX-63   497     Bunting Assignment Cards 2016 - 2019

 6    JX-64   497     Bunting Assignment Cards 2019 - 2022

 7    JX-65   652     Christensen Assignment Card 2016 -

 8                    2019

 9    JX-66   653     Christensen Assignment Card 2019 -

10                    2022

11    JX-84   568     Housing A-Side Specific (2021)

12    JX-103  461     J Unit Post Orders

13

14

15    Plaintiff

16    PLX-5   453     Compound 1 Specific Post Orders

17                    (2019)

18

19

20    Defendant

21    DX-5    505     Housing B-Side Specific (2021)

22    DX-7    502     SHU#3 (2021)

23

24

25
```