1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    KATHY AITKEN, et al.,                )

5              Plaintiffs,                ) Case No.

6                  vs.                    ) 19-520C

7    THE UNITED STATES OF AMERICA,        )

8              Defendant.                 )

9

10

11

12        William J. Nealon Federal Courthouse

13            235 North Washington Avenue

14              Scranton, PA  18501

15           Wednesday, March 15, 2023

16                  8:32 a.m.

17               Trial Volume 3

18

19

20      BEFORE:  THE HONORABLE STEPHEN S. SCHWARTZ

21

22

23

24

25   Reporter: Kayla Keating

734

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                    A P P E A R A N C E S
 2
 3    ON BEHALF OF THE PLAINTIFFS:
 4            MOLLY A. ELKIN, ESQ.
 5            SARAH M. BLOCK, ESQ.
 6            McGillivary Steele Elkin, LLP
 7            1101 Vermont Avenue, NW
 8            Suite 1000
 9            Washington, DC  20005
10            (202) 833-8855
11            mae@mselaborlaw.com
12
13    ON BEHALF OF THE DEFENDANT:
14            BRET R. VALLACHER, ESQ.
15            JOSHUA W. MOORE, ESQ.
16            DAVID M. KERR, ESQ.
17            U.S. Department of Justice
18            Post Office Box 480
19            Ben Franklin Station
20            Washington, D.C. 20044
21            (202) 616-0465
22            bret.r.vallacher@usdoj.gov
23
24
25
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1              A P P E A R A N C E S (Continued)

 2

 3    ALSO PRESENT:

 4            LISA AIKEN

 5            ADAM BOYER

 6            NATHAN ATKINSON

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

736

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1                        I N D E X

2

3

4    WITNESS:           DIRECT   CROSS   REDIRECT   RECROSS   VOIR

5    M. Buckingham       751      792      818

6    J. Dumont           822      880      900

7    W. Shemanski        907      969     1010

8    J. Meyers          1016     1056     1063

9    M. Whinnery        1067     1067

10

11

12   EXHIBITS                MARKED         ADMITTED

13   Joint

14   JX-3                     1149           1150

15   JX-6                      932            932

16   JX-11                    1047           1049

17   JX-55                    1146           1147

18   JX-61                     753            754

19   JX-62                     754            755

20   JX-106                   1093           1094

21

22   Plaintiff

23   PLX-2                    1090           1092

24   PLX-4                     960           1163

25   PLX-20                   1024           1025
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

737

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

| | EXHIBITS | MARKED | ADMITTED |
|---|---|---|---|
| 1 | | I N D E X (Continued) | |
| 2 | | | |
| 3 | EXHIBITS | MARKED | ADMITTED |
| 4 | Plaintiff | | |
| 5 | PLX-21 | 1026 | 1027 |
| 6 | PLX-22 | 828 | 830 |
| 7 | PLX-23 | 921 | 922 |
| 8 | PLX-24 | 912 | -- |
| 9 | PLX-25 | 835 | 836 |
| 10 | PLX-26 | 839 | 839 |
| 11 | PLX-27 | 840 | 841 |
| 12 | PLX-28 | 846 | 846 |
| 13 | PLX-29 | 850 | 850 |
| 14 | PLX-30 | 852 | 853 |
| 15 | PLX-31 | 860 | 860 |
| 16 | PLX-32 | 863 | 864 |
| 17 | PLX-33 | 865 | 865 |
| 18 | PLX-34 | 869 | 870 |
| 19 | PLX-35 | 872 | 872 |
| 20 | PLX-36 | 873 | 874 |
| 21 | | | |
| 22 | | | |
| 23 | Defendant | | |
| 24 | DX-14 | 926 | 927 |
| 25 | | | |

738

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1                P R O C E E D I N G S
 2                    (8:32 a.m.)
 3   COURT CRIER:
 4   All rise.  United States Court of
 5     Federal Claims is now in session.  Stephen Schwartz
 6     presiding.
 7   JUDGE:
 8   Please be seated.  Here for the third
 9     day of trial in Aitken versus United States Number
10     19-520C.
11   Counsel, please identify yourselves.
12   ATTORNEY ELKIN:
13   Good morning, Your Honor.  Molly Elkin,
14     with the Plaintiffs.
15   ATTORNEY BLOCK:
16   Good morning, Your Honor.  Sarah Block,
17     for the Plaintiffs.
18   JUDGE:
19   Government?
20   ATTORNEY VALLACHER:
21   Good morning, Your Honor.  Bret
22     Vallacher on behalf of the United States.
23   MR. BOYER:
24   Good morning, Your Honor.  Adam Boyer,
25     on behalf of the United States.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1   ATTORNEY KERR:
 2   Good morning, Your Honor.  David Kerr on
 3     behalf of the United States.
 4   ATTORNEY MOORE:
 5   Good morning, Your Honor.  Josh Moore,
 6     on behalf of the United States.
 7   MR. ATKINSON:
 8   Good morning.  Nathan Atkinson, on
 9     behalf of the United States.
10   JUDGE:
11   All right.  Now, this is still a sealed
12     proceeding.  Let's just make sure everybody in the
13     room is party, party representative, witness today, et
14     cetera.
15   Confirm?
16   ATTORNEY ELKIN:
17   I would say yes, Your Honor.
18   ATTORNEY VALLACHER:
19   Yes, Your Honor.
20   JUDGE:
21   Very good.  All right.  Any housekeeping
22     we ought to talk about this morning before we get into
23     presentation of evidence?
24   ATTORNEY ELKIN:
25   None from the Plaintiff.
```

740

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY VALLACHER:
2    None from Defendant.
3    JUDGE:
4    Okay.  I have one question, which is
5      that I understand that later today we'll be hearing
6      from Mr. Whinnery.
7    Is that right, Ms. Elkin?
8    ATTORNEY ELKIN:
9    We hope to do that, yes.
10   JUDGE:
11   Okay.
12   So Mr. Whinnery is one of the
13     Government's former 30(b)(6) designees.
14   Right?
15   ATTORNEY ELKIN:
16   That's correct.
17   JUDGE:
18   Like Ms. Juenger.  Are we --- from the
19     Government's side --- well, I guess, are we from the
20     Government's side going to be expecting more
21     objections to her ability to testify --- to his
22     ability to testify along the lines of the objections
23     we got for Ms. Juenger?
24   ATTORNEY VALLACHER:
25   Just within the confines of Rule 602,

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Your Honor, personal knowledge.  And he was Captain.
 2    So I think he at least had a lot of it back when he
 3    was Captain a few years back.
 4  JUDGE:
 5  Okay.  Well, let's try to streamline
 6    this a little bit, because I thought that the
 7    objections with Ms. Juenger were a little bit
 8    disruptive and not well taken.  My understanding,
 9    having looked into it a bit is that, you know, the 36
10    designation process is a process at the deposition
11    phase.  And so someone who can come here and testify
12    at trial is a different kind of ballgame.  But at the
13    same time, the person ought to be testifying to what
14    the person knows and what the person knows now ought
15    to be coextensive with what the person knew at the
16    30(b)(6) deposition.
17  And if the person testifies to something
18    more or less that what he or she knew at the
19    deposition, he or she can be impeached with the
20    transcript of the deposition to those.  So most of
21    those objections to personal or personal knowledge
22    ought to go away.  A person can testify to what he or
23    she knows.
24  ATTORNEY VALLACHER:
25  Yes, but it depends on the form of a
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    question.  I think when she says has BOP, the Bureau
2    of Prisons, done X, Y, Z, he can only speak to the
3    portions of it that he knows, which, yes, could
4    include what he knew when he was prepped back in
5    September of 2020.  But you know, he has been retired
6    for multiple years at this point.
7    JUDGE:
8    Well, so he can testify to what he
9    knows.  So --- okay.  So he's not --- so what you're
10   saying is that he wouldn't --- is that because he was
11   designated back then, he's been retired, he might not
12   know about things that happened later.
13   Is that what you're saying?
14   ATTORNEY VALLACHER:
15   That's right.
16   JUDGE:
17   Okay.
18   Ms. Elkin?
19   ATTORNEY ELKIN:
20   Your Honor, I believe that the rule ---
21   they designated him as a 30(b)(6).  They could have
22   designated anybody to testify on behalf of the United
23   States.  They designated him.  He didn't actually need
24   to have personal knowledge of anything.  They needed
25   to educate him on what the rules were, what the posts
```

743

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    were, whatever's in my deposition notes.

2    JUDGE:

3    Right.  He --- that's how a 30(b)(6)

4      deposition works.

5    ATTORNEY ELKIN:

6    Right.

7    JUDGE:

8    You don't need to designate someone with

9      personal knowledge of the facts to begin with.  You

10     designate someone who you educate on what the

11     organization knows.

12   ATTORNEY ELKIN:

13   And then at trial, that --- he

14     deposition --- that's the testimony of the corporation

15     or the United States.

16   JUDGE:

17   Right.  I follow you as far as his

18     testimony at the time of the deposition.  But I mean,

19     doesn't it kind of make sense that he --- that if he's

20     retired, he's not accountable for what the Government

21     might have learned after he --- after his retirement

22     or is there, do you have authority --- is there some

23     kind of continuing obligation to educate

24     30(b)(6)designees on everything that happens later?

25   ATTORNEY ELKIN:

744

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1      I think that's a good question, Your
2         Honor.  And I do believe that at least through
3         September 10th, 2020 or back when he testified, that's
4         the testimony of the United States.  He was the mouth
5         of the United States and through his mouth became all
6         of the answers to the questions on behalf of the
7         United States.  After 2020, to the extent he knows, he
8         can testify with respect to, I think, his personal
9         knowledge.  And if he doesn't know, then, you know,
10        that's where we leave it.
11     JUDGE:
12     Okay.
13     And for things that happened ---
14        happened later obviously, you don't necessarily need
15        to rely on Mr. Whinnery.  You've got Captain ---
16        you've got other witnesses.  You've got Captain
17        O'Kane.
18     ATTORNEY ELKIN:
19     Captain O'Kane will be testifying for
20        the Government, yes, and our witness is going to be
21        testifying about what has been happening since 2020.
22        So yes.
23     JUDGE:
24     Okay.
25     Does that kind of settle things in a way

745

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    that'll make it easier for us to clarify what he's
2    saying and what its significance is when ---?
3    ATTORNEY VALLACHER:
4    For the most part, Your Honor.
5    JUDGE:
6    Okay.
7    ATTORNEY VALLACHER:
8    So I understand that Rule 32A does allow
9      them to use the deposition to impeach Mr. Whinnery at
10     trial.  And I just wanted to be clear that at trial,
11     he's not speaking as the Bureau of Prisons.  And the
12     case on the point would be Brazos River Authority v.
13     GE Ionics, which is a Fifth Circuit case from 2006;
14     469 F.3d 416.
15   JUDGE:
16   I'm sorry.  Could you give me that
17     citation again?
18   ATTORNEY VALLACHER:
19   Yes.  So I actually have a number of
20     them here, but that one was 469 F.3d 416.  And then
21     the other case on point is Union Pump versus
22     Centrifugal Tech, which is 404 Fed. Appx 899.  And
23     that one says a corporate representative may not
24     testify to matters outside his personal knowledge to
25     the extent that information is hearsay not falling

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    within one of the authorized exceptions.  So you know,
2    there is a portion to which when you inform a 30(b)(6)
3    deponent that they are kind of regurgitating
4    information that you prepared for them.  So that
5    doesn't mean that everything he said was within his
6    personal knowledge as understood in Rule 602.
7    JUDGE:
8    Ms. Elkin, I know you haven't had a
9      chance to review these cases.
10   ATTORNEY ELKIN:
11   Yes.  And there are other cases, as
12     there always are.  Weatherford Tech Holdings, LLC
13     versus Tesco Corporations, E.D. Tex. 2018 ---.
14   JUDGE:
15   Oh ---.
16   ATTORNEY ELKIN:
17   Sorry.
18   JUDGE:
19   Okay.  2018.
20   ATTORNEY ELKIN:
21   U.S. District Court Texas 21-80-67 ---.
22   JUDGE:
23   Weatherford versus Tesco?
24   ATTORNEY ELKIN:
25   Eastern District of Texas.  And it's the
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1     --- Mr. Meeks' deposition testimony was given while he

2     was employed by Tesco and designated as a 30(b)(6)

3     representative.  Tesco is bound to those answers and

4     to that testimony.  Fairness requires that as the

5     matters within the topics of Mr. Meeks' 30(b)(6)

6     testimony, Mr. Meeks is to be considered Tesco's

7     30(b)(6) witness at the time of trial.

8   JUDGE:

9   Okay.

10  So that actually is a separate issue

11    that I suggested that we reserve back on Monday, on

12    the view that we can --- we can streamline the

13    question of a person --- of each witness's ability to

14    testify about personal knowledge and so forth.

15  But the question of whether the

16    testimony binds the organization is potentially a more

17    complicated issue with like you say, authorities on

18    both sides and can be resolved at the pretrial brief.

19    So I think that --- I think that I can --- that we can

20    streamline the question of Mr. Whinnery's ability to

21    testify and the knowledge he needs to have in order to

22    testify, while letting it remain agnostic for now on

23    the question of whether and how he's binding the

24    Government.

25  ATTORNEY ELKIN:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    Okay.

2    JUDGE:

3    Is that all right?

4    ATTORNEY ELKIN:

5    That's all right.  Sort of I buried the

6        lead on this case.  It does say that FRE602's personal

7        knowledge acquired shall not apply to those topics

8        addressed at his 30(b)(6) deposition.

9    ATTORNEY VALLACHER:

10   And Your Honor ---.

11   JUDGE:

12   Okay.  Yeah.  Which we know.

13   ATTORNEY ELKIN:

14   Okay.

15   JUDGE:

16   Which I know, which I don't think we're

17       even arguing about.  Because everybody knows, at least

18       at the point where it gets to his deposition, he's

19       testifying both from personal knowledge and from being

20       educated to the point where he can speak on behalf of

21       the organization itself.

22   ATTORNEY VALLACHER:

23   That's right.  Except to the extent

24       there is --- you know, I will point out that the U.S.

25       District Court of Texas is under the Fifth Circuit.

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      To the extent there is a disagreement between the two

2      authorities, the Fifth Circuit a hundred percent

3      prevails.

4    JUDGE:

5    Yeah.  Fifth Circuit clerk, I get that.

6    ATTORNEY VALLACHER:

7    Yes, Your Honor.

8    JUDGE:

9    Okay.

10   ATTORNEY VALLACHER:

11   But so, you know, those --- there is

12     that case law that talks about some of what a 30(b)(6)

13     is prepared on to speak about could technically be

14     hearsay, because it's not something that the

15     individual personally observed or experienced.

16   JUDGE:

17   Yes, yes.

18   ATTORNEY VALLACHER:

19   Okay.

20   JUDGE:

21   Yes.  I don't think anybody's

22     disagreeing about that.  In fact, I think that's what

23     --- I think Ms. Elkin would strongly agree with that.

24     Okay.

25   ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                                                    3/15/2023

```
 1    Okay.
 2    JUDGE:
 3    Okay.
 4    I hope we're in a better position to do
 5      a streamlined hearing when Mr. Whinnery comes today,
 6      you know, issues that come up and we'll address them
 7      when they come up.  But I wanted us to be singing more
 8      from the same page than we were on Monday.
 9    ATTORNEY VALLACHER:
10    Understood, Your Honor.
11    JUDGE:
12    Anything else to talk about?
13    ATTORNEY ELKIN:
14    Not from the Plaintiffs, Your Honor.
15    JUDGE:
16    Okay.
17    Plaintiffs, you can call your next
18      witness.
19    ATTORNEY ELKIN:
20    Plaintiffs call Michael Buckingham.
21    JUDGE:
22    Raise your right hand.
23                        ---
24                 MICHAEL BUCKINGHAM,
25    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1      HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

2      FOLLOWS:

3                          ---

4      JUDGE:

5      Have a seat.  Counsel?

6                          ---

7                     DIRECT EXAMINATION

8                          ---

9      BY ATTORNEY BLOCK:

10     Q. Okay.

11     Good morning.

12     A. Good morning.

13     Q. Can you state your full name for the record?

14     A. Michael Ray Buckingham.

15     Q. And are you currently employed by the Bureau of

16     Prisons?

17     A. Yes, I am.

18     Q. And are you employed at FCI Otisville?

19     A. Yes.

20     Q. How long have you been assigned to work at FCI

21     Otisville?

22     A. Since May of 2016.

23     Q. Is that when you began employment with the

24     Bureau?

25     A. Yes.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. And what is your current position?
 2      A. Correctional Systems Officer.
 3      Q. And when did you obtain that title?
 4      A. Roughly May of 2020.
 5      Q. And is that a Correctional Officer position?
 6      A. No.
 7      Q. And before May 2020, what was your job title at
 8      FCI Otisville?
 9      A. I was hired as a Correction Officer and then I
10      went to Senior Officer.
11      Q. And so were you a Correctional Officer from May
12      2015 to May 2020?
13      A. Yes.
14      Q. Has the Bureau of Prisons given you any training
15      on your job duties as a Correctional Officer?
16      A. Yes.
17      Q. Okay.
18   And I should say, would you agree today to limit
19      your testimony to the time that you worked as a
20      Correctional Officer at Otisville?
21      A. Yes.
22      Q. And what training have you be given on your job
23      duties?
24      A. We have the two weeks initial training before we
25      go on shift.  We also go to Glynco for an additional
```

753

Trial

Kathy Aitken, et al. v. USA                      3/15/2023

1    training phase.  I also was part of the disturbance
2    control team, which we did training.
3    Q. And based on all of your training and experience
4    as a Correctional Officer, what is the most important
5    job duty of a Correctional Officer at FCI Otisville?
6    A. Security and safety of everything.
7    Q. And does your security and safety job duty
8    require you to maintain any particular state of mind?
9    A. Yes.
10   Q. And what is that?
11   A. Just having a clear mind, being vigilant.
12   Q. All right.
13   I'm going to have you to turn to one of the green
14   binders in front of you, to look at tab 61.  And let
15   me know when you have that in front of you.
16   A. Yes, ma'am.
17   ATTORNEY BLOCK:
18   Do you recognize this document that's
19   marked JX-61?
20                         ---
21   (Whereupon, Joint Exhibit JX-61,
22   Buckingham Assignment Card 2016 - 2019,
23   was marked for identification.)
24                         ---
25   THE WITNESS:

754

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    I do, yes.
2     BY ATTORNEY BLOCK:
3     Q. And what is it?
4     A. It's my daily roster.
5     Q. And is it --- does it appear to be an accurate
6     list of the posts and shifts that you've been assigned
7     to each day from May 1st, 2016 until October 8th,
8     2019?
9     A. Yes.
10   ATTORNEY BLOCK:
11   Move to admit JX-61 into evidence.
12   ATTORNEY VALLACHER:
13   No objection, Your Honor.
14   JUDGE:
15   Admitted.
16                         ---
17   (Whereupon, Joint Exhibit JX-61,
18   Buckingham Assignment Card 2016 - 2019,
19   was admitted.)
20                         ---
21   ATTORNEY BLOCK:
22   And I would direct you to kindly flip to
23    the next tab, which is 62.
24                         ---
25   (Whereupon, Joint Exhibit JX-62,

755

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    Buckingham Assignment Card 2019 - 2022,

2    was marked for identification.)

3                                ---

4

5    BY ATTORNEY BLOCK:

6    Q. Do you recognize this document?

7    A. You said 62?

8    Q. Yes.

9    A. This appears to be my daily roster again.

10   Q. Okay.

11   And is this a --- does this appear to be an

12     accurate list of the posts and shifts that you've been

13     assigned to each day at FCI Otisville from

14     October 9th, 2019 through February 15th, 2022?

15   A. Yes.

16   ATTORNEY BLOCK:

17   And I move to admit JX-62.

18   ATTORNEY VALLACHER:

19   No objection, Your Honor.

20   JUDGE:

21   Admitted.

22                                ---

23   (Whereupon, Joint Exhibit JX-62,

24   Buckingham Assignment Card 2019 - 2022,

25   was admitted.)

756

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                              ---
 2    BY ATTORNEY BLOCK:
 3    Q. Is the most important job duty of safety and
 4    security that you just mentioned, is that the same on
 5    all of the custody posts to which you've been assigned
 6    at FCI Otisville on your time as a Correctional
 7    Officer?
 8    A. Yes, ma'am.
 9    Q. And at what location in the institution do you
10    start carrying out that job duty?
11    A. At the front door.
12    Q. And based on all of your experience and training,
13    at what point in your day are you on duty?
14    A. On duty?  At the front door.
15    Q. And at what point in the day do you stop
16    performing your safety and security duties?
17    A. When you exit the front door.
18    Q. Is that also when you are off duty?
19    A. Yes, ma'am.
20    Q. And are you expected to perform this job duty
21    even if inmates are present in your line of sight?
22    A. Yes.
23    Q. And do you perform that job duty regardless of
24    whether inmates are present?
25    A. Yes.
```

757

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Do you perform this job duty before and after
2    your scheduled shift if you are inside the
3    institution?
4    A. Yes, ma'am.
5    Q. And when are you subject to institution rules?
6    A. When you're inside the front gate.
7    Q. And does that include time outside of your
8    scheduled shift hours?
9    A. Yes.
10   Q. And when are you subject to orders of a
11   Lieutenant, or Captain or anyone of your chain of
12   command?
13   A. Any time you're in the facility.
14   Q. And does that include time prior to and after
15   your shift?
16   A. Yes.
17   Q. For any of the 24-hour posts, custody posts at
18   issue in this case, where do you have to be physically
19   at the start of your scheduled shift?
20   A. On post.
21   Q. Do you carry equipment on 24-hour custody posts?
22   A. Yes.
23   Q. And do you need to have all of that equipment
24   with you or on your person at the start of the
25   scheduled shift?

758

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes.
2      Q. And do you wear a uniform as a Correctional
3      Officer?
4      A. Yes.
5      Q. And when are you expected to be in uniform?
6      A. When you walk in the front door.
7      Q. Does that include time when you're walking to
8      your job post?
9      A. Yes.
10     Q. And since April of 2016 or May of 2016, when you
11     started at Otisville, have you been assigned to work
12     the 24-hour housing unit on all three shifts, morning
13     watch, day watch and evening watch?
14     A. Yes.
15     Q. And have you been assigned to work ▇▇▇▇ on
16     evening watch?
17     A. Yes.
18     Q. And have you worked in the Special Housing Unit
19     number one post on the morning watch?
20     A. Yes, I believe so.
21     Q. And have you worked in the Special Housing Unit
22     two post when it was a 24-hour post on evening watch?
23     Did you say yes?
24     A. Yes.
25     Q. All right.

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    And you worked Compound 1 on evening watch?
2    A. Yes.
3    Q. And for Control 1 on morning watch and evening
4    watch?
5    A. Yes.
6    Q. And so for purposes of your testimony, can you
7    agree to limit your answers to your experience the
8    times that you've been assigned to the posts I just
9    asked you about unless I specifically ask you about a
10   different post?
11   A. Yes.
12   Q. And do you wear a duty belt as a Correctional
13   Officer?
14   A. Yes.
15   Q. In your experience, do all Correctional Officers
16   who work custody posts wear duty belts?
17   A. Yes.
18   Q. And are you aware of any Correctional Officer at
19   FCI Otisville who does not use a duty belt when
20   working a custody post?
21   A. No.
22   Q. And why do you wear a duty belt?
23   A. To secure our equipment.  It's important to keep
24   the equipment secure at all times.
25   Q. Would you mind speaking up a little bit?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                           3/15/2023

```
1    A. Yes.  I'm sorry.
2    Q. The microphone's not working and it's hard to
3    hear.
4    A. Yes, no problem.
5    Q. Thanks.  Would you be able to safety and
6    effectively perform your safety and security duties
7    that you described earlier without wearing the duty
8    belt?
9    A. No.
10   Q. Why not?
11   A. Just for example, the keys.  The keys have to be
12   secure.  If we drop the keys, then that right there
13   could be a safety concern.
14   Q. Did the Bureau of Prisons give you an allowance
15   to purchase a duty belt?
16   A. They gave us a clothing allowance, yes.  So you
17   could purchase that with that.
18   Q. And did you use that to purchase a duty belt?
19   A. I can't say right offhand, but I would say yes
20   because it was part of my uniform allowance, but yes.
21   Q. And when you arrived in the front lobby for a
22   shift, do you have your duty belt with you?
23   A. Yes.
24   Q. And what is attached to the duty belt at that
25   time?
```

761

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      A. We have our key keepers, which hold the chits
 2      that we have.  Also our ████████████.  On mine, I
 3      have a glove pouch and a handcuff holder.
 4      Q. And what equipment do you typically --- do you
 5      obtain the equipment that you put into those holsters
 6      when you're on post?
 7      A. On any post you're saying or just ---?
 8      Q. On the 24-hour custody post.
 9      A. Oh, when you get to the housing unit.  If you're
10      working the housing unit side, you'll obtain it there.
11      Q. Okay.
12  And what equipment do you obtain on that, when
13      you get to the post?
14      A. ███████████████████████████ also.
15      Q. ██████████████████████████
16      A. ████████████████
17      Q. ████████████████████████
18      A. ██████
19      Q. And is there other equipment available to be used
20      on post by Correctional Officers that is maintained on
21      post?
22      A. Yes.
23      Q. And what are some of the examples of that?
24      A. We have ████████████████████████.
25      ██████████████████████████. ████████████████
```

762

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ████████████████████████████████████████████

2    █████████████    █████████████████████████████████

3    ████████████████████

4    Q. And if you needed to use one of these items when

5    you were on a post, what would you do to obtain the

6    equipment?

7    A. ███████████████████████████████████████████

8    ███████████████████████████████████████████████

9    ███████████████

10   Q. ████████████████████████████████████████

11   ████████████████████████████████████████

12   A. Yes.

13   Q. ██████████████████████████

14   A. Yes.

15   Q. All Correctional Officers assigned to a post

16   inside the institution must clear a security screening

17   site in the front lobby to enter.

18   Right?

19   A. Yes.

20   Q. Is that true of the ████████████████

21   A. Yes.

22   Q. And if you're assigned to a 24-hour custody post

23   in the main FCI on evening watch, approximately what

24   time frame is the clearing in the metal detector on

25   the post?

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1      A. Clearing the metal detector, so on evening watch,
 2      I would show up roughly at 35.  So it would take me
 3      two or three minutes to clear the metal detector to
 4      get to the A1 sally port door.
 5      Q. That two to three minute add time --- where do
 6      you put on your duty belt?
 7      A. In the lobby --- in the A1 lobby.
 8      Q. And why do you put it on in the lobby?
 9      A. Just to secure everything that's on your person
10      in case you have to respond to something, you know
11      everything's secure.
12      Q. Okay.
13  And could you wear your duty belt through the
14      metal detector?
15      A. No.
16      Q. Why not?
17      A. The metal on the belt would set off the metal
18      detector.
19      Q. And so the --- and what do you do once you put
20      your duty belt on?
21      A. Then you would be ready to enter the institution.
22      Q. And so does that --- do you watch A1 sally port?
23      A. Yeah.  That would be right --- there's a table
24      and then you go right to the sally port.
25      Q. Does the two to three minutes you just mentioned,
```

764

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     is that the time for when you clear the screening site
2     until you're at A1 sally port?
3     A. Yes.
4     Q. And it includes putting your duty belt on?  Are
5     there typically other Correctional Officers assigned
6     to your shift going through the screening process at
7     about the same time as you?
8     A. Yes.
9     Q. And are there ever supervisors in the front lobby
10    while you're screening?
11    A. Yes.
12    Q. Do they ever conduct ID checks?
13    A. Yes.
14    Q. And have any of the Lieutenants or supervisors
15    that are in the front lobby while you're screening,
16    can they ever instructed you to wait until the start
17    of your scheduled shift to proceed?
18    A. No.
19    Q. And have they ever instructed you not to put your
20    duty belt on in the A1 lobby?
21    A. No.
22    Q. And have they ever stopped you from putting it on
23    there?
24    A. No.
25    Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    So once you get to the A1 sally port, you're
2    working a 24-hour post, what do you do next?
3    A. You'll have to get through the A1 sally port.
4    Once you're in the sally port, you'll have to flip
5    your accountability chit and then you'll go through
6    the second door to the sally port.
7    Q. And what does flipping a chit signify?
8    A. That signifies you're either in or outside of the
9    facility.
10   Q. You may have said this, but just in case.
11   After clearing the A1 sally port, where do you
12   walk next?
13   A. You walk through a sidewalk towards the control
14   center sally port.
15   Q. If you're working a 24-hour post, do you need to
16   stop to the control center for anything?
17   A. You don't have to, no.
18   Q. And is there another sally port at the end to get
19   onto the compound?
20   A. Yes, the compound sally port.
21   Q. And approximately how long does it take you on
22   average to clear the A1 sally port, walk on the
23   sidewalk through the admin building and to clear the
24   compound sally port?
25   A. ███████████████████████████

766

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1   Q. And after you are onto the compound you're
2   working your post, the housing unit, SHU or compound,
3   where do you go next?
4   A. From the compound sally port?
5   Q. Yes.
6   A. You would make your way down the compound.  I
7   would stop by the Lieutenant's Office quick, and then
8   you can make your way to your respective unit.
9   Q. And why would you stop at Lieutenant's Office?
10  A. To check in.  Also we have mailboxes in there.
11  You can check your mailbox.
12  Q. And when you were stopping in the Lieutenant's
13  office, is it typically prior to the start of your
14  scheduled shift?
15  A. Yes.
16  Q. And is it --- do you talk to the Lieutenant while
17  you're in there?
18  A. Sometimes.
19  Q. And have they ever told you, you should not be in
20  there because it's before your scheduled shift start
21  time?
22  A. No.
23  Q. And are you doing anything while you're walking
24  to your post across the compound?
25  A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. And what are you doing?
 2      A. Just observing, making sure everything is in good
 3      order, there's no inmates that aren't supposed to be
 4      out, nothing on the fence line.  Just being observant.
 5      Q. And when you are --- do you do that even if there
 6      are no inmates present?
 7      A. Yes.
 8      Q. And when you're coming on for an evening watch
 9      shift, are there inmates --- are there typically
10      inmates present?
11      A. There can be, yes.
12      Q. And do you ever interact with them when you're
13      walking to post?
14      A. Yes.
15      Q. And what --- give me some examples of those types
16      of interactions.
17      A. On evening watch, most likely it would be the
18      recall.  So we'll maybe stop people, pat them down,
19      or, you know, behavior, address things, things like
20      that.
21      Q. Have you ever patted down an inmate on your way
22      to a post?
23      A. Yes.
24      Q. And how often do you interact with inmates,
25      address behavior or something like that?
```

Trial

Kathy Aitken, et al. v. USA                           3/15/2023

1       A. I would say at least once a week roughly.
2       Q. And why is it important to correct inmate
3       behavior and corrections?
4       A. Because if you don't correct it, they'll just
5       continue the negative behavior.
6       Q. Is that one of your job duties as a Correctional
7       Officer?
8       A. Yes.
9       Q. Are you expected by the agency, Bureau of
10      Prisons, to do the things you just mentioned, interact
11      with inmates, being observant, looking for anything
12      out of the ordinary on your walk to a post?
13      A. Yes.
14      Q. And has a supervisor ever instructed you not to
15      do any of these things on a walk to your post?
16      A. No.
17      Q. And are you expected to do these things on a walk
18      from your post as well?
19      A. Yes.
20      Q. And has a supervisor ever instructed you not to
21      do these things on your way out?
22      A. No.
23      Q. When is a Correctional Officer assigned to a
24      24-hour post allowed to leave their post?
25      A. Once they are relieved.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. And what does that --- have you heard the term
 2      proper relief?
 3      A. Yes.
 4      Q. And what does it mean to be properly relieved on
 5      a 24-hour post?
 6      A. The whole pass-on procedure is complete.
 7      Everything is accounted for.  All information is
 8      passed on.
 9      Q. So we'll come back to that in a minute.
10   When you were working a 24-hour housing unit,
11      let's start there.  After walking across the compound,
12      come to the compound control center sally port, on
13      average, what time is it when you are arriving at the
14      entrance to a housing unit for evening watch shift?
15      A. It could be anywhere between 40 and 45-ish,
16      somewhere in there.
17      Q. So for evening watch, would that be ███████
18      A. ████████████    correct.
19      Q. Okay.
20   And once you head to the door, what do you do
21      next?
22      A. You have to wait at the door until the relieving
23      officer would come let you in.  And then once you're
24      in, you proceed to the inner office.
25      Q. And then do you relieve the outgoing officer?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes.

2      Q. And you mentioned that as part of that proper

3      relief, you do a verbal pass-on information exchange?

4      A. Correct.

5      Q. What type of information do you discuss?

6      A. At the pass-on?

7      Q. Yes.

8      A. Anything that happened during the day.  Maybe if

9      one of your keys get broken.  Maybe there's equipment

10     that's malfunctioning.  Maybe you had an issue with an

11     inmate.  It could be anything.

12     Q. And is it important to you as a Correctional

13     Officer to have that information right when you arrive

14     at the post?

15     A. Yes.

16     Q. And why is that?

17     A. So the evening watch, the inmates are locked

18     down.  So if they give you information about a certain

19     inmate, maybe they had an argument, when they come

20     out, you need that information to be ready in case

21     there's a fight, in case --- anything can happen.

22     Q. █████████████████████████████████████████████

23     █████████████████████████████

24     A. Yes.

25     Q. And are you always able to check ████████ at

771
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1     right when you arrive on post?

2     A. No.

3     Q. And why not?

4     A. Sometimes you go right into calendar.  Sometimes

5     the computer's slow.  Sometimes the computer's not

6     working.

7     Q. And you mentioned when you go through control

8     post, you obtain the ██████████████████████,

9     the ████████

10    Is that what you said?

11    A. Yes.

12    Q. And do you take those items one at a time?

13    A. Yes.

14    Q. Why do you do that?

15    A. Just to make sure they are functioning correctly.

16    You're not missing any part of it.  It's not damaged.

17    Q. And so do you inspect the equipment as part of

18    your transfer?

19    A. Yes.

20    Q. Do you do that while the outgoing officer is

21    still there?

22    A. Yes.

23    Q. And why do you do that?

24    A. For the fact that if something is broken, maybe

25    they have the reason, maybe they have the information

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    to give you, or while they're still there, you can
 2    figure out the issue, basically who's accountable,
 3    why, and what you have to do with it.
 4    Q. And as a part of your relief process, do you
 5    inspect the other equipment that is in the cage and on
 6    post?
 7    A. Yes.
 8    Q. And do you do that while the outgoing officer is
 9    still there as well?
10    A. Yes.
11    Q. And why do you do that?
12    A. For accountability purposes.
13    Q. Is accountability of equipment important at
14    Otisville?
15    A. Yes.
16    Q. Why?
17    A. Well, if something's missing, say your ████
18    missing.  That could be a weapon.  So it's very
19    important, the accountability.  A lot of our tools can
20    be turned into weapons.
21    Q. And on a job position housing unit 24 hours,
22    about how long on average does the information and
23    equipment exchange inventory take?
24    A. The whole pass-on?
25    Q. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

```
 1      A. Like ██████████████████████, let's say.
 2      Q. And turn to the end of your shift when you're
 3   working a 24-hour housing unit post, do you get
 4   relief?  Does someone relieve you?
 5      A. Yes.
 6      Q. And do you go through the same relief process
 7   that you did at the beginning of your shift at the end
 8   of your shift?
 9      A. Yes.
10      Q. Just you're now the outgoing officer.
11   Right?
12      A. Correct.
13      Q. And so do you undergo that same information
14   equipment exchange?
15      A. Yes.
16      Q. Does it take about the same amount of time?
17      A. Yes.
18      Q. And what --- you're working the evening watch.
19   About what time are you typically able to meet the
20   housing unit to start heading back to the sally port?
21      A. I would say anywhere --- 50, 45 to 50.
22      Q. And you need to walk out across the compound to
23   get back to the sally port?
24      A. Yes.
25      Q. And as you're walking back across the compound in
```

774

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1       the other direction, do you do the same thing that you
2       were doing when you arrived to your post?
3       A. Yes.
4       Q. And you're working evening watch, about what time
5       is it typically when you're exiting the A1 sally port
6       and heading to the front lobby?
7       A. Heading out the front door, you're saying?
8       Q. Yes.
9       A. Roughly like 55 to maybe right on time, right at
10      ████████.
11      Q. Okay.
12  And have your practices been consistent since at
13      least April 2016 when you have worked at the post
14      housing unit 24 hours?
15      A. Yes.
16      Q. And when you work these 24-hour housing unit
17      posts, have you ever been paid for the additional 10
18      to 20 minutes of regular overtime you're on duty on
19      that post?
20      A. No.
21      Q. And based on your experience, would it be
22      possible for either --- would it be possible for you
23      to arrive at the institution and begin screening,
24      going through the screening process right at the start
25      of your scheduled shift and timely relieve the other

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      officer on the shift?
 2      A. No.
 3      Q. Why not?
 4      A. It's not possible to be on your post if you show
 5      up at the time you're supposed to be at your post.
 6      Q. Okay.
 7   I believe I misspoke based on the times that you
 8      gave.  So you say you typically begin screening in the
 9      lobby at ████ , ████ .
10   Is that correct?
11      A. Correct, yes.
12      Q. You are typically exiting the A1 sally port about
13      ████████████ ?
14      A. Yes, correct.
15      Q. Okay.
16   So let me re-ask this question, because I think
17      my math was wrong.  When you work at A-Side Housing
18      Unit post, have you ever been paid for the additional
19      20 to 30 minutes of regular occurring time that you
20      are entering the institution?
21      A. No.
22      Q. Now let's talk about the Special Housing Unit.
23      How, if at all, is the process of getting to the
24      Special Housing Unit any different from the process
25      you just described for getting into a Regular Housing
```

776

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1      Unit on evening watch?
2      A. It's not.  It just has a sally port to get into.
3      There's not really a difference.
4      Q. And do you arrive and begin screening at about
5      the same time?
6      A. Yes.  Same time, correct.
7      Q. And about how long on average does a walk from
8      the compound sally port to the outer door SHU take?
9      A. Like ████████████████████, I would say.
10     Q. And when you arrive to SHU, do you relieve
11     another officer?
12     A. Yes.
13     Q. And you just answered this, but how do you get
14     into the Special Housing Unit?
15     A. There's another sally port.  You have to hit a
16     buzzer on the outside.  It has to be verified through
17     control center.  Once that's verified, they buzz you
18     in.  You stand in the sally port and then they'll
19     verify you at that door, the Control 1 Officer or the,
20     I'm sorry, the SHU 1 Officer, with your ID.  And as
21     long as everything checks out, you'll be in.
22     Q. And do you ever perform any information equipment
23     exchange in the Special Housing Unit like you do in
24     the Regular Housing Unit?
25     A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1     Q. How, if at all, is it different?
2     A. There's a little more equipment, a little more
3     information, but basically the same --- the same
4     concept.
5     Q. And about how long does that equipment and
6     information exchange take in the SHU?
7     A. It takes about ████████████████████
8     Q. And at the end of your shift in SHU you're
9     working on a 24-hour evening post, does someone come
10    and relieve you?
11    A. Yes.
12    Q. And do you engage in the same information and
13    equipment exchange that you did when you came onto the
14    post when you're being relieved?
15    A. Yes.
16    Q. And does it take about the same amount of time?
17    A. Yes.
18    Q. If you're working a post in SHU, approximately
19    what time is it when you're entering the sally port
20    and heading --- the SHU in sally --- the A1 sally port
21    back to the front lobby?
22    A. Can you repeat that, please?
23    Q. Yes.
24    Well, actually I'm going to ask a different
25    question.  When you leave --- after you're relieved in
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    the Special Housing Unit, do you have to walk across

2    the compound back to the control lobby?

3    A. Yes.

4    Q. And are you doing the same thing when you're

5    walking back from your post as you were doing to your

6    post?

7    A. Yes.

8    Q. And about what time is it typically when you are

9    leaving the Special Housing Unit, you're stepping up

10   onto the compound to head back to the sally port?

11   A. Once you've been relieved?

12   Q. Yes.

13   A. Again, probably between 45 and 50.  About the

14   same as the Housing Unit.

15   Q. And is it then about the same time when you're

16   finishing the A1 sally port back into the front lobby?

17   So you have 55 to on the hour?

18   A. Pretty close, yeah.

19   Q. And have your practices been consistent since at

20   least April 2015 when you've worked a 24-hour post in

21   the Special Housing Unit?

22   A. Yes.

23   Q. And so working SHU in a 24-hour post, have you

24   ever been paid for the additional 20 to 30 minutes of

25   regular and recurring on-duty time?

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1     A. No.

2     Q. And let's talk about compound post.

3   So up until the point when you were through the

4     compound control center sally port, are your practices

5     the same when you go to a compound post as they were

6     from what you described go to a Housing Unit or SHU?

7     A. Yes.

8     Q. Are the times about the same?

9     A. Yeah, I would say.

10    Q. Okay.

11  And so once you are on the compound, where do you

12    go for a compound evening watch shift?

13    A. For the relief, it'll be at our side gate, which

14    is the Compound Office.

15    Q. And do you do the same thing when you're walking

16    to the compound post as you, when you were walking to

17    a housing unit or SHU?

18    A. Yes.

19    Q. And what time is it typically when you're

20    arriving at the side gate?

21    A. Side gate, it's almost like going to the housing

22    unit.  So I'd say it could take like ███████████,

23    upwards of █████ depending on the situation of

24    course, but ---.

25    Q. Oh.  So it would take you between ██████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                          3/15/2023

1          ████████  to get to the side gate?

2     A. Yes.   Correct.

3     Q. And is there anything different about the relief

4     process on a compound post from what you described for

5     a housing unit and SHU?

6     A. No.

7     Q. Do you also do equipment exchange inventory and

8     information exchange?

9     A. Yes.

10    Q. Does compound have more or less equipment than a

11    housing unit?

12    A. More.

13    Q. Are there more ████████

14    A. More ██████ correct.

15    Q. And about how long on average does the relief

16    process, the equipment exchange and information

17    exchange take on a compound post?

18    A. About ██████████████.

19    Q. And if you're working a 24-hour compound post, is

20    someone coming to relieve you at the end of the shift?

21    A. Yes.

22    Q. And do you undergo that same information

23    equipment exchange at the end of your shift?

24    A. Yes.

25    Q. Does it take approximately the same amount of

781

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    time?

2    A. Yes.

3    Q. And on average what time is it when you're

4    typically leaving the side gate to start heading back

5    to the sally port?

6    A. About the same as it was, 45, 50 walking out.  In

7    between there.

8    Q. And do you do the same thing while walking across

9    the compound on your way towards the sally port as you

10   were doing when you were walking towards the front

11   gate?

12   A. Yes.

13   Q. And approximately what time is it typically when

14   you're leaving a compound post and you're exiting the

15   A1 sally port back to the front lobby?

16   A. On the evening watch, about 55 to on time.  It's

17   about 55 to ---.

18   Q. Okay.

19   So about the same as ---?

20   A. About the same, yeah.  They're all about the

21   same.

22   Q. And have your practices been consistent since at

23   least April 2016 or May 2016 since you worked at

24   Otisville every time you've worked a 24-hour post in a

25   compound?

782

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    A. Yes.

2    Q. And so when you worked a 24-hour compound post,

3    on an average day, have you ever been paid for the

4    regular and recurring on-duty time you described

5    between 20 and 30 minutes above eight hours?

6    A. No.

7    Q. Now let's talk about the ██████.

8  Do you wear the same duty belts for ██████ that

9    you wear for a post in FCI?

10   A. Yes.

11   Q. And where do you typically put on your duty belt

12   when you're working the ██████

13   A. In the lobby.

14   Q. The ████████ lobby?

15   A. Yes, correct.

16   Q. Can you describe the process of getting to the

17   post in the ████████

18   A. Yeah. ███████████████████    ██████████ ,

19   ████████████    ████████████████████ .

20   █████████████████████████    ████████

21   ████████████████████████████

22   ███    ███████████████████████

23   ████████████████████████ .

24   ████████████████████████

25   ████████████████    ████████████

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       ██████████ .
2       Q. ██████████████████████████████
3       ██████████████████████████████
4       ████████████████████
5       A. ████████████████████████████████
6       ██████      And like I said, I'd show up about 30, 35
7       into the FCI.
8       Q. About what time is it typically when you're ---?
9       A. So████████████████████████
10      ████████████████████████████████████
11      ██████████████ .
12      Q. Okay.
13      And about what time is it typically when you are
14      arriving to the --- actually, let me ask this first.
15      What is the post location for the ████████  ██████
16      ██████████
17      A. ██████████████████████████
18      Q. So about what time is it when you are typically
19      arriving to the ████████████  to being relieved?
20      A. ██████████████████████████████████
21      ██████████████████ .
22      Q. And do you do an information and equipment
23      exchange on that post as well?
24      A. Yes.
25      Q. How, if at all, is it any different than what you

784

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1        described for a housing unit?

2        A. It's not.

3        Q. Is it the same equipment?

4        A. Yes, for the most part.

5        Q. Do you discuss the same types of information that

6        you discussed in the housing unit?

7        A. Yes.

8        Q. And how long does the information and equipment

9        exchange typically take in the ███████?

10       A. Same as a regular unit, about ██████ to ████

11       minutes.

12       Q. And do you also exchange the ████████████████

13       ██████

14       A. Yes.

15       Q. At the end of your shift when you're working as a

16       ████████officer, does someone come to relieve you?

17       A. Yes.

18       Q. And do you do the same type of information and

19       equipment exchange that you did upon arriving at the

20       post?

21       A. Yes.

22       Q. Does it take approximately the same amount of

23       time?

24       A. Yes.

25       Q. When you are leaving the ██████ post, do you take

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    anything with you?
 2    A. The ████████████.
 3    Q. And do you return that to the ████████████?
 4    A. Yes, yes.
 5    Q. And approximately what time is it typically when
 6    you're working a ██████ post and you're ████████████
 7    ████
 8    A. I think between 45 and 50, I would say.
 9    Q. And when you're working as a ████████████, have
10    you ever been paid for any additional --- it's really
11    10 to 20 minutes of regular and recurring on-duty time
12    on that post?
13    A. No.
14    Q. Okay.
15    Now, let's talk about the control center.  So you
16    worked at the control center.
17    Right?
18    A. Yes.
19    Q. And have you worked as Control 1?
20    A. Yes.
21    Q. How do you get into the control center?
22    A. It has its own sally port.  Once you're in the
23    main facility, there's the control sally port, and
24    then we have our own sally port to get into the
25    control center.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. When you work post Control 1, do you arrive at

2      the same --- to screen about the same time as you had

3      described for the other posting sites?

4      A. Yes.

5      Q. Thirty (30) to 35?

6      A. Yes, correct.

7      Q. Okay.

8   And about what time is it typically when you are

9      at the control center ---?

10     A. I would say about 35 ---.

11     Q. And do you also do a relief exchange process at

12     Control 1?

13     A. Yes.

14     Q. How is that --- how, if at all, is it different

15     than what you described at the other posts?

16     A. Control 1's more extensive.  There's a lot more

17     paperwork.  There's a lot more information to pass on,

18     head counts, fences.  There's a lot more activity

19     going on in the control center.

20     Q. And do you do an equipment inventory as well?

21     A. Yes.

22     Q. And so when you're working at Control 1, about

23     how long on average does the exchange process of

24     equipment information take?

25     A. On average, it could take ■■■ minutes or it

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      could be upwards of I want to say you could even take
 2      ███ minutes.  So ████████████████, somewhere in
 3      that range.
 4      Q. Okay.
 5   At the end of your shift, you're working as
 6      Control 1, do you get relieved?
 7      A. Yes.
 8      Q. And do you undergo the same information and
 9      equipment inventory exchange that you just described
10      for those prior posts?
11      A. Yes.
12      Q. And does it take approximately the same amount of
13      time?
14      A. Yes.
15      Q. And so what time is it typically when you are
16      able to leave the control center to start heading down
17      towards the A1 sally port?
18      A. Once relieved, you're saying?
19      Q. Yes, once you've been relieved.
20      A. Again, depend on when you relief gets there.  But
21      45, 50, typically.
22      Q. And approximately what time would it be when
23      you're exiting the A1 sally port?
24      A. Between 50, 50, 55, somewhere in there.
25      Q. And have your practices been consistent since
```

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    you've worked at FCI Otisville every time you worked

2    the post?

3    A. Yes.

4    Q. And when you work Control 1, have you ever been

5    paid for that additional 20 to 25 minutes of regular

6    occurring on-duty time above 8 hours?

7    A. No.

8    Q. Have you ever been disciplined or reprimanded for

9    arriving for the start of your scheduled shift to make

10   early exchange on any of the posts that we've

11   discussed today?

12   A. No.

13   Q. Are there cameras at FCI Otisville?

14   A. Yes.

15   Q. ████████████████████████████████████████

16   ████████████████████████?

17   A. Yes.

18   Q. And when you're in the control center, are you

19   able to monitor, at least what the cameras monitored?

20   A. Yes.

21   Q. ████████████████████████████████████

22   ████████████████████████████████████████

23   ████████████

24   A. ████

25   Q. ████████████████████████████████████████

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ██████████████████?

2    A. Right offhand, probably --- ██████ is when I

3    started working in there.  At least from 2017.  And I

4    stopped working in control about when I got hired as

5    monitoring staff.  So I would say in that range, █

6    ████████████████████████████████████████████

7    Q. Okay.

8    ████████████████████████████

9    A. ██████████████████████████. ████████████████

10   ██████. ███████████████████████████████████

11   ██████████████.

12   Q. And was it common knowledge among Correctional

13   Officers that ████████████████████████████████

14   ██████████

15   A. Yes.

16   Q. And what impact, if any, did █████████████████

17   ██████████████████████████ have on your

18   state of mind while you were walking to and from your

19   post across the compound?

20   A. I mean, you're kind of uneased.  That's kind of

21   our safety net.  And ██████████████████████████

22   ███████████████████████████████████████.

23   ████████████████████████████ t kind of

24   puts you at unease.

25   Q. Did it --- did this knowledge affect your level

Trial
Kathy Aitken, et al. v. USA                                      3/15/2023

```
 1     of vigilance?
 2     A. Can you repeat that?  I'm sorry.
 3     Q. Sure.
 4     Did this knowledge of the ████ affect your
 5     level of alertness and vigilance?
 6     A. I would say yes.
 7     Q. How so?
 8     A. You have to be more alert.
 9     Q. Okay.
10     Have you heard something called the freeze call?
11     A. Yes.
12     Q. What is that?
13     A. It's basically like a conference call.  Anyone
14     can do it.  Mostly it's Lieutenants.  Sometimes
15     higher-ups who disseminate information that's going on
16     in the facility.
17     Q. And is it --- when you were a Correctional
18     Officer, was it your practice to primarily work on
19     evening watch?
20     A. Yes.
21     Q. Okay.
22     And how often in your experience do freeze calls
23     actually occur on evening watch?
24     A. I would say probably no more than one or two
25     every couple weeks, maybe.
```

791

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Okay.

2    And I understand that the time may vary, but do

3      you do all the things that you discussed today,

4      putting on your duty belt, clearing the sally ports,

5      walking across the compound to your post while you

6      were being alert and vigilant, interacting with

7      inmates, and doing the on-post relief exchange, do you

8      do those things on every shift that you work in

9      24-hour custody post?

10     A. Yes.

11     Q. You mentioned the radio of the body alarm

12     earlier.

13   What is the expectation on you as a Correctional

14     Officer when you hear a body alarm?

15     A. To respond.

16     Q. And are you expected to respond to the alarm even

17     if it sounds after your scheduled shift hours?

18     A. Yes.

19     Q. And have you ever --- since --- when you were

20     working as a Correctional Officer, did you ever

21     respond to an emergency on your way to a post or after

22     you've been relieved?

23     A. Yes.

24     Q. And can you describe that?

25     A. I responded to one emergency after being

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    relieved.  I'm walking out.  You hear the body alarm.
2    You see people running.  So it's your duty to react.
3    So I responded also to the incident.
4    Q. And did you have a radio at that time?
5    A. No.
6    Q. So how did you know there was an incident?
7    A. A lot of people running.  I'd ask them, you know,
8    what's going on and would basically pass it on by
9    that.
10   Q. And if --- were you paid for the time spent
11   responding to that post shift emergency?
12   A. No.
13   Q. And is it important to respond to body alarms?
14   A. Yes.
15   Q. Why?
16   A. The safety of staff.
17   ATTORNEY BLOCK:
18   One moment.  I pass the witness.
19   JUDGE:
20   Government, any Cross?
21                        ---
22                   CROSS EXAMINATION
23                        ---
24   BY ATTORNEY VALLACHER:
25   Q. Good morning, Mr. Buckingham.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1    How are you?
 2      A. Good morning.  Good.  How are you?
 3      Q. I'm good.  So I see that you have been wearing a
 4      uniform.
 5    Is that right?
 6      A. Yes, sir.
 7      Q. Do you wear that uniform at work?
 8      A. This one particularly, no.
 9      Q. No.
10    Why not?
11      A. This is considered a Class A uniform.
12      Q. Okay.
13      A. So it's for formal occasions, special posts,
14      things like that.
15      Q. Is that a Class A uniform that applies to you in
16      your current role?
17      A. No.
18      Q. Okay.
19      A. I could wear it in my current role, but I've
20      never had to.
21      Q. I see.
22    You currently work receiving and discharge?
23      A. Yes, sir.
24      Q. Do you have a uniform in that role?
25      A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Is that a Class B uniform?
2    A. I believe that's what it's called, Class B.
3    Q. Is that any different than the uniform that a
4    Correctional Officer would wear?
5    A. No.
6    Q. Meaning it's correct?
7    A. It's correct, yes.  Same uniform.
8    Q. And I believe on Direct you testified that you
9    were serving institutional rules at the front gate.
10   Is that right?
11   A. Yes.
12   Q. So are you vigilant as soon as you start driving
13   up the winding path to FCI Otisville?
14   A. In regards to?
15   Q. Your vigilance, are you looking around?
16   A. Yes, I am, yes.
17   Q. And you'd be looking for potential escapees?
18   A. Correct.
19   Q. And that path is two miles long?
20   A. Yeah, roughly two miles, I would say.
21   Q. Is your vigilance during that drive any different
22   than let's say in the parking lot?
23   A. I wouldn't say so, no.
24   Q. Is it any different than in the A1 lobby?
25   A. No.

795

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Is it any different than in the sidewalk between
2      the A1 building and the control building?
3      A. No.
4      Q. Is it any different in the control lobby?
5      A. No.
6      Q. Okay.
7   So the vigilance level doesn't really change, I
8      assume, until you get on the compound?
9      A. No.  I think it stays pretty much the same all
10     the way through, just being alert.
11     Q. And speaking of the front lobby, the front lobby
12     officer does not log or report people from coming in
13     early or late.
14  Correct?
15     A. No.  No, sir.  That's correct.
16     Q. And Correctional Officers are generally trusted
17     to do the right thing?
18     A. Yes, sir.
19     Q. And that would include showing up to their shift
20     on time?
21     A. Yes, sir.
22     Q. And in the A1 lobby, you are not in possession of
23     your keys or equipment.
24  Correct?
25     A. Correct.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. And on Direct you testified that you wear a duty
 2      belt.
 3    Is that right?
 4      A. Correct.
 5      Q. And that you put it on in the A1 lobby?
 6      A. Correct.
 7      Q. And you also testified that you wouldn't be able
 8      to safely and effectively pursue your primary duty of
 9      safety and security without one.
10    Is that right?
11      A. Yes, correct.
12      Q. Okay.
13    But isn't it true that when you work at Control 1
14      post, you do not put on your duty belt ---
15      A. Correct.
16      Q. --- in the A1 lobby?
17      A. Yes.
18      Q. So is it the case that you do not perform Control
19      1 safely and effectively?
20      A. No.
21      Q. Or is it the case that Control 1 does not perform
22      the same primary duty of safety and security?
23      A. No.
24      Q. Which is it?
25      A. Control 1 is not required to wear the duty belt
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

797

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

```
 1      in the function of control.  That's what I would say.
 2      Q. So when you're working Control 1, ---
 3      A. Yes.
 4      Q. --- you would be able to safely and effectively
 5      perform your duties ---
 6      A. Without the belt you say?
 7      Q. --- without the belt?
 8      A. Correct.
 9      Q. Okay.
10   And that's because Control 1 has different
11      activities than the other posts?
12      A. Just because Control 1 isn't required to have ██
13      ████████████ .  ██████████████████████████████████
14      ███████████████ , because there are certain sections in
15      control where all these sit.  So you wouldn't need the
16      belt.
17      Q. I see.  Okay.
18   And Control 1 doesn't have ███████ on their person.
19   Is that what you said?
20      A. Yes, correct.
21      Q. █████████████████████████████████████████████████
22   █████████████████████████████████████████████████████
23   ███████████████████████████████████ .
24   Right?
25      A. Well, we have ███████ that we do use in control.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023



```
 1   ████████████████████████████  ████
 2   ████████████████████████████████████
 3   █████████████████████  ██████████████
 4   ██████████████████.
 5   Q. Right.
 6   And so control has that ███████████████
 7   ████  ---
 8   A. Correct.
 9   Q. ---  ██████████████
10   Right?
11   A. Yeah.
12   Q. And that ███  ████████████████.
13   Right?
14   A. I believe so.
15   Q. So it's only really to get to post and to leave a
16   post.
17   Right?
18   A. I would say.
19   Q. ████████████████████████
20   ████████████████████████████████.
21   A. No.
22   Q. Right?
23   A. No.
24   Q. █████████████████
25   A. ███████████████
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. And that's because you wouldn't be interacting,
2     you know, person to person with an inmate while you're
3     in control?
4     A. Not directly, no.
5     Q. And so you further testified that you need to put
6     on your belt in the A1 lobby because you need to
7     respond to emergencies?
8     A. You would have to, yes.
9     Q. So if you're on your way to Control 1 and there
10    were an emergency, would you not respond to it?
11    A. No, you would.
12    Q. Okay.
13  So could it just be the case that when you're
14    working a post where you eventually have to attach
15    your belt, because you have to have keys with two
16    points, that you might as well put it on when you're
17    in the front lobby?
18    A. It just makes everything easier to secure it to
19    your body, basically.
20    Q. Yeah.  It makes total sense.  So you also
21    testified about stopping by the Lieutenant's Office
22    before your shift.
23    A. Correct.
24    Q. When you're there, you're essentially just
25    checking in with the Lieutenant.

800

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Right?

2        A. Yes, sir.

3        Q. And stopping by the Lieutenant's Office is not

4    the only way to make your presence known with the

5    Lieutenant?

6        A. That's correct.

7        Q. And 95 percent of the time that you go there to

8    get mail there's nothing in the mailboxes?

9        A. Correct.

10       Q. And you're not even sure if they currently still

11   do mailboxes.

12   Right?

13       A. That is correct.  I'm not sure.

14       Q. And that's because memo rewrites and incident

15   reports rewrites cannot be sent by email?

16       A. No, they could.

17       Q. They can?

18       A. They can.

19       Q. And if you were a shift on a housing unit and you

20   knew there was an incident report, you could ask the

21   Compound Officer to bring it to you.

22   Correct?

23       A. That's correct.

24       Q. And in your deposition and today, you were asked

25   about activities performed by officers when they're on

801

Trial

Kathy Aitken, et al. v. USA                                   3/15/2023

1     a housing unit or SHU, Control, Compound.
2     Is that right?
3         A. Yes.
4         Q. You would still be able to do the activities of
5     those posts if you did not stop by the Lieutenant's
6     Office to check the mail.
7     Correct?
8         A. Yes.
9         Q. And you would still be able to do those
10    activities if you did not check in with the Lieutenant
11    in person?
12        A. Yes.
13        Q. So on Direct you also discussed interacting with
14    inmates.
15    Do you remember that?
16        A. Yes.
17        Q. So you're currently a Correctional Systems
18    Officer.
19    Right?
20        A. That's correct.
21        Q. And that's not a Correctional Officer?
22        A. No.
23        Q. That's in charge of --- you're in charge of
24    receiving and discharge?
25        A. Correct.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1        Q. So that's inmates basically coming in and out of
2        the institution?
3        A. Yes.
4        Q. And the typical amount of time when you do stuff
5        to speed --- and in that role, radio activity is quite
6        a bit.
7     Right?
8        A. Yes.
9        Q. The R and D role?
10       A. Yes.
11       Q. And the typical amount of time when you stop to
12       speak with the inmates on a compound is about ███
13       ███████
14       A. Yes, correct.
15       Q. And if it were longer, you would just tell them,
16       hey, come see me at a later time?
17       A. Yes, in an open house or in times we have a
18       little extra time.
19       Q. And before when you were a Correctional Officer,
20       you would stop to answer questions maybe once a week?
21       A. Yeah, about that.
22       Q. And now in your current role, I'd argue it's
23       actually more frequent?
24       A. More of it, yes.
25       Q. In fact, now in R and D, it's actually almost

803

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1     every time you're on the compound because they have
2     questions about your ---?
3     A. Yes, correct.
4     Q. And you're aware of what the Unit Team is?
5     A. Yes.
6     Q. Does that consist of Counselors, Case Managers,
7     and Unit Secretaries?
8     A. Yes.
9     Q. And the Unit Team are a separate hired position
10    from Correctional Officers.
11 Correct?
12    A. Correct.
13    Q. And yet the Unit Team are on the units.  So they
14    engage in direct supervision from, like the Unit
15    Officers.
16 Right?
17    A. Correct.
18    Q. And they also answer questions for inmates?
19    A. Yes.
20    Q. In fact, everyone does.
21 Right?
22    A. Yes, everyone can.
23    Q. And depending on the question, you'll try to
24    point inmates to the right direction?
25    A. Uh-huh (yes).  To the right person, yes.
```

804
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. And that includes Food Services?

2     A. Yes.

3     Q. Psychologists?

4     A. Yes.

5     Q. Education?

6     A. Yes, all staff.

7     Q. And the Unit Team also has a ██████████████████?

8     A. Yes.

9     Q. So you also quoted some walk-in times on Direct.

10    A. Yes.

11    Q. At the time of your deposition, you had never

12    timed walking to the housing unit with your watch.

13   Is that correct?

14    A. That's correct.

15    Q. Since your deposition was taken, have you

16    actually done so before today?

17    A. No.

18    Q. Including today, I should say.

19    A. Yeah, including today.

20    Q. So one Control 1, you said the exchange takes

21    about ██████████████?

22    A. Yes.  It could take that long.

23    Q. Are you aware that FCI Otisville has cameras

24    throughout the institution?

25    A. Yes.

805

Trial

Kathy Aitken, et al. v. USA                                            3/15/2023

1       Q. And are you aware that we reviewed them for the

2       purposes of this trial?

3       A. Yes.

4       Q. Would it surprise you to learn that when you were

5       Control 1, the total time between your walking into

6       the control center and the time the officer that

7       you're relieving walks out varied from ███████████

8       ████████████████████████████?

9       A. It would surprise me, especially while were in

10      the SHU.

11      Q. Okay.

12  Especially the ███████████████?

13      A. Yes.

14      Q. ██████████████  would not surprise you?

15      A. I mean, █████  --- it's almost ██████   So it could

16      --- the █████  minute could be.

17      Q. Okay.

18  So is it fair to say that you did not use a stop

19      watch to control ---?

20      A. Oh, yeah.  No.  Absolutely didn't.

21      Q. That would be fair to say?

22      A. That would be fair to say.

23      Q. On Direct you testified that you give the, quote,

24      key to get out, unquote, to the person that you're

25      relieving?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     A. For control center?

2     Q. For ███████?

3     A. Yes, yes.

4     Q. And is that called something like a hallway key

5     or anything, do you know?

6     A. I don't know if they call it by anything, but

7     it's basically the sally port.  It could be a hallway

8     key.

9     Q. Okay.

10    A. It could be.

11    Q. Okay.

12    And you were also asked about exchanges at SHU

13    and housing?

14    A. Yes.

15    Q. ████████████████████████████████████████

16    ███████████████████████████████████████████?

17    A. Yes.  Yes, there was.

18    Q. And when you're doing the exchange, the time it

19    takes to receive information during the exchange

20    varies, does it not?

21    A. It does.

22    Q. And it variance depends on the amount of

23    information that needs to be passed on?

24    A. Yes.

25    Q. And that amount of information depends on how the

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      day was and what was going on?
 2      A. Uh-huh (yes).  Correct.
 3      Q. ████████████████████████████████████████
 4      ████████████████████████████████████
 5      A. Yes, sir.
 6      Q. What's this --- ████████████████████████
 7      ███████████████████████████████████████████?
 8      A. Yes. ██████████████████████████. ███████████
 9      ███████████████████ ---
10      Q. Okay.
11      A. --- ████████ ████████████████████████████
12      ██████████████████████.
13      Q. Okay.
14      █████████████████████████████████████████████
15      ████████████████████████?
16      A. █████████████████████.
17      Q. Okay.
18      Did you ever verify the common knowledge?
19      A. In regards to ---?
20      Q. Well, you worked the control post, did you not?
21      A. Yes.
22      Q. ██████████████████████████████████
23      ████████████████████████████████████████
24      ██████████████████████████████████
25      A. Verified as in with a person or with the
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    actual ---?
 2    Q. ███████████████████████████
 3    A. Yes. ████████████████████
 4    Q. Okay.
 5    A. ██████████████████████████
 6    ████████████████████████████████
 7    ██████████████
 8    Q. Okay.
 9    ████████████
10    A. ███████████    correct.
11    Q. How many ████████ you said?
12    A. Total?
13    Q. That ---.
14    A. ███████████████████████████
15    █████████████
16    Q. Both.
17    A. ████████████████. ████████████
18    ███████████████████████████████████
19    ███████████████████████████████████
20    ███████████████
21    Q. Okay.
22    But you wouldn't ---.
23    A. I wouldn't know --- no, not an exact number, no.
24    Q. Okay.
25    A. Not right offhand.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1      Q. You were asked about whether you were paid for
2      responding to a post-shift emergency.
3   Do you recall that?
4      A. Correct, yes.
5      Q. Isn't it true that you've never put in an
6      overtime request that was denied?
7      A. Yes.
8      Q. So it's safe to say that you did not put in an
9      overtime request for that incident?
10      A. For that incident, I know I couldn't verify it,
11      but it's safe to say that I didn't, yes.
12      Q. That you did not?
13      A. That I did not, yes.
14      Q. Okay.
15   And you worked as a hospital officer.
16   Correct?
17      A. Correct.  Yes, sir.
18      Q. I'd like to turn your attention to DX-46, which I
19      believe has already been admitted.  I think it's in a
20      blue binder.
21      A. You said JX or DX?
22      Q. DX.
23      A. Oh, DX.  I'm sorry.
24      Q. Are you at DX-46?
25      A. DX-46, correct.  Outside hospital?
```

810
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       Q. Yes.

2       A. Yes.

3       Q. Did you recognize this document?

4       A. Yes, sir.

5       Q. What is it?

6       A. This is the post orders for outside hospital, it

7       looks like.

8       Q. Okay.

9     And an outside hospital officer is a Correctional

10      Officer post?

11      A. It can be manned by non-correctional.

12      Q. Okay.

13      A. And it does.  So I can't say --- it's not 100

14      percent, but it is --- it's hard to say.

15      Q. So you say it could be manned by non-custody ---?

16      A. Yes, correct.  If you're certified to do it, yes,

17      you can do it.

18      Q. Okay.

19     It's on the housing unit.

20     Right?

21      A. Yes, correct.

22      Q. And these are the control, ---?

23      A. Yes.

24      Q. --- compound?

25      A. Yes.

811
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. █████?
2      A. Yes.
3      Q. Okay.
4      SHU?
5      A. SHU, correct.
6      Q. Okay.
7      So it's a post just like the others.
8      Right?
9      A. Yes, yes.
10     Q. Okay.
11     And the Outside Hospital Officer supervises the
12     inmate at the hospital?
13     A. Yes.
14     Q. And there's no █████ in the hospital?
15     A. No, sir.
16     Q. And because there's no █████ in the hospital,
17     you would agree it's important to pass along pertinent
18     information to the Outside Hospital Officer relieving
19     you.
20     Correct?
21     A. Yes, yes.  Correct.
22     Q. And on a typical day, I think you said that it
23     took █████████ to get relieved as a hospital
24     officer?
25     A. Yeah.  Roughly, yes.

812

Trial

Kathy Aitken, et al. v. USA                                   3/15/2023

1       Q. And the amount, that amount of time varies as
2       well?
3       A. Yes, of course.
4       Q. And on that post, you had a firearm?
5       A. Yes.
6       Q. Bullet and a magazine ---
7       A. Yes.
8       Q. --- in the firearm?  And after that firearm and
9       equipment is secure, you'll update your relief.
10      Right?
11      A. With the pass-on information, you're saying?
12      Q. Yes.  It's a hospital, but yes.
13      A. Yes.
14      Q. And that could include a status update like the
15      inmate was restless?
16      A. Yes.
17      Q. Or you had contact with a Lieutenant to put
18      restraints on the inmate?
19      A. Correct.
20      Q. And those would just be examples ---
21      A. Yeah, just examples.
22      Q. --- of many of the things that you could have
23      discussed?
24      A. Correct.
25      Q. And you get pretty detailed with that status

813
Trial
Kathy Aitken, et al. v. USA                                3/15/2023

1    update.
2    Correct?
3        A. Yes.
4        Q. And then you check the restraints to make sure
5        the inmate is secured to his bed.
6        A. Uh-huh (yes).  Correct.
7        Q. And you look over at the log book and you make
8        sure the inmate is secure before leaving.
9    Right?
10       A. Yes.
11       Q. And that's important because there are fewer
12       lines of security at the hospital than there would be
13       at Otisville.
14   Right?
15       A. Correct.
16       Q. And there --- for example, there's no bars?
17       A. Correct.
18       Q. No gates?  And there's open, unlocked doors at
19       the hospital as well?
20       A. Correct.
21       Q. And so when you're performing that exchange --- I
22       direct your attention to the ██████████ for outside
23       hospital.
24       A. ██████████
25       Q. Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

814

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     A. Yes.

2     Q. You see there it says at the end of tour of duty,

3        you will be relieved by the daylight officers, pass on

4        any pertinent information and equipment you may have

5        in your possession, assist in checking the inmate's

6        restraints.

7     Do you see that?

8     A. Yes, correct.

9     Q. And that's what you're performing as you get

10       relieved from the outside hospital.

11    Correct?

12    A. Correct.

13    Q. Okay.

14    We're done with that exhibit.  You can put it

15       away.

16    So you also worked control from 2017 through

17       2020?

18    A. Roughly, yes.  Sorry.

19    Q. And in your experience during those years, the

20       only reason officers working 24-hour posts would stop

21       by control on the way to the post is to check the

22       roster?

23    A. Yes, the daily roster.

24    Q. And they're not picking up equipment?

25    A. No.

815

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Okay.

2   And Control 2 functions as the back-up to Control

3   1?

4    A. You could call it that, yes.

5    Q. And Control 2 is handing out █████████  ████

6   ████████

7   Is that right?

8    A. Correct.

9    Q. And they're also accounting for things going in

10   and out.

11   A. Correct, █████████

12   Q. Okay.  Okay.

13   So housing officers conduct a medical count.

14   Right?

15   A. Yes.

16   Q. And that's where they go to the cell and verify

17   the name and the number and make sure the inmates are

18   where they're supposed to be?

19   A. Correct.

20   Q. And the firearm security check is also performed

21   by housing officers?

22   A. Correct.

23   Q. And that requires more than just a visual

24   inspection.

25   Correct?

816

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1        A. Yes.
 2        Q. And an area search also entails a physical
 3     inspection?
 4        A. Correct.  Correct.
 5        Q. And an area search is performed by a Housing Unit
 6     Officer as well?
 7        A. Yes.
 8        Q. And a SHU Officer and Housing Unit Officer do a
 9     lot of the same activities?
10        A. I would say yes.
11        Q. That would include counts, rounds, searches and
12     bar taps?
13        A. Yes.
14        Q. And SHU Officers also trans-frisk inmates.
15     Is that right?
16        A. Yes.
17        Q. And trans-frisking is using a small handheld
18     metal detector?
19        A. Correct, any time the inmate leaves the cell.
20        Q. Okay.
21     And they also --- SHU officers also feed inmates?
22        A. Yes.
23        Q. And escort inmates to showers?
24        A. Yes.
25        Q. And provide them one hour of recreation?
```

817

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      A. Yes.

2      Q. And provide them a phone call?

3      A. Yes.

4      Q. And conduct cell rotations?

5      A. Correct.

6      Q. And escort them to haircuts?

7      A. Yes.

8      Q. And escort them to the law library?

9      A. Yes.

10     Q. And strip search them on relief?

11     A. Yes.

12     Q. Do weekly book carts, where they'd have to bring

13     books around to the inmates?

14     A. Uh-huh (yes).

15     Q. And do a linen exchange, where they exchange

16     blankets, sheets, and bedrolls?

17     A. Yes.

18     Q. And provide the inmates with cleaning equipment

19     and cleaning supplies?

20     A. Yes.

21     Q. And provide inmates with disposable razors for

22     shower days and keep account for that?

23     A. Yes.

24     Q. And SHU-1 also deals with a lot of paperwork?

25     A. Correct.

818

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1       Q. And it includes, you know, relief packets and
2       discharge of inmates?
3       A. Yes.
4       Q. Do you do any of that on your walk to post?
5       A. Just besides observing, no.
6       Q. And a compound officer just seeing contraband
7       without collecting it or reporting it would not be
8       performing his job correctly?
9       A. Correct.
10      Q. And just seeing the contraband without acting
11      would actually be a failure to report?
12      A. Correct.
13      Q. And in fact, a compound officer's searches also
14      require physical inspection, not just visual?
15      A. Correct.
16      ATTORNEY VALLACHER:
17      Okay.  No further questions.
18      JUDGE:
19      Any Redirect?
20                          ---
21                    REDIRECT EXAMINATION
22                          ---
23      BY ATTORNEY BLOCK:
24      Q. You've been testifying today you refer to coming
25      into the front gate.  Is that the front gate of the

Trial

Kathy Aitken, et al. v. USA                                          3/15/2023

```
1    building or is that something else ---?
2    A. The front of the facility.  The A1 lobby,
3    basically.
4    Q. If you put your duty belt on in the lobby and you
5    had to respond to an emergency, would your hands be
6    free in that situation?
7    A. No.
8    Q. When you're at the emergency and your belt is on,
9    would your hands ---?
10   A. Yes.  We would be able to respond.
11   Q. Okay.
12   A. Sorry.
13   Q. Do you sign overtime slips as a Correctional
14   Officer?
15   A. Yes.
16   Q. Is that --- do you do that in the Lieutenant's
17   Office?
18   A. Yes.
19   Q. Is that one of the things you might do on your
20   way to your post prior to the start of your scheduled
21   shift?
22   A. Yes.
23   Q. In your current position in R and D, is that a
24   relief position?
25   A. No, it isn't.
```

820

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. So when you are --- you were asked some questions
2      about answering inmate questions and being on the
3      compound, in your current role by the Department.
4   Do you recall that?
5      A. Yes.
6      Q. So when you're doing that in your current
7      position, are you actually on paid time?
8      A. Usually, yes, I would say.
9      Q. Is it important to conduct a verbal pass-down
10     even on a close ---?
11     A. Yes.
12     Q. Why?
13     A. For the simple fact that there's certain
14     information, like sensitive information.  It may have
15     been entered in the computer, but we don't have access
16     to it unless they do something like we talked about
17     before the conference call, then it would be
18     disseminated then.  If there is information that you
19     can't get from the computer or you might just have a
20     hunch.  A hunch could be, hey, I think this guy is
21     having a bad day, but something not serious enough to
22     put in the computer that you might just want to pass
23     on.
24     Q. Okay.
25   And have you ever been instructed that you should

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    not be conducting a verbal pass-down on a 24-hour
 2    post?
 3    A. No.
 4    Q. Is it your practice to do a verbal pass-down
 5    every shift that you were a 24-hour post with relief?
 6    A. Yes.
 7    ATTORNEY BLOCK:
 8    Nothing further.
 9    JUDGE:
10    All right.  Mr. Buckingham, thank you
11      very much.  Have a great day.  Plaintiffs, who do you
12      have next?
13    ATTORNEY ELKIN:
14    Sorry?
15    JUDGE:
16    Who do you have next?
17    ATTORNEY ELKIN:
18    Your Honor, we have Mr. Dumont, I
19      believe is here now, but do you mind a five minute
20      comfort break?
21    JUDGE:
22    Sure.  Five minutes.  We will be back at
23      --- on that clock, five minutes to the hour.  Sounds
24      good.
25    ATTORNEY ELKIN:
```

822
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    Thank you.

2    COURT CRIER:

3    All rise.

4                            ---

5      (WHEREUPON, A SHORT BREAK WAS TAKEN.)

6                            ---

7    COURT CRIER:

8    All rise.  The United States Court of

9      Federal Claims is now in session.  Judge Stephen

10     Schwartz presiding.

11   JUDGE:

12   Please be seated.  Okay.  Who do we have

13     next?

14   ATTORNEY ELKIN:

15   Your Honor, the Plaintiffs calls Jeremy

16     Dumont.

17   JUDGE:

18   Raise your right hand.

19                            ---

20                         JEREMY DUMONT,

21     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

22     HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

23     FOLLOWS:

24                            ---

25                         DIRECT EXAMINATION

823

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                              ---
 2     BY ATTORNEY ELKIN:
 3     Q. Good morning, Mr. Dumont.
 4     A. Good morning.
 5     Q. Can you please state your full name for the
 6     record?
 7     A. Jeremy Robert Dumont.
 8     Q. Are you still employed at FCI Otisville?
 9     A. I am.  I have a duty station office at FCI
10     Otisville.  I work for the Information Technology and
11     Data Division out of Central Office in Washington,
12     D.C.
13     Q. And when did you --- you said you have an office
14     at FCI --- are you on TDY?  Is that what they call it?
15     A. No.  I'm on --- I work for Central Office, but
16     I'm telework.  But I go into an institution one day a
17     week.  If I have nowhere else to go for my job, I go
18     to Otisville, so that way I'm in an institution one
19     day a week.
20     Q. Okay.
21     When I took your deposition in September,
22     September 10th, 2020, you were the Computer Services
23     Manager at FCI Otisville.
24     Is that correct?
25     A. Yes, that is correct.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1     Q. And when did you stop being Computer Services
2     Manager at FCI Otisville?
3     A. December of 2020, I switched.
4     Q. And you switched to your current position in
5     Central Office?
6     A. Yes.
7     Q. When you were --- the entire time that you were
8     at FCI Otisville as a Computer Services Manager, did
9     you report to the Executive Assistant, to the Warden?
10    A. Yes.
11    Q. And you supervised Computer Specialists in your
12    role?
13    A. Yes.
14    Q. And your position was max custody.
15    Is that right?
16    A. Correct.
17    Q. Can you tell us about your work history with BOP
18    going, prior to you going to FCI Otisville?
19    A. Yes.  I started with the Federal Bureau of
20    Prisons in November 2013 as the HVAC Foreman at FCI
21    Ray Brook.  I moved into the role of Electronics
22    Technician at FCI Ray Brook.  In May of 2019, I went
23    down to FCI Otisville as the General Foreman in the
24    Facilities Department.  And in October of 2019, I
25    became the Computer Services Manager for FCI

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Otisville.  And then in December of 2020, I became
 2    Regional Computer Services Coordinator, working for
 3    Central Office covering the Northeast Region.
 4    Q. And I understand you were at FCI Ray Brook.
 5  Were you at FCI Ray Brook from possibly 2013
 6    until 2019?
 7    A. That is correct.
 8    Q. What is your educational background?
 9    A. I have a Master's degree.
10    Q. In what?
11    A. My Master's is in Learning and Knowledge
12    Management Systems and my Bachelor's is in Computer
13    Science with a minor in Criminal Justice.
14    Q. And you're familiar with the claims in this case.
15  Correct?
16    A. Yes.
17    Q. And you first became familiar with the Fair Labor
18    Standards Act pre-shift, post-shift claims, overtime
19    claims when you were at FCI, these types of claims,
20    when you were at FCI Ray Brook.
21  Correct?
22    A. That is correct.
23    Q. And you were a participant in an FLSA grievance
24    there seeking to be paid for pre-shift and post-shift
25    work.
```

Trial

Kathy Aitken, et al. v. USA                               3/15/2023

1    Correct?

2    ATTORNEY KERR:

3    Objection, Your Honor.  The facts of a

4      prior case in which Mr. Dumont was a Grievant or

5      received settlement from has no consequence in this

6      case.  Objection on relevance under 401.

7    JUDGE:

8    Are you going to establish the

9      relevance?

10   ATTORNEY ELKIN:

11   Yeah.  I think it's relevant.  He

12     understands what the case is about.  Everybody who was

13     in --- were you in management?  You manage

14     somebody ---.

15   JUDGE:

16   No, no, no.  You can talk to me.

17   ATTORNEY ELKIN:

18   Oh, yes.  So yes, and this is a

19     prevailing prevalent problem in the FCI institutions.

20     It actually goes to good faith.  It goes to objective

21     reasonableness.  It goes to willfulness.  All of the

22     people who are going to testify for management have

23     been FLSA grievants at some point.

24   JUDGE:

25   Okay.  The objection's overruled on

827

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    relevance.

2    BY ATTORNEY ELKIN:

3    Q. I believe your answer was yes, you participated

4    in an FLSA grievance seeking to be paid for pre-shift

5    walking and equipment exchange, and information

6    exchange, and that kind of thing when you were at FCI

7    Ray Brook.

8    Correct?

9    A. Yes.  When I was at Ray Brook, I was a union

10   member and they had me sign up for what they call a

11   portal to portal, which is what you're referring to

12   legally.

13   Q. Okay.

14   And you did receive that paycheck.

15   Correct?

16   A. Yes.

17   ATTORNEY KERR:

18   Your Honor, I object again.  Whether he

19   received a settlement has no consequence to the

20   fact ---.

21   JUDGE:

22   Overruled.  Overruled.

23   BY ATTORNEY ELKIN:

24   Q. Okay.

25   I'm going to direct your attention --- there's a

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

```
 1      binder there that has a yellow cover on it.
 2      A. Yes.
 3   ATTORNEY ELKIN:
 4   And under the object --- sorry.  Direct
 5      your attention to Plaintiff's Exhibit 22.
 6                              ---
 7   (Whereupon, Plaintiff's Exhibit PLX-22,
 8   Dumont Settlement Check, was marked for
 9   identification.)
10                              ---
11      BY ATTORNEY ELKIN:
12      Q. Behind tab 22.
13      A. The binder is bent.  Yes, I have it open now.
14      Q. Okay.
15   Do you recognize this as the check you received
16      in the amount of $363.08 on June 10th, 20 --- I think
17      it was '13 and '15, for your participation in the
18      overtime pay grievance at Ray Brook?
19      A. Yes.
20      Q. Okay.
21   And you cashed this check.
22   Correct?
23      A. Yes.
24      Q. And you would not accept money from the
25      Government that you did not believe you deserved.
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    Is that correct?

2    ATTORNEY KERR:

3    Objection, Your Honor.  That question

4       calls for a legal --- for Mr. Dumont to decide whether

5       he deserved this money, the settlement, you would have

6       to weigh under the legal merits of the case.

7    JUDGE:

8    No, no, no, no, no.  He's not.  I don't

9       think she's asking for a legal opinion.  She's asking

10      for what he would under particular circumstances.  So

11      overruled.

12   THE WITNESS:

13   At the time in 2015, I'd only been with

14      the agency about 18 months.  And at the time, from

15      what I was guided by the Union, I believed that these

16      were standard and appropriate way based on my

17      knowledge at the time.

18      BY ATTORNEY ELKIN:

19      Q. Okay.

20   So you --- again, you would agree that you would

21      not accept a check from the United States ---?

22   JUDGE:

23   Oh, incidentally, you didn't ---.

24   ATTORNEY ELKIN:

25   Oh, sorry.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    JUDGE:

2    You forgot to move it into evidence.  I

3      just lost track of that.

4    ATTORNEY ELKIN:

5    Thank you for that.  I would like to

6      move in Plaintiff's Exhibit 22 into evidence.

7    ATTORNEY KERR:

8    Same objection, Your Honor.  There's no

9      facts in this case any more or less ---.

10   JUDGE:

11   Overruled.  It's admitted.  Exhibit 22,

12     Plaintiff's Exhibit 22.

13                              ---

14   (Whereupon, Plaintiff's Exhibit PLX-22,

15   Dumont Settlement Check, was admitted.)

16                              ---

17   ATTORNEY ELKIN:

18   Your Honor, may I proceed?

19   JUDGE:

20   Yes.

21   ATTORNEY ELKIN:

22   Okay.

23     BY ATTORNEY ELKIN:

24   Q. So the question I asked was, you would not accept

25     money from the United States that you did not believe

831

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1     you deserved.

2    Correct?

3       A. Correct.

4       Q. Now, you worked in non-custody at Otisville?

5       A. That is correct.

6       Q. I'm sorry, at Ray Brook?

7       A. At Ray Brook, I was a non-custody staff member.

8       Q. Okay.

9    So your recovery, perhaps, was not as much as

10      what the Correctional Officers who were regularly

11      working the post at issue there would have received.

12    Is that your understanding?

13      A. Correct.

14      Q. Do you recall that you were designated by the

15      Government as its Rule 30(b)(6) witness to testify

16      about video cameras at FCI Otisville?  Do you recall

17      that?

18      A. Yes.

19      Q. And you agree that you were competent to testify

20      about a location and the use of cameras throughout FCI

21      Otisville.

22    Correct?

23      A. Yes.

24      Q. Yes?

25      A. Yes.

832
Trial
Kathy Aitken, et al. v. USA                                          3/15/2023

1    Q. And you also agree that you were competent to
2    testify about the purpose of cameras and videotape
3    footage recorded by the cameras at FCI Otisville.
4    Correct?
5    A. Yes.
6    Q. You also agree that you were competent to testify
7    about whether the cameras are used by the Defendant to
8    determine the hours worked for purposes of calculating
9    the Plaintiff's pay in this case.
10   Correct?
11   A. Yes.
12   Q. And you were also designated to testify about the
13   capacity of the cameras at FCI Otisville to record and
14   store video footage.
15   Correct?
16   A. Yes.
17   Q. And you were competent to testify about that?
18   A. Yes.
19   Q. When you got to FCI Otisville, I believe you
20   started there on a TDY temporary detail?
21   A. Yes.  I went down for a week temporary detail as
22   the Electronics Technician prior to transferring there
23   in May of 2019.  I went in March 2019 for one week.
24   Q. Okay.
25   ██████████████████████████████████████████

833
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    ████████████████████████████████████████
2    █████████████████████████.
3    Correct?
4    A. █████████████████████████████.
5    Q. ██████████████████████████████████████
6    ███████████████████████.
7    Is that correct?
8    A. That is correct.
9    Q. Now, ███████████████████████████████
10   ████████████████████████████████████████████
11   ██████████████████████.
12   Is that correct?
13   A. Correct.
14   Q. And so the control center officers could still
15   open --- they could see the camera view for the
16   monitor and they could open and close the sally port
17   doors.
18   Is that correct?
19   A. Correct.  It gave them a live view to monitor
20   areas they could to see through the windows.
21   Q. But other than that, ████████████████████████
22   ████████████.
23   Is that correct?
24   A. Correct.
25   Q. ██████████████████████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                3/15/2023

1    ██████████████████████████████████████.
2    Is that correct?
3        A. Correct.  That's what I was told by staff that
4        were there when I arrived.
5        Q. ██████████████████████████████████
6    ███████████████████████████████████████████
7    ██████████████████████████████████.
8    Correct?
9        A. That is correct.
10       Q. So for purposes of this case, ████████████████
11   ███████████████████████████████████
12   ███████████████████████████████████████████,
13   █████████████████████████████████████████████
14   ██████████████████████████████████████████████
15   ████████████████████.
16   Is that correct?
17       A. That is correct.
18       Q. Once you got to Otisville, what was your
19       involvement in maintaining the video footage and
20       producing the video footage for this lawsuit?
21       A. So in June of 2019, I was the general foreman.  I
22       was requested to help with saving footage by our SIS
23       Department and some other staff.  They requested that
24       I help them because of my technical experience with
25       the system.  The current Electronics Technician hadn't

835

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     been there very long.  That's why I went in March

2     because I trained him when he started.  So I was

3     assisting with the exporting of the video onto

4     external storage drives, because the system is only

5     capable of holding a short period of time and we would

6     have lost it had we not done something to start saving

7     that data at the time.  So in June, we were requested

8     to start saving whatever we had, which was back to

9     March of 2019.

10    Q. Okay.

11    I want to go over the screenshots from the video

12       footage locations that you were able to save because

13       these cameras were actually working.

14    Okay?

15    A. Yes.

16    ATTORNEY ELKIN:

17    All right.  So if you can turn still in

18       that yellow binder to tab 25.

19                         ---

20    (Whereupon, Plaintiff's Exhibit PLX-25,

21    ███████████████████████████  ██ ,

22    was marked for identification.)

23                         ---

24    BY ATTORNEY ELKIN:

25    Q. Are you there?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1      A. Yes.
2      Q. Okay.
3    And let me know what we are looking at in this
4      here.
5      A. So this is the o█████████████████████████
6    ███████████████████████████████████████
7    ███████████████   ██████████████████████████
8    ███████████████████████   ██████████████████
9    ██████████████████████████████████████████
10   ████████████████████████   █████████████████
11   ████████████████████████████████████
12   █████████████████████████████████████
13     Q. And does this picture appear to be an accurate
14     reflection of the video that would have been captured?
15     A. Yes.
16   ATTORNEY ELKIN:
17   Your Honor, I move to admit Plaintiff's
18     Exhibit 25.
19   ATTORNEY KERR:
20   No objection.
21   JUDGE:
22   It's admitted.
23                        ---
24   (Whereupon, Plaintiff's Exhibit PLX-25,
25   ████████████████████████████   ████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

837

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    was admitted.)
 2                              ---
 3    BY ATTORNEY ELKIN:
 4    Q. Okay.
 5    ████████████████████████.  ██████
 6    ████████████████████████████████
 7    ███████████████████████████████████
 8    ██████████████████████████████████
 9    █████████████████████████████████████
10    ██████
11    Is that correct?
12    A. That's correct.  After you go through the
13    screening, whatever you need to do to pass the
14    security clearances. █████████████████████████
15    ████████████████████████████████.
16    Q. And what is --- I know you can't see it here, but
17    where is the account ---?  Well, maybe you can't see
18    it here. ████████████████████████
19    ██████████████
20    A. ████████████████████████████████
21    ██████████████████  ████████████████  ████
22    ██████████████████████████████  ████████
23    █████████████████████████████████████
24    ██████████████████████████████
25    ████████████████████████.
```



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

838

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1    Q. ████████████████████████ ██

2    ██████████████████████████████

3    ██████████████

4    A. Correct.

5    Q. ████████████████████████,

6    ██████████████████████

7    A. Yes. ██████████████████

8    ███████████████████.

9    Q. And so the officers who are Plaintiffs in this

10   case would have to be buzzed in ████████████████

11   ██████████████████████████████

12   ██████████████████████████████

13   ██████████████

14   A. That is correct.

15   Q. And can we see in this picture the ████████████

16   ████████████

17   A. Very difficult, but through the bars you can kind

18   of see the bottom of the door.  It's directly across.

19   It's that brown wall that's directly across the room

20   that you can kind of see through the window.  There's

21   a door in the center that you put right to this one,

22   referred to as the ██████████████, typically.

23   ATTORNEY ELKIN:

24   All right.  Moving on to Plaintiff's

25   Exhibit 26.

839
Trial
Kathy Aitken, et al. v. USA                                              3/15/2023

```
 1                              ---
 2      (Whereupon, Plaintiff's Exhibit PLX-26,
 3      Camera Screenshot - ██████████ was marked
 4      for identification.)
 5                              ---
 6       BY ATTORNEY ELKIN:
 7       Q. Does this appear to be an accurate depiction of
 8       what was seen from the ██████████ video camera?
 9       A. Yes.
10      ATTORNEY ELKIN:
11      Your Honor, I move to admit Plaintiff's
12       Exhibit 26.
13      ATTORNEY KERR:
14      No objection, Your Honor.
15      JUDGE:
16      Admitted.
17                              ---
18      (Whereupon, Plaintiff's Exhibit PLX-26,
19      Camera Screenshot - ██████████ was
20      admitted.)
21                              ---
22       BY ATTORNEY ELKIN:
23       Q. What is this that we're looking at here?
24       A. ██████████████████████████████████████
25      ██████████████████    ██████████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                     3/15/2023

1   ██████████████████ .  ██████████  █████████

2   ██████████████████████████  █████████████████

3   ████████████████████████████  ████████████████

4   ██████████████████████████████████████████████

5   ████████████ .  █████████████████████████████ ,

6   █████████████████████████████████████████████

7   █████████  ██████████████████████████████████

8   ████████████████████████████████████

9   ATTORNEY ELKIN:

10  Okay.  Let's move on to the next one,

11    Plaintiff's Exhibit 27.

12                          ---

13  (Whereupon, Plaintiff's Exhibit PLX-27,

14  Camera Screenshot - ███████████████  was

15  marked for identification.)

16                          ---

17    BY ATTORNEY ELKIN:

18    Q. And does this appear to be an accurate depiction

19    of the view ████████████████████████████████ ?

20    A. Yes.

21  ATTORNEY ELKIN:

22  Your Honor, I move to admit Plaintiff's

23    Exhibit 27.

24  ATTORNEY KERR:

25  No objection.

841

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    JUDGE:

2    Admitted.

3                              ---

4    (Whereupon, Plaintiff's Exhibit PLX-27,

5    Camera Screenshot - ███████████ , was

6    admitted.)

7                              ---

8    BY ATTORNEY ELKIN:

9    Q. What are we looking at here?

10   A. So this is a picture ██████████████

11   ███████████ . ████████████████████████

12   ███████████████████████████████████████

13   █████████████████████ █████████████████████

14   █████████████████████████████████ ███

15   ████████████████████████████████ ██

16   ████████████████████████████████████

17   ████████████████████████████████

18   ██████████████████████████████████

19   ████████████████████ ███████████████

20   ███████████████████████████████████

21   ███████████████

22   Q. ██████████████████████████████████████

23   ██████████████████████

24   A. Yes.

25   Q. ████████████████████████████████

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1    ████████████████████████████████

2    A. ██████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████

5    █████████████████████████    ████████████████

6    ██████████████████

7    Q. ████████████████████████████████████

8    ██████████████████████

9    A. Yes.

10   Q. Did that happen while you were still at FCI

11   Otisville?

12   A. It's ---.

13   Q. You're sort of still there.

14   A. I'm still there.  It happened after I was no

15   longer an employee at Otisville.

16   Q. Okay.

17   A. But I'm aware of it, since I'm still at the

18   institution at times.

19   Q. Okay.

20   ████████████████████████████████

21   ████████████████████████████████████

22   Correct?

23   A. Correct.

24   Q. ██████████████████████████████████

25   ██████████ .

843

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Correct?

2      A. Correct.

3      Q. And you agree that Correctional Officers stop in

4      Lieutenant's Office from time to time on the way to

5      their post?

6      A. Yes.  They can use their own decision to stop and

7      get information or pick up overtime slips or whatever

8      may be needed if they need to speak to the Lieutenant

9      personally face to face.  At their discretion, they

10     can stop.

11     Q. And you've been in that area a lot of times.  So

12     you see that the officers will typically stop in to

13     check what's going on.

14   Correct?

15     A. Yes.

16     Q. Okay.

17   And you would agree that the Correctional

18     Officers stop in a Lieutenant's Office on the way to

19     or from a post, either prior to their shift or after

20     their shift, so that they can sign overtime slips.

21   Correct?

22   ATTORNEY KERR:

23   Objection, Your Honor.  It's vague as

24     far as the time frame.

25   JUDGE:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

844

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    I think she's referring to before and
2      after a shift.
3    Right?
4    ATTORNEY ELKIN:
5    Yes.
6    ATTORNEY KERR:
7    Only the time frame, what years?
8    JUDGE:
9    Could you clarify in that regard?
10     BY ATTORNEY ELKIN:
11     Q. Based on your experience, and beginning in 2019,
12     when you came to FCI Otisville, and I understand
13     you're still there sometimes, you would agree that
14     Correctional Officers stop at a Lieutenant's Office on
15     the way to their post prior to their shift, on their
16     way out of the institution after they've been relieved
17     so that they can sign overtime slips.
18   Correct?
19     A. They can at their own discretion, yeah.  It's
20     right on the main walkway.  So most of the staff going
21     to different posts would past right by this.  So it'd
22     be very easy if they wanted to versus doing it another
23     way, they could just physically stop in and sign.
24     Q. And you're not aware of any rule against them
25     stopping in to sign these overtime slips?
```

845

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. No.

2      Q. And they're required to sign overtime slips if

3      they worked overtime?

4      A. Yes.

5      Q. Or if they worked approved overtime, I should

6      say?

7      A. Yes.

8      Q. And you agree that no time is built into their

9      scheduled eight-hour shift to stop into the

10     Lieutenant's Office to sign these overtime slips or to

11     check in?

12     A. There is no time booked in to do that, but there

13     are options with digital signatures and other options

14     that are available for them to sign or get information

15     without physically stopping and signing if they'd like

16     to.

17     Q. But for overtime slips, they have to sign a paper

18     copy.

19     Correct?

20     A. They can sign it digitally for agency policy.  I

21     don't know the exact Otisville requirement on that.

22     Q. Okay.

23     So as we sit here today, you don't know whether

24     they're required to sign an actual paper copy?

25     A. I do not.

846

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:

2    Okay.  Okay.  Let's look at tab 28,

3      which is Plaintiff's Exhibit 28.

4                        ---

5    (Whereupon, Plaintiff's Exhibit PLX-28,

6    Camera Screenshot - █████████████,

7    was marked for identification.)

8                        ---

9     BY ATTORNEY ELKIN:

10     Q. Does this appear to be an accurate depiction of

11      the camera view titled ███████████████?

12     A. Yes.

13    ATTORNEY ELKIN:

14    Your Honor, I move to admit Plaintiff's

15      Exhibit 28.

16    ATTORNEY KERR:

17    No objection.

18    JUDGE:

19    Admitted.

20                        ---

21    (Whereupon, Plaintiff's Exhibit PLX-28,

22    Camera Screenshot - ████████████,

23    was admitted.)

24                        ---

25     BY ATTORNEY ELKIN:

847

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1    Q. What are we looking at here?

2    A. 

13    Q. And I should have asked you this before.  And if

14    you can flip back if you want to, to the exhibits that

15    have been admitted.  But they're all time and date

16    stamped.

17    Correct?

18    A. Correct.

19    Q. And where does that time and date stamp come

20    from?

21    A. That comes from the recording system.  When the

22    video is saved on the recorder, it is synchronized

23    with the different time that comes from the atomic

24    clock.  So those times are all set in the recording

25    system via the computer system.

848
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

    1    Q. And are they, in fact --- are cameras, in fact,
    2    synchronized?  I mean, if we're looking at the view at
    3    12:00:06 on 11/10/2019 looking at the control lobby
    4    1-271 camera, if we were looking at the ███████████
    5    ███████████████ at the exact same time, we would also
    6    have the exact same time stamp?
    7    A. Yes.  Assuming the system is functioning
    8    properly, ████████████████████████████████████████
    9    ██████████████████████████
   10    Q. Okay.
   11  Assuming the system is functioning properly.
   12  Did you do any checks when you collected the data
   13    of the videotape that you produced and submitted to
   14    the Plaintiff to ensure that the data from this video
   15    camera were, in fact, synched during the time period
   16    that you collected it?
   17    A. The log file on the server is monitored and if
   18    there were any errors, we would correct it as soon as
   19    possible.  During the time, I don't exactly recall.
   20    But if there were any errors, it usually would have
   21    only been a matter of a few hours before we noticed
   22    and would have corrected it.  I do not believe there
   23    were any errors during that time for time
   24    synchronization.  That's typically only --- once it's
   25    installed, it typically runs pretty well, unless

849

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      there's a major outage of everything.

2      Q. All right.

3  And so do you see a human there in this picture

4      in front of the ████████████

5      A. Yes.

6      Q. Okay.

7  And can you tell what is happening here?

8      A. ████████████████████████████

9  ████████████████. ████████████████████

10 ████████████████████████████

11 ████████████████.

12     Q. And who would be --- ████████████

13 ████████████ ---

14     A. Yes.

15     Q. --- at████████ ████████████████

16 ████████████    Anybody besides Correctional

17 Officers?

18     A. No one that I can think of.

19     Q. ████████████████████

20 ████████████████████████████████

21 ████████████████████████████████

22     A. Yes.

23     Q. All right.

24 Moving on to --- let me go back and you might

25     have said it already.  We cannot see the ████████

850

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ████████████████████████████████

2    Right?

3        A. No.

4    ATTORNEY ELKIN:

5    Okay.  So let's look at PLX-29.

6                                  ---

7    (Whereupon, Plaintiff's Exhibit PLX-29,

8    Camera Screenshot - ████████████████

9    was marked for identification.)

10                                 ---

11    BY ATTORNEY ELKIN:

12    Q. Does this appear to adequately depict the video

13    view from ████████████████

14    A. Yes.

15    ATTORNEY ELKIN:

16    Your Honor, I move to admit Plaintiff's

17    Exhibit 29.

18    ATTORNEY KERR:

19    No objection.

20    JUDGE:

21    Admitted.

22                                 ---

23    (Whereupon, Plaintiff's Exhibit PLX-29,

24    Camera Screenshot - ████████████████,

25    was admitted.)

851

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                          ---
 2     BY ATTORNEY ELKIN:
 3     Q. What are we looking at here?
 4     A. ████████████████████████████ ███ ,
 5     ████████████████████████████████
 6     ██████████████████████████ ██████
 7     ██████████████████████████████
 8     ██████   ███████████████████████████
 9     ██████████████████████████ ███████
10     ██████████████████████████
11     Q. So can we --- is the █████████████ under the
12     sticker that says Dumont 25?
13     A. Yes.
14     Q. And this ███████████████ that we can see in
15     this picture, is that the ██████ ---?
16     A. I always get it backwards.  So it's the ████████
17     ██████████   ██████████████████████████
18     ██████████████████
19     Q. Okay.
20       And can we see through here to the ███████
21     A. Very, very difficult. ██████████████████
22     █████████████   ███████████████████████ ,
23     █████████████████████████   █████████████
24     ████████████████████████████████
25     ██████████████ .
```



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

852

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. So was the --- and there's been testimony about
2      how the officers get in here.  The ████████████████
3      ████████████████████████████████ ---
4      A. Yes.
5      Q. --- ████████████████████████████████?
6      A. Yes.
7      Q. ██████████████████████████████████
8      ████████████████████████████████████████████████
9      ████████████████████████████████████████████████,
10     ███████████████████████████.
11     Correct?
12     ATTORNEY ELKIN:
13     All right.  Let's look at PLX-30.
14                            ---
15     (Whereupon, Plaintiff's Exhibit 30,
16     Camera Screenshot - ████████████████, was
17     marked for identification.)
18                            ---
19     BY ATTORNEY ELKIN:
20     Q. Does this appear to be an accurate depiction of
21     the ██████████████ camera?
22     A. Yes.
23     ATTORNEY ELKIN:
24     Your Honor, I move to admit PLF-30.
25     JUDGE:

853

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Counsel, any objection?

2    ATTORNEY KERR:

3    Oh, I'm sorry, Your Honor.  No

4      objection.

5    JUDGE:

6    It's admitted.

7                              ---

8    (Whereupon, Plaintiff's Exhibit PLX-30,

9    Camera Screenshot - ████████████ , was

10   admitted.)

11                             ---

12    BY ATTORNEY ELKIN:

13    Q. Okay.

14   Is this sort of the quality of the camera footage

15     that you produced?

16    A. Yes.  At the time, this was the --- ████████

17   ████████████████████████████████████████

18   ██████████   ████████████████████████████

19   ██████████████████████████████████████████

20   ███████

21    Q. And what are we looking at here?

22    A. You're looking at a ████████████ , which is ---

23   █████████████████████████████████████████.

24   ██████████████████████████████████████████

25   ████████████████████████████████   ████████████

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                            3/15/2023



1
2
3
4
5
6
7    Q. Okay.
8    And where is the ▮▮▮▮▮▮▮▮ if we can see
9    on this?
10   A. ▮▮▮▮▮▮▮▮▮▮▮▮
11
12
13
14
15
16
17
18
19   Q. Okay.
20   And you would agree that no other specific ---
21   sorry.  This is the sort of view you would see
22
23
24   A. Yes.
25

855

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ███████████████████████████████████

2    █████████████████████████████.

3    Q. And this one is specifically for ██████████

4    A. Correct.

5    Q. ██████████████████████████████

6    ████████████████████████████████████

7    ███████████████████████████

8    ATTORNEY KERR:

9    Objection.  Foundation.

10   JUDGE:

11   Yes.  Objection.  That's sustained.

12   ATTORNEY ELKIN:

13   Okay.

14   JUDGE:

15   Let's take this step by step.

16   ATTORNEY ELKIN:

17   Okay.

18    BY ATTORNEY ELKIN:

19    Q. You would agree that no other ████████████████

20   ███████████████████████████████.

21   ATTORNEY KERR:

22   Objection.

23   JUDGE:

24   Yeah, same thing.  Sustained.  Let's

25    start from the beginning.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:

2    Okay.

3     BY ATTORNEY ELKIN:

4     Q. Would there be cameras trained on the ██████

5    ████████████████████████████████████████████████████

6    ████████████

7    A. ████████████████████████████████████████████████

8    ████████████████████████████████    ████████████████████

9    ████████████████████████████████████████████████████████

10    ████████████████████    ████████████████████████████████

11    ████████████████████████████████████████████████████

12    ████████████████████████████████████

13    Q. Okay.

14    So is it fair to say that you did not, in fact,

15    produce any other --- ████████████████████████████████

16    ████████████████████████████████████████████████.

17    Correct?

18    ATTORNEY KERR:

19    Same objection.  Mr. Dumont doesn't know

20    what the Government produced.  He testified to what

21    was captured.

22    JUDGE:

23    Sustained.  Can you ask him if he knows

24    what was produced?

25    ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Okay.

2    And I can also ask him what was captured

3      and then what was ---.

4    JUDGE:

5    Right.  You have options.

6    ATTORNEY ELKIN:

7    Okay.

8    JUDGE:

9    Let's lay some foundation.

10     BY ATTORNEY ELKIN:

11   Q. █████████████████████████████████

12   █████████████████████████████████████

13   ███████████████████████████████

14   A. █████████████████  ███████████████

15   █████████████████████  ██████████

16   ████████████████████████████████

17   ██████████████████  ████████████████

18   █████████████████████████████

19   ████████  ████████████  █████████████

20   ██████████

21   Q. Would it refresh your recollection to look at

22   your deposition testimony?

23   A. It may.  At the time I may have remembered or

24   been more familiar with ████████████████████

25   ████████████████████████████.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

858

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    ATTORNEY ELKIN:

2    Okay.

3    May I approach, Your Honor?

4    ATTORNEY ELKIN:

5    Yes.

6      BY ATTORNEY ELKIN:

7      Q. When you gave your testimony, Mr. Dumont, you

8      were under oath.

9    Is that right?

10     A. Yes.

11     Q. And you told the truth.

12   Correct?

13     A. Yes.

14     Q. Okay.

15   Do you ---?

16   ATTORNEY KERR:

17   Your Honor, I thought this was a ---.

18   JUDGE:

19   Yes.

20   ATTORNEY ELKIN:

21   You're right.  I withdraw the last few

22     questions.

23   JUDGE:

24   Okay.

25     BY ATTORNEY ELKIN:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1     Q. So the page 51 of the transcript, if you look at

2     line ten.  So the question was, ███████████████

3     ██████████████████████████████████████████

4     ███████████████     ████████████████████████

5     ██████████████     ██████████████████████████████

6     And your answer was yes.  █████████████████

7     █████████████     ███████████████████████

8     ████████████████████████████████████████

9     ██████████

10    Does that refresh your recollection?

11    A. Yes.

12    Q. Okay.

13    A. And it's the same thing.  ███████████████████

14    █████████████████████████████████████████

15    █████████

16    Q. ███████████████████████████████

17    █████████████████████████████████

18    ██████████████████████████████

19    Correct?

20    A. Correct.

21    Q. ██████████████████████████████████████

22    ████████████████

23    A. Correct.

24    ATTORNEY ELKIN:

25    Okay.  Moving on, I believe, to 30 ---
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    sorry.  27, no, 31.

2                              ---

3    (Whereupon, Plaintiff's Exhibit PLX-31,

4    Camera Screenshot – ███████████ , was

5    marked for identification.)

6                              ---

7    BY ATTORNEY ELKIN:

8    Q. Does this appear to be an accurate depiction of

9    the ████████████ ?

10   A. Yes.

11   ATTORNEY ELKIN:

12   Your Honor, I move to admit Plaintiff's

13    Exhibit 31.

14   ATTORNEY KERR:

15   No objection.

16   JUDGE:

17   Admitted.

18                              ---

19   (Whereupon, Plaintiff's Exhibit PLX-31,

20   Camera Screenshot – ███████████ was

21   admitted.)

22                              ---

23   BY ATTORNEY ELKIN:

24   Q. Okay.

25   Can you describe what we are looking at here at

Trial
Kathy Aitken, et al. v. USA                                      3/15/2023



1   ██████████████████████████████████
2   ████████████████ ---?
3   A. ███████████████████████████████
4   ██████████████████ ████████████████
5   ██████████████████████████████████
6   ████████████████ █████████████████████
7   ████████████████████ █████████████████
8   ██████████████████████████████████
9   ██████████████████████████████████
10  ████████████████████ .
11  ████████████████████████████████
12  ████████████ █████████████ ████████████
13  --- █████████████████████████████
14  ██████████ █████████████████████████
15  ███████ █████████████████████
16  ██████████████████████████ █
17  ██████████████████████ █████████
18  ████████████████████████████████
19  ██████████ ████████████████████████
20  ████████████████████ ████████████████ .
21  ████████████████████████ █████████
22  ████████████████████ .
23  Q. Okay.
24  ████████████████████
25  ████████████████████████████ ?

862

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       A. Yes.

2    ATTORNEY KERR:

3    Objection.   Vague.

4    JUDGE:

5    Overruled.

6     BY ATTORNEY ELKIN:

7       Q. So we can't see the .

8    Right?

9       A. No.

10      Q. And we can't really see --- can we see the

11   

12      A. No.

13      Q. Can we --- so can we see the entrance to any

14   other                           ?

15      A.                              .

16   

17   

18   

19   

20   

21   So I'm getting confused.   Sometimes the

22   

23   

24   

25

863
Trial
Kathy Aitken, et al. v. USA                                         3/15/2023

1      Q. Do you mind marking ███████████████

2   ATTORNEY ELKIN:

3   Can I approach, Your Honor?

4   JUDGE:

5   Yes.

6   THE WITNESS:

7   Mark the ██████

8      BY ATTORNEY ELKIN:

9      Q. Yeah.  Mark ██████████    that you can see.

10     A. There's ████████████████████  are the

11        ██████  that you can see for ███████████████

12        ██████  ---

13     Q. Okay.

14     A. --- from this picture.

15  ATTORNEY ELKIN:

16  Let's move on to Plaintiff's Exhibit 32.

17                              ---

18  (Whereupon, Plaintiff's Exhibit PLX-32,

19  Camera Screenshot - ██████████████ , was

20  marked for identification.)

21                              ---

22     BY ATTORNEY ELKIN:

23     Q. Does this appear to be an accurate depiction of

24        the ████████████████ ?

25     A. Yes.

864

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

    1    ATTORNEY ELKIN:
    2    Your Honor, I move to admit Plaintiff's
    3      Exhibit 32.
    4    ATTORNEY KERR:
    5    No objection, Your Honor.
    6    JUDGE:
    7    It's admitted.
    8                        ---
    9    (Whereupon, Plaintiff's Exhibit PLX-32,
   10    Camera Screenshot - ███████████████, was
   11    admitted.)
   12                        ---
   13    BY ATTORNEY ELKIN:
   14    Q. And what are we looking at here?
   15    A. ████████████████████████████████████
   16    ███████████████████████████████  ██████
   17    ██████████████████████████████
   18    █████████████████████████████████ ██████
   19    ████████████████████████████ ███████████
   20    ████████████████████████████████████
   21    ███████████████████████████████████████
   22    ███████████████████
   23    ATTORNEY ELKIN:
   24    Okay.  All right.  I'm moving on to
   25      Plaintiff's Exhibit 33.

865

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                              ---
 2      (Whereupon, Plaintiff's Exhibit PLX-33,
 3      Camera Screenshot - ███████████ , was
 4      marked for identification.)
 5                              ---
 6      BY ATTORNEY ELKIN:
 7      Q. Does this appear to be an accurate depiction of
 8      the ██████████████?
 9      A. Yes.
10      Q. So this is the front of the ████████████████.
11      Is that right?
12      A. Yes.
13      Q. And this is the only camera ---?
14    JUDGE:
15    Is there going to be a motion?
16    ATTORNEY ELKIN:
17    Oh, sorry, Your Honor.  I move to admit
18      Plaintiff's Exhibit 33.
19    ATTORNEY KERR:
20    No objection.
21    JUDGE:
22    Admitted.
23                              ---
24      (Whereupon, Plaintiff's Exhibit PLX-33,
25      Camera Screenshot - ███████████ , was
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    admitted.)

 2                              ---

 3      BY ATTORNEY ELKIN:

 4      Q. And do you know whether this was the ██████████

 5    ████████████████████████████████████████████████████████

 6    ████████████?

 7      A. I believe ---.

 8    ATTORNEY KERR:

 9    Objection, Your Honor.  Lack of

10      foundation.

11    JUDGE:

12    Well, she's asking if he knows.  He can

13      say if he knows.

14    THE WITNESS:

15    ███████████████████████████████

16    ██████████████████████████████████████████████

17    ████████████████████

18      BY ATTORNEY ELKIN:

19      Q. █████████████████████████████████████████

20    ████████      ████████████████████████████████████████.

21    █████████████████████████████████████████

22    █████████

23      A. Yeah.  We made three copies and turned them over

24      to Legal to do whatever they did with them.  We saved

25      three copies of everything.
```

867

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Okay.

2   So ████████, is this the view that we --- sorry.

3           ████████████████████████████████  ---?

4      A. Yes, unfortunately.

5   ATTORNEY KERR:

6   Objection, Your Honor.  Vague.  ████████

7   JUDGE:

8   ██████████████████████████

9      ██████████████████████

10  ████████████████████████████

11     ██████████████████?

12  THE WITNESS:

13  Yes, Your Honor.

14  JUDGE:

15  Okay.  Overruled.

16     BY ATTORNEY ELKIN:

17     Q. And in the ████████, what side, looking at this

18     camera, what ████████████████████████████

19  ████████████████████████?

20     A. It'd be to the right.

21     Q. Okay.

22  And do you know where it is in the ████████?

23     A. The ████████████.  So it would be to the left.

24     That's the ████████████████████████████

25     ████████████.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1        Q. Okay.

2    Was this camera that's trained on the ███████

3    ████████████████████████████████████████

4    ████████████████████████████████████████?

5        A. I believe so.

6        Q. ████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████.

9    Is that correct?

10       A. Correct. ████████████████████████████

11   ████████████████████████.

12       Q. ███████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████████████████████████████.

15   Correct?

16       A. Correct.

17       Q. So if an officer was assaulted in front of one of

18   the ███████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████

21   Correct?

22       A. Correct.

23       Q. Are you aware that the Union brought the issue of

24   the █████████████████████████████████████████

25   ████████████████

869

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023



```
 1    A. I am not.
 2    Q. And are you aware that the ████████████
 3    ██████████████████████
 4    A. I am not aware.
 5    Q. ██████████████████████
 6    A. ████  ██████████████████████
 7    ██████████████████████████████
 8    ████████████████  ██████████████████
 9    ██████████████████████████████
10    ██████████████  ████████████████████
11    ████████████████████████████████
12    ██████████████  ████████████████████
13    ████████████████████████████████
14    ████████████████████████████  ████████
15    ████████████████████████  ██████████
16    ████████████████████████████████.
17    ████████████████████████████
18    ████████
19    ATTORNEY ELKIN:
20    I want to turn your attention to PLX-34.
21                        ---
22    (Whereupon, Plaintiff's Exhibit PLX-34,
23    Camera Screenshot - ██████████, was
24    marked for identification.)
25                        ---
```

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

```
 1      BY ATTORNEY ELKIN:
 2      Q. Does this appear to be an accurate depiction of
 3      the ████████████████?
 4      A. Yes.
 5   ATTORNEY ELKIN:
 6   I move to admit Plaintiff's Exhibit 34,
 7      Your Honor.
 8   ATTORNEY KERR:
 9   No objection, Your Honor.
10   JUDGE:
11   It's admitted.
12                          ---
13   (Whereupon, Plaintiff's Exhibit PLX-34,
14   Camera Screenshot - ████████████, was
15   admitted.)
16                          ---
17      BY ATTORNEY ELKIN:
18      Q. Okay.
19   What are we looking at here going from left to
20      right?
21      A. ████████████████████████████████
22   ████████████████████████████████
23   ████████████████████████████████████
24   ████████████████████████  ████████████
25   ████████████████████████████████
```

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023



1    ██████████   ████████████████████   ██
2    ████████████████████████████████████████
3    ████████████████████████████   ████████
4    ████████████████████   ████████████
5    ████████████████████   ████████████████
6    ████████████████████████████
7    ████████████████████████████████
8    ████████████ .
9    Q. ████████████████████████████
10   ████████████████████ ?
11   A. ████   ████████████████████████
12   ████████████████████████████
13   ████████████████████████████████
14   ████
15   Q. And is it fair to say that you ████████████
16   ████████████████████ ?
17   A. Correct. ████████████████ .
18   ████████████████████████████
19   Q. ████████████████████████
20   ████████████████████████████
21   A. ████████████████████████████ t
22   ████████████   ████████████   ████████
23   ████████████████████████████████ ,
24   ████████████████████████████████ ,
25   ████████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

872

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1    ATTORNEY ELKIN:
 2    And then let's look at PLX-35.
 3                          ---
 4    (Whereupon, Plaintiff's Exhibit PLX-35,
 5    Camera Screenshot - ███████████████,
 6    was marked for identification.)
 7                          ---
 8     BY ATTORNEY ELKIN:
 9     Q. Is this the ███ --- this depicts the video view
10      of the ██████████████
11     A. Yes.
12    ATTORNEY ELKIN:
13    Your Honor, I move to admit Plaintiff's
14      Exhibit 35.
15    ATTORNEY KERR:
16    No objection, Your Honor.
17    JUDGE:
18    It's admitted.
19                          ---
20    (Whereupon, Plaintiff's Exhibit PLX-35,
21    Camera Screenshot - ███████████████,
22    was admitted.)
23                          ---
24     BY ATTORNEY ELKIN:
25     Q. Okay.
```

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    So what are we looking at here?
 2      A.
```

```
10    ATTORNEY ELKIN:
11    Okay.  And would the ---?  Okay.
12    So I believe we have a view of what the
13      inside of the               .  So let me show you
14      Plaintiff's Exhibit 32.  I'm sorry, 36.  Not 32.
15      Plaintiff's Exhibit 36.
16                            ---
17    (Whereupon, Plaintiff's Exhibit PLX-36,
18    Camera Screenshot -                 ,
19    was marked for identification.)
20                            ---
21    THE WITNESS:
22    Yes.
23      BY ATTORNEY ELKIN:
24      Q. Does this accurately reflect the
25      camera view?
```

874

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1       A. Yes.  This would be the lobby area of ███ and

2       that ---.

3   ATTORNEY ELKIN:

4   Hold on one second.  Can I move to admit

5       Plaintiff's Exhibit 36?

6   ATTORNEY KERR:

7   No objection, Your Honor.

8   JUDGE:

9   It's admitted.

10                          ---

11  (Whereupon, Plaintiff's Exhibit PLX-36,

12  Camera Screenshot - ██████████

13  was admitted.)

14                          ---

15      BY ATTORNEY ELKIN:

16      Q. Continue.

17      A. Yeah. ███████████████████████

18  ████████████████  ███████████████████

19  ███████████████████████████████

20  ████████████████████.

21      Q. ██████████████████████

22  █████

23      A. ███ ██████████████████

24  ████████████  ███████████████████

25  ██████  █████████████████████
```

875

Trial

Kathy Aitken, et al. v. USA                           3/15/2023

1     ███████████████████████████████████

2     Q. So I believe I just showed you screenshots from

3     █████████████████.

4     Correct?

5     A. Correct.

6     Q. Okay.

7     Those are all the camera views that you

8     collected, and put on the hard drives, and produced in

9     this litigation.

10    Correct?

11    A. That's correct.

12    Q. You would agree that FCI Otisville does not use

13    the video cameras for purposes of timekeeping of

14    Correctional Officers.

15    Correct?

16    A. Correct.

17    Q. You would agree that the video, ███████████

18    ████████████, was never used to record the work time

19    for the Correctional Officers.

20    Correct?

21    A. Correct.

22    Q. Now, ████████████████████████████ it wasn't

23    used to record the work time of the Correctional

24    Officers.

25    Correct?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    A. Correct.
 2    Q. You agree that the purpose of the video cameras
 3    is for security of the institution and staff and
 4    inmates?
 5    A. Correct.
 6    Q. You agree that the cameras ████████████████████
 7    ██████████████████████████████████████████████████████
 8    ██████████████████████████████████████████████
 9    ████████████████████████████████████████.
10    Correct?
11    A. Correct.
12    Q. And you agree that the remainder of the cameras
13    throughout the institution are used for inmate
14    monitoring and staff ---?
15    A. Correct.
16    Q. And when the cameras trained on ████████████████
17    ████████████████████████████████████████████.
18    Correct?
19    A. Correct.
20    Q. You would agree that Correctional Officers have
21    to be extra vigilant ████████████████████████████████████
22    ████████████████████████████████████████████████
23    ████████████
24    Correct?
25    ATTORNEY KERR:
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Objection.  Lack of foundation.
 2    JUDGE:
 3    What foundation do you think is missing?
 4    ATTORNEY KERR:
 5    Sorry.  She's asking about whether
 6      Correctional Officers have to be more vigilant.  I'm
 7      sorry.  Withdraw the objection.
 8    JUDGE:
 9    Okay.
10    THE WITNESS:
11    So part of being in a prison is you
12      always have to be vigilant.  The cameras are just
13      there for either after the fact or after you've
14      identified something.  Typically control will either
15      live monitor or SIS in the future would investigate to
16      help make sure everybody involved is correctly
17      identified and dealt with in the incident, whatever it
18      might be.  ████████████████████████████████████
19    ██████████████████████████████████████████████████
20    ██████████████████████████████████████████
21    ████████████    The cameras aren't going to protect you.
22    That's your job as an officer or employee inside the
23    institution.
24    BY ATTORNEY ELKIN:
25    Q. ████████████████████████████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ██████████████████████████████████████

2    A. ██████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████.

5    Q. Turn to page 86 of your deposition transcript.

6    A. Yes.

7    Q. Okay.

8    I'm going to start just to give you context.  I'm

9      on line six.  I have a question.

10   JUDGE:

11   I'm sorry.  What are we doing here?  Is

12     this impeachment?

13   ATTORNEY ELKIN:

14   Yes.

15   JUDGE:

16   Okay.

17   ATTORNEY ELKIN:

18   And then the last question was ████████

19   ████████████████████████████████████████████

20   ██████████████

21   JUDGE:

22   Okay.

23   BY ATTORNEY ELKIN:

24   Q. Line eight, in case --- I'm just going to start

25     reading the question.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1    But you would agree that it would be more
 2       beneficial for the outgoing officer who just spent
 3       eight hours on duty with inmates and the General
 4       Population Housing Unit where he is completely
 5       outnumbered to explain to the oncoming shift any kind
 6       of security issues, these people are goofing up.  This
 7       guy, I don't know, he didn't go to the mainline today.
 8       You might want to look out for him.  In case the
 9       oncoming officer actually had any questions to go
10       ahead and get those answered face to face from an
11       outgoing officer.
12    That would be beneficial to enhance the safety
13       and security ---
14    ATTORNEY KERR:
15    Your Honor, ---
16       BY ATTORNEY ELKIN:
17       Q. --- of the institution.
18    ATTORNEY KERR:
19    --- I don't mean to interrupt, but I
20       object.  This is not relevant to her original
21       question.
22    JUDGE:
23    I'll let her accomplish the impeachment
24       that she's trying to accomplish.
25       BY ATTORNEY ELKIN:
```

880

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. That that would be beneficial to enhance the
2     safety and security of the institution, in your
3     opinion.  And your answer was, in my opinion, there's
4     a lot of things.  That would definitely be one of the
5     many things that could be used to enhance it at any
6     time.  But obviously everything, as you know, has to
7     be weighed.  ██████████████████████████████
8     ████████████████████████████████████████.
9     Correct?  And your answer is, that is correct.
10    That was your testimony then?
11    A. Yes.
12    ATTORNEY ELKIN:
13    Okay.  Your Honor, I have no further
14     questions.
15    JUDGE:
16    Mr. Kerr?
17    ATTORNEY KERR:
18    Thank you.
19                        ---
20                   CROSS EXAMINATION
21                        ---
22    BY ATTORNEY KERR:
23    Q. Good morning, Mr. Dumont.
24    What were the cameras of this building used for?
25    A. They're used to monitor ████████████, to make

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    sure that ████████████████████████████████████
 2    ████████████████    ████████████████████████████
 3    ████████████████████████████.  And also for
 4    investigative uses after an incident's been reported
 5    or identified, they will use the cameras to
 6    corroborate or add anything to that investigation to
 7    make sure that everybody's held accountable that was
 8    involved and everything is properly correct and
 9    documented.
10    Q. And would you say one use is used more than
11    another ---?
12    A. I mean, day to day, every day we're identifying
13    people who go through the doors a hundred times a day.
14    So that is used more often.  The more, you know, long-
15    term use is the being able to follow-up on incidents
16    that happen to identify what actually happened and use
17    the camera to corroborate the reports and the
18    statements that are provided by everybody.
19    Q. So what's the primary use of the recorded
20    footage?
21    A. To follow up on investigations based on
22    identified issues, to make sure that all the data is
23    correct, what actually happened, happened, and
24    everything is correct.  If it's either witnessed or
25    identified at some point that an incident occurred,
```

Trial

Kathy Aitken, et al. v. USA                                  3/15/2023

1    they will use that recorded video to see what actually
2    happened and make sure that it's properly matching up.
3    Q. Do you think correctional officers have to be
4    more vigilant if those recordings aren't being made?
5    A. No, because their job is to be the one to report
6    that.  If nobody ever reports an incident occurred, no
7    one's every going to look at the video footage.  So
8    they have to be doing their typical duties, making
9    sure that they're identifying incidences, reporting
10   them.  And then based on what it is that is witnessed
11   or they give an inkling to something, they can pass it
12   along to have a follow-up done, to look at the
13   recorded footage to see what is happening or what
14   happened, to make sure people are properly held
15   accountable for anything that happened that should not
16   have.
17   Q. What is your understanding of the security
18   concerns regarding inmates of Otisville in March of
19   2019?
20   A. So during that time, when I arrived, the typical
21   compound inmate was one of two things.  They were what
22   was referred to as gang dropped or people who had
23   previously been gang members and were no longer
24   affiliated and/or sexual offenders.  And that was the
25   common inmate that we had on the compound.  They were

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    more of a --- they were medium-level inmates.  That's
2    what they were designated, medium level.  But compared
3    to other medium FCIs, these inmates were more behaved,
4    because they didn't have anywhere else to go.  If they
5    got in trouble and were shipped to another
6    institution, there weren't a whole lot of other
7    institutions that would take them or they wouldn't ---
8    those two types of inmates are not well-liked at
9    typical other prisons.
10   Q. And are those two types of inmates less violent
11   than other inmates?
12   ATTORNEY ELKIN:
13   Objection, Your Honor.  Foundation.
14   JUDGE:
15   He can ask if he knows.  So overruled.
16   THE WITNESS:
17   I mean, depending on the inmate.
18   They're all unique.  But typically statistically, you
19   would see less violent offenses being reported from
20   those types of inmates once they are settled in, which
21   the inmates at Otisville were because they had been
22   here a while.
23   JUDGE:
24   Oh, and it was a foundation.  I'm sorry.
25   Was your question how he would know?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

884

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:

2    Yes, Your Honor.

3    JUDGE:

4    Oh, okay.  Okay.

5    Mr. Kerr, could you lay a little bit

6       more foundation for why he would know the answer to

7       that question?

8    ATTORNEY KERR:

9    Sure, Your Honor.

10      BY ATTORNEY KERR:

11      Q. In your experience working at Otisville and at

12      Ray Brook, did you come to an understanding of sort of

13      the different levels of security concerns and

14      different types of inmates?

15      A. Yes, yes.  We're all trained during annual

16      training on the different types, the point system and

17      how they're medium, high, low-type custody levels of

18      inmates.  But also we're also trained every year on

19      the incident reporting system that they use for

20      discipline.  So we write incident reports and there's

21      different levels of incident reports.  And the

22      severity of it obviously.

23   Staff are able to see the incident reports

24      written and also see the packets that are done for

25      larger incidents.  That's all put into systems where

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    you can see those log files.  Based on the numbers
 2    that I was seeing being Duty Officer and just looking
 3    in the system at Otisville while I was there, they
 4    were lower level and less numbers of offenses than I
 5    saw at Ray Brook.  In terms of the level of offense,
 6    they were lower.  Obviously that's all dealt with by
 7    our SIS and the disciplinary process, which I wasn't
 8    involved in, but all staff are trained on the basis of
 9    it and can look in the system and see what's going on.
10  It just, in my opinion, appeared that they were
11    lower-level offenses and not as many occurring, based
12    on the inmates at Otisville while I was there.
13  ATTORNEY KERR:
14  Sorry.  My prior question ---?
15  JUDGE:
16  You can proceed.
17  ATTORNEY KERR:
18  Okay.  Thank you.
19    BY ATTORNEY KERR:
20    Q. You testified in your written Direct Examination
21    and file from prior settlement at Ray Brook.
22    A. Yes.
23    Q. Has your understanding of that settlement
24    changed?
25    A. Yes.  At the time, that was --- 2015 was when the
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    check was issued.  I started in March.  I'm sorry.  I
2    started in November of 2013.  And it wasn't long after
3    I worked there that the Union had filed for this.  My
4    Union coworkers --- I was a member of the Union, I was
5    a bargaining unit member --- explained that basically
6    every so often the Union got the Government to give
7    them some money for that overlapping time.  At the
8    time I signed up for it not knowing I was non-custody,
9    they came down with a sheet.  I signed up for it.
10    After the fact or actually since then I've
11    learned kind of what the deal is.  Mostly because
12    after that they changed some of the rules around to
13    eliminate that issue at Ray Brook while I was there.
14    And I realized it's really a custody thing and it's
15    very minimal as to who it affects.  And it really
16    didn't affect me, that case that I had signed up for.
17    But at the time, being new, I wasn't aware of it.
18    Q. Are there differences between Ray Brook and
19    Otisville?
20    A. I mean, every institution's different.  So things
21    are very similar.  But, you know, when it comes to your
22    custody and your roster, yes, there's unique details
23    to each post, but overall, the typical operations of
24    most of the institutions are the same in terms of, you
25    know, really officers were leading each other, the way

887

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    equipment's handled.  A lot of that is pretty
2    standardized across the Bureau.
3    Q. You look at a lot of still shots from the video.
4    A. Yes.
5    Q. Does the quality of the video depend on the
6    weather conditions?
7    A. Yes.  It depends on a lot of things, especially
8    ████████████████████  We explored the video. ██
9    ████████████████████████████████████████████████
10   ████████████████████████████████████████
11   ██████████████████████████████████████  ---
12   ████████████████████████████████████████████████
13   █████████  ██████████████████████████████████
14   ██████████████████████████████████████████
15   █████
16   ██████████████████████████████  ████████████
17   ███████████████████████████████████.  ██
18   ███████████████████████████████████.
19   ██████████████████████████████████
20   ████████████  ███████████████████████████
21   ████████████████████████████████████████,
22   ███████████████████████  ████████████████████
23   ████████████████████  ██████████████████
24   ██████████████████
25   Q. ███████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

888

Trial

Kathy Aitken, et al. v. USA                          3/15/2023



1   ████████████████████████████████████

2   ██ ---?

3   A. ██████   ███████████████████

4   ████████████   ██████████████████

5   ███████████████████████████████████,

6   █████████████

7   Q. Could you please look at PLX-31?

8   A. Yes.  That's the ██████.

9   Q. This was one of the still shots you were shown on

10  direct.

11  ████████████████████████████████

12  ████████

13  A.████████████████████

14  █████████   ████████████████████,

15  ██████████████   ███████████████

16  ████████ ██████████████ █

17  ████████ █████████████

18  █████████████████████

19  ██████████████████████████

20  ████████ █████████████

21  █████████████████

22  Q. ████████████████████

23  A. Yes.

24  Q. You were asked a lot on Direct about the camera

25  being trained here and trained there.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023



1      Are these cameras trained in one place?

2      A.

25     Q.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023



1

2    A. Yes.

3

4    Q.

5

6

7

8    A. Yes.

9    Q. Do still shots necessarily

10

11   A.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

891

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ██████████████████████

2    Q. Can you please turn to PLX-28?

3    A. ███████████████.

4    Correct?

5    Q. You were shown this picture on Direct and a

6    Correctional Officer ████████████████████████████

7    ████████████████

8    A. Yes.

9    Q. Do you know whether it would be easier to

10    identify that Correctional Officer if you had a video

11    that shows █████████████████████████████████████?

12    A. Yes, because you can, you know, with a video,

13    find the exact frame.  The way a video is, it's a

14    bunch of still shots per second.  You can find the

15    exact frame where it's easier to identify somebody.

16    As you've probably seen on TV or done yourself, you

17    can use the frame-by-frame button on a lot of video

18    playback to find the exact frame if you're trying to

19    identify somebody.

20    And whether this is the best or exact frame out

21    of the video, it's hard to say.  But in the video

22    playback, you'd be able to typically go frame by frame

23    and find what would hopefully be the best view.

24    Again, it's all dependent on where they walk, what

25    time they go through and lighting whether you could

Trial
Kathy Aitken, et al. v. USA                          3/15/2023

1    identify somebody on that video or not.
2    Q. Have you worked any of the 24-hour posts at
3    Otisville?
4    A. I've been augmented to cover some of the posts at
5    Otisville during times that we did department head
6    reliefs, but only a few.  Not many at Otisville.  Most
7    at other institutions.
8    Q. What posts at Otisville?
9    A. I worked the --- GB typically was where I was
10   whenever we were doing a relief of staff to allow them
11   to go out to events.  I know that one I did two or
12   three times.  And when I was in Computer Services, the
13   Computer Services Manager typically relieved the
14   Control 1 Officer during a time period when they need
15   to be relieved to go do training or events or whatever
16   when management was doing reliefs.
17   Q. Do you wear a duty belt?
18   A. I do.
19   Q. Are Correctional Officers required to put on
20   their duty belt immediately after going through
21   security?
22   ATTORNEY ELKIN:
23   Objection.  Foundation.
24   JUDGE:
25   You're asking how he would know,

893

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

 1    basically?

 2    ATTORNEY ELKIN:

 3    Yes, Your Honor.

 4    ATTORNEY KERR:

 5    Your Honor, he was augmented ---.

 6    ATTORNEY ELKIN:

 7    It doesn't even sound like he was

 8      augmented for a full shift.

 9    JUDGE:

10    Did he testify that he was augmented?

11    ATTORNEY KERR:

12    Yes, Your Honor.

13    JUDGE:

14    Ms. Elkin, do you remember if he

15      testified he was augmented?

16    ATTORNEY ELKIN:

17    I think he testified that he was

18      augmented to relieve an officer to go to an event.  So

19      I don't know exactly what that means a shift ---.

20    JUDGE:

21    I'll overrule the objection and we find

22      out if he knows.

23    BY ATTORNEY KERR:

24    Q. Do you know whether Correctional Officers have to

25      put on their duty belt immediately after going through

894

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    security?

2    A. No.  The duty belt is required to secure your

3    keys and equipment.  So you wouldn't need it until you

4    had issued equipment to you, whether that be at the

5    control center or at a post or wherever, because the

6    first time that you would need a duty belt or the

7    equipment that's on it would be to secure your keys to

8    a chain and to secure typically your OC spray into a

9    proper holster by policy.  So that would be when you

10   would need it.

11   Up until then, until you're issued equipment,

12   there's no --- you can put it on whenever you'd like

13   to.  Once you have your equipment, you have to

14   properly secure that by policy.

15   Q. Can you explain to the Court what that --- what

16   augmentation you've done at Otisville?

17   A. So at Otisville, again, like I said, I've been

18   augmented a few times to both Bravo unit and a few

19   times to the control center.  I don't remember exactly

20   how many.  I have not done a lot of custody at

21   Otisville.  I've done a significant amount at Ray

22   Brook and AUSP Thompson.

23   Q. So at Otisville, how long does it take you to

24   walk from the control lobby to the SHU?

25   A. I would say approximately ████████ .  That's ██████

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1        ███████████████████████.  Obviously everybody's
 2    going to be a little different, depending on their
 3    walking speed.  It's, you know, y████████████████████
 4    ████████████████████    ████████████████.  ████████
 5    ████████████████████████████████████████████████
 6    ████████████████████████████
 7    Q. And what's the farthest office?
 8    A. That would probably be ████████.  Those are your
 9    way down in the back.  Those would be the farthest
10    away from your compound sally port that you have to
11    walk to.
12    Q. And how long does it take you to walk from the
13    control lobby sally port, excuse me, to those housing
14    units?
15    A. I would say ████████████, you know, depending on
16    the speed you walk, weather.  Obviously if it's
17    slippery, you're not going to want to be --- you know,
18    you might go a little slower if it's not
19    Well-shoveled.  But I would say it's no more than ████
20    ████████
21    Q. How long does it take to walk from the patrol
22    lobby to Unit D?
23    A. ███████████████    ████████████████████████
24    ████████████████    ████████████████████████
25    ████████████    ████████████████████    ████████████████
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     ███████████████████████████

2     Q. And how long does it take you to walk from the

3     control lobby to Unit G?

4     A. G?  I would say that's, ██████████████████

5     ██████████████████   ████████████████████████████

6     ███████████████████████████████   ███████████

7     ██████████████████     But it's --- you don't have to

8     look down that.  As we saw in the pictures, it's kind

9     of like those smaller walkways that go down a bit of a

10    slope to the farther unit.  ███████████████████████

11    █████████████████  which is covered, which is usually

12    typically easier to walk even in poor conditions.

13    Q. How long does it take to walk from the control

14    lobby to the compound post?

15    A. At the time that we're talking about these

16    videos, it was ███████████████████████████████████

17    ███████████████████████████████████████.

18    That's ██████████████     Now, it's really near ██  So I'd

19    say about a ████████████████████████████████████████

20    █████████████████████████.

21    Q. And how long does it take you to put on your duty

22    belt?

23    A. Depends on the style you have.  The only I have

24    is the one I was issued by the Bureau long ago, which

25    I believe is kind of standard.  It's a plastic snap.

Trial

Kathy Aitken, et al. v. USA                               3/15/2023

1      It's a couple seconds.  It just snaps together.  You

2      know, some staff have chosen to get, you know, almost

3      like a standard belt, where it's got the pins and

4      you've got to weave it through and connect it.  That

5      can take you upwards of 30 seconds, probably, to

6      actually get it on.  And then depending on if your

7      equipment is located where you like it --- mine stays

8      on.  So it goes right on.

9    But if --- you know, you take your equipment off

10     each time or whatever, it's a personal choice, that

11     might take you up to a minute, I would say.  If you do

12     it regularly, it's a task that becomes, you know,

13     common.  It's your choice on how you want to do it.  I

14     would say up to a minute at most.

15     Q. Do Correctional Officers have to stop by the

16     Lieutenant's Office on their way to a post?

17     A. There is no requirement that they do, that I'm

18     aware of.  Like anything else, people have a personal

19     choice.  If they want to stop and see their supervisor

20     on their way in, they can do that.

21     Q. Do Correctional Officers have to exchange

22     information before their post?

23     A. There's no requirement.  It's nice to do that,

24     but there are systems in place that assuming the

25     on-duty officer logs everything properly in the

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      variety of systems that we have for logging
2      information, the oncoming staff can look there and
3      determine all that information.
4      Q. In your experience, how long does it take to
5      exchange the equipment at the beginning?
6      A. So each post is different the number of pieces
7      you get.  But I would say five to ten seconds per
8      piece of equipment.  And you know, I'd say probably
9      upwards of five to eight at most.  So no more than a
10     minute.
11  You know, obviously if you get there and your
12     relief is wandering around or not ready, it might take
13     them an extra little bit to get ready.  But most of
14     the time the person who's leaving for the day is aware
15     of it and is kind of ready to meet you when you get
16     there.  You know, just hand over equipment five to ten
17     seconds at most, if that, per piece.  You make sure
18     that it's legit and that everybody --- you know, the
19     off-going person wants to account for it, as well as
20     the person coming on.  But it doesn't take very long
21     to do that with most equipment.
22     Q. And that gives you enough time to inspect it?
23     A. Yes, yes.
24  ATTORNEY KERR:
25  I have no further questions.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

899

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    JUDGE:

2    Any Redirect?

3    ATTORNEY ELKIN:

4    Yes, Your Honor.

5    JUDGE:

6    Incidentally, it occurs to me, as

7      thinking through these objections to foundation,

8      they're really objections to lack of personal

9      knowledge, right, which is a different kind of

10     evidentiary theory?  I mean, so I mean, I think we've

11     worked through these objections in a reasonable way,

12     but let's pay attention to what exactly you're arguing

13     when you make objections to a question or testimony.

14   ATTORNEY ELKIN:

15   Your Honor, in the past I've always laid

16     a foundation for purposes of saying he doesn't have

17     personal knowledge of ---.

18   JUDGE:

19   They're different things.  Lack of

20     personal knowledge goes to a witness' common

21     competency and so forth.  Foundation goes to, you

22     know, establishing you're saying exceptions and so

23     forth.  I think you ended up --- you both ended up

24     making your points clearly enough.  I'm just raising

25     it.

900

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:

2    Okay.

3    Your Honor, I will make the objection,

4      personal knowledge, next time.  That's what I meant

5      when I said foundation.

6    JUDGE:

7    Yeah.  And with both of you I figured it

8      out, but you make my job easier ---.

9    ATTORNEY ELKIN:  Yes, we will try to say

10     the right words ---

11   JUDGE:

12   Thank you.

13   ATTORNEY ELKIN:

14   --- in the courtroom.  Sometimes it's

15     hard to say the right words anywhere.

16   JUDGE:

17   No kidding.

18                      ---

19              REDIRECT EXAMINATION

20                      ---

21    BY ATTORNEY ELKIN:

22    Q. Those times that you were just giving about how

23    long it takes to get from point A to point B, those

24    were just estimates.

25   Right?

901

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       A. Yes.

2       Q. And you didn't actually time yourself?

3       A. Not for those, no.

4       Q. You did time yourself for how long to get from

5       the screening site to the Admin Building or the

6       Control Center?

7    Correct?

8       A. I believe so.

9       Q. And you did this exercise twice, right, once on

10      the day of your deposition and once about a week

11      before that.

12   Correct?

13      A. Correct.

14      Q. And you would agree that the space between the

15      --- where the screening site is and to where you get

16      to the Control Center and sally port, that's not as

17      far as getting from --- going from the Control Center

18      to, for example, FA.

19   Correct?

20      A. Correct.  Yes, the distance through there,

21      there's more obstacles in your way, but there's ---

22      the distance is much shorter.

23      Q. And the ▮▮▮▮▮ that you said it took you to get

24      from the A-1 --- sorry -- yes, the A-1 lobby to the

25      Control Center lobby was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

902

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Does that sound right?
2      A. That sounds correct.
3      Q. When you were talking about for the level of
4      violent inmates and you said that Ray Brook, you're
5      familiar with that and Otisville, you were familiar
6      with Otisville, you never actually did any kind of
7      study to determine who had more violent inmates, ---
8      A. No, that's ---.
9      Q. --- what prison, whether it was FCI Ray Brook or
10     whether it was FCI Otisville.
11   Is that correct?
12     A. Correct.  That's just my opinion based on what I
13     have seen.  But the actual numbers would have to be
14     provided by another department.
15     Q. And when you were talking about the exchange and
16     how long things take, that's based on your experience
17     at FCI Otisville, when you worked the Control Center 1
18     post.
19   Did you work there for a whole shift?
20     A. I don't believe I ever worked Control 1 for a
21     whole ---.
22   ATTORNEY MOORE:
23   Objection, Your Honor.  That's a
24     compound question.
25   JUDGE:

903

Trial

Kathy Aitken, et al. v. USA                                   3/15/2023

1    Can you break it up?

2    ATTORNEY ELKIN:

3    Yes.

4     BY ATTORNEY ELKIN:

5     Q. Did you work Control 1's post for a whole shift?

6     A. I do not believe I ever worked Control 1 at

7     Otisville for an entire shift.

8     Q. And this case concerns Otisville.

9    Correct?

10    A. Correct?

11    Q. Did you ever work a B-Side Housing Unit for a

12    full shift?

13    A. Yes, I believe I have, at least once.

14    Q. At least once.

15   But was it more than once?

16    A. It may have only been a full shift once.  There's

17    several times I've worked it.  I don't remember if

18    they were --- more than one time was a full shift.

19    Q. And as you sit here today, your testimony is

20    based on working a full shift once at the B-Side

21    Housing Unit, as far as you can recall?

22    A. At FCI Otisville.

23    Q. At FCI Otisville, right.

24   And just going back to the camera, to the camera

25    viewpoints.

904

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

```
1    So I think your testimony is that the weather
2      might change how much we can see on the camera.
3    Is it often foggy at the top of that hill at FCI
4      Otisville?
5    A. Yes.  They have a large number of days where
6      they're under inclement weather watch because of the
7      fog up there.
8    Q. And then with respect to cashing your check when
9      you receive one as a non-custody worker, was it your
10     understanding that your pay was tied to the time that
11     you actually worked custody post --- was for when you
12     were working custody post at FCI Ray Brook?
13   A. No.  What we were told was they made a
14     settlement, and they just divided up how much money
15     they had across everybody.  That's why non-custody got
16     --- got money as well as custody people.  It caused
17     some concerns between staff members when that
18     happened.  That's why I learned more about it after
19     that as to what was actually --- this thing was about.
20   Q. But you understand that you received --- I think
21     you already testified on Direct that you received less
22     than what custody workers received?
23   A. Correct.  Yes.
24   Q. And you were, in fact, augmented to custody posts
25     when you were at FCI Ray Brook?
```

905

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      A. Yes.

2      Q. So you were eligible to receive money for working

3         overlapping shifts.

4   Correct?

5      A. I believe so.

6      Q. And you didn't work where you work now, not where

7         you're at now, but at FCI Otisville you didn't work

8         the Computer Specialist, in terms of a manager, that's

9         not a relief position.

10  Correct?

11     A. No.

12     Q. And you had to draw equipment.

13  Correct?

14     A. Correct.

15     Q. And you would draw that on your own time with

16        regard to your equipment at the start of your shift.

17  Correct?

18     A. Correct.

19     Q. And you're leaving on time and returning

20        equipment at the end of your shift.

21  Correct?

22     A. Correct.

23     Q. And did you have to --- where was your office, if

24     you had one?

25     A. It was in the admin area.  When we look at that

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Control 1, it was in that area, up by the HR Wardens,
2       up that walkway up there?
3   ATTORNEY ELKIN:
4   I have no further questions.
5   JUDGE:
6   Okay.
7   You're free to go.
8   Ms. Elkin, do you want to call your next
9       witness or do you want to take a short break?
10  ATTORNEY ELKIN:
11  I'd like a little break.
12  JUDGE:
13  Let's take a break until 11:25.
14  ATTORNEY ELKIN:
15  Okay.
16  COURT CRIER:
17  All rise.
18                        ---
19    (WHEREUPON, A SHORT BREAK WAS TAKEN.)
20                        ---
21  COURT CRIER:
22  All rise.  The United States Court of
23    Federal Claims is now in session.  Judge Stephen
24    Schwartz presiding.
25  JUDGE:

907
Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1    Be seated.  And who's next?

2    ATTORNEY ELKIN:

3    Your Honor, we call Willie Shemanski.

4                          ---

5    WILLIE SHEMANSKI

6      CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

7      HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

8      FOLLOWS:

9                          ---

10   ATTORNEY ELKIN:

11   Your Honor, one housekeeping.

12   JUDGE:

13   Yes.

14                         ---

15   (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

16                         ---

17                    DIRECT EXAMINATION

18                         ---

19   BY ATTORNEY ELKIN:

20   Q. Good morning, Mr. Shemanski.

21   A. Good morning.

22   Q. Please state your full name for the record.

23   A. Willie Luke Shemanski.

24   Q. And how long have you been employed at FCI

25   Otisville?

908

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Since 2013.
2      Q. And were you a Correctional Officer during that
3      time?
4      A. Yes.
5      Q. For how long?
6      A. From '13 to '20.
7      Q. And since '20, what has your job been?
8      A. Tool Room Officer.
9      Q. What does a Tool Room Officer do?
10     A. A Tool Room Officer is in charge of
11     accountability of tools throughout the institution,
12     classification of tools, along with the Captain.
13     Q. Okay.
14   And are you sort of a Monday through Friday
15     worker now?
16     A. Correct.
17     Q. What are your hours?
18     A. 7:00 to 3:00.
19     Q. Have you worked for any other DOC ---?
20     A. No.
21     Q. What did you do before coming to Otisville?
22     A. I was a Correctional Officer, Pike County
23     Correctional Facility.
24     Q. Approximately how long did you work there?
25     A. Approximately six years.

909

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1    Q. And prior to that, what did you do?

2    A. I was a carpenter, construction.

3    Q. Do you hold any office --- well, let me ask you

4    this.  Is there a Union at FCI Otisville?

5    A. There is.

6    Q. And what is that Union?

7    A. Local 3860 CPL 33.

8    Q. Is that currently AFGE?

9    A. AFGE, correct.

10   Q. Do you hold any office?

11   A. I'm the president of the local.

12   Q. Is that an elected position?

13   A. Yes.

14   Q. What responsibilities do you have as the

15   president?

16   A. As the president, general oversight of the local,

17   acting on behalf of the membership.  I'm an automatic

18   delegate by proxy as being president at conventions.

19   I just negotiate in good faith management ---.

20   Q. Do you attend ---?  Sorry.

21   A. No, go ahead.

22   Q. Do you attend labor management --- LMR meetings,

23   I guess they're called.

24   A. I do.

25   Q. Labor management relations meetings on behalf of

910
Trial
Kathy Aitken, et al. v. USA                                      3/15/2023

1    the Union?

2    A. LMR, yes.

3    Q. Have you held any other positions with the local

4    besides president?

5    A. Yes.

6    Q. What?

7    A. Secretary, chief steward, vice president.

8    Q. And based on your capacity as the president and

9    having these other positions, are you familiar with

10   the three FLSA pre-shift/post-shift grievances that

11   the local filed against FCI Otisville prior to this

12   lawsuit?

13   A. I'm aware, yes.

14   Q. How did you become aware?

15   A. Just my responsibility of being a local

16   president.  That was a part of one of them.  Just

17   trying to have as much knowledge in regards to the

18   FLSA violations and the arguments that were made.

19   Q. And do you know when the first FLSA grievance was

20   filed for overtime pay for working pre and post shift?

21   A. 2005.

22   Q. And was there an arbitration on that one?

23   A. Yes.

24   Q. And who won?

25   A. The Union.

911

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. And did the agency make any changes to the shift
2     schedule?  For example, did it implement overlapping
3     shifts for any folks following that arbitration?
4     A. No, ma'am.
5     Q. Was there a second FLSA grievance filed by the
6     local in which it sought to get its Bargaining Unit
7     members paid for pre and post shift work time?
8     A. Yes.
9     Q. Do you know when that one was filed?
10    A. 2007.
11    Q. Did that case go to arbitration?
12    A. Yes.
13    Q. Who won?
14    A. The Union again.
15    Q. And was there an award issued?  And if so, do you
16    now by --- the name of the Arbitrator?
17    A. There was an award, Margo Newman.
18    Q. And did Ms. Newman determine how many minutes
19    each post should receive beyond eight hours?
20    A. Yes.
21    Q. Do you recall the exact number of minutes she
22    awarded?
23    A. I do not recall.
24    ATTORNEY KERR:
25    Relevance.  The amount of minutes that

912

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      an Arbitrator awards isn't relevant.

2    JUDGE:

3    Overruled.  I'll let it in for whatever

4      its probative value turns out to be.

5    BY ATTORNEY ELKIN:

6    Q. Your answer was, you do not recall?

7    A. I do not recall the exact number, no.

8    Q. If I showed you the award, would that refresh

9      your recollection?

10   A. Yes, ma'am.

11   Q. There is a yellow book in front of you somewhere?

12   A. PLX?

13   Q. Yes, PLX.  If you can go to PLX-24.  Let me know

14     when you're there.

15   A. I'm there.

16                          ---

17   (Whereupon, Plaintiff's Exhibit PLX-24,

18   Arbitrators' Decision, FCI Otisville and

19   AFGE Local 3860, FMCS No. 10-04502-8,

20   was marked for identification.)

21                          ---

22   BY ATTORNEY ELKIN:

23   Q. Okay.

24   Could you turn to page 43 of that award?

25   A. I'm there.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

913

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      Q. The middle of the page, the --- filing.

2    ATTORNEY KERR:

3    Objection, Your Honor.  If Counsel

4      refreshes his recollection, it should be read into the

5      record.

6    ATTORNEY ELKIN:

7    Okay.

8    So that's ---.

9    JUDGE:

10   So I have actually been very generous on

11     that lately, as far as reading material that's being

12     used for refreshing recollection, because there ---

13     but because there isn't a jury here, I think that

14     that's all right for drawing the witness' attention to

15     the relevant passage.  So overruled.

16   BY ATTORNEY ELKIN:

17     Q. Could you go to the middle of the page, where the

18     Arbitrator says, thus, I find the following to be the

19     appropriate compensable overtime work by COs for the

20     following positions on a daily basis.

21   If you review those numbers, would that refresh

22     your recollection about how much time should be

23     awarded to overtime minutes for the post?

24     A. Yes.

25     Q. And so, as far as you know, did the agency ever

914

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    begin to pay the compound officers 60 minutes of

2    overtime the day following this award?

3    A. No.

4    Q. Would your answer be the same with respect to the

5    post listed and the minutes awarded for these other

6    posts?

7    A. Yes.  The answer would be no.

8    Q. And at the time that the hearing took place, if

9    you know, if you look at the last page you'll see when

10   she issued her award.

11   A. November 4th, 2012.

12   Q. 2000 what?

13   A. '12.

14   Q. That's when she issued her award.  So is it your

15   understanding that the hearing took place prior to

16   that time?

17   A. Yes.

18   Q. And at the time the hearing took place, were

19   there battery chargers already on the housing units?

20   A. No.

21   Q. Are you sure?  Sorry.

22   Do you know when battery chargers went on the

23   housing units?

24   A. ████████

25   Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1   And do you know that from reading this award?

2      A. Yes.

3      Q. Okay.

4   Did this Arbitrator award liquidated damages,

5      finding that that the agency failed to prove that it

6      acted in good faith or object on reasonable grounds,

7      complying with the FLSA?

8      A. Yes.

9      Q. Did the agency change any of its pay or

10     scheduling practices?  Meaning did the agency start to

11     schedule overlapping paid shifts on the 24-hour

12     housing unit post --- after this award?

13  ATTORNEY KERR:

14  I object, Your Honor.  It's been asked

15     and answered.

16  JUDGE:

17  I'm not sure.  Is this question the same

18     --- does it differ from a previous question?

19  ATTORNEY ELKIN:

20  The first question went to the first

21     award in 2008.  And now this question is going to the

22     2012 award.  And other witnesses have said there's no

23     overlapping shifts, so I think that I'm ---.

24  JUDGE:

25  I think she's asking a different

916

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1     question about a different award.  Did you think she
2     was asking the same question?
3     ATTORNEY KERR:
4     I thought she already asked this
5     question.
6     JUDGE:
7     Considering that there's doubt on this
8     objection, I'll overrule it.  You can ask the
9     question.
10    BY ATTORNEY ELKIN:
11    Q. Did the agency change any of its pay or
12    scheduling practices, meaning did the agency implement
13    any paid, overlapping shifts on 24-hour posts filed in
14    the Arbitrator's award?
15    A. No.
16    Q. Was there a third grievance filed by the AFGE
17    Local 3863 ---
18    A. Yes.
19    Q. --- to cover back pay and related damages for pre
20    and post shift work?
21    A. Yes.
22    Q. And when was that one filed?
23    A. 2015.
24    Q. Do you know if that went to arbitration?
25    A. It did not.

917
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Did it get resolved?

2    A. It did.

3    Q. Was there a settlement?

4    A. Yes.

5    Q. Do you know approximately when it was settled?

6    A. I don't recall the exact date.

7    Q. Sometime after 2015?

8    A. Yes.

9    Q. Did the agency change any of its pay or

10   scheduling practices?  Meaning did the agency

11   implement any pay for overlapping shifts following the

12   settlement in that case?

13   A. No.

14   Q. Did the agency put timeclocks into the

15   institution?

16   A. No.

17   Q. Did the Union specifically authorize the agency

18   to put timeclocks into the institution?

19   A. No.

20   Q. Are you ---?

21   A. Did they authorize?

22   Q. Did they say --- did the Union say that it would

23   be okay for the agency to put timeclocks ---

24   A. Yes.

25   Q. --- into the institution as long as the agency

918

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    engaged in negotiations over where those timeclocks
2    should be?
3    A. Yes.
4    Q. Did the agency ever come to the Union after 2016
5    to say we'd like to start negotiating over where we
6    should put the timeclocks?
7    A. No.
8    Q. Are you a Plaintiff in this case?
9    A. I am.
10   Q. Did the Plaintiffs request video footage from FCI
11   Otisville cameras as part of discovery in this case?
12   A. Yes.
13   Q. Do you know whether the parties entered into an
14   agreement about the dates of the footage that would be
15   produced?
16   A. Yes.
17   Q. And do you recall what the dates of that footage
18   that will be used in this case are?
19   A. The exact dates?  It was May 2019, July, August.
20   Q. Do you know?  I mean, if you don't ---.
21   ATTORNEY ELKIN:
22   I mean, I think it's on the record.  I
23   think there's a stipulation.
24   JUDGE:
25   I think you're right.

919

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:
2    Can I use this to refresh his
3      recollection or can I just say what the dates are and
4      see if ---?
5    JUDGE:
6    You can just say what the dates are.
7      And if Counsel disagrees, we can sort it out.
8    Do you have the dates of ---?
9    ATTORNEY KERR:
10    I have the dates right here.
11    JUDGE:
12    Okay.
13    So just go ahead, Ms. Elkin.
14      BY ATTORNEY ELKIN:
15      Q. Do you understand the stipulation to be that the
16      video that the Government would produce and the only
17      video that would be used in this location was from
18      May 1st, 2019 to December 31st, 2019?
19      A. Yes.
20      Q. Okay.
21    Did the Government produce video footage covering
22      that time frame?
23      A. Yes.
24      Q. And how was it produced?
25      A. Hard drive.

920

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Sorry?

2    A. It was on a hard drive.

3    Q. Okay.

4    And did you receive a copy of the hard drive?

5    A. Yes.

6    Q. Were some days missing from those hard drives

7    from the period of May 1st, 2019, to December 31st,

8    2019?

9    A. There was.

10   Q. Do you know why they were missing?

11   A. I do not.

12   Q. Did you review --- did you have time to review

13   all of the video that was provided?

14   A. No.

15   Q. What did you review --- approximately how many

16   weeks of video footage did you review?

17   A. If I remember correctly, I believe it was five.

18   Q. And did you submit a Declaration --- do you

19   recall exactly what weeks that you reviewed as you sit

20   here?

21   A. I do not.

22   Q. Did you see the Declaration in this case ----

23   A. I did.

24   Q. --- of the Plaintiffs' Motion for Summary

25   Judgement?

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    A. I did.

2    Q. If you looked at that Declaration, would it help

3    you --- would it refresh your recollection about

4    exactly what you reviewed?

5    A. Of course.

6                          ---

7    (Whereupon, Plaintiff's Exhibit PLX-23,

8    FRE 1006 Summary of Video Footage

9    Review, was marked for identification.)

10                         ---

11    BY ATTORNEY ELKIN:

12    Q. So if you'd turn to Plaintiff's Exhibit 23.

13    Are you there?

14    A. Yes.

15    Q. That appears to be a copy of your Declaration

16    with various exhibits attached.

17    A. Yes.

18    ATTORNEY ELKIN:

19    Your Honor, I'd move to admit

20    Plaintiff's Exhibit 23.

21    ATTORNEY KERR:

22    No objection.

23    JUDGE:

24    Well, this is just to refresh, so you

25    don't need to.

922

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

```
 1     ATTORNEY ELKIN:
 2     But I do want to admit it.
 3     JUDGE:
 4     You do want to admit it?
 5     ATTORNEY ELKIN:
 6     Yes.
 7     JUDGE:
 8     You might as well admit it.
 9     ATTORNEY ELKIN:
10     Okay.
11     ATTORNEY KERR:
12     We have no objection.
13                        ---
14     (Whereupon, Plaintiff's Exhibit PLX-23,
15     FRE 1006 Summary of Video Footage
16     Review, was admitted.)
17                        ---
18     BY ATTORNEY ELKIN:
19     Q. Does looking at this Declaration --- let's see.
20     Let me get there myself.  Bottom of the first page,
21     paragraph four, continuing onto the second page,
22     paragraph five, does this refresh your recollection
23     about what weeks that you reviewed?
24     A. Yes, ma'am.
25     Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    What weeks did you review?

2      A. May 6th to May 11th.

3    JUDGE:

4    If his memory is being refreshed, you

5      can't read from it.

6    ATTORNEY ELKIN:

7    Okay.

8    JUDGE:

9    So I mean, if you're refreshing a

10     recollection, you're supposed to look at it and then

11     it's out of your head, not off of the page,

12     technically.

13   Does it actually matter which particular

14     dates that he --- which particular weeks he chose?

15   ATTORNEY ELKIN:

16   I mean, I'd like it in the record ---

17     well, we're going to receive the exhibit, so ---.

18   JUDGE:

19   Okay.

20   So since it's been admitted, --

21   ATTORNEY ELKIN:

22   We can talk about it later.

23   JUDGE:

24   --- since it's been admitted, maybe he

25     can read off of it.  Now we aren't refreshing

924
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      recollection anymore.  Now we're just talking about
2      the exhibit.
3    ATTORNEY ELKIN:
4    Okay.  Fair enough.
5      BY ATTORNEY ELKIN:
6      Q. What weeks did you review?
7      A. May 6th through May 11th, 2019, June 13th to the
8      15th, 2019, July 7th to the 13th, 2019, August 11th to
9      the 17th, 2019, and October 6th through the 12th,
10     2019.
11     Q. And I notice that July --- I'm sorry, June 13th
12     to the 15th doesn't seem to be a fully week.
13   Why didn't you review the full week?
14     A. Because there was nothing to review.  It wasn't
15     available.
16     Q. So they did not produce --- that was June 9th
17     through the 12th or so?
18     A. Correct.
19     Q. How did you select which weeks to review of the
20     seven months or so of videos produced?
21     A. I just randomly selected weeks to review that fit
22     into a month that were available, and I'd review it.
23     Q. And did you review the 24-hour posts?
24     A. I did.
25     Q. Which 24-hour posts did you review and

925
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      report ---?
2      A. Control 1, Compound 1, Delta Alpha, Echo Bravo,
3      Alpha, Alpha Alpha, SHU 1
4      Q. And you said Echo Bravo, that's the B side
5      Housing Unit.
6    Is that right?
7      A. Correct.
8      Q. Was there a 24-hour post in 2019?
9      A. Yes.
10     Q. Did you have a chance to review the Government's
11     video report, an exhibit that hasn't been introduced,
12     but did you have a chance to review that before it was
13     produced in trial?
14     A. I did.
15     Q. And did the Government include EB as a 24-hour
16     post as well?
17     A. It did.
18     Q. You said you reviewed the Government's video
19     exhibit.
20   Is that right?
21     A. Correct.
22     Q. And I'd like you to identify it if you can.
23   ATTORNEY ELKIN:
24   And I'd move to admit it, if I can, as
25     DX-14, I believe.

926

Trial

Kathy Aitken, et al. v. USA                        3/15/2023

```
 1                         ---
 2      (Whereupon, Exhibit DX-14, FRE 1006
 3      Summary of Video Footage Review, was
 4      marked for identification.)
 5                         ---
 6  THE WITNESS:
 7  I'm there.
 8    BY ATTORNEY ELKIN:
 9    Q. You're there?  Does that --- what's set forth as
10    DX-14 appear to be the video review analysis that the
11    United States did?
12    A. Yes.
13  ATTORNEY ELKIN:
14  Your Honor, I'd like to move to admit
15    DX-14.
16  ATTORNEY KERR:
17  No objection, Your Honor.
18  JUDGE:
19  DX-14, that's the document that says
20    Michael Buckingham dated at the top?
21  ATTORNEY ELKIN:
22  Yes.
23  JUDGE:
24  No objection.  It's admitted.
25                         ---
```

927

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1       (Whereupon, Exhibit DX-14, FRE 1006

2       Summary of Video Footage Review, was

3       admitted.)

4                                    ---

5       BY ATTORNEY ELKIN:

6       Q. Do you know how the Government treated the SHU 2

7       post in terms of whether it was a 16 or 24-hour post

8       at the time of the date of the award?

9       A. On how the Government treated SHU 2?

10      Q. Yes.  If I can direct your attention to page four

11      of Government's DX-14, the data they did for Eric

12      Christiansen.  If you go down the left-hand side, SHU

13      2.

14      A. Sixteen (16).

15      Q. Okay.

16      And you did not include SHU 2 in your review

17      either.

18      Is that correct?

19      A. Correct.

20      Q. I notice that you did not include any ███████

21      video in the post that you described, the 24-hour post

22      that you did a review on.

23      Why didn't you include █?

24      A. Because it wasn't provided.

25      Q. Okay.

928

Trial

Kathy Aitken, et al. v. USA                                     3/15/2023

1    Why don't you tell us about your review process.

2    How did you go about capturing times for the

3    workers in your analysis?

4    A. When I was --- I would utilize the daily roster

5    for that date.  I would review the ██████████████.

6    ████████████████████████████████        That's when I

7    would document their time to the left of their name on

8    the daily roster.  I don't really recall exactly, but

9    --- and then, at the end of the shift, I would utilize

10   the ████████████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ██████████████   ████████████████████████████████

14   ████████████████████████████████████████████

15   ████████████

16   Q. You were here while Mr. Dumont was testifying.

17   Correct?

18   A. Correct.

19   Q. I want to just make sure I understand what

20   cameras you used.  So if you can look to PX 28 in the

21   yellow binder.

22   A. I'm there.

23   Q. Is the ████████ continue to be one camera --- the

24   camera you used to record the oncoming shift?

25   A. ████████

929

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1    Q. I'm sorry.  I handed you the 26.  I gave you the
2    wrong number.
3    A. Yes, ████████████
4    Q. And did you --- at what point --- did you record
5    that they went through the door?  Would you identify
6    that?
7    A. It is --- as soon as I can identify them, yes.
8    Q. Okay.
9    ███████████████████████████████████
10   ██████████████████████████████████████
11   ████████████████████████
12   A. For --- for their entrance side?
13   Q. Yes.
14   A. I just didn't.
15   Q. ███████████████████████████████
16   ██████
17   A. ███████████████████
18   Q. Okay.
19   ████████████████████████████████
20   ████████████████████████
21   A. ██████████
22   Q. █████████████
23   A. ████████████████████
24   Q. You're going to have to let me finish my
25   question.

930

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Okay?

2    ████████████████████████████████████

3      ██████████████████████████████████████

4      ████████████████████████████████████████

5      █████████████████████████████

6    Is that correct?

7      A. Correct.  That's fair.

8      Q. Okay.

9    I want you to look at PLX-29.  It says ██████████

10     ███████████████

11   Is this the camera angle that you used to

12      identify the workers as they were outgoing?

13     A. Correct.

14     Q. Okay.

15   So tell us about the --- did they give you

16      24-hour footage on these cameras?

17     A. Yes.

18     Q. All right.

19   So you got to look at all 24 hours to do your

20      analysis?

21     A. No.

22     Q. So approximately what time did the overtime stamp

23      --- about what time did you start looking for the

24      oncoming day work shift?

25     A. My primary focus was about 40 minutes prior to

Trial

```
 1    and about 20 to 30 minutes following the end of the
 2    shift.
 3    Q. So that would be true for day watch --- those
 4    would be the hours you would use for the shift change
 5    from morning watching day watch, so it would I guess
 6    ██████████ until ███████████
 7    A. Correct.
 8    Q. And then moving forward to the next shift, ████
 9    ████████████████████
10    A. Yes.
11    Q. And then moving up to the next shift, you
12    reviewed the time between ███████████ until the next
13    day at ██████ or so ---
14    A. Correct.
15    Q. --- ██████?
16    And you said you knew --- can you identify the
17    officers based on your own knowledge of who they are?
18    A. Yes.
19    Q. Okay.
20    And you said you would --- you knew --- how did
21    you know what shifts they were working on the days
22    that you reviewed?
23    A. I had the daily roster printout from the CP
24    roster program.
25    Q. Okay.
```

932

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Just so that we can look at that, can you grab
2       Joint Exhibit 6, I believe.  And that's the green
3       binder, one of three.
4    Are you there?
5       A. I'm there.
6       Q. Okay.
7    Does this appear to be a trainee assignment
8       roster from Monday, May 9th, 2016?
9       A. It does.
10   ATTORNEY ELKIN:
11   I move to admit JX-6.
12                          ---
13   (Whereupon, Joint Exhibit JX-6, FCI
14   Otisville Daily Assignment Roster,
15   5/9/2016, was marked for
16   identification.)
17                          ---
18   ATTORNEY KERR:
19   No objection, Your Honor.
20   JUDGE:
21   It's admitted.
22                          ---
23   (Whereupon, Joint Exhibit JX-6, FCI
24   Otisville Daily Assignment Roster,
25   5/9/2016, was admitted.)

933

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                              ---
 2      BY ATTORNEY ELKIN:
 3      Q. While I realize 2016 was outside of the
 4      parameters of your review, this is --- the daily
 5      roster is essentially the same thing for 2019, when
 6      you reviewed it?
 7      A. Yes.
 8      Q. Okay.
 9    And so let's just go to Unit D, for example.
10    Is that a 24-hour post --- or Unit EA?
11      A. Unit EA, yes.
12      Q. So that's out on the post on the left-hand side.
13      And then it has --- explain to us --- you knew what
14      shift people were coming on and where you put the ---
15      you know, how you marked their time in.
16      A. So the column to the left, if you look at the
17      top, it shows the shifts.  So shift one is ████ which
18      is ████████ to ████ which is obviously ████████  So
19      right underneath that --- and one and eight are both
20      morning watch shifts, just different time, start time.
21      Q. Okay.
22      A. Shift eight is ████ to ████
23      Q. So then when you --- so you knew that Hagenburg,
24      for example, was working the midnight to ████████
25      shift on, this review ---
```

934

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    A. Correct.
 2    Q. --- May 9th, 2016, and you would mark his
 3    entrance time and you could identify him on the ███
 4    ██████████████? 
 5    A. Correct.
 6    Q. And would you put that to the left of it?
 7    A. Yes.
 8    Q. And then his outgoing time you would identify
 9    once you identify him on the ████████████████
10    camera, you put that exit time on the right of his
11    name?
12    A. When he exited that door, yes.
13    Q. Okay.
14 And you knew that he was working what post that
15    day?
16    A. Hagenburg is working ██████████.
17    Q. Okay.
18 And you would do that for all the 24-hour posts
19    that you listed in your review?
20    A. Yes.
21    Q. Okay.
22 And the video was timestamped?
23    A. It was.
24    Q. Were there occasions when you could not capture
25    both an entry and exit time for an individual?
```

935

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      A. Yes.

2      Q. Did you use those occasions in your analysis of

3      how much time the workers were on duty?

4      A. No.

5      Q. And what about if somebody worked a back-to-back

6      double shift, like ---

7      A. No.

8      Q. --- overtime, did you use that in your analysis

9      of how long workers were on duty?

10     A. NO.

11     Q. Okay.

12     There seems to be a spreadsheet attached to your

13     Declaration, as it's in the new book, but we have to

14     go back to the yellow book.

15     A. I'm there.

16     Q. You're there?

17     Would it be easier if you just had like your own

18     copy of it instead of having to ---?

19     A. This is fine.

20     Q. Okay.

21     And what is the spreadsheet at Exhibit A?

22     A. Exhibit A?

23     Q. Uh-huh (yes).

24     JUDGE:

25     Exhibit 23.

936

Trial

Kathy Aitken, et al. v. USA                                 3/15/2023

```
1     BY ATTORNEY ELKIN:
2     Q. I'm sorry.  Exhibit A to Plaintiff's Exhibit 23.
3     A. Exhibit A, the summary is the average of total
4        time per shift.
5     Q. Okay.
6   So do you know how --- what did you do with your
7        --- the time that you marked on those daily rosters?
8     A. What did I do with them?
9     Q. Did you provide them to anybody?
10    A. I did, yes.
11    Q. Who did you provide them to?
12    A. To the attorney.
13    Q. Okay.
14  And so did somebody at the attorney's office
15       appear this spreadsheet?
16    A. Yes.  They --- yes.
17    Q. Did you check the time entered under the column
18       arrival time and the column under departure time
19       against your own --- the daily rosters that you were
20       working on?
21    A. Yes.
22    Q. Okay.
23  And is Exhibit A an accurate reflection of the
24       time that you entered?
25    A. It is.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. So your entrance time, your arrival time, which
2      is six columns over, that's from a different camera,
3      is that your understanding, than from what the
4      Government used in Exhibit DX-14?
5      A. Yes.
6      Q. Okay.
7    And what is your understanding of what the
8      Government used as the arrival time for the worker?
9      A. The camera that they used ---
10     Q. Yes.
11     A. --- for the arrival time?
12     Q. Yes.
13     A. Was the ███████████████████.
14     Q. Okay.
15   So that will be after ---?
16     A. After --- through the screening site, through the
17     ██████████████████, across the walkway.
18     Q. So why did you ---?
19   ATTORNEY KERR:
20   Your Honor, I object to the use of the
21     right arrival time on the Government's exhibit.  The
22     Government's exhibit is slightly different.  The
23     document speaks for itself, but I wanted to put that
24     on the record, the use of the term arrival time.
25   JUDGE:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Okay.

2    But what's the specific term that the

3      Government ---?

4    ATTORNEY KERR:

5    The time CO enters the compound.

6    JUDGE:

7    Okay.

8    That's reasonable.  Ms. Elkin, could you

9      try to tie your --- make sure we're comparing apples

10     and oranges and calling them apples and oranges.  So

11     let's tie it to the term that the Government uses to

12     describe arrival.

13   ATTORNEY ELKIN:

14   Your Honor, can I approach, so he

15     doesn't keep to have going back to the ---?

16   JUDGE:

17   That's a good idea.

18   ATTORNEY ELKIN:

19   Okay.

20     BY ATTORNEY ELKIN:

21     Q. So when you said the Government used arrival time

22     of the control center area ---?

23   ATTORNEY KERR:

24   Objection, Your Honor.  Arrival time

25     again.

939
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY ELKIN:
2    I'm going to try to tie it back into
3       what he was talking about here.
4    JUDGE:
5    Why don't you finish your question, and
6       then we can see if there's still an objection.
7    BY ATTORNEY ELKIN:
8    Q. When you testified that the Government used a
9       different camera to report an arrival time, were you
10      talking about the time set forth on the Government's
11      exhibit under time CO enters compound or stops to get
12      shift at the beginning --- it says of a 16-hour post.
13   Okay.
14   So let me go to the next column.  Time CO gets
15      ███████████████████████████ at the beginning of a
16      shift.
17   A. Yes.
18   Q. So for a 24-hour post, if we go down to
19      Buckingham, for example, B Unit, B Side.
20   Do you see that halfway down the page?
21   A. Unit B Side, correct.
22   Q. Okay.
23   When you were saying arrival time, was that the
24      time CO enters the compound?
25   A. Yes.

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    ATTORNEY ELKIN:

2    A moment, Your Honor.

3      BY ATTORNEY ELKIN:

4      Q. But you use the camera closest to where the

5      ███████████████████████████████████████, is that

6      right, ---

7      A. Correct.

8      Q. --- for the time that they come on duty?

9      A. Correct.

10     Q. Then why did you use that camera?

11     A. Because that's the time we believe is

12     compensable.

13     Q. Sorry?

14     A. That's the time they're on duty here.

15     Q. Did your exit time use the same camera in the

16     Government's analysis?

17     A. Yes.

18     Q. And you know that from your review of the time?

19     A. Correct.

20     Q. Okay.

21     So let's just look at Exhibit ---.

22     ATTORNEY ELKIN:

23     Your Honor, may I approach?  Again,

24       they're just separate.

25     JUDGE:

941

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

```
 1   Okay.
 2     BY ATTORNEY ELKIN:
 3     Q. Let's look at your Exhibit A for the first
 4     representative here --- do you see that about four
 5     lines down?
 6     A. Yes.
 7     Q. And you capture his arrival time at what time?
 8     A. At  █████  so  ████████
 9     Q. Okay.
10   And you started --- you were going to the exit
11     time.  You calculated departure time at ---?
12     A.  █████████████
13     Q. Okay.
14   And if you look to the Government's exhibit for
15     Hagenburg, which is DX-13, on 5/6/2019, the column
16     that says time CO leaves compound, and then in
17     parentheses, returns equipment, 16-hour p.m. shift,
18     what time does the Government report?
19     A.  ██████.
20     Q. Okay.
21   And so your  ████  is --- is that how you did it,
22     do you round up seconds and round down seconds?
23     A. Yes.
24     Q. So was your practice to round anything 30 or
25     higher up to the next minute?
```

942

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1        A. Yes.

 2        Q. And under 30 would go where?

 3        A. Down.

 4        Q. Okay.

 5   And then just to continue along the line, 5/7/19

 6        for Hagenburg, you captured as the departure time what

 7        time?

 8        A. ███████████

 9        Q. And if you flip to the Government's exhibit on

10        5/7/2019, what time do they have?

11        A. ████████████████

12        Q. Okay.

13   And does that reflect the kind of rounding that

14        you did?

15        A. Yes.

16        Q. And then one more.  Hagenburg on 5/9/2019, you

17        captured his departure time at what time?

18        A. ██████

19        Q. And the Government captured it at?

20        A. ████████████████████████

21        Q. Okay.

22   So based on that review, is it your understanding

23        that you used the same camera as the Government for

24        the end of the shift?

25        A. Yes.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

943

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY KERR:

2    Objection, Your Honor, to the extent the

3       Government just had camera at the end of the shift.  I

4       understand Counsel's question, it could be misleading

5       that the Government used that camera.

6    JUDGE:

7    I think it's pretty clear in context

8       we're lining up departure time on the Government's

9       analysis and Plaintiff's analysis.

10   Is that what's going on?

11   ATTORNEY ELKIN:

12   That's correct, Your Honor.

13   ATTORNEY KERR:

14   Well, just so the record's clear, we're

15      lining up departure time on Mr. Shemanski's exhibit

16      with the time the CO leaves compound on the

17      Government's exhibit.

18   JUDGE:

19   I think that is clear from the question,

20      and now it's even more clear.  So thank you for

21      raising it.

22   ATTORNEY KERR:

23   Thank you.

24      BY ATTORNEY ELKIN:

25      Q. Okay.

944

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Based on your study --- and did you do this ---
2       the Excel programs average all the times for the
3       different --- for the different posts?
4       A. Correct.
5       Q. Okay.
6    So there was no human math involved in ---
7       A. No.
8       Q. --- any of the averages?  Based on your study,
9       what were the average times per shift for the Compound
10      1 Officer?  And you can refer to your Declaration if
11      that helps in paragraph 19.
12      A. It's the Exhibit A summary.
13   Correct?
14      Q. No.  I'll have you look to your Declaration,
15      which is in front of the Exhibit A summary at
16      paragraph 19.
17      A. Compound 1?
18      Q. Yes.
19      A. Eight hours, 12.02 minutes.
20      Q. And then for Control 1?
21      A. Eight hours, 10.02 minutes.
22      Q. SHU 1?
23      A. Eight hours, 14.61 minutes.
24      Q. A-Side Housing Units?
25      A. Eight hours, 17.27 minutes.

945

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. And for the posts that are subject to this
2      report, how --- this analysis, how many times were you
3      able to capture both entry and exit times for the
4      Compound 1 post?
5      A. Can I refer ---?
6      Q. You can refer to that.  You can refer to your
7      Declaration at paragraph 21.
8      A. Which paragraph?
9      Q. Twenty-one (21).
10     A. The Compound 1 was 58 shifts.
11     Q. For Control 1?
12     A. Fifty-seven (57).
13     Q. SHU 1?
14     A. Fifty-nine (59).
15     Q. And the 24-hour Housing Unit?
16     A. 213.
17     Q. Now, I see in your Declaration that you captured
18     average times for the Plaintiffs that submitted their
19     own Declarations in the Report of Summary Judgment.
20     Is that what you did?
21     A. Yes.
22     Q. Three of those Plaintiffs have been chosen by the
23     parties to be representative Plaintiffs.  They are
24     Buckingham, Hagenburg and McPhillips.
25     What were the average times for Mr. Buckingham?

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      It was at paragraph 23 of the Declaration.

2      A. Eight hours, 20.89 minutes.

3      Q. And then for Mr. Hagenburg?

4      A. Eight hours and 21 minutes.

5      Q. And Mr. McPhillips?

6      A. Eight hours, 14.5 minutes.

7      Q. The other four representative Plaintiffs are

8      Christian Conklin, Jean Leimkuhler, Matthew Bunting

9      and Eric Christiansen.

10     Did you capture any video times for Leimkuhler?

11     A. No.

12     Q. Why not?

13     A. Because he wasn't on a covered post.

14     Q. So he wasn't on camera on one of the posts that

15     you reviewed?

16     A. No.

17     Q. Okay.

18     How about for Christian Conklin?

19     A. No.

20     Q. Why not?

21     A. He wasn't working a covered post.

22     Q. Okay.

23     Now, I notice your Exhibit A, there is an entry

24     for Conklin.  So go to your Exhibit A, page five, and

25     tell me when you're there.  It's a ---.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
1       A. I'm there.

2       Q. Okay.

3     We're looking for May 10th, 2019, Unit D, and you

4       can see there's a Conklin there with a total time of

5       eight hours and 33 minutes and assigned to Unit D.

6       A. Yes.

7       Q. Why didn't you put that down?

8       A. That's Steve Conklin.  It's a different one, a

9       different Conklin.

10      Q. A different Conklin.  Okay.  And would your

11      answer be the same for the 5/7/2019 entry of --- Unit

12      EV, which I believe is --- that's page eight of nine,

13      about six lines up from the bottom.

14      A. Yes.

15      Q. May 7th, 2019, is that also Steve Conklin with

16      that eight hour and 22-minute entry?

17      A. Correct.

18      Q. Okay.

19    And Mr. Bunting --- Matt Bunting was the other

20      --- another representative Plaintiff.  Why did you ---

21      or did you include any times for him?

22      A. No.

23      Q. Why not?

24      A. He wasn't on a covered post.

25      Q. Okay.
```

948

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Is it possible he was on ███████ during that time,

2       if you know?

3       A. Yes.  It's quite possible.  There's no

4       documentation.

5       Q. And then Eric Christiansen, it appears that you

6       did review him.

7    Is that right?

8       A. Yes.

9       Q. And these are ---.  When we go over these, I want

10      you to look at page two.  Start off there of your

11      exhibit.  When he was working at Control 1, almost ---

12      a little bit more than halfway down the page on

13      5/11/2019.

14      A. I'm there.

15      Q. Okay.

16   Do you see what you recorded for him as the entry

17      and exit times?

18      A. I do.

19      Q. What was it?

20      A. ████████████████

21      Q. And the average total time --- or the total time

22      inside was ---?

23      A. Eight hours --- eight hours, nine minutes.

24      Q. Okay.

25   And then if you look to page five when he's

949

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

1      working Unit D on May 8th, 2019.

2      Do you see that?

3         A. I do.

4         Q. Okay.

5      And what was the total time captured for that?

6         A. Eight hours, 19 minutes.

7         Q. I'm going to take you again to Defendant's

8      Exhibit 14.

9      Is that still in front of you?

10        A. This?

11        Q. That.  And if you look to Christiansen on that

12     date --- Christiansen in that exhibit.

13     Do you see any entry for Christiansen on Guards

14     exhibit for 5/8/2019?

15        A. 5/8/2019?

16        Q. Yes.

17        A. for 5/8, no.

18        Q. Okay.

19     And you captured eight hours and 19 minutes of

20      that tape.

21     Correct?

22        A. Correct.

23        Q. All right.

24     Going back to your Exhibit A.  So, so far we have

25      8/09 and 8/19.  Page six, if we can look to July 8,

Trial

Kathy Aitken, et al. v. USA                                  3/15/2023

```
 1    2019 when Christiansen was working Unit FA, what is
 2    the total amount of time that you have based on your
 3    review for him?
 4    A. Eight hours 22 minutes.
 5    Q. Okay.
 6  If you look at the Government exhibit for Eric
 7    Christiansen.  I withdraw that.
 8  Then for 7/9/2019, Unit FA, what do you have for
 9    Christiansen?
10    A. 7/9?
11    Q. Yes.
12    A. Eight hours, 18 minutes.
13    Q. Okay.
14  And then also on the same page for July 11, 2019,
15    when working FA, what do you have for Christiansen?
16    A. Eight hours 21 minutes.
17    Q. Okay.
18  And were you able to do an average of Eric
19    Christiansen's hours at some point prior to today?
20    A. Yes.
21    Q. And approximately how much --- well, how much
22    time was Eric Christiansen based on your study on duty
23    beyond eight hours?
24    A. Over 15 minutes.
25    Q. Do you know whether it was over 17 minutes?
```

951

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. I don't remember exactly.

2    Q. But the way you would find the average would be

3    add up all those minutes and divide it by the number

4    of times ---

5    A. Correct.

6    Q. --- recorded?

7    A. Correct.

8    Q. And if I told you that we've done that exercise,

9    and it was 17 minutes and 66 seconds --- or 17.66

10   minutes, would you have any reason to doubt that?

11   A. No.

12   Q. Now, why did you use ---?  Sorry.

13   Why did you use the ████████████, which was

14   provided to us?  We saw that when ---.

15   Why did you use the ██████ --- the same door

16   that the Government was?

17   A. Probably should have.

18   Q. And why do you say that?

19   A. Because you're still --- you still are subject to

20   responding and expected to respond to an emergency if

21   you're inside the institution.

22   Q. And had you used the ███████████ for which we

23   had a camera, would that have added time to the video

24   review that we did?

25   A. Of course.

952

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1     Q. Are you still subject to all the rules of the
 2     institution when you're at ███?
 3     A. Yes.
 4     Q. And you would have to follow instructions of the
 5     lieutenants and Captains at that point?
 6     A. Of course.
 7     Q. Yes?
 8     A. Yes.
 9     Q. You were on the tour with us with the Judge
10     and the lawyers ---.
11     A. Uh-huh (yes).
12     Q. I believe it was on February 28th.
13  Do you recall that?
14     A. Yes.
15     Q. Would you describe --- what we observed on the
16     compound during that tour, was that normal operations
17     or was there different about that day?
18     A. No, it wasn't normal operations.  We had a
19     snowstorm the day prior and as the tour was occurring
20     mainline was delayed.
21     Q. What time did mainline normally start?
22     A. ███
23     Q. And what time did it start this day, do you
24     recall?
25     A. It was after ███
```

953
Trial
Kathy Aitken, et al. v. USA                                3/15/2023

1    Q. And what prompted, do you recall, the mainline to
2    start ---?
3    A. I believe Judge Schwartz wanting to see it.
4    Q. And at that point, did the Captain and the
5    Lieutenant make some calls on the radio to make the
6    mainline happen?
7    A. The Captain directed the Operations Lieutenant,
8    too --- on the mainline.
9    Q. Did we see any moves during the time --- the
10   entire time we were inside the institution?
11   A. No.
12   Q. Okay.
13   And normally during the hours we were in there,
14   which were, I think, ███████████ or so, were there
15   visits?
16   A. Yes.
17   Q. Were there --- and the mainline would have been
18   called normally at ██████
19   A. Yes.
20   Q. Did the Lieutenants or the Captains that were
21   with us, did they have radios with them during our
22   tour?
23   A. Yes.
24   Q. And were they able to radio to control center and
25   have the pass-down reports when we were at ---?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

954

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. Yes.

2    Q. When you were --- when Correctional Officers are

3    leaving a 24-hour post, do they have their radios with

4    them?

5    A. No.

6    Q. Would you agree that on our tour the doors were

7    open pretty instantaneously once we were all sort of

8    at the count, at the control center door?

9    A. I would.

10   Q. Is a Captain normally wearing a suit and tie

11   during the shift?

12   A. No.

13   Q. Are there normally 14 or so people going from ---

14   visitors, Judges, lawyers, going into the housing

15   units?

16   A. No.

17   Q. After your deposition, did you have a time --- a

18   chance to do a study of the times between where you

19   recorded the arrival time at that outer door, A-1,

20   PTD, and where the Government recorded the time that

21   the Correctional Officer entered the compound?

22   A. Yes.

23   Q. Okay.

24   And if you go to --- I think it's under

25   Supplemental Response --- Response Analysis, at the

955

Trial

Kathy Aitken, et al. v. USA                    3/15/2023

1      back of your Exhibit A.  Right at the end of
2      your ---.  It starts at the bottom.
3   So does this reflect the study that you did after
4      your deposition?
5      A. Yes.
6      Q. Okay.
7   And are these the same times that are set forth
8      on your Exhibit A, as your arrive time?
9      A. Yes.
10     Q. And where did the time on the compound come from?
11     A. From the compound --- compound camera door.
12     Q. From the Government's exhibit?
13     A. Correct.
14     Q. Okay.
15   So that was their arrival time?
16     A. Arrival time.  This is the difference.
17     Q. I noted that, you know, for example, 6/14/2019,
18     you have the arrival time, but the Government didn't
19     so you weren't able to make any kind of comparison.
20   Is that right?
21     A Correct.
22     Q. Okay.
23   So otherwise is it fair to say that the
24     comparison is you're subtracting the time at the
25     arrival --- you're not, the Excel program is ---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      subtracting the time from the arrival time at the
2      front line from what the Government reported in its
3      compound arrival?
4      A. Correct.
5      Q. Okay.
6  And then the program would do the difference
7      between that front round door and the compound door?
8      A. It did.
9      Q. And for Mr. Buckingham, was the average amount of
10     time it took him to get from one point to the other,
11     ████████████████████████
12     A. Correct.
13     Q. And for Christensen, was the average, ████--- I'm
14     sorry, that's not right.
15  Was the average, ██████████████████████████
16     ███████████████████
17     A. Yes.
18     Q. Okay.
19  So this is ████████████████, is that
20     approximately ████████████?
21     A. Yes.
22     Q. Okay.
23  And then the same question for Christensen, was
24     the average time ████████████
25     A. Correct.

957
Trial
Kathy Aitken, et al. v. USA                                          3/15/2023

1    ATTORNEY KERR:
2    Objection, Your Honor.  The time is
3      reflected in time as opposed to decimals.  If this
4      witness perhaps can clarify that or ---?
5    JUDGE:
6    Yeah, I think there's a better way to do
7      it.  Why don't you ask the witness why it's stated in
8      time and why you're going by decimals?  So if you want
9      to go by decimals, you need to justify it for the
10     witness's testimony.
11   ATTORNEY KERR:
12   Thank you, Your Honor.
13   ATTORNEY ELKIN:
14   According to my brain, I misspoke.  It's
15     milliseconds.  So it's ██████████████████
16     ████████████████    But that's --- that's what the time is,
17     since it's recorded in time.
18   Does that sound right?
19   JUDGE:
20   No, it does not at all sound right.
21   ATTORNEY ELKIN:
22   It doesn't?
23   JUDGE:
24   ██████████████████  ████████████████ ---
25     ██████████████████

958

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY KERR:

2    Your Honor, the cameras at Otisville are

3      good, but not like to the ---.

4    JUDGE:

5    Why don't --- I don't --- why don't you

6      ask the witness the --- ask the witness about the ---

7      about the numbered entries?

8    ATTORNEY ELKIN:

9    Okay.

10     BY ATTORNEY ELKIN:

11     Q. Are the --- are the numbered entries at the

12     bottom, how --- are they averages?

13     A. They are averages.

14     Q. Okay.

15   And even though there's a decimal point (sic)

16     there, that's ---.

17   JUDGE:

18   Even though there's a colon there.

19   ATTORNEY ELKIN:

20   Sorry.

21     BY ATTORNEY ELKIN:

22     Q. Even though there's a colon there, should it

23     actually be, for example, for Christensen, ████

24   ████████

25     A. Yes.

959

Trial

Kathy Aitken, et al. v. USA                                          3/15/2023

1       Q. Okay.

2   And it's --- would your answer be the same if

3       Hagenburg, it took him ██████████ to get from where

4       you recorded the entrance time to where the camera

5       reported the entrance time?

6       A. Correct.

7       Q. And then the same thing for, McPhillips would be

8       approximately ██████████ to get from the --- where

9       you recorded the entrance time to when he arrived at

10      the compound?

11      A. Correct.

12      Q. And on average, do you recall what you testified

13      in a deposition for on average it took to get from

14      that location where --- the front entrance to the

15      compound?

16      A. ████████████████████

17      Q. And was this study generally consistent with that

18      testimony?

19      A. It was.

20      Q. ██████████████████████████████

21      ████████████████

22      A. Yes.

23      Q. Were these ever discussed in LMR meetings?

24      A. They were.

25      Q. Was that prior to your --- were you at LMR

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    meetings or how do you know about that?  Let me ask
 2    you that.
 3    A. Just reviewing LMR minutes and documents in the
 4    Union office trying to find documents pertaining to
 5    other issues that we were currently dealing with.
 6    Q. Okay.
 7    A. Just documents that are.
 8    Q. I'm going to show you what's been marked as
 9    Plaintiff's Exhibit 4.  It is in the yellow binder.
10                         ---
11    (Whereupon, Plaintiff's Exhibit PLX-4,
12    LMR Meeting Minutes 3/18/14, was marked
13    for identification.)
14                         ---
15    BY ATTORNEY ELKIN:
16    Q. Are you there?
17    A. I'm there.
18    Q. Okay.
19    Are these the minutes from a labor management
20    meeting from March 20th --- March 2014?
21    A. Yes.
22    Q. I'm sorry?  Are they?
23    A. They are.
24    Q. Okay.
25    And it does not appear that you were at this
```

961

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    meeting, but are you familiar with this document?
2    A. Yes.
3    Q. And does it appear to accurately --- does it
4    appear to be the minutes of this meeting?
5    A. It does.
6    ATTORNEY KERR:
7    Objection, Your Honor.  It wasn't a
8    meeting as it accurately reflects.
9    JUDGE:
10   Well, he can --- he can authenticate it
11    as a copy of the minutes, but he can't authenticate it
12    as an accurate reflection of what happened at the
13    meeting that he didn't attend.
14   Does that solve the problem?
15   ATTORNEY KERR:
16   Yeah.  That's the basis of my objection,
17    Your Honor.
18   ATTORNEY ELKIN:
19   Okay.
20   JUDGE:
21   So --- so I mean, it's --- it's hearsay
22    obviously, and he wasn't there, so he doesn't know
23    what was said and said there.  So we've got quite a
24    bit of hearsay here.  But if he sees minutes, he can
25    say that this is a copy of the minutes.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    ATTORNEY ELKIN:

2    Okay.

3      BY ATTORNEY ELKIN:

4      Q. You've seen minutes before from LMR meetings?

5      A. Yes.

6      Q. And is this a copy of the minutes that you have

7      seen in the Union office?

8      A. Yes.

9    ATTORNEY ELKIN:

10   Can I move to admit this?

11   JUDGE:

12   Give it a try.

13   ATTORNEY ELKIN:

14   Okay.

15   ATTORNEY KERR:

16   Object, Your Honor, on hearsay and lack

17     of foundation.  And we have here, Your Honor, a more

18     complete version of this.  So it's incompleteness as

19     well.  This isn't the complete record.

20   JUDGE:

21   What's missing from this one?

22   ATTORNEY ELKIN:

23   No --- nobody's ever --- I mean we've

24     --- that was one of their objections to exhibits.

25   ATTORNEY KERR:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      I'm sorry, I misunderstood.  It's under
2        minutes, it's a collection.
3      JUDGE:
4      Okay.
5      ATTORNEY KERR:
6      So I'm sorry, I misunderstood.
7      JUDGE:
8      Okay.
9      So --- so you've got a hearsay objection
10       and a foundation objection?  Okay.  So can you
11       establish that he's --- that he personally saw it?
12       That he's personally seen these minutes before this,
13       of this meeting and that he would know outside of
14       sitting on the stand today what --- what that it is
15       what it purports to be?
16       BY ATTORNEY ELKIN:
17       Q. Have you personally seen a copy of these minutes,
18       and can you testify that it is what it purports to be
19       which are the minutes of a meeting?
20       A. Yes.
21       JUDGE:
22       Okay.
23       So I'll admit it, but the --- but only
24         as a copy of the minutes.  Not for the truth of the
25         matter asserted, unless --- unless you can prove that

964

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    hearsay exceptions apply to its contents.
2    ATTORNEY ELKIN:
3    Let me see if there's an exception.
4      Okay, let me lay a foundation.  Your Honor, I think
5      the exception is the business records exception.
6    JUDGE:
7    Okay.
8    Can you lay --- if you ---.
9    ATTORNEY ELKIN:
10   Okay.
11   JUDGE:
12   You could lay some foundation for that.
13     Or maybe, could you ask questions about something in
14     particular that's in it, and then you can address
15     whatever objection comes up in light of your
16     exception?
17   ATTORNEY ELKIN:
18   I think I'll lay the foundation as the
19     business record, and then I want it to be non-hearsay
20     or an exception to hearsay, whatever.
21   JUDGE:
22   Okay.
23   ATTORNEY ELKIN:
24   Okay.
25   So Mr. Shemanski, are labor management

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       --- LMR meeting minutes, are they ---?

2    JUDGE:

3    And --- and which hearsay exception are

4       you talking about?  What's the --- which --- 803 what?

5    ATTORNEY ELKIN:

6    803(6).

7       BY ATTORNEY ELKIN:

8       Q. Okay.

9    So is --- are LMR meeting minutes, were these

10      meeting minutes that's dated March 18th, 2014, are

11      they made at or near the time that the March 2014

12      meeting took place?

13      A. I would say yes.

14      Q. Okay.

15   And are these kind of LMR meeting minutes kept in

16      the course of regular conducted activity of the Union

17      and agency?

18      A. Yes.

19      Q. And making a record of the meeting minutes was a

20      regular practice of the Union and agency?

21      A. Yes.

22   ATTORNEY ELKIN:

23   Okay.

24   Your Honor, I move to admit this as ---

25      as an exception to hearsay.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY KERR:

2    Objection, Your Honor.  Mr. Shemanski's

3      testified to the general practice of the Union, but he

4      wasn't at this meeting.  He doesn't --- it's a lack of

5      foundation for the business exception.  He doesn't

6      know whether this particular document was created.

7    JUDGE:

8    Yeah.  Does he have --- like say how

9      does he know?  How do we know if the record was made

10     at or near the time by someone with knowledge?  It's

11     not ---.

12   ATTORNEY ELKIN:

13   I mean.

14   JUDGE:

15   I mean, I don't know who wrote it.  It's

16     not signed by anybody.  Any --- their signature's at

17     the top, but I don't know if it was signed by --- I

18     don't know.  I don't know about 6(a).  It says the

19     conditions have to be --- the conditions for --- for

20     803(6) have to be shown by the testimony of the

21     custodian or another qualified witness.

22   ATTORNEY ELKIN:

23   Okay.

24   Your Honor, can I keep going?

25     BY ATTORNEY ELKIN:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Is the Union President the custodian of labor

2    management meeting minutes?  Do you have these in your

3    file at the Union Office?

4    A. Yes.

5    JUDGE:

6    Does the Union --- I don't know if he

7    was the Union President at the time.  And Mr. Kerr, if

8    he's the Union President, does that satisfy you?

9    ATTORNEY KERR:

10   So Your Honor, he wasn't at this

11   meeting, so ---.

12   JUDGE:

13   Yeah, he wasn't at the meeting.

14   ATTORNEY ELKIN:

15   But the general ---.

16   ATTORNEY KERR:

17   And also, how can he testify about when

18   this was created?

19   JUDGE:

20   Yeah.  I don't know if he can testify

21   about when the document was created if he wasn't.

22   ATTORNEY ELKIN:

23   I --- I will, we have the minutes yeah,

24   right?

25   JUDGE:

968

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    It's not.

2    ATTORNEY ELKIN:

3    Okay.

4    JUDGE:

5    It's been admitted for a limited

6      purpose.

7    ATTORNEY ELKIN:

8    Okay.

9    JUDGE:

10   But not for the truth in any of the

11     matters asserted in it.

12   ATTORNEY ELKIN:

13   And Your Honor, I'm not going to even

14     ask any more questions about this.  I'm just going to

15     ask whether --- do you have personal knowledge of

16     whether the Union ever raised the issue ███████

17     ███████

18   BY ATTORNEY ELKIN:

19     Q. And that's a safety concern at FCI Otisville?

20     A. I mean it's widely known.

21     Q. Okay.

22   And did the Union, in fact, raise that issue to

23     management?

24     A. Yes.

25   ATTORNEY ELKIN:

969

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Your Honor, I have nothing further.

2    JUDGE:

3    Okay.

4    Do we want to go right into Cross or do

5      we want to have our lunch break now?

6    ATTORNEY KERR:

7    Well, I'm happy to go either way, Your

8      Honor.

9    JUDGE:

10   But how long do you think Cross would

11     be?

12   ATTORNEY KERR:

13   At least an hour, if we were to start.

14   JUDGE:

15   I can go for it.  Everybody comfortable?

16     Let's go for it.

17                      ---

18                   CROSS EXAMINATION

19                      ---

20     BY ATTORNEY KERR:

21     Q. Good morning, Mr. Shemanski.

22     A. Good morning, how are you?

23     Q. Nice to see you again.

24     A. Good morning.

25   JUDGE:

970

Trial

Kathy Aitken, et al. v. USA                                         3/15/2023

1   By the way, before --- before you go, I
2     want to --- I happen to avail myself to the chance to
3     ask questions of witnesses.
4   Did I hear you correctly say, Mr.
5     Shemanski, that the prisoner move for lunch was done
6     at a particular time because you thought it was what I
7     wanted to see or did I misunderstand you?
8   THE WITNESS:
9   No, that's --- that was my
10    interpretation of it.
11  JUDGE:
12  Oh, my gosh, I had no idea that that is
13    why the prisoners moved then.  I would never under any
14    circumstances have asked you to do anything different
15    for the --- for the, with the prisoners just for me to
16    see it.  I am apologetic, and I deeply regret if
17    anything that I happened to --- I happened to have
18    done, gave you the impression that I wanted you to
19    manage your prisoners to put on a show for me.  It's
20    not what I wanted.  I had no idea that that was what
21    was going on.  I am sorry if that is what you --- how
22    you interpreted it.
23  THE WITNESS:
24  No, I'm happy to --- yes, sir.
25  JUDGE:

Trial

Kathy Aitken, et al. v. USA                           3/15/2023

1    Okay.  That's fair.

2    ATTORNEY ELKIN:

3    Your Honor, that raises something for me

4      to continue asking him a question.

5    Is that okay?

6    JUDGE:

7    What's that?  It's --- in bench trial

8      Judges sometimes ask questions of witnesses.

9    ATTORNEY ELKIN:

10   No, absolutely.  I --- I don't, I just

11     want you to know that the only thing, I think the

12     reason that was said is that normally there's a

13     ████████████████████.  And things weren't operating as

14     normal that day.  Maybe it was the snow, maybe it was

15     we were all there.  But it was, seemed like they were

16     intentionally keeping it quiet and not having them

17     while we were there.

18   JUDGE:

19   It's --- I don't mind, and I think I ---

20     and I think I understood that.  And I think I

21     understood from Mr. Shemanski's testimony just now

22     that it wasn't --- it wasn't a typical day.  What I'm

23     surprised by, and what I wanted to emphasize was that,

24     now I understood it was a little bit different, but I

25     don't want anybody to think that I wanted anybody to

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    manage prisoners different --- differently to put on a
2    show for me.
3  ATTORNEY ELKIN:
4  I don't think that's at all what Mr.
5    Shemanski was saying.  I think that --- I think that,
6    if anything, and this is a Judge trial so ---.  I
7    think that if anything, the Government was putting on
8    a show for you, trying to make it look like ---.
9  JUDGE:
10  I do not want to --- I don't want
11    fingers pointed at anybody ---
12  ATTORNEY ELKIN:
13  Okay.
14  JUDGE:
15  --- anybody else.  We can --- I want to
16    move on ---
17  ATTORNEY ELKIN:
18  Okay.
19  JUDGE:
20  --- move on from this.  I don't know ---
21    I'm not blaming anybody in particular and I don't want
22    to hear the parties blame --- blame each other.  The
23    important thing is just for me to emphasize that ---
24    that I recognize the day was unusual, but I want --- I
25    didn't want anything to be done differently just

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1     because of me.  Whatever caused, that is not what I

2     would have ever wanted.

3   ATTORNEY ELKIN:

4   Understood, Your Honor.

5   JUDGE:

6   Mr. Kerr, you can go ahead with your

7     Cross.

8     BY ATTORNEY KERR:

9     Q. Good morning, Mr. Shemanski.

10    A. Good morning.

11    Q. Did the Union ever request time clocks?

12    A. Did they request?

13    Q. Time clocks?

14    A. Time clocks, no.

15    Q. Would you want time clocks?

16    A. Would I want time clocks?

17    Q. Yeah.

18    A. It would have to be discussed with the body.

19    It's not about what I want.

20    Q. Mr. Shemanski, I'd like to ask you some questions

21    to better understand your footage review.

22   Is it ---?

23    A. Can I --- can I go back?  Can I open ---?

24    Q. I'm sorry?

25    A. Can I look to my ---?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. Yes, please.

2     A. Yeah.

3     Q. Yeah, that was an inarticulate way to direct you

4     to it.

5     A. Yeah, no.  I'm sorry.

6     Q. PLX-23.  Could you please turn to Exhibit A of

7     --- excuse me, PLX-23, page number two of nine?

8     A. Okay.

9     Q. Yeah, almost halfway down that page there are two

10    dates from May 5th, 2019?

11    A. Okay.

12    Q. Do you see those?

13    A. Yep, I do.

14    Q. The second date says approximately I wrote

15    Control 1 ██████████ Shemanski?

16    A. Correct.

17    Q. Is that you?

18    A. That's me.

19    Q. So after your name there are three columns of

20    times that you went over on Direct.  Arrival time,

21    departure time and total time?

22    A. Correct.

23    Q. And I want to make sure we're clear.  Arrival

24    time is the time of entering the A1 lobby.

25    Is that correct?

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. That's correct.

2      Q. And departure time is the time entering the

3      control lobby while you went back from shift?

4      A. Correct.

5      Q. And the total time is the duration between those

6      two times?

7      A. Correct.

8      Q. So your video footage review didn't capture the

9      time a Correctional Officer arrived on post.

10     Is that correct?

11     A. Do you mean physically walking into the housing

12     unit?  Correct.

13     Q. Yes.  And looking at the line above on the same

14     day, May 5th, 2019, Officer Rivera from ██████████

15     ██████

16     A. Okay.

17     Q. On this date, did you relieve Officer Rivera?

18     A. I did.  I relieved him.

19     Q. So you didn't capture what time Officer Rivera

20     left the post after you arrived.

21     Is that correct?

22     A. Do you mean like physically the day I went to

23     work?

24     Q. Yeah.  No, he left the post.  You didn't record

25     what time he left the post that day?

976

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      A. No.

2      Q. Okay.

3    And then underneath your name it's Officer Drake

4      ███████████

5    On this day, you relieved Officer Drake?

6      A. Officer Drake relieved me.

7      Q. Yeah, I'm sorry.

8      A. Correct.

9      Q. Thank you.

10    So on May 5th, 2019, you arrived in the A1 lobby

11      at ██████

12    Is that correct?

13      A. Correct.

14      Q. And you arrived in the control lobby on your way

15      back, at ██████

16    Is that correct?

17      A. Correct.

18      Q. And your shift that day ended at ██████████

19    Is that right?

20      A. Correct.

21      Q. So you entered the control lobby on your way home

22      13 minutes before the end of your shift.

23    Is that right?

24      A. Correct.

25      Q. Were you relieved early that day by Officer

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

977

Trial

Kathy Aitken, et al. v. USA                                   3/15/2023

1      Drake?

2      A. Was I relieved early?

3      Q. Yes.

4      A. No, I wouldn't say early.  I was relieved.

5      Q. Were you relieved before the end of your shift?

6      A. No.

7      Q. Your shift goes to █████████

8    Correct?

9      A. It does.

10     Q. And you're leaving the control of your --- you're

11     entering the control at █████

12     A. After I was properly relieved, yes, sir.

13     Q. And that's --- that's before ███████

14   Correct?

15     A. Correct.

16     Q. So were you relieved before the end of your

17     scheduled shift?

18     A. I was relieved --- I was relieved from my shift.

19     Q. So the departure time of the officer you

20     relieved, which was Officer Rivera, is █████

21   Correct?

22     A. Correct.

23     Q. And the time --- and again, that's the time he

24     entered the control lobby after his shift?

25     A. Yes.  Yes.

978

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      Q. Considering that Officer Rivera entered the
2      control lobby at █████, is it fair to say that you
3      were over 18 minutes --- you were at your shift
4      approximately 18 minutes before your shift was
5      scheduled to start?
6      A. Can you rephrase again?
7      Q. Sure.
8   So Officer Rivera's time entering the control
9      lobby is █████.
10  Is that correct?
11     A. That's correct.
12     Q. So that's after you relieved him.
13  Is that correct?
14     A. Correct.
15     Q. So is it fair to say that you started your shift
16     over 18 minutes before your shift was scheduled to
17     start?
18     A. It's fair to say on paper perhaps what our post
19     orders say.  But in order to --- to be prepared for
20     your shift at ████████████████, there's a
21     count.  So I have to have all that documentation ready
22     for count.  If that's not done and I don't get there
23     until█████ the count, the operation of the
24     institution is, you know, it's on pause, whatever you
25     want to call it.

979
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. Officer Rivera's departure time of ▮▮▮▮ is four
2     minutes after your arrival time at ▮▮▮▮.
3  Is that correct?
4     A. Correct.
5     Q. So is it fair to say that on May 5th, 2019 it
6     took ▮▮▮▮▮▮ for you to go from the A1 lobby to
7     the control room to exchange equipment with Officer
8     Rivera, and then for Officer Rivera to exit the
9     control room?
10     A. That's what it shows here.
11     Q. All of that happened in ▮▮▮▮▮▮▮.
12  Correct?
13     A. That's what it shows here.
14     Q. Your shift on May 5th, 2019 was scheduled to
15     start at ▮▮▮▮.
16  Correct?
17     A. Correct.
18     Q. So you were required to be on post at ▮▮▮▮.
19  Is that correct?
20     A. Correct.
21     Q. Do the post orders for Control Center 1 require
22     you to be on post at ▮▮▮▮
23     A. Correct.
24     Q. You were not required to be over 18 minutes prior
25     to 1▮▮▮.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

980
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Correct?

2      A. No.

3      Q. Could you please look down that page to July 7th,

4    2019?  It's the --- there's two July 7ths, so we'll

5    focus on the second one.  It says Control 1, again

6    ████████████████████

7      A. Yes.

8      Q. Mr. Shemanski, do you see where I am?

9      A. I do.

10     Q. On this date, you arrived at the A1 lobby at

11   ███████████

12   Is that correct?

13     A. Correct.

14     Q. So were you late for your shift on July 7th,

15   2019?

16     A. I don't know.  I could have been working overtime

17   or did a swap, I don't know.

18     Q. Sorry, were you finished?

19     A. Yeah, I'm finished.

20     Q. But you relieved ---?

21     A. From that shift this time, yes, sir.  I went ---

22   did --- that time indicates that I was late.

23     Q. So there's no Lieutenant posted in the A1 lobby

24   to mark you down as late.

25   Right?

981
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1       A. Correct.
2       Q. And then the Control Officer in the lobby isn't
3       marking people down as late.
4    Correct?
5       A. Correct.
6       Q. And if you'll please look at the line above
7       McGregor, his shift was the same day as yours ██████
8       ████ .
9       A. Same --- same thing.
10      Q. And you relieved McGregor that day.
11   Is that correct?
12      A. Correct.
13      Q. And he --- his departure time is █████ .
14   Is that correct?
15      A. Correct.
16      Q. So his departure time is ███████████████████
17      after your arrival time at ██████
18   Is that correct?
19      A. Correct.
20      Q. So it's fair to say on July 7th it took █████
21      ██████  for you to go from the A1 lobby to the control
22      room, exchange equipment with Officer McGregor, and
23      for Officer McGregor to exit the control room?
24      A. Correct.
25      Q. And your total for that day is seven hours and 41

982

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     minutes.

2  Is that correct?

3     A. Correct.

4     Q. Mr. Shemanski, I'd like you to please turn to the

5     next page, three of nine.  And I'm looking at the date

6     of August 11th, 2019.

7     A. Okay.

8     Q. ████ to again████    Shemanski --- your arrival

9     time on that date is ████.

10  Is that correct?

11     A. That's correct.

12     Q. And again, you're relieving Mr. McGregor on the

13     line above.

14  Is that correct?

15     A. That's correct.

16     Q. And Mr. McGregor's departure time is ████.

17  Is that correct?

18     A. That's correct.

19     Q. And ████ is ████████ after your arrival time

20     of ████.

21  Correct?

22     A. Correct.

23     Q. So is it fair to say that on August 11th it took

24     ████████ for you to go from the A1 lobby to the

25     control room to exchange equipment with Officer

983

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      McGregor and for Officer McGregor to exit the control
2      room?
3      A. Correct.
4      Q. Could you please turn to Exhibit PLX-23?
5      A. Twenty-two (22)?
6      Q. Did I say 23?  Yeah, 23.  PLX-23, Exhibit B.  And
7      I just want to make clear, when I say going from the
8      A1 lobby to your post, you're passing through
9      security.
10     Is that correct, the screening --- the security
11     screening?
12     A. Clarify that again?
13     Q. When I say you go from the A1 lobby, your arrival
14     time ---
15     A. Correct.
16     Q. --- to your post, you --- that includes passing
17     through the security screening.
18     Correct?
19     A. Correct.
20     Q. If you'll turn to Exhibit B, please.  The summary
21     page of Exhibit B.  And this page has average total
22     time per shift?
23     A. Correct.
24     Q. For Officer Hagenburg, this reports an average of
25     total time per shift of eight hours and 21 minutes?

984

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1        A. Correct.

2        Q. Do you see where I am?

3        A. I do.

4        Q. And this includes the time to go from the A1

5        lobby to the control room.

6    Is that correct?

7        A. Correct.

8        Q. Okay.

9    So this is an average.  I'd like to focus on ---

10       if you'll bear with me.

11       A. Sure.

12       Q. Officer Hagenburg's, the individual dates and

13       where he got this average.

14       A. Yeah.

15       Q. So if you turn the page of Exhibit B, almost in

16       the middle of the page there are --- I count 11 lines

17       for Officer Hagenburg.

18       A. Okay.

19       Q. And they're all a compound post.

20   Is that correct?

21       A. That's correct.

22       Q. And the shifts all begin at █████

23   Is that correct?

24       A. Correct.

25       Q. And end at █████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

985

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1       A. Correct.

2       Q. Okay.

3    Focusing on those lines, I'd like to go down a

4       couple of the departure times.  The first departure

5       time on May 6th, 2019 is ███████

6    Do you see that?

7       A. I do.

8       Q. And that's before his scheduled shift is, are you

9       --- that's before his scheduled shift is scheduled to

10      end.

11   Is that correct?

12      A. Correct.

13      Q. The next one is ██████ which is four minutes after

14      his scheduled shift?

15      A. Correct.

16      Q. Is scheduled to end, correct?  The next one is

17      ██████  which is again before his scheduled shift ends.

18      The next one is ██████ which again, is before the

19      shift is scheduled to end.

20   Is that correct?

21      A. Correct.

22      Q. The next one's ██████ the next one is ██████, the

23      next one is ██████, another██████ ████████████ and

24      ██████

25   Is it fair to say of the 11 days you captured for

986

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Officer Hagenburg, he entered the control lobby prior
2    to the end of his --- when his shift is scheduled to
3    end?
4    A. Correct.
5    Q. And on August 15th, 2019, Officer Hagenburg
6    entered the control lobby more than a half hour before
7    he ended his shift.
8    Is that correct?
9    A. Correct.
10   Q. And now I'd like to focus on the arrival times,
11   and the total times.  Again, for these 11 entries.
12   A. Okay.
13   Q. And I'd like to start with Officer Hagenburg's
14   earliest arrival time and move forward.  His earliest
15   arrival time that I found is the arrival time on
16   August 15th at ███.
17   A. Okay.
18   Q. And that's over a half hour before his shift is
19   scheduled to begin.
20   Correct?
21   A. Correct.
22   Q. And his total time that day is eight hours and 24
23   minutes.
24   Correct?
25   A. Correct.

987

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. And that's --- that's above eight hours and ten

2      minutes.

3   Right?

4      A. Yes.

5      Q. The next time I want to look at is July 7th,

6      2019.  Just the arrival time is ▮▮▮▮ which is 50

7      minutes before his shift is scheduled to start.

8   Is that correct?

9      A. Correct.

10      Q. And his total time for that day is eight hours

11      and 37 minutes, which is above eight hours and ten

12      minutes.

13   Correct?

14      A. Correct.

15      Q. The next time I want to look at is just below

16      there, ▮▮▮▮ which is 45 minutes before his shift is

17      scheduled to begin.

18   Correct?

19      A. Correct.

20      Q. And his total time is eight hours and 30 minutes.

21   Is that correct?

22      A. Correct.

23      Q. The next one is on August 11th, 2019.  His

24      arrival time is ▮▮▮▮, which is before --- over a half

25      hour before his scheduled shift is supposed to start.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

988
Trial
Kathy Aitken, et al. v. USA                          3/15/2023

1    Right?

2       A. Correct.

3       Q. And his total time is eight hours and 19 minutes?

4       A. Correct.

5       Q. The next one is May 9th, 2019.  His arrival time

6    is █████ , which is over a half hour before his shift

7    is scheduled to begin?

8       A. Correct.

9       Q. And his total time is eight hours and ten

10   minutes.  The next one is May 7th, 2019.  His arrival

11   time is █████ , which again is more than half an hour

12   before his scheduled shift?

13      A. Correct.

14      Q. And his total time is eight hours and 30 minutes.

15   The next one is July 9th, 2019.  His arrival time is

16   █████ .

17   Is that correct?

18      A. That's correct.

19      Q. Which is over a half hour before his shift is

20   scheduled to begin, and his total time is █████ .

21   Is that correct?

22      A. Correct.

23      Q. The next one is just below that, July 11th, 2019

24   which is █████ , which is over a half hour before his

25   arrival time which is scheduled to begin, and before

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    his shift is scheduled to begin.  And his total time

2    is 8:10, more than --- it's more than eight hours and

3    ten minutes?

4    ATTORNEY ELKIN:

5    Your Honor, I've been very patient and

6    I'm going to object that ---.

7    ATTORNEY KERR:

8    I have a question for every one ---.

9    JUDGE:

10   Overruled.

11   BY ATTORNEY KERR:

12   Q. The next one is the 9th, the one we're looking at

13   is May 6th, 2019.  His arrival time is ████, which

14   you'll agree is more than a half hour before his shift

15   is scheduled to begin?

16   A. Yes.

17   Q. And his total time is eight hours and 19 minutes.

18   I want to pause there and just emphasize.  For these

19   nine, out of 11 entries, Officer Hagenburg's arrival

20   time is over a half hour before his shift begins.

21   Is that correct?

22   A. Correct.

23   Q. And all of his total entries are more than eight

24   hours and ten minutes.

25   Is that correct?

990

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. Correct.

2    Q. I want to look at the last two now with you.  One

3    is August 14th, 2019.  His arrival time is ███ ,

4    which is 21 minutes before his shift is scheduled to

5    start.

6    Is that correct?

7    A. Correct.

8    Q. And his total time is eight hours even.

9    Correct?

10   A. Correct.

11   Q. The 11th one is on July 10th, 2019.  His arrival

12   time, and this is at the A1 lobby, right?  Is ███

13   and his total time which is 20 minutes before his

14   shift is scheduled to begin, and his total time is

15   eight hours and seven minutes.

16   Is that correct?

17   A. Correct.

18   Q. So is it fair to say that Officer Hagenburg's

19   total time for the 11 entries that you recorded to him

20   are above eight hours and ten minutes because he's

21   arrived over a half hour before his shift on nine of

22   the 11 occasions?

23   A. It's fair to say that.

24   Q. And I want to be clear, Mr. Shemanski, you didn't

25   record how long it takes Officer Hagenburg to get to

991

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     his post from the A1 lobby.
2   Is that correct?
3     A. To get to the compound office?
4     Q. Yes.
5     A. No.
6     Q. And you didn't --- you can't tell from your chart
7     what time Mr. Hagenburg arrives on post.
8   Is that correct?
9     A. Correct.
10    Q. And we can't tell how long it takes Officer
11    Hagenburg to get from the post to the --- to get from
12    his post to the control lobby after his shift ends.
13  Is that correct?
14    A. Correct.
15    Q. I'd like --- if you could look back, please, at
16    Exhibit B summary.  And for the average and total time
17    spent per shift, Officer Buckingham is eight hours and
18    20.89 minutes.
19  Is that correct?
20    A. That's correct.
21    Q. And this includes the time for the A1 lobby to
22    the control room lobby.
23  Is that correct?
24    A. Correct.
25    Q. Please turn to the page --- let's take a closer

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

    1      look at Buckingham, but not as close as we did with
    2      Hagenburg.  At the top of the page are nine lines for
    3      Officer Buckingham.
    4   Correct?
    5      A. Yes.
    6      Q. And these are all shifts starting at █████
    7      Would you --- well, let me ask the initial question.
    8   Would you agree that the date on July 15th, the
    9      time --- shift start time on July 15th, 2019 is a
   10      typo?
   11      A. Yes.
   12      Q. That should be █████?
   13      A. Yes.
   14      Q. So on all of these, the shift starts at █████
   15      A. Correct.
   16      Q. And it ends at █████
   17      A. Correct.
   18      Q. Looking down at the departure times for Mr.
   19      Buckingham, █████ and █████, █████.
   20   Do you see where I am?
   21      A. Uh-huh (yes).
   22      Q. On all of the ones of Officer Buckingham, his
   23      departure time, which is at the control lobby, is
   24      before his shift is scheduled to end at █████.
   25   Correct?

993

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1        A. Correct.

2        Q. Okay.

3     And looking at Mr. Buckingham's arrival times,

4         the first one is ████.

5     Is that correct?

6        A. Correct.

7        Q. And then look at all the other arrival times for

8         Officer Buckingham, excuse me.  All the rest of the

9         arrival times of Officer Buckingham are over a half

10        hour before his shift starts.

11    Is that correct?

12       A. Correct.

13       Q. And all of Officer Buckingham's total times are

14        over eight hours and ten minutes.

15    Is that correct?

16       A. Correct.

17       Q. So is it fair to say that Officer Buckingham's

18        average time is more than eight hours and ten minutes,

19        because he also arrived more than 30 minutes before

20        his shift begins?

21       A. That's fair to say.

22       Q. Okay.

23    Please look back at Exhibit A of PLX-23.  If you

24        could please look at the July 7th times.

25       A. What page, sir?
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1        Q. I'm sorry.  One of nine of the Exhibit AD2.  And
 2     this is the day Officer Hagenburg arrived at the A1
 3     lobby at      ██████ .
 4   Do you see where I am?
 5        A. Yes.
 6        Q. And on that day, he's relieving Officer Hoehmann.
 7   Is that correct?
 8        A. Yes.
 9        Q. And Officer Hoehmann's departure time is  ██████ .
10   Is that correct?
11        A. Correct.
12        Q. So we don't know when exactly Mr. Hagenburg
13     arrived on post.
14   Correct?
15        A. Correct.
16        Q. But we knew --- we do know he was on post
17     sometime before ██████ .
18   Is that correct?
19        A. Correct.
20        Q. Which is over a half hour before his post is
21     scheduled to start.
22   Correct?
23        A. Correct.
24        Q. He's not required to be on post a half hour
25     before it starts.
```

995

Trial

Kathy Aitken, et al. v. USA                                           3/15/2023

1    Correct?

2      A. He's not required, no.

3      Q. They don't --- the post orders don't require him

4      to be on post a half hour before it starts.

5    Correct?

6      A. No.  But it would make this a lot easier.

7      Q. I'm sorry?  I didn't hear you.

8      A. No, I said that would make this easier.

9      Q. It would.  And on July 7th, Officer Hagenburg's

10     departure time is ███████

11   Is that correct?

12     A. July 7th?

13     Q. Yeah, July 7th, the same.

14     A. ██████

15     Q. So Officer Hagenburg, and that's when he arrives

16     at the control lobby.

17   Is that correct?  So he's left his post and

18     walked up the compound to the control lobby?

19     A. Yes.

20     Q. So he's entering the control lobby before his

21     shift is scheduled to end at ██████

22   Is that correct?

23     A. Correct.

24     Q. So he's being relieved early.

25   Correct?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1        A. He's probably relieved, yes.

2        Q. But not --- not as earlier as he arrived, which

3        is a half hour early.

4    Is that correct?

5        A. Correct.

6        Q. And on July 7th, 2019, Officer Hartman's total

7        time was less than eight hours.

8    Is that correct?

9        A. That's correct.

10       Q. Okay.

11   I'd like to look at the July 10th dates on that

12       page as well, just a few down.

13   Do you see where I am?

14       A. I do.

15       Q. So your video review captured the whole 24 hours

16       each live time.

17   Is that fair?

18       A. Correct.

19       Q. And Officer Hagenburg again, as we discussed,

20       worked ███████████ shift.

21   Is that correct?

22       A. Correct.

23       Q. And he --- he relieved again Officer Hoehmann.

24   Is that correct?

25       A. Yes.

997

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1       Q. And Officer Hoehmann's arrival (sic) time is
2       ████  .
3    Is that correct?
4       A. His departure.
5       Q. I'm sorry, his departure time.
6    Is that right?
7       A. Yes.
8       Q. And Mr. Hagenburg's arrival time --- I got ahead
9       of myself --- is ████ ?
10      A. Correct.
11      Q. And that's a ████████████████ ?
12      A. Correct.
13      Q. So it took no more than ████████ for Officer
14      Hagenburg to go from the A1 lobby, through security to
15      the compound post, exchange equipment with Officer
16      Hartman, and for Officer Hartman to go back up the
17      compound to the control room.
18   Is that correct?
19      A. That's what this shows.
20      Q. And we can't tell what time Officer Hagenburg
21      arrived on post on July 10th, 2019.
22   Correct?
23      A. You mean specifically in the compound office?
24      Q. Yes.
25      A. No.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

998
Trial
Kathy Aitken, et al. v. USA                                   3/15/2023

1      Q. And we can tell how long the exchange took?
2      A. No.  There could have been an emergency with
3      Hoehmann.  He could have been in the control lobby, I
4      don't know.
5      Q. But you don't know?
6      A. I do not know.
7      Q. Officer Hartman's arrival time is ██████.
8   Is that correct?
9      A. That's correct.
10     Q. And Officer O'Connell --- O'Connor who he
11     relieved, departure time is ██████.
12   Is that correct?
13     A. Correct.
14     Q. And the difference there is ████████.
15   Is that correct?
16     A. Yes.
17     Q. And again, that includes going through the
18     security line?
19     A. Yes.
20     Q. So on July 10th, it took no more than ██████████
21     for Officer Hartman to go from the A1 lobby to the
22     compound post, exchange equipment with Officer
23     O'Connor, and for Officer O'Connor to go back up to
24     compound control lobby.
25   Is that fair?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes.

2      Q. On July 10th, Officer O'Connor --- Officer

3      Herman, I'm sorry, Hoehmann, and Officer Hagenburg all

4      have arrivals in the A1 lobby within 25 minutes prior

5      to the start of their shift.

6   Is that correct?

7      A. That's correct.

8      Q. And all of their total times are either eight

9      hours and ten minutes or less.

10   Is that correct?

11      A. Correct.

12      Q. Could you please turn to Exhibit A, but still

13      within Exhibit A, go to page number three of nine?

14      A. Okay.

15      Q. Thank you.  These are two entries for the SHU-1

16      post.

17   Is that correct?

18      A. For?

19      Q. I'm sorry, for May 5th, 2019?

20      A. May 5th, correct.

21      Q. So on page, three of nine.

22      A. Three of nine.  MacGregor.

23      Q. May 5th, 2019, MacGregor and McPhillips?

24      A. Correct.

25      Q. So McPhillips relieved MacGregor that day.

1000

Trial

Kathy Aitken, et al. v. USA                                         3/15/2023

1   Is that correct?
2     A. That's correct.
3     Q. And McPhillips' arrival time is ████?
4     A. Yes.
5     Q. And MacGregor's departure time is ████
6   Is that correct?
7     A. Correct.
8     Q. So we can't tell from this chart how long it took
9   Officer Phillips to walk to SHU.
10  Is that correct?
11    A. Correct.
12    Q. And we cannot tell the time also McPhillips
13  arrived on post.
14  Is that correct?
15    A. Correct.
16    Q. The difference between Officer MacGregor's
17  departure time and Officer McPhillips' arrival time is
18  ███████████.
19  Is that correct?
20    A. Correct.
21    Q. So on May 5th, 2019, it took no more than ████
22  ██████ for Officer McPhillips to go from the A1 lobby
23  to the SHU post, exchange equipment with Officer
24  MacGregor, and for Officer MacGregor to get back onto
25  the control lobby.

1001

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Is that correct?

2      A. Correct.

3      Q. Okay.

4    And can you please turn to exhibit --- still at

5    Exhibit A, page five of nine.  And looking at the

6    dates, May 7th to May 8th.

7    Do you see where I am?

8      A. I do.

9      Q. So Officer Christensen worked █████ to █████ on

10    May 8th.

11    Is that correct?

12      A. That's correct.

13      Q. And he relieved Officer Hurn.

14    Is that correct?

15      A. That's correct.

16      Q. But Officer Hurn was the shift ███████████.

17    Is that correct?

18      A. Correct.

19      Q. Officer Christensen's arrival time is █████.

20    Is that correct?

21      A. That's correct.

22      Q. And again, that's arrival at the A1 lobby, the

23    very front?

24      A. Yes.

25      Q. And Officer Hurn's departure time is █████.

1002

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Is that correct?
 2      A. That's correct.
 3      Q. And that's, again, the time he arrived at the
 4    control lobby after his shift.  And that difference is
 5    ███████████
 6    Is that correct?
 7      A. That's correct.
 8      Q. So on May 7th, 2019, it took no more than ███
 9    ███████    for Officer Christensen to go from the A1
10    lobby to Unit D post, exchange equipment with Officer
11    Hurn, and for Officer Hurn to go to the control lobby.
12    Is that right?
13      A. Correct.
14      Q. And when we looked at your charts comparing the
15    two studies, do you remember what Officer
16    Christensen's average was for going for the A1 lobby
17    to the control lobby?
18      A. It was I believe ███████  or above █████████.
19    I don't recall exactly.
20      Q. But let me show you, so if you could turn to that
21    page.  So at the end of response analysis, ---
22      A. Okay.
23      Q. --- for Christensen, and actually before we ---
24    well, let's finish this, yes, sir.  No, I have to do
25    this.
```

1003
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    Do you --- can you explain again why you're
2    reading this time as a decimal?  I believe you
3    testified ████?
4    A. Yes.  And he --- it's an average.  It's a simple
5    average of the mathematical, you add the times and you
6    divide.
7    Q. But you couldn't get an average of time when you
8    convert it back into time.
9    Right?
10   A. I suppose.
11   Q. And this is written as a time?
12   A. Correct.
13   Q. It's not written as a decimal.
14   Right?
15   A. Correct.
16   Q. Well, you --- would you agree that Mr.
17   Christensen's average time from the A1 lobby to the
18   control lobby is ██████████████?
19   A. Correct.
20   Q. So on May 7th, 2019 was an average day for
21   Officer Christensen to get to security.  It took no
22   more than ███████████ for him to go from --- to get
23   to the Unit D post to the control lobby, exchange
24   equipment with Officer Hurn, and for Officer Hurn to
25   walk back up to the control lobby.

1004

Trial

Kathy Aitken, et al. v. USA                                  3/15/2023

1     Correct?
2        A. Yes.
3        Q. Yes?
4        A. Correct.
5        Q. If you could please turn back to Exhibit A
6     detail, page six of nine.  If you could please find
7     the entry for July 11th for Christensen.
8        A. Yes.
9        Q. And this entry is for the Unit FA?
10       A. Okay.
11       Q. ██████████████████████.
12    Is that correct?
13       A. That's correct.
14       Q. And on this day Officer Christensen relieved
15    Officer Jennings.
16    Is that correct?
17       A. That's correct.
18       Q. And Officer Christensen's arrival time is ████.
19    Is that correct?
20       A. Correct.
21       Q. And that's at the A1 lobby.
22    Correct?
23       A. Correct.
24       Q. So we can't tell, again we can't tell in your
25    analysis what time Officer Christensen arrived on

1005

Trial

Kathy Aitken, et al. v. USA                                          3/15/2023

1     post.
2     Correct?
3        A. Correct.
4        Q. And Officer Jennings' departure time is ███.
5     Is that correct?
6        A. Correct.
7        Q. And that's the time he arrived at the control
8     lobby?
9        A. Correct.
10       Q. So the difference between Officer Jennings'
11    departure time, ███, and Officer Christensen's
12    arrival time of ███ is ██████.
13    Is that correct?
14       A. Correct.
15       Q. And again, when you look back at Officer
16    Christensen's time to go from the A1 lobby to
17    security, that's ███████.
18    Is that correct?
19       A. Correct.
20       Q. But we --- we can't tell from your video analysis
21    how long it took Officer Christensen to walk from the
22    control lobby through the Unit FA.
23    Is that correct?
24       A. Correct.
25       Q. And we can't tell how long it took Officer

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      Christensen and Officer Jennings to exchange
2      equipment.
3   Is that correct?
4      A. Correct.
5      Q. And then we can't tell through your video
6      analysis how long it took Officer Christensen to walk
7      back to the control lobby after he was relieved.
8   Correct?
9      A. Correct.
10      Q. So looking back at the July 11th date, Officer
11      Christensen is relieved by Officer Carey.
12   Is that correct?
13      A. Yes.
14      Q. And Officer Carey's (sic) departure time is
15      ████ .
16   Is that correct?
17   ATTORNEY ELKIN:
18   Objection, Your Honor.  Misrepresents
19      the time elapsed from this document.
20   ATTORNEY KERR:
21   I'm sorry.
22   JUDGE:
23   So --- so sustained.  Let's just, can we
24      get back on the page with what time you're talking
25      about?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1007

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

```
1    ATTORNEY KERR:
2    Yeah, I'm sorry, Your Honor.  I misspoke
3      the officer's name.
4      BY ATTORNEY KERR:
5      Q. But the difference between Officer Christensen's
6      departure time at        and Officer Carey's arrival
7      time at        is              .
8    Is that correct?
9      A. Correct.
10     Q. So on July 11th, 2019, it took no more than
11            for Officer Carey to go from the A1 lobby to
12     the Unit FA post, exchange equipment with Officer
13     Christensen, and for Officer Christensen to go back to
14     the control lobby.
15   Is that correct?
16     A. Correct.
17     Q. But we can't tell how long it took for them to
18     exchange equipment.
19   Right?
20     A. No.
21     Q. If you could please turn to nine of nine.  Please
22     find the entry near the top, June 14th, 2019 for
23     Officer Buckingham.
24     A. Yes sir.
25     Q. And this is a Unit EB post.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1     Is that correct?
 2       A. Correct.
 3       Q. And Officer Buckingham served the ████ to
 4     ██████ post shifts?
 5       A. Correct.
 6       Q. Is that correct?  And on this day, Officer
 7     Buckingham relieved Officer Coleman.
 8     Is that correct?  I'm sorry, Officer Coleman
 9     relived Officer Buckingham.
10     Is that correct?
11       A. Correct.
12       Q. And Officer Coleman's arrival time is ████.
13     Is that correct?
14       A. Correct.
15       Q. And again, that's the time he arrived at the A1
16     lobby?
17       A. Yes.
18       Q. And Officer Buckingham's departure time is ████.
19     Is that correct?
20       A. Correct.
21       Q. And this is the time he arrived at the control
22     lobby after his shift.
23     Correct?
24       A. Correct.
25       Q. So the difference between Officer Buckingham's
```

1009

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    departure time of ███ and Mr. Coleman's arrival time
2    at ███ is ████████.
3    Is that correct?
4        A. Correct.
5        Q. And again, that includes the time for Officer
6    Coleman to go from the A1 lobby to the control room
7    lobby.
8    Correct?
9        A. Correct.
10       Q. But we cannot tell from the video how long it
11   took Officer Buckingham and Officer Coleman to
12   exchange equipment.
13   Correct?
14       A. Correct.
15       Q. And we can't tell from your video, would you ---
16   what time Officer Buckingham left Unit EB post.
17   Is that correct?
18       A. Correct.
19       Q. And we can't tell how long it took Officer
20   Buckingham to walk to the control room from EB after
21   his post.
22   Correct?
23       A. Correct.
24   ATTORNEY KERR:
25   I have no further questions, Your Honor.

1010

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    Thank you.

2    THE WITNESS:

3    Thank you.

4    JUDGE:

5    Any Redirect?

6    ATTORNEY ELKIN:

7    Yes, briefly.

8                        ---

9              REDIRECT EXAMINATION

10                       ---

11   BY ATTORNEY ELKIN:

12   Q. Mr. Shemanski, I think we're --- you were on page

13   nine of nine of Exhibit A?

14   A. Yes.

15   Q. And just going down to Buckingham again,

16   8/16/2019, and he's working EB?

17   A. Yes, and where?

18   Q. And he arrived at ██████ at the front lobby?

19   A. Correct.

20   Q. And he testified a little back he has a duty belt

21   on, he's making his way to the post.  You would agree

22   that by the time of his arrival on the front lobby

23   ██████ until Cronin departs the control center at

24   ████████████████.

25   Is that right?

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. Correct.
2    Q. So would you agree that the agency has the
3    benefit of the --- both of these bodies working at the
4    institution during those time periods?
5    A. Yes.
6    Q. And would your answer be the same with respect to
7    all of those other minutes that you were talking about
8    where there's an overlap of two officers assigned to
9    one post?
10    A. Yes.
11    Q. On --- on the institution premises.
12    Is that --- your answer would be the same?
13    A. Yes.
14    Q. As the Union President, would you know if any
15    officers were disciplined?  Do you --- do you
16    represent, for example, officers in grievances that
17    they feel they were unfairly disciplined?
18    A. Of course.
19    Q. Okay.
20    So would you know if officers are issued
21    discipline?
22    A. Yes.
23    Q. In your knowledge, based on your Union work over
24    the last however many years, are you aware of any
25    times that the agency has issued any kind of

1012

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    disciplinary action to any other Correctional Officers
2    for coming in early in order to make a relief on their
3    post on time?
4    A. No.
5    Q. And are you aware of any officers being
6    disciplined for being relieved earlier on their post
7    so that the outgoing officer can make his way out of
8    the institution?
9    A. No.
10   ATTORNEY ELKIN:
11   All right.
12   I have nothing further, Your Honor.
13   JUDGE:
14   Okay.
15   Thank you, Mr. Shemanski.
16   THE WITNESS:
17   Thank you, sir.
18   JUDGE:
19   Okay.
20   That puts us to a little after 1:00,
21    1:15.  Do we want to reconvene at 2:00?
22   ATTORNEY ELKIN:
23   Yes.  I want to try this.
24   JUDGE:
25   Okay, wonderful.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Anything to --- anything to talk about
2      before we --- before we take a 40, 45-minute break?
3    ATTORNEY ELKIN:
4    Well, I think we're going to get to, I
5      believe the next witness is Meyers.  I think we're
6      going to get delirious looking who's around here.
7      Okay.
8    JUDGE:
9    Okay.  Great.
10   That'd be good.  So then maybe we can
11     --- we can get at least Plaintiff's review of,
12     Plaintiff's Direct done this afternoon.
13   ATTORNEY ELKIN:
14   I think so.
15   JUDGE:
16   Great, good news.  See you all at 2:00.
17                          ---
18   (WHEREUPON, A SHORT BREAK WAS TAKEN.)
19                          ---
20   COURT CRIER:
21   All rise.  The United States Court of
22     Federal Claims is now in session.  Judge Stephen
23     Schwartz presiding.
24   JUDGE:
25   Please be seated.  Plaintiffs, ready for

Trial

Kathy Aitken, et al. v. USA                    3/15/2023

1    your next witness?

2    ATTORNEY ELKIN:

3    Thank you, Your Honor.  Plaintiff

4     calls ---.

5    ATTORNEY MOORE:

6    Just one procedural matter.

7    JUDGE:

8    Yes.

9    ATTORNEY MOORE:

10   Your Honor, my apologies.  So I don't

11    think there'd be an issue, but I think we should tell

12    the Court.  We just found out today that Valerie

13    Cross, who is our witness who will be testifying, our

14    last witness to try take our client, she was in close

15    quarters with someone who tested positive for COVID on

16    Monday.  She is testing --- she was tested today.

17   JUDGE:

18   Oh, dear.

19   ATTORNEY MOORE:

20   Yeah.  So to the extent that she does

21    test positive, I'm not sure it would be appropriate

22    for her to drive down to court.  And we would request

23    that she be able to testify remotely.  To the extent

24    she tests negative, obviously no issue.  But I just

25    wanted to raise that with Your Honor.

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    JUDGE:

2    Okay.

3    And you --- the parties had already

4      agreed that she could testify remotely, I think?

5    ATTORNEY ELKIN:

6    That's correct, Your Honor.

7    JUDGE:

8    Okay.  Okay.

9    If she --- you know, if there's a health

10     reason like that, it would be bad for her to --- to

11     travel.  I'm sure we can make last minute arrangements

12     for her for remote testimony for that --- for that

13     reason.

14   ATTORNEY MOORE:

15   Thank you, Your Honor.  I appreciate it.

16     Nothing further.

17   JUDGE:

18   Ms. Elkin.

19   ATTORNEY ELKIN:

20   Your Honor, we call Joseph Meyers.

21   JUDGE:

22   Raise your hand.

23                         ---

24                   JOSEPH MEYERS,

25     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
 2    FOLLOWS:
 3                             ---
 4    JUDGE:
 5    Have a seat.
 6                             ---
 7                    DIRECT EXAMINATION
 8                             ---
 9    BY ATTORNEY ELKIN:
10    Q. Good afternoon.
11    A. Good afternoon.
12    Q. Lieutenant Meyers, are you still a Lieutenant?
13    A. No, ma'am.
14    Q. Okay.
15    Good afternoon, Captain Meyers or Mr. Meyers?
16    A. Mr. Meyers is fine.
17    Q. Okay.
18    A. Supervisory Intelligence Officer.
19    Q. Okay.
20    And where do you currently work?
21    A. Martinsburg, West Virginia.
22    Q. Do you still work with the BOP?
23    A. I do.
24    Q. And Supervisory Intelligence Officer, is that
25    what you said?
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes.

2      Q. What does that position do?

3      A. I'm technically the Chief of the Gang Unit.

4      Q. And how long have you held that position?

5      A. Since end of August last year.

6      Q. August of 2022?

7      A. Yes.

8      Q. And so from --- sorry.  From 2016 until August of

9      2022, were you a Lieutenant at FCI Otisville?

10     A. No, ma'am.

11     Q. All right.

12     Why don't you tell me --- I took your deposition

13     on September 10th, 2016 and you had been a Lieutenant

14     --- sorry, September 10th, 2020 ---

15     A. Correct.

16     Q. --- and you had been a Lieutenant at FCI

17     Otisville from 2016?

18     A. Right.

19     Q. At least until that point?

20     A. I ---.

21     Q. When did you leave Otisville?

22     A. I left --- my last official day at Otisville was

23     December 27th, I believe, 2020.

24     Q. Okay.

25     And then you went?

1018

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. As an Intelligence Officer.

2      Q. Okay.

3      A. From --- I started --- January 4th was my report

4      date, until August of last year.

5      Q. Okay.

6      So you started FCI Otisville 2008 as a

7      Correctional Officer.

8      Is that correct?

9      A. Correct.

10     Q. And you were a Correctional Officer there until

11     the end of 2012?

12     A. Correct.

13     Q. And then you were promoted to a Lieutenant at FCI

14     Cumberland, Maryland?

15     A. Yes.

16     Q. And then for personal reasons, you came back to

17     FCI Otisville and dropped back to a Correctional

18     Officer in 2013?

19     A. Yes.

20     Q. And then in 2016, you were promoted again to a

21     Lieutenant at FCI Otisville.

22     Is that right?

23     A. Correct.

24     Q. And so you were a Lieutenant at Otisville from

25     2016 until you left in December 2020?

1019

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yeah.

2      Q. Okay.

3    As a Lieutenant, you reported to a Captain?

4      A. Yes.

5      Q. And as a Lieutenant, all the Correctional

6      Officers whatever shift you were on as Operations

7      Lieutenant would report to you.

8    Is that right?

9      A. Yes.

10     Q. And as an Operations Lieutenant, you worked the

11     same shifts, the same watches as the Correctional

12     Officers assigned to 24-hour posts.

13    Is that right?

14     A. Yes.

15     Q. And what were the job duties of an Operations

16     Lieutenant?

17     A. Basically if it was off shift, it was either

18     watching more watch, you're responsible for the

19     running of the institution from 8:00 to 4:00.  That

20     duty fell on the Captain during the work week, and

21     you're just responsible for maintaining the orderly

22     running of the institution.

23     Q. Okay.

24    And you were designated by the United States to

25     provide binding testimony at a September 10th, 2020

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    deposition that I took on topics related to

2    timekeeping, time --- timekeeping systems, and the

3    reporting of the Plaintiff's work hours.

4  Do you recall that?

5    A. Yes.

6    Q. And at the beginning of that deposition, you

7    testified that you understood that you would, in fact,

8    bind the agency on testimony with respect to the

9    topics in that deposition notice.

10  Correct?

11    A. Well, I think there was something that I didn't

12    agree upon, right?  Because I wasn't --- I'm not a

13    time key or time ---.

14    Q. Right --- well ---?

15    A. Right.  Well, when we went through them, there

16    were topics that I said I couldn't speak on because I

17    was not a time key or a time key systems person.

18    Q. That --- that's may be true, but the beginning of

19    your deposition, you did understand that you were

20    binding the United States with respect to the topics

21    that you could speak on?

22    A. Yes, yes.  Right.

23    Q. Okay.

24  And we went through those topics, and you put

25    your initials next to each one that you were

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    qualified, competent to speak on.

2    Correct?

3       A. Correct.

4       Q. And some of those topics about which you've

5    agreed that you were competent to testify included the

6    topic of since April 9th, 2016 and continuing to date,

7    all policies, procedures and methods used by Defendant

8    to determine the number of compensable hours worked by

9    Plaintiff?

10      A. Yeah, I haven't seen my --- it was a couple years

11   ago so I can't remember if I, what I agreed to and

12   what I didn't agree to.

13      Q. Okay.  Okay.

14   You can, if you'd look at your deposition

15   transcript, would that help you remember?

16      A. Yeah.

17      Q. Okay.

18   ATTORNEY ELKIN:

19   May I approach?

20   JUDGE:

21   Yes.

22      BY ATTORNEY ELKIN:

23      Q. And if you turn to --- page 13 is when we start

24   talking about the deposition notice that page 14 of,

25   when we started initially line nine.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1   Do you want to read that to yourself and let me
 2      know if that refreshes your recollection about whether
 3      you ---?  You might have to read your deposition
 4      notice.  Let me know if you want me to read to you EE?
 5      A. Okay, please.
 6      Q. Okay.
 7   EE, since April 9th, 2016 and continuing to date,
 8      all policies, procedures, and methods used by
 9      Defendant to determine the number of compensable hours
10      worked by Plaintiffs.
11   Okay?
12   Does reading your deposition refresh your
13      recollection?
14      A. Yes.
15      Q. Okay.
16   And so did you feel that you were competent to
17      testify as with respect to that topic?
18      A. Yes.
19      Q. You also agree that you were competent to testify
20      on the topic of since November 4th, 2012 and
21      continuing to date, any decisions to modify or change
22      the methods or procedures used by Defendant for
23      compiling, calculating or compensating for hours
24      worked by Plaintiffs.
25   Do you recall that you testified that you were
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1023

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     competent to testify about that topic?

2     A. Yes.

3     Q. Okay.

4     And you also agreed that you were competent to

5     testify on this topic?  Since November 4th, 2012 and

6     continuing to date, the policies, practices, rules and

7     procedures regarding ensuring that Correctional

8     Officers, workers at FCI Otisville do not perform

9     uncompensated work before and/or after the scheduled

10    shifts?

11    Do you recall that you were --- on the topic JJ,

12    recall that you testified that you were competent to

13    testify about that?

14    A. Yes.

15    Q. Okay.

16    And then you also agreed that you could testify

17    about how to read the rosters, the assignment rosters?

18    A. Yes.

19    Q. Okay.

20    And you understand what this case is about,

21    right, this lawsuit?

22    A. I do.

23    Q. Okay.

24    So you understand that the Plaintiffs are seeking

25    to be paid for the regular occurring work that they

1024

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

1   performed prior to their pay shift and after they were
2   relieved on post.
3   Do you understand that?
4       A. Yeah.
5       Q. And when you were a Correctional Officer at FCI
6   Otisville, you saw the same overtime days for the same
7   thing in at least two different FLSA grievances that
8   were filed.
9   Correct?
10      A. Yes.
11      Q. You signed up for I believe a second formal
12  grievance.  That's the one that went to arbitration in
13  2012?
14      A. Right.
15      Q. And was paid out in 2013.
16  Do you recall that you signed up for that one?
17      A. Yes.
18      Q. And I'm going to show you what we've marked as
19  Plaintiff's Exhibit 20.
20                        ---
21  (Whereupon, Plaintiff's Exhibit PLX-20,
22  Meyers Settlement Check 2012, was marked
23  for identification.)
24                        ---
25      BY ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. Actually the exhibit's up there.  It's in a
 2      yellow covered binder.  If you could go to the tab
 3      that says 20.
 4   And is this a copy of the check that was made out
 5      to you dated March 25th, 2013 in the amount of
 6      $5,347.57?
 7      A. Yes, ma'am.
 8   ATTORNEY ELKIN:
 9   Your Honor, I'd like to move to admit
10      Plaintiff's Exhibit 20.
11   ATTORNEY MOORE:
12   No objection, Your Honor.
13   JUDGE:
14   Admitted.
15                              ---
16   (Whereupon, Plaintiff's Exhibit PLX-20,
17   Meyers Settlement Check 2012, was
18   admitted.)
19                              ---
20      BY ATTORNEY ELKIN:
21      Q. And this was in resolution of that second formal
22      grievance.
23   Is that correct?
24      A. I believe so, yeah.
25      Q. And you endorsed the check and deposited it.
```

1026
Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Right?

2      A. Yes.

3      Q. And then they signed up to participate in a third

4      formal grievance, formal grievance meaning that it's

5      --- well, what do you understand a formal grievance to

6      mean the workers receiving, to be paid overtime pay

7      for performing pre and post-shift work.

8    Correct?

9      A. I do.

10     Q. Okay.

11   You signed up for a third one, for which you had

12     sought overtime pay for Correctional Officers assigned

13     to certain posts for performing work prior to and

14     after their shifts.

15   Correct?

16     A. Correct.

17     Q. And you recovered in that grievance as well.

18   Right?

19     A. Correct.

20     Q. Right.  If you could turn to the tab Exhibit 21.

21                          ---

22   (Whereupon, Plaintiff's Exhibit PLX-21,

23   Meyers Settlement Check 2016, was marked

24   for identification.)

25                          ---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    BY ATTORNEY ELKIN:

2    Q. Are you there?

3    A. Uh-huh (yes).

4    Q. Okay.

5    So this appears to be a check made out to you on

6    April 6th, 2016 in the amount of $993.71?

7    A. It does.

8    ATTORNEY ELKIN:

9    Your Honor, I move to admit Plaintiff's

10   Exhibit 21.

11   ATTORNEY MOORE:

12   No objection.

13   JUDGE:

14   Admitted.

15                        ---

16   (Whereupon, Plaintiff's Exhibit PLX-21,

17   Meyers Settlement Check 2016, was

18   admitted.)

19                        ---

20   BY ATTORNEY ELKIN:

21   Q. And this is the check you received as a result of

22   the resolution of the third formal grievance.

23   Is that right?

24   A. Yes.

25   Q. And you actually --- I'm sorry.  You endorsed the

1028

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    check and you cashed the check.
2   Right?
3       A. Yeah.
4       Q. And I think all the assignments for the first
5       formal grievance, which I believe was filed in 2008
6       --- I'm sorry, 2005 but resolved in 2008.  But because
7       you didn't work here ---?
8       A. Yeah, I wasn't --- I wasn't ever qualified for
9       that.  I think it ended like the day I started.
10      Q. Okay.  All right.
11  So you did not receive any settlement money from
12      the first formal grievance.
13  Is that fair to say?
14      A. Yeah, I wasn't involved in it.
15      Q. Okay.
16  But you signed up for at least three cases
17      involving the agency's failure to pay for regular and
18      recurring preshift activities, including collecting
19      and donning a duty belt, walking to and from posts,
20      and exchanging information and equipment on post.
21  Is that correct?
22      A. Yes ma'am.
23      Q. And you would not have deposited monies --- taken
24      monies from the United States that you did not believe
25      you were entitled to.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1029

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Is that correct?

2      A. Correct.

3      Q. Now, you're not eligible to participate in the

4    current lawsuit, the fourth time Plaintiffs at FCI

5    Otisville have sought to be paid for this regular and

6    recurring work because you were already a Lieutenant

7    in 2019 when this lawsuit was filed.

8    Is that right?

9      A. Yes.

10     Q. You would agree that the Bureau of Prisons never

11   put time clocks in the institution for purposes of

12   recording the work time of Correctional Officers

13   assigned to 24-hour posts after Margo Newman's

14   November 4th, 2012 arbitration award.

15   Is that correct?

16     A. Yeah.  No, time clocks were never put in.

17     Q. And you would agree that there was nothing

18   preventing the agency from putting in time clocks ---

19   from putting in time clocks.

20   Correct?

21   ATTORNEY MOORE:

22   Objection, Your Honor.  It's a 602, I

23   know that the Court has limited this earlier, but I

24   believe she's asking whether the agency has done

25   something.  He's testifying to his personal knowledge.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1   JUDGE:

2   He's testifying to his personal

3     knowledge in light of the preparation that he did in

4     order to speak on behalf of the United States at his

5     deposition.

6   ATTORNEY MOORE:

7   I just wanted to make the record

8     clear ---.

9   JUDGE:

10  So overruled to the extent that there's

11    anything that ---

12  ATTORNEY MOORE:

13  Thank you.

14  JUDGE:

15  --- there's anything else to cover.

16    BY ATTORNEY ELKIN:

17    Q. And you would agree that there was nothing

18    preventing the agency from implementing the

19    timekeeping system using time clocks.

20  Correct?

21    A. Not that I know of.

22    Q. And in fact, the Union agreed that the agency

23    could implement a timekeeping system of its choice.

24  Correct?

25    A. I'm not sure.

Trial

Kathy Aitken, et al. v. USA                                              3/15/2023

1    Q. As a Lieutenant at FCI Otisville, you never
2    received training on the time and attendance reporting
3    handbook.
4    Is that right?
5    A. Correct.
6    Q. Okay.
7    And are you familiar, just so we know we're
8    talking about the same thing, if you look at Joint
9    Exhibit 4?
10    A. Forty (40)?
11    Q. Four.  It should be the first binder, and it's
12    number four.
13    A. I don't know see a number four.
14    Q. Tab four in binder one.  Okay.
15    As a Lieutenant at FCI Otisville, you did not
16    receive any training on the time and attendance
17    reporting handbook that's in front of you, JX-4 that's
18    already been admitted.
19    Is that correct?
20    A. Correct.
21    Q. You understand that the Plaintiffs in this
22    lawsuit are not exempt employees covered by the Fair
23    Labor Standards Act.
24    Correct?
25    A. Correct.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    Q. And you understand that they are entitled to
2    overtime pay for any work performed in excess of eight
3    hours in a workday.
4    Correct?
5    ATTORNEY MOORE:
6    Objection, Your Honor.  Calls for a
7     legal conclusion.
8    JUDGE:
9    Sustained.
10    BY ATTORNEY ELKIN:
11    Q. Based on your job duties as a Lieutenant, did you
12    understand that the officers were entitled to be paid
13    overtime for working in excess of eight hours in a
14    workday?
15    A. Yes.
16    Q. And you would agree that based on your
17    understanding of timekeeping as a Lieutenant that
18    management cannot accept the benefits of FLSA covered
19    employees, such as the Plaintiffs, can't accept
20    benefits of their work without paying the employees
21    for that work.  That's your understanding.
22    Correct?
23    ATTORNEY MOORE:
24    Objection, Your Honor.  Calls for a
25     legal conclusion.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    JUDGE:
 2    I --- I think she's asking about his
 3       state of mind and his ---.
 4    ATTORNEY MOORE:
 5    Whether it benefits the agency, I mean,
 6       that's --- that's a question of law.  I mean, that the
 7       Courts just hypothetically --- I'm not sure if he can
 8       testify to that.
 9    JUDGE:
10    I'll give Ms. Elkin a little bit of
11       leeway on that --- on that one, but if you can be
12       careful.
13    ATTORNEY ELKIN:
14    Okay.
15    THE WITNESS:
16    Could you repeat the question?
17       BY ATTORNEY ELKIN:
18       Q. You understand in your capacity as a Lieutenant
19       --- let me just, I'll --- let me ask that.
20    In your capacity as a Lieutenant, you were the
21       --- all the Lieutenants were the ones who would put in
22       overtime slips for overtime work for the Correctional
23       Officers.
24    Is that correct?
25       A. Correct.
```

1034

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Okay.

2    And in your capacity as the person in charge, you

3      know, all Lieutenants have this responsibility of

4      making sure the employees get paid for their work, you

5      understood that under the FLSA, management cannot

6      accept the benefits of an FLSA covered employee's work

7      without compensating the employee for that work.

8    Was that your understanding?

9      A. I --- I don't understand.  I guess so, yes.

10     Q. I'm sorry?

11     A. I --- I don't really understand the question.

12     Q. Okay.

13   So in the beginning of your deposition, you

14     recall that I said one of the most important rules is

15     if you don't understand one of my questions, you would

16     ask me to rephrase it or to ask it again in a way that

17     you could understand.

18   Do you understand that's ---?

19     A. Okay, yeah.  Could you rephrase the question?

20     Q. No, that's not --- you've got to answer that

21     question.  You understand that ---

22     A. Yes.

23     Q. --- when I took your deposition, I told you that

24     if you didn't understand one of my questions during

25     the deposition, you should tell me?  Otherwise,

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     everybody reads your deposition's believing ---
2     assuming you understood the question.
3   Okay?
4     A. Okay.
5     Q. You recall that.
6   Right?
7     A. Yes.
8     Q. Okay.
9   And so if you could turn in the deposition
10    transcript to page 36.
11  ATTORNEY MOORE:
12  Objection, Your Honor.  This is --- he
13    said he didn't understand the question.  I'm not sure
14    what we're doing here.  If this is impeachment, if
15    this ---.
16  JUDGE:
17  That is a fair point.  He said that he
18    didn't understand your question about his
19    understanding the FLSA requirements.  And now you're
20    impeaching him on what?  On his --- on whether or not
21    he understood your question?
22  ATTORNEY ELKIN:
23  He understood when I asked it in
24    September of 2020.  And if he didn't, based on the
25    rules of the deposition, he should have told me.

1036

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1   JUDGE:

2   I'll overrule the objection.  Let's see

3     where the impeachment goes.

4   ATTORNEY ELKIN:

5   Okay.

6     BY ATTORNEY ELKIN:

7     Q. If you look at page 36, line six I guess we can

8     start.  So under --- under FLSA, it says management

9     cannot accept the benefits of an FLSA covered

10    employee's work without compensating the employee for

11    that work.

12  Is that your understanding of the timekeeping?

13    And you said what was that, I didn't hear you?  And

14    the question was, I said, is that your understanding

15    of what's required as you sit here as the timekeeping

16    witness for the agency?  And your answer was yes.

17  Did I read that correctly?

18    A. Right.  But I think I also stated that I was not

19    a timekeeping expert.

20    Q. Okay.

21  You agree that the Correctional Officers in this

22    lawsuit are scheduled to work eight hours every shift.

23  Right?

24    A. Correct.  Yes.

25    Q. And it's your understanding as the person the

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Government put forth as its witness to bind it on

2    contestable hours of work for Correctional Officers

3    that Correctional Officers are entitled to be paid for

4    any pre-shift or post-shift work that benefits the

5    agency about which the supervisors knew of?

6    A. Correct.

7    Q. You agree that the agency does not consider the

8    pre-shift collecting and donning the duty belt, the

9    walking through the secured confines of the

10   institution, correcting the inmate's behavior on the

11   way to a post prior to shift, exchanging information

12   of equipment --- that the agency does not consider

13   this time to be compensable of time.

14   Correct?

15   ATTORNEY MOORE:

16   Objection, Your Honor.  That calls for a

17   legal conclusion.

18   JUDGE:

19   Yeah, she --- you're asking what the

20   agency --- whether the agency considers it

21   compensable?

22   ATTORNEY ELKIN:

23   Yes.

24   JUDGE:

25   Yeah, overruled.

1038

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

 1    THE WITNESS:
 2    They do not.
 3      BY ATTORNEY ELKIN:
 4      Q. Sorry?
 5      A. They do not.
 6      Q. Okay.
 7    And you agree that the agency never reported the
 8      amount of time that these activities that I just read
 9      take further Correctional Officers.
10    Correct?
11      A. Not that I know of.
12      Q. And that those pre-shift activities, you would
13      agree that the agency never reported the amount of
14      time that it takes to exchange information, equipment,
15      and exit the secured confines of the institution while
16      perhaps correcting inmate behavior or the security
17      breaches?  The agency never recorded that post-shift
18      time either, did it?
19      A. Not that I'm aware of.
20      Q. And you would agree that as a Lieutenant, nobody
21      higher than you has ever given you a directive to stop
22      the Correctional Officers from reporting to work prior
23      to the start of their shifts, reporting to the front
24      line prior to the start of their shifts?
25      A. Can you repeat the question?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1039

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. Nobody in management ever made you, a Lieutenant,
2        the directive that it's your job to stop the
3        employees, the Correctional Officers, from coming in
4        and clearing that screening site prior to the start of
5        their scheduled shifts?
6     Is that correct?
7        A. Yeah, correct.
8        Q. Okay.
9     And that would be true even if an employee came
10       in 35 minutes prior to the start of his scheduled
11       shift?  Nobody ever told you that you need to
12       discipline that employee for coming in 35 minutes
13       prior to the start of his scheduled shift.
14    Correct?
15       A. Correct.
16       Q. And you're not aware of any Lieutenants who have
17       been disciplined for coming in 30 minutes, 35 minutes,
18       25 minutes, whatever.  Twenty (20) minutes prior to
19       the start of a scheduled shift.
20    Correct?
21       A. Any Lieutenants who have been disciplined for?
22       Q. Allowing that to happen.
23       A. No, not that I'm aware of.
24       Q. And you're not aware of any Correctional Officers
25       who have been disciplined for regularly day after day

1040

Trial

Kathy Aitken, et al. v. USA                                  3/15/2023

1    shift, after shift coming in 30 minutes, 20 minutes
2    prior to the start of the scheduled shift.
3    Correct?
4    A. Correct.
5    Q. You agree that the Lieutenants have not been
6    trained --- given any training on what constitutes
7    compensable time under the Fair Labor Standards Act.
8    Is that correct?
9    A. Correct.
10   Q. But Lieutenants are the people who are
11   responsible for entering everyone's time who is on
12   their shift.
13   Is that correct?
14   A. Yes, ma'am.
15   Q. And the times that you are instructed to enter,
16   assuming no leave was taken for the day ---?  Well,
17   let me ask this.
18   Do you enter the time into the roster program?
19   A. From our respective --- what time are you talking
20   about, like ---?
21   Q. For when you were a Lieutenant, did you enter the
22   time of Correctional Officers or their shifts into the
23   roster program?
24   A. As the Admin Lieutenant, I create --- I created
25   rosters and weekly rosters, yes.

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Okay.
2    And so the time that you entered into that roster
3      program, assuming no leave was taken, would be
4      additional start and end times of the day?
5      A. We don't enter the start end times.  They're
6      automatically generated.
7      Q. Are they automatically generated by the shifts
8      that the person's working?
9      A. Yes.
10     Q. So if they're working evening watch, they're
11     going to get how many hours?
12     A. Eight.
13     Q. If they're working morning watch, how many hours
14     are automatically generated?
15     A. Eight.
16     Q. And the same --- answer would be the same for day
17     watch?
18     A. Correct.
19     Q. Okay.
20   I think you already testified to this, but you
21     agree that it's the Lieutenant's job to complete the
22     overtime spreads for Correctional Officers.
23   Is that right?  On your shifts?
24     A. Yeah.  Correct.
25     Q. Okay.

1042

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    And so the situation, has this happened?  Where a
2      Correctional Officer is held over on a post for let's
3      say four hours because of staff issues?  Or eight
4      hours, a full shift?  They're held over and they have
5      to stay for another shift?
6      A. Okay.
7    Are there --- if I could ---?
8      Q. Has that happened before?
9      A. Yeah.
10     Q. Okay.
11   So that would be an overtime shift.
12   Is that right?
13     A. Correct.
14     Q. Okay.
15   And so can you describe, would the Lieutenant
16     have to generate an overtime slip for --- in the
17     roster program for working the extra shift?
18     A. Yes.
19     Q. Okay.
20   And you would have to provide a reason for the
21     overtime and the purpose of the overtime.
22   Is that right?
23     A. Correct.
24     Q. And then you would print the overtime slip, and
25     the officer would have to sign the overtime slip

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    before it goes to time and attendance.

2   Is that correct?

3    A. Correct.  Yeah, usually towards the end of the

4    shift if I had down time, I would print the overtime

5    slips for my shift.  I would initial them, put them on

6    the board for the officers to come up when they had a

7    chance to sign it.

8    Q. Okay.

9   And there was no rule against that --- officers

10    signing those overtime slips prior to the start of

11    their shift as they're making their way to their post

12    past the Lieutenant's Office.

13   Correct?

14   And there are no rules against the officers

15    stopping into the Lieutenant's Office to sign an

16    overtime slip after they've been relieved on post.

17   Correct?

18    A. Correct.

19    Q. And you agree, they cannot electronically sign

20    those slips?

21    A. I don't know if things have changed in the last

22    couple years, but when I was there, I mean, they

23    probably could have, but the Lieutenant would have to

24    print it, scan it, email it, and then they'd have to

25    email it back and I could print it out and ---.

1044

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. Okay.

2    So was the fact that they could come in and sign

3    a hard copy of the slips?

4    A. Yes.

5    Q. Okay.  Okay.

6    So when you put in the roster program that

7    somebody has worked --- let's just take four hours

8    extra past their shift.  Has that ever happened, where

9    they had to work an extra four hours because of

10   coverage?

11   A. I'm sure it has.

12   Q. Okay.

13   If they have to work an extra four hours past

14   their shift, they would be working --- well, they'd be

15   scheduled to work the first eight hours.

16   Right?  And they'd be working the four hours, so

17   12 hours, according to the roster program.

18   Is that right?

19   A. Correct.

20   Q. And then would you be instructed, as a

21   Lieutenant, when you completed the overtime slip, to

22   add in the actual time they started putting on their

23   duty belt and making their way to the post and

24   exchanging information?  Would that also be added, the

25   pre-shift time that it took them to get to the post on

1045

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      time that morning?

2      A. No.

3      Q. And it's never been the practice for Lieutenants

4      to add that pre-shift time, because that's --- and you

5      were to testify the agency does not consider that time

6      work.

7      Is that correct?

8      A. Correct.

9      Q. And following the Newman award, which you were a

10     Grievant, you understand that Arbitrator Newman set

11     forth different amounts of minutes, extra overtime

12     minutes that each post --- each worker assigned to a

13     post should receive every shift that they work that

14     post?

15     You remember that.

16     Right?

17     A. I'm not aware of the specific details of it,

18     but ---.

19     Q. Do you --- do you recall when I showed you the

20     arbitration award in your deposition?

21     A. Yeah.  If you showed it to me, I've seen it.  But

22     I wasn't keen to like all the specifics of what was

23     paid out and what wasn't.

24     Q. Okay.

25     Why don't you look at just Plaintiff's Exhibit

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      24?  Yellow book.  I believe if you could go to, when

2      you get there go to page 38.  I'm sorry, page 43.

3      A. Forty-three (43)?

4      Q. Yeah.  In the middle of the page are the

5      Arbitrator's finding about the appropriate compensable

6      overtime worked by COs in the following position on a

7      daily basis, and then she sets forth minutes for each

8      of the posts.

9   Do you see that?

10     A. Uh-huh (yes).

11     Q. Okay.

12  So as a person who was going to testify about

13     compensable work hours and timekeeping, does it

14     indicate if you ever put in place ---?  And I

15     understand there are no time clocks.  But did they

16     ever add 16 minutes to the Compound 1 and 2 posts so

17     that the shift would be an eight hour 16 minute post?

18     A. No.

19     Q. And they never --- your answer would be the same

20     for all these other posts?  They never added 17

21     minutes to the control center.

22  Correct?

23     A. Correct.

24     Q. And you agree that battery chargers were already

25     on the housing unit by the time the hearing was ---

1047

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    took place in this arbitration.

2   You understood that?

3    A. I believe so, yes.

4    Q. And you agree that after the arbitration award

5    was issued, nothing about the way you as a

6    Correctional Officer or the other Correctional

7    Officers perform the pre-shift and post-shift

8    activities changed?  Nothing changed.

9   Correct?

10    A. Not that I'm aware of.

11    Q. And as a Lieutenant, you observed Correctional

12    Officers or did up until you left in 2020.

13   Correct?

14   As part of your job.

15   Right?

16   And as a Lieutenant, you would agree that while

17    you were at FCI Otisville from 2016 until you left,

18    the Correctional Officers still performing the same

19    pre-shift and post-shift work activities that you

20    performed when you were a Correctional Officer and

21    part of the area's FLSA grievances.

22   Correct?

23    A. Yes, ma'am.

24                         ---

25    (Whereupon, Joint Exhibit JXL-11

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1      Buckingham T&A 2016, was marked for
 2      identification.)
 3                              ---
 4      BY ATTORNEY ELKIN:
 5      Q. I'd like to turn your attention to Joint Exhibit
 6      11, which will be found in the first green binder that
 7      Joint Exhibit 4 was in.
 8  Does this appear to be Web T&A certified summary
 9      of time as well as overtime slips for Michael
10      Buckingham?
11      A. The first page is the Web T&A summary.
12      Q. Okay.
13  And how about the page, at the bottom right-hand
14      corner, 6040?  Do you see that?
15      A. Yeah.
16      Q. What is that?
17      A. That is the overtime authorization slip.
18      Q. Okay.
19  And if you slip through those, are those a
20      collection of different Web T&As and the time rosters
21      and overtime slips for Mr. Buckingham?
22      A. Yeah.
23      Q. Do these look familiar to you?
24      A. Yeah.
25      Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    ATTORNEY ELKIN:

2    I'd like to move to admit Joint Exhibit

3      11.

4    ATTORNEY MOORE:

5    No objection.

6    JUDGE:

7    Admitted.

8                              ---

9    (Whereupon, Joint Exhibit JXL-11,

10   Buckingham T&A 2016, was admitted.)

11                             ---

12    BY ATTORNEY ELKIN:

13    Q. If you --- if you turn to page 64, it's the first

14    overtime slip.

15    A. To the second actual page?

16    Q. 6040, at the bottom right-hand corner.

17    A. I'm there.

18    Q. Okay.

19   Have you come to that?  Yeah.  Do you see, are

20    you there?

21    A. Yeah.  It's not an actual page, it's the second

22    like hard copy page in there, that's just the

23    document?

24    Q. Okay.

25   So this is an overtime pay slip for Michael ---

1050

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1     Michael Buckingham.
 2   Is that your understanding?
 3     A. Yeah.
 4     Q. And what is this call center up in the right-hand
 5     corner?
 6     A. Call center is B2, which is the outside hospital.
 7     Q. Okay.
 8   So is there a separate --- sorry, go ahead.
 9     A. It's medical.  Medical Unit.
10     Q. So is there a separate pile of money for --- for
11     when there's a need for overtime because of outside
12     hospital?
13     A. Yes.
14     Q. And then what is the pile of money for just
15     regular overtime because staff go through the
16     institution?
17     A. I believe it's E1.
18     Q. Okay.
19   But on this day, Mr. Buckingham was actively
20     working an outside hospital post for his overtime.
21   Is that correct?
22     A. Correct.
23     Q. Okay.
24   So is that, I mean is that an appropriate usage
25     of B2 overtime monies?
```

1051

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yeah.  So if you look at a shift one morning
2      watch, Compound 2 to provide correctional --- cover
3      correctional post covered for staff member who was
4      adjusted to work at the outside hospital.
5      Q. Okay.
6      So --- okay.  So --- so on this day, Michael
7      Buckingham he worked a regular evening watch shift.
8      Is that right?
9      A. Morning watch, Compound Officer.
10     Q. Well, that's the overtime.
11     Right?
12     A. Yeah.  So you're looking at shift one morning
13     watch?  That's regular overtime on the overtime sheet.
14     Q. And do you know whether he actually also worked
15     12/25/2016?
16     A. Looking at the page prior, his daily assignments
17     on 12/25/2016 was on the day of --- is that 25?  No
18     ma'am.
19     Q. No, this is 20 ---.
20     A. I'm looking at --- yeah.
21     Q. So 12/25/2016, wasn't that working Compound 2 on
22     the evening watch?
23     A. Yes.
24     Q. So you're looking at page 6039.
25     Correct?

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1       A. Yes, yes.

2       Q. So on Christmas Day, he worked or he's scheduled

3       from ███████████████.

4    Is that correct?

5       A. Correct.

6       Q. And then he was held over, Merry Christmas, on

7       12/26 to work another full shift.

8    Is that right?

9       A. Correct.

10      Q. Because the prison had to send somebody else to

11      do some hospital coverage.

12   Is that right?

13      A. Most likely, yeah.

14      Q. Okay.

15   And so the purpose of the overtime is set forth,

16      and you read that out loud already.

17   Right?

18      A. Uh-huh (yes).

19      Q. And then the reason work cannot be accomplished

20      during regular tours of duty, and the answer is no

21      staff available on the daily roster.

22   Do you see that?

23      A. Yeah.

24      Q. Would it be appropriate for a Lieutenant to write

25      under purpose of the overtime that an employee had to

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    collect his duty belt after it's been scanned, he has
 2    to wait to a secured confine of the institution, he
 3    had to relieve the outgoing tour as the purpose?  And
 4    then the reason work cannot be accomplished during the
 5    regular tour of duty, would it have been acceptable to
 6    write officer needs to be on the post at the start of
 7    his duty --- tour of duty?  Therefore, additional
 8    performance is needed prior to his tour of duty?
 9    A. Would I write --- you're asking me if I would
10    write that?
11    Q. Yeah.
12    A. No.
13    Q. It would be impossible to put that into a roster
14    program.
15    Correct?
16    A. You could --- you could write whatever you wanted
17    to in there.
18    Q. But there's no posts associated with it.
19    Is that right?  You have to be able to write,
20    well, actually you would never --- let me back up.
21    You would not write, reason work cannot be
22    accomplished during regular tour of duty, you would
23    never write can't do this work and be on the post at
24    the start of the shift at the same time?  That would
25    not be something that would go in there.
```

1054

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Correct?

2        A. I really don't understand what you're trying to

3        --- what you're trying to ask.

4        Q. Okay.

5    So the reason work cannot --- you have a place to

6        write a reason work cannot be accomplished during the

7        regular tours of duty.

8    Do you see that?

9        A. Okay.  Correct.

10       Q. Would it be appropriate for Lieutenants to write

11       in that line the reason all that pre-shift stuff

12       cannot be accomplished during regular tours of duty is

13       because the officer actually needs to be on his post

14       and ready to work by the start of his shift?

15       A. I don't --- I don't think I'm --- I don't think

16       we're on the same page as --- so a reason work can't

17       be accomplished to fill a shift would be there's no

18       --- is a person.  It wouldn't be duty.  It's --- and

19       we have no people to fill that post.

20       Q. Okay.

21       A. It wouldn't be ---.

22       Q. So that's not something that would ever be

23       written on there?  You know, perform this pre-shift

24       stuff and working the post on time?

25       A. No.  The reason work can't be accomplished

1055

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      because there was nobody there.
2      Q. Right.
3      A. There's no person to fill that empty post.
4      Q. But the person who writes this overtime slip up
5      is the Lieutenant.
6      Is that correct?
7      A. Correct.
8      Q. And then the officer would have to sign it.  Is
9      that where it says signature of employee, and then
10     it's sort of underneath the second line?  The little
11     second line?
12     A. Right.  It would be time verified as the
13     Lieutenant from the overtime slip.  Signature of
14     employee is the person that worked the overtime, and
15     then the signature below is the Warden.
16     Q. Okay.
17     So the Warden actually has to sign the overtime
18     slip?
19     A. The Warden or its designee.
20     Q. Okay.
21     And you would agree that the Correctional
22     Officers do not have the authority or ability to
23     complete the purpose section of the Lieutenant slip.
24     Is that correct?
25     A. You're asking me if they're able to fill this

1056

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    out?
 2    Q. Yes.
 3    A. No.
 4    Q. Okay.
 5    Neither the purpose or the reason.
 6    Correct?
 7    A. Correct.
 8    Q. That's the Lieutenant's job?
 9    A. Uh-huh (yes).
10    ATTORNEY ELKIN:
11    I pass the witness.
12    JUDGE:
13    Yeah, you can give ---.
14    ATTORNEY MOORE:
15    One moment, Your Honor.  My apologies.
16      If the Court will indulge.
17    JUDGE:
18    Okay.
19    ATTORNEY MOORE:
20    Thank you.  My apologies, Your Honor.
21    JUDGE:
22    All right, proceed.
23                      ---
24                 CROSS EXAMINATION
25                      ---
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      BY ATTORNEY MOORE:

2      Q. Good afternoon, Mr. Meyers.

3      A. Good afternoon.

4      Q. How are you doing?

5      A. Okay.

6      Q. Yeah.  Good afternoon.  Are you still --- you

7      were --- you were just previously asked, I believe it

8      was Exhibit JX-11.  Do you have that in front of you?

9      A. It's in the yellow binder?

10     Q. JX-11 is in the green binder.

11     A. Okay.

12     Q. And you --- if you turn to page 6040.

13     A. Okay, yeah.

14     Q. And Ms. Elkin was just asking you about for a

15     reason work could not be accomplished during regular

16     tours of duty.  And she asked you, and I think in if I

17     understand it right, she was asking you is whether or

18     not you could put in there, you know, with doing

19     pre-shift activities, i.e., walking to work and doing

20     the exchange.

21     Do you recall being asked that question?

22     A. Yeah.

23     Q. And you said you didn't really understand the

24     question because that wouldn't go in there.

25     Is that right?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1058

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    A. Right.  It's not asking --- it's asking for why
 2    that shift couldn't be filled.  So it's not really
 3    per se an action.  It's a person.
 4    Q. Right, but --- so but it seems to me if you read
 5    that it says reason work cannot be accomplished during
 6    regular tours of duty.  But isn't --- isn't the work
 7    that they're assigned to do is work on post?
 8    A. Correct.  The post needed to be filled by a
 9    person.
10    Q. Exactly.  So --- so if you would put in there,
11    does it make any sense to put in there unable to do,
12    you know, doing pre-shift activities?  Do the
13    pre-shift activities prevent a Correctional Officer
14    from doing their work?
15    A. No.
16    Q. Okay.
17  I'd also like to ask you a little bit about your
18    experience as a Lieutenant.  And at Otisville when you
19    were a Lieutenant, did you sit at the Lieutenant
20    Office's ever?
21    A. Yes.
22    Q. And the Lieutenant's Office, did you see other
23    Correctional Officers full time?
24    A. If I was in the office at the time, I can't see
25    anybody walking by, no.
```

Trial

Kathy Aitken, et al. v. USA                                  3/15/2023

```
 1       Q. Did you ever stand on the compound while there
 2       was a shift exchange going on?
 3       A. Sure.
 4       Q. Did you see Correctional Officers walking by?
 5       A. Sure.
 6       Q. And when they were walking by, were they carrying
 7       anything on their person?
 8       A. Bags, lunch boxes, drinks.
 9       Q. So they're carrying like a backpack or a bookbag?
10       A. Yeah, their backpack or a duffel bag.
11       Q. Were they carrying --- what else, do they have a
12       coffee mug or ---?
13       A. A lunchbox, a coffee, a soda or Gatorade.
14       Q. They're carrying a lot of things.
15       Were they ever carrying the duty belt on their
16       shoulders?
17       A. Sometimes.
18       Q. Sometimes.  Okay.
19       And where were they going when they were carrying
20       all of these things?
21       A. They were either walking out or walking in.
22       Q. And where were they walking into?
23       A. They were either walking to their assigned post
24       for the day or they were leaving their assigned post
25       going home.
```

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

```
 1     Q. So it's fair to say they were walking to do their
 2     job?  They were walking to work?
 3   ATTORNEY ELKIN:
 4   Objection, Your Honor.  Legal
 5     conclusion.
 6   ATTORNEY MOORE:
 7   I'm not sure if it's a legal --- I'm
 8     just asking if they repeat things while they're
 9     walking to work.
10   JUDGE:
11   I --- I, what conclusion do you think
12     we're getting at?
13   ATTORNEY ELKIN:
14   Work, of the definition of work.  We're
15     not here about that.
16   JUDGE:
17   Walking to duty post.
18   ATTORNEY MOORE:
19   Walking to a duty post?  Were they
20     walking to their job?
21   JUDGE:
22   Okay, you can rephrase.
23   ATTORNEY MOORE:
24   Okay.
25     BY ATTORNEY MOORE:
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Were they walking to their job?
2      A. Yeah.  They were either walking to their job or
3      walking out the door to go home.
4      Q. And when they got to their job, were they ---
5      have you ever seen a Correctional Officer, after he
6      had assumed the duties of his job, assumed the duties
7      of his post, have you ever seen him carrying a
8      backpack around while he was doing his job?
9      A. On his post?
10     Q. Yeah.
11     A. No.
12     Q. Why not?  Why do you think that you've never seen
13     them carrying a backpack while they're on post?
14     A. Why he wouldn't be wearing a backpack while he's
15     working?
16     Q. Yeah.
17     A. It's a safety and security issue.
18     Q. And have you ever seen a Correctional Officer
19     carry a duty belt on his shoulder while they were
20     working on post?
21     A. While they were working, like while they were
22     like in a housing unit walking around with ---?
23     Q. Yeah.
24     A. No.
25     Q. Why not?

1062

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Safety and security.

2      Q. Have you ever seen a Correctional Officer walk

3      around with coffee mugs and lunch bags while they were

4      doing rounds, for example?

5      A. No.

6      Q. And why not?

7      A. For the same reason, safety.  You know, safety

8      and security.

9      Q. And Mr. Meyers, have you ever given overtime when

10     someone was --- if a Correctional Officer was relieved

11     late and they came to you and asked for overtime, if

12     they were to leave 30 minutes late, would you give

13     that overtime?

14     A. Yes.

15     Q. Have you given that overtime?

16     A. Yes.

17     Q. Have you ever denied overtime when it was

18     requested, ---

19     A. No.

20     Q. --- when they were running late?

21     A. No.

22     Q. No?  Okay.

23     ATTORNEY MOORE:

24     No further questions, Your Honor.  I'll

25     pass the witness.

1063

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

```
 1    JUDGE:
 2    Ms. Elkin, any Redirect?
 3    ATTORNEY ELKIN:
 4    One moment, Your Honor.
 5    JUDGE:
 6    Of course.
 7                          ---
 8                    REDIRECT EXAMINATION
 9                          ---
10    BY ATTORNEY ELKIN:
11    Q. Just like when you were a Correctional Officer
12    and seeking to be paid for the overlap of shifts,
13    walking to your post, did you perform the security ---
14    a security function as you were walking to your post?
15    If an inmate was on the grass, you tell them to get
16    off the grass.
17    Would you do that?
18    A. I would.
19    Q. Okay.
20    And you think that these Correctional Officers
21    are also expected to do that.
22    Correct?
23    A. I wouldn't say they're expected to, but I
24    mean ---.
25    Q. They do, correct?  They do do that?
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      A. It's everybody in the institution's
 2      responsibility for safety and security.  So I would
 3      say Correctional Officer to a full service code.  If
 4      they see somebody walking down the compound with their
 5      pants down, they're going to say, hey, pull your pants
 6      up.
 7      Q. Okay.
 8   So you would agree that in that bubble of people,
 9      that would include the Correctional Officers here.
10   Correct?
11      A. Yes.
12      Q. And if they're walking to their post prior to
13      their shift, they're not getting paid for that time.
14   Correct?
15      A. Correct.
16      Q. And when you recovered over $6,000 for doing the
17      same types of duties here, did you feel that you were
18      working and performing a security function, you were
19      ready to respond to an emergency?  You had your duty
20      belt with you, you were ready to go.  Did you feel
21      that you were working and performing a security
22      function, as you walked to your post inside the
23      secured confines of the prison?
24      A. I did.
25   ATTORNEY MOORE:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Objection, Your Honor.  Objection, legal
2      conclusion, Your Honor.
3    JUDGE:
4    She's asking about his feelings and his
5      understanding.  Right?
6    ATTORNEY ELKIN:
7    That's correct, Your Honor.
8    JUDGE:
9    Okay.
10   She can ask him about his state of mind,
11     obviously.  It won't tell me anybody about the legal
12     conclusions.
13   ATTORNEY MOORE:
14   Thank you, Your Honor.
15     BY ATTORNEY ELKIN:
16     Q. And you answered yes.
17   Correct?
18     A. Yes.
19   ATTORNEY ELKIN:
20   I have nothing further, Your Honor.
21   JUDGE:
22   Mr. Meyers, free to go.  Who's next?
23   ATTORNEY ELKIN:
24   Captain Whinnery.
25   ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1    Your Honor, can we take a five minute
2      comfort break?
3    JUDGE:
4    Yes, of course.  Let's be --- let's be
5      back in five minutes.
6    COURT CRIER:
7    All rise.
8                         ---
9      (WHEREUPON, A SHORT BREAK WAS TAKEN.)
10                        ---
11   COURT CRIER:
12   All rise.  The United States Court of
13     Federal Claims is now in session, Judge Stephen
14     Schwartz.
15   JUDGE:
16   Be seated.  Who's going on?
17   ATTORNEY ELKIN:
18   Captain Whinnery, Your Honor.
19   JUDGE:
20   Captain Whinnery?
21   ATTORNEY ELKIN:
22   Mr. Whinnery, actually, because he's
23     retired.
24   JUDGE:
25   Raise your right hand.

1067

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                        ---
 2                   MATTHEW WHINNERY,
 3      CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
 4      HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
 5      FOLLOWS:
 6                        ---
 7      JUDGE:
 8      Have a seat.
 9                        ---
10                   DIRECT EXAMINATION
11                        ---
12      BY ATTORNEY ELKIN:
13      Q. Good afternoon, Captain Whinnery.
14   Is it okay if I still call you that?
15      A. Call me Whinnery, Matt, whatever you want.
16      Q. So Captain Whinnery, this, I believe, is our
17      third time we have met with you being under oath.
18   Is that correct?
19      A. Sounds reasonable.
20      Q. Okay.
21   Can you please state your name for the record?
22      A. Matthew Whinnery.
23      Q. And are you here pursuant to a subpoena?
24      A. Yes.
25      Q. You were a Captain at FCI Otisville from February
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1      14th, 2011 through February 28th, 2019, when you
2      retired.
3    Correct?
4      A. Correct.
5      Q. So this is the fourth --- basically we're a
6      little beyond the fourth anniversary of your
7      retirement?
8      A. Yes.
9      Q. You understand that the Plaintiffs in this case
10     are seeking to be paid overtime pay for the duties
11     they perform prior to their scheduled shifts and after
12     their shifts.
13   Is that correct?
14     A. Yes.
15     Q. And as I stated before, this is not the first
16     time you testified in a case where FCI Otisville
17     Correctional Officers are seeking to be paid for
18     pre-shift and post-shift work.
19   Is that correct?
20     A. Correct.
21     Q. And you testified in 2012 in an arbitration in
22     which the Union sought overtime pay for pre-shift and
23     post-shift for its bargaining unit members.
24   Correct?
25     A. Correct.

1069

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. And you recall that the Union won that case.
2   Correct?
3    A. Correct.
4    Q. And you recall that the Arbitrator ruled that the
5   Correctional Officers at FCI Otisville were entitled
6   to be paid for performing pre and post-shift work,
7   including time spent walking to and from post and
8   exchanging information and equipment.
9   Correct?
10   A. To the best of my understanding, yes.
11   Q. And you recall that --- another FLSA grievance
12   for management's side, after the 2012 one in which the
13   Union was again seeking overtime pay for pre-shift and
14   post-shift work performed by bargaining unit members.
15   Correct?
16   A. I'm sorry, can you state the year again?
17   Q. It was --- I didn't give you a year, but it was
18   sometime after 2012.  You were involved in another
19   grievance involving FLSA?
20   A. Sounds reasonable.
21   Q. You came to Washington, DC as part of the
22   mediation team for the United States?
23   A. I do remember that, correct.
24   Q. Okay.
25   And you yourself, when you were a Correctional

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Officer, recovered monies in an FLSA grievance seeking

2    to be paid overtime pay for performing pre and

3    post-shift work.

4    Is that correct?

5    A. Correct.

6    Q. You agree that FCI Otisville is a paramilitary

7    organization with a ranked structure.

8    Correct?

9    A. Somewhat, yes.

10    Q. Well, is there a ranked structure at FCI

11    Otisville?

12    A. Yes.

13    Q. And the rank goes from Correctional Officer up to

14    Lieutenant up to Captain up to AW up to the Warden.

15    Is that correct?

16    A. Correct.

17    Q. And FCI Otisville is a medium-security

18    institution?  With a camp?

19    A. In the administrative facility.

20    Q. Okay.

21    A. So it encompasses anything from a low to a high.

22    Q. But it is classified as it is a medium-security

23    institution.

24    Is that correct?

25    A. Correct.

1071

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. And you would agree that the security features of
2    FCI Otisville include a dual fence with razor wire and
3    alarms?
4    A. Yes.
5    Q. And that dual fence marks the perimeter of
6    institution?
7    A. Correct.
8    Q. And FCI Otisville --- at FCI Otisville, that
9    fence is where the A1 sally port is.
10   Correct?
11   A. Correct.
12   Q. And that you agree that the security features
13   include two armed patrols ---
14   A. Correct.
15   Q. --- that go --- each of them are going 24 hours a
16   day?
17   A. Correct.
18   Q. And you agree that the Correctional workers are
19   integral and indispensable part of the security
20   features of the institution.
21   Correct?
22   A. Absolutely.
23   Q. And you would agree that there are murderers
24   housed in FCI Otisville.
25   Correct?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1072
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Correct.

2      Q. And these are inmates I'm talking about, right?

3      And you agree that the inmates are rapists, among the

4      inmates.

5   Correct?

6      A. Correct.

7      Q. And you agree that there are gang members among

8      the inmates.

9   Correct?

10     A. At times, yes.

11     Q. You agree that there are drug offenders among the

12     inmates.

13   Correct?

14     A. Yes.

15     Q. You agree that there are men convicted of violent

16     crimes among the inmates.

17   Correct?

18     A. Yes.

19     Q. And when you were a Captain, there were gang

20     members from numerous gangs including the Bloods,

21     Crips, Ice Lords, Mexican Mafia, and MS-13.

22   Is that correct?

23     A. At what time frame?

24     Q. Right --- the time period that you were a Captain

25     there.  I think it was at 2011 through 2019 there were

1073

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    gang members there from those gangs?

2    A. Yes, but we also transitioned in a mission

3     change.

4    Q. Okay.

5    When I --- so are you talking about toward the

6     end of your career, it became a dropout yard for gang

7     members?

8    A. I'd say more in the middle of my career, yes.

9    Q. Okay.

10   When you testified about --- if you want to turn

11    to page 41 of your deposition transcript.

12   ATTORNEY VALLACHER:

13   Your Honor, I'm not sure exactly if this

14    is an impeachment or refreshment of recollection of

15    what exactly.

16   JUDGE:

17   It's an impeachment, right?

18   ATTORNEY ELKIN:

19   Yes.

20   ATTORNEY VALLACHER:

21   Okay.

22   JUDGE:

23   Overruled.

24   THE WITNESS:

25   What page?

1074

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     BY ATTORNEY ELKIN:
2     Q. Here, I'll look.  Forty-one (41), line number 15
3     is the question.  Tell me when you're there.  Are you
4     there, Captain?
5     A. Yes.
6     Q. Okay.
7     And what kind of gangs are --- I don't know if
8     it's the right word, represented?  Which gangs were
9     --- had people inside the institution?  And your
10    answer was, to be more specific about it, you'd have
11    to give me a year, because toward the end of my
12    career, this was a gang dropout yard.
13    Did I read that correctly?
14    A. Correct.  And that's what I stated.
15    Q. Okay.
16    And so what year did it become a gang dropout
17    yard?
18    A. I don't recall the exact year, but it was
19    sometime probably around 2015.
20    Q. And so --- but does that mean that gang members
21    from other institutions who no longer wanted to be in
22    their gangs would come to this --- to this
23    institution?
24    A. Correct.
25    Q. So former gang members?

1075

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. Correct.

2    Q. And the gang members --- if gang members or

3    former gang members that were represented at FCI

4    Otisville, you would agree include Bloods?

5    A. Could have been a dropout from any gang member.

6    Q. If you want to turn to your deposition transcript

7    again on page 41 and 42.  I'm looking at the wrong

8    one.  I'm looking at the wrong deposition, my fault.

9    Okay, so prior to the dropout gang, dropout yard, what

10   gangs were represented?  And your answer was, we had

11   Bloods, Crips, Vice Lords, Mexicana, Mexican mafia,

12   and stuff like that.

13   Was that your answer?

14   A. Correct.

15   Q. And I said MS-13, is that something?  Answer,

16   yes?

17   A. Correct.

18   Q. And you would say okay, and then you said there

19   was a wide variety, I would say.

20   Is that correct?

21   A. Yes, ma'am.

22   Q. And so all of those people, even when it was a

23   dropout yard, you had members of those --- former

24   members of those gangs at FCI Otisville?

25   A. Yes.

1076

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. And do you know whether after you retired in
2    2019, whether it's --- whether it's still a dropout
3    yard?
4    A. I was told it wasn't, but I can't answer to the
5    fact of that.
6    Q. Okay.
7    But based on what you had been told, it is no
8    longer a dropout yard, so there's still --- there are
9    --- as far as you know, are there gangs there now?
10   ATTORNEY VALLACHER:
11   Objection, calls for hearsay, based on
12   the ---.
13   JUDGE:
14   It's sustained.
15   BY ATTORNEY ELKIN:
16   Q. And you agree during your time as Captain, there
17   were assaults by inmates on other inmates.
18   Correct?
19   A. Correct.
20   Q. And you would agree there were assaults, there
21   were assaults by inmates on staff.
22   Correct?
23   A. Rarely, but it could happen.
24   Q. You agree that it did happen?
25   A. I don't recall.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1     Q. Okay.
 2    Look at page 42, line 14.
 3     A. Okay.
 4     Q. Well, actually, let's start at line nine.  Okay,
 5     and there were assaults ---.
 6    ATTORNEY VALLACHER:
 7    Your Honor, is this a refreshment of
 8     recollection?  His response was, I don't recall.
 9    JUDGE:
10    I think you're impeaching?
11    ATTORNEY ELKIN:
12    I am impeaching.
13    JUDGE:
14    Okay.
15    So this is an impeachment, then.
16     BY ATTORNEY ELKIN:
17     Q. Line nine, okay.  And there were assaults by
18     inmates on other inmates.  Is that something that
19     happens at medium-security institutions such as FCI
20     Otisville?  Answer, yes.  Question, and how about
21     assault by inmates on staff?  Answer, I've seen it.
22     A. Correct.
23     Q. And question, does it happen?  You agree that at
24     FCI Otisville there are approximately 120 to 150
25     inmates housed on each side of the General Population
```

1078

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Housing Unit?

2    A. Sounds about right.

3    Q. And you agree that there's never been scheduled

4    paid overlap on any of the shifts on any of your

5    24-hour posts at FCI Otisville?

6    A. Correct.

7    Q. And you would agree that there's one Correctional

8    Officer assigned to each side of the housing unit.

9    Correct?  Well, one officer on A-side for 24

10   hours a day, correct?

11   A. Correct.

12   Q. And one officer on B-side for 16 hours a day?

13   A. Correct.

14   Q. And no officers on B-side for eight hours a day.

15   Correct?

16   A. Correct.

17   Q. You would agree that --- I might've asked this,

18   but has --- there's never been a schedule paid overlap

19   between the shifts on any the 24-hour posts at FCI

20   Otisville?

21   A. Correct.

22   Q. You would agree that the primary job duty of a

23   Correctional Officer assigned to general housing units

24   is to maintain the safety and security of the inmates,

25   institution and the public.

1079

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Correct?
 2      A. Everybody who works inside of a prison should be
 3      aware of safety and security.
 4      Q. Okay.
 5    I'm going to ask the question again, and I want
 6      an answer to my question.  You would agree that the
 7      primary job duty of a Correctional Officer assigned to
 8      a general housing unit is to maintain safety and
 9      security of inmates, institution, and the public.
10    Correct?
11      A. Can you restate that?  You're talking kind of
12      soft.  I'm having trouble hearing you.
13      Q. Am I talking soft?
14      A. Well, I don't know ---.
15      Q. No one's ever accused me of that.
16      A. I don't have the greatest hearing anymore.
17      Q. Okay.
18    I want you to be sure you hear my questions.  So
19      let me know if you cannot hear my question.  You would
20      agree that the primary job duty of a Correctional
21      Officer assigned to a General Population Housing Unit
22      is to maintain safety and security of its inmates,
23      institution, and the public.
24    Correct?
25      A. I would agree it's one of their duties.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                              3/15/2023

1      Q. You would agree that it's their primary job duty.
2    Correct?
3      A. No, because they have many duties.
4      Q. Okay.
5    I'd like to turn your attention to page 46 of the
6      deposition transcript.  And just to be clear, this is
7      impeachment.  Line 12, question.  You would agree that
8      the primary job duty of a Correctional Officer
9      assigned to a general population housing unit is to
10      maintain safety and security of its inmates,
11      institution, the public?  Answer, what was your
12      answer?
13      A. Yes.
14      Q. You would agree that the SHU, Special Housing
15      Unit, is also sometimes referred to as the Z unit?
16      A. Did you say Z?
17      Q. Z?
18      A. Yes.
19      Q. You agree that SHU holds up to ███████████?
20      A. Sounds about right.
21      Q. ████████████████████████████████████████
22    ███████
23    Correct?
24      A. Correct.
25      Q. And what is that used for?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      A. In a secured facility, like SHU, I'm going to
 2   call it SHU, not Z, because I've never called it Z,
 3   but ███████████████████████████████████████
 4   ███████████████    ███████████████████████
 5   █████████████████████████   █████████████████████
 6   ██████████████████████████████████████
 7   ██████████████████████████████████████████
 8   ███████████████████████    █████████████████████████
 9   █████████████    ████████████████████████████████
10   ██████████████████████████████████████████████████████
11   ████████████████████████
12      Q. Okay.
13   So you'd agree that an inmate in SHU have used
14   ███████████████ for purposes of assaulting Correctional
15   Officers.
16   Correct?
17      A. Yes.
18      Q. And that includes inmates throwing feces and
19   urine as officers come ████████████████
20   Correct?
21      A. Correct.
22      Q. And food trays that have gone through ████████████,
23   those have been used as weapons by inmates in SHU.
24   Correct?
25      A. Could be, yes.
```

1082

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. You agree that the primary job duty of a

2     Correctional Officer assigned to a 24-hour post in the

3     SHU is to maintain the safety and security of the

4     institution, staff and inmates.

5     Correct?

6     A. Correct.

7     Q. ████████████████████████     ██████████

8     ████████████████

9     A. Yes.

10    Q. And that's a ██████████████

11    Correct?

12    A. Correct.

13    Q. And there could be up to ███████████████

14    ████

15    A. While I was there, yes, it sounds feasible.

16    Q. And officers assigned to █████ , ███████████

17    ██████████

18    Correct?

19    A. Correct.

20    Q. ████████████████████████████████

21    ████████████████████████████████████

22    █████████████████████████

23    Correct?

24    A. Can you restate that, I'm sorry?

25    Q. ███████████████████████████████

Trial

Kathy Aitken, et al. v. USA                          3/15/2023



1    ████████████
2    A. Correct.
3    Q. ████████████████████████
4    ████████████████████████████████
5    ████████████████████████████████
6    ████████████████████████
7    A.████████
8    █████████████████  █████████████████████
9    ███████████████████████████  █████████
10   ████████████████████████████
11   ██████████████
12   Q. ████████████████████
13   A. ████████████  ████████████  ██████████
14   ████████
15   Q. ████████
16   ██████████████████████████
17   ████████████████████
18   A.██████████████████  ██████████████
19   ██████████████  ████████████████████████
20   ████████████████████
21   Q. Okay.
22   ██████████████████████████
23   ████
24   A. Correct.
25   Q. All right.

1084

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1    You would agree that the primary job duty of all

2      other Correctional Officers, no matter which post they

3      are assigned to, is to maintain safety and security of

4      the inmates, staff and institution.

5    Correct?

6      A. Correct.

7      Q. And you would agree that part of the primary job

8      duties of ensuring safety and security for

9      Correctional Officers is to issue corrective action to

10      the inmates when appropriate?

11      A. Correct.

12      Q. And you agree that when Correctional Officers

13      enforce rules, staff are safer, inmates are safer and

14      the public is safer.

15    Correct?

16      A. Yes, ma'am.

17      Q. And you would agree that would apply to the

18      enforcement of little rules like keep off the grass.

19    Correct?

20      A. Correct.

21      Q. And that was one of your pet peeves when inmates

22      are on the grass.

23    Correct?

24      A. Absolutely.

25      Q. The only time inmates should be on grass is if

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1     they are mowing the yard or picking up trash.
2   Correct?
3     A. Correct.
4     Q. And you agree that there's a rule that inmates
5     should not be loitering.
6   Correct?
7     A. Correct.
8     Q. And if an inmate breaks a rule, even a small one,
9     your expectation is that a CO should correct that
10    behavior when he sees it.
11  Correct?
12    A. Absolutely.
13    Q. And you'd agree that for small infractions, COs
14    should correct those small infractions verbally.
15  Correct?
16    A. Yes, ma'am.
17    Q. And you'd agree that there are rules for inmates
18    on how they are supposed to wear their uniforms.
19  Correct?
20    A. Correct.
21    Q. And the rule, it was added September 15th that
22    uniform is khaki pants, khaki shirt tucked in with
23    only one button unbuttoned.
24  Is that correct?
25    A. Correct.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. And if a Correctional Officer sees an inmate with
 2      a shirt untucked and buttons unbuttoned, you would
 3      expect the Correctional Officer to correct that rule
 4      infraction when the CO sees it.
 5   Correct?
 6      A. I would love it if they did.
 7      Q. You would expect that.
 8   Correct?
 9      A. Correct.
10      Q. And if a Correctional Officer sees an inmate
11      trying to take food out of Food Service, or running on
12      the compound, you would expect the Correctional
13      Officer to correct that behavior --- behavior verbally
14      as he sees the infraction in real time.
15   Correct?
16      A. Correct.
17      Q. And why is it important for the Correctional
18      Officers to correct these small infractions when they
19      see them?
20      A. It's important for all staff who work inside the
21      institution up to and including Correctional Officers
22      to correct inmate behavior so the institution runs
23      safely.
24      Q. And why is it important to correct the small
25      infractions?
```

1087

Trial

Kathy Aitken, et al. v. USA                                     3/15/2023

1      A. Because it could --- you let small ones go, it
2         could turn into bigger ones.
3      Q. Okay.
4    And then you would agree that if there's bigger
5         violations, it would be more difficult to maintain
6         control of the institution, safety and security.
7    Correct?
8      A. Correct.
9      Q. And you would agree that staff are outnumbered by
10        inmates.
11   Correct?
12     A. Absolutely.
13     Q. And on housing units, the inmates to the staff
14        ratio, at least on certain hours of the day, would be
15        130 to one.
16   Correct?
17     A. Yes.  I would say yes.
18     Q. Okay.
19   And you'd agree that part of the primary job
20        duties to ensure safety and security, Correctional
21        Officers are required to search for and remove
22        contraband as they find it.
23   Correct?
24     A. Correct.
25     Q. And you'd agree that contraband is a problem

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      inside FCI Otisville?

2      A. Correct.

3      Q. You'd agree that inmates have 24 hours a day to

4      think of things they want to get in their cells, and

5      it's the Correctional Officer's job to find and remove

6      contraband whenever they see it?

7      A. Right.

8      Q. And Correctional Officers themselves have a duty

9      not to bring contraband into the institution.

10     Correct?

11     A. Absolutely.

12     Q. And you would agree that the mandatory staff

13     screening site furthers that objective by making sure

14     staff do not bring in metal objects or cellphones,

15     things that could be seen as contraband.

16     Correct?

17     A. Correct.

18     Q. And you'd agree that the Correctional Officers

19     have to clear an upright metal detector prior to their

20     shifts.

21     Correct?

22     A. Correct.

23     Q. And you would agree that the purpose of requiring

24     officers to clear the screening site is to ensure that

25     they've not accidentally or intentionally bring in

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1      contraband to the institution?
 2      A. Correct.
 3      Q. And the intent of the screening site is to ensure
 4      that prohibited objects do not come into the
 5      institution.
 6   Correct?
 7      A. Correct.
 8      Q. And a personal cellphone is contraband.
 9   Correct?
10      A. Correct.
11      Q. And why is that?
12      A. An inmate gets ahold of it, and then we can't
13      monitor whatever communications they have.
14      Q. So in the institution when inmates make phone
15      calls on landlines, those phone calls are monitored.
16   Correct?
17      A. And recorded, correct.
18      Q. Okay.
19   And you would agree that the officers arrive at
20      the screening site at the start of a paid shift, let's
21      say a day watch shift, at ████████ starting ██████████
22      for the day watch shift, ████████. for an evening
23      watch, midnight for a midnight watch shift.  If they
24      begin screening at that time, they would be late.
25   Correct?
```

Trial
Kathy Aitken, et al. v. USA                          3/15/2023

1    A. No.  Not to my knowledge.

2    Q. I'd like you to turn ---.

3    A. I'm going to retract and say yes.  I thought

4       about it, what you're asking me.

5    Q. Okay.

6    So let's just make sure we have a clean record

7       here.

8    You would agree that officers arrive at a

9       screening site at the start of a paid shift, ███

10      ███, and we're just talking about 24-hour shifts

11      here.

12   A. ████████████████████

13   Q. ███████████████████████.  And they

14      begin screening at that time or begin collecting their

15      duty belts at that time, they would be late.

16   Correct?

17   A. Correct.

18   Q. Okay.

19   I'd like to turn your attention to Plaintiff's

20      Exhibit 2.

21                         ---

22   (Whereupon, Plaintiff's Exhibit PLX-2,

23   Whinnery Memo to Front Lobby Officers:

24   Screening Procedures (Re-

25   familiarization), was marked for

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

 1      identification.)

 2                                    ---

 3    THE WITNESS:

 4    What color?

 5      BY ATTORNEY ELKIN:

 6      Q. Yellow.

 7      A. It's like really yellow?

 8      Q. Is there a yellow color?

 9      A. There it is, sorry.  Kind of blends in with the

10      green.  Okay.

11      Q. Are you on the last page?  Go to tab two.

12      A. Tab two.

13      Q. Okay.

14    This is dated October 4th, 2011.  It's a

15      memorandum from front line officers from you regarding

16      screening procedures, re: familiarization.

17    Does this appear to be a memo prompting you to

18      allow the officers not to screen?

19      A. Yes, ma'am, that's my signature.

20      Q. Okay.

21    ATTORNEY ELKIN:

22    I'd like to move to admit Plaintiff's

23      Exhibit 2.

24    ATTORNEY VALLACHER:

25    Court's indulgence, please.

1092

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    JUDGE:

2    Okay.

3    ATTORNEY VALLACHER:

4    No objection.

5    JUDGE:

6    Admitted.

7                          ---

8      (Whereupon, Plaintiff's Exhibit PLX-2,

9      Whinnery Memo to Front Lobby Officers:

10     Screening Procedures (Re-

11     familiarization), was admitted.)

12                         ---

13     BY ATTORNEY ELKIN:

14     Q. If you go to the last paragraph, all items must

15     pass through the x-ray machine for scanning and this

16     includes duty belts, lunchboxes, et cetera.

17   Is that a requirement?

18     A. Anything that would set off the metal detector,

19     yes.

20     Q. And you would agree the █████████████████████

     █      ███████████████████ would set off the metal

22     detector.

23   Correct?

24     A. Correct.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1093

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Captain Whinnery, if you could turn to binder
 2       three of three, with a green label.  And I want you to
 3       turn to Joint Exhibit 106.
 4                              ---
 5    (Whereupon, Joint Exhibit JX-106,
 6    Program Statement 3740.02 Staff Entrance
 7    and Search Procedures, was marked for
 8    identification.)
 9                              ---
10       BY ATTORNEY ELKIN:
11       Q. Are you there?
12       A. Yes, ma'am.
13       Q. Okay.
14    Is this the program statement number 3740 besides
15       the date March 28th, 2016?  Does this appear to be
16       staff entrance and search procedure?
17       A. Yes ma'am.
18    ATTORNEY ELKIN:
19    I'd like to move to admit JX-106.
20    ATTORNEY VALLACHER:
21    Is this strictly to --- withdrawn.  No
22       objection.
23    JUDGE:
24    Admitted.
25                              ---
```

1094

Trial

Kathy Aitken, et al. v. USA                           3/15/2023

```
 1    (Whereupon, Joint Exhibit JX-106,
 2    Program Statement 3740.02 Staff Entrance
 3    and Search Procedures, was admitted.)
 4                            ---
 5    BY ATTORNEY ELKIN:
 6    Q. This is a program statement that covers staff
 7    entrance procedures.
 8    Correct?
 9    A. Yes, ma'am.
10    Q. And you'd agree that the staff screening
11    procedures, pursuant to this data, are implemented to
12    facilitate the legal obligations to ensure the safety,
13    security and orderly operation of BOP facilities and
14    to protect the public.
15    Right?
16    A. Right.
17    Q. And you agree that --- excuse me.  You agree that
18    service procedures for contractors, official visitors,
19    volunteers and inmate visitors are covered by a
20    separate policy statement, separate procedure.
21    Correct?
22    A. I don't understand your question.
23    Q. You agree that the search procedures for
24    contractors, official visitors, volunteers and inmate
25    visitors are covered by a separate procedure?  They've
```

1095

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      not covered by program statement 3704.02.

2   Correct?

3      A. I'm not sure, to be honest with you.  They all go

4       through the screening site.

5      Q. But you would agree that this document, that is

6       JX-106, applies only to staff entrance and search

7       procedures, and then there's another document for

8       visitors and the like?

9      A. Honestly, I don't recall.

10      Q. Okay.

11   Would it refresh your recollection if you looked

12       at your deposition testimony?

13      A. Probably.

14      Q. So let's look at page 95.  Line 14.  If you want

15       to read that, through line 19, and then let me know if

16       that refreshes your recollection.  You can read it to

17       yourself.

18      A. After reading that, I want to say correct.

19      Q. Okay.

20   And is it correct, too, that there's a separate

21       procedure for visitors, contractors, volunteers and

22       inmate ---?

23      A. I believe so, yes.

24      Q. Okay.

25   So when staff come through the screening site,

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      they are expected to place a duty belt, chits, clips,

2      et cetera to pass through screening for safety.

3   Is that correct?

4      A. Correct.

5      Q. On an x-ray machine next to the upright metal

6      detector.

7   Is that correct?

8      A. Right.

9      Q. And you'd agree that once the officer clears the

10     upright metal detectors, he has a collective duty belt

11     containing the chits, clips, and chains that he had on

12     after the belt and its attachment as it's screened.

13  Correct?

14     A. Correct.  He could be --- takes whatever cleared

15     through that metal detector and screening site and

16     x-ray machine.

17     Q. ███████████████████████████████████████

18  ███████████████████████████████.

19  Correct?

20     A. Correct.

21     Q. And they're issued by the Bureau of Prisons.

22  Correct?

23     A. Correct.

24     Q. And you would agree they are necessary and

25     indispensable to account for equipment inside the

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    jail.

2    Correct?

3        A. Yes.  They are used to account for equipment.

4    ATTORNEY VALLACHER:

5    I think we're starting to use legal

6        terminology.  I'm just getting a little bit close to

7        objecting, if we --- you know, using indispensable and

8        accurate.  I think for now, I'll put the objection on

9        the record.  I know this is important for my case,

10       though.

11   JUDGE:

12   Okay.

13   I'll overrule the objection for now, and

14       I'll overrule it under the assumption that we're

15       talking about these terms in an ordinary, common

16       assumption.  It doesn't carry any controlling legal

17       significance.

18   ATTORNEY VALLACHER:

19   Okay.  Thank you, Your Honor.

20   THE WITNESS:

21   Can I have one second to find my binder?

22       BY ATTORNEY ELKIN:

23       Q. Sure.  You're not the first witness who's lost

24       it.

25       A. I spun around too fast.  Got it there.  Binders

1098

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

```
 1    are dangerous.  I'll have to break a toe, someone
 2    could break a toe, exactly.  I'm sorry, go ahead.
 3    Q. My friend over here objected to the word.  I know
 4    it's been overruled, but you agree that accountability
 5    of equipment is extremely important inside the Federal
 6    Correctional Institution Otisville.
 7  Correct?
 8    A. Tools, equipment is extremely, positively 100
 9    percent vital.
10    Q. Okay.
11  And that is right behind safety of the staff.
12  Correct?
13    A. Staff's our number one priority, number one
14    resource.
15    Q. █████████████████████████████████████
16  ██████████████████████████████████████████████
17  █████████████████████
18  Correct?
19    A. ██████████████████████████
20    Q. Okay.
21  ███████████████████████████████████████████████
22  ████████████████████████████████
23  Correct?
24    A. ██████████████████████████████████████
25  ████████████████████████
```

1099

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1     Q. Fair enough.  But that --- so whether it's
 2     equipment or tools, you would expect to see equipment
 3     or tools on that ████████████  ████████████████████
 4     ████████████████████████████████████████████
 5     A. ██████████████
 6     Q. ██████████████████████████.
 7     Correct?
 8     A. 100 percent.
 9     Q. ██████████████████████████████████
10     ██████████████████████████████████████████
11     ██████████████████████████████
12     A. Yes.
13     Q. ██████████████████████████████
14     ██████████████████████████████████████████
15     ██████████████████.
16     Correct?
17     A. I'm sorry, repeat that again.
18     Q. ██████████████████████████████████████
19     ████████████████████████████████████████████████
20     ████████
21     Correct?
22     A. ██████████████████████████████████
23     ████████████  ████████████████████████████
24     ██████████████████████████████.
25     Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1     But you understand some officers bring in their
2        own chains because they feel like the chains issued by
3        the FCI Otisville are too short?
4        A. That I am not --- that I am not aware of.
5        Q. Okay.
6     You would agree that the location where the
7        officers collect their chits, chains, they bring them
8        in clips and duty belts and on the agency's premises
9        after they've screened in to the A1 lobby after
10       they've done the screening process.
11    Correct?
12       A. After the x-ray machine, correct.
13       Q. Yes.  And you'd agree that keys cannot be
14       exchanged or collected until officers who are wearing
15       the duty belt with those key keepers and key clips,
16       key clips.
17    Correct?
18       A. Some sort of belt, correct.
19       Q. Okay.
20    Agree that the OC spray canister --- do you agree
21       that the OC spray canister that the officer exchanged
22       on the 24-hour post have to be affixed to the
23       Officer's duty belt.
24    Correct?
25       A. They have to be affixed to a belt, yes.

1101

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     Q. Okay.

2   I'm going to show you some post orders, post

3     orders that have already been entered.  And you would

4     expect Correctional Officers to follow post orders.

5   Correct?

6     A. Yes.  That is now one of their activities of

7     their post.

8     Q. Okay.

9   I'm going to have you look at Joint Exhibit 58.

10    A. That same binder group?  You said 58, correct?

11    Q. Now before you get --- well, when you get there,

12    let me know.

13    A. Well, I'm in your binders for binders.  I dropped

14    the things.  All right, 58.

15    Q. General post orders apply to Correctional

16    Officers.

17  Correct?

18    A. I was trying to get the right page.

19    Q. Okay.

20  You agree that the general post orders apply to

21    all Correctional Officers working custody post.

22  Correct?

23    A. I'd say all Correctional Workers working

24    correctional posts.  So yes, Correctional Officers

25    would be included.

1102

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. Okay.

2    So is that --- and the post orders don't apply

3      correctional workers when they're working education.

4    Correct?

5      A. Correct.

6      Q. Okay.

7    So if you go to the last one, go to page 43 of

8      43.

9      A. I apologize.  This binder is like spread, and

10     it's hard to look at the pages.  Okay, 43 of 43.

11     Q. Okay.

12   Is that your signature at the bottom of page

13     79 ---?

14     A. Sure is.

15     Q. And is that January of 2019.

16   Correct?

17     A. January 30th, looks like '19.  Correct.

18     Q. And these post orders were in effect until you

19     retired at least until you retired until your post

20     orders were issued by, and that's by Captain O'Kane,

21     if you know?

22     A. Yeah.  Up until I retired, these post orders were

23     in effect.

24     Q. Okay.

25     A. I do not know when they changed them.

1103

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

```
 1      Q. Okay.
 2   Look under retention awareness. ████████████
 3      ██████████████████████████████████████████████
 4      ██████████████████████████████████████
 5   Do you see that?
 6      A. Uh-huh (yes).
 7      Q. And you wrote these post orders.
 8   Correct?
 9      A. Right.
10      Q. Okay.
11   So you expected, when you wrote these post
12      orders, for your Correctional Officers to follow these
13      post orders.
14   Correct?
15      A. Correct.
16      Q. And they would be impossible to follow this post
17      order if the Correctional Officer did not, in fact,
18      have a duty belt as outlined here.
19   Correct?  As written?
20      A. As written, yes.
21      Q. And the ████████ that it's talking about here,
22      the ████████████████████████████████████████
23      ████████████████████████████████. ████████████████
24      ████████████████████████████████████
25      ████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1104

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    Correct?

2    A. Every staff member.

3    Q. So that would include the Correctional Officers?

4    A. Correct.

5    Q. You agree that FCI Otisville also issued stab

6    resistant vests to all the Correctional Officers?

7    A. Can you say that again?

8    Q. You agree that FCI Otisville issue stab ---

9    stab-resistant vests to all Correctional staff.

10   Correct?

11   A. This is actually a tough one, because they hadn't

12   as of when I retired, but I do recall myself --- my

13   secretary did the female staff.  We did measure

14   everybody and we ordered them.

15   Q. Okay.

16   And you testified as a 30(b)(6) witness all the

17   equipment and all that other stuff that was --- that

18   Correctional Officers use in their daily activities

19   you recall.

20   Right?

21   A. For the stab vests?

22   Q. No.  You recall when I took your deposition,

23   where you agreed to bind the agency with various ---

24   on various topics including the type of equipment that

25   Correctional Officers used.  And the uniforms that

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    they wear.

2    Correct?

3     A. Correct.

4     Q. Okay.

5    And so you were educated at that deposition about

6     the fact officers do, in fact, have to wear stab

7     vests.

8    Correct?

9     A. Right.  I wasn't denying that.

10     Q. Okay.

11     A. I just wasn't there for the issuance.

12     Q. Okay.

13    I understand that, but you do know that they

14     were, in fact, issued.

15    Correct?

16     A. My wife got one so I'm pretty sure they all got

17     one.

18     Q. Okay.

19    She works there?  Does she still work there?

20     A. Used to.

21     Q. You agree that any staff who enters the secured

22     confines of the ████ or the main institution must

23     wear a stab-resistant vest.

24    Correct?

25     A. I am aware of that, correct.

1106

Trial

Kathy Aitken, et al. v. USA                                      3/15/2023

1      Q. Okay.

2  And you agree that Correctional Officers are

3     required to wear uniforms while on duty?

4      A. Correct.

5      Q. And you agree that after they collect their duty

6     belt at the screening, they go to the A1 sally port

7     and they are assigned to work, put on a 24-hour post

8     inside the institution?

9      A. No, but most of the 24-hour posts, yes, are

10    inside the, past the A1.

11     Q. Okay.

12  And my question was if they're assigned to work

13    that post inside the institution, they would have to

14    pass through the A1 sally port.

15  Correct?

16     A. Yes.  I misheard you.

17     Q. That's okay.  And you agree that to pass through

18    that sally port at the front lobby, the officer will

19    tell the control center A1 entered secured, and then a

20    Control Center Officer will pop that outer sally port

21    door.

22  Correct?

23     A. Yes.

24     Q. And then the Control Center Officer will see on

25    his camera inside control that A1 outer --- that when

1107

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      the A1 outer door closes, he can visually inspect and
 2      visually ID the offices inside the sally port on his
 3      camera, and then he will pop that inner door.
 4  Correct?
 5      A. Correct.
 6      Q. And inside the A1 sally door is an accountability
 7      chit board.
 8  Correct?
 9      A. Correct.
10      Q. And you have knowledge that the Correctional
11      Officers chits are --- they're numbered sequentially
12      one through whatever, and after that ---?  Well, let
13      me ask you this.
14  Do you know whether the Correctional Officer
15      chits are separate from the Correctional ---
16      Correctional Worker non-custody staff?
17      A. Okay.
18  Yeah, no.  I get you.  Each department is broken
19      down into sections.  Correctional Services was all
20      one.  Officers, Captain, Lieutenants, they're all
21      under Correctional Services.
22      Q. Okay.
23  So if you wanted to look at the board to see
24      which Correctional Officers were inside the
25      institution, you know what section of the board to
```

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1      look at?  You don't have to look at all 330 chits?
2      A. Correct.
3      Q. Okay.
4   And you agree that officers are required to flip
5      their assigned number chit on that board to in to show
6      that they are going on duty inside the institution.
7   Correct?
8      A. Correct.
9      Q. And that board is to account for who's in or out
10     of the institution if something goes wrong.
11  Correct?
12     A. Absolutely.
13     Q. And you agree that the accountability chit board
14     is a safety precaution that helps ensure safety and
15     security of an institution, staff and inmates?
16     A. I would.
17     Q. And you would agree that any supervisor at any
18     time of day should be able to look at that door and
19     know who is inside the institution?
20     A. I could, yes.
21     Q. And that's --- you would agree knowing who is
22     inside the institution is important and directly tied
23     to the safety and security of the institution?
24     A. Yes.
25     Q. So if a supervisor looked at that board at 7:40

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    and he looks at the correctional worker --- sorry
 2    Correctional Officer section of the board, if he looks
 3    at that at say 7:40 a.m., he could see all the
 4    Correctional Officers who are inside the institution.
 5   Correct?
 6    A. Seconds feasible.
 7    Q. And would know from the daily roster which
 8    Correctional Officer is assigned to which shift.
 9   Correct?
10    A. Correct.
11    Q. Has the agency ever done a study of an
12    accountability chit board, say at 30 minutes or 20
13    minutes prior to shift change times, and compared to
14    the daily roster, to see who is inside the
15    institution?
16    A. Not to my knowledge.
17    Q. So you agree that the rule is to flip the chit to
18    show you are inside when you are coming on duty and to
19    flip it again as you leave after your shift to show
20    that you are no longer inside.
21   Correct?
22    A. Correct.
23    Q. And you agree that Correctional Officers are
24    required and expected to follow rules of the
25    institution.
```

1110
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Correct?
 2      A. I expect all employees to, yes.
 3      Q. And you would agree the accountability chit board
 4      was in play for the entire time you were a Captain at
 5      FCI Otisville.
 6    Correct?
 7      A. Yes, ma'am.
 8      Q. And it was in place over the 2012 grievance,
 9      then?
10      A. Yes.
11      Q. You would agree that the Correctional Officers do
12      not have control over how quickly the Control Center
13      Officer will open the sally port doors.
14    Correct?
15      A. Correct.
16      Q. Control has control of that.
17    Correct?
18      A. Yes, ma'am.
19      Q. So after the control --- sorry, the officers are
20      going through ---.
21      A. I don't like this chair.
22      Q. You okay?
23      A. I got to keep uniform or I'll fall over.
24    ATTORNEY ELKIN:
25    Off the record for a minute.
```

1111

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                       ---
 2      (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
 3                       ---
 4      BY ATTORNEY ELKIN:
 5      Q. So after the Correctional Officers flip their
 6      chits and they exit the A1 inner door, they are on the
 7      sidewalk to the administration building.
 8    Correct?
 9      A. Correct.
10      Q. And officers assigned a 24-hour post, they do not
11      have to stop at control.
12    Right?
13      A. Correct.
14      Q. So they go through --- next thing they would do
15      is go through the control center sally port upon
16      exiting and upon exiting that, they're on the
17      compound.
18    Correct?
19      A. Yes, ma'am.
20      Q. And once the correctional staff are on the
21      compound or walking to their post, they are locked
22      inside the institution by two sets of sally port doors
23      that are controlled by someone else.
24    Correct?
25      A. Right.
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. And they're in full uniform, and now a vest on.
2    Correct?
3      A. Hopefully, yes.
4      Q. And they are required to remain alert to their
5      surroundings.
6    Correct?
7      A. Anyone who enters a prison should be alert to
8      their surroundings, so yes.
9      Q. And they are required to remain vigilant inside
10     the institution as they are walking to their post
11     prior to their shifts.
12   Correct?
13     A. Seems before.  Not just Correctional Officers,
14     anyone who enters that prison, yes.
15     Q. And they are not allowed to run unless they are
16     running to an emergency.
17   Correct?
18     A. Not allowed to run?
19     Q. The Correctional Officers.
20     A. Nobody should be running unless they're running
21     to an emergency, up to and including Correctional
22     Officers.
23     Q. And inmates should never be running, right?  That
24     would be a rule violation?
25     A. Well, if somebody's chasing another inmate with a

1113

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    knife, I'd be running.

2    Q. Other than that?

3    A. No, they better not be running.

4    Q. Agree that officers on their way to their posts

5    can't just sit down on the grass and hang out for a

6    while?

7    A. I don't know why they'd want to, but no, they

8    don't.

9    Q. Okay.

10   And of course they are not allowed to chat on

11   their cellphone because they can't even have a

12   cellphone inside the institution.

13   Correct?

14   A. Right.

15   Q. You would agree that officers are in a state to

16   respond to emergencies when they are inside the

17   secured confines of the institution.

18   Correct?

19   A. Once again, I'd say Correctional Officers and all

20   staff should be in a state of readiness in case

21   something jumps up.  So my answer would be yes.

22   Q. Okay.

23   And you would agree for those --- and you would

24   agree that Correctional Officers, as they're making

25   their way to their post, if a body alarm would go off,

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1       they are required to respond to it before their shift?
2       A. That would be my expectation of Correctional
3       Officers and any other staff coming on or off duty.
4       Q. Okay.
5    Let's just talk for another couple minutes about
6       non-custody staff.  Let's talk about let's say
7       Educational Specialist.  Their hours are from ███████
8       ████████████████████████████████████████████
9       A. Somewhere on the day shift, I will agree to that.
10      Q. Okay.
11   So isn't it true that for Educational Specialists
12      or any kind of Case Manager, Unit Team Members, those
13      are all non-custody positions.
14   Right?
15      A. Right.
16      Q. And they don't require relief.
17   Correct?
18      A. Correct.
19      Q. And under the work schedule for them, they are on
20      time for their control center, let's say the shift
21      starts at seven o'clock.  They're on time when they're
22      on the control center at 7:00 a.m.
23   Correct?
24   ATTORNEY VALLACHER:
25   Your Honor, personal knowledge.  The

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Captain oversees only custody, not non-custody.

2    JUDGE:

3    Well, he can testify to what he knows.

4    If he doesn't know, he can say he doesn't know.

5    BY ATTORNEY ELKIN:

6    Q. Do you know?

7    A. I don't know.  I don't know what expectations

8    their boss would have put in line for them.

9    Q. You agree that you have never met an officer who

10   wouldn't respond to help his fellow officer.

11   Correct?

12   A. No.

13   Q. So correct?

14   A. Correct.

15   Q. That's part of the law-enforcement training.

16   Correct?

17   A. Correct.

18   Q. And it's ingrained in their very natures, you run

19   to an emergency when an alarm sounds, even when it is

20   prior to your pay time or after you've been removed

21   from post.

22   Correct?

23   A. Correct.

24   Q. And you agree that officers are in a dangerous

25   environment when they are on institution grounds.

Trial
Kathy Aitken, et al. v. USA                                3/15/2023

1    Correct?

2      A. Once again, Correctional Officers and all staff.

3      Yes.

4      Q. Okay.

5    When you wrote down --- and your shift was from

6      7:30 to 4:00?

7      A. On a good day.

8      Q. Well, fair enough.  You come in around 7:10 or

9      7:15.

10    Is that correct?

11      A. I'm not a morning person.  Usually around 7:15, I

12      guess.

13      Q. And so you were in the institution by the time

14      the morning watch officer would be relieved by the day

15      watch officers.

16    Correct?

17      A. It's feasible, yes.

18      Q. And the Captain's officer was in the Lieutenant's

19      Office?  Same area?

20      A. Yes.

21      Q. And you have not --- when you were there at the

22      compound,

23      .

24    Correct?

25      A. Correct.

1117

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    Q. And you've seen the compound officers make their

2    reliefs.

3  Correct?

4    A. I'm sure I have.

5    Q. And you've seen that take place prior to ███

6    ███

7  Correct?

8    A. Without looking at something in front of me, I'm

9    not going to answer that, because I'm not sure.

10    Q. Okay.

11  If you could turn to page 128 of your deposition.

12  ATTORNEY VALLACHER:

13  Is this impeaching or refreshing

14    recollection?

15  ATTORNEY ELKIN:

16  I mean ---.

17  ATTORNEY VALLACHER:

18  He says without something in front of

19    him, he's not sure.

20    BY ATTORNEY ELKIN:

21    Q. Okay.

22  If you looked at your deposition, would that help

23    refresh your recollection of whether the compound

24    officer ---

25    A. Yes.

Trial

Kathy Aitken, et al. v. USA                    3/15/2023

1    Q. --- exchanged information/equipment prior to the
2    shift?
3    A. Yes.  That's why I asked you for something in
4    front of me.  I don't want to come off sideways on
5    something.
6    Q. Okay.
7  So if you look at page 128, lines 14 and 15, and
8    let me know if that refreshes your recollection.
9    A. Okay.
10    Q. Okay.
11  Does that refresh your recollection?
12    A. Yep.
13    Q. So you have seen Correctional --- I'm sorry,
14    C.O.s who are assigned to compound posts make an
15    exchange prior to the start of the ---
16    A. Correct.
17    Q. --- Correctional Officers on the shift.
18  Correct?
19    A. Correct.
20    Q. Do you agree that no C.O. at FCI Otisville has
21    ever been disciplined for making an early relief, say
22    15, 20, 30 minutes prior to the start of their shift
23    on 24-hour post.
24  Correct?
25    A. Correct.

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1     Q. And you agree that no Lieutenant has ever been
2     disciplined for allowing the Correctional Officers to
3     come in and start screening 30 minutes prior to the
4     shift.
5   Correct?
6     A. Correct.
7     Q. You agree that Correctional Officers are subject
8     to hostile hostage and assault situations?
9     A. Correctional Officers and all staff who work for
10    the Bureau of Prisons inside an institution could be
11    held hostage, so yes.
12    Q. Okay.
13  And you agree that it's actually in the
14    Correctional Officers' position description, that they
15    are subject to possible hostage and assault
16    situations.
17  Correct?
18  ATTORNEY VALLACHER:
19  Objection, Your Honor, best evidence.
20  JUDGE:
21  Explain.
22  ATTORNEY VALLACHER:
23  By the context of the document.
24  JUDGE:
25  Is there a document you're asking about?
```

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1    ATTORNEY ELKIN:

2    I said you would agree that the position

3      description, I would assume that the Captain is in

4      charge of the Correctional Officers would know the

5      position description of the Correctional Officers.

6    JUDGE:

7    Then you are asking him to testify to

8      the contents of the document.

9    ATTORNEY ELKIN:

10   But I can show him the document.

11   JUDGE:

12   That would be good.

13   ATTORNEY ELKIN:

14   Okay.

15     BY ATTORNEY ELKIN:

16     Q. It requires a different giant green binder.

17     Joint Exhibit 2, as an example.

18     A. Hold on.  Let me get ---.

19     Q. That would be the one of three.

20     A. All right.

21   Which tab?

22     Q. Two, please.

23     A. Two?

24     Q. Yeah.

25   Are you there?

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes.

2      Q. Okay.

3    You're familiar with this document?  You see this

4      as a Correctional Officer position description.

5    Correct?

6      A. Correct.

7      Q. If you go down on their main reviews and

8      responsibilities.

9      A. Uh-huh (yes).

10     Q. You would agree that in the fifth paragraph down

11      it states that Correctional Officers are subject to

12      being subject to hostile and life-threatening

13      situations, as riots in cells and escape attempts.

14    Correct?

15     A. Correct.

16    ATTORNEY VALLACHER:

17    Objection, Your Honor.

18    JUDGE:

19    Well, now he's agreeing about the words

20      are on the document are.

21    Right?

22    ATTORNEY VALLACHER:

23    Yes.

24    JUDGE:

25    Okay.

Trial
Kathy Aitken, et al. v. USA                           3/15/2023

```
 1    So overruled.  Now he's talking about
 2      the document.
 3      BY ATTORNEY ELKIN:
 4      Q. You agree that Correctional Officers are subject
 5      to being in such hostile and life-threatening
 6      situations as riots in cells and escape attempts.
 7    Correct?
 8      A. You turned your head that way again, so I'm not
 9      hearing you as well.
10      Q. Sorry.
11    You agree that pursuant to --- so based on your
12      own personal knowledge, and the position description
13      that caused the Correctional Officers that you are in
14      charge of, you would agree that Correctional
15      Officers are subject to being in such hostile or
16      life-threatening situations as riots, assaults and
17      escape attempts.
18    Correct?
19      A. Right.
20      Q. And if we turn to the last page on the level of
21      responsibility.
22      A. Okay.
23      Q. The last paragraph, it says the work performed is
24      within a federal prison and the incumbent is subject
25      to possible hostage and assault situations.
```

1123
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1    Correct?
2      A. That's it, yes.
3      Q. Again, you agree that that is an accurate
4      reflection of the type of work environment that they
5      work in.
6    Correct?
7      A. I would agree that everyone who works inside the
8      prison is the same way, yes.
9      Q. Okay.
10    We're looking at Correctional Officer position
11      description.
12      A. Yes.
13      Q. You can confirm that's the ---
14      A. Yes, Correctional Officers.
15      Q. --- position description.
16    Correct?
17      A. Yes.
18      Q. And you agree that Correctional Officers could be
19      subject to assault or a hostage situation when they
20      are on the way to their post, prior to their paid time
21      and when they leave their post after they had been
22      relieved.
23    Correct?
24      A. Say that again.  I'm sorry.
25      Q. You would agree that Correctional Officers could

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1     be subject to assault or a hostage situation when they
2     are on their way to their post, prior to their paid
3     time and when they leave their post after they had
4     been relieved.
5     Correct?
6          A. All staff, including Correctional Officers, could
7     be subject to that, yes.
8          Q. Okay.
9     And I specifically asked prior to their pay time
10    and when they leave their post after they've been
11    relieved, they are subject to hostage or assault
12    situations.
13    Correct?
14         A. And I answered yes.
15         Q. You agree that the job duties of Correctional
16    Officers require frequent direct contact with
17    individuals who have been convicted of crimes.
18    Correct?
19         A. Correct.
20         Q. These contacts can occur prior to their paid
21    shift and after they've been relieved on post on the
22    compound, depending on when the officer is coming on
23    the post --- 24-hour post.
24    Correct?
25         A. Correct.

1125

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1      Q. You agree that the Correctional Officer job
 2      involves daily stress and exposure to potentially
 3      dangerous situations, such as physical attacks.
 4    Correct?
 5      A. Correct.
 6      Q. And that daily stress and exposure could be while
 7      the officer is walking to his post prior to his shift
 8      or after he's been relieved from the post and making
 9      his way out of the institution.
10    Is that correct?
11      A. If there's inmates on the compound, correct.
12      Q. And you agree that all officers --- I think you
13      already said this --- has to comply with the general
14      post orders?
15      A. Yes.
16      Q. You'd agree that the post orders prohibit the
17      Correctional Officer from leaving their post, 24-hour
18      post, for any reason without approval from the
19      Lieutenant.
20    Correct?
21      A. Correct.
22      Q. And so if the officer's relief is running late,
23      the officer on the post must remain on the post until
24      his relief gets there or until the Lieutenant advises
25      him to leave.
```

1126

Trial

Kathy Aitken, et al. v. USA                               3/15/2023

1    Correct?
2      A. Correct.
3      Q. You agree that the Correctional Officers are
4      expected to demonstrate alertness and competence,
5      tasked with the judgment in handling all situations.
6    Correct?
7      A. Correct.
8      Q. And that could be situations that occur prior to
9      their paid time, on the way to the post or after
10     they've been relieved.
11   Correct?
12     A. It could be, yes.
13     Q. You would agree that all Correctional Officers
14     assigned to 24-hour posts must be on their assigned
15     posts with all of their equipment at the start of
16     their designated shift.
17   Correct?
18     A. Say it again.  I missed the beginning.  I'm
19     sorry.
20     Q. You agree that all Correctional Officers assigned
21     to the 24-hour post must be on their assigned posts
22     with all of their equipment by the start of their
23     designated shifts?
24     A. Should be on their assigned posts with their
25     designated shift, yes.

1127

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

```
 1      Q. And it's also the Correctional Officer's
 2   responsibility to make his presence known to the
 3   Lieutenant when he's assuming his post.
 4   Correct?
 5      A. When feasible.
 6      Q. Has a Correctional Officer ever been disciplined
 7   for assuming the duties of a 24-hour post prior to the
 8   start of a designated shift?
 9      A. Not to my knowledge, no.
10      Q. And you agree that the Correctional Officers
11   sometimes make their presence known to the Lieutenant
12   while they are on the way to the post prior to their
13   shift when they walk by --- walk into the Lieutenant's
14   Office.
15   Correct?
16      A. I'm sure it happens.
17      Q. And you're actually aware of that.
18   Correct?
19      A. Correct.
20      Q. And you agree that the Correctional Officers are
21   required to converse with the inmates when there's an
22   obvious need to do so and to maintain professional
23   relationships at all times.
24   Correct?
25      A. Correct.
```

1128

Trial

Kathy Aitken, et al. v. USA                                         3/15/2023

1      Q. And that would include times when the
2      Correctional Officer is walking to his post prior to
3      the shift or walking out of the institution after the
4      shift.
5      Correct?
6      A. If there's inmates present, yes.
7      Q. And you would expect the Correctional Officers to
8      talk about these small rule infractions, you would
9      expect the Correctional Officers to correct rule
10     infractions on the way to the post prior to the shift
11     and receives a rule infraction by ---?
12     A. I answered that before, yes.
13     Q. And your answer would be the same, you would
14     expect Correctional Officers to correct rule
15     infractions on the way out of the institution after
16     he's been relieved on the post.
17     Correct?
18     A. Correct.
19     Q. And you would agree that the rule that requires
20     Correctional Officers to be in uniform while they're
21     on duty, that requires the Correctional Officers to be
22     in uniform while they're walking to the post prior to
23     their shift and as they're leaving the institution.
24     Correct?
25     A. Correct.

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

1   Q. There's a midnight count.
2   Correct?
3   A. 12:01, yes.
4   Q. You would agree that the morning watch officers
5   are responsible for the midnight count.
6   Correct?
7   A. Morning watch, correct.
8   Q. Do you still have Joint Exhibits 58, general post
9   orders that you signed in front of you somewhere?
10  A. And that's page 43 of --- 43 of 58.
11  Q. Okay.
12  And if you could turn to 26 of 43?  These are the
13  general proposed orders that apply to all Correctional
14  Officers.
15  A. Twenty-six (26).
16  Q. Okay.
17  
18
19
20  Do you see that?
21  A. That's correct.
22  Q. Okay.
23  So I've heard you say something about
24  You would agree that the general post order says
25  that the count ---?

1130

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
1      A. Correct.
2      Q. So the morning watch officers have to be on their
3      post in uniform with all equipment and any information
4      they need by the ███████ count in order to do that
5      count at ████████
6   Correct?
7      A. Correct. ████████████████████████████
8   ██████████████.
9      Q. Okay.
10  ████████████████████████████████
11  ██████████████.
12  Correct?
13     A. Correct.
14     Q. Pursuant to the post orders.
15     A. Correct.
16     Q. Okay.
17  And so the morning watch officers would have to
18     be on their post in uniform with all equipment and
19     information by ████████ in order to connect --- sorry,
20     conduct the ████████████, as set forth in your
21     general post orders?
22     A. Correct.
23  ATTORNEY VALLACHER:
24  Objection, misstates the --- misstate
25     the --- mischaracterizes the record.
```

1131

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    JUDGE:
2    I mean, he answered yes to the question,
3        though.
4    ATTORNEY VALLACHER:
5    Oh, he already answered?
6    JUDGE:
7    Yeah.
8    But in what way did the question
9        mischaracterize?
10   ATTORNEY VALLACHER:
11   Because the post orders do not specify
12       when that equipment gets to be put on.
13   JUDGE:
14   The witness said yes.
15   ATTORNEY VALLACHER:
16   Okay.
17   I didn't hear him.  Sorry.
18   JUDGE:
19   It's overruled.
20       BY ATTORNEY ELKIN:
21       Q. And you would agree that there's a ███████
22       █████ pursuant to your post orders signed by you.
23   Correct?
24       A. Correct.
25       Q. And so your answer would be the same for day

1132
                                    Trial
Kathy Aitken, et al. v. USA                              3/15/2023

    1    watch officers, they would have to be --- well, let me
    2    back up.
    3  Who does the --- is it evening watch officers
    4    that do the ██████████████?
    5    A. Correct.
    6    Q. Okay.
    7  So the evening watch officers would have to be on
    8    their post in uniform with all the equipment they need
    9    and any information they need by ████████████ in order
   10    to conduct the ██████████████.
   11  Correct?
   12    A. Correct.
   13    Q. You would agree that there are only 13 staff
   14    members on duty during the morning watch shift.
   15  Correct?
   16    A. If I stated that, it's probably correct.
   17    Q. Do you want to know whether you said that?
   18    A. I'd have to see that roster, because we're
   19    talking over four years ago.
   20    Q. Well, let me see if this will refresh your
   21    recollection.  It was page 198.  We were talking about
   22    how busy the control center is between the hours of 11
   23    o'clock and 12 o'clock.
   24  The different shift --- the different shift
   25    change times.  And if you look at line 13 to 15 of

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1     your answer and let me know if that refreshes your
2     recollection about how many people would be on the
3     shift --- the morning watch shift.
4     A. I will agree with that.  Correct.
5     Q. I'm sorry.  I was walking, I didn't hear you.
6     A. I never heard that before either.  I would agree
7     that's about the right number.
8     Q. About 13?
9     A. Yes.
10    Q. In the entire institution?
11    A. At that time.
12    Q. At that time.  During the hours of between
13    ████████████████████  ████████████████████████
14    █████  ████████████████████████████████████
15    A. Correct.
16    Q. Now, these five housing units, you're familiar
17    with those.
18    Right?
19    A. Correct.
20    Q. And they have specific post orders that describe
21    the tasks that are to be performed throughout the
22    shift.
23    Correct?
24    A. Correct.
25    Q. I'm going to show you what was previously marked,

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    I think as Exhibit JX-6 --- JX-5.  One moment.
2    The blue binder.  And I'd like you to look at
3    DF-5, which has been previously admitted.
4    A. What is it?
5    Q. DF-5.
6    A. Does it got a tab number?
7    Q. Five.
8    A. Okay.  I'm there.
9    Q. Okay.
10   Do you see that this is a housing unit B-side
11   post order?
12   Correct?  Sorry, B-side specific post order.
13   ATTORNEY VALLACHER:
14   Your Honor, I'm going to have to just
15   object to this post order.  It was created after he
16   retired and therefore wouldn't have personal
17   knowledge.
18   ATTORNEY ELKIN:
19   Your Honor, it's already been admitted,
20   and I'm going to have him go through it and then ask
21   him whether this same thing was in effect when he was
22   an Officer.
23   JUDGE:
24   I think that's fair.
25   ATTORNEY ELKIN:

1135

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1   Not Officer, Captain.

2   JUDGE:

3   It's overruled.

4    BY ATTORNEY ELKIN:

5    Q. Okay.

6   So looking at the DF-6 --- sorry, 5 ---.

7   JUDGE:

8   And if he doesn't have personal

9    knowledge, he can say that he doesn't know.

10  ATTORNEY VALLACHER:

11  Understood, Your Honor.

12  Thank you.

13   BY ATTORNEY ELKIN:

14   Q. At ████████ for the B-side units, E, B, F, E, G

15   unit, they're to ██████████████ and draw all

16   necessary equipment wearing the prescribed uniform.

17  Do you see that?

18   A. Yes.

19   Q. So you would agree that the B-side housing unit

20   officers have to be at the ████████████ drawing

21   their equipment at ██████████ correct, to be on time?

22   A. By looking at this?

23   Q. Yes.

24   A. Yes.

25   Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1136

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    And then if you go to the end of evening watch
 2      shift, which is on page seven of eight --- well,
 3      actually before we go to that.
 4    So you would agree if officers are following
 5      their post orders, which they're expected to do, then
 6      they are on paid time with these five housing unit
 7      officers as they are walking to their post from the
 8      control center.
 9    Is that correct?
10      A. Say that again.
11      Q. Okay.
12    You agree they draw their equipment --- they have
13      to --- in order to not to be late, they must be
14      drawing their equipment by ████████ pursuant to this
15      post order.
16    Correct?
17      A. Pursuant to, yes, ████████ at ████████, they
18      are on shift.
19      Q. Okay.
20      A. In a paid status.
21      Q. Correct.
22    So thank you for that clarification.
23    So you would agree that while they walk from the
24      control center through the control center south to
25      their B-side housing units, their walk is on paid
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    time.

2    Correct?

3      A. Correct.

4      Q. And if you go to page seven of eight.  At █████

5        █████  the B-side p.m. officer would document that the

6      30-minute irregular rounds are complete and make the

7      shift --- end shift entry he would secure outgoing

8      mail office and then at ██████████ he would proceed to

9      return keys radio equipment.

10   Do you see that?

11     A. █████  yes.

12     Q. Okay.

13   And so he was expected to return his equipment by

14     ████████████

15     A. By reading this, yes.

16     Q. Okay.

17   So pursuant to these post orders, you would

18     expect that --- I'm sorry, pursuant to these post

19     orders, the B-side housing unit officers on the p.m.

20     watch are on paid time as they walked across the

21     compound after their shift.

22   Correct?

23     A. Pursuant to what I looked at, yes.

24     Q. Okay.

25   And would you agree that you had similar post

Trial
Kathy Aitken, et al. v. USA                              3/15/2023

1    orders in effect when you were the Captain?
2    A. It's possible.
3    Q. Do you know if you had similar post orders in
4    effect when you were a Captain?
5    A. Do I know?
6    Q. Yes.
7    A. I know I retired over four years ago.  My memory
8    is not the greatest.
9    Q. Okay.
10   Would it help you to look at the documents so
11   that you can confirm ---?
12   A. To refresh my memory would be great, because I
13   really didn't think much about the Bureau until the
14   last couple days.
15   Q. Did you post anything on Facebook about coming
16   here today?
17   A. I sure did.
18   Q. Do you remember what you posted about coming here
19   today?
20   A. I sure do.
21   Q. Why don't you tell us?
22   A. I wasn't happy about it.
23   ATTORNEY VALLACHER:
24   Objection, relevance.
25   JUDGE:

Trial

Kathy Aitken, et al. v. USA                    3/15/2023

1    I don't see the relevance.

2    ATTORNEY ELKIN:

3    It might become relevant.  He posted

4      something on Facebook about his ---.

5      BY ATTORNEY ELKIN:

6      Q. Do you want to be here today?

7      A. I'm here.

8      Q. Okay.

9    ATTORNEY ELKIN:

10   I'll move on.

11   JUDGE:

12   Why don't you move on?  He's testified

13     that he's here pursuant to a subpoena.

14   ATTORNEY ELKIN:

15   Okay.

16   But I do believe that this does go to

17     credibility at some point.

18   JUDGE:

19   If it's --- you said that it might

20     become relevant, so if it becomes relevant, you can

21     return to it.

22   ATTORNEY ELKIN:

23   Okay.

24   JUDGE:

25   For now, let's move on.  Objection's

1140

Trial

Kathy Aitken, et al. v. USA                                          3/15/2023

1    sustained.

2    ATTORNEY VALLACHER:

3    Thank you, Your Honor.

4    BY ATTORNEY ELKIN:

5    Q. So you were Captain in 2011.

6    Correct?

7    A. February 2011.

8    Q. So I'm going to show you some post orders that

9    were in effect in March 2011, okay.  The way they were

10   written then include both A and B-side.  I'm going to

11   point you to where I want you to go to refresh your

12   recollection.

13   ATTORNEY ELKIN:

14   May I approach?

15   JUDGE:

16   And you said these are just for

17   refreshing recollection and not for evidence?

18   ATTORNEY ELKIN:

19   Yes.

20   JUDGE:

21   Okay.  Approach.

22   BY ATTORNEY ELKIN:

23   Q. Okay.

24   If you can go to page 3 of 15 of the document

25   that's in front of you.  I want you to read what

Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

1       happens at ████████ for the units E, D, F, E, G.

2                                ---

3       (WHEREUPON, WITNESS REVIEWS DOCUMENT.)

4                                ---

5    THE WITNESS:

6    Okay.

7       BY ATTORNEY ELKIN:

8       Q. So does this refresh your recollection of where

9       the B-side housing unit officers have to be when

10      they're working a shift on --- an a.m. shift on a

11      16-hour B-side post?  At ████████ where they have to

12      be or does it refresh your recollection?

13      A. After reading this with the ████████ to me it

14      sounds like the B-side may have been manned.  I don't

15      know what year that went into effect, that the off

16      sides were vacated on the morning watch shift, so I

17      --- that doesn't really refresh my memory.  It

18      actually kind of clouds it.

19      Q. Okay.

20      A. And I say that because it says 24-hour basis.

21      Q. It says unit B, D, F, G, E, D report to control

22      and draw all necessary equipment unless B-sides are

23      manned by staff, go directly to your assigned housing

24      unit wearing the assigned uniform.

25   So I'm asking for about --- if they're not

Trial

Kathy Aitken, et al. v. USA                                                    3/15/2023

```
 1    manned, 24 hours ---?
 2    A. Then they stop at control.
 3    Q. Okay.
 4    So does that recollection now?
 5    A. Yes.
 6    Q. Okay.
 7    So for the B-side housing units that are manned
 8    only 16 hours a day, the a.m. officer, he's on time
 9    but he's drawing his equipment ████████████████████
10    Correct?
11    A. Right.
12    Q. So that's the same as what we looked at in the
13    post order that was DX-5.
14    A. I will agree, correct.
15    Q. So that was in place when you were Captain as
16    well.
17    Correct?
18    A. Correct.
19    Q. And then for the ███████ shift for the D dorm
20    officer, which, I guess, is a 16-hour post at the
21    time ---.
22    ATTORNEY VALLACHER:
23    Can we have a page, please?
24    ATTORNEY ELKIN:
25    I'm sorry, 8 of 15. I mean, maybe you
```

Trial

Kathy Aitken, et al. v. USA                                              3/15/2023

1    need to ---.

2    JUDGE:

3    Now, you're questioning him about ---.

4    ATTORNEY ELKIN:

5    You're right.  I'm not going to ask

6      that.  I will ask a different question.  Sorry.

7    BY ATTORNEY ELKIN:

8    Q. All right.

9    Do you recall when you were Captain whether you

10     also gave the B-side p.m. officers from█████████

11     ██████to walk out of institution on paid time?

12   A. It sounds feasible, yes.

13   Q. I need a yes or no.  And let me know if your

14     document will help refresh your recollection if I

15     point you to the right place.

16   A. May I peruse this?

17   Q. I'd like you to look at page ---.

18   JUDGE:

19   Let's do it by step and step and ask him

20     if he remembers, and he can answer if he doesn't

21     remember and so forth.

22   BY ATTORNEY ELKIN:

23   Q. Do you remember when you were the Captain whether

24     the B-side p.m. officers were to proceed to the

25     ████████████████████████████████████████████████

Trial
Kathy Aitken, et al. v. USA                              3/15/2023

1       ██████████

2       A. ████████████████████████

3       Q. No, no.  Sorry.  ████████████████████

4       ██████████████████████████████ just like

5       the joint exhibit --- sorry, Defense Exhibit 5 we just

6       looked at?

7       A. That sounds about correct, so I would say yes.

8       Q. Okay.

9       So I don't need to refresh.

10      JUDGE:

11      I guess not.

12      ATTORNEY ELKIN:

13      Okay.

14      BY ATTORNEY ELKIN:

15      Q. So then you would agree that the B-side housing

16      officers, at least on the p.m. watch were on paid time

17      as they walked across the compound at the end of the

18      shift.

19      Correct?

20      A. Correct.

21      Q. And you would agree that --- and the inmates are

22      where at ██████████████

23      A. ████████████████

24      Q. Yes.

25      A. ████████████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1145

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1    Q. ████████████████████████
 2   Right?
 3    A. Yes.
 4    Q. █████████████████████████████████
 5   █████████████████████████████████████████████
 6   ████████████████████████████  ██████████████████
 7   ██████████████████████████████████████████
 8   ████████████████████████████████████████
 9    A. Yes.
10    Q. Okay.
11   ████████████████████████████████████████
12   ████████████████████████████████, that the B-side
13   officers are in a paid status as they walk across the
14   compound, ███████████████████████████████████████
15   ███████████████████████
16    A. Correct.
17    Q. And do you recall from the SHU-3 officer, that's
18   not a 24-hour post.
19   Correct?
20    A. I don't believe so, no.
21    Q. Sixteen (16) hour post?
22    A. Three, I believe so, yes.
23    Q. Okay.
24   And do you recall that when you were a Captain,
25    the post orders provided that the SHU p.m. officer
```

1146

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    should leave the SHU-3 by ████████ in order to return

2    his equipment to the ████████████████████████

3    A. I heard every part except what time? ████████████

4    Q. ██████

5    A. Okay.

6    Q. Do you recall that being the ---?

7    A. That sounds about right, yes.

8    Q. You agreed for the SHU-3 officers, as long as

9    that they were at the a.m. watch, was at the ████████

10   █████████████████████████ they were on time under the

11   post orders, when you were the Captain.

12   Correct?

13   A. Yes.

14   Q. And you would agree that the a.m. post orders had

15   them arriving at their SHU post by ██████ and they would

16   be on time.

17   Correct?

18   A. Right.

19                           ---

20   (Whereupon, Joint Exhibit JX 55, BOP

21   Program Statement P3420.11 – Standards

22   of Employee conduct (2013), was marked

23   for identification.)

24                           ---

25   BY ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      Q. And I'd like you to turn to JX-55.

2    Are you at JX-55?

3      A. Yep.

4      Q. Okay.

5    This has not yet been the unit --- okay.  So I am

6      having you look at program statement 3420.11, dated

7      12/6/2013, entitled Standards of Employee Conduct.

8    You recognize this document as the standards of

9      employee conduct?

10     A. Yes.

11   ATTORNEY ELKIN:

12   And I would like to move to admit JX-55.

13   ATTORNEY VALLACHER:

14   No objection.

15   JUDGE:

16   It's admitted.

17                          ---

18   (Whereupon, Joint Exhibit JX 55, BOP

19   Program Statement P3420.11 - Standards

20   of Employee conduct (2013), was marked

21   for identification.)

22                          ---

23   BY ATTORNEY ELKIN:

24   Q. So this document would apply to all correctional

25      workers at FCI Otisville.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                              3/15/2023

1    Correct?
2      A. Most of them, correct.  Yes.
3      Q. And you would agree that pursuant to this
4      document, Correctional Officers would be disciplined
5      for failing to respond to an emergency.
6    Correct?
7      A. Could be.
8      Q. And you would agree that as long as the
9      Correctional Officers are on the agency premises ---
10     on the institution premises he has to respond to an
11     emergency, even if it is prior to his shift or after
12     he's been relieved from post.
13   Correct?
14     A. I would hope so, yes.
15     Q. That's a requirement.
16   Correct?
17     A. I believe so.
18     Q. Okay.
19   I'd like to turn your attention to page 20 ---
20     you're raising your hand.
21     A. No, I'm waiting to grab something.
22     Q. 222 of your ---.  Would it be acceptable for one
23     of the Plaintiffs in this lawsuit if a body alarm
24     kicks off say at ███ and already through screening,
25     if they sign on, say, hey, my shift hasn't started

Trial
Kathy Aitken, et al. v. USA                          3/15/2023

1    yet, I'm chilling right here, would that be okay?
2    Your answer is, no, because they're on the premises.
3  So are they required to respond to emergencies as
4    long as they're on the premises?
5    A. After refreshing my memory, I will answer yes.
6    Q. Okay.  And you would agree that they could be
7    subject to discipline if they fail to respond,
8    pursuant to Joint Exhibit 55.
9  Correct?
10    A. Correct.
11    Q. Even during those times prior to the shift or
12    after the shift.
13  Correct?
14    A. Correct.
15    Q. Are you familiar with the Correctional Services
16  Manual?
17    A. The current one?
18                        ---
19    (Whereupon, Joint Exhibit JX-3,
20    Correctional Services Manual, Section
21    5500.15, was marked for identification.)
22                        ---
23    BY ATTORNEY ELKIN:
24    Q. It's dated January 2nd, 2018.  I'm going to show
25    it to you in JX-3 in the green binder.  Are you there?

1150

Trial

Kathy Aitken, et al. v. USA                                 3/15/2023

```
 1    A. Yes.
 2    Q. Would you agree that this is program statement
 3    550.15, dated January 2nd, 2018 entitled Correctional
 4    Services Manual?
 5    A. Yes.
 6    ATTORNEY ELKIN:
 7    I move to admit JX-3.
 8    ATTORNEY VALLACHER:
 9    No objection, Your Honor.
10    JUDGE:
11    Admitted.
12                         ---
13    (Whereupon, Joint Exhibit JX-3,
14    Correctional Services Manual, Section
15    5500.15, was marked for identification.)
16                         ---
17    BY ATTORNEY ELKIN:
18    Q. Do you agree that the purpose and scope of this
19    manual is to implement policies and procedures to
20    protect the public and maintain a secure and safe,
21    orderly, living and working environment for staff and
22    inmates?
23    A. Sounds about right, yes.
24    Q. The first bullet point on here is that staff will
25    be alert to changes and inmate behavior and be
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    proactive in preventing and curtailing disturbances.
2    Did I read that right?
3        A. Yes, ma'am.
4        Q. And you would agree that that would apply any
5    time that Correction Officers are on institution
6    ground and observe something that could rise to a
7    service.
8    Correct?
9        A. Correct.
10       Q. And the second bullet point regarding
11   emergencies, staff would be prepared to respond
12   effectively to emergency situations through training
13   and the establishment of predetermined standard
14   contingency plan.
15   Do you see that?
16       A. Yes, ma'am.
17       Q. And you would agree that that applies --- they
18   need to be prepared to respond any time officers are
19   on the prison premises.
20   Correct?
21       A. Yes.
22   JUDGE:
23   Do you need a break?
24   THE WITNESS:
25   Can I get a bathroom break or something?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    JUDGE:

2    Do you need a break, Mr. Whinnery?

3    THE WITNESS:

4    A real quick one.

5    JUDGE:

6    Can he take a break?

7    ATTORNEY ELKIN:

8    Just for the Court, I'm almost done.

9      But take a break, Your Honor.

10   JUDGE:

11   How about we take a five-minute break.

12     We'll be back at --- we can come back at 4:00 and at

13     4:30 wrap up.

14                          ---

15     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

16                          ---

17   COURT CRIER:

18   All rise.  The United States Court of

19     Federal Claims is in session.  Judge Stephen Schwartz

20     presiding.

21   JUDGE:

22   Be seated.  Mr. Whinnery, you understand

23     you're still under oath?

24   THE WITNESS:

25   Yes, sir.

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

```
1    JUDGE:
2    Very good.
3      BY ATTORNEY ELKIN:
4      Q. And Captain Whinnery, you agree that there is at
5      least one supervisor, an Op Lieutenant on a shift 24
6      hours that post, the Operations Lieutenant is manned
7      24 hours a day, seven days a day, 365 days.
8    Correct?
9      A. I would agree.
10     Q. I'm sorry?
11     A. I agree.
12     Q. And during daylight hours and evening hours,
13     there are even more Lieutenants on shift?
14     A. Correct.
15     Q. And you agree that no matter which 24-hour post a
16     Correctional Officer is assigned to work, they are
17     subject to the same work rules.
18   Correct?
19   ATTORNEY VALLACHER:
20   Objection, vague.
21   ATTORNEY ELKIN:
22   The same rules of conduct.  Does that
23     help?
24   JUDGE:
25   Does that answer your question?
```

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    ATTORNEY VALLACHER:

2    Not really.

3    JUDGE:

4    Overruled.

5    THE WITNESS:

6    I'm still confused.

7      BY ATTORNEY ELKIN:

8      Q. Well, we went through the JX --- when we had the

9      JX-55, the standards of employee conduct.  You would

10     agree that no matter what 24-hour post that a

11     Correctional Officer is assigned to work, they are

12     subject to the same standards of employee conduct.

13   Correct?

14     A. Correct.  All staff are under that.

15     Q. Okay.

16   And no matter which 24-hour post the Correctional

17     Officer was assigned to work, they are subject to the

18     same policy.  In other words, they're all paid for a

19     straight eight-hour shift on at least 24-hour post.

20   Correct?

21     A. Correct.

22     Q. And you would agree that, pursuant to those pay

23     policies, that they are paid for only eight hours of

24     work unless there's an extra overtime shift or a

25     substantial amount of time after the shift waiting for

Trial

Kathy Aitken, et al. v. USA                                              3/15/2023

1    relief.

2    Correct?

3    A. Can you start that again?  I'm sorry.

4    Q. Pursuant to the pay policy that you said they're

5    all subjected to, Correctional Officers, pursuant to

6    those policies, they are paid for only eight hours of

7    work unless there's an extra overtime shift or a

8    substantial amount of time on a post after shift

9    waiting for relief.

10   A. I would say yes.

11   Q. And we talked in the beginning about how you

12   testified in 2012 overtime pay involving 24-hour

13   shifts worked.

14   Do you remember that?

15   A. Yes.

16   Q. And you understand that Arbitrator issued an

17   award on November 4, 2012, finding that FCI Otisville

18   suffered or permitted bargaining unit employees to

19   perform work before and/or after their scheduled shift

20   without compensation from July 1st 2008 to the present

21   in violation of the FLSA, you understood that.

22   Right?

23   A. To the present as in today or when the ruling

24   came out?

25   Q. When the ruling came out.

1156

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1      A. Yes, I'm aware of that.

2      Q. You did not know what was awarded?  You didn't

3      know how much time was awarded, and you didn't care.

4   Isn't that correct?

5      A. It's above my pay grade.

6      Q. Is that correct, that you did not care how much

7      time was awarded?

8      A. Yes, I do not -- I didn't care.  Let's move on.

9      Q. Would you agree that the Arbitrator stated how

10     much time each officer should be paid?

11  Correct?

12     A. Sounds feasible, yes.

13     Q. And you were the Captain for some eight years

14     after the issuance of the award.

15  Isn't that correct?

16     A. Possibly, yes.

17     Q. And you have no knowledge --- I'm sorry, the

18     agency did not appeal the Arbitrator's Decision.

19  Is that correct?

20     A. I do not know.

21     Q. You agree that the agency never started paying

22     the extra minutes to the employees assigned to the

23     post at issue, as determined by the Arbitrator in that

24     award.

25  Correct?

1157

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    A. I don't recall.

2    Q. You don't recall when you started paying, for

3    example, compound officers 8 hours and 60 minutes

4    every shift worked, or do you know that you did not,

5    in fact, start paying compound officers?

6    A. Wording it that way, no.

7    Q. So is it fair to say that after the award was

8    issued the agency, FCI Otisville, did not start paying

9    the officers for the eight hours plus the minutes that

10   she awarded.

11   Correct?

12   A. Correct.

13   Q. You agree that Correctional Officers working a

14   post inside the institution wear a duty belt because

15   it's a more secure way to hold up the equipment that

16   they carry.

17   Correct?

18   A. Correct.

19   Q. You agree that as far as you know, the agency has

20   never done a study or an audit to see how often

21   Correctional Officers interact with inmates on the way

22   to or from a post?

23   A. No.

24   Q. And you agree that Correctional Officers do, in

25   fact, encounter inmates coming onto a day watch shift

1158

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

1    and meeting a morning watch list.

2    Correct?

3      A. Correct.

4      Q. And you agree that you never issued an Order

5    verbally or in writing that told the officers that

6    they had to seek --- that they should seek overtime

7    pay for correcting inmate behavior on the way to a

8    post or after being relieved from the post?

9      A. Can you say that again?  I'm sorry.

10     Q. Yes.  Do you agree that you never issued an

11   Order, either verbally or in writing, that told the

12   Correctional Officers that they should seek overtime

13   pay for correcting inmate behavior while walking to a

14   post or after they are leaving a post after they have

15   been relieved.

16   Is that correct?

17     A. I would say correct.

18   ATTORNEY ELKIN:

19   Your Honor, I pass the witness.

20   JUDGE:

21   All right.

22   Mr. Vallacher, seeing the time, do you

23   think you could finish it up in the next four or five

24   minutes or so?

25   ATTORNEY VALLACHER:

Trial

Kathy Aitken, et al. v. USA                                3/15/2023

```
 1    I do not, Your Honor.
 2    JUDGE:
 3    Okay.
 4    Does Mr. Whinnery's subpoena extend to
 5       tomorrow or do we have to finish it up today?
 6    ATTORNEY VALLACHER:
 7    I'm not sure about the scope of the
 8       subpoena, but I think that we've actually authorized
 9       the necessary paperwork for him to be --- to come back
10       tomorrow already.  Yeah, that's right.
11    JUDGE:
12    Okay.
13    So do I hear you saying you'd rather
14       break for the day and do Cross tomorrow?
15    ATTORNEY VALLACHER:
16    Yes, Your Honor.
17    JUDGE:
18    Ms. Elkin, are you okay with that?
19    ATTORNEY ELKIN:
20    Yes, Your Honor.  Can you give the
21       witness the instruction, though?
22    JUDGE:
23    About remaining --- about remaining
24       under oath and no conversations with anybody?
25    ATTORNEY ELKIN:
```

1160

Trial

Kathy Aitken, et al. v. USA                              3/15/2023

```
 1    Yes.

 2    JUDGE:

 3    Of course.  I would have anyway.

 4    ATTORNEY ELKIN:

 5    I'm sure you would have.

 6    JUDGE:

 7    Mr. Whinnery, you're done for the day.

 8      You'll be --- the Cross Examination from Government

 9      will be tomorrow.  Now, you understand that you'll

10      remain under oath overnight, you'll still be under

11      oath when you come in tomorrow.

12    Right?

13    THE WITNESS:

14    Correct, sir.

15    JUDGE:

16    Okay.

17    And one aspect of the case, pursuant to

18      various orders, I would ask you not to have any

19      conversations about the case with anybody after you're

20      gone today until you come in.  Don't talk about the

21      substance, don't talk about your testimony.  Just talk

22      about other things, and then we can wrap up tomorrow.

23    THE WITNESS:

24    I think there's a hockey game on

25      tonight.  We're safe.
```

Trial

Kathy Aitken, et al. v. USA                                        3/15/2023

1    JUDGE:

2    Okay.

3    I can get your commitment on that?

4    THE WITNESS:

5    100 percent.

6    JUDGE:

7    All right.

8    You're free to go this afternoon, see

9      you in the morning.

10   THE WITNESS:

11   Thank you, sir.

12   JUDGE:

13   And it's at 8:30.  Okay.

14   So if that's all we have for today,

15     you'll be able to Cross in the morning.  Is there any

16     housekeeping we need to talk about other than going

17     over the admitted exhibits?

18   ATTORNEY ELKIN:

19   Your Honor, the only thing we would let

20     you know is that we're closing --- we rest tomorrow.

21   JUDGE:

22   Okay.  Good to know.

23   ATTORNEY VALLACHER:

24   Nothing further today, Your Honor.

25   JUDGE:

1162

Trial

Kathy Aitken, et al. v. USA                          3/15/2023

1    Okay

2    So let's just talk about the exhibits.

3      Everyone ready?

4    So today I have that we admitted JX-3,

5      JX-6, JX-11, JX-55, JX-61, JX-62, JX-106, PLX-2,

6      PLX-20, 21, 22, 23, 25, 26, 27, 28, 29, 30, 31, 32,

7      33, 34, 35, 36.  DX-14.  And that's it for what I have

8      for today.

9    Everything line up?

10   ATTORNEY ELKIN:

11   Yes.  But just to be clear, PLX-4, which

12     is the LMR meeting minutes ---.

13   JUDGE:

14   I'm sorry, can you speak up?

15   ATTORNEY ELKIN:

16   Yeah.  So PLX-4, which is the LMR

17     meeting minutes, just for clarity, I know there was

18     some discussion about whether it was admitted for a

19     limited purpose, so I just ---.

20   JUDGE:

21   Oh, I had that --- I had that on

22     yesterday's for today.

23   Right?

24   ATTORNEY ELKIN:

25   Yes, PLX ---.

1163
Trial
Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1   JUDGE:
 2   Yeah, that's right.  It was admitted for
 3     a --- yeah, PLX-4, I forgot about that one.  It was
 4     admitted with a limited purpose because of the hearsay
 5     issue.
 6                              ---
 7     (Whereupon, Plaintiff's Exhibit PLX-4,
 8     LMR Meeting Minutes 3/18/14, was
 9     admitted for a limited purpose.)
10                              ---
11   ATTORNEY ELKIN:
12   Okay.
13   That's the only discrepancy I had.
14   JUDGE:
15   Okay.  Okay.  Thank you.  Thank you for
16     pointing that out.  You're right to correct me.
17   ATTORNEY VALLACHER:
18   No discrepancy.
19   JUDGE:
20   Okay.  Sounds good.
21   In that case, thanks for a productive
22     day and see you all bright and earlier tomorrow.
23   COURT CRIER:
24   Rise.
25              * * * HEARING CONCLUDED AT 4:43 P.M. * * *
```

1164

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                    CERTIFICATE

 2

 3   I hereby certify, as the stenographic

 4     reporter, that the foregoing proceedings were taken

 5     stenographically by me, and thereafter reduced to

 6     typewriting by me or under my direction; and that this

 7     transcript is a true and accurate record to the best

 8     of my ability.

 9     Dated the 5th day of April, 2023

10

11

12   s/Kayla Marie Keating

13   Kayla Marie Keating,

14   Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```

1165

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
 1                    ADMITTED EXHIBITS

 2

 3

 4   JX       PAGE    DESCRIPTION

 5   JX-3     1150    Correctional Services Manual Section

 6                    5500.15

 7   JX-6     932     FCI Otisville Daily Assignment Roster

 8                    5/9/16

 9   JX-11    1049    Buckingham T&A 2016

10   JX-55    1147    BOP Program Statement P3420.11 -

11                    Standards of Employee Conduct (2013)

12   JX-61    754     Buckingham Assignment Card 2016 - 2019

13   JX-62    755     Buckingham Assignment Card 2019 - 2022

14   JX-106   1094    Program Statement 3740.02 Staff

15                    Entrance and Search Procedures

16

17

18   PX       PAGE    DESCRIPTION

19   PLX-2    1092    Whinnery Memo to Front Lobby Officers:

20                    Screening Procedures (Re-

21                    familiarization)

22   PLX-4    1163    LMR Meeting Minutes 3/18/14

23   PLX-20   1025    Meyers Settlement Check 2012

24   PLX-21   1027    Meyers Settlement Check 2016

25   PLX-22   830     Dumont Settlement Check
```

1166

Trial

Kathy Aitken, et al. v. USA                                    3/15/2023

```
1    PLX-23   922    FRE 1006 Summary of Video Footage
2                     Review
3    PLX-25   836    Camera Screenshot - A1 Outer Door -
4                     24
5    PLX-26   839    Camera Screenshot - A1 PTZ-1
6    PLX-27   841    Camera Screenshot - Admin Roof - 3
7    PLX-28   846    Camera Screenshot - Control Lobby
8                     1-271
9    PLX-29   850    Camera Screenshot - Control Lobby
10                    2-272
11   PLX-30   853    Camera Screenshot - GB Front 92-92
12   PLX-31   860    Camera Screenshot - GA Roof 8
13   PLX-32   864    Camera Screenshot - Rear Gate- 193
14   PLX-33   865    Camera Screenshot - FA Front 38
15   PLX-34   870    Camera Screenshot - DA Roof 13
16   PLX-35   872    Camera Screenshot - SHU Outer Door
17                    23
18   PLX-36   874    Camera Screenshot - SHU Entrance
19                    257
20
21
22   DX       PAGE   DESCRIPTION
23   DX-14    927    FRE 1006 Summary of Video Footage
24                    Review
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555