1          IN THE UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4    KATHY AITKEN, et al.,                    )

5              Plaintiffs,                    ) Case No.

6                   vs.                       ) 19-520C

7    THE UNITED STATES OF AMERICA,            )

8              Defendant.                     )

9

10

11

12          William J. Nealon Federal Courthouse

13               235 North Washington Avenue

14                 Scranton, PA  18501

15               Thursday, March 16, 2023

16                     8:30 a.m.

17                  Trial Volume 4

18

19

20        BEFORE:  THE HONORABLE STEPHEN S. SCHWARTZ

21

22

23

24

25    Reporter: Kayla Keating

1168

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4            MOLLY A. ELKIN, ESQ.
 5            SARAH M. BLOCK, ESQ.
 6            McGillivary Steele Elkin, LLP
 7            1101 Vermont Avenue, NW
 8            Suite 1000
 9            Washington, DC  20005
10            (202) 833-8855
11            mae@mselaborlaw.com
12
13   ON BEHALF OF THE DEFENDANT:
14            BRET R. VALLACHER, ESQ.
15            LAUREN SPRINGER-MOORE, ESQUIRE
16            JOSHUA W. MOORE, ESQ.
17            DAVID M. KERR, ESQ.
18            U.S. Department of Justice
19            Post Office Box 480
20            Ben Franklin Station
21            Washington, D.C. 20044
22            (202) 616-0465
23            bret.r.vallacher@usdoj.gov
24
25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1169

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1              A P P E A R A N C E S (Continued)

 2

 3     ALSO PRESENT:

 4           LISA AIKEN

 5           ADAM BOYER

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1170

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                    I N D E X

 2

 3

 4    WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VOIR

 5    M. Whinnery                1177    1231

 6    J. Leimkuhler    1247      1258    1272

 7    J. Nalepa        1279      1335    1368

 8    P. O'Kane        1384      1473    1542

 9

10

11    EXHIBITS              MARKED          ADMITTED

12    Joint

13    JX-1                  1196              --

14    JX-55                 1200              --

15    JX-58                 1186              --

16    JX-59                 1552             1553

17    JX-60                 1554             1555

18    JX-69                 1532             1533

19    JX-70                 1533             1534

20    JX-71                 1258             1260

21    JX-72                 1264             1264

22    JX-77                 1424             1425

23    JX-78                 1425             1426

24    JX-82                 1419             1420

25    JX-83                 1421             1422
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1171

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                    I N D E X (Continued)
 2
 3     EXHIBITS              MARKED           ADMITTED
 4     Joint
 5     JX-84               1400                --
 6     JX-85               1401               1402
 7     JX-90               1410               1410
 8     JX-91               1415               1417
 9     JX-92               1411               1412
10     JX-95               1434               1435
11     JX-96               1432               1433
12     JX-97               1430               1430
13     JX-98               1431               1432
14     JX-108              1223               1224
15
16
17     Defendant
18     DX-14               1284                --
19     DX-16               1205               1209
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1              P R O C E E D I N G S
 2                   (8:30 a.m.)
 3   COURT CRIER:
 4   All rise.  United States Court of
 5     Federal Claims is now in session.  Judge Stephen
 6     Schwartz presiding.
 7   JUDGE:
 8   Please be seated.  Here for the fourth
 9     day of trial in Aitken versus United States,
10     19-520C.
11   Counsel, who are you and what are your
12     names?
13   ATTORNEY ELKIN:
14   Molly Elkin.  I'm here for the
15     Plaintiff.  Ms. Block will be back.  We can start when
16     you're ready.
17   ATTORNEY VALLACHER:
18   Good afternoon, Your Honor.  Bret
19     Vallacher on behalf of the United States.  I'm joined
20     by Adam Boyer and Lisa Aiken.
21   JUDGE:
22   All right.  The only other person I see
23     in the courtroom is Mr. Whinnery.  Let's keep an eye
24     and make sure that the only people who are allowed to
25     be here in this sealed proceeding show up.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Anything we need to talk about this
2      morning or can we go right into Mr. Whinnery's Cross?
3    ATTORNEY ELKIN:
4    After you.
5    ATTORNEY VALLACHER:
6    One item, Your Honor.  So Valerie Cross
7      is not feeling well.  She did test negative, but she
8      seems to not be --- she seemed to be feeling under the
9      weather.  So given the circumstances, we're just not
10     going to call her.  I think that virtual would be
11     tougher, too.
12   JUDGE:
13   Okay.  Okay.
14   Well, let me know if the situation
15     changes, obviously.  But for now, I'll assume that
16     we'll just cross her off the witness list.
17   ATTORNEY VALLACHER:
18   Okay.  And then ---.
19   JUDGE:
20   Convey my best wishes for her
21     recovery, ---
22   ATTORNEY VALLACHER:
23   I will.
24   JUDGE:
25   --- if you happen to communicate with

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

 1    her.

 2    ATTORNEY VALLACHER:

 3    And also given --- I think we might be

 4       able to end today.

 5    JUDGE:

 6    Is that so?

 7    ATTORNEY VALLACHER:

 8    Yes.

 9    JUDGE:

10    Wouldn't that be exciting?  All right.

11    ATTORNEY ELKIN:

12    Your Honor, sorry.

13    JUDGE:

14    Yes.

15    ATTORNEY ELKIN:

16    Okay.  The one thing for me is that I

17       don't know if it's a housekeeping matter and probably

18       against Rule 101 of being a good trial lawyer, which

19       is don't rub the stain.

20    In the risk of rubbing the stain.  I

21       messed up that Exhibit 23, the response exhibit

22       analysis, when it was time versus decimals.

23    JUDGE:

24    Okay.

25    ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    And I think the witness understood it
2      and I confused you, Your Honor.  I confused Counsel
3      opposite --- I confused myself.  I apologize.  The
4      exhibit should speak for itself, Exhibit A.  That's
5      where my head was.
6    It took me so long to understand that
7      20.50 is a point on Exhibit A was 20 minutes and 30
8      seconds.  But then when we got to that response
9      exhibit, both colons, that was time.  And I messed
10     that up and I apologize, Your Honor.  But we can ---
11     it's in the record.  The exhibit's in the record.  We
12     can deal with it on briefing and whatnot.
13   JUDGE:
14   Okay.
15   ATTORNEY ELKIN:
16   I just wanted to say I apologize for
17     burdening the Court for my math error.
18   JUDGE:
19   Okay.
20   Mr. Vallacher, do you want to add
21     anything about that or do you think the record will be
22     clear enough?
23   ATTORNEY VALLACHER:
24   I believe so, Your Honor.  It's actually
25     not my issue.  That would be David Kerr's issue, but I
```

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1    assume Mr. Boyer is going to relay the message.

2    JUDGE:

3    Okay.  Okay.  That sounds good.  If we

4      need to talk about it during the break, we can.

5    ATTORNEY VALLACHER:

6    Okay.

7    JUDGE:

8    But Ms. Elkin, thank you very much for

9      trying to clean things up.  It was pretty confusing at

10      the time.

11   ATTORNEY ELKIN:

12   Sorry about that.  Milliseconds.

13   JUDGE:

14   Happens to everyone.  Okay.

15   In that case we're ready for Mr.

16      Whinnery's Cross?

17   ATTORNEY VALLACHER:

18   Yes.

19   JUDGE:

20   Okay.  Mr. Whinnery.  Good morning.  Oh,

21      you understand you're still under oath?

22                          ---

23                  MATTHEW WHINNERY,

24   CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

25   HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AND SAID AS

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1    FOLLOWS:
 2                           ---
 3    JUDGE:
 4    All right.
 5    You hadn't talked about the substance of
 6       the case since after Direct yesterday?
 7    THE WITNESS:
 8    No, sir.
 9    JUDGE:
10    Good.  All right.
11                           ---
12                      CROSS EXAMINATION
13                           ---
14    BY ATTORNEY VALLACHER:
15    Q. Good morning.
16    A. Good morning.
17    Q. How are you, Dr. Whinnery?
18    A. Awake.
19    Q. Awake.  Thank you very much for coming back
20    today.  Hopefully after today you can return to your
21    retirement.
22    A. Thank you.
23    Q. So yesterday, do you remember you were asked
24    about gangs at FCI Otisville?
25    A. Asked about what, sir?
```

1178
Trial
Kathy Aitken, et al. v. USA                                3/16/2023

1     Q. Gangs.
2     A. Gangs, yes.
3     Q. And you testified that Otisville became a drop
4     yard around 2015 through the time of your retirement?
5     A. Correct.
6     Q. What is a dropout yard?
7     A. It's gangs, gang members who were at an active
8     yard who go through a process via debriefings, really
9     give up law-enforcement information.  They can give up
10    other gang members' rank structure.  Then they go
11    through a variety of live extra tests to make sure
12    they're being truthful about wanting to get out of
13    their gang.  Once they're --- I'm going to say blessed
14    by the powers above me, they are transferred to
15    Otisville, which was a gang dropout yard.
16    Q. Okay.
17    So when you say they would give up members of
18    their gang, what does that mean?
19    A. They might know some internal gang issues that
20    the Bureau or Law Enforcement didn't know about.  So
21    they'll provide information to show that they're being
22    truthful in wanting to leave that gang.
23    Q. Okay.
24    So are they kind of giving external evidence to
25    the government against the gang?

1179

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      A. They have, yes.

2      Q. So is it fair to say that inmates that do that

3         won't be going back to that gang?

4      A. No.

5      ATTORNEY ELKIN:

6      Objection.  Calls for speculation.

7      JUDGE:

8      He can testify to his knowledge and

9         experience.  So overruled.

10     THE WITNESS:

11     If they were to go back to their gang,

12        they wouldn't be around much longer.

13        BY ATTORNEY VALLACHER:

14        Q. Okay.

15     And if --- yesterday, Ms. Elkin asked you whether

16        there was just one housing officer on the A-side.

17     Do recall that question?

18     A. Yes.

19     Q. And are there other people who generally work in

20        the housing unit?

21     A. Yes.

22     Q. Other than A-side Officer?

23     A. Yes.

24     Q. And would that be Unit Team?

25     A. Correct.  Unit Team, Unit Manager, Unit

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     Secretaries.
 2     Q. And what equipment does the Unit Team have?
 3     A. Keys, radio, OC spray.  Some of them carry
 4     handcuffs.
 5     Q. Okay.
 6   And what training does the Unit Team have?
 7     A. They go to the same training as Correctional
 8     Officers, three weeks at FLETC.
 9     Q. Okay.
10     A. Excuse me.  They also do the same firearms
11     training yearly.  They do the same ART.  They take the
12     same institutional familiarization.
13     Q. Okay.
14   Do they receive training to supervise inmates?
15     A. Yes.
16     Q. And do they also supervise inmates?
17     A. Yes.
18     Q. You were asked about the ratio of inmates to
19     staff on a housing unit.
20   Do you recall that question?
21     A. Correct.
22     Q. And I think you said the answer was a hundred and
23     something to 1.
24   Do you remember that?
25     A. Yes.
```

1181

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. Would it be fair to say that ratio would be
 2      substantially less on most shifts if we included the
 3      Unit Team members?
 4      A. Depending on the shift, yes.
 5      Q. And because the Unit Team members aren't always
 6      on the unit.
 7   Right?
 8      A. Correct.  And some of them do have like the late
 9      night, which I believe, and this is to my knowledge,
10      was 6:00 p.m. at the time.
11      Q. Okay.
12   So some do late nights, some don't?
13      A. Correct.  And it rotates through different Unit
14      Team, different times and different days of the week.
15      Q. Okay.
16   And would that ratio also be substantially less
17      if a housing unit were not full?
18      A. Correct.
19      Q. During the time where you were Captain, were the
20      housing units always full?
21      A. No.
22      Q. Are all staff, including non-Correctional
23      Officers, trained to supervised inmates?
24      A. Yes.
25      Q. Is it fair to say that the ratio would be
```

1182

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1    substantially less if we looked at the ratio of all
2    staff at FCI Otisville against all inmates at FCI
3    Otisville?
4    ATTORNEY ELKIN:
5    Objection.  I let substantially go for a
6    while.  I'm not sure what that means in the context of
7    math again.
8    JUDGE:
9    That's a fair question.  What do you ---
10   could you clarify what you mean by substantially?
11   ATTORNEY VALLACHER:
12   Okay.  Yes, I will.
13   BY ATTORNEY VALLACHER:
14   Q. Do you recall in your deposition as the finding
15   as to the ratio between all staff at FCI Otisville to
16   all inmates at FCI Otisville?
17   A. I don't.  Not without looking at a ---.
18   Q. Would it refresh your recollection if I showed
19   you in your deposition?
20   A. Yes.  I have mine.
21   Q. So if you turn to page 79.
22   A. Seventy-nine (79).
23   Q. Okay.
24   And all those questions would be starting at line
25   8 to line 14.
```

1183

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Yes, that's what I stated.

2      Q. Okay.

3    So does that refresh your recollection?

4      A. Yes.

5      Q. So do you remember now what the ratio of all

6      staff at FCI Otisville would be to all inmates?

7      A. The number.

8      Q. The ratio?

9      A. The number of staff against the number of inmates

10     when all staff are on duty, yes, it would lower it.

11     Q. Yes, sir.  Would it be about seven or nine to

12     one?

13   ATTORNEY ELKIN:

14   Objection, Your Honor.  He said ---

15     well, never mind.  I will withdraw it.

16   JUDGE:

17   Okay.

18   THE WITNESS:

19   Can you say it again, please?

20     BY ATTORNEY VALLACHER:

21     Q. Would it be about seven or nine to one?

22     A. Approximately, yes.

23     Q. All right.

24   Yesterday you were also asked about the primary

25     duty of officers as being to maintain the safety and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1184

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    security of the inmates in the institution and the
2    public.
3    Do you recall that?
4    A. Yes.
5    Q. Is it fair to say that maintaining safety and
6    security of the inmates at the institution and public
7    is a goal?
8    A. Yes.
9    Q. And in fact, is maintaining the security and
10    safety the Bureau's general purpose is running a
11    prison?
12    A. Correct.
13    Q. And is that purpose carried out for activities?
14    A. Yes.
15    Q. And where would we be able to see the activities
16    that Correctional Officers are doing to achieve that
17    goal?
18    A. Correctional Officers activities are outlined
19    within their post orders at their assigned post.
20    Q. Okay.
21    And yesterday you were shown the Correctional
22    Services manual.
23    Do you remember that?
24    A. Yes.
25    Q. If you turn to JX-3.  It's in the green binder.

1185

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1      A. You said JX-3?
2      Q.  JX-3, yes.
3      A. Okay.
4      Q. Okay.
5    You're on the page?
6      A. Yes, sir.
7      Q. Do you see the first line under purpose?
8      A. Implement policy, procedures and guidelines to
9      protect the public, and maintain the secure, safe and
10     orderly living and working environment for inmates and
11     staff.
12     Q. Correct.
13   So would you agree that that's, you know, the
14     general purpose here?
15     A. Yes.
16     Q. We're done with that exhibit.  And do you recall
17     being asked a question about whether when officers
18     correct inmate misbehavior, they're serving the
19     purpose of safety and security?
20     A. Yes.
21     Q. If Correctional Officers spend over
22     seven-and-a-half minutes correcting this behavior, is
23     it safe to say they would be paid for the overtime?
24     A. Yes.  But that's a responsibility of a
25     law-enforcement officer.  We don't have everybody
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    everywhere at every time.  There's a limited amount of
 2    supervisors compared to line staff or bargaining
 3    staff.  So if they told us about it, I would say they
 4    would be compensated.
 5    ATTORNEY VALLACHER:
 6    Okay.
 7    So I'd like you also now to turn to
 8    JX-58.
 9                         ---
10    (Whereupon, Joint Exhibit JX-58,
11    General Post Orders 2019, was marked
12    for identification.)
13                         ---
14    THE WITNESS:
15    Got it.
16    BY ATTORNEY VALLACHER:
17    Q. Please turn to page 43 of 43.  Hold on.  I'm
18    missing that court binder.
19    A. Okay.
20    Q. Do you see the paragraph under retention
21    awareness?
22    A. Yes.
23    Q. And yesterday I believe you were asked whether it
24    be a possible to comply with this order without
25    wearing a duty belt.
```

1187

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    Do you remember that?
 2    A. I remember the question, yes.
 3    Q. And I believe your answer stuck out to me.  You
 4    said as written, yes.
 5    Do you recall that?
 6    A. Yes.
 7    Q. Now, when my colleague was asking the questions,
 8    you didn't have an opportunity to explain that.  So I
 9    would like to ask you now, how would you define a duty
10    belt?
11    A. A duty belt could be a free-form belt, which you
12    clip over your pant belt, which already has your whole
13    rig set up, i.e., ███████████████████████████
14    ███████████████.  And that goes through the metal
15    detector.  Some people as in like myself --- am I
16    allowed to stand?
17    JUDGE:
18    Yes, yes.  Of course, if that would help
19    you.
20    THE WITNESS:
21    This is the same belt I wore when I was
22    in.
23    BY ATTORNEY VALLACHER:
24    Q. Okay.
25    A. It clears the metal detector.  Once I get
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    through, I add my clips.  My radio holster just slid
2    in.  And I believe the OC pouch did not go off in the
3    metal detector, so it stayed on there.  And then I've
4    seen when staff become pregnant and they start
5    showing, they have what's called like a pregnancy
6    belt.  It goes over the shoulders, so not to obstruct,
7    is the best word I can think of, their condition.
8    Q. Okay.  Thank you.  That helps clarify.
9  So you know, as used in that paragraph, you would
10   have viewed a duty belt to be only the police-type
11   belt?
12   A. Correct.  A lot of staff just wore regular,
13   either leather belts or these Teflon/plastic clip
14   belts so they could clear the metal detector.
15   Q. Okay.
16   A. It's not required to wear a police type belt.
17   It's a choice.
18   Q. Okay.
19  And you were asked a lot of questions yesterday
20   about the expectations of Correctional Officers.
21  Do you recall that?
22   A. Yes.
23   Q. You were asked whether Correctional Officers are
24   expected to respond to inmate questions if inmates
25   happen to ask them questions while they're walking to

1189

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1     their post.
2   Do you remember that?
3     A. Correct.
4     Q. And from their post?
5     A. Yes.
6     Q. Okay.
7   Is it your understanding that expectation would
8     also apply to non-Correctional Officer staff at FCI
9     Otisville?
10    A. Yes.  Inmates can approach any staff member.
11    Q. It would apply to all staff?
12    A. Yes.
13    Q. And is it your understanding that BOP would
14    actually pay all staff, including Correctional
15    Officers, if responding to a question took over
16    seven-and-a-half minutes?
17    A. Yes.
18  ATTORNEY ELKIN:
19  Objection.  Mischaracterizes the record
20    about whether or not custody staff --- they're not on
21    the clock.  They're getting paid for this.
22  JUDGE:
23  Mischaracterizes in what way?  I'm not
24    sure I follow.
25  ATTORNEY ELKIN:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1190

Trial

Kathy Aitken, et al. v. USA                    3/16/2023

```
 1    At least one witness testified that
 2      there's, the non-custody staff, they have to get the
 3      control center at seven o'clock.  They have to return
 4      their equipment at three o'clock, after the tour.  So
 5      yeah, they're getting paid.  It doesn't have to be
 6      seven-and-a-half minutes.
 7    JUDGE:
 8    Okay.  He can --- so he's free --- okay.
 9      So he's free to contradict what other witnesses have
10      said.
11    Right?
12    ATTORNEY ELKIN:
13    I just thought it's a misleading
14      question.
15    JUDGE:
16    Can you ask the question again?
17    ATTORNEY VALLACHER:
18    Yes.
19      BY ATTORNEY VALLACHER:
20      Q. It was --- is it your understanding that the
21      Bureau would actually pay all staff, including
22      Correctional Officers, if responding to questions, if
23      that responding to questions took over
24      seven-and-a-half minutes?
25    JUDGE:
```

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
 1    He can ask Mr. Whinnery's understanding.
 2      And if there's a conflict between his understanding
 3      and what documents or witnesses have said, that can
 4      be clarified.  So overruled.  You can answer.
 5    THE WITNESS:
 6    It is my belief staff should be paid for
 7      any compensable work that they do while they're not on
 8      the clock, yes.
 9      BY ATTORNEY VALLACHER:
10      Q. Okay.
11    So you know, for example, if a Food Services'
12      worker were walking to the chow hall and someone ---
13      an inmate approached them and started asking
14      questions, and the person had to stop and answer the
15      questions for, let's say, eight minutes, would that
16      staff member be allowed to get overtime?
17      A. If they weren't at a paid status at that time.
18      Q. Okay.
19    So they would either be paid for regular status
20      or overtime?
21      A. Yes.  It depends on --- I'm not sure their shift
22      of Food Service ---.
23      Q. Right.  Okay.  And I didn't specify the exact
24      time.  I'm just saying before their shift.
25      A. Right.
```

1192

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Okay.

2    And you were asked whether Correctional Officers

3       are expected to correct inmate misbehavior walking to

4       or from post.

5    Do you remember that question?

6    A. Yes.

7    Q. If --- is it your understanding that all staff,

8       including people other than Correctional Officers at

9       FCI Otisville, are expected to respond or to correct

10      inmate misbehavior if they happen to spot it on their

11      way to post?

12   A. Yes, to ensure the orderly running and safety of

13      the institution and staff.

14   Q. And would that be true on the way leaving post as

15      well?

16   A. Correct.

17   ATTORNEY ELKIN:

18   Objection to the use of post if we're

19      talking about non-custody workers.  They're not

20      assigned to posts.

21   ATTORNEY VALLACHER:

22   Duty station.

23   JUDGE:

24   Does that solve it?

25   ATTORNEY ELKIN:

1193

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    Yes.
 2    JUDGE:
 3    Okay.  So why don't you re-ask the
 4      question again so there's a clear record using duty
 5      station.
 6    ATTORNEY VALLACHER:
 7    Okay.  Thank you, Your Honor.  That's a
 8      great idea.
 9    BY ATTORNEY VALLACHER:
10    Q. You were --- is it your understanding that all
11      staff, including people other than Correctional
12      Officers at FCI Otisville should correct inmate
13      misbehavior if they happen to see it on the way to
14      their duty station?
15    A. Yes.
16    Q. And would the same be true leaving the duty
17      station to the exit of the FCI Otisville?
18    A. Yes.
19    Q. Now, I think you also asked a question about
20      whether Correctional Officers would be expected to
21      respond to an emergency ---
22    A. Yes.
23    Q. --- before their post or leaving their post?
24    A. Correct.
25    Q. And after.
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1194

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    Right?
 2     A. Yes.
 3     Q. Is it your understanding that all staff,
 4    including people other than Correctional Officers at
 5    FCI Otisville, are expected to respond in the event of
 6    an emergency?
 7     A. Correct.
 8     Q. In fact, your wife, until recently, was a teacher
 9    at FCI Otisville.
10    Right?
11     A. Yes.
12     Q. Would even she be required to respond to an
13    emergency?
14     A. Yes.
15     Q. Kitchen staff?
16     A. Yes.  Anyone who's not supervising inmates at the
17    time.  You don't leave a bunch of inmates in response
18    and then they're not supervising and God only knows
19    what could happen.  If there's five people in a
20    department --- and I'll use Education since you
21    brought my wife up.  If there's four people in that
22    department, one stays behind, supervises who's there.
23    The rest respond.
24     Q. Okay.  Thank you.
25    I think yesterday you testified that between
```

1195

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1        ████████████████████    there were 13 staff on duty
 2     throughout the institution?
 3     A. Approximately, yes.
 4     Q. Approximately.
 5  Where are the inmates from ███████    ████████
 6     A. The majority of the inmates from ████████
 7     actually from ████████████    to ████████    are
 8     locked in, except for a select few who come out at
 9     ████████    and are supervised by the compound to go
10     to the kitchen and prepare the morning meal.
11     Q. Okay.
12  That would be detail, food detail?
13     A. Yes.  I couldn't give you an example number.  I'd
14     say approximately 15 to 25 from various units.  So it
15     could be five, five, five, five, somewhere in that
16     vicinity from each unit.
17     Q. Okay.
18  And then once they're in the kitchen, are they
19     supervised?
20     A. Yes.
21     Q. By who?
22     A. The Food Service Foreman.
23     Q. Food Service Foreman.  Okay.
24  And without the Food Service Foreman, would it be
25     possible for them to be cooking, the inmates?
```

1196

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      A. No, because they'd be unsupervised and they

 2      wouldn't have the materials needed to cut, cook ---

 3      pans.

 4   ATTORNEY VALLACHER:

 5   Okay.  And at this time I'll ask you to

 6      pull up JX-1.

 7                              ---

 8   (Whereupon, Joint Exhibit JX-1,

 9   Position Description Correctional

10   Officer (GS 0007-08), was marked for

11   identification.)

12                              ---

13   THE WITNESS:

14   JX-1?

15      BY ATTORNEY VALLACHER:

16      Q. Yes.  It's the green binder.

17      A. Okay.

18      Q. And it's --- what is this that we're looking at?

19      A. It's a position description for Correctional

20      Officer, Senior Officer Specialist.

21      Q. Okay.

22   And do you remember being asked about some

23      language in here about hostage and assault situations?

24      A. Correct.

25      Q. And there's also some language here about family
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1197

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    stress, physical attack.
2  Do you remember that?
3    A. Yes.
4    Q. So does this position description apply only at
5    Otisville or is it across the Bureau of Prisons?
6    A. I do believe this is written by Central Law
7    Office, Human Resources.
8    Q. Okay.
9  So would this apply to, for example, FPC
10   Alderson, which is the female camp where Martha
11   Stewart stayed?
12   A. Best of my understanding, I'd say probably yes.
13   Q. And at the other end of the spectrum, would this
14   apply to staff members working at ADX Florence, the
15   highest-level security at the Bureau of Prisons, known
16   as the Supermax, where El Chapo is housed?
17   A. To my knowledge, yes.
18   Q. So is it fair to say that these position
19   descriptions are not based on BOP's assessment of the
20   specific circumstances and FCI Otisville?
21   A. Correct.
22   Q. So on Direct, do you remember being shown a
23   B-side Housing Officer post order?
24   A. Yes.
25   Q. So I'm going to try to break it down step by

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      step.  I hope you can bear with me.
 2   So is it your understanding that at the beginning
 3      of an a.m. shift, for a B-Side Housing Officer, the
 4      a.m. officer should be at the ████████████ to pick
 5      up equipment at ██████████?
 6      A. Yes.
 7      Q. And would that officer be considered on time if
 8      they were in the ██████████ where they could get that
 9      equipment?
10      A. Yes.
11      Q. And is it your understanding that the B-side
12      officer's walking to his post with his equipment
13      during his shift?
14      A. Yes.
15      Q. And at the end of the p.m. shift --- so this is
16      the p.m. officer, end of the day.  So is it your
17      understanding that the p.m. officer on B-side is
18      provided some time during his shift to return that
19      equipment to the ██████████████?
20      A. Yes.  I believe it was ██████████████, depending on
21      the post.
22      Q. Okay.
23   And when you were Captain at FCI Otisville, were
24      the ████████████████ to be picked up from the ████████
25      ██████ specific to each post?
```

1199

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     A. Yes.

2     Q. So if I was working EA, there would be an

3     EA-specific radio at the ██████████?  Or EB.

4     Sorry.

5     A. I was going to say EAs a 24.  So it's always down

6     there.  EB, it says right in their post orders what

7     radio number and what key number.

8     Q. Okay.

9     A. So they know how many of the ████ we talked

10    about yesterday that they need to go to the window

11    with, throw in the window.

12    Q. So would it be fair to say that the EB post has a

13    designated radio?

14    A. Yes.

15    Q. And is that a designated ███████?

16    A. Yes.

17    Q. And so would it be fair to say that while you

18    were Captain at FCI Otisville, Otisville paid

19    Correctional Officers from the moment they received

20    the equipment at their post until the moment they

21    relinquished it?

22    A. Yes.

23    ATTORNEY VALLACHER:

24    At this time I'd direct your attention

25    to JX-55.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1200
Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1                        ---
 2    (Whereupon, Joint Exhibit JX-55,
 3    General Post Orders 2015, was marked
 4    for identification.)
 5                        ---
 6    THE WITNESS:
 7    Okay.
 8      BY ATTORNEY VALLACHER:
 9      Q. Okay.
10    And what is this document?
11      A. The employee standards of conduct.
12      Q. Okay.
13    And so do you see on the first page, the second
14      full paragraph, these standards apply to all employees
15      of the Bureau of Prisons, including employees of the
16      Public Action, Public Health Service, the National
17      Institute of Corrections, and to any person detail in
18      any of those agencies, including the inter-
19      governmental personnel?
20      A. Correct.
21      Q. Is it your understanding that that would --- you
22      know, it says all employees there, does it not?
23      A. Yes.
24      Q. Is it your understanding that that would apply to
25      BOP Counsel, Mr. Boyer, over here?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1201

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes.

2    Q. And these standards of employee conduct apply on

3    and off duty?

4    A. Yes.

5    Q. I mean, would that --- so okay.

6    So on Direct you were asked if Correctional

7    Officers are provided extra over --- provided

8    overtime, when they have an overtime shift or when

9    --- I think the question was actually using the word

10   substantial amount.  Do you recall that, when they

11   were kept on posed by a substantial amount?

12   A. Yes.

13   Q. What do you interpret to be a substantial amount?

14   A. Substantial amount to me, in reality, after the

15   first formal decision, I would say seven-and-a-half

16   minutes, because that was one of the things that was

17   put.  But 15 minutes is really the kicker because we

18   time in 15 minute intervals.

19   Q. Right.

20   You mean you key in only in 15-minute chunks?

21   A. Yes.

22   Q. Okay.

23   But at seven-and-a-half minutes, would you round

24   up or down?

25   A. Up.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1202
Trial
Kathy Aitken, et al. v. USA                           3/16/2023

```
 1    Q. Okay.
 2   To 15?
 3    A. Correct.
 4    Q. So is it your understanding that the Bureau would
 5       paying all staff, including Correctional Officers, if
 6       they responded to questions, responding to
 7       emergencies, or correcting inmate misbehavior for over
 8       seven-and-a-half minutes?
 9    A. If it is brought to the attention of the
10       Lieutenant or the Captain, yes.
11    Q. Okay.
12   And why does it need to be brought to the
13       attention of the Lieutenants or the Captain?
14    A. Like I state before, there's a lot of officers.
15       I think at the time there was 11 Lieutenants and 1
16       Captain, not all on duty at the same time.  So there's
17       not eyes everywhere.
18    Q. Around the time that you had 11 Lieutenants and 1
19       Captain, approximately how many Correctional Officers
20       did you have?
21    A. It varied from I'd say 120 to 130.
22    Q. 120?
23    A. Yes.
24    Q. To 130?  Okay.
25   And on Direct, I think you were asked whether you
```

1203

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

```
 1    cared how much was awarded in arbitration.
 2    Do you remember that?
 3        A. Yes.
 4        Q. Is it fair to say you have no dog in this current
 5    portal case?
 6        A. Right.  Yesterday I said I didn't care.  Let's
 7    just move on and keep going.
 8        Q. Right.
 9    Even when you were Captain, you know, unlike
10    Plaintiffs, it was not your money.
11    Correct?
12        A. Correct.
13        Q. So is it fair to say that you have nothing to be
14    lost or gained by the outcome of today's case?
15        A. Correct.
16        Q. You were also asked whether you never issued an
17    order telling the Correctional Officers to seek
18    overtime pay if they were correcting inmate
19    misbehavior on the way to post.
20    Do you remember that?
21        A. I remember a question, yes.
22        Q. Do you remember your answer?
23        A. Not from my knowledge, I believe, is what I said.
24        Q. Okay.
25    Unfortunately, I can't refresh your question with
```

1204

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1     the transcript of trial.  But I believe your answer
2     was no, that you had not issued an Order instructing
3     Correctional Officers to seek overtime pay if they
4     were correcting inmate misbehavior or answering a
5     question.
6     Is that right?
7     A. I'm sure I didn't.
8     Q. Okay.
9     In your experience, do Correctional Officers
10    appear to already know about their ability to submit
11    overtime pay in certain circumstances?
12    A. Yes.  They loved to get paid.
13    Q. Okay.
14    And do they submit requests like that?
15    A. They'll talk to Lieutenant via the phone, or they
16    can send an email.  If the Lieutenant doesn't satisfy
17    them, then they can move up their chain of command.
18    Q. Okay.
19    And when you were Captain, did the Bureau rely on
20    Correctional Officers walking on their way to post or
21    front post to supervise the compound while they're
22    walking?
23    A. Not solely.
24    Q. Okay.
25    A. There's already staff on duty with keys,

1205

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      radios, ---
2      Q. Okay.
3      A. --- OC spray.
4      Q. And when you were Captain, how frequently did
5      officers respond to emergencies before or after their
6      shift?
7      A. Rarely.
8      Q. And if those Correctional Officers were to
9      respond to an emergency, would they be compensated?
10     A. Absolutely.
11     Q. Why?  There would be --- if there's an emergency
12     and you're standing in key line ready to turn in your
13     keys and one of your brothers and sisters is down in
14     the unit or in Food Service and there's a body alarm,
15     they're going to go, and they're going to get paid.
16     If they have to stay and write a memo, they're going
17     to get paid more.  If they need to be debriefed,
18     they're going to get paid more.
19   It depends on the amount of time.  Beyond their
20     shift, they will be compensated.
21   ATTORNEY VALLACHER:
22   Okay.  Thank you.  So at this time, I'd
23     turn your attention to DX-16.
24                        ---
25   (Whereupon, Defendant's Exhibit DX-16,

1206

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    LMR Meeting Minutes Excerpts, was
 2    marked for identification.)
 3                              ---
 4    THE WITNESS:
 5    Blue?
 6    BY ATTORNEY VALLACHER:
 7    Q. That is ---.
 8    A. JX or DX?
 9    Q. I'm actually colorblind, but I think it's blue.
10    A. I'm sorry, what was the number again, sir?
11    Q. It was DX-16.  So I'm just going to represent to
12    you that this is actually four different LMR minutes.
13    So I'm going to walk you through each one to see if
14    you recognize it.
15    Q. Okay.
16    A. And then before we admit them into evidence.
17    Does that sound good?
18    A. Yes, sir.
19    Q. Okay.
20    So on page one, can you tell me what that appears
21    to be?
22    A. Those are LMR --- typed up LMR meeting minutes
23    for October of 2017.
24    Q. 2017?
25    A. Yes.
```

1207

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

    1       Q. Okay.
    2    And on page 13 --- so unfortunately these aren't
    3    numbered well.  You have to actually look at page 13.
    4       A. What was the page number?
    5       Q. Thirteen (13).  So it's right after 12 of 12.
    6       It's a brand new start.
    7    JUDGE:
    8    You can use the Bates numbers.
    9    ATTORNEY VALLACHER:
   10    Oh.  Oh, yeah.  They are Bates numbered.
   11       Okay.  So ---.
   12    THE WITNESS:
   13    I have 12 of 12.
   14       BY ATTORNEY VALLACHER:
   15       Q. Can you go one after that?
   16       A. I would if I could.  Mine ends at 12.
   17       Q. Yours ends at 12?
   18       A. Where the last paragraph says Department
   19       holiday/leave schedule.
   20       Q. I'd ask if you could turn one more page.
   21    JUDGE:
   22    I'm just looking over the ledge there.
   23       The Bates numbers are continuous.  So if you refer to
   24       the Bates numbers, I think he'll have an easier time.
   25       BY ATTORNEY VALLACHER:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.  So it's actually Bates number RE829000093.

2      A. No.  That's page one --- December 13th, 2017?

3      Q. Yes.  What does this document appear to be?

4      A. Typed up LMR minutes from September of 2017.

5      Q. Okay.

6   And do you see your name on this list under the

7      following staff are present?

8      A. Correct.

9      Q. Okay.  And then I'm going to ask you to turn to

10     Bates Number RB829000160.

11     A. 160.  Okay.

12     Q. Do you recognize this document?

13     A. It's a --- excuse me.  A typed LMR meeting

14     minutes from January 2015.

15     Q. Okay.

16   So it's not from year '21, as the subject might

17     suggest?

18     A. Good catch.

19     Q. Okay.

20   And if we go down to RP829000170.

21     A. Did you say 170?

22     Q. 170.  That's right, sir.

23     A. Okay.

24     Q. What does that appear to be?

25     A. Typed meeting minutes from the October 2014 Labor

1209

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

    1     Management Committee meeting minutes.
    2     Q. And do you see your name under the following
    3     staff are present?
    4     A. Yes, sir.
    5     Q. Are you familiar with this document?
    6     A. Yes, sir.
    7   ATTORNEY VALLACHER:
    8   At this time, Defendant moves to have
    9     DX-16 into evidence.
   10   ATTORNEY ELKIN:
   11   No objection.
   12   JUDGE:
   13   Admitted.
   14                          ---
   15   (Whereupon, Defendant's Exhibit DX-16,
   16   LMR Meeting Minutes Excerpts, was
   17   admitted.)
   18                          ---
   19   BY ATTORNEY VALLACHER:
   20     Q. So if we turn now to 170.
   21   Do you see that you were present at this meeting
   22     on October 30, 2014 at 10:20 a.m.?  Do you have any
   23     reason to doubt that?
   24     A. No.
   25     Q. If we go to the next page, I see there under ---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                        3/16/2023

1       there's a side that says portal-to-portal issues.
2   Do you see that?
3       A. Yes, sir.
4       Q. And it says Mr. Merlak asked if there any portal-
5       to-portal issues.
6   Who is Mr. Merlak?
7       A. He was the LMR chair.  He's an Associate Warden.
8       Also he was my supervisor at the time, my direct
9       supervisor.
10      Q. Okay.
11  So he's an Associate Warden at FCI Otisville?
12      A. Yes.
13      Q. Did he often raise --- ask if there were any
14      portal issues at these LMR meetings?
15      A. Almost --- every meeting, almost always it was
16      asked by either the LMR Chair, which is an Associate
17      Warden or myself.
18      Q. Okay.
19  And so it says here next, that Mr. Drewett and
20      Mr. Cerone listed their ongoing violations.  █████████
21      ████████████████████████████████████████████████████
22      ███████.  Staff still perform unpaid work or there are
23      unpaid hours of work, using various security screen
24      sites, donning required equipment on the agency's
25      premises, and performing work while walking to and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1211
Trial
Kathy Aitken, et al. v. USA                                          3/16/2023

```
 1      from their assigned post.
 2   Do you see that?
 3      A. Yes.
 4      Q. Is that about the level of detail that would be
 5      provided at these meetings from the Union?
 6      A. That's actually pretty detailed, a good one for
 7      that.
 8      Q. Okay.
 9   Usually it would be less?
10      A. A lot of times I remember Mr. Drewett or his
11      representative, and of course they changed throughout
12      elections when people left, we'd ask if there were any
13      portal-to-portal issues and they'd say there's always
14      ongoing portal-to-portal issues.
15      Q. Okay.
16   Would they ever elaborate or would it be more
17      kind of a boilerplate?
18      A. Sometimes they would elaborate, like this one
19      with Mr. Cerone stating screening sites and things
20      like that, yes.
21      Q. Okay.
22   And they also here stated the ███████████████
23   ██████████████████.
24      A. Yes.
25      Q. So the next sentence here says Mr. Merlak and the
```

1212

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1    Captain both stated there are ███████ that have
2    arrived.  That should alleviate some of the issues
3    brought forth.
4  Do you see that?
5    A. Yes.
6    Q. Do you have any recollection of those ████████?
7    A. Yes.
8    Q. And can you tell me a little bit more about, you
9    know, what was going on at that time, at least with
10   the ██████
11   A. The ██████ we had at that time at Otisville, I
12   believe, were the ████████████████████
13   ████████████████████████ ██████████,
14   ████████████████████████████. ████████████
15   ████████████████ ████████████████████.
16   ████████████████
17   ████████████████████████████
18   ████████████████████████████
19   ████████████ ████████████ ████████████████████
20   ████████████████████████████ █
21   ████████████████████████████
22   ████████████████████
23   Q. Okay.
24   A. ████████████████████████████
25   ████████████████

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     Q. ████████████████████████████████
 2     A. Oh, yeah.  It's like the difference between an
 3     iPhone 1 and an iPhone 14.
 4     Q. I'm not sure if that's judicially-noticeable.
 5     All right.  So if we turn now to page RB0009.  It's
 6     under the Bates page.
 7     A. You said nine?
 8     Q. Nine.  Make sure I have that right.
 9     A. I'm sorry.  Say the number again, sir.
10     Q. Oh, 93.  Sorry.
11     A. 82993?
12     Q. Yes.
13     A. Dated September 13th, '17?
14     Q. Right.
15   So you see that?  It says the following staff
16     were present.
17     A. Yes.
18     Q. And you see your name there?
19     A. Correct.
20     Q. And you see that it says the meeting was held on
21     Monday, September 11th, 2017 at approximately 9:30
22     a.m.?
23     A. Yes.
24     Q. Do you have any reason to believe that you were
25     not at that meeting?
```

1214

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. No.

2      Q. So on page --- could we turn now to, skip to page

3         100, the very last page ---.

4      A. Okay.

5      Q. All right.

6    It says portal to portal.

7    Do you see that?

8      A. Yes, sir.

9      Q. And then it says Mr. Whinnery asked if there were

10        issues with portal to portal.

11   Is that --- would that be part of the same

12        practice you were describing earlier that you or Mr.

13        Merlak ---?

14     A. Almost always.  Whoever the LMR chair was because

15        we changed Associate Warden at Otisville as fast as we

16        change our socks.

17     Q. Okay.

18   And then it says Mr. Hunter stated issues still

19        continue regarding portal.  He stated issues portal to

20        portal could be covered with sticking to annual

21        compressed schedules.

22   Do you see that?

23     A. Yes.

24     Q. So first, who is Mr. Hunter?

25     A. At that time, he was the Union President.

1215

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Okay.

2    And what is sick/annual compressed schedules?

3    A. There wasn't such a thing at the time.

4    Compressed is --- I believe he wanted a ten-hour

5    shift.

6    Q. Okay.

7    A. And we did not have those at the time.

8    Q. When you say you didn't have those, would that

9    not be --- so is a sick and annual schedule --- could

10   you explain, I guess, what a ten-hour shift is?

11   A. Some staff --- the only ones in custody when I

12   left, because I can't recall when it came into place.

13   I do believe the bus crew was a ten-hour shift.

14   Q. Okay.

15   A. But regular sick and annual is a pool.  You can

16   bid for it or if you don't get the post you want and

17   you're lower in seniority, you get sick and annual.

18   They cover the morning watch shift, a.m., day watch,

19   p.m.  They can cover any shift.  They're kind of

20   plugged in.

21   Q. Okay.

22   A. Covering sick people and annual leave people.

23   Q. And so that would be --- and then when it comes

24   to compressed schedules, that would be --- you know,

25   would that be four days of ten hours of these instead

Trial
Kathy Aitken, et al. v. USA                                3/16/2023

1    of five?
2    A. I believe that's what they were asking for, yes.
3    Q. Okay.
4    So then the next line says Mr. Kulick stated you
5    brought it up and bring it to the next meeting.
6    A. Yes.
7    Q. Do you see that?  That's on September 11th, 2017.
8    A. Correct.
9    Q. How often did these LMR meetings occur?
10   A. I honestly don't recall if they were monthly or
11   quarterly.
12   Q. Okay.
13   Well, so the next --- we actually do have one
14   from the next month.
15   Would that refresh ---?
16   A. So from September to January.
17   Q. Okay.
18   So I'll turn your attention now to page one of
19   this DX-16, which is Bates 000064.
20   ATTORNEY ELKIN:
21   Your Honor, I'm going to object to the
22   extent that Mr. Boyer has represented to the Court and
23   the witness that this is from the next month.  It
24   appears to be two years earlier.
25   JUDGE:

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1   Mr. Vallacher, I think ---.
 2   ATTORNEY VALLACHER:
 3   September 11, 2017 ---.
 4   JUDGE:
 5   I'm sorry.  Please don't interrupt.
 6     Could you straight out the dates that you're talking
 7   ATTORNEY VALLACHER:
 8   Yes.  So I believe that we were just
 9     looking at September 11th, 2017 and now we're looking
10     at October 30th, 2017.
11   ATTORNEY ELKIN:
12   Where did you go to?
13   ATTORNEY VALLACHER:
14   The first page.
15   JUDGE:
16   That's what it looks like ---.
17   ATTORNEY ELKIN:
18   Your Honor, I thought you said go to the
19     next page, which would have been the January 28th,
20     2015 document.  So I apologize.  I misheard.  You're
21     going to the first page of ---
22   ATTORNEY VALLACHER:
23   Yes.
24   ATTORNEY ELKIN:
25   --- DX-16?
```

1218
Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    JUDGE:

2    Yes.  We're going from a September 2017

3      meeting to an October 2017 meeting.  Okay.  Objection

4      overruled.  You can proceed.

5    ATTORNEY VALLACHER:

6    Thank you.

7      BY ATTORNEY VALLACHER:

8      Q. So what are we looking at right now on this first

9      page?

10     A. Typed minutes from the October 2017 LMR Committee

11     meeting minutes.

12     Q. Okay.

13   And you see where it says the following staff

14     were present.

15   And do you see your name under that list?

16     A. Yes.

17     Q. And do you have any reason to doubt that you were

18     at this meeting?

19     A. No.

20     Q. If we go now to page 3 of 12.

21     A. Okay.

22     Q. Under portal to portal, it says Mr. Kulick

23     requested that Mr. Hunter bring the proposal to the

24     next meeting to help elevate this issue.  All parties

25     agree this is not done and to move forward.

1219

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1   Do you see that?
2       A. Yes, sir.
3       Q. Is that consistent with your recollection of that
4   meeting?
5       A. Yes.
6       Q. And do you remember if Mr. Hunter ever brought
7   that proposal to an LMR meeting?
8       A. Not to my knowledge.
9       Q. All right.  Okay.
10  And now I'd like to turn your attention to JX-56.
11  Are you there, sir?
12      A. Yes.
13      Q. What does this exhibit depict?
14      A. It looks like post orders for the pool.
15      Q. JX-56?  You might be in DX.
16      A. Oh, I am.  Sorry.  My apologies.
17      Q. It might be how you find out are color blind,
18  too.
19      A. Huh?
20      Q. This might be how you find out that you're color
21  blind, too.
22      A. Okay.
23      Q. Okay.
24  So what does this document appear to be?
25      A. General post orders.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1220

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Do you see a date on the bottom right?

2    A. 6/22 of 2015.

3    Q. And would you be Captain at that time?

4    A. Yes.

5    Q. So would these post orders have come from you?

6    A. Yes.  They would have been signed by me.

7    Q. Okay.

8  So if we go to the third page, page 3 of 45.  The

9    fourth paragraph down under one.

10  Do you see that?

11    A. Do not make any changes?

12    Q. Yes.  So it says do not make any changes in your

13    post orders.  All changes or revisions in post orders

14    must have prior approval of the Captain.  Suggestions

15    for changes may be submitted at any time.  It is not

16    necessary to wait until the change form has been

17    distributed.

18  So when you --- when it says suggestions for

19    changes may be submitted at any time, did that mean

20    that Correctional Officers could make suggestions to

21    post orders?

22    A. Yes.

23    Q. Was there ever, you know, some type of post order

24    change sheet circulated?

25    A. Yes.  It went out with their bid sheets.  Bid

1221

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1     sheets meaning bidding proposed.
 2     Q. And in your eight plus years as Captain, how many
 3     post order change requests did you get from
 4     Correctional Officers?
 5     A. We've had some, but I cannot give you a
 6     definitive number.
 7     Q. Okay.
 8   Do you recall any Correctional Officer ever
 9     proposing that the post orders require a verbal
10     exchange?
11     A. No.
12     Q. Do you require a Correctional Officer ever
13     suggested adjustments in alleged portal issues?
14     A. Not to my knowledge.
15     Q. Okay.
16   Now I'll turn your attention to page 10 of 45.
17     A. Okay.
18     Q. Do you see where it says number three there?
19     A. The number of keys?
20     Q. Yes.  So it says the number of keys on a key ring
21     should always be checked when keys are passed from one
22     employee to another.
23     A. Correct.
24     Q. Is that referring to counting keys?
25     A. Counting of the keys, yes, and noting if there's
```

1222

Trial

Kathy Aitken, et al. v. USA                                     3/16/2023

```
 1      any bent, broken, damaged keys.
 2      Q. Okay.
 3  And how long would it take you to notice if a key
 4      was bent or broken?
 5      A. A second.
 6      Q. Okay.
 7  And so if you were looking at, you know, a normal
 8      key ring on post, like a 14 Folger Adams keys, how
 9      long would that take you to notice?
10      A. Folger Adams keys, if you find the bent one, let
11      me know.  I've only seen one in my whole career.
12      Q. Okay.
13      A. They're steel.  It takes a lot.  But they also
14      have to look to see if they have the key shield.  So
15      you can tell right away because Folger Adams keys are
16      gold.  The end of the key, which hides the teeth, so
17      inmates can't see it is silver.  So you'd know right
18      away if that was missing.
19      Q. Okay.
20  So if you had to give a ballpark, you know,
21      because you've been a Correctional Officer.
22  Right?
23      A. Yeah.  It doesn't take long.  Probably 15
24      seconds, if that.
25      Q. Okay.
```

1223

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

 1    So get the keys, count them, and inspect them?
 2      A. Uh-huh (yes).
 3    ATTORNEY VALLACHER:
 4    Okay.  I'd like to draw your attention
 5      to JX-108.
 6                            ---
 7    (Whereupon, Joint Exhibit JX-108, Full
 8    Human Resources Manual P3000.03
 9    (12/19/07), was marked for
10    identification.)
11                            ---
12      BY ATTORNEY VALLACHER:
13      Q. So what is --- do you know what this document
14      appears to be?
15      A. It appears to be the Human Resource Manual.
16      Q. Okay.
17    Are you familiar with The Human Resources
18      Management Manual?
19      A. Somewhat.  Not in-depth.  It's really not the
20      manual custody follows.
21      Q. Okay.
22    I'm going to then ask you about a specific
23      provision.  We'll see if you're familiar with that.
24    Does that sound fair?
25      A. Yes.

1224
Trial

Kathy Aitken, et al. v. USA                           3/16/2023

1    JUDGE:
2    Do you want to move it into evidence
3       before you do?
4    ATTORNEY VALLACHER:
5    At this time. Defendant moves JX-108
6       into evidence.
7    ATTORNEY ELKIN:
8    No objection.
9    JUDGE:
10   It's admitted.
11                        ---
12   (Whereupon, Joint Exhibit JX-108, Full
13   Human Resources Manual P3000.03
14   (12/19/07), was admitted.)
15                        ---
16    BY ATTORNEY VALLACHER:
17    Q. Okay.
18   So if we go to PLF 592.
19    A. Okay.
20    Q. So do you see where it says institution shift
21    starting and stopping time?
22    A. Yes.
23    Q. And then under purpose and scope, it says to
24    establish basic perimeters for shift starting and
25    stopping times for employees working at the Bureau

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      institution and the procedures to establish these
2      practices at all Bureau institutions.
3    Do you see that?
4      A. Yes.
5      Q. Have you ever seen this section before?
6      A. I'm sure I have sometime in my career.
7      Q. Okay.
8    So if we go down to PLF 593.
9      A. 593?
10     Q. 593.
11     A. Okay.
12     Q. Are you on page 593?
13     A. It was the next page.
14     Q. Okay.
15   And you see in paragraph six, it says scheduling
16     consideration?
17     A. Yes.
18     Q. So there --- the first paragraph says institution
19     employee whose shift starts at ███████ must be at
20     the ██████████ and have received his or her
21     equipment no later than █████ to be considered on time
22     at the time of his or her shift.
23   Do you see that?
24     A. Yes.
25     Q. Does FCI Otisville consider people on even if

1226

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1     they're in the line for their equipment?
 2     A. Yes.
 3     Q. Okay.
 4   So would it be fair to say that FCI Otisville is
 5     actually more generous than the Human Resources
 6     Manual?
 7   ATTORNEY ELKIN:
 8   Objection.  Can you read the next
 9     sentence?  Well, I withdraw the objection.
10   JUDGE:
11   Okay.
12   THE WITNESS:
13   Can you say it again?
14     BY ATTORNEY VALLACHER:
15     Q. Would it be fair to say that that's actually ---
16     that FCI Otisville is more generous to employees than
17     the Human Resources Manual would suggest?
18     A. It would be feasible, yes.
19     Q. And it says to accomplish this, each location
20     should ensure minimum waiting time for the employees
21     in the key line.
22   Do you see that?
23     A. Yes.
24     Q. Do you ever undertake any efforts to shorten key
25     line?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1227

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
 1      A. Yes.

 2      Q. What were they, if you recall?

 3      A. ███████████████████████████████████ and

 4      when the, excuse me, screening site came in to cut

 5      down on the amount of people coming in and out of the

 6      screening site.  When I first started as the Captain,

 7      you'd have outside camp staff who have to come in, I

 8      believe, the outside maintenance people.

 9    Anyone who works outside the fence, sewage

10      treatment plant, the garage foremen, they would all

11      have to screen through the site, come get their stuff

12      and scanned in without screen.  So we moved all the

13      equipment, keys and radios for them, up to including

14      Correctional Officer rear gate because he really had

15      no need to come in, because he drove his car around to

16      the rear gate, parked, opened the gate.  ██████████

17      ██████████████████████████████████████.

18    So it took a bunch of people out of the key line

19      of the FCI and moved it to █.

20      Q. Okay.

21      A. And since they weren't entering ███████, they

22      could just go to the front window of █, ████████

23      █████████  and they didn't have to screen because they

24      were going right back out.  They were not going into a

25      secure facility.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. Okay.
 2   And so the next paragraph --- on the next page
 3      under PLF 594.  So it says if that same employee's
 4      shift ends ███████████ ██████████████████████
 5   ██████████████████████████████████████████████
 6   ██████████████████████████████.
 7   Do you see that?
 8      A. Yes.
 9      Q. So is that consistent with FCI Otisville's
10      practice?
11      A. Yes.
12      Q. Granted, ███████████ is not right when people are
13   ████████████████████████ because that would
14      be a p.m. shift.
15      A. Well, people get up ---.
16   ATTORNEY ELKIN:
17   Objection.  I'm confused.  I didn't hear
18      the question, actually.
19   JUDGE:
20   How about if you just state the same
21      question again so everybody ---.
22   ATTORNEY VALLACHER:
23   Okay.
24      BY ATTORNEY VALLACHER:
25      Q. I wanted to just clarify with the caveat that the
```

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1229
Trial
Kathy Aitken, et al. v. USA                                3/16/2023

```
1     people dropping off equipment at control would do so
2     at ███████████████████████      With that --- I mean,
3     ███████████████████████████
4     A. Okay.  You're confusing me.
5     Q. I'm confusing myself.  Odd numbers.
6   So with the caveat that at Otisville, at least in
7     my understanding, is that when people are ████████
8   ██████████████████████████████████████████████████
9   ██████████████
10  Is that right?
11  ATTORNEY ELKIN:
12  Objection.  What people?  Is he just
13    talking about the B-Side Housing Unit?
14  JUDGE:
15  I don't even know if there's --- if
16    that's a question.
17  How about if you take like 15 seconds to
18    sort out the questions in your mind and where you're
19    going, I think we can make a better record here.
20    BY ATTORNEY VALLACHER:
21    Q. A B-Side Housing Unit Officer returns equipment
22    to the ████████████ at what time, p.m.?
23    A. They should be at the window at ██████████ ---
24    Q. Okay.
25    A. --- dropping their equipment off because they've
```

Trial
Kathy Aitken, et al. v. USA                              3/16/2023

1    got that built-in time to move after the inmates are

2    locked in to ██████████████████ by the post orders.   I

3    believe it was ████████████████  ████████ talked about

4    yesterday.

5    Q. Okay.

6    So if we replace the ████████████████████████

7    in that sentence, would that be true at FCI Otisville?

8    A. Yes.

9    Q. Okay.

10   And then the next sentence says reasonable travel

11   time to and from the duty post to ████████████ will

12   be compensable as part of the employee's work duty.

13   Do you see that?

14   A. Yes.

15   Q. And is that true when we're talking about the

16   employee dropping off equipment at ████████████████

17   at FCI Otisville?

18   A. Yes.

19   Q. During your deposition, you recall being shown

20   the Marco Newman arbitration Decision?

21   A. I'm sure I was.  That was a while ago.

22   Q. Are you familiar with that Decision at all?

23   A. I think what I know, there was award and ---

24   Q. Okay.

25   A. --- things.

1231

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    ATTORNEY VALLACHER:
 2    Do you recall anything --- so we've ---
 3      I'm going to end the examination.  Thank you.
 4    JUDGE:
 5    No further questions?  All right.  Ms.
 6      Elkin, any redirect?
 7    ATTORNEY ELKIN:
 8    Yes, Your Honor.
 9                           ---
10                        REDIRECT EXAMINATION
11                           ---
12    BY ATTORNEY ELKIN:
13    Q. Good morning, Captain Whinnery.
14    A. Good morning.
15    Q. Joint Exhibit 108 is still in front of you, I
16    hope, the big binder.  Sorry.
17    A. 108?
18    Q. Yes.  I know.
19    A. PLF 431?
20    Q. I believe that first starts looking at PLF 595.
21    Sorry.  PLF 592.  Institution starting stopping time.
22    You said you were familiar with this document.
23    Do you see the date on it is 12/19/2007?
24    A. Yes.
25    Q. And you agree that that is prior to the date that
```

Trial

Kathy Aitken, et al. v. USA                                   3/16/2023

1    the institution Bureau-wide put in the staff training
2    site in 2008.
3    Correct?
4    A. Correct.
5    Q. As far as you know --- and after the Bureau of
6    Prisons implemented staff screening sites in 2008, you
7    would agree that the officers who are bringing in
8    ▮▮▮▮▮▮▮▮▮▮, and metal chains, and metal clips, and
9    duty belts with metal snaps and pouches that have
10   metal snaps on them, they're required to screen the
11   duty belt through the x-ray machine, and they
12   themselves have to clear the upright metal detector in
13   order to get onto the institution premises.
14   Correct?
15   A. Yes.
16   Q. And that's a safety and security function.
17   Correct?
18   A. Correct.
19   Q. And the location where the officers pick up their
20   duty belt, pouches, chits, chains, clips, that's at
21   that screening site.
22   Correct?  After it's been screened?
23   A. Yes.
24   Q. Do you know, as you sit here today, whether
25   anybody from --- who wrote this Human Resources Manual

1233

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1        --- actually, let me back up.
2    You are not aware that anybody has ever revisited
3        601.1 of this Human Resource Manual that's in front of
4        you about shift starting and stopping times after the
5        screening sites had been put in place.
6    Correct?
7        A. Not to my knowledge.
8        Q. Okay.
9    So to your knowledge, the Bureau never updated
10        this portion of the --- or revisited or reconsidered
11        this portion of Joint Exhibit 108.
12    Correct?
13        A. Not to my knowledge.
14        Q. I think you can move this one away.
15                            ---
16        (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)
17                            ---
18    JUDGE:
19    Where are we going?
20    ATTORNEY ELKIN:
21    You can just --- I don't know.  Don't
22        throw it down.  You might have to go to there.
23        BY ATTORNEY ELKIN:
24        Q. You testified that, you know, about have to know
25        where the time --- how much time it took to count and

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1234

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1    inspect.
2    Do you recall that?
3        A. Yes.
4        Q. When's the last time you were a Correctional
5    Officer?
6        A. Even as a Captain, I had to count my keys.
7        Q. Okay.
8    Did you ever time yourself counting the keys?
9        A. I did not pull out a stopwatch and time myself.
10   So no.
11       Q. Did you ever issue an order to Correctional
12   Officers to tell them that they should be asking for
13   overtime if it took them seven-and-a-half minutes to
14   collect their duty belt, walk to the post through the
15   various sally ports and relieve the outgoing officer?
16       A. I'm going to apologize to you right now.  Can you
17   repeat that?  I saw a shadowy object and got
18   distracted.  I like that.
19   JUDGE:
20   The record can reflect that the blinds
21   are going down on that.
22   ATTORNEY ELKIN:
23   Was that you?
24   JUDGE:
25   No.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1235

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1    ATTORNEY ELKIN:

2    It was you?  Okay.  Do you want that one

3      down, so it's not in your face either?

4    JUDGE:

5    Why don't you?

6    ATTORNEY ELKIN:

7    Magic.

8    THE WITNESS:

9    Distracted.

10   JUDGE:

11   Go ahead with your question.

12   ATTORNEY ELKIN:

13   Okay.  Thank you, Your Honor.

14     BY ATTORNEY ELKIN:

15     Q. I'll repeat the question.

16     A. Thank you.

17     Q. Isn't it true that you have never issued an

18   Order, either writing or verbally, to the Correctional

19   Officers telling them that they should be asking for

20   overtime if it took them more than seven-and-a-half

21   minutes to collect their duty belt, walk to their post

22   through the various sally ports, and relieve the

23   outgoing officer?

24     A. Correct.

25     Q. How many workers are coming on shift at ▮▮▮▮

1236

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1          ████?
 2     A. Ten to 15.  I'd have to ---
 3     Q. At most?
 4     A. --- give you a ballpark.
 5     Q. Okay.
 6  Leaving at ████████    that's just going to be
 7     the Housing Unit, B-side Housing Unit Officers and
 8     SHU-3.
 9  Is that correct?
10     A. Sounds correct.
11     Q. And we were talking about the ratio of staff to
12     inmates.  And the way I was hearing your testimony was
13     that you were talking about for the full complement of
14     staff, which I believe would be, what?  Would you say
15     about 300 people, less than 300?
16     A. About --- somewhere in that ballpark sounds about
17     right.
18     Q. And then versus the full complement of inmates,
19     which is roughly 1,000 people inside the main
20     institution and the ████████
21  Sound about right?
22     A. Yes, ma'am.
23     Q. Okay.
24  So those 300 persons are not on duty all the
25     time.
```

1237

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

```
 1    Correct?
 2     A. That's correct.
 3     Q. And it's only --- let's just go back again just
 4    so I'm clear on the numbers.  Between ███████    and
 5    ████████  on a housing unit, is it fair to say that
 6    there's only one officer?  Is that correct?
 7     A. Yes.
 8     Q. And that would be covering both the A-side and
 9    the B-side?
10     A. Correct.
11     Q. And there could be up to 300 inmate?
12     A. On a very high day, yes.
13     Q. Okay.
14    So it could be up to 260 to 300 inmates?
15     A. Sounds feasible, yes.
16     Q. Okay.
17    So on those --- during those hours, during every
18    day, 365 days a year, is it fair to say that there are
19    --- that one Correctional Officer is outnumbered by
20    200 and at least 60 inmates to 1?
21     A. It's reasonable to say, but the inmates are also
22    locked in
23     Q. Until ███████████  in the morning when some are
24    unlocked to go to Food Services.
25    Is that correct?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1238

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1       A. Small number, yes.

2       Q. Okay.

3    And you would agree that fights can happen inside

4       cells when inmates are locked in.

5    Correct?

6       A. Yes.

7       Q. Okay.

8    And then going to the daylight hours, the inmates

9       are unlocked at █████████

10   Is that right?

11      A. In that vicinity.  Once all the posts are manned

12      and the Lieutenant knows they're manned, then they can

13      unlock.

14      Q. Okay.

15      A. Preparation for chow.

16      Q. And what time are the Unit Team people coming to

17      work?

18      A. I can't speak to their hours, to be honest with

19      you.  A lot come in at I'd say ███████████.

20      Q. Okay.

21   So usually between ██████████████████████ we

22      now have two officers to a ratio of 260 to 300 who are

23      now unlocked.

24   Is that correct?

25      A. Yes.

1239

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1    Q. Okay.

2    And then when the Unit Team comes in, team sounds

3     like a lot of people to me.  Let's talk about what

4     that is.  Is a Case Manager --- it's one Case Manager.

5    Correct?

6    A. Per unit.

7    Q. So is there an A-side and B-side Case Manager?

8    A. When I was there, yes.

9    Q. Okay.

10   So it's two Case Managers, one Secretary?

11   A. And I believe it's one Secretary for ---

12   Q. Total?

13   A. --- both sides.

14   Q. Okay.

15   And then what was the other position, Unit ---?

16   A. Unit Manager and Unit Counselors.

17   Q. And so it's Unit Manager, Unit Counselor.

18   Are there two of them?

19   A. There's one Unit Manager for both sides and a

20   Counselor on each side.

21   Q. So it's about six or seven people?

22   A. Correct.

23   Q. Plus the two officers?

24   A. Correct.

25   Q. Do during the best-case scenario, during daylight

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      hours from ████████████ or so, maybe if someone stays
 2      late, there might be an extra person, there could be
 3      260 to 300 inmates to 8 workers on those housing
 4      units.
 5   Is that correct?
 6      A. If they were all in the unit, yes.  But they have
 7      job details.  They're allowed to go to rec.  They have
 8      to go to school.  They can be at medical appointments.
 9      So that number could vary.
10      Q. Okay.  Fair enough.
11   Now, I understand from your testimony that your
12      wife is a teacher or was a teacher at FCI Otisville?
13      A. Yes.
14      Q. And I know that you would know what her tour of
15      duty is.
16   Right?  What was her --- what were her hours?
17      A. 7:30 to 4:00.
18      Q. 7:30 to 4:00?
19      A. Yes.
20      Q. And so she had to be at the key line by 7:30 in
21      order to be on time.
22   Correct?
23      A. Yes.
24      Q. And she had to be at the ███████████████████
25      ███████████ by 4:00 p.m. to go off duty.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Correct?
 2       A. Correct.
 3       Q. So you would agree --- and that her sort of duty
 4       station is in that education area after you pass rec?
 5       A. Okay.  All big glass windows.
 6       Q. Okay.
 7      So you would agree that she is on paid time when
 8       she is walking from where she collected her radio ---
 9       and she would collect ███████████████████████?
10       A. Yes.
11       Q. To her duty station at the Education Department.
12      Correct?
13       A. Correct.
14       Q. And so when she is correcting inmate behavior as
15       she walks, even if it doesn't take seven-and-a-half
16       minutes to correct an inmate, he or she is being paid
17       for it.
18      Correct?
19       A. Yes.
20       Q. And your answer will be the same for after her
21       tour, when she gets to leave the Education Department
22       and she's returning her equipment so that she's at the
23       control center by four o'clock, she gets paid for
24       correcting inmates if they're coming off of recall,
25       she has to talk to them, she's on paid time.
```

1242

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Correct?
 2      Q. On her way to, I will agree with.  On her way up,
 3      the ████████████████████     ████████████████████
 4      ████████████████   Staff being that close to the
 5      door don't leave that early.
 6      A. But if she had encountered an inmate on her walk,
 7      on her way out of the Education Department and she was
 8      going to ██████  to return her equipment by four
 9      o'clock, she's on paid time if she has to correct
10      inmate behavior, even if it is less than
11      seven-and-a-half minutes of correction time.
12      Correct?
13      A. Yes.
14      Q. You talked about the LMR meeting.
15      A. Yes.
16      Q. And the Union is pretty much always bringing up
17      ongoing portal-to portal-issues.
18      You recall that?
19      A. Yes.
20      Q. And you would agree that it's the employer's
21      obligation to properly pay employees.
22      Correct?
23      ATTORNEY VALLACHER:
24      Objection.  Calls for legal conclusion.
25      JUDGE:
```

1243

Trial

Kathy Aitken, et al. v. USA                               3/16/2023

1    What is the question?  Say the question
2      again.
3      BY ATTORNEY ELKIN:
4      Q. You would agree that it's the employer's
5      obligation to properly pay employees.
6    JUDGE:
7    I'll overrule the objection.
8    ATTORNEY VALLACHER:
9    That wasn't quite the question asked.
10   JUDGE:
11   Well, I'll overrule the objection as to
12     that question, which is now the one pending.
13   ATTORNEY VALLACHER:
14   Thank you, Your Honor.
15   THE WITNESS:
16   Okay.  I'm ready.
17     BY ATTORNEY ELKIN:
18     Q. So ask it again?  You would agree that it is the
19     employer's obligation to properly pay employees.
20   Correct?
21     A. Yes.
22     Q. And did you explore with --- I think it was Jason
23     Hunter, his idea about using the sick and annual
24     roster and making the longer schedule in order to
25     alleviate portal problems?

1244

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     A. It's possible.

2     Q. You don't have any recollection on it today,

3     though?

4     A. I can't remember, but it's possible.

5     Q. And wouldn't you agree that during the time

6     period of those LMR meetings that were looking at,

7     which were DX-16, virtually the whole time, the Union

8     is either bringing up portal-to-portal issues or there

9     is a pending grievance or grievance on

10    portal-to-portal issues.

11    Correct?

12    A. Sounds reasonable, yes.

13    ATTORNEY ELKIN:

14    Okay.  Your Honor, Court's indulgence.

15    JUDGE:

16    Of course.

17    ATTORNEY ELKIN:

18    I have nothing further, Your Honor.

19    JUDGE:

20    Okay.  Mr. Whinnery, I realize you're

21    here pursuant to a subpoena.  It's a public service

22    for you to be here.  Thank you very much for coming

23    and telling us what you know.

24    THE WITNESS:

25    Thank you.

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    JUDGE:
 2    You can go home.
 3    THE WITNESS:
 4    Have a good day.
 5    JUDGE:
 6    Ms. Elkin, anything further?
 7    ATTORNEY ELKIN:
 8    Oh, no.  I'm just reading.
 9    JUDGE:
10    Okay.
11    ATTORNEY ELKIN:
12    Oh, Your Honor.  We rest.
13    JUDGE:
14    Right.  That's what I'm asking.
15    ATTORNEY ELKIN:
16    I usually do it like this.  We rest.
17    JUDGE:
18    Mr. Vallacher, maybe we can take a short
19      break.  Do you want a few minutes to get yourself
20      organized for your first witness?
21    ATTORNEY VALLACHER:
22    That sounds great, Your Honor.
23    JUDGE:
24    How long would you like?
25    ATTORNEY VALLACHER:
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Ten minutes.

2    JUDGE:

3    Ten minutes?  All right.  Then let's

4      come back here 10, maybe 10:00, 10:05, sometime in

5      there to ready to pick up.

6    ATTORNEY ELKIN:

7    Okay.

8    JUDGE:

9    Wonderful.  All right.

10   COURT CRIER:

11   All rise.

12                          ---

13            (WHEREUPON, A SHORT BREAK WAS TAKEN.)

14                          ---

15   COURT CRIER:

16   All rise.  The United States Court of

17     Federal Claims is now in session.  Judge Stephen

18     Schwartz presiding.

19   JUDGE:

20   Please be seated.  Government, you ready

21     to call your first witness?

22   ATTORNEY JOSHUA MOORE:

23   We are, Your Honor.  The Government

24     calls Jean Leimkuhler.

25   JUDGE:

1247

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Raise your hand.

2                              ---

3                         JEAN LEIMKUHLER,

4    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

5    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

6    FOLLOWS:

7                              ---

8    JUDGE:

9    Please have a seat.

10                             ---

11                       DIRECT EXAMINATION

12                             ---

13   BY ATTORNEY JOSHUA MOORE:

14   Q. Sorry about the binders there.

15   Mr. Leimkuhler, can you state your name for the

16   record?

17   A. Jean Michael Leimkuhler.

18   Q. And Mr. Leimkuhler, we've never met before, but

19   my name is Josh Moore and I'm attorney at the

20   Department of Justice and I represent the Defendant,

21   United States.  You are a Plaintiff in this matter.

22   Is that correct?

23   A. That is correct.

24   Q. And are you aware that you were designated as a

25   representative Plaintiff by agreement of the parties?

1248

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      A. Yes, sir.
 2      Q. Okay.
 3    And do you recall having your deposition taken
 4      this matter by my colleague, Mr. Vallacher?
 5      A. Yes, sir.
 6      Q. Okay.
 7      A. And you're currently employed at Otisville as a
 8      Lieutenant.
 9    Is that right?
10      A. Yes, sir.
11      Q. And you recently were promoted to Lieutenant?
12      A. Approximately three years.
13      Q. Three years ago.
14      A. If you consider that recent.  Yes, sir.
15      Q. And before that, you were a Correctional
16      Officer ---
17      A. That's correct.
18      Q. --- at Otisville?
19      A. Yes, sir.
20      Q. And you were there for a Correctional Officer for
21      about 14 years?
22      A. That's correct, sir.
23      Q. That's right?
24      A. Yes.
25      Q. When did you start with the Bureau of Prisons?
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     A. 2005.
2     Q. For the entire time at the Bureau of Prisons that
3     you've been at Otisville?
4     A. Yes, sir.
5     Q. And for that entire time, were you in custody?
6     A. Yes, sir.
7     Q. And as a Correctional Officer, did you work all
8     of the housing unit posts?
9     A. Yes, sir.
10    Q. And all of the compound posts?
11    A. Yes, sir.
12    Q. All of the control center posts?
13    A. Yes, sir.
14    Q. All the SHU posts?
15    A. Yes, sir.
16    Q. And they were all at Otisville?
17    A. Yes, sir.
18    Q. Okay.
19    And Mr. Leimkuhler, today I'd like to limit our
20    discussion to the time it takes you to get from the A1
21    sally port to various posts within Otisville, complete
22    the equipment exchange, and then leave the
23    institution.
24    Is that okay?
25    A. That's fine.

1250

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
1        Q. All right.  That should be pretty --- okay.
2    So let's start where if you can imagine that you
3      come into Otisville to come to work and you have gone
4      through security and you're standing in front of the
5      A1 outer sally port door.
6    Are you with me?
7        A. Doing screen side already?
8        Q. You did the screen side already.
9        A. Okay.
10       Q. Okay.
11   So you're standing in front of A1 sally port
12     door.
13   And how long would you say it would take you to
14     get through the A1 sally port door, ███████████████,
15     and get on the other side of A1 sally port?
16       A. Just to get through the doors?
17       Q. Just to get through the doors, ███████████, get
18     on the other side.
19       A. Maybe five to ten seconds.
20       Q. Five to ten seconds?  Okay.
21   And after you're out of that, you are on the
22     sidewalk leading to the control center lobby.
23   Are you with me?
24       A. I'm --- yes, sir.
25       Q. And then how long would it take you to walk that
```

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1    sidewalk to get into the control center lobby to get
2    in front of the outer control or, I guess, outer
3    compound sally port door?
4    A. Maybe another ████████████.
5    Q. ████████████        Okay.  And then you're at
6    the compound sally port door.  And how long would it
7    take you to get through the compound sally port door
8    to get through the outer compound sally port door
9    through to the inner compound sally port door?
10   A. Maybe another ████████████.
11   Q. ████████████.  Okay.  Okay.
12   So now we've gone through the compound sally port
13   door and we're inside of the secured area of the
14   compound.
15   Are you with me?
16   A. I'm tracking.
17   Q. Okay.
18   So let's talk specifically about a housing unit.
19   How long would it take you to get from the inner
20   compound --- excuse me, the inner compound sally port
21   door to one housing unit?
22   A. ████████████████████
23   Q. ████████████████████ Okay.  All
24   right.
25   And so we've walked across the compound.  We've

1252

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    gotten to the housing unit and let's say we're talking
2    about an A-Side Housing Unit 24-hour post.  You've
3    worked in A-Side Housing Unit?
4    A. Yes, sir.
5    Q. Yeah.  And how long --- once you get there, you
6    have to do an exchange, is that right, to relieve the
7    person that's on post?
8    A. Yes, sir.
9    Q. How long would it take you to do for an A-Side
10   Housing Unit, how long would it take you to do that
11   exchange and assume the duty post?
12   A. Are we just talking about handing ██████████
13   over or are we talking about inventory and checking
14   keys?
15   Q. We're talking about, you know, the time it takes
16   you to relieve the officer that's already there.  So
17   before you, you know ---.
18   A. Approximately one to two minutes.
19   Q. One to two minutes?  Okay.  All right.
20   And then let's talk about same thing for ---
21   let's say you're working compound.
22   How long would it take you to do an exchange at
23   compound to relieve the officer there?
24   A. I would say it's about the same, one or two
25   minutes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. One to two minutes.  Okay.
2    And what about SHU?  If you were working SHU-1,
3      how long would it take you to relieve the officer?
4      A. SHU-1 may take a little longer.  Maybe two to
5      three minutes.
6      Q. Two to three minutes, max three minutes?
7      A. Max three minutes.
8      Q. Okay.
9    And you've worked Control 1 as well?
10     A. Yes, sir.
11     Q. Okay.
12   How long would it take you to relieve the Control
13     1 Officer?
14     A. I would say it's about equal as the SHU Number 1,
15     about two to three minutes.
16     Q. Three minutes max?
17     A. Yes, sir.
18     Q. Okay.
19   So let's say you're working the housing unit and
20     you've done the exchange.  You've worked your shift.
21   At the end of your shift, you do the exchange for
22     the incoming officers that relieve you?
23     A. Yes, sir.
24     Q. And that would probably take about the same
25     amount of time as, you know, when you initially

1254

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     relieved the officer before you?
2     A. I would say it all depends on the officer.
3     Q. It all depends on the officer?
4     A. Yes, sir.
5     Q. But in one to two minutes, would that be about
6     average?
7     A. I would say generally, yes, sir.
8     Q. Okay.
9   How long would it take for you to get from --- so
10    you've been relieved from post and you're now leaving,
11    exiting the institution.
12  How long would it take you to exit the
13    institution?
14    A. To get from the housing unit completely out to
15    the like --- out of the secured confines, maybe one
16    and ███████████████.
17    Q. ███████████████.  Just one second.
18  Do you recall having a deposition taken in this
19    matter?
20    A. Yes, sir.
21    Q. And when you took your --- when your deposition
22    was taken, do you recall that you swore to tell the
23    truth?
24    A. Yes, sir.
25    Q. The same oath you took today?

1255

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      A. Yes, sir.
 2      Q. And Mr. Vallacher asked you some questions?  Do
 3      you recall being asked some questions?
 4      A. I do.  A lot of questions.
 5      Q. I believe it was Ms. Block asked you some
 6      questions as well?
 7      A. Yes, sir.
 8   ATTORNEY JOSHUA MOORE:
 9   Okay.  Your Honor, I'd like to approach.
10   JUDGE:
11   Yes.
12   ATTORNEY BLOCK:
13   And just so I'm clear, this is for
14      impeachment?
15   JUDGE:
16   I think it's pretty clear this is
17      impeachment.  We'll find out what he's impeaching
18      over.
19   ATTORNEY BLOCK:
20   I understand.
21      BY ATTORNEY JOSHUA MOORE:
22      Q. Okay.
23   Mr. Leimkuhler, you have your deposition in front
24      of you.
25   Could you turn to page 148?
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Okay.
2    Q. And if you go --- you see those numbers on the
3    left-hand side?  It starts with one, two, three, four,
4    five.
5    A. Yes.
6    Q. If you go down to number 18.  I'm going to start
7    reading there.
8    Okay?
9    A. Yes, sir.
10    Q. Tell me if I read this correctly.  Question,
11    okay, if you're working a 24-hour housing unit, after
12    relief, what you do?  Answer, generally I proceed out
13    of the institution.  Question, okay.  How long does
14    that take you?  Answer, probably the same amount of
15    time getting the unit, ██████████████.  ████████████
16    Probably, maybe at the most.
17    Did I read that correctly?
18    A. Yes, you did.
19    ATTORNEY BLOCK:
20    What page are you on?
21    THE WITNESS:
22    Would it be 148?
23    ATTORNEY JOSHUA MOORE:
24    Oh, sorry.  148.  My apologies.  Did I
25    say 149?

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
1   JUDGE:
2   I'm on page 148.
3   ATTORNEY BLOCK:
4   Yeah, you didn't say that.
5   Do you have a page 148 as well, Your
6     Honor?
7   JUDGE:
8   I'm on his 148.
9   ATTORNEY BLOCK:
10  I apologize.  I think I was looking at
11    the wrong --- I was looking at the ---.
12  JUDGE:
13  Okay.
14  ATTORNEY BLOCK:
15  That's a bit of an issue.
16  JUDGE:
17  Okay.
18  ATTORNEY JOSHUA MOORE:
19  Did you keep track, Your Honor?
20  JUDGE:
21  Yeah.  I'm tracking as far as I can tell
22    you're turning people's attention to the right one,
23    right lines.  At least you got me on the right page.
24  ATTORNEY JOSHUA MOORE:
25  Okay.  Great.
```

1258

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1     BY ATTORNEY JOSHUA MOORE:
2     Q. Did you follow, Mr. ---?
3     A. Okay.  I'm tracking.
4     Q. Okay.  That is correct.
5     ATTORNEY JOSHUA MOORE:
6     Okay.  One moment, Your Honor.  Okay.
7        Mr. Leimkuhler, thank you for talking to me.  Again,
8        just keeping it very simple, we just want to talk
9        about some times.  That's all we talked about today.
10       So I do appreciate it and I will pass the witness,
11       Your Honor.
12    JUDGE:
13    Ms. Block?
14    ATTORNEY BLOCK:
15    Turn to the green binder of the tab 71
16       in it.  Which one, one two, or three?  The binder with
17       71.
18                        ---
19    (Whereupon, Joint Exhibit JX-71,
20    Leimkuhler Assignment Cards 2016 -
21    2019, was marked for identification.)
22                        ---
23    THE WITNESS:
24    The binder with 71?
25                        ---
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1259

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                    CROSS EXAMINATION
 2                         ---
 3      BY ATTORNEY BLOCK:
 4      Q. Yes.  Green binder.  I think it's three of three.
 5      Tab 71.
 6      A. Seventy (70)?  What number's on it?
 7      Q. Binder three of three.  The green binder, number
 8      three of three.
 9      A. Three of three.
10      Q. The binders are marked.
11      A. I don't see them labeled three of three.
12      Q. Tab 71.  So the binder that has tab 71 in it.
13      So it starts at ---.
14      A. Okay.  So it has 71 on it?
15      Q. Yes.  And we're going to go to tab 71.
16      A. Can you tell me what's on the cover of the
17      binder, please?
18      Q. It should say Defendant's Exhibit 15.  I mean,
19      no, Joint Exhibit.  I apologize.  Green cover.  Joint
20      Exhibit JX.
21   And I don't know if what the numbers are on your
22      copy, but it's the green binder joint exhibit with tab
23      71 in it.
24      A. Okay.  This is JX-70.
25      Q. Let me know when you have 71.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. I don't see a 71.  Okay.

2    Q. Let me know when you have tab 71.

3    A. I have it.

4    Q. Okay.

5    And do you recognize this document?

6    A. Yes, ma'am.

7    Q. And is it your --- is it a daily assignment

8    listing for you?

9    A. Yes, ma'am.

10    Q. Okay.

11    And does it show your --- all the posts ---

12    custody posts and shifts you worked from April 9th,

13    2016 until October 8, 2019?

14    A. Yes, ma'am.

15    ATTORNEY BLOCK:

16    All right.  I move JX-71 into the

17    record.

18    ATTORNEY JOSHUA MOORE:

19    No objection, Your Honor.

20    JUDGE:

21    Admitted.

22                          ---

23    (Whereupon, Joint Exhibit JX-71,

24    Leimkuhler Assignment Cards 2016 -

25    2019, was admitted.)

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1261
Trial
Kathy Aitken, et al. v. USA                                3/16/2023

```
 1                              ---
 2     BY ATTORNEY BLOCK:
 3     Q. And during this time period from April 9, 2016
 4     until October 8th, 2019, were you a Correctional
 5     Officer during this time?
 6     A. Yes, ma'am.
 7     Q. Okay.
 8   And looking at this, can you tell if it was your
 9     practice to work 16-hour posts?
10     A. Yes, ma'am.
11     Q. It was?
12     A. It was, yes.
13     Q. Do you know how many times during this time
14     period you working a 24-hour post for a full
15     eight-hour shift that was not in your overtime shift?
16      Meaning it wasn't a shift that immediately followed
17     one of your other shifts?
18     A. I don't remember.  Don't recall.
19     Q. Okay.
20   If we could turn to page 27 of this document and
21     a page number on the bottom, it says RFP4121767.
22     A. Okay.
23     Q. Okay.
24   And at the very top of the page, it says
25     June 18th, 2016.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1262

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1    Do you see that line?
2    A. I do.
3    Q. And on that day, did you work Control 1 on day
4    watch shift?
5    A. That's correct.
6    Q. And was that shift a full eight hour non-overtime
7    shift?
8    A. Yes, ma'am.
9    Q. Okay.  And then if you can turn to page 21.  And
10   the bottom number is RFP4121761.  And let me know when
11   you're there.
12   A. I'm there.
13   Q. Okay.
14   And you go to the second line, February 16th,
15   2017.
16   Do you see that?
17   A. Yes, ma'am.
18   Q. And on that day it appears you worked Unit 1
19   Officer 1 from ██████████████.
20   Is that correct?
21   A. Yes, ma'am.
22   Q. Okay.
23   And was that a full eight hour non-overtime
24   shift?
25   A. Yes, ma'am.

1263

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Q. Okay.
2    And you can flip through.  Can you tell if you
3    worked any other 24 hour full eight-hour shifts that
4    were not consecutive overtime shifts during this time
5    period?  Let me know once you're done ---.
6    A. Yes, correct.  I think so.
7    Q. So there are no other full 8 hour shift on
8    24-hour post during this time period that you can
9    tell?
10   A. I believe Perimeter 1 is 24-hour post.
11   Q. Sorry.  Can you just say that again?  I didn't
12   hear you.
13   A. Perimeter 1 is a 24-hour post.
14   Q. Okay.
15   Do you know if Perimeter 1 is a covered post in
16   the ---?
17   A. I believe it's not.
18   Q. Okay.
19   So that would be two shifts during this entire
20   period from April 9th, 2016 until October 8th, 2019
21   that he worked a full eight-hour shift on one of the
22   24-hour posts covered ---?
23   A. That is correct.
24   ATTORNEY BLOCK:
25   Okay.  All right.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1264

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1   And then I'll have you turn to the very
 2     next tab in the binder, which is JX-72.
 3                              ---
 4   (Whereupon, Joint Exhibit JX-72,
 5   Leimkuhler Assignment Cards 2019 -
 6   2022, was marked for identification.)
 7                              ---
 8   THE WITNESS:
 9   Okay.
10     BY ATTORNEY BLOCK:
11     Q. You have it open?
12     A. I do.
13     Q. Okay.
14   And do you recognize this document?
15     A. They appear to be my daily assignments from
16     October 9, 2019 to 10/20/2022.
17   ATTORNEY BLOCK:
18   I move JX-72 into evidence.
19   ATTORNEY JOSHUA MOORE:
20   No objection, Your Honor.
21   JUDGE:
22   Admitted.
23                              ---
24   (Whereupon, Joint Exhibit JX-72,
25   Leimkuhler Assignment Cards 2019 -
```

1265

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    2022, was admitted.)
 2                              ---
 3    BY ATTORNEY BLOCK:
 4    Q. So during some of this time period, you were
 5    still a Corrections Officer.
 6  Is that right?
 7    A. Yes, ma'am.
 8    Q. Okay.
 9  And if I could have you turn to what I think is
10    page 17, and it's the page number at the bottom.  It
11    says Aitken Assignments Update 1491, the second to
12    last page.
13    A. I'm there.
14    Q. Okay.
15  And if you would go to the line that says
16    September 7th, 2019.  On this day, you were assigned
17    to Compound 1 on day watch.
18  Do you see that?
19    A. Yes, ma'am.
20    Q. Okay.
21  And was that a full eight-hour shift on Compound
22    1?
23    A. It appears to be so.
24    Q. Okay.
25  And other than this one shift on Compound 1 day
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    watch on December 7th, 2019, during the time
 2    Correctional Officer from October 9, 2019 forward, is
 3    this the only time that you worked a full 24, full
 4    Eight-hour shift on a 24-hour post ---?
 5    A. Yes, ma'am.
 6    Q. When you have worked on 24-hour posts as a
 7    Correction Officer, I believe the three posts that I
 8    just pointed out to you, what was your practice with
 9    respect to when you arrived to begin clearing the
10    screen site front lobby?
11    A. Well, you should up about 15 minutes to 30
12    minutes early.
13    Q. And if you arrived at that time, would you
14    typically arrive to your post location to relieve the
15    outgoing officer prior to the start of your scheduled
16    shift?
17    A. Yes, ma'am.
18    Q. And once you relieve the outgoing officer, are
19    you performing your --- are you working on that post
20    even before the start of your second shift?
21    A. Yes, ma'am.
22    Q. Have you ever been disappointed or reprimanded
23    for arriving early on your shift?
24    A. No, ma'am.
25    Q. You're currently a Lieutenant.
```

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    Correct?
 2      A. That's correct.
 3      Q. Okay.
 4    Are you any particular type of Lieutenant?
 5      A. The SIS Lieutenant.
 6      Q. Okay.
 7    And does the SIS Lieutenant have any
 8      responsibility with respect to contraband?
 9      A. Yes, ma'am.
10      Q. And what responsibility is that?
11    ATTORNEY JOSHUA MOORE:
12    Objection, Your Honor.  This is going
13      beyond the scope of my Direct Examination.
14    JUDGE:
15    Well, pretrial, a person can do a Cross
16      and then a Direct.
17    Right?  Right, Ms. Block?
18    ATTORNEY BLOCK:
19    Yes.  And I think to the extent that he
20      was asked about the position as a Lieutenant.  He
21      testified he is a Lieutenant.  I should be able to ask
22      him about his duties as a Lieutenant.
23    JUDGE:
24    Okay.  The objection's overruled.
25    ATTORNEY JOSHUA MOORE:
```

1268

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1    I just want to note for the record that
2      Mr. Leimkuhler's not on the Plaintiffs' witness list.
3    JUDGE:
4    Oh, he's not on the Plaintiffs' witness
5      list?
6    ATTORNEY BLOCK:
7    He was originally on our witness list
8      and we --- we decided not to call him in our case in
9      chief.  He was on our list initially, as a
10     representative Plaintiff, but I do believe that even
11     to the extent that I can't go outside the scope, I
12     believe this is properly within the scope, given that
13     he's a Lieutenant and testified as such.
14   JUDGE:
15   I mean, he was on the Plaintiff's
16     witness list.  He just wasn't on the list for the EUP,
17     putting him on the Plaintiff's Order of witnesses.
18   ATTORNEY JOSHUA MOORE:
19   Your Honor, they took him off the
20     witness list and then we had to affirm --- put him on
21     our witness list.  If we had not done so, he would
22     have not have been here today.
23   JUDGE:
24   Okay.  Well, regardless, I think his
25     role as a Lieutenant is fairly within the scope of the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1269

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     --- scope of Direct.  So we'll sort anything else out
 2     if it needs to --- if it comes up.
 3   ATTORNEY JOSHUA MOORE:
 4   Thank you, Your Honor.
 5   JUDGE:
 6   You can ask him about his work.
 7   ATTORNEY BLOCK:
 8   Okay.  Thank you.
 9     BY ATTORNEY BLOCK:
10     Q. Lieutenant Leimkuhler, I think I just asked you
11     what your responsibilities with respect to ---?
12     A. Yes.  I recovered a contraband from a lock box.
13     Either one of the ---.
14     Q. Can you ---?
15     A. Be sure it gets documented and all the proper
16     documentation is done.  It gets all loaded into
17     Truescope.  It gets put in a secure location.
18     Q. Can contraband be found in the institution at any
19     time of day?
20     A. Yes, ma'am.
21     Q. What type of things are typically found?
22   ATTORNEY MOORE:
23   Objection, Your Honor.  I assume this is
24     going beyond the scope.  I know this is background,
25     but I just don't understand.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    JUDGE:
 2    Well, now I think we might be going
 3      beyond the scope, because you're asking about ---.
 4    ATTORNEY BLOCK:
 5    I can move on.
 6    JUDGE:
 7    Okay.
 8      BY ATTORNEY BLOCK:
 9      Q. When you became a Lieutenant, were you provided
10      any training on the types of activities for approval
11      of overtime?
12      A. No.
13      Q. And were you provided any training on when you
14      can approve overtime for pre-shift work?
15      A. No.
16      Q. And were you ever provided training as to what
17      you're supposed to do, if anything, when you see a
18      Correctional Officer on the compound before or after
19      their scheduled shift?
20    ATTORNEY MOORE:
21    I have to object again.  I just don't
22      understand what training has to do with the time it
23      takes to get in and out of the institution.
24    JUDGE:
25    I think it has to do with his role as a
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Lieutenant.  So I'll overrule the objection.

2    ATTORNEY MOORE:

3    I understand.

4    JUDGE:

5    But careful about going over the line.

6    ATTORNEY BLOCK:

7    Yes, I understand.

8    THE WITNESS:

9    So what was the question again?

10    BY ATTORNEY BLOCK:

11    Q. Sure.

12    Were you ever provided training as a Lieutenant

13    on what you are supposed to do, if anything, when you

14    see a Correctional Officer on the compound before or

15    after their scheduled shift?

16    A. No.

17    Q. You were asked by Mr. Moore about how long it

18    takes for you to do certain things ---

19    A. Uh-huh (yes).

20    Q. --- to get from Point A to Point B at the

21    institution.

22    Have you ever timed those activities?

23    A. No.

24    Q. And compared to an average person, how would you

25    describe the speed at which you typically walk?

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     A. I probably walk faster than most average people.
 2   ATTORNEY BLOCK:
 3   Okay.  Nothing further.
 4   JUDGE:
 5   Any Redirect?
 6   ATTORNEY MOORE:
 7   Yes, Your Honor.
 8                         ---
 9                    REDIRECT EXAMINATION
10                         ---
11   BY ATTORNEY JOSHUA MOORE:
12     Q. Mr. Leimkuhler, just to confirm, you've worked at
13   Otisville for 18 years.
14   Is that right?
15     A. Seventeen (17) and a half.
16     Q. Seventeen (17) and a half.  That's all on
17   custody?
18     A. Yes, sir.
19     Q. That's a pretty long time.  Are you one of the
20   longest serving continuous Correctional Officers at
21   Otisville?
22     A. No.
23     Q. No?  Who's there longer than you?
24     A. Longer than me?
25     Q. Yeah.  Or continuously at Otisville?
```

1273

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1       A. There's a few others.
2       Q. There's a few.  You're one of the longest.
3   Right?
4       A. I mean, I never really looked, but I mean, you
5       could say top ten, maybe.
6       Q. Top ten.  Okay.  That's pretty good.
7   And so your 18 years of experience working at
8       custody, you've gone through the sally port quite a
9       number of times, haven't you?
10      A. I have.
11      Q. You've walked the compound quite a number of
12      times, haven't you?
13      A. Yes, sir.
14      Q. You've done quite a number of exchanges, haven't
15      you?
16      A. Yes, sir.
17      Q. And in your role as Lieutenant, do you ever walk
18      the compound?
19      A. Yes, sir.
20      Q. And you do rounds.
21  Is that right?
22      A. That's correct.
23      Q. And do you --- when you're a Lieutenant, you
24      still do the same thing as a Correctional Officer?
25      You walk through the A1 sally port.
```

1274

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Is that correct?
2      A. That's correct.
3      Q. You walk through the compound sally port.
4    Is that correct?
5      A. Yes, sir.
6      Q. You walk on the compound.
7    Is that correct?
8      A. Yes, sir.
9      Q. Have you ever been a SHU Lieutenant?
10     A. I have, sir.
11     Q. You've witnessed exchanges as a SHU Lieutenant?
12     A. I've observed them.
13     Q. Yes.  And just talking about the rounds of
14   Lieutenant, do you do rounds on housing units?
15     A. Yes, sir.
16     Q. On SHU?
17     A. Yes, sir.
18     Q. Compound?
19     A. Yes, sir.
20     Q. Control?
21     A. Yes, sir.
22     Q. And as a Lieutenant, do you change equipment?
23     A. Depends on what shift I'm on.
24     Q. But you do it at times?
25     A. We do.  Yes, sir.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    Keys, radio, OC?

3      A. Yes.

4      Q. Okay.

5    Ms. Block asked you a little bit about what

6      shifts you had worked.  And if you want to bring back

7      up JX-71.

8      A. I have it open.

9      Q. Okay.

10   And I think you turn to --- if you turn back in

11     one of the second to last pages, I think RP4121767.

12     A. Okay.

13     Q. And you see at the top there, it says June 18th,

14     2016?

15     A. Yes, sir.

16     Q. It says you were Control 1?

17     A. Yes, sir.

18     Q. So you did an exchange on that day with Control

19     1?

20     A. Yes, sir.

21     Q. Okay.

22   And you walked to Control 1.

23   Is that right?

24     A. I did.

25     Q. Okay.

1276

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

```
 1    And even --- I think if you go to the next post,
 2       if you were working continuous --- if you're working
 3       an overtime, for example, you were doing one post,
 4       then you're doing overtime for a different post.
 5    Are you with me?  Just conceptually different.
 6       A. Control 2?
 7       Q. Not Control.  Just --- you can separate from the
 8       document.
 9       A. Oh.
10       Q. Just conceptually.  You're working a post, and
11       then you're working overtime for another post back to
12       back, you would still have to do the exchange.
13    Is that right?
14       A. That's correct.
15       Q. Okay.
16    So it doesn't really matter whether you worked a
17       full eight hours or not.  You're still going to have
18       to do the exchange.  You're still going to have to
19       leave the compound.
20    Is that right?
21       A. Well, it depends on the post.
22       Q. Depends on the post.  But if you're working
23       within the compound?
24       A. Then I don't have to leave the compound.
25       Q. Say again?
```

1277

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1      A. Then I would not have to leave the compound.
2      Q. No, no.  But after you did your overtime?
3      A. Oh, okay.  Yes, sir.
4      Q. Yeah.  And to get into the compound, obviously
5      you'd have to go through the sally port, the compound
6      sally port, and then walk to your initial post before
7      you did the overtime post.
8    Is that right?
9      A. That's correct.
10     Q. And Mr. Leimkuhler, you were asked if you were a
11     fast walker.
12     A. I was.
13     Q. Okay.
14   What do you mean when you say you're a fast
15     walker?  I'm sorry.
16     A. I move probably quicker than most people.
17     Q. Okay.
18   But on the compound, you're not running on the
19     compound?
20     A. No, I'm not running.
21     Q. Why are you not running on the compound?
22     A. Why am I not running?
23     Q. Yeah.
24     A. I would say for safety reasons.
25     Q. Are you ---?
```

1278

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. It's not protocol to run on the compound.
2      Q. Are you speed walking on the compound?
3      A. I'm just walking normally.
4      Q Walking normally on the compound?  You need to
5      walk normally on the compound.
6      Isn't that right?
7      A. That's correct.
8      Q. And that's for the safety and security of the
9      institution.
10      Is that right?
11      A. I mean, that's part of it.
12      ATTORNEY MOORE:
13      That's part of it?  No further
14      questions, Your Honor.
15      JUDGE:
16      Okay.  Thank you, Mr. Leimkuhler.
17      You're free to go.
18      Who does the Government have next? You
19      ready for the next one?
20      ATTORNEY KERR:
21      Yes, Your Honor.  The Government calls
22      Lieutenant Nalepa.
23      JUDGE:
24      Lieutenant?
25      ATTORNEY KERR:

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1    Nalepa.

2    JUDGE:

3    Raise your hand.

4                              ---

5                    JOSEPH NALEPA,

6    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

7    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

8    FOLLOWS:

9                              ---

10   JUDGE:

11   Be seated.

12   ATTORNEY KERR:

13   The Court's indulgence.

14                             ---

15                    DIRECT EXAMINATION

16                             ---

17   BY ATTORNEY KERR:

18   Q. Good morning.  Could you please introduce

19   yourself for the record?

20   A. My name is Joseph Nalepa.  I'm currently a

21   Lieutenant at FCI Otisville.  I've been there for

22   seven years as a lieutenant.  Prior to that, I worked

23   at the Federal Correctional Institution in Berlin, New

24   Hampshire.  Prior to that, I was at the Federal

25   Correctional Complex at Allenwood.  I served in the

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Army National Guard two years full time with that.
2    From there, I moved on to local Corrections, and then
3    worked Juvenile Corrections for New York State prior
4    to coming to the Bureau.
5    Q. Have you ever served in the military?
6    A. Yes, sir.
7    Q. In what rank?
8    A. Army National Guard.
9    Q. What did you do?
10   A. I enlisted as an infantryman and was activated to
11   New York City after September 11th and worked with the
12   Amtrak police down there just assisting them.  From
13   there, I went to Stratton Air Base, which is outside
14   of Albany, New York and supplemented their Air Force
15   security forces at that installation.
16   Q. And what positions did you hold at Allenwood?
17   A. GS5 Correctional Officer to GS7 Senior Officer.
18   Q. And what positions did you hold at Berlin?
19   A. I'm sorry.  What was that?
20   Q. At Berlin?
21   A. Senior Officer Specialist.
22   Q. And what about Otisville?
23   A. Otisville, 9 Lieutenant, GS9 Lieutenant in 2015
24   and a GS11 Lieutenant beginning in 2018.
25   Q. Are you married, Lieutenant?

1281

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Yes.

2      Q. Do you have children?

3      A. Sure do.

4      Q. What are their ages?

5      A. Soon to be 10 and soon to be 13.

6      Q. What are your duties as a Lieutenant at

7      Otisville?

8      A. Primarily running the shift.  I make my rounds in

9      units.  I run a roster program.  You know, if staff

10     needs sick leave or whatever the case is, they'll call

11     me.  I'm just responsible of the overall running.  So

12     making rounds on a unit.  If we have inmate

13     situations, inmate problems, the officer will give me

14     a call.

15   I'll dictate where we go from there.  I serve

16     incident reports, which are, you know, disciplinary to

17     the inmates if they're charged with something.  You

18     name it.  I'm responsible for the entire shift.

19     Q. Are you involved with the Disturbance Control

20     Team?

21     A. I am.  I am the Disturbance Control Team Leader.

22     Q. And what does the Disturbance Control Team do?

23     A. The Disturbance Control Team is a volunteer team

24     of staff at the prison who through a tryout process

25     and try to get on the team.  We are responsible for,

1282

Trial
Kathy Aitken, et al. v. USA                                   3/16/2023

1     if our prison had a large-scale disturbance or
2     anything like that, our team would get activated and
3     we would take care of that.
4   More recently, we were deployed to the prison in
5     New York City in Manhattan a couple of years ago when
6     there was protests going on.  We were sent there to
7     protect the grounds and the property of the prison.
8     When they had issues in Brooklyn at the Detention
9     Center there, we were sent there to keep the peace
10    from the institution.  It was a high-profile protest
11    going on.  So we're there to deescalate any situation.
12    Q. Are there surveillance cameras at Otisville?
13    A. Yes.
14    Q. In performing your duties as Lieutenant, do you
15    use those surveillance cameras?
16    A. I do.  Typically I scan through the cameras
17    daily.  It kind of gives me an idea when I pull up
18    different cameras.  You know, something looks out of
19    place when I pull the rec yard camera, do I have
20    inmates grouping up, large numbers here and there?
21    Housing units, if something looks out of place as far
22    as, you know, large groups in the housing units.  You
23    know, it just kind of gives me an idea of what the
24    temperature, I guess, is in the unit.  See what's
25    going on.

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      I also use it for mainly investigative stuff with
 2      inmates.  We receive drop notes, they call them, where
 3      an inmate will leave a piece of paper, something for
 4      the officer saying, you know, something happened,
 5      whether it was a fight or drugs are being sold, you
 6      know, at a specific location.  And I'll pull up those
 7      cameras and do kind of like a desk investigation just
 8      to see if I can find anything.  So I do use the
 9      cameras regularly.
10      Q. Was there ever a time at Otisville where the
11      cameras weren't recording footage?
12      A. Correct.
13      Q. Did you feel less safe during that time?
14      A. No.
15      Q. Why not?
16      A. I never feel unsafe as it is.
17      Q. Did you feel you had to be more vigilant when the
18      cameras weren't recording?
19      A. No.
20      Q. Were you asked to use the surveillance footage of
21      the cameras for this litigation?
22      A. Yes.
23      Q. What were you asked to do?
24      A. I was asked to track staff members, their times
25      entering the institution, getting to post, leaving, so
```

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      on and so forth.

2      Q. And what did you do with those times?

3      A. Logged them.  They're currently in Excel.

4   ATTORNEY KERR:

5   Could you please turn --- there are a

6      bunch of binders there.  One has DX-14.

7                           ---

8   (Whereupon, Defendant's Exhibit DX-14,

9   FRE 1006 Summary of Video Footage

10  Review, was marked for identification.)

11                          ---

12     BY ATTORNEY KERR:

13     Q. One of the green ones.

14     A. DX-14.

15     Q. I'm sorry.

16     A. I've got it now.  You said section 14?  DX-14?

17     Q. Yeah.  I'm sorry.  The blue binder, DX-14.

18     A. Okay.  Yeah.  We're there.

19     Q. Is this the Excel spreadsheet?  Is that correct?

20     A. Yes, it is.

21     Q. And just to be clear, did you type these times

22     into that?

23     A. I did not type.

24     Q. But does this spreadsheet accurately list the

25     times you captured?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. It does.

2    Q. How did you choose which dates to look at?

3    A. I randomly selected certain weeks and then looked

4    at the staff member's roster for that week and tried

5    to see if I had the ability to track them during that

6    week.  If they were on leave, or loan, or, you know,

7    outside the institution, I scrapped that week, grab

8    another one, and see if I can get data off of that.

9    Q. So when the randomly selected six weeks, the

10   first initial six weeks didn't yield enough

11   information, what did you do?

12   A. If it didn't, I chose another week.

13   Q. And random?  Was that random?

14   A. Random, correct.

15   Q. I'd like to go through here on DX-14 column by

16   column, just to explain the purpose of the

17   spreadsheet.

18   What's the first column where it says post?

19   A. The post is the post that Buckingham worked

20   during that time period.

21   Q. And what does covered post mean?

22   A. Whether it's covered post by this lawsuit or not.

23   Q. And then the next column, 16 hour to 24-hour

24   post.

25   A. Yes.

1286

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. What does that mean?
2    A. Whether it was a 16 hour, Compound, Control 2,
3    something like that, SHU's 2, 3, and 4, or whether
4    it's a 24-hour post, which is, you know, typically our
5    A-side Housing Units and our Number 1 posts.
6    Q. So is it your understanding that the 16-hour
7    posts were what's at issue in this lawsuit?
8    A. Yes.  I understand that they were taken out of
9    the case.
10   Q. Okay.
11   The next column says Correctional Officer.
12   Does this identify the Correctional Officers?
13   A. Yes, it does.
14   Q. Which Correctional Officers did you review
15   footage on?
16   A. Michael Buckingham, Matthew Bunting, Justin
17   Iocolano, Christian Conklin, Timothy Hagenburg.  Who
18   else?  Richard McPhillips and Erik Christensen.  I
19   believe that's it.
20   Q. And the next column, it says date.
21   What is that column?
22   A. That's the date that I reviewed the footage for
23   the post.  It's when they worked.
24   Q. The next column says time CO enters compound.
25   A. Yes.

Trial
Kathy Aitken, et al. v. USA                                        3/16/2023

1    Q. What does that mean?
2    A. That's the time that they got to the outer
3    compound door, that sally port.  Or if they were
4    working a 16-hour post, that would have been the time
5    that they stopped at the ███████████████     prior
6    to entering the compound to retrieve equipment.
7    Q. So is that the next column, where it says time CO
8    gets equipment?
9    A. Yes.
10   Q. Looking back to the first column, time CO enters
11   compound, can you go down that column.  The first date
12   or the first time, excuse me, 1:30 is grayed out.
13   Why is it grayed out?
14   A. That's a 16-hour post and we're not using those
15   as far as I'm aware, after the fact of putting that
16   data together
17   Q. The next column says time CO arrives at their
18   post.
19   What's that column indicate?
20   A. That's what time they got to their post.  So if
21   they worked SHU, it would be the time that that SHU
22   door opened for them.  Housing Unit's when they
23   entered the Housing Unit.
24   Q. Okay.
25   The next column is time relieved CO leaves post.

1288

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1     What's that indicate?
2     A. That was the time --- that's the time that the
3     relieved staff member exits the housing unit or
4     wherever they were relieved from.
5     Q. The next column, time CO leaves post at end of
6     shift.
7     A. That would be the time that they're relieved.
8     They had a relief and that they left their post at the
9     end of their shift
10    Q. And then the final column, or excuse me, the next
11    column is the CO leave compound.
12    A. So that would be the time that they get back to
13    that outer compound door to the control lobby.
14    Q. I would like to pause there and talk about what
15    cameras you used for the last six columns we just
16    looked at.  And if you could turn with me to the
17    yellow binder, which are Plaintiffs Exhibits, and turn
18    to Plaintiff's Exhibit Number 25.
19    A. I'm sorry, what number was that?
20    Q. Number 25.
21    A. Okay.
22    Q. So I'd like to walk through these photos.  And
23    when we get the photos, to cameras that you used in
24    your review, you know, can you identify them?
25    A. Sure.

1289

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     Q. So what's the first, what does PLX-25 show?
 2     A. This is the ████████████████████████████████
 3     ████████
 4     Q. And so --- okay.  Thank you.
 5   Can we turn to the next exhibit, PX-26?
 6     A. That is the ████████████.  That looks at the
 7     ████████████████████████.
 8     Q. And what does PTZ mean?
 9     A. Pan, tilt and zoom.  So it's a camera that we can
10     manually move, zoom in, and point it to where we want
11     to.
12     Q. So how does the pan, tilt, zoom function of the
13     camera equate with the recording the footage?  What's
14     being recorded?
15     A. Whatever it's pointed at, at that given time.
16     Q. Okay.
17   If you can please turn to PLX-27.
18   What is this photo?
19     A. This is the admin roof.  That is also a PTZ
20     camera and it's looking at the Lieutenant's
21     Office/Compound Office.
22     Q. Did you use this photo in your review?
23     A. This photo?
24     Q. Or I'm sorry, the video ---
25     A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. --- of this camera?

2    A. Yes.

3    Q. Thank you.

4    What did you use it for?

5    A. This camera looks directly at the ███████

6    █████████████████████  So if somebody was working

7    Compound 1 or in the compound, I was able to track

8    them to that door.

9    Q. And does this still shot capture the quality of

10   the video you were looking at?

11   A. I think the quality is a little better while it's

12   moving.  So yes and no.  It's not as good as it looks

13   if you're viewing it, I guess is what I'm trying to

14   say.

15   Q. So the photo is as good as the videos?

16   A. No, it's not as good.

17   Q. All right.

18   If you could turn to the next exhibit, PLX-28.

19   What does this still shot show?

20   A. This is the ████████████████████████,

21   ████████████████████████████████████████

22   ████████████████████████ if they were on a

23   16-hour post.

24   Q. Did you use this camera?

25   A. Yes, I did.

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      Q. It looks like there's a Correctional Officer
 2      patrolling them.
 3      A. Uh-huh (yes).
 4      Q. Would that officer be easier to identify if it
 5      were a video?
 6      A. Correct.
 7      Q. How so?
 8      A. Because on a video whatever you're looking at is
 9      constantly moving.  This --- I can't tell if he's in
10      between a turn or whatever's going on here.  So yes, a
11      video is better.
12      Q. And just to be clear, you used this for the times
13      ████████████████████████ .
14   Is that correct?
15      A. Yes, I did.
16      Q. And at what time did you record specifically?
17      Where was the Correctional Officer?
18      A. Going through the ████████████████ , which if
19      you're looking at this picture would be to the right,
20      right under the exhibit sticker.
21      Q. And then did you also use this for when the
22      ████████████████████████████████ ?
23      A. Yes, I did.  You can --- ████████████████████
24      ██████████████████████████████████████ .
25      Right to the right of that behind, I guess, where it
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    says ▬▬  there's a ▬▬▬▬▬▬  So I used
 2    that for ▬▬▬▬▬▬.
 3    Q. So can you explain right where they go, what time
 4    you captured?
 5    A. When they made their way up to that door and they
 6    opened the door and they disappeared is when I started
 7    the time.
 8    Q. Thank you.
 9    Can you please turn to the next exhibit, PLX-29?
10    What does this photo show?
11    A. This is the ▬▬▬▬▬▬▬▬▬,
12    which is just showing a different direction as opposed
13    to the last picture.  This one is focused right on the
14    ▬▬▬▬▬▬.  So I used this one as well.
15    Q. So is this the same ▬▬▬▬ that we looked
16    at in the prior case?
17    A. It is.  This view just gives a better view so I
18    can see, you know, them actually going through the
19    door onto the ▬▬▬▬
20    Q. And during your video review, did you use
21    multiple cameras?
22    A. I did.
23    Q. Could you please turn to PLX-30, the next video
24    or the next picture?  What's this picture showing?
25    A. This is the ▬▬▬▬  front door to the ▬▬▬
```

1293

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    ████████████████████████
2    Q. And did you use this camera when you did your
3    video review?
4    A. I did.
5    Q. And what did you use it for?
6    A. I believe we had one or two of the guys that ████████
7    ████████ as their post.  So when they walk through that
8    door is when I counted them being on post.  And when
9    they --- the staff got relieved, I also used that as
10   when the staff member left the housing unit.
11   Q. Is the quality of this video captured by this
12   still shot?
13   A. The quality is better when the video is actually
14   going.
15   Q. Now that we're talking about post, if it helps
16   you to remember what posts part of your video, if you
17   look back at PX-14.  Page 13 of that exhibit lists the
18   dates by post.
19   A. Okay.
20   Q. You could stay with Plaintiff's Exhibit and turn
21   to Plaintiff's Exhibit 31.
22   A. Okay.
23   Q. What's this picture showing?
24   A. This is the ████████████████████████████████████
25   ████████████████████████████████████.

1294

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    Q. And what are we looking at across the compound?
 2    A. We're looking at ███████████████████████
 3    ████████████████████.
 4    Q. And do what these kind of splotches are on that?
 5    Those sort of blurry --- two little blurry circles,
 6    one in the middle and one off to the right?
 7    A. It looks like maybe moisture, some sort of
 8    condensation on the outside of the globe or the
 9    cameras inside.  It's a moving camera, is my guess.
10    Q. And is it always raining at Otisville?
11    A. No.
12    Q. Is this a PZT camera?
13    A. Yes, it is.
14    Q. And if this were zoomed in when the video was
15    captured, would the video show the zoomed in?
16    A. Yes, it would.
17    Q. And did you use this camera in your video?
18    A. I did.
19    Q. How certain are you that when you recorded the
20    time of an officer arriving on post that you
21    identified the officer?
22    A. I'm 100 percent certain on that.
23    Q. What if there was a day where there's fog or bad
24    weather and you weren't sure?
25    A. Then I noted that and I couldn't give a time.
```

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1    Because if I can't see them, I can't log it.
2    Q. Could you please to to the next Plaintiff's
3    Exhibit, PLX-32.
4    And what does this show?
5    A. This is the ███████████████████████
6    ██████████████
7    Q. And what's the kind of white line in the middle?
8    A. I'm not really sure.  It looks like when this ---
9    when the still capture was taken right at the minute
10   there was some sort of flash or something on the
11   screen.  I'm not sure.
12   Q. Did you use this camera in your review?
13   A. No, I did not.
14   Q. Can you please turn to PLX-33?  What does this
15   image show?
16   A. This is the front door of ████████████████████.
17   Q. Did you use this camera in your review?
18   A. I did.
19   Q. What did you use it for?
20   A. To identify staff going in and exiting ████████
21   Q. And does this still shot capture the quality of
22   the video?
23   A. The quality of the video, it's better every time
24   with video than it is just the screenshot.
25   Q. Could you please turn to PLX-34?  And what does

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    this image show?

2    A. This is another ███████████████████████

3    ███████████████████████████████████.

4    Q. And did you use this camera in your review?

5    A. I did.

6    Q. And is this another ████ camera?

7    A. It is.

8    Q. Okay.

9    Could you please turn to PLX-35?  What does this

10   image show?

11   A. This is the outer door to the ████████████

12   ████

13   Q. And did you use this camera in your review?

14   A. Yes, I did.

15   Q. At what point did you record the ████████████

16   being on the post?

17   A. When they got to this door and the control center

18   opened it.  So when they're actually entering the

19   unit.

20   Q. So when they're actually entering this door, ---

21   A. Yes.

22   Q. --- they're being buzzed in?  And who opens the

23   inner door?

24   A. The ██████████████████.

25   Q. In your experience, do you think the ██████████

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1         ████████ would delay letting in the relief officer?

2    A. No, I don't think so.  He's probably in a hurry

3       to get relieved.

4    Q. Okay.

5    Could you please turn to PLX-36?  What does this

6       image show?

7    A. This is inside of the ████████████████

8       looking at the door that the ████████ would open and then

9       you can see just past that, ████████████████    that we

10      looked at on the last picture.

11   Q. And did you use this video in your review?

12   A. Yes, I did.

13   Q. What did you use it for?

14   A. I used it just to get an idea of when the staff

15      member was leaving and then I'd switch back to the

16      other camera in the ████████████████.

17   Q. Okay.  Thank you.

18   You can put the Plaintiff's exhibit to the side.

19      Return to the blue binder and turn back to page, to

20      the first page of DX-14.  I believe we're up to the

21      column that says duration of commute before starting

22      shift.

23   What does that column show?

24   A. That is when they went through that sally port

25      outer door and arrived to their post.

1298

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1     Q. The next column says duration from CO arriving on
2     post and release CO leaving post.
3   What does that column show?
4     A. That shows when the officer entered, say that
5     unit or got to that post, made his relief, and the
6     relieved officer came out of that same door.
7     Q. Does that necessarily show the time of the
8     exchange?
9     A. No.
10    Q. Why not?
11    A. It's just showing what time one entered and one
12    exited.  I don't know if they're --- what they're
13    doing.  An exchange target.
14    Q. Could that time be longer than the exchange?
15    A. It could.
16    Q. Why?
17    A. Well, Buckingham is kind of a friendly guy.  So
18    I'm sure he's shooting the breeze a little bit here.
19  ATTORNEY ELKIN:
20  Objection, Your Honor.  Speculation.
21  JUDGE:
22  Sustained.
23    BY ATTORNEY KERR:
24    Q. The next column is duration from leaving post at
25    the end of shift to leaving compound.  What does that

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1      column show?

2      A. That's when the officer leaves that ██████████

3      and gets back to that outer compound door to control.

4      Q. And the next column is total door to door

5      duration including compound --- what does that mean?

6      A. That's the time that they entered the compound

7      through the outer compound door to the time that their

8      shift was complete and made it back to that outer

9      compound door to leave.

10     Q. And then the last column says notes.

11     What's that column?

12     A. Notes were just if I couldn't see due to fog or

13     darkness or something like that on the camera and I

14     couldn't make a proper identification on a staff

15     member, then I noticed it there because, as you can

16     see, we're missing time on that one because I couldn't

17     find an employee.

18     Q. So is that explaining the empty times?

19     A. Yes, it is.

20     Q. Could you go back to, please, with me to time CO

21     gets equipment at control at beginning of shift and go

22     down to the entry for May 7, 2019 for Buckingham.

23     A. Okay.

24     Q. And that time ██████ is in that column.

25     Why is that in that column and not column four,

1300
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1       which is time CO enters compound?
2       A. This column I used just specifically for control
3       center, just to simplify it for me.
4       Q. And in your review, did you see any Correctional
5       Officers working 24-hour shift other than ███████████
6       █████████████████████████████████████████████?
7       A. No.
8       Q. Okay.
9    I'd like to focus you to the page two of this
10      exhibit.  And at the bottom, it says Buckingham
11      average along the bottom line.
12   What's that bottom line for?
13      A. That's the total time for each one of those
14      categories.
15      Q. Is that the total or the average?
16      A. That's the total time.
17      Q. So we're looking at the yellow line that says
18      Buckingham average.
19   Is that ██████████████████████?
20      A. Correct.
21      Q. Is that the average time for Buckingham's
22      duration of commute before starting shift?
23      A. Yes, it is.
24   ATTORNEY ELKIN:
25   Objection, Your Honor.  I mean, I know

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    the label it commute for obvious reasons, but I'm just
 2    going to have to object to the term commute as the
 3    same way that they were objecting to giving it any
 4    legal significance whatsoever, to say this should
 5    somehow be excluded on ---.
 6    ATTORNEY KERR:
 7    Well, Your Honor, my objection yesterday
 8    was about identifying the way an exhibit identified
 9    it.  It wasn't about any legal conclusion.
10    JUDGE:
11    That makes sense to me.  They can call
12    it a commute, but that doesn't control whether I
13    consider it to be a commute or something else.
14    ATTORNEY ELKIN:
15    Thank you, Your Honor.
16    JUDGE:
17    Does that answer your question?
18    ATTORNEY ELKIN:
19    Yes.
20    JUDGE:
21    Okay.  You can proceed.
22    ATTORNEY KERR:
23    Your Honor, may I approach the easel?
24    I'd like to keep track of the egress.
25    JUDGE:
```

1302

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Yes.  By all means.

2    ATTORNEY KERR:

3    And I call it egress, too.

4    JUDGE:

5    This will be fun.

6    ATTORNEY KERR:

7    All right.  I'd like to keep track of

8      these as we go.

9    JUDGE:

10   Lieutenant, this is a ---.

11   ATTORNEY KERR:

12   If I get a little oil on my shirt, it's

13     not going to take anybody out.  Court's indulgence.

14   JUDGE:

15   Of course.

16   ATTORNEY KERR:

17   I'm going to have to write bigger.

18     Q. Okay.  So looking at the total Buckingham average

19     time, the total egress exchange and egress.

20   ATTORNEY ELKIN:

21   I can't hear, Mr. Kerr.

22   JUDGE:

23   I can't hear either.

24   ATTORNEY KERR:

25   Oh, I'm sorry.

1303
Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    BY ATTORNEY KERR:
2    Q. Looking at the Buckingham average time, the
3       duration of commute before start time is 3 minutes and
4       36 seconds.
5    Is that right?
6    A. Correct.
7    Q. And the duration of CO arriving on post is █
8    █████████████████████.
9    Is that right?
10   A. Correct.
11   Q. And the duration of leaving post at end of shift
12      to leaving compound is ████████████████.
13   Is that right?
14   A. Correct.
15   Q. Doing adding time, so the total average time for
16      those three columns is less than ten minutes.
17   Is that right?
18   A. Yes, sir.
19   Q. And the total time, door to door is ██████.
20   Is that right?
21   A. Correct.
22   Q. Okay.
23   Can we please turn to the next page?  So I'm
24      looking at page three of Exhibit DX-14.  What does
25      this show on this page?

1304

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. This is the data for Matthew Bunting.

2      Q. Okay.

3   So let's add up Officer Bunting's time.  So for

4      average duration of start is ████.  For duration from

5      CO arriving on post is ████.  And the next one is

6      ████.  So again, so that's ████   So this Officer

7      Bunting's total average time for these three

8      activities is just at ten minutes.

9   Is that correct?

10     A. Correct.

11     Q. And his total door to door time is eight minutes

12     or eight hours, nine minutes?

13     A. Correct.

14     Q. Okay.

15  Please turn to the next page.  What does this

16     page show?  And I'm on page, I think it's page four.

17     This is the data for Erik Christensen.

18     A. Okay.

19     Q. So for him, we have ████ , ████ , and ████ .  And

20     again, since we're dealing with time, so Mr. ---

21     Officer Christensen's average time for these three

22     activities is under ten minutes.

23  Is that correct?

24     A. Correct.

25     Q. And his total door to door time is 8 hours, 10

1305
Trial
Kathy Aitken, et al. v. USA                                      3/16/2023

1    minutes and 43.
2    Correct?
3      A. Correct.
4      Q. Okay.
5    The next page is Officer Hagenburg.
6    What does this page show?
7      A. The times, the data collected on Officer Timothy
8      Hagenburg.
9      Q. Okay.
10   So his times are ███ , ███ , ███ .  And let's
11   carry that over.  So his total time for these three
12   averages is 7 minutes, 24 seconds, which is less than
13   10 minutes.
14   Correct?
15     A. Correct.
16     Q. And his total time is 8:18:50.
17   Is that correct?
18     A. Correct.
19     Q. Please turn to page six of Defense Exhibit 14.
20   What does this page show?
21     A. This is the data collected on Officer Christian
22   Conklin.
23     Q. And are there any averages for Officer Conklin?
24     A. No, there's not.
25     Q. Why not?

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1      A. These were all 16 hour posts that ended up being
2         taken out.
3      Q. Okay.
4      Please turn to page seven of this exhibit.  What
5         does this page show?
6      A. Data collected on Richard McPhillips.
7      Q. So his averages are ███ , ███ , and ███ .
8      Is that right?
9      A. Correct.
10     Q. So his --- the total average time for those three
11        activities is under ten minutes.
12     Correct?
13     A. Correct.
14     Q. And his total door to door time is 8 hours 10
15        minutes and 12 seconds.
16     Correct?
17     A. Yes, sir.
18     Q. So is it fair to say that all of the officers
19        have a combined time of under ten minutes?
20     A. Yes, sir.
21     ATTORNEY ELKIN:
22     Objection.  There was a bunch of
23        different times there.
24     JUDGE:
25     I think I know what he means.  You're

1307

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    talking about the combined times of those three
2    numbers that you're adding up?
3    ATTORNEY KERR:
4    Correct.
5    JUDGE:
6    Okay.  So overruled.
7    ATTORNEY KERR:
8    I'm sorry.  What?
9    JUDGE:
10   So you can ask the question.
11   ATTORNEY KERR:
12   Oh.
13    BY ATTORNEY KERR:
14    Q. Lieutenant, is it fair to say all the officers
15    that you used old video footage for, when you look at
16    their the total average time of the three categories
17    in the spreadsheet have a total average time of less
18    than ten minutes.
19   Is that correct?
20    A. Yes.
21    Q. If you could please look at page eight.  The
22    title says all data, solidified date.  What does this
23    page show?
24    A. This shows the data collected based on date.
25    Q. So this is all the data you collected, including

1308

Trial
Kathy Aitken, et al. v. USA                                3/16/2023

1    days off, including 16-hour posts.
2   Is that correct?
3    A. Correct.  All by date.
4    Q. If you could please turn to page 13 of the
5    exhibit.  What's the chart on page 13 show?
6    A. This is the data I collected broken down by post.
7    Q. And then if you'll just turn to page 15.  What
8    does this chart show?
9    A. This is the averages of all the covered posts,
10    Compound 1, Control 1, Housing Units, and SHU-1.
11    Q. I'd like to add this one to our chart; 250, 358,
12    272.  So is it fair to say that the total average time
13    for the full covered post for those three columns adds
14    up to less than ten minutes.
15   Is that correct?
16    A. Correct.
17    Q. I noticed on Compound 1, the total door to door
18    time is 8 hours, 18 minutes and 50 seconds.  Is that
19    exactly Mr. Hagenburg's total door to door time?
20    A. Yes.
21    Q. Okay.
22   So I'd like to look at Officer Hagenburg's chart,
23    if you could take that.  Well, actually, I'm sorry.
24    Let's look at page 13.  That was the total time ---
25    correct?

1309

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1     A. Correct.
 2     Q. Could you please look with me on the line for
 3     June 25th, 2019 for Officer Hagenburg?  And looking
 4     across --- do you see where I am?
 5     A. Yes, sir.
 6     Q. Officer Hagenberg, he arrives on post on June
 7     25th, 2019 at ███████.  Is he required to arrive on
 8     post ---
 9     A. No, sir.
10     Q. --- at ████?
11     A. No.
12     Q. Is that necessary for him to perform his job?
13     A. No.
14     Q. And then if you go across, the duration of
15     commute time is almost ██████████.  Duration from CO
16     arrive on post is about ██████████ and duration of
17     leaving post is just over ████████.  So that's about
18     seven minutes.
19     Q Is that correct?
20     A. Correct.
21     Q. When you add those three together?
22     A. Yes, sir.
23     Q. But his total door to door time on that day is 8
24     hours and 24 minutes, 44 seconds.
25     A. Yes, sir.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Do you know why Mr. Hagenburg's door to door time
2    is over eight hours and seven minutes?
3    A. He shows up excessively early.
4    Q. Is he required to show up that early?
5    A. No, sir.
6    Q. Is it necessary?
7    A. No, sir.
8    Q. Does it benefit Otisville?
9    A. No, sir.
10   Q. Looking at the duration from CO arriving on post
11   and relieve CO leaving post, looking at that column,
12   do how many times are in that column?  And this is
13   from page 13 and 14.
14   A. There's a total of 66.
15   Q. Sixty-six (66) times that are collected for that
16   column.
17   A. Correct.
18   Q. And do how many of those times are over five
19   minutes?
20   A. There's 11 that are over 5 minutes.
21   Q. And now looking down that column again to the May
22   6, 2019 called time for Buckingham.  It's 7 hours and
23   45 --- I'm sorry, 7 minutes and 45 seconds.  Do you
24   see where I am?
25   ATTORNEY ELKIN:

1311

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    I don't.
2    THE WITNESS:
3    I'm not tracking here.
4      BY ATTORNEY KERR:
5      Q. So looking down that column to the row that's
6      May 6, 2019.
7    ATTORNEY ELKIN:
8    I'm sorry.  I got lost.  Mr. Kerr, what
9      page are you on?
10   ATTORNEY KERR:
11   I'm sorry.  I'm still on page 13.
12   JUDGE:
13   You're looking at the D Unit grill,
14     aren't you?
15   ATTORNEY KERR:
16   Sorry?
17   JUDGE:
18   Are you looking at the D Unit?
19   ATTORNEY KERR:
20   Yes, the D Unit.  Maybe that's easier,
21     Judge.  Because there's only one D Unit access.
22     BY ATTORNEY KERR:
23     Q. Looking down that road where the post is D Unit.
24     And across that road is Buckingham.  May 6th, 2019.
25   Do you see where I am?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1      A. Yes, sir.
 2      Q. The duration from CO arriving on post and relief
 3      CO leaving post for Buckingham on that day is ▓
 4      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
 5  Do you see that?
 6      A. Yes, sir.
 7      Q. And then going down that road to the next time is
 8      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  And that's Christensen.
 9  Is that correct?  Do you see where I am?
10      A. Can you repeat the last one?
11      Q. Sure.  Go down that road, the next --- or going
12      down that column, ---
13      A. Okay.
14      Q. --- the next number is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15      ▓▓▓▓▓▓▓▓▓.
16      A. Correct.
17      Q. Go back over to Correctional Officer, that's the
18      time for Christensen?
19      A. Yes, sir.
20      Q. And the next time is only ▓▓▓▓▓▓▓▓▓▓▓▓▓
21      ▓▓▓▓▓▓▓.  And that's also for Christensen.
22  Correct?
23      A. Correct.
24      Q. And the next one is ▓▓▓▓▓▓▓▓.  That one's also
25      for Christensen.
```

1313

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    ATTORNEY ELKIN:

2    I'm just going to object to this line of

3       questioning because you keep saying it's for

4       Christensen and it seems like it's in the column that

5       says duration from CO arriving on post and relieved CO

6       leaving post.  This would be the exchange time, I

7       guess, that you're measuring and I don't know who the

8       other person is in the institution for the exchange.

9       So it's not just Christian.  There's clearly more

10      people involved in the exchange.

11   JUDGE:

12   Yes.  Since we moved on from the, talked

13      about the D Unit row, I have gotten lost as well.

14   ATTORNEY KERR:

15   Okay.  Well, I'm just moving down that

16      row and Christensen is one side of the exchange.  I'm

17      just using that to identify that duration of time.  So

18      that's under Christensen --- that's Christiansen

19      started his post on, in this case, on July 7th, 2019.

20   JUDGE:

21   I actually did not see a --- if we're

22      still looking at page 13, I do not see a July 7th, ---

23   ATTORNEY KERR:

24   Did I say 7?

25   JUDGE:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1314

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

1    --- 2019.

2    ATTORNEY KERR:

3    Sorry.  It's July 11th, 2019.

4    JUDGE:

5    So are you looking at F Unit, A-Side?

6    ATTORNEY KERR:

7    Yes.  F Unit, A-Side.

8    BY ATTORNEY KERR:

9    Q. Looking at F Unit, A-side for Christiansen.  And

10   I'll sort of backtrack here.  Sorry.  At F Unit, A-

11   side for Christiansen on July 9th, 2019, July 10th,

12   2019, and July 11th, 2019.  And then moving over on

13   those rows to the duration of CO arriving on post to

14   relieved CO leaving post, those times for those three

15   dates are ███████████████████████████

16   ████████████████ .

17   Is that correct?  Do you see where I am?  So

18   Christiansen, the times of Christensen being involved

19   in that exchange are around a ████████████████ .

20   Do you see where I am?

21   A. I'm having trouble tracking you.

22   Q. Okay.

23   So we're on page 13.

24   Right?

25   A. Correct.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Looking down the post column, find the F Unit
2    A-side.
3    A. Okay.
4    Q. Oh, I'm sorry.  I missed that one.  The F Unit
5    A-side, Christiansen, it looks like there are four
6    entries; July 8th, July 9th, July 10th, and July 11th.
7    A. Correct.
8    Q. And then looking over at the duration from CO
9    arrive on post, those range, the first one is ████
10   ████.  Then the second one is ████████
11   ████
12   Do you see where I am?
13   A. I do.
14   Q. And then on July 10th, it was ██████████,
15   just ████████████.  And then on July
16   11th, it was about ████████.
17   A. Correct.
18   Q. So Mr. Christiansen's times for the exchange are
19   around one to ████████ with one exception that's
20   about ████████.
21   A. That's correct.
22   Q. And then Mr. Buckingham's exchange, if we go down
23   to the very next line on July 13th is ████████
24   ████
25   A. That's correct.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                          3/16/2023

1    Q. Do you supervise Officer Buckingham?
2    A. During this time, yes.
3    Q. Do you know him?
4    A. Yes, I do.
5    Q. Based on what you know about Officer Buckingham,
6    do you have any idea why his exchanges might take
7    longer than the exchanges involving Mr. Christiansen?
8    A. He likes to talk.  He's a friendly guy.
9    Q. Could you please turn with me to the very last
10   page of this exhibit again, page 15.  And these are
11   the averages represented Plaintiffs covered post,
12   again, for these three aspects; walk to post,
13   exchange, what we're calling exchange, and walking
14   from post.  So the total cover, the total average for
15   all covered posts.  So keep in mind that's all the
16   posts you have at Otisville is █████████████
17   █████████  for the walk to post.
18   A. Correct.
19   Q. Does that seem consistent with your understanding
20   of Otisville?
21   A. Yes.
22   Q. The total average time for the exchange, again,
23   that's the whole post is ████████████████████.  Is
24   that consistent with your understanding of how long an
25   exchange should take?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      A. That seems a little bit longer than the norm.
 2      Q. And then the walk from post, the total average
 3      time, and again, this all post, this is an average, is
 4      ███████████████████████.  Does that seem consistent
 5      with your understanding ---?
 6      A. Yes, sir.
 7      Q. Do you have an explanation of why the walk from
 8      post average is less than the walk to post average?
 9      A. I would say that staff are quicker to want to go
10      home than they are to come in.
11      Q. Thank you, Lieutenant.  You can put DX-14 aside.
12      So your video review does not include the ████████.
13      Correct?
14      A. No, it did not.
15      Q. Did you recently conduct a distance time study of
16      ████████?
17      A. I did.
18      Q. What do you measure?
19      ATTORNEY ELKIN:
20      Objection, Your Honor.  Nothing on ██
21      ██████ was ever produced to us.  I'm not sure what is
22      considered.
23      JUDGE:
24      Counsel?
25      ATTORNEY KERR:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   Well ---.

2   ATTORNEY ELKIN:

3   And there was also mention of a time

4     study that has been asked for so many times in

5     discovery over the course of this litigation.  So I'm

6     not ---.

7   JUDGE:

8   Can you explain?

9   ATTORNEY KERR:

10  Yes, we can.  All the witnesses have

11    given estimates and, you know, their impression of the

12    distances.  And the Lieutenant recently timed himself

13    walking in the ████.  So this isn't --- it's not an

14    official time study, but it's more than just an

15    estimate.  This wasn't --- I mean, this is something,

16    you know, I'm ---.

17  ATTORNEY ELKIN:

18  Oh, my gosh.

19  JUDGE:

20  Oh, I'm not sure I like this, Mr. Kerr,

21    either.

22  Ms. Elkin?

23  ATTORNEY ELKIN:

24  Your Honor, we have asked repeatedly for

25    all the time studies that have been done within the

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    institution.  They have a continuing obligation.  We
 2    had a date by which we had to exchange exhibits and
 3    witness lists, and I don't know if you can make an
 4    exhibit out of it, but I think it was improper
 5    testimony because it wasn't ever produced to us.
 6  ATTORNEY KERR:
 7    Your Honor, can he give an estimate
 8    then?
 9  JUDGE:
10    So like I said, I don't know if I like
11    this.  My suggestion is that how about if you make a
12    proffer of what he would say.  Then if you want to
13    argue in your post trial briefing that I should
14    consider it, you can.  But my --- just to make sure
15    it's there in case you can change my mind on this.
16    But I don't like viewing this as evidence.
17  ATTORNEY ELKIN:
18    And Your Honor, I would also just
19    continue this objection.  When we did exchange our
20    witness lists and what they were going to be
21    testifying about, docket number, what, 77, all they
22    said he was going to be testifying about was the video
23    footage review and analysis.  Sounds like there's
24    going to be a new analysis that has nothing to do with
25    the video footage.  And Plaintiffs job
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    responsibilities.

2    JUDGE:

3    Okay.  So ---.

4    ATTORNEY KERR:

5    Your Honor, ---

6    JUDGE:

7    Go ahead.

8    ATTORNEY KERR:

9    --- I think maybe I misspoke.  This

10    isn't really an official time study.  This is

11    Lieutenant, you know, recording the time as he's

12    walking.  So it's not, you know, a time study per se.

13     It's just him with his --- he can testify on what he

14    used on reporting these distances.  And, you know,

15    it's sort of a back ---.  There's been lots of

16    estimates during this case, and we wanted to give you,

17    you know, more of a background for Lieutenant Nalepa's

18    estimates.

19    JUDGE:

20    Did you ask him about this at his

21    deposition, about the timing ███████ by any chance?

22    ATTORNEY ELKIN:

23    Your Honor, we didn't take his

24    deposition because we were busy producing all the

25    seven representative Plaintiffs and the video

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Plaintiff, our Plaintiff for deposition.  So we did
2    not take his deposition.
3  JUDGE:
4  Oh.  Well, that actually complicates
5    things.
6  ATTORNEY ELKIN:
7  I would also say this.  He wasn't
8    disclosed until, as a witness until January, February
9    when ---.
10  ATTORNEY KERR:
11  He actually was on our initial
12    disclosures at the very beginning of the case.  I will
13    say that.
14  ATTORNEY ELKIN:
15  But as a witness in this trial.  They
16    had not --- they didn't produce the video document
17    until ---
18  JUDGE:
19  Okay.
20  ATTORNEY ELKIN:
21  --- right before.
22  JUDGE:
23  So there seem to be a couple of moving
24    parts here.  There's a question of what exactly he's
25    going to say.  There's a question of whether there's a

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      surprise.  There's a question of whether you could
2      have figured this out by deposing him.  So there are a
3      few moving parts.  There's the issue of how he's
4      described on the witness list.  So rather than try to
5      sort all that out now, I'm going to stick with what I
6      said originally.  You can make a proffer.  To my ear,
7      it sounds like this is something that you're
8      surprising the Plaintiff with based on the witness
9      list if nothing else.  Feel free to try to change my
10     mind in your post-trial briefing.  But right now,
11     we'll consider this a proffer of something that's
12     inadmissible.
13   ATTORNEY KERR:
14   Okay.  Thank you.
15   JUDGE:
16   Again, but feel free to try to change my
17     mind.
18   ATTORNEY KERR:
19   And are you --- do you want me to put
20     that proffer?
21   JUDGE:
22   Yeah.  You can make your proffer by
23     asking your questions and getting his answers.  And if
24     you want to convince me later that this isn't an
25     unfair surprise for the Plaintiff based on your

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1       description in the witness list, feel free.
2       ATTORNEY KERR:
3       Okay.  Thank you.
4       BY ATTORNEY KERR:
5       Q. Lieutenant, did you recently time yourself
6       walking through the ██████?
7       A. I did.
8       Q. And did you record the distance?
9       A. I did.
10      Q. Can you describe what distance you recorded?
11      A. I recorded from the compound door entering the
12      compound at ██████████████████████████████
13      ██████████.
14      Q. And how far was that?
15      A. ████████.
16      Q. And how long did it take you?
17      A. Approximately ██████████.
18      Q. Lieutenant, you testified earlier that you were a
19      correctional officer at Allenwood.
20      Is that correct?
21      A. Yes, sir.
22      Q. Did you receive a settlement check for a portal
23      case involving Allenwood?
24      A. Yes, sir.
25      Q. Why did you accept this money?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      A. Well, I was approached by some of the staff and
 2      the union said here, sign this.  You're owed money.
 3      And I signed it.
 4      Q. Could you please turn in the yellow binder to
 5      PLX-23?  So this is PLX-23.  It says on the front
 6      Declaration ---.
 7     Can you find that document?
 8      A. Yes, sir.
 9      Q. Could you please turn with me towards the end of
10      the document?  The last few pages says response
11      analysis.  Five pages from the back.
12      A. Yeah.  Just give me a second ---
13      Q. Sure.
14      A. --- because this is coming apart on me.  Okay.
15      What section was that?
16      Q. So towards the back, I think about five pages
17      from the unit, there's a section on this exhibit on
18      PLX-23 called response analysis.
19      A. What section is that in again?
20      Q. Well, it's sort of an added on section.  It's
21      Exhibit A to the PLX-23.  Exhibit B.  And then this is
22      added response.
23      A. Okay.  I don't know where we're at here.
24      Q. Are you at PLX-23?
25      A. Okay.  23.  I was ---.
```

1325

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. PLX-23.  It covers the Declaration of

2    relation ---.

3    A. Yes, sir.

4    Q. So if you could flip through the document,

5    there's a Declaration and then Exhibit A to the

6    Declaration in Exhibit B.  And then there's a section

7    called response analysis.  And it's a single page.

8    A. Okay.

9    Q. So you're on that single page.  It says response

10   analysis.  Can you turn to the next page?  It has a

11   chart that says Buckingham at the top.

12   A. Yes, sir.

13   Q. What's your understanding the purpose of this

14   chart?

15   A. This chart is time staff arrived at the screening

16   site and the compound.

17   Q. So it's you're understanding that arrival time

18   lobby is A1?

19   A. Yes, sir.

20   Q. And then arrival time compound, that's the

21   control center lobby?

22   A. Yes.

23   Q. So is this compared times from Plaintiff's study

24   and the time of your study or is this on the days, the

25   random date overlap?

1326

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      A. It is.
 2      Q. If you could please look at July 12th, 2019.
 3      Control 1 is the post.
 4      A. Yes, sir.
 5      Q. And it's Buckingham.  The arrival time A1 lobby
 6      is ███████.
 7   Do you see where I'm at?
 8      A. Yes.
 9      Q. And then for arrival time compound, it's blank.
10   Is that correct?
11      A. Correct.
12      Q. Okay.
13   If you could please turn back with me to DX-14.
14      Sorry.  I said we were done with that.  Look at page
15      one, DX-14.  I'll give you a minute to get there.
16      A. What section are we in?
17      Q. So we're at DX-14.  Stay on the first page, the
18      Michael Buckingham page.
19      A. Still section 23?  Is that it?
20      Q. No, I'm sorry.  I'm sorry, Lieutenant.  I didn't
21      explain it very well.
22   Can we go back to the blue binder?
23      A. Okay.
24      Q. And in the blue binder, go to DX-14.  And the
25      very first page of DX-14 is the microphone data.
```

1327

Trial

Kathy Aitken, et al. v. USA                                   3/16/2023

1    Okay.  And then just over halfway down on that page,
2    there's an entry that the post is control center one
3    Buckingham on July 12th, 2019.
4    A. Yes, sir.
5    Q. And then there's a time there, ████████████
6    A. Correct.
7    Q. Is that the time Officer Buckingham got to his
8    post?
9    A. Yes, it is.
10   Q. So that's 37 minutes after ██████.  You remember
11   back on PLX-23, it was 22 minutes after that he
12   arrived at the A1 lobby.  There's this 15 minutes
13   difference.
14   Is that correct?
15   A. Correct.
16   Q. What did you observe on the video that Officer
17   Buckingham was doing during these 15 minutes?
18   A. I observed Buckingham go up the steps like he was
19   going to the control door going to control center.
20   But he made his way down the admin hallway.  Less than
21   a minute later, he came back and went to the outer
22   compound door and went out onto the compound.  And he
23   reappeared back from the compound into the control
24   lobby approximately ten minutes later and then assumed
25   his post.

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      Q. So fair to say that Officer Buckingham didn't go
 2      directly to his post that day?
 3      A. Correct.
 4      Q. What are Correctional Officers required to do
 5      when they are on post?
 6      A. To read their post orders.  They do what we call
 7      a post and picture file.  That's due monthly.
 8      Sometimes there's trainings that need to get done on
 9      the computer.  They're responsible for making rounds,
10      counting, searching areas, locking, unlocking the cell
11      doors, diffuse situations with inmates, call me if
12      need be.
13      Q. Do you wear a duty belt?
14      A. Yes, sir.
15      Q. How long does it take you to put on your duty
16      belt?
17      Q. Probably less than ten seconds.
18      Q. Do you wear belt keepers?
19      A. No, I do not.
20      Q. Why not?
21      A. I have a belt that the inside of it is lined with
22      Velcro and my pants belt on my uniform came with that
23      and that's made out of Velcro as well.  So you don't
24      need duty belt or you don't need belt keepers because
25      it just Velcro's right around and stays put.
```

1329
Trial
Kathy Aitken, et al. v. USA                        3/16/2023

1    Q. Do Correctional Officers, are they required to
2    put on their duty belt immediately after going through
3    security?
4    A. No.
5    Q. Why not?
6    A. They typically wouldn't need it until they assume
7    their post.
8    Q. When you were a Correctional Officer, did you put
9    on your duty belt immediately after going through
10   security?
11   A. Sometimes, sometimes not.  Just depended on how I
12   was feeling, I guess.
13   Q. Are Correctional Officers expected to correct
14   inmates when they're walking to post?
15   A. No.
16   Q. Are they expected to respond to an inmate's
17   questions?
18   A. No.
19   Q. Do Correctional Officers have to respond to
20   emergencies when they're walking to post?
21   A. No.
22   Q. Would a Correctional Officer --- I'm sorry.  Do
23   Correctional Officers have to respond to
24   emergencies ---
25   A. No.

1330
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    Q. --- when they're walking to post?  If there's an
 2    emergency, would a Correctional Officer have to
 3    respond?
 4    A. I mean, if there is an emergency, if there's ---
 5    I would say if there's a staff member in front of them
 6    being assaulted or something like that, I would expect
 7    them to help out.  Normal day to day, no.
 8    Q. And if they helped out an emergency like that
 9    outside of their scheduled post, would they be
10    reimbursed for that time?
11    A. Yes.
12    Q. How often does this happen?
13    A. I have yet to see it at Otisville.
14    Q. Do Correctional Officers have to stop by the
15    Lieutenant's office on their way to post?
16    A. No.
17    Q. When the Correctional Officer arrives on post,
18    are they required to exchange information with the
19    on-duty officer?
20    A. No.
21    Q. Are the Correctional Officers required to
22    exchange equipment with the on-duty officer?
23    A. Yes.
24    Q. Can you describe for me equipment exchange?
25    A. ████████████████████████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1331

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     ████████████████.  Sometimes the officers just have the

2     ████████████████████████████████████████████████████

3     █████████████████████████     █████████████████████

4     ██████████████████████████████     █████████████████

5     ███████████████████████████

6     Q. Are Correctional Officers supervised when they

7     exchange equipment?

8     A. No.

9     Q. Lieutenant, you said you wear a duty belt.  Did

10    you bring your duty belt to court today?

11    A. Yes, sir.

12    ATTORNEY KERR:

13    Your Honor, it would be helpful to the

14    Court, Lieutenant would like to show you the duty belt

15    and also ---.

16    ATTORNEY ELKIN:

17    No, no.  Your Honor, I think we have a

18    pre-trial order in place that said that if they're

19    going to use any demonstratives, they have to show it

20    to the other side in 24, 48 hours in advance.  Your

21    Honor has already had the opportunity to see duty

22    belts worn by various officers on the post.  Nobody's

23    provides me with a duty belt to see whether it's the

24    one that the Correctional Officers wear.  He is not in

25    the position as the Correctional Officer right now.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1   JUDGE:
2   This sounds like a demonstrative to me
3     and I'm hearing that it hasn't been disclosed.
4   ATTORNEY KERR:
5   Well, I wasn't thinking it was a
6     demonstrative.
7   JUDGE:
8   To me, it sounds like a demonstrative.
9     Do you have a theory for what it is other than a
10    demonstrative?  What is it other --- if it's not a
11    demonstrative, what is it?
12  ATTORNEY KERR:
13  Part of --- I think of a demonstrative
14    as something we put a demonstrative label on.
15  JUDGE:
16  I mean, you could just as easily ---.
17  ATTORNEY KERR:
18  Which I can't do in this case, I'm
19    afraid.  It's part of the witness's testimony.  As I
20    said, only if it's useful to the court.
21  JUDGE:
22  Okay.  Well, you've asked him if he's
23    brought one to do a demonstration with.  So that would
24    be a demonstrative, either a demonstrative or an
25    exhibit.  So let's not do this.  So the objection will
```

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1    be sustained.

2    ATTORNEY KERR:

3    Okay.  Thank you, Your Honor.  I have no

4      further questions for the witness.

5    JUDGE:

6    All right.  So it's a little before

7      noon.  We've been going for a while.  Would this be a

8      time to take, to go to lunch a little bit early or do

9      you want to take a five minute break and do your

10     Cross?

11   ATTORNEY ELKIN:

12   I think I prefer to get the Cross done.

13     But I also --- in a point of order, I would move to

14     strike his testimony about, I know, all the stuff said

15     about you don't have to respond to emergencies.  You

16     don't have to correct inmate behavior.  You don't have

17     to do anything when you're walking across the compound

18     because it is inconsistent and the opposite of what

19     the 30(b)(6) witness, Captain Whinnery, said on the

20     subject, and they're not allowed to do that.

21   JUDGE:

22   Okay.  I will deny the motion to strike.

23     Your recourse is to --- at least for now, you may

24     impeach him with the 30(b)(6) deposition because

25     that's still out there.  And as I've said several

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    times this week, if there are questions about the
 2    exact capacity of a 30B(6) deponent to bind the
 3    government to the exclusion of contrary testimony at
 4    trial, we can address it in the post-trial briefing.
 5  So with that, how about we take a
 6    Five-minute break?  We can be back at about five
 7    minutes to the hour.
 8  ATTORNEY ELKIN:
 9  Okay, Your Honor.
10  COURT CRIER:
11  All rise.
12                         ---
13          (WHEREUPON, A SHORT BREAK WAS TAKEN.)
14                         ---
15  COURT CRIER:
16  All rise.  United States Court of
17    Federal Claims is now in session.  Judge Stephen
18    Schwartz presiding.
19  JUDGE:
20  Please be seated.  Mr. Nalepa, you
21    understand you're still under oath?
22  THE WITNESS:
23  Yes, sir.
24  JUDGE:
25  Okay.  Ms. Elkin?
```

1335

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    ATTORNEY ELKIN:
 2    Thank you, Your Honor.
 3                         ---
 4                  CROSS EXAMINATION
 5                         ---
 6    BY ATTORNEY ELKIN:
 7    Q. Lieutenant Nalepa, you testified that you were
 8    part of a grievance when you were a Correctional
 9    Officer at Allenwood?
10    A. That's correct.
11    Q. It was FCI Allenwood.
12    A. Yes, ma'am.
13    Q. Which institution?
14    A. Medium
15    Q. So you were at the medium at FCI Allenwood.
16    Is that right?
17    A. Correct.
18    Q. And you were part of that grievance.  I believe
19    you testified that senior staff told you to be in it.
20    Is that right?
21    A. Correct.
22    Q. But you willingly signed up to be in it.
23    Correct?
24    A. Yes.
25    Q. So you literally had to ask to be in it in order
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1336
Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    to get paid.
2    Correct?
3       A. Correct.
4       Q. And you understood when you signed up to be in
5    the grievance that it was about getting overtime paid
6    for performing the exact same pre-shift duties and
7    post shift duties that we're here in this court
8    talking about today.
9    Correct?
10      A. No.
11      Q. What was your understanding?
12      A. My understanding was hey, you're owed money.
13   Sign here.  Everybody's signing up and that was it.
14      Q. And you received lots of correspondence
15   explaining that the case was about the officers having
16   to come in and work de facto overlapping shift because
17   the agency at FCI Allenwood Medium never scheduled an
18   overlap on 24-hour shifts.
19   Correct?
20      A. I don't recall what any correspondence said.
21      Q. Okay.
22   You received a total of $3,416 in back pay,
23   $3,416 in gross liquidated damages.
24   Correct?  Those are the gross amounts on your
25   recovery match.  It's almost ---

1337

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Okay.

2      Q. --- $7,000.

3   That sound about right?

4      A. It sounds about right.

5      Q. Okay.

6   And you would not have cashed a check if you did

7      not think that you were entitled to from the United

8      States of America.

9   Correct?

10      A. The portal gave in the way it was given to me

11      was ---.

12      Q. You can answer my question.  You would not cash a

13      check ---.

14   ATTORNEY KERR:

15   Your Honor, object.  He was answering

16      the question.

17   JUDGE:

18   I'm not sure that he was.  So I think

19      Counsel can restate the question and the witness can

20      answer it.

21      BY ATTORNEY ELKIN:

22      Q. You would not catch a check from the United

23      States of America of up to almost $7,000 that you did

24      not think you were entitled to.

25   Is that correct?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. I did cash it.
2      Q. Okay.
3   I'm going to ask it again.  I understand you did
4      cash it.  You believed you were entitled to that
5      $7,000 in back payment the day ---?
6      A. At that time --- correct.  At that time, I did
7      believe I was entitled.
8      Q. And now that you're a Lieutenant, you don't think
9      any of the stuff that the Correctional Officers do
10     prior to and after their shift is considered work
11     time?
12     A. Well, now that I've been in longer, I kind of
13     look at it differently.
14     Q. That's not my question.  Now that you're
15     Lieutenant, you don't believe that any of the pre-
16     shift donning of a, collecting of the duty belt,
17     walking on post, walking down the compound, going to
18     the sally port door, doing an information and
19     equipment exchange, doing the same thing in reverse
20     order, the same things you did as a Correctional
21     Officer got $8,000, almost $8,000 order.  Now that
22     you're a Lieutenant, you don't believe that's work
23     time.
24  Is that correct?
25     A. Correct.

1339

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    I'd like to talk about your Exhibit DX-14 and

3      also PLX-23.

4    You have both of those in front of you.

5      A. What was the other one, ma'am?  DX-14?

6      Q. Is that your exhibit?

7      A. Yes.

8      Q. Okay.

9    That one.

10     A. And PLX what?

11     Q. Twenty-three (23).  The Exhibit A, details.

12     A. Okay, ma'am.

13     Q. Okay.

14   So you were, you reviewed the video footage from

15     --- that was collected.

16   Correct?

17     A. Correct.

18     Q. In order to make your DX-14.  You only reviewed -

19   -- actually, you mentioned somebody's name who did not

20     appear on your DX-14.  It was Icolano, I believe.

21     A. Correct.

22     Q. Okay.

23   So that's not part of your exhibit.

24     A. Okay.

25     Q. No, I'm asking you.  Is that part of the exhibit

1340

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    you made?  You mentioned that name that you review the
2    video ---.
3    A. No.  He was initially part of it, but has been
4    since taken off.  So ---
5    Q. Okay.
6    A. --- he's not in this, no.
7    Q. And you would agree that Lieutenant Leimkuhler is
8    not on here as well?
9    A. Correct.
10   Q. And what is the reason for that?
11   ATTORNEY KERR:
12   Objection, Your Honor.  Lack of
13     foundation.
14   JUDGE:
15   What foundation do you think is missing?
16   ATTORNEY KERR:
17   Lieutenant testified that he didn't
18     choose which Plaintiffs to look at.
19   JUDGE:
20   I think she can ask why a particular
21     individual isn't there.  So overruled.
22   ATTORNEY KERR:
23   Okay.
24   BY ATTORNEY ELKIN:
25   Q. Why didn't you review Lieutenant Leimkuhler's
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1341

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    video?
 2    A. I was not told to review Lieutenant Leimkuhler.
 3    Q. So you didn't review his at all even though he's
 4    a representative Plaintiff?
 5    A. Correct.
 6    Q. Okay.
 7    And so did you have a chance --- you did look at
 8    PLX-23 at least today.
 9    Did you have a chance to look at it before today?
10    A. No, I did not.
11    Q. Okay.
12    I want to go over some of the entries and find
13    out what --- because you had included that in your
14    bullet --- let me back up.  Did you do your review on
15    duty?
16    A. Yes.
17    Q. Okay.
18    And when did you do your review?
19    A. Over the course of a month.  I don't know the
20    exact time frame.
21    Q. Sometime this year?
22    A. Yes.
23    Q. But you've been in possession of the six months'
24    worth of video or more than six months?
25    A. Yes.
```

1342

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. May 1st of 2019 through December 31st of 2019,
2    eight months of video.  You've been in possession of
3    that for years.
4  Correct.
5    A. This year, correct.
6    Q. But hasn't the United States been --- do you
7    whether the hard drives have been in possession of the
8    Government for years?
9    A. No.
10    Q. Since it was collected?
11    A. I have no idea about the hard drives prior to me
12    getting them.
13    Q. Okay.
14  So nobody ever instructed you to do an analysis
15    of all of the Plaintiffs in the case or all of the
16    workers, and their comings and goings.
17  Is that correct?
18    A. Correct.
19    Q. And so your analysis does not capture a full 24
20    hour shift.
21  Correct, 24-hour post?
22    A. I'm sorry.  I don't understand that.
23    Q. You're just capturing Buckingham.  You don't get
24    content on there because he only had that 16-hour
25    post.  Bunting.  You're only capturing their time with

1343

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1      the exception of when the outgoing officer leaves
2      whatever unit they're on.
3   Correct?
4      A. Correct.  So it's just the one staff member, not
5      the one that they were leaving or, you know, prior to.
6      Q. Okay.
7   So you didn't do a review of a full 24-hour
8      period.
9   Correct?
10     A. That's correct, if that individual is not on
11     there.
12     Q. Okay.
13  So your focus was on the five or six, I guess,
14     people that you have in your study.
15  Is that right?
16     A. Yes, ma'am.
17     Q. Okay.
18  And did you have a limited amount of time, paid
19     time to do your review?
20     A. Yes, I did.
21     Q. Okay.
22  What were the limitations?
23     A. I mean, I was assigned to this as on the roster
24     program as part of my day.  I mean, I don't know what
25     --- what are you trying to figure out?
```

1344

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. I'm trying to figure out you had as much time as
2        you needed to do whatever review was asked of you?
3    A. Yes.
4    Q. Okay.
5    And had you been told to do the review of all the
6        Plaintiffs in the case or all the workers during this
7        time period for all the months that was in the
8        government's possession, it's your understanding that
9        you could have on duty time to do that.
10   Correct?
11   A. Correct.
12   Q. Okay.
13   I want to turn --- actually, let's just look at
14       Buckingham for a second on the front on the first
15       page.
16   Did you include --- okay.  So when you worked
17       control center, you didn't have any time for his walk
18       time.
19   Correct?
20   A. Correct.
21   Q. Okay.
22   Did you include the zeros for control center
23       whenever anybody worked control center in your
24       averages of the walk time for all of the people?
25   A. No, ma'am.

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1       Q. It might be easier if we just look at page 15.

2       The control center doesn't have any walk time based on

3       the government's data of just measuring from compound

4       sally port to compound sally port.  If we removed the

5       zeros here and we added those numbers up ███ plus

6       ███ plus ███, the total minutes, I believe, would be

7       ███.  And then you would divide that by the three

8       entries removing the control center, who don't have a

9       log time.  And then the number I get on my magic phone

10      is ███.  So is it your understanding we removed the

11      control center from the average walk time both to and

12      from post the numbers listed at the bottom of your

13      page 15 would be higher.

14      A. Correct.

15      Q. Okay.

16      And if we add up the numbers at the bottom of

17      your page, on page 15 of ████████████████████

18      ████████████████████████████████████

19      you would agree that would be more than 7.5 minutes.

20      Correct?

21      ATTORNEY KERR:

22      Objection, Your Honor.  It's vague.  I

23      think Counsel's mixing up decimals with times.  I

24      think ---.

25      ATTORNEY ELKIN:

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Am I doing it ---?

2    ATTORNEY KERR:

3    I think the calculation on your phone is

4    ███████████████████████████████████████.

5    ATTORNEY ELKIN:

6    Okay.  That's correct.  ████████████

7    ██████████.

8    JUDGE:

9    Okay.  Okay.

10   ATTORNEY ELKIN:

11   Which is more than ████████████ ---.

12   JUDGE:

13   I guess sustained to the extent we need

14     to --- to the extent that you were confused on that.

15   ATTORNEY ELKIN:

16   Okay.

17     BY ATTORNEY ELKIN:

18     Q. So just going back that just to clear it up.

19     Once we removed the control center for purposes of

20     determining walking time, ████████████ would be ---

21     sorry. ██████████████████████████, which

22     you would agree is more than your ████████████████

23     ████████ as stated here.

24   Correct?

25     A. Yes, ma'am.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1347

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Okay.
2   And if we did the same thing on the walk from the
3    post, you would agree that if we remove the control
4    center, the walk time would be increased.
5   Correct?
6    A. Correct.
7    Q. All right.
8   If we add up the minutes at the bottom here on
9    all cover codes that you got of the ███████████
10   ████████████████████████████████████████████ ███
11   ████████████, you would agree that that would be more
12    than 7 and a half minutes.
13   Correct?
14    A. Correct.
15    Q. And under the agency's policy, if it is
16    determined that this is work time, the employee would
17    be entitled to 15 minutes.
18   Correct?
19    A. Correct.
20    Q. I want to go to the last column on your total
21    door at the door, which is 8 minutes, sorry, 8 hours,
22    11 minutes and 52 seconds.
23   Do you see that?
24    A. Yes, ma'am.
25    Q. So we round that up to 8 hours and 12 minutes.

1348

Trial

Kathy Aitken, et al. v. USA                           3/16/2023

```
1     You would agree that it is beyond ten minutes of time
2     beyond 8 hours.
3   Correct?
4     A. Yes, ma'am.
5     Q. And under the agency's policy, that 11 minutes
6     and 52 seconds would be rounded up to 15 minutes of
7     overtime pay.
8   Correct?
9     A. Correct.
10    Q. And you would agree that the only column on your
11    chart that includes both the walking time from the
12    compound to the post, any kind of information exchange
13    that took place, and the work that was performed by
14    the employee on the post, as well as the walk back
15    from the post and any relief that took place after
16    shift, the walk back from the post to the compound
17    door, the only time that captures the work performed
18    on the employee's shift is that last column that is 8
19    hours, 1 minutes and 52 seconds.
20  Correct?
21    A. Correct.
22    Q. And I believe --- did you ever supervise
23    Hagenburg, the Lieutenant?
24    A. Yes.
25    Q. And you've never disciplined him for coming in
```

1349

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    early, have you?

2    A. No, I haven't.

3    Q. You allowed him to come in, do his exchange, do

4    his walk, and start working, do his work?

5    A. Correct.

6    Q. And you've never been told by anybody above you

7    that you should be disciplining him and not allowing

8    them to start working early.

9    Correct?

10   A. Correct.

11   Q. Going briefly to Plaintiff Exhibit 23, I want to

12   go to the part at the end where it's under response

13   analysis and we're talking about Buckingham.  If it

14   helps, it's about four or five pages from the back,

15   four pages from the last page.

16   A. Okay.  I'm there.

17   Q. Are you there?

18   A. Yes, ma'am.

19   Q. Okay.

20   On the day in question, July 12th, 2019, your

21   study didn't have a variety of compounds.  You had

22   them arriving at the post.

23   Right?

24   A. Correct.

25   Q. Okay.

1350

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    And according to your study, it was ████████
 2       when he arrived at his control center post?
 3       A. That is correct.
 4       Q. Okay.
 5    So and he's still starting to work prior to the
 6       start of his ██████████ .
 7    Correct?
 8       A. Yes, ma'am.
 9       Q. And nobody stopped him from doing that.
10    Correct?
11       A. Correct.
12       Q. And he didn't get disciplined for starting to
13       work prior to his shift.
14    Correct?
15       A. Correct.
16       Q. And you don't know as you sit here today --- let
17       me just back up.  I think you testifies, based on the
18       cameras --- when did you go back and look at the
19       camera to determine where he went between ████████████
20       ██████████████████      When did you do that analysis?
21       A. I don't know a specific date.
22       Q. Was it in the last day or two?
23       A. No.
24       Q. The last week?
25       A. No.
```

1351

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1     Q. About a month ago?
 2     A. Give or take, yeah.  I don't know the exact date.
 3     Q. Okay.
 4   Would it surprise you to learn that we didn't
 5     provide this response analysis to the government until
 6     at least after March 3rd sometime?
 7     A. No, that would not surprise me.
 8     Q. Okay.
 9   So do you think you reviewed the --- you went
10     back and looked at the hard drive.  Is that what you
11     did?
12     A. Correct.
13     Q. Okay.
14   And that was at the instruction of Counsel?
15     A. Yes, ma'am.
16     Q. All right.
17   So what did you look at --- I think you said he
18     went through and he went up ██████████████████████
19     ████████████████████████████████
20   Correct?
21     A. Correct.
22     Q. Did you mark that time down anywhere?
23     A. That he just went up those steps then came back
24     down the hallway?
25     Q. Yes.
```

1352

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. No.  Just when he came back and went down the
2      compound and then came back up the compound and went
3      to his post.
4      Q. Okay.
5    So when he went back down the compound, you would
6      agree that the Lieutenant's Office is on the compound.
7    Correct?
8      A. Yes.
9      Q. So he could have been going to the compound to
10     sign his overtime slips prior to the shift.
11   Correct?
12     A. He could have done, yes.
13     Q. He could have been following an order.  Somebody
14     perhaps could have given him something to take up to
15     the compound.
16   Correct?
17     A. Yes, ma'am.
18     Q. And ---.
19   ATTORNEY KERR:
20   Objection, Your Honor.  These questions
21     call for speculation.
22   JUDGE:
23   I'm not sure they do.  I think she's
24     asking the limits of what he knows and the limits of
25     his analysis.

1353

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Right?

2    ATTORNEY ELKIN:

3    That's correct.

4    JUDGE:

5    Okay.  So overruled.

6    BY ATTORNEY ELKIN:

7    Q. And he could have been following an order from a

8    Lieutenant or a Captain to deliver something on the

9    compound prior to his shift?

10   A. Correct.

11   Q. And as you sit here today, you don't know what he

12   was doing during the time between ███████████,

13   other than he was on the secured confines of the

14   compound in the institution?

15   A. That's correct.

16   Q. And there's nothing that prohibits the employee

17   from going into the Lieutenant's Office and signing

18   the overtime slip prior to the start of their shift.

19   Correct.

20   A. Correct.

21   Q. Okay.

22   So looking at PLX-23 on the first page, on July

23   7th, 2019, about halfway down the page, Compound 1.

24   Well, it's less than halfway down.  Hagenburg is

25   working.

1354

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1    Do you see that?
2       A. What page is that, ma'am?
3       Q. The first case of Exhibit A of Plaintiff's
4       Exhibit, PLX-23.
5       A. Okay.
6    I'm on Exhibit A.
7    Is that correct?
8       Q. Yeah.
9       A. Okay.
10      Q. And it starts --- the first line is 5/5/2019 for
11      Compound 1.
12   Do you see that?
13      A. Yes, ma'am.
14      Q. Okay.
15   I want you to go a third down page to July 7th,
16      2019, Compound 1, Hagenburg.  And the total time from
17      our measurements, from the Plaintiff's measurements
18      from when he gets to the front lobby until he exits
19      the compound is 8 hours and 37 minutes.
20   Correct?
21      A. Correct.
22      Q. And then if you compare that to your chart,
23      Hagenburg's on July 7, 2019, it's on page five of
24      DX-14.  You might want to just keep these open side by
25      side.

1355

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Okay.

2      Q. What do you have for pay for July 7, 2019?  I can

3      just lead you.  You don't have anything for Hagenburg

4      on July 7, 2019.

5    Right.

6      A. Correct?

7      Q. So that 37 minutes was not included in the

8      averages.

9    Right?

10      A. Correct.

11      Q. And then, again on July 8, 2019, we have 8 hours

12      and 30 minutes.  You have nothing.

13    Right?  I'm sorry.  You want to look --- are you

14    looking at PLX and confirm that July 8th, 2019 there's

15    8 hours 30 minutes there?

16      A. Yes, there is.

17      Q. Okay.

18    And then looking at your chart, there's nothing.

19    Correct?

20      A. Correct.

21      Q. So you did not include that 30 minutes beyond

22    eight hours in your exhibit.

23    Correct?

24      A. Correct.

25      Q. Or your averages?

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      A. Correct.

2      Q. And then have you had --- you had access to all

3      of these dates.

4    Right?

5      A. Yes, ma'am.

6      Q. Okay.

7    July 9th, 2019, Hagenburg serve in the compound 8

8      hours and 19 minutes.

9    Did you include that one?

10     A. I don't believe I did that one.

11     Q. No.  That one wasn't in there either.  So that 19

12     minutes above 8 hours was not included in the

13     averages.

14   Correct?

15     A. Correct.

16     Q. Here's one for 7/10/2019 the seven minutes above

17     8 hours.  That was not included either, was it?

18     A. No, it was not.

19     Q. And then 7/11/2019, he's still working compound 8

20     hours and 19 minutes.  You would agree that you did

21     not include any time for him on 7/11/2019?

22     A. Correct.

23     Q. And then on 8/11/2019, again, 8 hours and 19

24     minutes.  That was not included in your study, was it?

25     A. No, it was not.

1357

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Q. And then again on April 14, 2019, he got there in
2    8 hours.  That was not included in your study.
3    Correct?
4    A. No, it was not.
5    Q. And that 8 hours, I'm sorry, 8/15/2019, the 24
6    minutes beyond 8 hours was not included in your study.
7    Correct?
8    A. Correct.
9    Q. Had you included that time, even if we took off a
10   couple of minutes because ours --- let's say we took
11   off four minutes from our video because we measured it
12   a different way from --- we measured ours from the
13   front lobby.
14   A. Sure.
15   Q. If we took off four minutes, would it surprise
16   you to know that the average of those times would be
17   19.37 minutes above 8 hours?
18   A. No, it wouldn't surprise me.
19   Q. And if we added those to your averages, you would
20   agree that that would elevate the averages for Mr.
21   Hagenburg.
22   Correct?
23   A. Yes, ma'am.
24   Q. If we look at Mr. Christensen for your, on your
25   study.  You would agree that this time of 8 hours, 10

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1358

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    minutes and 43 seconds, under the agency's policy,
2    that that time is considered compensable time and
3    would be entitled to 15 minutes of overtime.
4    Correct?
5        A. Correct.
6        Q. And do you know why you did not include for Mr.
7    Christensen when he worked in Unit D, and I can take
8    you to PLX-23, page five of nine.
9        A. Okay.  I'm there.
10       Q. Okay.
11   Do you see, like, six lines down, we have 8 hours
12   and 19 minutes?
13       A. Yes.
14       Q. And he worked morning watch on Unit D?
15       A. Yes, ma'am.
16       Q. And you would agree that that's not included in
17   your analysis.
18   Correct?
19       A. That is correct.
20       Q. And if we added that 19 minutes, the average of 8
21   hours and 10 minutes and 33 seconds would be even
22   higher.
23   Right?
24       A. Yes, ma'am.
25       Q. And that would be true even if we took off the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1        ██████  ███████  or so that it takes to get from the front

2        body lobby, donning the duty belt, going through A1,

3        etcetera, to the control center, it would be an

4        additional 15 minutes above 8 hours.  That would also

5        increase the average that you came up with.

6    Correct?

7        A. Yes, it would.

8        Q. Okay.

9    If we can look at Buckingham on your exhibit on

10       6/15/2019 when he worked GA evening watch.  I

11       withdraw.  I have the wrong date.  I'm sorry.  I was

12       looking at the wrong exhibit.  I was looking at my

13       exhibit.  6/15/2019 for GA evening watch.  It's the

14       bottom left line on page seven of nine for finding.

15       A. Yes, ma'am.

16       Q. Okay.

17   And you can see that we have 8 hours of 22

18       minutes recorded from the time he gets to the front

19       lobby until the time he exits the compound sally port

20       door.  See that?

21       A. Yes.

22       Q. And then you go back to your exhibit.  You would

23       agree --- there's no entry for Buckingham on 6/15/19.

24   Correct?

25       A. Correct.

1360

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. And as you sit here today, you don't have any
2    reason that you didn't include that.
3    Right?
4    A. That wasn't one of the weeks that I randomly
5    selected.
6    Q. To review?
7    A. To review.  Correct.
8    Q. Okay.
9    Had you included that extra 22 minutes, even if
10   we take off four minutes for the walk between the ---
11   not that we think legally we should take off the four
12   minutes.  I'm just saying if we did take it off, the
13   average would increase.
14   Correct?
15   A. Correct.
16   Q. And the same thing, you didn't include 6/14/2019
17   for Christensen (sic) when he worked EB evening watch.
18   6/14 EB.  It's on page nine of nine.  Oh, wait.  Is
19   it?  And I said Christensen.  I meant Buckingham.
20   We're on Buckingham.  So do you see, on 6/14/2019, he
21   was assigned to unit EB, it was eight hours and 25
22   minutes beyond --- sorry, 25 minutes beyond eight
23   hours?
24   A. I'm sorry, what was the date on that?
25   Q. 6/14/2019 for Buckingham.  I think I said

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     Christensen earlier.  I apologize.  Last page of
2     exhibit --- nine of nine of ---.
3     A. Can you say what that date was again, ma'am?
4     6/14?
5     Q. 6/14/2019.
6     A. Okay.
7     Q. And you see there that it's eight hours and 25
8     minutes when he was assigned to Unit EB?
9     A. Yes.
10    Q. And you would agree --- I understand, just to
11    confirm, your video review included the B side of E at
12    the 24-hour post during this period.
13    Correct?
14    A. That is correct.
15    Q. And it was, in fact, a 24-hour post during this
16    period.
17    Right?
18    A. I don't remember the exact dates that have
19    changed, but it was during this time period a
20    24-hour ---.
21    Q. Okay.
22    And Plaintiffs also included it as a 24-hour
23    post, so it must have been.  And then he said you did
24    not include the 25 minutes in your averages.
25    Correct?

Trial

Kathy Aitken, et al. v. USA                                     3/16/2023

```
1     A. Correct.
2     Q. And you said we took off four minutes for the
3     walk time, five minutes even.  You didn't include any
4     time above eight hours in your averages for Mr.
5     Buckingham for 6/14/2019?
6     A. That's correct.
7     Q. And your answer would be the same thing for
8     8/16/2019, when he's also assigned to EB, and it's 22
9     minutes beyond eight hours?  You would agree that you
10    did not include any time beyond --- any time for him
11    8/16/2019?
12    A. That's correct.
13    Q. And you're the United States, you had access to
14    these hard drives, and you could have had as much paid
15    time as you wanted to do this review.
16    Correct?
17    ATTORNEY JOSHUA MOORE:
18    Objection, Your Honor.  The Lieutenant
19     is not the United States ---.
20    JUDGE:
21    Sustained to the --- to that extent, but
22     she can ---.
23    ATTORNEY JOSHUA MOORE:
24    That's my only objection
25    JUDGE:
```

1363

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1    And she can ask her --- ask her question
2      and it --- and it doesn't necessarily carry any legal
3      weight.  And her asking the question doesn't make him
4      the United States.
5    Right?
6    ATTORNEY ELKIN:
7    That's correct, Your Honor.
8      BY ATTORNEY ELKIN:
9      Q. So as a Lieutenant with the task of this
10     assignment, you could have had as much time as needed
11     to review all the data in question for these limited
12     number of Plaintiffs
13    Correct?
14    All the dates that you have data for?
15     A. Right.
16     Q. Okay.
17    But 8/16/2019 was not included, and you would
18     agree had we added the 22 minutes, it would have
19     increased the total amount of time for --- it took off
20     four minutes, it would increase this whole amount of
21     time for Mr. Buckingham.
22    Correct?
23     A. Yes, ma'am.
24     Q. On Direct you testified that --- I think you
25     testified.  Sometimes it's hard --- but that

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1    Correctional Officers are not expected to respond to
2    emergencies as they are making their way to their post
3    prior to their shifts.
4  Was that your testimony?
5    A. Yes, it was.
6    Q. And are you --- is that your understanding, that
7    Correctional Officers, let's say it's ██████ in the
8    morning.  They're coming through A1 sally port, body
9    alarm goes off in EA.  There's a massive fight.  That
10   Correctional Officer who's on the premises in his
11   uniform with his vest on, right?  He has to have a
12   vest on?
13   A. Okay.
14   Q. That officer is like, ██████ my shift doesn't
15   start until ██████████ and I get paid.  Go ahead,
16   boys, you take care of this.
17  That'd be okay?
18   A. I mean, there's no --- nothing in the policy that
19   says you have to do it.  I mean, if there's --- if
20   there's, like I said, a staff member or something
21   getting injured or something in front of them then I
22   would expect them, but I don't ---.
23   Q. No, I want you to answer my question.  Massive
24   fight on EA.  That officer has his vest on.  He is on
25   the compound walking to his post at ██████████  He sees

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    all his fellow officers running to EA.  No staff
2    involved, inmate fight.
3    A. Okay.
4    Q. Okay?
5    It's your understanding that that officer can
6    simply say, go ahead, boys, you take care of this,
7    I'm not on --- I'm not on shift yet.
8    That's your understanding?
9    A. Yes, he could.
10    Q. That --- sorry, that is?
11    A. Yes.
12    Q. Okay.
13    And do you understand that that is inconsistent
14    with what the testimony was provided by actually,
15    every Plaintiff, other Lieutenants who have testified,
16    as well as the witness who's here to bind the
17    Government, Captain Whinnery, on the requirements of
18    officers prior and after their shift?
19    A. Okay.
20    I think it's a personal --- up to the person.
21    Q. And if the Captain says it's a requirement that
22    all officers who are on the premises must respond to
23    an emergency prior to their shift, would that be ---
24    would that be the requirement, in your head?
25    A. Yes, if the Captain said so.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.
2    And if the Captain said that his expectation is
3      that the officers correct inmate behavior as they see
4      it, even if it's prior to their shift when they're
5      walking to their post or after they've been released.
6    If that's what the Captain said is the policy,
7      would you agree that is the policy?
8      A. Yes.
9      Q. And you would also agree that it is important
10     inside the Federal Correctional Institution to correct
11     innate behavior and inmate infractions, even if little
12     ones.
13   Correct?
14     A. Yes.
15     Q. And you --- it's important to correct them as you
16     see them.
17   Correct?
18     A. Yes.
19     Q. And you would, as a Lieutenant who has been with
20     the Bureau of Prisons for it sounds like almost, I
21     don't know, 15 years, you would, as you're walking to
22     your post prior to your shift, and you see an inmate
23     on the grass, would you just walk by that inmate?
24     A. No, I would correct them.
25     Q. Okay.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

 1    And just because you understand you're required
 2      to do that.
 3    Correct?
 4    A. I hold myself to a higher standard than that.
 5    Q. Is it your testimony that the Correctional
 6    Officers aren't professionals like you and they don't
 7    hold themselves to the same standards?  Is that your
 8    testimony?
 9    A. No, not necessarily.  Regardless if I'm working
10    or not, I'm going to address and take care of issues.
11    Q. As you see them?
12    A. As I see them, yeah.
13    Q. And your expectation would be the same for the
14    Correctional Officers who work for you.
15    Correct?
16    A. I don't expect them to, on their way to their
17    posts, yell to an inmate to tuck your shift in or
18    something like that, no.
19    Q. But you would do that?
20    A. I would.
21    Q. And doesn't that promote the safety and security
22    of the institution, letting the inmates know that
23    you're in charge, you're looking and they're breaking
24    the rules?
25    A. Sure.

1368

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1     Q. Okay.

2   And is it your expectation that Correctional

3     Officers every time --- all the time that they're on

4     --- on the premises, their job is to promote the

5     safety and security of institution.

6   Correct?

7     A. Yes.  Yes ma'am.

8     Q. And so, if they didn't correct that inmate

9     behavior, even if it's a tuck your shirt in, they

10    would not be promoting the safety and security of the

11    institution, if they left the little things slide.

12  Correct?

13    A. Correct.

14    Q. Okay.  One moment.

15  ATTORNEY ELKIN:

16  Your Honor, I have nothing further.

17    Pass the witness.

18  JUDGE:

19  Mr. Kerr, any Redirect?

20  ATTORNEY KERR:

21  Yes.

22                      ---

23                REDIRECT EXAMINATION

24                      ---

25    BY ATTORNEY KERR:

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     Q. Lieutenant Nalepa, let's --- let's clarify.
 2   As a Federal Law Enforcement Officer, are
 3     Correctional Officers required to respond to
 4     emergencies as an emergency in the compound?
 5     A. While they're working?
 6     Q. Before their shift, as a Federal Correctional
 7     Officer, as a Federal Law Enforcement Officer?
 8     A. No.
 9     Q. You said your understanding of the cases have
10     changed since becoming a Lieutenant?
11     A. Yes, it has.
12     Q. What did you mean by that?  Can you explain?
13     A. Well, now that I've been around a while, I mean
14     going to post is just kind of part of the job, part of
15     your --- you know, you come in, go to your post and
16     --- and go about your day.
17     Q. And what do you mean by it's part of the job,
18     part of the day?
19     A. In the same way we drive to work.  We just get
20     here, go through, get to here we need to be and start
21     our shift.
22     Q. Could you please turn to, this in the green
23     binder, JX-71, 72?
24     A. What section is that, sir?
25     Q. So the green binder JX-71.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1370

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    What --- do you recognize this document?

2    A. They are daily rosters for staff.

3    Q. And --- and which, whose this daily roster for?

4    A. Leimkuhler.

5    Q. Can you go to May 1st, 2019 on this roster?

6    Which is on Bates number ending 1744.  When I refer to

7    Bates number, that's the number in the left-hand

8    corner.

9    A. What was that date again?

10   Q. May 1st, 2019.

11   A. Okay.

12   Q. And then could you, looking from May 1st, 2019,

13   going forward, so coming back from the front of the

14   document, can you look for any covered post that

15   officer --- and when I mean cover post, post at issue

16   in this case that Officer Leimkuhler was assigned to?

17   A. No, I don't see any.  So what date?

18   Q. So starting on May 1st, 2019 and coming towards

19   the present.

20   A. Right.

21   Q. So looking through May and then June 2019.

22   A. No, I don't see any.

23   Q. And then July.

24   Do you --- do you see any covered posts?

25   A. I do not.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. If you could look on page number --- Bates number
 2      ending 743?  Right down near the bottom, is it
 3      covered, there's a post SHU-2.
 4   Is that a covered post?
 5      A. No, it is not.
 6      Q. Is that --- is that a 24-hour ---?
 7      A. No, it's not
 8      Q. Can you put that exhibit aside, please, and look
 9      at JX-72?
10   So JX-22 (sic), if you could turn to the very
11      back please, the last page ending in Bates number
12      1492.
13      A. I'm still trying to see where we're at.
14      Q. Right there.
15      A. You said 1492?
16      Q. Yes, that's correct.  The very last page of the
17      exhibit.
18      A. Okay.
19      Q. And it ends at October 9th, 2019.
20   Do you see that?
21      A. Yes sir.
22      Q. Could you look at Mr. Leimkuhler's daily
23      assignments from October 9th, 2019 over to the other
24      page up to December 31st, 2019?  And let me know if
25      you see any covered posts.  And when I mean covered
```

1372

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      posts, I'm talking about posts at issue in this case.
2      A. No, sir, I don't see any.
3      Q. Looking --- looking at the Bates number 91, so
4      the second page from the end, about two-thirds of the
5      way down on December 7th, 2019, did Mr. Leimkuhler
6      work Compound 1?
7      A. Yes, he did.
8      Q. Is --- is that a covered post?
9      A. Yes, it is, sir.
10     Q. It's your understanding that Mr. Leimkuhler only
11     worked one covered post during the time you did your
12     bigger review analysis?
13     A. Yes.
14     Q. You were asked a lot of questions about what Mr.
15     Buckingham doing --- did during those 10, 15 minutes
16     on July 12th when he entered the compound.
17   Could he have been going into the compound for
18     personal reasons?
19     A. Yes.
20     Q. Could he have been going into the compound for
21     non-job-related reasons?
22     A. He could have, yes.
23     Q. How --- the Contracting Officers that you've
24     looked at for your video review, how did they compare
25     with other Correctional Officers as far as, know, when

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1373

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

1      they arrived at work?
2    ATTORNEY ELKIN:
3    Objections.  Contracting Officers I
4      believe I heard?
5    ATTORNEY KERR:
6    I meant to say Correctional Officers.
7    JUDGE:
8    Why don't you --- so why don't you ask
9      the question again using --- using the word that you
10     intended?
11   ATTORNEY KERR:
12   Okay, I will.  That pre-lunch ---.
13     BY ATTORNEY KERR:
14     Q. Lieutenant Nalepa, you --- you looked at the
15     representative Plaintiffs when you did your video
16     review?
17     A. Yes.
18     Q. And we looked at the times they arrived on post?
19     How did those representative Plaintiffs regarding how
20     early they arrived to post compared to other
21     Correctional Officers that you supervised?
22   ATTORNEY ELKIN:
23   Objection, Your Honor they're
24     representative Plaintiffs.  They're representative of
25     everybody else in that here.  That's the deal.

1374

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   ATTORNEY KERR:
2   Well, one issue is whether they
3     represent their normal system.
4   JUDGE:
5   Overruled.  He can ask --- ask his
6     question.
7   ATTORNEY ELKIN:
8   Well, then I'm going to say foundation,
9     did he review --- I think he already said he didn't
10    review anybody else.
11  JUDGE:
12  Now that's fair.  Can you --- can you
13    lay some foundation from his own personal knowledge as
14    to non-representative Plaintiffs?
15    BY ATTORNEY KERR:
16    Q. Lieutenant Nalepa, do you supervise
17    non-representative Plaintiffs?  You know, who are
18    Correctional Officers at Otisville?
19    A. Who are ---?
20    Q. Do you supervise other Correctional Officers
21    other than the representative Plaintiffs?
22    A. Other than these six or ---?
23    Q. Yes.
24    A. Yes.  Yes, sir.
25    Q. In that work as supervisor, are you aware of

1375

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    whether some come to post right at the time their post
2    starts?
3    A. Yes.
4    Q. So how does that compare with the representative
5    Plaintiffs that you reviewed from your video footage?
6    A. The representative Plaintiffs are some of the
7    earlier reliefs that we have.
8    Q. Thank you.
9   You --- you testified on Direct that you randomly
10   selected weeks for your review.
11   Is that correct?
12   A. That's correct.
13   Q. And then on Cross, you were asked about a lot of
14   different dates that weren't part of your review.
15   Do you remember what --- what dates, you said you
16   randomly --- you testified that you randomly selected
17   six weeks to start with?
18   A. Correct.
19   Q. Do you remember what date those were?
20   A. I don't remember.
21   Q. Do you remember preparing a draft Declaration?
22   Or do you, regarding your video review or not?  Do you
23   remember reviewing the draft Declaration?
24   A. I don't --- I don't really understand the
25   question.  I guess I don't know.

1376

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

    1      Q. Do you remember reviewing a document that
    2      described your --- the process of your video analysis
    3      at the time that you created the video analysis?
    4      A. I --- I don't recall.
    5      Q. Okay.
    6   Could you look, please, at page 13?  I'm sorry,
    7      could you look at page nine, eight?  All the data
    8      sorted by date.  And I'm sorry, I was just --- I'm
    9      looking at Defense Exhibit 14.
   10      A. What --- what section is that?
   11      Q. So I'm looking at page eight.
   12      A. Okay.  I'm there.
   13      Q. Of Defense Exhibit 14.  Which at the top is data,
   14      all data sorted by date?
   15      A. Correct.
   16      Q. And you testified on Direct that you chose six
   17      weeks randomly.
   18   Is that correct?
   19      A. That is correct.
   20      Q. And then some of the weeks didn't provide enough
   21      information, so you chose additional weeks ---
   22      A. That is correct.
   23      Q. --- for specific Correctional Offices?  Is that
   24      correct?
   25      A. Yes, that's correct.

1377

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

1      Q. Okay.

2    Looking --- looking down this chart, is --- is

3    May 5th through May 11th one of the original weeks you

4    selected?

5    A. Yes, it is.

6    Q. And is May 14th through May 20th one of your

7    additional weeks you selected for Christensen?

8    A. Yes, it was.

9    Q. And is June 23rd through June 29th one of the

10   original weeks you selected?

11   A. Yes, it is.

12   Q. And is July 7th through July 13th one of the

13   additional weeks you selected for Buckingham,

14   Christensen and McPhillips?

15   A. Yes, sir.

16   Q. And is July 14th through July 20th one of the

17   original weeks you selected?

18   A. Yes, it is.

19   Q. And is August 18th through August 24th one of the

20   additional weeks you selected for Christensen?

21   A. Yes, sir.

22   Q. And is September 1st through September 7th one of

23   the additional weeks you selected for Bunting?

24   A. Correct.

25   Q. And is September 22nd through September 28th

1378

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      another additional week you selected for Bunting?
2      A. Yes, it is.
3      Q. And is October 6th through October 12th, one of
4      the original weeks you selected?
5      A. Yes, it is.
6      Q. And is October 20th through October 26th one of
7      the additional weeks you selected for Bunting?
8      A. Correct.
9      Q. And is November 10th through November 16th one of
10     the original weeks you selected?
11     A. It is.
12     Q. And is December 1st through December 7th one of
13     the additional weeks you selected for Bunting?
14     A. Yes, sir.
15     Q. And is December 8th through December 14th one of
16     the additional weeks you selected for Christensen?
17     A. Correct.
18     Q. And is December 15th through December 21st one of
19     the additional weeks you selected for Bunting?
20     A. Correct.
21     Q. And you selected those weeks entirely at random.
22  Is that correct?
23     A. That is correct.
24     Q. And as far as you know, are the dates that
25     opposing counsel asked you about on Cross Examination,

Trial

Kathy Aitken, et al. v. USA                           3/16/2023

1    were those dates outside the randomly-selected weeks?

2    A. yes, they were.

3  ATTORNEY KERR:

4  I have no further questions, Your Honor.

5    I appreciate it.  Thank you, Lieutenant.

6  JUDGE:

7  Okay.

8  Thank you very much, Lieutenant.  So Mr.

9    Vallacher, what do you want to do with --- want to do

10   next?  Do you want to break for lunch and call Captain

11   Whinnery --- Captain O'Kane, I'm sorry?

12 ATTORNEY VALLACHER:

13 Captain O'Kane.  I would definitely

14   prefer a break for lunch.

15 JUDGE:

16 Okay.

17 Is that okay with everybody?  Great.

18 ATTORNEY VALLACHER:

19 And Your Honor, I actually do have a ---

20   as we come to a point of order, I need to address

21   something on the record.

22 JUDGE:

23 Okay.

24 ATTORNEY VALLACHER:

25 Because there was an accusation levied

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1380

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    that because of the nature of the accusation, no fact
2    witness could attest to it.  It concerns case events.
3  So Ms. Elkin implied that the Government
4    selectively chose certain people to review while
5    opting not to review all Plaintiffs.  And Your Honor
6    may have noticed that the people that were chosen
7    happen to be people who were testifying at trial this
8    week.  And to the extent they have sufficient footage
9    of the working covered post.
10  And that's no coincidence.  That's
11    evidence from the Court's docket where the party
12    selected representative Plaintiffs.  We asked Mr.
13    Nalepa to review the representative Plaintiffs
14    precisely because they are representative Plaintiffs.
15    And we believed and continue to believe that video
16    data other than all the Correctional Officers chosen
17    to be the representative Plaintiffs would be
18    irrelevant.
19  Most importantly, this is something the
20    parties stipulated on the record.  In paragraph one,
21    it says, quote, although there are 195 Plaintiffs in
22    this case, the parties have selected seven
23    representative Plaintiffs for the purposes of
24    discovery and trial liability.
25  And that's also why we removed exhibits

1381

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    pertaining to Mr. Iocolano.  The parties both did

2    that.  And that's also why Mr. Iocolano's data is not

3    on the exhibit.  So we ---.

4  JUDGE:

5  I'm sorry, I don't mean to interrupt

6    you.

7  ATTORNEY VALLACHER:

8  So the accusation that we, the

9    Government, told Attorney Nalepa to review only

10   certain Plaintiffs, to exclude all other Plaintiffs

11   for some invidious purpose, I think that needs to be

12   addressed.

13  JUDGE:

14  Ms. Elkin, did you mean to make such a

15   --- such an implication?

16  ATTORNEY ELKIN:

17  No, Your Honor.  And I would also point

18   out that they can't have it both ways.  They --- we

19   agreed they're representative.  They picked some, we

20   picked some.  And they're representative.  And if

21   they're representative, they're representative on

22   everything, including what time they come in.

23  So I --- I was pointing out, though,

24   in order to get a full picture, there was nothing to

25   prevent them from recording the time of everybody that

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      --- they chose to make the video review however they
 2      wanted to make it.  And there was nothing like they
 3      were --- no, there was nothing invidious.
 4   JUDGE:
 5      Okay.
 6   So it sounds like nobody means to accuse
 7      anybody else of anything, anything invidious and
 8      everything else just goes to the --- the weight that I
 9      ought to give the particular video analyses.
10   Right?
11   ATTORNEY ELKIN:
12      That's exactly right, Your Honor.
13   ATTORNEY VALLACHER:
14      Okay, Your Honor.
15   JUDGE:
16      Are you happy with that?
17   ATTORNEY VALLACHER:
18      Yes.
19   JUDGE:
20      Great.  All right.  Okay.
21   So everybody, everybody wants to eat.
22      Let's --- let's meet back here at 1:45 to make things
23      easy?
24   ATTORNEY ELKIN:
25      That's fine.
```

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1    ATTORNEY VALLACHER:
2    Yes, Your Honor.
3    JUDGE:
4    Great, okay.
5    COURT CRIER:
6    All rise.
7                        ---
8              (WHEREUPON, A LUNCH BREAK WAS TAKEN.)
9                        ---
10   COURT CRIER:
11   All rise.  United States Court of
12     Federal Claims is now in session.  Judge Stephen
13     Schwartz presiding.
14   JUDGE:
15   Have a seat.  Sorry to keep everybody
16     waiting.  I had a quick matter to sort out on my end.
17   You ready for your next witness?
18   ATTORNEY VALLACHER:
19   Yes, Your Honor.
20   JUDGE:
21   Okay.
22   ATTORNEY VALLACHER:
23   The United States calls Captain O'Kane
24     to the stand.
25                        ---

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                    PATRICK O'KANE,
 2     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
 3     HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
 4     FOLLOWS:
 5                        ---
 6     JUDGE:
 7     Have a seat.
 8     THE WITNESS:
 9     Thank you.
10                        ---
11                  DIRECT EXAMINATION
12                        ---
13     BY ATTORNEY VALLACHER:
14       Q. Good afternoon, Captain O'Kane.
15     How are you?
16       A. Good, how are you doing?
17       Q. Pretty good.
18     Who's your current employer?
19       A. The United States Department of Justice.
20       Q. Okay.
21     And specifically within the Department of
22     Justice?
23       A. The Federal Bureau of Prisons.
24       Q. Okay.
25     And when did you start working at the Federal
```

1385

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1       Bureau of Prisons?
2       A. I started working with the Federal Bureau of
3       Prison after I was discharged from the United States
4       Marine Corps in October of 2006.
5       Q. Okay.
6    So you were a Marine?
7       A. Yes, sir.
8       Q. And when did you enlist?
9       A. I initially enlisted in January of 1998 under the
10      Military Occupational Specialty of 0341, which is
11      infantry mortarman.  From there, I applied under the
12      security forces' waiver, so that way I was sent to
13      Naval submarine based Bangor, in Washington State,
14      where we guarded the United States Nuclear Strategic
15      Arms Depot, so ---.
16      Q. And when you --- when you --- did you
17      specifically guard the nuclear ---?
18      A. Yes.  Yes.  We --- there was roughly 1,600
19      warheads and missiles up in the sub bays.
20      Q. Okay.
21      A. And we were responsible for ensuring their
22      overall safety and security.
23      Q. Okay.
24   So that was your goal?
25      A. That was --- yes, absolutely.  That was our goal.

1386

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1       Q. Okay.

2    Is it safe to say that you accomplished that

3       goal?  Because I never heard of any nuke going off.

4       A. Exactly.  We have --- during the entire time I

5       was there, we accomplished our mission.  We didn't

6       lose any nuclear warheads.

7       Q. Okay.

8       A. From there, I transferred to Honolulu, Hawaii,

9       Kaneohe, Marine Corps Base, where I was deployable

10      infantryman.  Then I went to Northwest Annex,

11      Chesapeake, Virginia, to be a Security Forces

12      Instructor, where I became a combat weapons master

13      instructor and close quarters battle instructor.  And

14      then after that point, I got out of the Marine Corps,

15      and later on that year I began working for the federal

16      prison.

17      Q. Okay.

18   And what --- what rank did you leave as?

19      A. I left as a Sergeant.

20      Q. Okay.

21   And so when --- you said that you joined the

22      Bureau of Prisons what year?

23      A. In 2006, the same year I was discharged from the

24      Marine Corps.

25      Q. Okay.

1387
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1    And where --- what was your first prison that you
2       worked at?
3       A. I initially was hired at FCI Danbury in Danbury,
4       Connecticut.  Started as a GS5 Officer, went up to a
5       GS6 Officer, GS7 Officer, GS8 Officer, was temporarily
6       promoted to a Lieutenant, and then I got a permanent
7       Lieutenant up in FCI Ray Brook in New York.  That was
8       in April of 2014 when.
9       Q. Okay.
10      So at Danbury did you work SHU post?
11      A. Absolutely.
12      Q. And that's Special Housing Unit?
13      A. Yes, absolutely.
14      Q. Housing?
15      A. Yes.
16      Q. Control?
17      A. Yes.
18      Q. In compound?
19      A. Yes.
20      Q. Do they have a ████████████?
21      A. No, they do not.
22      Q. Okay.
23      And so when you --- when you were a Correctional
24      Officer at Danbury, did you --- did you say you were a
25      temporary Lieutenant?

1388

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

 1      A. Yes.
 2   I was temporarily promoted to a Lieutenant.  They
 3      had, they were short on Lieutenants, and I was
 4      temporarily promoted to a GS9 Lieutenant.  And then
 5      after that period, they had hired a permanent GS9
 6      Lieutenant, and I went back being an officer --- a
 7      Senior Officer Specialist.
 8      Q. Okay.
 9   But is that, you know, if it's until you were at
10      FCI Ray Brook?  That was in 2014?
11      A. Yeah.
12      Q. So it's about eight years being a Correctional
13      Officer?
14      A. Yes.
15      Q. Okay.
16   And then how long were you at Ray Brook?
17      A. I was at Ray Brook from April of 2014 to about
18      September of 2016.  I initially went up there to be
19      promoted to a GS9 Lieutenant, and then I was promoted
20      to a GS11 Lieutenant at Ray Brook.  I was the SORT
21      leader, the Special Operations Response Team, which is
22      the Bureau of Prisons' equivalent of a SWAT --- SWAT
23      commander for the police force.
24      Q. Okay.
25   Does --- does Otisville have a SORT team?

1389

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1      A. No, they currently do not.

2      Q. Okay.

3    Does Otisville have, you know, anything similar?

4      A. Yes.  Well, not --- not similar.  They have a

5      less lethal component.  It's set up on a multi-pronged

6      approach.  They'll have DCT, which is Disturbance

7      Control Team.  They --- they're focused more on a less

8      lethal response to a disturbance, where the SORT team

9      is trained in a lethal response to a disturbance.

10     Q. Okay.

11   And how often does the Disturbance Control Team

12     get deployed at FCI Otisville?

13     A. For disturbances at Otisville?

14     Q. Yeah.

15     A. Zero.  They have been deployed more to do

16     security for the protests down MDC Brooklyn, ---

17     Q. Okay.

18     A. --- which have occurred over the past recent

19     couple of years.  They were deployed down there just

20     for ground control.  They've never been activated for

21     any disturbance at FCI Otisville.

22     Q. Okay.

23   And then so when you --- you --- where did you go

24     next, after FCI Ray Brook?

25     A. So after FCI Ray Brook, I lateraled back to FCI

1390

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Danbury.  I was going through a divorce at the time,
2    and it was based out of Connecticut, so I lateraled
3    back to Danbury as an 11 Lieutenant to go through my
4    divorce.
5    Once the divorce was finalized and finished, at
6    that point, then I lateraled as a GS11 Lieutenant to
7    United States Penitentiary Canaan.
8    Q. Okay.
9    And how long were you there?
10   A. I was at USP Canaan from February of 2019 through
11   August of 2020.
12   Q. Okay.
13   And what happened in August of 2020?
14   A. I was promoted to the position of Captain at FCI
15   Otisville.
16   Q. Okay.
17   So just doing quick back down, a little math.
18   From 2014 to 2020, you were a Lieutenant.
19   Is that right?
20   A. Yes.
21   Q. So eight years of experience as a Correctional
22   Officer?
23   A. Yes.
24   Q. And six as a Lieutenant?
25   A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1     Q. Okay.

2   And when you --- when you transferred to Ray

3     Brook and made Lieutenant at the same time, is that

4     common or is that --- is that a coincidence that both

5     of those things happened at the same time?

6     A. It used to be --- that used to be how you had to

7     get promoted, was they would tell you that they

8     wouldn't in-house Lieutenants, that you usually have

9     to leave the prison that you started at ---

10    Q. Okay.

11    A. --- to get promoted to a Lieutenant.

12    Q. And why is that?

13    A. It can create difficulties for the person being

14    promoted to a Lieutenant because you're going from

15    being a member of your peers to now being somebody who

16    supervises your peers.  So it creates difficulties

17    when --- when that happens.  Some people can't

18    separate the peer from supervisor lines.

19    Q. I see.

20  Is it --- is it kind of like you don't want to be

21    the boss of your friends?

22    A. Absolutely.

23    Q. Okay.

24  And so you came to FCI Otisville in August of

25    2020?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1392

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Yes, sir.

2      Q. As Captain?

3      A. Yes, sir.

4      Q. So there's one matter that I think we should

5      clear up at the outset.

6      A. Yes, sir.

7      Q. Do you remember earlier this --- I think it was

8      earlier this month.  It was about two, three weeks

9      ago, you went on a tour at FCI Otisville?

10     A. Yes.

11     Q. And were you curious when Ms. Elkin accused the

12     Government of putting on a show during the tour?

13     A. Yes, I was.  It actually upset me to an extent.

14     Q. So you do not agree with that accusation?

15     A. No, I do not.

16     Q. Can you explain what was happening that day?

17     A. Unfortunately, that day there was a snowstorm, as

18     I'm sure everybody in the --- that attended that tour

19     is well aware of, that there was a snowstorm.

20     Unfortunately, during snowstorms, staff have to drive

21     to work.  Some staff couldn't get out of their

22     driveway.  So it --- we had approximately 50 percent

23     of the staff that were normally there or that would

24     normally be there on day watch, they called in sick.

25     So we had very limited staffing, and as a result,

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

```
 1    we had to shut down programming areas, so that way we
 2    could supplement Correctional Officers from those
 3    programming areas.
 4    Q. Okay.
 5  So when you say 50 percent of staff, do you mean
 6    across Correctional Officers and non-Correctional
 7    Officers?
 8    A. Yes, that is true.
 9    Q. Okay.
10  And so you basically had to take whoever you had
11    and you augmented them for that housing unit?
12    A. Yes, that is true.
13    Q. And would you be able to augment people who've
14    not been trained to be Correctional Officers?
15    A. No.
16    Q. So would it be fair to say that non-Correctional
17    Officers have similar training?
18    A. Yes, absolutely.  Everybody --- all BOP staff
19    have to go through the initial institution
20    familiarization, or I've heard it referred to as ICT
21    during this trial.  All BOP staff have to go --- are
22    assigned to an institution have to go to FLETC, the
23    Federal Law Enforcement Training Center in Glynco,
24    Georgia, as well as all BOP staff in the institution
25    are on a one year probationary period where they're
```

1394

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1      expected to be mentored and guided through that
2      timeframe to help them get the knowledge, skills and
3      abilities to carry out their duties as a correctional
4      worker or Correctional Officer.
5      Q. Okay.
6   So for example, a teacher could be augmented as a
7      Correctional Officer?
8      A. Yes.
9      Q. Would they be, you know, any less effective that
10     you know of?
11     A. Absolutely not.  They received the exact same
12     training on how to deal with inmates as a regular
13     Correctional Officer.
14     Q. Okay.
15  And do non-Correctional Officers have the same OC
16     spray?
17     A. Yes.
18     Q. Radio?
19     A. Yes.  That was --- that was passed down that all
20     staff are required to carry the MK-4 OC dispenser
21     whenever they enter the institution, regardless of
22     what their position description is of being a teacher,
23     Food Service Foreman, a Psychologist, a Chaplain,
24     everybody has to carry the MK-4 OC dispenser.
25     Q. Okay.

1395

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      And to be clear, that would not include the
 2         officers whose OCs are to be on a post?
 3         A. Yes, that is true.  Because that is assigned to
 4         their post.
 5         Q. Okay.
 6      So explain why, I guess, all the inmates were ---
 7         because that's why they were all in the housing unit?
 8         A. Yes.
 9         Q. Would they typically not have been all just
10         hanging out in the housing unit?
11         A. Oh, absolutely not.  During the day, on a normal
12         day, the housing unit would have roughly half of the
13         inmates in it that it did.  We encourage the inmates
14         to go to programming, go to the Chapel, go to
15         recreation.
16      Me personally, as a Captain, I don't want inmates
17         in the housing units, because they --- it's just one
18         more thing that the officers have to listen to, the
19         officers have to listen, can I get toilet paper and
20         things of that nature.
21         Q. Idle hands ---
22         A. Yes.
23         Q. --- lead to complaints?
24         A. Yes.
25         Q. So that explains the inmates in the housing
```

1396

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
 1      units, and you know, I guess, that's really been a
 2      prisoner would leave their cell while we were there,
 3      maybe?
 4      A. Yes.
 5      Q. But so, was chow also delayed?
 6      A. Yes, this is true.
 7      Q. And I think --- can you explain what's going on
 8      with that?
 9      A. Yes.  Ordinarily the ██████████████████████
10      ███████████████████████████████████████  ███████
11      ████████████████████  ████████████████████████████
12      ████████████      It was delayed and it was brought up.
13  And I actually looked at the time, we normally
14      started at ███████  And I asked the Lieutenant that was
15      there with us, hey, find out why we're not running
16      chow yet.  It's normally going on.
17  And he stepped away, came back and informed me
18      that the Food Service Foremen that were working that
19      post showed up to work late because of the snowstorm.
20      And because of that, everything else got pushed back
21      late.
22      Q. Okay.
23  And so earlier --- were you here when Captain
24      Whinnery was testifying?
25      A. Yes.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. And I think he testified that inmates could not
2      cook without the supervision of the Food Service
3      Foreman?
4      A. That is true.
5      Q. That's correct?
6      A. Yes.
7      Q. So is it --- is it your testimony today that
8      things were not kept intentionally quiet when the
9      compound was they thought ---?
10     A. Absolutely.  That is --- that's not true.  We did
11     not keep anything intentionally quiet.  Unfortunately,
12     Mother Nature dealt us a hand and we had to respond.
13     Q. Okay.
14  So as the Captain of the FCI Otisville, are you
15     the head of any department at FCI Otisville?
16     A. Yes.  I oversee the Correctional Services
17     Department, and I'm overall responsible for the entire
18     security of the institution.
19     Q. Okay.
20  And the Correctional Services Department, who's
21     in that?
22     A. The Correctional Services Department comprises
23     myself, my Lieutenants and all of my Correctional
24     Officers.
25     Q. Okay.

1398

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Are there any Correctional Officers not within
2       the department that you oversee?
3       A. Any Correctional Officers?
4       Q. Correctional Officers.
5       A. No, they're all --- they're all my
6       responsibility.
7       Q. Okay.
8    Are you responsible for drafting and executing
9       post orders at FCI Otisville?
10      A. I am.
11      Q. What are post orders?
12      A. Post orders are the specific job duties for a
13      specific post.  That's what clearly identifies the
14      duties that staff have to conduct while they're on
15      post.  All of those post orders pretty much combine to
16      create the overall safety and security of the entire
17      institution.
18      Q. Okay.
19   So would you say that the purpose of the post
20      orders is to pursue that safety and security?
21      A. Absolutely.  Safety and security is --- it's a
22      mission.  It's a goal that we --- that we hope to
23      attain to.  Those --- that goal can only be met by
24      carrying out specific duties, which are identified in
25      the post orders.

1399

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     Q. Okay.
2     And in your opinion, would you consider safety
3       and security to be the job duties of a Correctional
4       Officer?
5     A. No, I would not.  And just as I stated, it's ---
6       it's a goal.  I identify a duty as something that you
7       --- an activity, something that you can do.  I can't
8       tell you to go do safety.  I can't tell Ms. Elkin ----
9       Ms. Elkin to go do security.
10    Those are --- what --- what are they?  They're
11      intangible.
12    Q. Okay.
13    So if I wanted to determine the activities ---
14      and you're also holding the hiring decisions of
15      Correctional Officers?
16    Is that right?
17    A. I am responsible for conducting initial
18      interviews and giving input to the Warden on who
19      should be hired.
20    Q. Okay.
21    So if I wanted to determine the activities that
22      Correctional Officers are paid to perform when they're
23      assigned to a 24-hour housing post, ---
24    A. Yes.
25    Q. --- what would I look at?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. You would look at the post orders for that
2      specific post, whether it's a housing unit.  If you
3      said A-Side Housing Unit, you'd have to go to the
4      specific post orders as well as the special post
5      orders for that housing unit.
6                              ---
7      (Whereupon, Joint Exhibit JX-84,
8      Housing A-side Specific (2021), was
9      marked for identification.)
10                             ---
11     BY ATTORNEY VALLACHER:
12     Q. Okay.
13     Can you please turn to JX-84?
14     A. You said 84, correct, sir?
15     Q. Eighty-four (84).
16     A. Okay, I'm there, sir.
17     Q. Okay.
18     Are you familiar with this document?
19     A. I am.
20     Q. What is it?
21     A. These are the specific post orders for Units D,
22     E, F, and G A-side officers.
23     Q. Okay.
24     So would that be the 24-hour housing?
25     A. That is true.

1401

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
1      Q. Okay.
2  I believe this has already been admitted, but
3     just keep that out in front of you.  I'm going to ask
4     you to open another.
5      A. Yes, sir.
6      Q. Could you also turn to JX-85?
7                         ---
8  (Whereupon, Joint Exhibit JX-85,
9  Housing A-side Special (2021), was
10 marked for identification.)
11                        ---
12 THE WITNESS:
13 Okay.  I'm there, sir.
14   BY ATTORNEY VALLACHER:
15   Q. Do you recognize this document?
16   A. I do, sir.
17   Q. What is it?
18   A. It is the special post orders for Units D, E, F,
19     and G A-side officers.
20   Q. Okay.
21 And if you want to flip through.
22 Did you execute these?
23   A. I did.
24   Q. Okay.
25 ATTORNEY VALLACHER:
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    At --- at this time, I'm going to move
 2      to admit JX-85.
 3    ATTORNEY ELKIN:
 4    No objection.
 5    JUDGE:
 6    Admitted.
 7                              ---
 8    (Whereupon, Joint Exhibit JX-85,
 9    Housing A-side Special (2021), was
10    admitted.)
11                              ---
12    BY ATTORNEY VALLACHER:
13    Q. So can you please review JX-85?
14    A. Yes, sir.
15    Okay, sir.
16    Q. Okay.
17    So this has the health procedures?
18    A. Yes.
19    Q. How to interact with inmates procedures?
20    A. Yes.
21    Q. And has detail census checks?
22    A. Yes.
23    Q. Mail monitoring?
24    A. Yes.
25    Q. Morning wakeup and unlocking procedure?
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes.

2    Q. And with --- throughout, I guess eight pages of

3    fire drills, roll call, visiting?

4    A. Yes, sir.

5    Q. Would you read --- do the activities listed on

6    these two documents represent the activities that the

7    Bureau is paying officers assigned to its A-Side

8    Housing Unit post to perform?

9    A. Yes, absolutely.

10   Q. And so turning to the last page of 85, I see that

11   it says post orders are issued as guidelines for the

12   officers assigned to this post and are not intended to

13   describe and detail all the duties assigned to this

14   post.  Officers assigned to this post are expected to

15   use their initiative, good judgment in all situations

16   covered in these post orders.  If any question should

17   arise to policy and procedures pertaining to the

18   consulting program statement, institution supplement

19   specific internal rules and their supervisor.

20  Do you see that?

21   A. Yes, sir, I do.

22   Q. Did you --- did you write this paragraph?

23   A. I did.

24   Q. So what were you trying to convey with that

25   paragraph?

1404

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1       A. I was trying to convey with this paragraph that
2       no one person can possibly foresee every possible
3       instance which could occur or the officers are faced
4       with on a day-to-day basis.  It's trying to give them
5       that power to implement their initiative and good
6       judgment during those certain circumstances.
7    And if they have any questions about it, to refer
8       to national policy, refer to local policy, ask their
9       supervisor.  And even to the point of I routinely tell
10      all staff, if there's questions about anything, please
11      ask me.  I --- I am an open book.  I will always tell
12      any staff if they have questions, please come to me
13      and ask those questions.
14      Q. Okay.
15   Do any do that?
16      A. On occasion.  Not very often, but there are
17      occasions when they do, yes.
18      Q. Do --- so is this paragraph kind of saying, I'm
19      not --- we can't contemplate everything out of the
20      ordinary that might happen?
21      A. Absolutely.
22      Q. And so in that case, you know, read something or
23      ask somebody?
24      A. Yes.
25      Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1405

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Do all of your post orders contain that language?
2      A. They do.
3      Q. Okay.
4    Because I see it also on the bottom of 84?
5      A. Yes.
6      Q. With respect to JX-84, page ten of ten.
7    So all of your post orders just contain that?
8      A. Yes.
9      Q. And does the same language found in those post
10     orders mean the same thing?
11     A. Yes.
12     Q. Okay.
13   So we're talking about an A-Side Housing Unit
14     Officer?
15     A. Yes, sir.
16     Q. I'm going to ask you, could a Correctional
17     Officer assigned to the housing unit A-side perform
18     all the activities that we just --- you know, that
19     you're paying them to perform if they did not put on
20     the duty belt attachments, chits until the moment they
21     got to their post, I'm going to ask you?
22     A. Could they --- they're not --- if they're
23     assigned to the A-Side Housing Unit, they're not
24     actually on duty until they reach the A-Side Housing
25     Unit, so.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    So the question is, if for example, I'm not

3      donning a duty belt in the A1 lobby?

4      A. Yes.

5      Q. And instead I'm just carrying it ---

6      A. Yes.

7      Q. --- to the post.

8    Would I be able to do everything in the post

9      orders?

10     A. No, absolutely not.

11     Q. What do you mean?

12     A. You're issued equipment on the post that is

13     required to do your job.

14     Q. Okay.

15   So you need to put it on when you're receiving

16     that equipment?

17     A. Yes.

18     Q. Okay.

19   What about if they were not vigilant when they

20     walk their post?  Would they be unable to do any of

21     these duties?

22     A. If they were not vigilant on their post, on the

23     walk?

24     Q. Yeah.

25     A. They --- they don't have to be vigilant until

1407

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1     they're on post.  I understand vigilance is more of a
2     mindset than it is an actual activity.
3     Q. Okay.
4     But --- but my question is, if they were not
5     vigilant on the walk to their post, would they still
6     be able to perform all the activities in the post
7     order?
8     A. I'm not fully understanding that.
9     Q. What don't you understand?
10    A. Would they --- would they be able to do all the
11    activities that are outlined in the post orders if
12    they're not on post?
13    Q. If before they get to a post, ---
14    A. Yes.
15    Q. --- they're not being vigilant on their walk to
16    post, would they be unable to do anything in the post
17    orders?
18    A. No.
19    Q. Okay.
20    So they would be able to do it?
21    A. Yes.  Yes, absolutely they would.
22    Q. Was that the confusion ---?
23    A. Yes, yeah.  It was --- when --- the way my mind
24    works is when we're talking about the post, that's ---
25    that's their --- that's where they do work.

1408
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. Okay.
2    A. Once they receive that equipment, then that's
3    where they do their work.
4    Q. Okay.
5    And could a Correctional Officer assigned to a
6    housing unit A-side perform all those activities if
7    they do not answer any inmate questions on the way to
8    post?
9    A. Yes.
10   Q. Could they --- the Correctional Officer assigned
11   to that housing unit A-side perform all those
12   activities if they did not respond to any emergencies
13   on the way to post?
14   A. Yes.
15   Q. Could other a Correctional Officer assigned to
16   the housing unit perform all of those activities if
17   they did not look for contraband on their way to post?
18   A. Yes.
19   Q. And could a Correctional Officer assigned to a
20   housing unit perform all those activities if they did
21   not pat down any inmates on the way to post?
22   A. Yes.
23   Q. Let me put it this way.
24   If a Correctional Officer plugged his ears and
25   closed his eyes and somehow made it to the housing

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial
Kathy Aitken, et al. v. USA                                3/16/2023

1    unit, at which point he opened his eyes and unplugged
2    his ears, put on his belt, would he be able to do all
3    these activities on his post?
4    A. Absolutely.
5    Q. Okay.
6  So if I wanted to determine the activities of a
7    Correctional Officer assigned to the Special Housing
8    Unit, what would I look at?
9    A. You would look in the Special Housing Unit either
10    depending on which post you were looking at, if you
11    were looking at SHU-1, you would look at the specific
12    post orders for each of those posts and then special
13    Orders for the Special Housing Unit.
14  ATTORNEY ELKIN:
15  Your Honor, can we just establish ---?
16  THE WITNESS:
17  I'm sorry.  I --- I was just standing so
18    I could read.
19  JUDGE:
20  You can feel free to sit down.
21  THE WITNESS:
22  All right.
23  ATTORNEY VALLACHER:
24  So could you please turn to JX-90?
25                              ---

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1   (Whereupon, Joint Exhibit JX-90, SHU
 2   #1 (2021), was marked for
 3   identification.)
 4                          ---
 5   THE WITNESS:
 6   Okay.
 7   I'm there, sir.
 8     BY ATTORNEY VALLACHER:
 9     Q. You are?  Are you, do you recognize this
10     document?
11     A. Yes, sir, I do.
12     Q. What is it?
13     A. It is the specific post orders for the Special
14     Housing Unit Number 1 Officer.
15     Q. And did you execute this post order?
16     A. I did.
17   ATTORNEY VALLACHER:
18   At this time I'm going to move to admit
19     JX-90.
20   ATTORNEY ELKIN:
21   No objection.
22   JUDGE:
23   Admitted.
24                          ---
25   (Whereupon, Joint Exhibit JX-90, SHU
```

1411

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1   #1 (2021), was admitted.)
 2                            ---
 3   ATTORNEY VALLACHER:
 4   So I'm also going to direct your
 5     attention to JX-92, and hopefully you can keep both of
 6     them open in front of you.
 7                            ---
 8   (Whereupon, Joint Exhibit JX-92, SHU
 9   Special (2021), was marked for
10   identification.)
11                            ---
12     BY ATTORNEY VALLACHER:
13     Q. And hopefully --- if it helps you to stand again.
14     A. Okay, sir.
15     Q. Okay.
16   So you have JX-92 in front of you?
17     A. Yes.
18     Q. Do you recognize this document?
19     A. Yes, sir, I do.
20     Q. What does it appear to be?
21     A. It is the special instructions for Special
22   Housing Officers and the Property Officer in Special
23   Housing Unit.
24     Q. And did you also execute this?
25     A. I did.
```

1412

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

```
 1      Q. Okay.
 2    ATTORNEY VALLACHER:
 3    At this time I'm going to move to admit
 4      JX-92.
 5    ATTORNEY ELKIN:
 6    No objection.
 7    ATTORNEY VALLACHER:
 8    Okay.
 9    JUDGE:
10    Admitted.
11                          ---
12    (Whereupon, Joint Exhibit JX-92, SHU
13    Special (2021), was admitted.)
14                              ---
15      BY ATTORNEY VALLACHER:
16      Q. So you're familiar with the contents of these
17      documents?
18      A. Yes, sir, I am.
19      Q. Do the activities listed within these two
20      documents represent the activities the Bureau's
21      paying, paying officers assigned to those, the Special
22      Housing Unit 1 post?
23      A. Yes.
24      Q. And I see on the final page we have the same
25      paragraph that we were discussing?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1413

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
1      A. Yes, sir, that is correct.
2      Q. That means the same thing that we already
3      discussed?
4      A. Yes.
5      Q. Okay.
6      Could a Correctional Officer assigned to SHU-1
7      perform all the activities we are paying them to
8      perform if they did not put on their duty belt
9      attachments and chits in the front lobby?
10     A. Yes.
11     Q. And could they --- what about if they were not
12     vigilant on their walk to post?
13     A. Yes.
14     Q. And what if they did not answer any inmate
15     questions on the way to post?
16     A. Yes.
17     Q. Or what if they did not respond to any emergency
18     on their way to post?
19     A. Yes.
20     Q. Or did not look for contraband on their way to
21     post?
22     A. Yes.
23     Q. Or not help any inmates on their way to post?
24     A. Yes.
25     Q. And assuming the same hypothetical of the plug
```

1414

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1     the ears and eyes until they get to post, would they
2     be able to perform all of these activities?
3     A. Yes, sir.
4     Q. Okay.
5  And at this time I'd like to turn your attention
6     to --- well, so if we go back to JX-92.
7     A. Yes, sir.
8     Q. That --- is that just for SHU-1, or is that also
9     for other --- other SHU Officers?
10    A. That is for the --- all SHU Officers.
11    Q. So do special orders tend to be divided more by
12    unit and specific orders are by post?
13    A. Yes, yes.
14    Q. Okay.
15    A. The specific --- the specific orders are a
16    template for what their job duties are during that
17    time frame.  The special orders go into the duties
18    that are expected or they will most likely have to
19    encounter.  And then the general post orders are
20    all-encompassing.
21    Q. I see.  Okay.
22  And so if I want to determine the activities of a
23    SHU-2 Officer, would I then turn to --- I would, I can
24    look --- I can keep looking at JX-92?
25    A. Yes, sir.  For the special --- for the special

1415
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     instructions, special orders.
 2                            ---
 3     (Whereupon, Joint Exhibit JX-91, SHU#2
 4     (2021), was marked for identification.)
 5                            ---
 6     BY ATTORNEY VALLACHER:
 7     Q. And I'll direct your attention now to JX-91.
 8  You could put a JX-90 away, to the extent you're
 9     running out of space.
10     A. Okay.
11  No, I've been flipping back and forth, keeping my
12     fingers in tabs and everything.
13     Q. Okay.
14  What is JX-91?
15     A. It is the Special Housing Unit Number 2 Officer.
16     And that is the specific post orders.
17     Q. Okay.
18  And you're familiar with this document?
19     A. Yes, sir, I am.
20     Q. Did you, in fact, execute it?
21     A. Yes, I did.
22     Q. Is that the right word, by the way?  That might
23     be executed?
24     A. That if it has my signature on it, then that
25     means it's from me.  So execute, authored, enacted.
```

1416

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1       Q. Okay.

2   Just want to make sure I'm getting that right.

3       A. Yes, sir.

4       Q. And so we looked at JX-92 and JX-91.

5       A. Yes, sir.

6       Q. Would we --- do the activities listed ---?

7   ATTORNEY ELKIN:

8   Your Honor, I don't think we admitted

9       this.

10  JUDGE:

11  Yeah, yeah.  We haven't had a motion to.

12  ATTORNEY VALLACHER:

13  I'm sorry.  I do.  At this time,

14      Defendant moves to admit JX-92.

15  ATTORNEY ELKIN:

16  No objection.

17  JUDGE:

18  And 91?

19  ATTORNEY VALLACHER:

20  And 91.

21  JUDGE:

22  Ninety-one (91).

23  ATTORNEY ELKIN:

24  No objection.

25  JUDGE:

1417

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Admitted.
2                              ---
3    (Whereupon, Joint Exhibit JX-91, SHU#2
4    (2021), was admitted.)
5  (Whereupon, Joint Exhibit JX-92, SHU
6  Special (2021), was admitted.)
7                              ---
8    BY ATTORNEY VALLACHER:
9    Q. And so you're familiar with the contents of those
10   exhibits?
11   A. Yes, sir, I am.
12   Q. Do these activities listed in these two documents
13   represent the activities of FCI Otisville for officers
14   assigned to the post, a SHU-2 post orders?
15   A. Yes, sir.
16   Q. And I see the same paragraph on the front page
17   with the same language.
18  I assume that has the same name?
19   A. Yes, sir.
20   Q. And the questions I asked about SHU-1 in terms of
21   going down the compound, not vigilant, not patting
22   down, not shaking down, not conducting searches, not
23   responding to emergencies, not answering questions.
24   That would all apply also to a SHU-2 Officer, that
25   that officer could still perform their duties once

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1418

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      they get to their post?

2      A. Yes, sir.

3      Q. And the Correctional Officer who plugged his ears

4      and covered his eyes and somehow --- somehow made it

5      to SHU-2 could still perform those duties once he gets

6      to SHU-2?

7      A. Yes, sir.

8      Q. And to be clear, I understand that you would not

9      want --- you would expect people to respond to

10     emergencies.

11     Correct?

12     A. Yes, sir.  I absolutely do expect people to

13     respond to emergencies.

14     Q. And you were here when you heard Lieutenant

15     Nalepa testify.

16     Correct?

17     A. Yes, that is true.

18     Q. Do you have any thoughts on his testimony on that

19     topic?

20     A. He was incorrect, and I have already spoken to

21     him about that inquiry --- about his error.

22     Q. Okay.

23     Thank you for clarifying that.  And that'll be

24     part of your duties as his supervisor.

25     Correct?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes, sir.  That is correct.

2    Q. He was mistaken?

3    A. Yes, sir.

4    Q. Do you believe he was mistaken?

5    A. He absolutely was mistaken, sir.

6    Q. Okay.

7    ATTORNEY ELKIN:

8    Objection, Your Honor.  I don't know

9      whether he can say whether he was mistaken or not

10     telling the truth.  I don't think that he has the

11     capacity to say either way --- that he's incorrect,

12     that'd be all he can say.

13   JUDGE:

14   Mistake.  He can --- he can say

15     mistaken.  Overruled.

16     BY ATTORNEY VALLACHER:

17     Q. So if I wanted to determine the activities that

18     Correctional Officers are paid to perform when they're

19     assign to Compound 1, what would I look at?

20     A. You would look at the Compound 1 specific post

21     orders and special post orders.

22                          ---

23     (Whereupon, Joint Exhibit JX-82,

24     Compound Specific 1 (2021), was marked

25     for identification.)

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                              ---
 2      BY ATTORNEY VALLACHER:
 3        Q. Okay.
 4      So at this time I would direct you to JX-82.
 5        A. Eighty-two (82)?
 6        Q. Eighty-two (82).
 7        A. All right.  Yes, sir, I'm there.
 8        Q. Do you recognize this document?
 9        A. I do, sir.
10        Q. What is it?
11        A. It is the Compound Number 1 Officer specific post
12      orders.
13        Q. And did you also sign this?
14        A. I did.
15        Q. Okay.
16      ATTORNEY VALLACHER:
17      At this time, Defendant moves to admit
18      JX-82.
19      ATTORNEY ELKIN:
20      No objection.
21      JUDGE:
22      Admitted.
23                              ---
24      (Whereupon, Joint Exhibit JX-82,
25      Compound Specific 1 (2021), was
```

1421

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

1       admitted.)

2                                    ---

3    ATTORNEY VALLACHER:

4    And I will also direct you to JX-83.

5                                    ---

6    (Whereupon, Joint Exhibit JX-83,

7    Compound Special (2021), was marked for

8    identification.)

9                                    ---

10   THE WITNESS:

11   Yes, sir.

12     BY ATTORNEY VALLACHER:

13     Q. Do you recognize this document?

14     A. I do, sir.

15     Q. What is it?

16     A. It is the special orders or special instructions

17     for the Compound Number 1 and Number 2 Officers.

18     Q. Okay.

19   And so this is consistent with special post

20     orders being for the --- like it's more broad, I

21     suppose?

22     A. Yes.

23     Q. Okay.

24   So the --- Compound 1 has specific post orders?

25     A. Yeah.

1422

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Compound 2 has specific post orders?

2      A. Yes.

3      Q. Compound 1 and 2 share special post orders?

4      A. Yes.

5      Q. Okay.

6      A. And then all of the correctional services posts

7      also have the general orders.

8      Q. Okay.

9    JUDGE:

10   Mr. Vallacher, if I could turn around.

11   Was there a motion to admit 83?

12   ATTORNEY VALLACHER:

13   I was just about to get to that, Your

14     Honor.  Thank you.

15   JUDGE:

16   Okay.

17   ATTORNEY VALLACHER:

18   So at this time, Defendant moves to

19     admit JX-83.

20   ATTORNEY ELKIN:

21   No objection.

22   JUDGE:

23   Admitted.

24                           ---

25   (Whereupon, Joint Exhibit JX-83,

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    Compound Special (2021), was admitted.)
2                          ---
3    BY ATTORNEY VALLACHER:
4    Q. Have you --- and you're familiar with the
5    contents of both these documents?
6    A. Yes, sir, I am.
7    Q. Do the duties listed, do the activities listed in
8    these two documents represent the activities the
9    Bureau is paying officers assigned to those posts to
10   perform?
11   A. Yes.
12   Q. And the same questions I've asked earlier about
13   what exactly happened on the walk to the Compound
14   Officer --- it's called a Compound Office?
15   A. The Compound Officer.
16   Q. The Compound Officer's Office.
17   What's that?
18   A. Yes.
19   Q. Side gate?
20   A. Yes.  It's changed names several times.  It was
21   the side gate.  Now it is the Compound Officer's
22   station, is how I refer to it.
23   Q. Okay.
24   A. There are staff who still refer to it as a side
25   gate.
```

1424

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1       Q. Okay.

2    So all the questions I asked about prior posts,

3       about what exactly one does on their Block 2, Compound

4       1, would you still be able --- if once somehow you

5       made it with your eyes closed and ears plugged, and

6       then you unplugged your ears, uncovered your eyes, put

7       on your duty belt, would you be able to perform all

8       your activities as a Compound 1 Officer?

9       A. Yes.

10      Q. Okay.

11   And if I wanted to determine the activities that

12      Correctional Officers are paid to perform when they're

13      assigned to Control 1, where would I look at?

14      A. You would look at the Control 1 specific post

15      orders and the Control 1 special instructions or

16      special orders.

17      Q. Okay.

18   So at this time, I direct your attention to

19      JX-77.

20                               ---

21   (Whereupon, Joint Exhibit JX-77,

22   Control Center 1 (2021), was marked for

23   identification.)

24                               ---

25   THE WITNESS:


For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1425

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    Yes, sir.  I'm there.
 2      BY ATTORNEY VALLACHER:
 3      Q. Okay.
 4    And what does JX-77 appear to be?
 5      A. It is the Control Center Number 1 Officer
 6      specific post orders.
 7      Q. Okay.
 8    And did you execute this document as well?
 9      A. I did.
10      Q. Okay.
11    ATTORNEY VALLACHER:
12    At this time, Defendant moves to admit
13      JX-77.
14    ATTORNEY ELKIN:
15    No objection.
16    JUDGE:
17    Admitted.
18                        ---
19    (Whereupon, Joint Exhibit JX-77,
20    Control Center 1 (2021), was admitted.)
21                        ---
22    ATTORNEY VALLACHER:
23    And I turn now your attention to JX-78.
24                        ---
25    (Whereupon, Joint Exhibit JX-78,
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Control Officers Special (2021), was

2    marked for identification.)

3                              ---

4    THE WITNESS:

5    Yes, sir.

6      BY ATTORNEY VALLACHER:

7      Q. And are you familiar with this document?

8      A. Yes, sir.

9      Q. And what does it appear to be?

10     A. It is the Control Center Officer Number 1 and

11     Number 2 special post orders or special instructions.

12     Q. Okay.

13     And did you also execute this document?

14     A. I did.

15     Q. Okay.

16     ATTORNEY VALLACHER:

17     At this time, Defendant moves to admit

18     JX-78.

19     ATTORNEY ELKIN:

20     No objection.

21     JUDGE:

22     Admitted.

23                              ---

24     (Whereupon, Joint Exhibit JX-78,

25     Control Officers Special (2021), was

1427

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    admitted.)
 2                              ---
 3    BY ATTORNEY VALLACHER:
 4    Q. And you're familiar with the contents of both
 5    JX-77 and JX-78?
 6    A. Yes, sir.
 7    Q. Do the activities listed in these two documents
 8    represent the activities the Bureau is paying officers
 9    assigned to those posts to perform?
10    A. Yes.
11    Q. Can I see the same paragraph on the final page?
12    A. That is correct, sir.
13    Q. Say it again?
14    A. Yes, sir.
15    Q. Okay.
16  And could a Correctional Officer assigned to
17    Control 1 perform all the activities you're paying
18    them to perform because they have not put on their
19    duty belt attachments and chits in the A1 lobby?
20    A. Yes, sir.
21    Q. And what if they were not vigilant in the A1
22    lobby, in the walk to the control center?
23    A. Yes, sir.
24    Q. And what if they did not answer any inmate
25    questions during that walk?
```

1428

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    A. They shouldn't be answering any inmate questions
2    if they're on that walkway.
3    Q. It's a trick question?
4    A. Yes, sir.
5    Q. And could a Correctional Officer with that
6    assignment perform those activities if they didn't
7    respond to any emergencies on their walk to post?
8    A. Yes, sir.
9    Q. And could a Correctional Officer with that
10   assignment perform those activities if they were
11   looking for contraband on their way to the control
12   room?
13   A. Yes, sir.  Yes.
14   Q. And what if they didn't pat anyone down on their
15   way to control?
16   A. Yes, sir.
17   Q. And if an officer plugged his ears, closed his
18   eyes and somehow made it to the control center, at
19   which point he opened his eyes and unplugged his ears,
20   would he be able to do his activities once he gets to
21   post?
22   A. Yes, absolutely sir.
23   Q. Okay.
24  If --- and that --- that would also be true of
25   Compound 1.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

```
1    Right?
2       A. Yes.
3       Q. Okay.
4    And would it be true also on the way back from
5       all these posts?
6       A. Yes.
7       Q. Okay.
8    So if someone were not vigilant after their post,
9       it wouldn't have any effect on their ability to carry
10      out their activities while they were at their post
11      previously, would it?
12      A. No, sir.
13      Q. That's all the time?
14      A. Yes.
15      Q. So if I wanted to determine the activities that
16      Correctional Officers are paid to performed when they
17      are assigned to the ████ , what would I --- how would
18      I determine that?
19      A. You would look at the ████████████████
20      specific post orders and the ████████████████
21      post orders.
22      Q. Okay.
23   So at this time I'll turn your attention to
24      JX-97.
25                                  ---
```

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1    (Whereupon, Joint Exhibit JX-97, ████
 2    ███████████ (2021), was marked for
 3    identification.)
 4                              ---
 5    THE WITNESS:
 6    Yes, sir.
 7      BY ATTORNEY VALLACHER:
 8      Q. Do you recognize this document?
 9      A. I do, sir.
10      Q. What does it appear to be?
11      A. It is the ██████████ specific post orders.
12      Q. And it looks like you also executed this
13    document?
14      A. Yes, that is correct.
15    ATTORNEY VALLACHER:
16    At this time, Defendant moves to admit
17      JX-97.
18    ATTORNEY ELKIN:
19    No objection.
20    JUDGE:
21    Admitted.
22                              ---
23    (Whereupon, Joint Exhibit JX-97, ████
24    ███████ (2021), was admitted.)
25                              ---
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1431

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    ATTORNEY VALLACHER:
 2    And now I'm going to direct your
 3      attention to at JX-98.
 4                              ---
 5    (Whereupon, Joint Exhibit JX-98, ██████
 6    ████████  (2021), was marked for
 7    identification.)
 8                              ---
 9    THE WITNESS:
10    Yes, sir.
11    BY ATTORNEY VALLACHER:
12    Q. What is this?  Are you familiar with this
13    document?
14    A. I am, sir.
15    Q. What --- what is it?
16    A. It is the ███████████████████  instructions or
17    special post orders.
18    Q. Okay.
19    Is ██████████████  just one post?
20    A. The ████████████  ███████████████
21    ████████████  ██████████████████████
22    ███████████████████████████████████
23    ██████████████████████████████
24    Q. Okay.
25    So I'll direct your attention to JX-96.
```

1432

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                              ---
 2    (Whereupon, Joint Exhibit JX-96, ██████
 3    ████████ (2022), was marked for
 4    identification.)
 5                              ---
 6    JUDGE:
 7    Wait, is there a motion to admit JX-98?
 8    ATTORNEY VALLACHER:
 9    Yes, Your Honor.  And Defendant at this
10      time moves to admit JX-97.
11    ATTORNEY ELKIN:
12    No objection.
13    JUDGE:
14    We already admitted 97.
15    ATTORNEY VALLACHER:
16    Ninety-eight (98), I'm sorry.
17    ATTORNEY ELKIN:
18    Now I object.  No objection.
19    JUDGE:
20    Admitted.
21                              ---
22    (Whereupon, Joint Exhibit JX-98, ██████
23    ████████ (2021), was admitted.)
24                              ---
25    JUDGE:
```

1433

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    And we're going back to what?

2    ATTORNEY VALLACHER:

3    JX-96.

4    THE WITNESS:

5    Yes, sir.

6      BY ATTORNEY VALLACHER:

7      Q. And what does this document appear to be?

8      A. Is it the special instructions for the ████

9      ████████

10     Q. And did you execute this?

11     A. Yes, I did.

12    ATTORNEY VALLACHER:

13    At this time Defendant moves to admit

14     JX-96.

15    ATTORNEY ELKIN:

16    No objection, Your Honor.

17    JUDGE:

18    Admitted.

19                         ---

20    (Whereupon, Joint Exhibit JX-96, ████████

21    ████████ (2022), was admitted.)

22                         ---

23      BY ATTORNEY VALLACHER:

24      Q. And would this reflect the change that you're

25      referring to or would it be the specific post orders?

1434

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      A. It would be more specific post orders, because
 2      just as before, where the Control 1 and 2 had special
 3      post orders, they would be included in the ███████
 4      ██████████
 5      Q. Okay.
 6      So at this time I'll direct your attention to
 7      JX-95.
 8                           ---
 9      (Whereupon, Joint Exhibit JX-95, █████████
10      ██████████████  (2022), was marked for
11      identification.)
12                           ---
13      THE WITNESS:
14      Yes, sir.
15      BY ATTORNEY VALLACHER:
16      Q. Are you familiar with this document?
17      A. I am, sir.
18      Q. And what is it?
19      A. It is the ███████████████  specific post orders.
20      Q. Okay.
21      And did you execute this as well?
22      A. I did.
23      Q. Okay.
24      ATTORNEY VALLACHER:
25      And at this time Defendant moves to
```

1435

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    admit JX-95.

2    ATTORNEY ELKIN:

3    No objection.

4    JUDGE:

5    Admitted.

6                              ---

7    (Whereupon, Joint Exhibit JX-95, ██████

8    ████████  (2022), was admitted.)

9                              ---

10    BY ATTORNEY VALLACHER:

11    Q. Okay.

12   So do the activities listed in --- I suppose

13   we're in 2020 --- we're currently looking at 2022?

14    A. Yes, sir.  Yes, these ones are 2022.

15    Q. And does this reflect the change that you're

16   referring to?

17    A. This is the Number 1 Officer.  There is a Number

18   2 Officer that ---

19    Q. I see.

20    A. --- is also included.

21    Q. So it's that you added a specific post to ██████

22   █?

23    A. Yes.  Yes, that is true.

24    Q. Okay.

25   And what are the shifts of the ████████

1436

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    A. The ████████████████████████████
 2  ████████████████████████████████████████
 3  ████████████████████████████████████████████
 4  ████████████████████████████████████.
 5    A. I see.
 6    Q. Okay.
 7  So do the activities listed in these ██████
 8    documents, the JX-95, 96, 97, 98, do these represent
 9    the activities that the Bureau is paying officers
10    assigned to the ███████████████?
11    A. Yes, sir.
12    Q. And so ████████████████████████████████
13  ████████████████
14    A. That is true.
15    Q. Is it a ████████████████████████████
16    A. Yes.
17    Q. And so the ███████ as I understand it, has ---
18    can you walk me through your process ████████████
19  ████████████████████████████████████████████
20    A. Yeah, so on ████████████████████████ ---.
21    Q. ████████████████████████████
22    A. Okay.
23    Q. ████████████████████████████████
24  ████████████████████
25    A. Okay.
```



1437

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1  ████████████████████████████
2  ██████████████████
3  Q. ████████████████
4  A. Okay.
5  ████████████████████████
6  ██████████████████████████████
7  ████████████████  ████████████
8  ██████████████████  ██████████████
9  ██████████████████████  ████████
10 ████████████████████████
11 ██████████████
12 ██████████████████████
13 ██████████████████████████████
14 ███  ██████████████████████
15 Q. Okay.
16 A. ████████████████████
17 ██████████████████████████████
18 ██████████████  ██████████████
19 ██████████████████████████████
20 ██████████████████████████
21 ██████████████████████████████
22 ████████████████████████████
23 ██  ██████████████████████████
24 ██████████████████████████████
25 ████████████  ████████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1438

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023



1
2
3    Q. Okay.
4
5
6    A.
7
8    Q. Okay.
9    A.
10
11   Q. Okay.
12
13
14   A. That is true.
15   Q.
16
17   A. Yes.
18   Q. Okay.
19   Do you know when that occurred?
20   A.
21
22   Q. Okay.
23   And as the Captain of the FCI Otisville, are you
24      familiar with how long it takes to get places?
25      A. Yes, sir, I am.

1439

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    Q. Are you familiar with how long it takes to get
2       through security?
3    A. I am.
4    Q. How long does that take?
5    A. Less than a minute.
6    Q. Okay.
7    But when we were on the floor, it took longer.
8    Is that ---?
9    A. Yes, sir, it did.
10   Q. Why --- why is that?
11   A. You don't work in jail?
12   Q. That's correct.
13   A. There's --- I see two people in the courtroom
14      that work in a jail.  We're familiar with the security
15      --- the security requirements, so we know what belts
16      are going to set off metal detector or what shoes are
17      going to set off the metal detector.  We come prepared
18      to clear the metal detector, because it's something
19      that we all know that we have to do.  Everybody has
20      to, regardless of who you are, has to clear the metal
21      detector in order to get inside to the institution.
22   So Correctional Officers know this in advance.
23   And the equipment that they buy to carry, they work
24   --- is usually designed around that.  It's all for
25   ease of access, basically.  So I know Ms. Elkin, I
```

1440

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      believe it was her pants at the time, had a metal clip
 2      on it that was setting off the metal detector.  Any
 3      metal like that is going to cause a delay.
 4   Correctional Officers are aware of that.  So they
 5      remove all metal as soon as they walk in the building
 6      in order to clear that screen site more quickly.
 7      Q. Okay.
 8   And when you were a Correctional Officer for
 9      those eight years, did you don your duty belt right
10      after security?
11      A. As an officer?
12      Q. Yes.
13      A. I didn't even have a duty belt.  I didn't even
14      have a duty belt.
15      Q. What did you have?
16      A. It was a nylon --- they call it riggers belt.
17      It's basically a wider nylon belt with composite belt
18      loop that would clear the metal detector, and it was
19      strong enough to hold all of my equipment.  I actually
20      --- I don't know.  I did bring a representation of
21      what I wore.
22      Q. I don't think that the Court would enjoy that
23      very much.
24      A. Really?  I would enjoy it if you disclosed it to
25      your opposing counsel.  It was --- I have seen other
```

1441

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Correctional Officers wear a leather belt.
2    Q. Okay.
3    And the belt that you wore, would that go through
4       your belt loops?
5    A. Yes.
6    Q. Okay.
7    But so that would take a while to take off?
8    A. It did.  And that's --- and that's the ultimate
9       reason why most staff have a duty belt is for --- you
10      don't have to take anything off.  It makes it easy and
11      fast to take it off, throw it on the belt, have it
12      x-rayed, pick it up, wrap it around your waist and
13      attach it.
14   Q. And when you say duty belt, you mean the one that
15      has like the loose-type clip?
16   A. Yes.  Yes.  Those are typically just quicker to
17      put on.  You don't have to worry about taking all of
18      your --- I know we were talking about belt clutter and
19      key clips and OC holders and OC pouches and cuff
20      pouches.  With a regular riggers belt, you would have
21      to slide those on and then weave them through your
22      belt loops.
23   With duty belt, that is whatever it is we're
24      referring to as a duty belt, you don't have to take
25      any of that off.  You just put the whole belt on the

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1        --- on the x-ray machine, it gets scanned through, you
 2        pick it up, wrap it around your waist, click it on and
 3        it's good.
 4        Q. And I noticed that you put spare clips around the
 5        duty belt?
 6        A. Yes.
 7        Q. And you said it wasn't referred to as that?
 8        A. Yes.
 9        Q. Why isn't that?
10        A. Because a duty belt is any belt that you wear for
11        the purpose of holding your equipment while you're on
12        duty.
13        Q. Okay.
14        A. Which is I didn't have a duty belt as a
15        Correctional Officer.  I wore the riggers belt.  That
16        --- that was my duty belt.
17        Q. And were you ever disciplined for that?
18        A. No.
19        Q. Were you ever told not to do that?
20        A. I did it for eight years.
21        Q. And when you're a Correctional Officer, did you
22        put your belt back on immediately after screening?
23        A. As an officer, I did, because I with my --- my
24        duty belt, not the actual duty, duty belt or whatever
25        it is referred to, I did just because it's a belt and
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1       I wanted to put it on.

2       Q. It was also your pants belt?

3       A. Yes.

4       Q. Okay.

5       A. Yes, yeah, yeah.  Sorry, yeah.  So it was also

6       acting as my pants belt.

7       Q. We'll, yeah, leave it alone.  Okay.

8    So, and then now you don a belt after going

9       through security?

10      A. I do.

11      Q. Okay, why?

12      Q. It's easy.  It's one less thing that I have to

13      carry.  And typically I will go from the screening

14      site directly ███████████████████████████

15      Q. Okay.

16   But it's not required to do that?

17      A. No.  No, absolutely not.

18      Q. Is it in any way necessary to do that?

19      A. No.  No.  It's just --- it's --- it's easy to put

20      your belt on.  It's one last thing that you have to

21      carry.

22      Q. Okay.

23   And how long does it take to put on what you

24      currently --- because you currently wear a belt clip.

25   Right?

1444

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. Yes.

2      Q. And how long does it take to put that on?

3      A. Matter of seconds.

4      Q. Okay.

5   What --- what if you want to put everything on

6      it?  Or I guess everything stays on it?

7      A. Yes.  And which is the reason why people get

8      them, because they don't have to take anything off

9      while they're going through a screening section.

10     Q. It just stays put?

11     A. Yes.

12     Q. And, okay.

13   What about the belt keepers?  That should take

14     some time.

15   Right?

16     A. I don't use belt keepers.

17     Q. Why not?

18     A. I never have.  I --- there's --- I don't

19     understand the reason of why, I think it's one of

20     those things that if your belt's adjusted properly,

21     you don't really need belt keepers.

22     Q. Okay.

23     A. It'll stay on your waist, where it's supposed to

24     be.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      So then after you clear the screening site, how
 2        long would it take you --- and I suppose you already
 3        put on --- if you were to put on a belt ---?  And
 4        let's leave the belt out of it for now.
 5        A. Very well, sir.
 6        Q. After you clear the screening site, how long
 7        would it take for you to walk to get to the compound,
 8        to put feet on the compound?
 9        A. ████████████████████
10        Q. And once you're on the compound, how long would
11        it take you to get to the housing units?
12        A. ███████████████████
13        Q. And from the compound door, how long would it
14        take you to get to SHU?
15        A. ████████████████████████
16        Q. And how long would it take you to get to the
17        compound office?
18        A. ██████████████████████████████
19        Q. Okay.
20      And would all those times be the same going in
21        the opposite direction?
22        A. ██████████████
23        Q. And you recently volunteered to do a shift,
24      Is that right?
25        A. Yes, that is true.
```

1446

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      Q. Well, tell us about that.
2      A. The officers were getting mandated like ---.
3      Q. And what is mandated?
4      A. Mandated is when management --- well, by the
5      Master Agreement, management has the right to mandate
6      staff to work overtime against their wishes.  So it's
7      not voluntary overtime.  I tell somebody, hey, listen,
8      I don't have coverage for this post, you have to stay.
9      So it's mandatory overtime that they don't have an
10     option to refuse it.
11     Q. Okay.
12     Are --- are officers paid when they demand it?
13     A. Yes, yes.  They still pay out at the overtime
14     rate, but it's not voluntary overtime.  Where
15     ordinarily if they would like overtime, they can sign
16     up on an overtime list.  And if there are vacant
17     posts, then the Lieutenants will call for overtime and
18     try to hire overtime for those posts.  If they can't
19     fill it and if there is vacancy, then that comes into
20     mandatory overtime.
21     Q. Okay.
22     And is it --- who --- how do you determine who's
23     up for this involuntary ---?
24     A. There is a --- there is a list.  It's on the
25     computerized roster program.  It has a list and it

1447

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

        1    tracks all of the previous mandates for all of the
        2    staff in the bargaining unit in Correctional Services.
        3    And once they're --- once they're ordered to mandatory
        4    overtime, it will drop their name down to the bottom
        5    of the list, and then they can't be mandated again
        6    until everybody above them is mandated.
        7    Q. Okay.
        8  And so were you mandated?
        9    A. No.  No.
       10    Q. Okay.
       11    A. I volunteered so that way an officer wouldn't get
       12    mandated.
       13    Q. And why did you do that?
       14    A. Because I don't like when officers have to work
       15    against their will or against their wishes.  I would
       16    rather for them to go home to their families and spend
       17    time with their families.
       18    Q. So you volunteer so someone wouldn't effectively
       19    get drafted?
       20    A. Yes.
       21    Q. Okay.
       22  And what post did you work at that time?
       23    A. I worked SHU Number 1.
       24    Q. Okay.
       25    A. For morning watch.

1448

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     Q. And do you know when this was, approximately?
2     A. January, February time frame, possibly.
3     Q. Okay.  Okay.
4   I thought it was more recent, but you're saying
5     it was that long ago?
6     A. Yeah.  I believe it was January or February time
7     frame.
8     Q. Okay.
9   And you relieved one of the representative
10    Plaintiffs.
11  Is that right?
12    A. Yes, that is true.
13    Q. And who was that?
14    A. I relieved Officer Bunting.
15    Q. Okay.
16  And what --- what shift were you working?
17    A. I was working morning watch and he was working
18    evening watch.
19    Q. Okay.
20  So he was coming up?  You --- so walk me through
21    what happened.
22    A. From what point?
23    Q. The time that you walk into SHU.
24    A. From the time I walked into SHU, I looked
25    that ---.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023



1      Q. Actually, start a little bit before that.

2    Before you got into SHU, how did you get into

3      SHU?

4      A.

5

6                                                              ,

7

8

9

10

11     Q. Okay.

12   How long ---?

13     A. That was paraphrasing what I actually told him,

14     but ---.

15     Q.

16

17   A.

18

19

20

21

22

23

24

25

1450

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023



1    ███████   ██████████████████████████

2    █████████████████████████████████

3    Q. Okay.

4    A. ████████████████████████████████

5    ████████  ████████████████████████████

6    ██████████████

7    Q. Okay.

8    ███████████████████████████████████

9    ██████████████████████

10   A. ███████████████████████████

11   ████████████████████████████████

12   █████████████████  ███████████████████

13   ██████████████████████████████████████

14   ██████████████████  ███████████████████

15   ████████████████████████████████████████

16   ████████████████████████  ███████████████

17   ██████████████████████████████████

18   Q. Okay.

19   ███████████████████████████

20   ████████████████████████████████

21   ████████████████████████████████

22   █████████████████████████

23   A. That is true.

24   Q. That you heard of that.

25   Right?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes, I did.

2    Q. Is that --- do you think that's accurate?

3    A. I do not think it is accurate whatsoever.

4    Q. Why not?  You are the Captain.

5  Right?

6    A. This is true.

7    Q. Shouldn't they be trying to get in your good

8    graces by popping the door really quick?

9    A. They should do it for all staff, not necessarily

10   anybody that's in their supervisory chain of command

11   or not.  They should do it for all staff.  And there's

12   a camera that they verify staff is at that outer door,

13   so they know, okay, there's staff at the outer door.

14   And even when we came into the A1 sally port, the A1

15   lobby officer called the door.  Hey, A1 outer, they

16   popped it, everybody went in.  As soon as that door

17   closed, within approximately two seconds, the inner

18   door opened.

19   Q. Yeah, why was that?

20   A. That happens all the time, ███████████████████

21   █████████████████████████████████████████████████

22   ██████████   ██████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████

25   ████████████████████████████████████████████

Trial
Kathy Aitken, et al. v. USA                              3/16/2023



1
2
3
4
5
6
7
8  .
9   Q. Okay.
10
11
12
13  A.
14
15  Q. Okay.
16
17  A.           .
18  Q. Yeah.  Yes.
19  A.
20           .
21  Q. Okay.
22  So going back to when you were at the SHU
23  relieving Officer Bunting.
24  A. Yes, sir.
25  Q. So you arrived at the SHU, you went through the

1453

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    sally port.
2    Then what happened?
3    A. ███████████████████████████████ █
4    ████████████████████████████ ██
5    ████████████████████████████ ███
6    ████████████████ ██████████████████
7    ███████████ █████████████████████
8    █████████████████████████████
9    █████████████ ████████████████████
10   ██████████████ ████████████████ ███
11   █████████████ ███████████████ ██████
12   █████████████████████████ ███████████
13   ████ ████
14   Q. Yeah.
15   A. I want him to get out and go home to his family.
16   Q. Right, right.
17   And you'll --- you submit you don't need that
18   verbal pass-on?
19   A. No.
20   Q. Why not?
21   A. Because especially in the Special Housing Unit
22   that there is the SHU Number 2 Officer, ████████
23   ██████████████████████        Anything that is going
24   on, he's going to dump.
25   Q. ████████████████████████████████

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1454

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    ████████████████████████████████████
 2    A. Yes.
 3    Q. Okay.
 4    ████████████████████████████████████
 5    ████████████████████████
 6    A. Yes.
 7    Q. I see.  Okay.
 8    Have you --- have you ever volunteered for a
 9    housing unit at FCI Otisville?
10    A. Not at FCI Otisville, no.
11    Q. Okay.
12    But you have --- you've done housing units at
13    other places?
14    A. Yes.
15    Q. At --- at other Federal Bureau Prisons?
16    A. Yes.
17    Q. Then there --- then would you also kind of refuse
18    the verbal pass-on?
19    A. Yes.  There's no --- anything that's going on I
20    can deal with.
21    Q. Okay.
22    And how would you deal with it?
23    A. ██████████████████    ████████████████████
24    ██████████████████████████████████████
25    ████████████████████    █████████████████████████
```

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023



```
 1  ████████████████████████████████████
 2  ████████████████████████████████████
 3  █████████████     █████████████████████
 4  ███████████████████████████  █████████████
 5  ██████████████████
 6  ███████████████████████████████████████
 7  ███████████████████████████████████████████
 8  ████  ██████████████████████████████████████████
 9  ███████
10  Q. Okay.
11  ████████████████████████████████████████
12  ███████████████████████████████████████
13  A. ████  █████████████████████████████████████
14  ██████████████████████
15  Q. ██████████████████████████████████
16  ████████████     ████████████████████
17  A. ████████████████████████████████████████
18  ███████     ██████████████████████████████
19  ████████████████████████████████████████████
20  ██████████████████████████████████████
21  ███████████████████████     █████████████████
22  █████████████████████████████████████
23  ██████████████████████████████████████████
24  ██████████████████████████████████████████
25  █████████████████████
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1456

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. Okay.
 2      A. ████████████████████████████████
 3      ████████████████████████████████ .
 4      Q. And just to be clear, what time did you relieve
 5      Mr. Bunting?
 6      A. I believe it was ██████
 7      Q. Okay.
 8    You relieved him early?
 9      A. Yes.
10      Q. Why is that?
11      A. It is a professional courtesy that is common
12      practice in every single prison that I've been at.  It
13      is something that officers do.  It's one of the nice
14      things that officers do for each other.  We try to
15      take care of each other.  It's not required, however,
16      it's something that officers always do.
17      Q. Is it kind of like I'll scratch your back, if
18      you'll scratch mine?
19      A. Absolutely.
20      Q. And so how long did it take until he was able to
21      leave SHU?  Mr. Bunting.
22      A. I would be willing to bet that he was out of the
23      Special Housing Unit within ██████████████████
24      ██████ , at most.
25      Q. Okay.
```

1457

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
 1      A. And that's because he had to go back in his ---
 2      he had to go back in the office and pick up his
 3      backpack and put it on.
 4      Q. Okay.
 5   And so when you --- when you, in order to get to
 6      SHU ████████ --- ████████ what time did you arrive or
 7      were you already on the institution?
 8      A. No, no.  I showed up I believe it was probably
 9      --- I'll say between ████████, when I actually
10      showed up.
11      Q. Okay.  Okay.
12   So you intentionally arrived at A1 early?
13      A. Yes.
14      Q. Why?
15      A. So that way I could get Bunting out of there.  I
16      know that all of the officers will show up early for
17      each other.  And it's again, something nice that we
18      can do for each other.  And I say we because I include
19      myself in that.
20      Q. Okay.
21   And do you recall whether you were relieved
22      early?
23      A. I believe it was probably about one or two
24      minutes early, yes.
25      Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Would you still consider that good relief?

2      A. Yes.  I don't --- I'm there for --- how I always

3      looked at it is, I'm there for eight hours.  I don't

4      care where you put me for those eight hours.  Put me

5      --- you could literally tell me to go out and start

6      digging holes in the middle of the compound.

7      Q. But it's funny, on this instance, you actually

8      were there for longer than eight hours?

9      A. Yes.

10     Q. And that's because you extended a courtesy that

11     was not extended back to you?

12     A. Yes.

13     Q. So since we're talking about the exchange

14     process, is it your understanding that the verbal

15     pass-down is not required?

16     A. No, it's not required.

17     Q. Okay.

18     And would you say that's also a professional

19     courtesy?

20     A. Absolutely.  It saves people time from having to

21     go back into ████████    ██████████████████.

22     Q. Okay.

23     So it's more convenient?

24     A. No, 100 percent.

25     Q. But I did notice that there was one post order,

1459

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     at least that I found, that did require a verbal
2     pass-down?
3     A. Yes, sir.
4     Q. Do you know which one I'm talking about?
5     A. Yes, sir, I do.
6     Q. Which one am I talking about?
7     A. It is the Outside Hospital Officer.
8     Q. Okay.
9   And so why would there be a requirement for a
10    verbal pass-down to pass on any pertinent information
11    in the Outside Hospital Officer post order, but it's
12    not in SHU or control, compound, housing?
13    A. That is an additional security practice that we
14    put in place, because we are not inside of the
15    institution.  We don't have all of the different
16    layers of security that we normally would if we were
17    inside the institution.  So we want to go a little, I
18    would say excessive, to a point of making sure, hey,
19    A, B and C is covered.
20  I know at times that the hospital staff have come
21    in and told ██████████████████m., they may come
22    in and tell the officer, hey, at ███████████ he's going
23    to --- he has to go for a test.  Well, the officer, ██
24    ██████████████████████, when the hospital staff
25    show up at ██████████ they could surprise the officers

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    in the room.  And I'm not a fan of having people with
2    guns being surprised.
3    Q. Fair enough.
4    Is it the Outside Hospital Officer is armed?
5    A. That is true.
6    Q. So you need firearms training for that?
7    A. Yes.
8    Q. And in the prison, are there any guns?
9    A. Inside the prison?
10   Q. Yes.
11   A. There are no firearms.
12   Q. Okay.
13   And anyone with a firearm, could they interact
14   with an inmate?  Would that be a secure thing to do?
15   A. Interact in what sense?  Speak to them?  Yes.
16   Actually have hands on ---.
17   Q. Like do a pat-down?
18   A. No.
19   Q. Why not?
20   A. That is a poor security practice to have an
21   officer who is armed be that close to an inmate.
22   Q. Okay.
23   A. So if the inmate were able to get a hold of the
24   officer's firearm, it could, again, be very bad.
25   Q. Understood.  So one other topic I want to address

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      with you is the Lieutenant's Office.

2      A. Yes, sir.

3      Q. How often do Correctional Officers have to go  in

4      there before going to shift?

5      A. Very, very, very rarely.

6      Q. Okay.

7      A. There's no need for them, too.

8      Q. But --- but we saw mailboxes on the tour?

9      A. Yes.

10     Q. Don't they need to check those?

11     A. When I believe we did the tour, the booklets that

12     were in the mailboxes were put there about three

13     months prior.

14     Q. Okay.

15 So does that mean that the officers just aren't

16     picking them up?

17     A. That is true.

18     Q. What were those booklets?  Do you know?

19     A. I believe it was psychology-related educational

20     material that Psychology distributed to --- they

21     printed pamphlets for all of the staff inside the

22     institution, custody, non-custody, everybody.  And

23     that's the easiest way to distribute them, is they

24     came and dropped them off in the mailboxes.

25     Q. Okay.

1462

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1    And what about overtime slips?  Do they need to
2       go the Lieutenant's Office to put in overtime ---?
3       A. They don't have to.
4       Q. Why not?
5       A. It is my understanding that it's actually not
6       required.
7       Q. Meaning?  If --- so if I were a Correctional
8       Officer and I didn't sign my overtime slip, would I
9       still get paid?
10      A. Yes, absolutely.
11      Q. Why do you say absolutely?
12      A. Because I certify all the pay, and it's the ---
13      the overtime slips are just a paper record.  It's not
14      what's required to pay the staff.  The electronic
15      record is what's entered, and I certify every pay
16      period.
17   And the staff get paid whether they sign the
18      overtime slips or whether even an overtime slip is
19      generated.
20      Q. Okay.
21   So it's kind of a bureaucratic surplus ---?
22      A. Yes, yes.  It's a paper trail.
23      Q. And you can live with it?
24      A. Yes.
25      Q. Okay.
```

1463

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    What about getting a briefing to a Lieutenant?
2       Don't you have to go to Lieutenant's Office for a
3       briefing?
4       A. No.
5       Q. Why not?
6       A. No, you don't.  Because Lieutenants have multiple
7       different avenues that they could give briefings,
8       through a threescall, through the roll call tab on
9       Truescope.
10      Q. What's a threescall?
11      A. It's a conference call with the unit officers.
12      We have our own internal phone system, so all of the
13      phones are connected through the control center.  You
14      can pick up any phone from the officers' station and
15      dial 333, and it will go to the control center.  So
16      when the Lieutenants want to conduct an entire shift
17      briefing, they'll have control announce, Control Unit
18      Officers call control on the threesand stand by for a
19      Lieutenant.
20   All of the unit officers know that pick up the
21      phone, dial 333, and wait for a Lieutenant.  And a
22      Lieutenant will come on the threes call, and give them
23      a shift briefing about any pertinent information, any
24      intel we pass along, if there's any change in
25      operations.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

1    During that time, all of that would be covered.
2       And in addition, they also have the roll call tab
3       which the Lieutenants can enter a ████████████
4    ███████████████████████████████████████████████
5    █████████████████████████.
6       Q. Okay.
7    And you know, when I asked you earlier whether
8       Correctional Officers stop by the Lieutenant's Office,
9       and you said it's very rare?
10      A. Yes.
11      Q. How would you know that?
12      A. My office is at the back of the Lieutenant's
13      Office and my door is very rarely, if ever, closed.
14      If my door is closed, it usually means one of three
15      things.  I'm in a meeting, I'm on a WebEx or I'm not
16      there.
17      Q. Okay.
18   So speaking of knowledge, is anyone at FCI
19      Otisville tracking when every Correctional Officer
20      arrives at FCI Otisville?
21      A. No.  No.
22      Q. But to the extent you happen to become aware that
23      a Correctional Officer was coming in early, do you
24      ever stop the Correctional Officers for coming early?
25      A. No.

1465

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1    Q. Do you --- why not?
2    A. Again, that's something nice that the officers do
3       for each other.  It's always nice to get out a couple
4       minutes early.  So by doing that, that would destroy
5       the morale of the officers.  It would make them feel
6       as though they themselves were incarcerated.
7    Q. If they could not extend that courtesy to the
8       person that they ---?
9    A. Yes.
10   Q. Okay.
11   Well, I guess do you ever discipline Correctional
12      Officers for coming in early?
13   A. No.
14   Q. Is --- why not?
15   A. Again, the same thing.  They're --- they're
16      trying to do something nice for each other, and that
17      would destroy the morale, if I started holding
18      officers to a --- you're not allowed to come to post
19      until it's two minutes before your start time.  That
20      would destroy the morale of the officers.
21   Q. Okay.
22   Are you familiar with the standards of employee
23      conduct?
24   A. Yes, sir.
25   Q. Who do they apply to?

1466

Trial

Kathy Aitken, et al. v. USA                           3/16/2023

```
 1      A. They apply to all BOP staff, both on duty and off
 2      duty.
 3      Q. Okay.
 4    They apply to off-duty staff as well?
 5      A. Yes.  Yes.
 6      Q. So if Mr. Boyer did something, you know, tonight,
 7      for example, could he be in trouble underneath the
 8      standards of employee conduct?
 9      A. Absolutely.
10      Q. Okay.
11    Captain O'Kane, is it currently your
12      understanding that you were previously a portal
13      grievant?
14      A. Yes.  That is true.
15      Q. In the arbitration?
16      A. Yes, that is true.
17      Q. Do you know when?
18      A. I believe it was previous --- 2014.
19      Q. Okay.
20    And what institution were you at?
21      A. That was FCI Danbury.
22      Q. Okay.
23    So fast-forwarding to 2022.
24      A. Yes, sir.
25      Q. Did you provide testimony at a portal-to-portal
```

1467

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    arbitration last year regarding your time as a
2    Lieutenant at FCI Danbury?
3    A. Yes, sir, I did.
4    Q. And that that you were asked questions about
5    whether you recall being a portal grievant?
6    A. Yes.
7    Q. And during that time they asked if you recall
8    being one?
9    A. Yes.
10   Q. Do you remember that?  And what was your
11   response?
12   A. I replied, no, I do not recall being one.
13   Q. And is that true in that testimony, you did not
14   recall?
15   A. Yes, that is true.
16   Q. So after that hearing, did you look into why they
17   asked you about that?
18   A. Yes, yes.  I had questions ---.  It started
19   making me rack my brain, and I actually did an email
20   search of my email archives and discovered that I
21   actually was a portal grievant.
22   Q. Okay.
23   Well, so what exactly did you discover?
24   A. I discovered three emails with the word portal in
25   it from that time frame.  One of the emails was from

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    an officer who was a union steward at the time to the
2    Union, which identified myself and five other staff as
3    being --- requesting to place us on the portal
4    grievance.  And then the second email was from, I
5    believe, the Union Vice President, later asking for
6    the times that I was temped --- temporarily promoted
7    to a Lieutenant while I was at Danbury.  I gave him
8    those times.
9  And the third email I sent to a Mr. Reed Coploff
10   with my address at the time.
11   Q. Okay.
12   A. And those were the only three emails.
13   Q. And based on that email with your address, what
14   do you --- what's your understanding of that email?
15   A. It is my understanding that I was a portal
16   grievant at that time, during that time frame.
17   Q. Okay.
18  Did you see a consent form in your search?
19   A. No, I did not.
20   Q. Did you see a letter?
21   A. No, I did not.
22   Q. Did you check your bank records to try to find
23   out whether you were paid?
24   A. Yes, I tried to.
25   Q. What do you mean tried to?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1469

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. During that time I was --- again, as I stated
2       earlier, in 2014, I was going through a divorce and
3       there was an issue with my now ex-wife had taken, I
4       believe it was like $3,000 out of the checking
5       account.  So I had to open up a new account and close
6       that account.  And the records that I can currently
7       get don't go back that far.
8    Q. I see.  So it was a joint account that you ---
9    A. Yes.
10   Q. --- have to get away from?
11   A. Yes.
12   Q. Okay.
13   But do you have any actual recollection of the
14      procedure or the check ---?
15   A. No, I don't have any recollection of it.
16   Q. Is it possible --- so, but --- but based on those
17      emails, is it your understanding today that you were a
18      grievant?
19   A. Yes.  Yes.  Based on those emails, I will --- I
20      will attest to that I believe I was a grievant.
21   Q. Okay.
22   So assuming that you took money, why would you
23      have done that?
24   A. The way that --- the way that it was portrayed.
25   Q. Okay.

1470

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    What do you mean by that?  Who portrayed what?
2      A. The Union members at the time, or pretty much
3      every time, they don't go into specifics about why
4      they're going to file a grievance.  They portray it
5      as, hey, we're filing the portal grievance.  If we
6      win, you're going to get free money.  You want to sign
7      up?  Who would say no to free money?
8      Q. Fair enough.
9    So were there any of the details that you recall,
10     you know, that you're entitled to this because we
11     allege that this is work?
12     A. No.  No.  I --- like I said, it would have never
13     come up.
14     Q. Okay.
15   And today, would you sign up ---
16     A. No.
17     Q. --- if you were still a Correctional Officer?
18     A. No, absolutely not.
19     Q. Why not?
20     A. I think at the time, as an officer, I was
21     immature in understanding how --- the bigger picture.
22     That I was concerned --- as an officer, you're pretty
23     much concerned with this little bubble, which is
24     yourself.  And then as it expands and you start to
25     gain a little bit more experience, maybe leadership,

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    you start to understand that it's part of a bigger
 2    picture.
 3  And it's not --- you're not just worried about
 4    yourself, you're now worried about your shift.  You're
 5    now worried about all of your officers, you're now
 6    worried about the entire institution.  So the scope
 7    goes from a little minute person up to the entire
 8    thing.
 9    Q. The entire institution?
10    A. Yes.
11    Q. And the function of it?
12    A. Yes.
13    Q. Okay.  Okay.
14  And at FCI Otisville if --- so I think we were
15    talking earlier that you would expect staff to respond
16    to an emergency?
17    A. Yes, absolutely.
18    Q. And if they respond to an emergency, would you
19    pay them for that?
20    A. Yes, 100 percent.
21    Q. And why?
22    A. Because I would rather pay somebody for
23    responding to an emergency before their shift than not
24    have them respond and actually be needed.
25    Q. I see.  So you don't want like a boy who cried
```

1472

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1       wolf situation?

2       A. Absolutely.

3       Q. So if someone spent over seven-and-a-half minutes

4       to respond to a man-down alarm and it turned out to be

5       a false alarm?

6       A. I --- I don't care.  I would rather have them

7       there and it be --- in an ideal world, they're there

8       for a false alarm.  Because knowing the alternative, I

9       would rather have them there for a false alarm.

10      Q. You wouldn't want to disincentivize the response?

11      A. Absolutely.

12      Q. Okay.

13  No further questions.  Thank you, Captain.

14      A. Thank you, sir.

15  ATTORNEY VALLACHER:

16  Pass the witness.

17  JUDGE:

18  Ms. Elkin, do you want to take a short

19    break before you jump into Cross?

20  ATTORNEY ELKIN:

21  Yeah, a five minute comfort break is

22    fine.

23  JUDGE:

24  Yeah, let's do a five-minute break.

25    Let's come back at --- I'll be back a few minutes

1473

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    before 3:30.
 2    COURT CRIER:
 3    All rise.
 4                          ---
 5         (WHEREUPON, A SHORT BREAK WAS TAKEN.)
 6                          ---
 7    COURT CRIER:
 8    The United States Court of Federal
 9     Claims is now in session.  Judge Stephen Schwartz
10     presiding.
11    JUDGE:
12    Please be seated.  Ms. Elkin, ready for
13     your Cross?
14                          ---
15                    CROSS EXAMINATION
16                          ---
17    BY ATTORNEY ELKIN:
18     Q. Captain O'Kane.
19     A. Yes, ma'am.
20     Q. To be sure, your testimony covers only the time
21    period as it --- from --- based on your personal
22    knowledge from when you became a Captain at the
23    institution in August of 2020?
24     A. Yes, ma'am.
25     Q. Okay.
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. Now, you said that you relieved Officer Bunting
 2      about three, two to three months ago.
 3   Is that right?
 4      A. Yes, ma'am.
 5      Q. And when you came onto your post, that you were
 6      working that evening --- so it was around ████    when
 7      you got to the post.
 8   Right?
 9      A. ████ .
10      Q. Sorry, ████████████████████ .
11   Correct?
12      A. Yes, ma'am.
13      Q. And is Captain --- sorry.  Is Correctional
14      Officer Bunting, is he below you in the chain of
15      command?
16      A. Yes.
17      Q. And in fact, you were his supervisor's
18      supervisor.
19   Right?
20      A. Yes.
21      Q. And so when you walked down to post and you said
22      at the relief, the shift exchange, you said you ready
23      to get yourself and get out?  And he followed those
24      orders.
25   Correct?
```

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

1    A. No, he actually did not.

2    Q. He tried to --- he tried to give you information,

3    as would be his normal --- normal pass-down exercise,

4    but you refused to have it.

5    Correct?

6    A. I didn't refuse.  I told him that there's no need

7    for it, that ████████████████████ or talk to the

8    Number 2 Officer and ---.

9    Q. So you told him to get to --- you're ready to get

10   your stuff and get out, and he tried to give you

11   pertinent pass-down information.  And you said, I

12   don't need it, get out.

13   Correct?

14   A. That's true.

15   Q. Okay.

16   A. It's not required.

17   Q. But it's expected.

18   Correct?

19   A. No, ma'am.

20   Q. So your testimony is that you don't expect

21   Correctional Officers to give verbal pass-downs?

22   A. No, ma'am.

23   Q. Is that your testimony?

24   A. Yes, ma'am.  It's required that they enter ---

25   they ███████████████████████████████

1476

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. I'm not asking you that.  You need to answer my
2      question.
3    Is it your testimony that you do not expect the
4      Correctional Officers to pass down verbally pertinent
5      information?
6      A. My expectations of them?
7      Q. Yes.  You're the Captain.
8      A. Yes.
9      Q. They work for you.
10     A. My personal expectations of them?  I hope they
11     would.
12     Q. Okay.
13    You hope?  I'm getting a little confused here.
14     A. But it's not required.
15     Q. You're not --- no, no.  That's not my question.
16     You should listen to my questions.  You did a good job
17     listening to Mr. Vallacher's questions.  Listen to my
18     questions.
19    Okay?
20    My question is, is it your testimony that you do
21     not expect the Correctional Officers to provide a
22     verbal pass-down when they're making a relief?
23     A. They should.
24     Q. Okay.
25     A. If that's an expectation, then yes.

1477

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     Q. So you do ---?

2     A. It's not required.

3     Q. Okay.

4     You do expect, as their Captain, the Correctional

5        Officers to provide a verbal pass-down during the

6        relief.

7     Correct?

8     A. Yes.  Yes.

9     Q. Okay.

10    And you also expected that when you were a

11       Lieutenant at FCI Danbury.

12    Correct?

13    A. Yes.

14    Q. Okay.

15    And in fact, you testified that there's only one

16       post order that you --- that under --- that you've ---

17       what was the word used?  Not implemented,

18       executed, ---

19    A. Yes.

20    Q. --- that required in writing pass-down of

21       personal verbal information.

22    Is that right?

23    ATTORNEY VALLACHER:

24    I think that misstates the testimony.

25    JUDGE:

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

1    Misstates what testimony?

2    ATTORNEY VALLACHER:

3    I think I said that I discovered one

4      post order that does that.

5    ATTORNEY ELKIN:

6    And he confirmed it.  He said ---.

7    ATTORNEY VALLACHER:

8    He confirmed that that post order did,

9      in fact, require ---.

10   ATTORNEY ELKIN:

11   He --- sorry.

12   JUDGE:

13   I mean, my recollection is that he ---

14     is that he said that, in fact, the hospital order did

15     require a verbal pass-down, right?  Everybody agrees

16     on that?

17   ATTORNEY VALLACHER:

18   Yes.

19   ATTORNEY ELKIN:

20   That --- that's correct, and I ---

21     that's the only that he said required it.

22   ATTORNEY VALLACHER:

23   I think that was what I was saying.

24   JUDGE:

25   So is --- is there an issue for me to

1479

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1    resolve or should we go --- move on with the
2    questioning?  I --- I don't understand what we're
3    fighting about.
4    ATTORNEY VALLACHER:
5    I'm saying misstates testimony, but I
6      think if she's willing to move that past, I withdraw.
7    JUDGE:
8    I mean, why did you ask the question,
9      Ms. Elkin?  I don't understand what we're fighting
10     about.
11   ATTORNEY ELKIN:
12   Me neither.
13     BY ATTORNEY ELKIN:
14     Q. Your testimony on Direct was that the only order
15       that you're aware of that requires a pass along of
16       pertinent information is the hospital escort position?
17   Is that correct?
18     A. Yes.
19     Q. Okay.
20   And so the ---?
21   JUDGE:
22   The Hospital Escort Officer.
23   ATTORNEY ELKIN:
24   Is that not what I said?  Hospital
25     escort position.  Hospital Escort Officer?
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    JUDGE:

2    Officer, yes.

3    ATTORNEY ELKIN:

4    Okay.  All right.

5     BY ATTORNEY ELKIN:

6     Q. I'd like to turn your attention to Joint Exhibit

7     91.   Tell me when you're there.

8     A. Okay.

9     Q. SHU 2 Officer ███████████  bottom of the page.

10    Exchange all equipment with the a.m. shift SHU-2

11    Officer and pass along any pertinent information.

12   You agree that that is --- did I read that

13    correctly?

14    A. Yes.

15    Q. And then if you turn to the last page, that's

16    your signature dated 5/5/21.

17   Correct?

18    A. Yes.

19    Q. Okay.

20   So there's at least one post inside the

21    institution that has that information about passing

22    along all pertinent information.

23   Correct?

24    A. Yes.

25    Q. Okay.

1481

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1    And all of the post orders require a proper
 2      relief.
 3    Correct?
 4      A. Yes.
 5      Q. And your expectation of a proper relief includes
 6      a verbal pass-down.
 7    Correct?
 8      A. Sorry, could you restate the question?
 9      Q. Your expectation of a proper relief ---
10      A. Yes, my expectation ---.
11      Q. --- includes a verbal pass-down?
12      A. Not my expectation --- yes.
13      Q. Okay.
14    And you're the boss.
15    Right?
16      A. No.
17      Q. You're --- well, you have a boss.  But you're the
18      boss of the Lieutenants, you're the boss of the
19      Correctional Officers.
20    Correct?
21      A. Yes.
22      Q. Okay.
23    And you like to lead by example.
24    Right?
25      A. Yes.
```

1482

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    And so I want to talk a little bit about those

3       questions that Mr. Vallacher asked you about.  You

4       don't need to be vigilant in the compound and you can

5       still do your job on your post.  You don't need to

6       correct inmate behavior on the compound.  You can

7       still do your job on your post.  You can just walk by

8       anything on the compound and you can still do your job

9       on your post.

10   Do you recall that testimony?

11     A. Yes.

12     Q. Okay.

13   Let's talk about this vigilance on the compound

14      and correcting inmate behavior.

15   If an officer is walking to his post prior to his

16      shift, you would agree that if he sees, for example,

17      there was testimony during the time you were here,

18      somebody leaving the Health Center, whatever it's

19      called there with a box of gloves they're not supposed

20      to have, you would expect an officer who sees it to

21      deal with it immediately.

22   Correct?

23     A. I would hope they would.  I don't have an

24      expectation that they do, because I also have an

25      expectation that the unit officers wear a uniform work

1483

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    and many times they do not.
2    Q. Okay.
3    I'm talking about this information.  The
4    expectation is that the officer would correct
5    somebody's, an inmate stealing something from ---.
6    A. Well, stealing is an incident report code, and by
7    policy, it's 200 for an incident report.
8    Q. okay.
9    A. So they have to write an incident report, by
10   policy.
11   Q. They --- so they would have to deal with it?
12   They can't just walk by it.
13   Correct?
14   A. They would have to report it to somebody.
15   Q. So they would have to address it.
16   Correct?
17   A. It's not something that has to be addressed
18   immediately.
19   Q. They can ---.
20   A. It doesn't affect the overall life of an
21   individual.
22   Q. Okay.
23   Let's talk about ---.
24   A. It's not an emergency situation.
25   Q. Let's talk about just an inmate who is on the

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    grass, hanging out on the grass, and the officer is
2    coming on duty at a time when there are inmates
3    around.
4  It would be okay for you if the Housing Unit
5    Officer just sees the inmate on the grass and just
6    keeps on walking?
7    A. There's a Compound Officer that's on post.  He
8    would be responsible for ---.
9    Q. But it's a Compound Officer --- it's --- the
10   compound is big.  There's one Compound Officer, there
11   could be 500 people.
12   A. There's two Compound Officers now.
13 JUDGE:
14 Let's not talk over each other.
15 THE WITNESS:
16 I'm sorry, Your Honor.
17 JUDGE:
18 Look, I think both of you that's low in
19   temperature a little bit.  Let's take a turn and try
20   to pay a little more attention to regular courtesy of
21   the conversation.
22 ATTORNEY ELKIN:
23 Okay.
24   BY ATTORNEY ELKIN:
25   Q. So there could be two officers on the compound.

1485

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    One can be doing a fence check, one can be doing
2    something else.  There's no Compound Officer in my
3    hypothetical in view of this inmate who's hanging out
4    on the grass during the move while oncoming shift is
5    coming on for work.
6    Wouldn't it be your expectation that the
7    Correctional Officer who passes the inmate who's on
8    the grass to say something to him?
9    A. They should.
10   Q. So again, that's your expectation.
11   Correct?
12   A. Yes.
13   Q. And don't you also agree that let's say that
14   happens every day that officers coming in and coming
15   in at the same time that inmate's on the grass every
16   day and the officer doesn't do anything, doesn't that,
17   in fact, impact the officer's ability to do his job
18   safely and effectively on the post?  Doesn't that?
19   A. If he doesn't correct it?
20   Q. Yes.
21   A. No, it doesn't.
22   Q. You don't believe?
23   A. It sets a poor example to the inmate population.
24   Q. Right.
25   And once the inmate population is feeling like,

1486
Trial
Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1     whoa, we can get away with stuff in here, that's a
 2     problem for safety and security, don't you agree?
 3     A. It could turn into a problem for managing the
 4     inmate population.
 5     Q. Okay.
 6  So the best practice is to, as the 30(b)(6)
 7     witness testified, correct inmate infractions as you
 8     see them.
 9  Correct?
10     A. Yes.
11     Q. Okay.
12  That would include on the way to the post and on
13     the way leaving from the post.
14  Correct?
15     A. Yes.
16     Q. And in fact, that does improve even the
17     effectiveness of your safety and security functions as
18     a Correctional Officer when you're working on a
19     housing or compound or another post in the
20     institution?
21     A. Yes.
22     Q. You testified that there's no requirements that
23     the officer sign an overtime slip.
24  Is that correct?
25     A. That is true.
```

1487

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    So why are they being asked to come in and sign

3      overtime slips in the Lieutenant's Office?

4      A. They can come in and sign them during their

5      shift.  The overtime slips can be brought around to

6      them by the Captain's Secretary, by the Lieutenant.

7      Q. Have you ever put any order in place since 2020

8      when you became the Captain, to say, let's say, a

9      certain time of day 11 o'clock, I'm going to have the

10      Captain's Secretary go to each housing unit and

11      deliver overtime slips for signature?

12      A. No.

13      Q. You've never done anything like that.

14    Right?

15      A. No, I haven't.

16      Q. And you, in fact, allow the officers to come in

17      and sign overtime slip prior to their tour of duty.

18    Correct?

19      A. Yes.

20      Q. And you've seen that happen in the --- in the

21      Lieutenant's Office.

22    Correct?

23      A. Yes.

24      Q. And those mail packets of psychological reviews

25      or whatever that's in there, it's your testimony that

1488

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    officers have not come in and check their mailboxes in
2    the last three months?
3    A. No.
4    Q. Or is it your testimony that they haven't come in
5    and taken that psychological pamphlet out of the
6    mailbox and they perhaps don't want it?
7    A. I would hope if there was anything in their
8    mailbox that they would take it out.  If they don't
9    want it, then they could throw it in the garbage.
10   Q. Okay.
11   But as you sit here today, you can testify with
12   certainty that not a single Correctional Officer has
13   come in and checked his mailbox in the last three
14   months?
15   A. I believe one has.  That I can --- that I can
16   testify to.  That I believe one has.
17   Q. Okay.
18   A. That --- while they were on duty.
19   Q. Okay.
20   That you know of?
21   A. Yes.
22   Q. While they were on duty?
23   A. Yes.
24   Q. And what --- who was that and what was it?
25   A. I don't remember who it was.  I remember I was

1489

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1    actually standing in the hallway of the Lieutenant's
 2    Office and an officer walked in and said, hey, I'm
 3    just going to check my mailbox.  And he had keys and a
 4    radio on, so he was on duty at the time.
 5    Q. And what post was he assigned to?
 6    A. If he had keys and the radio, it must have been
 7    one either the Compound 1 or the Compound 2 Number ---
 8    Number 2 Officer.
 9    Q. Because there's no way a housing unit officer
10    could leave his post without being relieved.
11    Right?
12    A. That is not true.
13    Q. A housing officer can leave his post ---?
14    A. Housing, Special Housing Unit Number 3 and 4 will
15    routinely come up and get lunch.
16    Q. You have to --- sorry.  You have to listen to my
17    question.
18    A. Okay.  Sorry.
19    Q. A Housing Unit Officer cannot leave his post
20    without being relieved.
21    Correct?
22    A. What type of housing unit?
23    Q. A General Population Housing Unit Officer.
24    A. General population, no.
25    Q. On these threes, the Lieutenant calls, the
```

1490

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      conference call, ---

2      A. Yes, ma'am.

3      Q. --- you don't know how often those happen, if at

4      all, on morning watch, do you?

5      A. On morning watch?  I can only testify to the

6      three shifts that I was actually on morning watch for.

7      And all --- all three of them had conference calls.

8      Q. And did you conduct those conference calls?

9      A. No, I did not.

10     Q. Okay.

11     And then so you don't know of any of the other

12     times that they happen on weekly basis or a monthly

13     basis or a daily basis?

14     A. I was not present for them.

15     Q. Okay.

16     And you don't have your Lieutenants sort of log,

17     hey, I made this threes ---?  Well, let me back up.

18     It's not a requirement that the Lieutenant make a

19     conference call to pass on information each shift at

20     the beginning of each shift.

21     Correct?

22     A. It's an expectation.

23     Q. It is not a requirement?

24     A. It's an expectation.

25     Q. But it doesn't happen, does it?

1491

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1        A. On the Lieutenant's logs daily, there is a spot
2        on the Lieutenant's log that entails the threes
3        conference call.
4        Q. And ---.
5        A. There is information that is entered into that.
6        So it is my expectation that the Lieutenants conduct a
7        conference call every shift.
8        Q. And you don't know what time that that conference
9        call is conducted?
10       A. Ordinarily near the beginning of the shift.
11       Q. But you don't know what time as you sit here?
12       A. I don't know.  If there's no verbatim time that
13       it happens every single day, on every single day.  It
14       can happen at various times.  My expectation is that
15       it's conducted in the beginning part of their shift.
16       Q. And the Lieutenant would not have been on each of
17       the housing units on the prior shift who's conducting
18       the threes.
19       Correct?
20       A. Sorry, say again?
21       Q. The Lieutenant would not --- the Lieutenant who's
22       conducting the call was not on the previous shift.
23       Right?
24       A. I don't understand.  If the ---?
25       Q. It the day watch shift where there's a threes

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1492

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    going on.

2  Right?

3    A. Yes.

4    Q. That is the day watch Lieutenant conducting a

5    call?

6    A. Yes.

7    Q. So he's not the morning watch Lieutenant?

8    A. That is true.

9    Q. Okay.

10  And so he's passing on information about what's

11    going to happen during the day, that kind of thing?

12    A. Either what can happen during the day, what

13    happened during the previous shift, what happened

14    during the previous day.  Yes.

15    Q. Okay.

16  And so --- but his expectation, though, is the

17    best information that a Housing Unit coming ---

18    Officer coming on shift or a Compound Officer coming

19    on shift or a SHU Officer coming on shift, the best

20    way he can get information is from the guy who is

21    leading him and to do just a verbal pass-down?

22    A. Not necessarily.

23    Q. Did you --- you said you eventually, you went

24    back and you realized you did, in fact, receive money

25    in the portal that you were part of at FCI Danbury?

1493

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1    A. That is not true.  I said that I did an email
2    search and identified that I was a portal grievant.
3    Q. And so, are you saying that you did not receive
4    money?
5    A. I do not recall receiving any money.
6    Q. Did you correct the record in any way that you
7    did, in fact --- you were, in fact, a portal grievant
8    after the hearing in the case?
9    A. I just recently discovered it last week.
10   Q. So you --- you went back and what ---?
11   A. It was, actually.  It was bothering me, yes.
12   Q. But you didn't do it until you came to ---
13   because you knew I was going to ask you about it.  So
14   you didn't do it until the --- until last week when
15   the attorney said go back and see whether you were, in
16   fact, a portal grievant?
17   ATTORNEY VALLACHER:
18   Objection to the extent it calls for
19   privilege.
20   JUDGE:
21   What's the question?  What's the
22   question again?
23   ATTORNEY ELKIN:
24   He didn't go and look at, to see his
25   emails to see whether he was in fact a grievant in a
```

1494

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1    portal grievance until the attorney instructed him to
 2    do it in the last week.
 3  JUDGE:
 4  Do you have a basis for saying he was
 5    instructed to?
 6  ATTORNEY ELKIN:
 7  He only did it in the last week.
 8  JUDGE:
 9  I am asking you if you have a basis for
10    saying that he was instructed to or is that you
11    speculating?
12  ATTORNEY ELKIN:
13  I could ask him.  I don't have a basis
14    other than the timing.
15  JUDGE:
16  Oh, goodness.
17  How about you just focus on the timing?
18  ATTORNEY ELKIN:
19  Okay.
20    BY ATTORNEY ELKIN:
21    Q. It was in the last week that you went back to
22    research your emails?
23    A. Roughly, yes.
24    Q. Okay.
25  And you did that because you knew I was going to
```

1495

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1      be asking about this portal grievance.
2    Right?
3      A. I don't know what you were going to be asking me.
4      You could ask me anything.  I could only speculate
5      that you would have asked me.
6      Q. You testified that the best place to find the
7      sort of tasks that the employees perform are in the
8      positions --- I'm sorry, the post orders as well as in
9      their special instructions.
10   Is that right?
11     A. The post orders as a whole, there's five sections
12     to the post orders.
13     Q. And with respect to what Housing Unit Officers
14     are doing the task respective duties, you look at the
15     specific post orders and the special instructions?
16     A. Yes, that is correct.
17     Q. And for SHU you would look at their special
18     instructions and the post orders.
19   Correct?
20     A. At the specific and the special --- yes.
21     Q. And your answer would be the same for compound
22     and for control.
23   Correct?
24     A. Yes.
25     Q. And it was your testimony that this --- the stuff

1496

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      that they're supposed to be doing and that they do on
 2      post, that's what they're paid for.
 3   Correct?
 4      A. Yeah.
 5      Q. And that's what they get paid for?
 6      A. Yes.
 7      Q. And when you relieve Mr. Bunting a month, two
 8      months, whatever it was ago ---
 9      A. Yes.
10      Q. --- you started assuming the duties of that SHU 1
11      mode 15 minutes prior to the start of that shift.
12   Right?
13      A. Yes, that is correct.
14      Q. And so you were performing the duties of the SHU
15      between the time of ███████████████ .
16   Correct?
17      A. Yes.
18      Q. So you were performing the duties that are set
19      forth in the specific post orders and the special
20      instructions.
21   Correct?
22      A. Yes.
23      Q. You were not --- you did not get paid for that
24      time.
25   Correct?
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1      A. I was there for six, actually, I think, 18 hours
2        that day.  So I only got paid for eight.
3        Q. Okay.
4      So you would agree that you didn't get paid for
5        that time?
6        A. No.  It was --- once I assume that post, then
7        that's --- that's my post.
8        Q. Okay.
9      Well, let's talk about --- maybe you're special
10       and you get paid for all the time.  Let's talk about
11       actual Correctional Officers.
12     Okay?
13     Your testimony is that when they are, they ---
14       they're paid to do what they do on their posts.
15     Correct?
16       A. Yes.
17       Q. Okay.
18     But that's not, in fact, true, is it?
19       A. No, it is true.
20       Q. Okay.
21     You've been sitting through this trial all week.
22     Right?
23       A. Yeah.
24       Q. I want you to look at DX-14, please.
25       A. Okay.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1498

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1    Let me stand up one second.  You said DX-14,
 2       delta x-ray 14?
 3       Q. Yes.  Yep.  Tell me when you're there.
 4       A. I am there, ma'am.
 5       Q. Okay.
 6    So if we look at the first page, Michael
 7       Buckingham data.
 8       A. Yes, ma'am.
 9       Q. And this is the document that the Government
10       prepared?
11       A. Yes.
12       Q. You would agree that time relieved --- time
13       relieved Correctional Officer leaves post.
14    Do you see that, sort of, I don't know, about
15       seven columns in in dark blue?
16       A. Time Correctional Officer leaves post at the end
17       of the shift?
18       Q. No.  Sort of halfway, halfway through the
19       document, under, like, the G-H-A-M in Buckingham.
20       A. Okay.
21    The time relieved Correctional Officer leaves
22       post.
23       Q. Okay.
24       A. Okay.
25       Q. And that's --- if you go to the one next door to
```

1499

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    the left, that's the time Mr. Buckingham is arriving
2    at his post.
3    Correct?
4    A. Yes.
5    Q. And so,the time that the relieved Correctional
6    Officer leaves his post by that time, Mr. Buckingham
7    will assume the duties of the post.
8    Correct?
9    A. Yes.
10   Q. Okay.
11   So if you look at control center one on 6/26/19.
12   Do you see that?
13   A. Hold on a second.  Control center.
14   Q. It's halfway down the page.
15   A. Control Center 1, 7/12/19 is the date?
16   Q. 6/26/19.
17   A. 6/26/19, got it.
18   Q. And you see he's working the control center?
19   A. Yes.
20   Q. And if you go over to the column where you agree
21   that he has assumed the duties of the post, it's
22   ████████.
23   Correct?
24   A. Yes.
25   Q. But Mr. Buckingham doesn't get paid until ███

1500

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    ██████████

2    Correct?

3        A. Yes.

4        Q. Even though he's performing, he is --- he is

5        doing the duties of the post at least by ██████████

6    Correct?

7        A. Yes.

8        Q. Okay.

9    And your answer would be the same if you go down

10       to the SHU 1 post for him on 10/6/19.  Move over to

11       that column where the relief is already done and he's

12       assumed the duty of his post.  You can see that he

13       started working the post at ██████████

14   Correct?

15       A. I lost you.

16   Could you go back to?

17       Q. Sorry.  SHU 1, left-hand side, 10/6/19.

18       A. Okay, got it.

19       Q. Okay, I'm sorry.

20   And then you move over to that column that we're

21       interested in, which is the time that Mr. Buckingham

22       assumes the duty of the post?

23       A. Yes.

24       Q. And you see that it's at ██████████

25       A. Yes.

1501

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1     Q. And you would agree that his pay doesn't start
2     until █████
3     A. Yes.
4     Q. Even though he has assumed the duties of the post
5     and is doing those things in the SHU-specific post
6     order and in the SHU special instructions.
7     Correct?
8     A. He also left 19 minutes early and wasn't docked
9     sick time.
10    Q. Okay.
11    But you would agree that ---?
12    A. So he would remain until ████████
13    Q. But he was not paid from ██████████████
14    Correct?
15    A. He was --- no, he was not.
16    Q. And you would agree that he was inside an
17    institution on this post and within the secured
18    confines of the prison, compound for 14 minutes beyond
19    eight hours?  Second to last column.
20    A. Second to last column.  That's what --- that's
21    the time that is reflected, yes.
22    Q. Okay.
23    And so would your answer would be the same for
24    all of these SHU-1 posts where he had already assumed
25    the duties of the post ████████████     He is not

1502

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     paid for the time between that time before█████

2     █████████████

3   Correct?

4     A. Yes.

5     Q. And you would agree that if it was the case, I

6     believe when you did the SHU post, the person didn't

7     relieve you until ████ or something like that?

8     A. No, it was --- I believe it was like █████

9     Q. Okay.  All right.

10  And your testimony would be the same if went to,

11    for example, Matt Bunting on the next page on, when he

12    worked SHU-1 in the middle of the page, 10/23/19.

13    A. Okay.

14    Q. He is assuming the duties of the post at █████

15  Correct?

16    A. Yes.

17    Q. And he's not being paid until ████████.

18  Correct?

19    A. He also left 19 minutes early.

20    Q. From the post, not from the institution?  He left

21    --- he did not leave the compound until at least eight

22    hours and ten minutes after he arrived on the

23    compound.

24  Correct?

25    A. He was paid until ████████

1503
Trial
Kathy Aitken, et al. v. USA                           3/16/2023

```
 1      Q. And he did not get paid for anything above eight
 2    hours?
 3      A. According to this, he owes the Government money.
 4      Q. Okay.
 5   And you would agree, though, he did not pay for
 6    any of the time between the ████████████████████
 7    ████████████████████████████████████████████████████
 8      A. Yes.
 9      Q. And that true even if their relief gets there at
10    ████████████     They're still not going to get paid for
11    that time?
12      A. If the relief gets there at ███████████   the relief
13    is on time.
14      Q. And you would agree they would still not get
15    paid, they being the person, Mr. Bunting he arrived at
16    ███████  for the SHU post.  He would not get paid even
17    though he assumed the duties of post for the 25
18    minutes prior to his shift that he's on the post on
19    the days that his relief arrived at the post at
20    ██████████████
21   Correct?
22      A. Could you restate the question again?
23      Q. On the days that the officers arrived to the post
24    early, you said everybody comes to the post early?
25      A. Yes.
```

1504

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. That's for ---?

2    A. It's universal.

3    Q. Except for the person who relieved you got there

4    at █████

5    A. He forgot his belt in his car and had to go back

6    to his car.

7    Q. He needed his belt for his job?

8    A. He didn't.

9    Q. No, they --- he did need his belt for his job?

10   A. He felt that he did, but it you need a belt for

11   an attachment point for equipment that you're given.

12   Q. Okay.  Right.  Okay.

13   So on those occasions when people forget their

14   belts that they need for their jobs and they have to

15   go back to the car, and then they don't show up to the

16   post until ████████    You would agree that the prison

17   does not pay the workers for being on the post at

18   ██████ assuming the duties of the post.

19   Correct?

20   A. Yes.

21   Q. Now I notice your duty belt, you bring in your

22   own chains.

23   Right?

24   A. Yes.

25   Q. And a number officers bring in their own chains.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   Right?

2   A. No.

3   Q. Do you --- have you ever done ---?

4   A. There's --- there's a small handful that do.

5   Q. Have you ever done an audit of how many people

6   bring in their chains?

7   A. No, I don't.

8   Q. Okay.

9   So you don't really know who brings a chain?

10  A. No, I know that they, there's a small handful

11  because the chains that are attached to the keys were

12  bought on a roll and they're smaller.  The links are

13  smaller.  You can't find links that small anymore.

14  Q. Okay.

15  So you bring in your own chains because the

16  chains that are attached to the keys aren't on it?

17  A. No, that is not true.

18  Q. So why do you bother bringing your own chains?

19  A. Because when I transferred --- because FCI

20  Danbury had chains attached to the keys, when I went

21  to FCI Ray Brook as a Lieutenant, they don't have

22  chains attached to the keys.  So I bought chains that

23  were longer.  And it also just so happened to be that

24  it was from my dog, or from my dog that passed away

25  and as kind of like a little remembrance that I get to

1506

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

```
 1      keep him with me, because it was my first dog that I
 2      actually owned by my own.  So it's sentimental.
 3      Q. Okay.
 4  So you bring in these longer chains with you?
 5      A. It doesn't, it's the fact that they are longer,
 6      it was --- it's a dog collar.  That's actually what it
 7      was.
 8      Q. Okay.
 9      A. It was a dog collar.
10      Q. All right.
11  So ████████    you didn't talk about ████████████
    ████     ████████████████████ .
13  Right?
14      A. That is true.
15      Q. You attach yours to the ████████    I think I saw
16      that?
17      A. I do.
18      Q. Yeah.  And so, that's all attached to your duty
19      belt when you put it through the screening site,
20      through the x-ray machine, with the metal chits are
21      already attached.  The metal chains are already
22      attached.  The metal clips are already attached.
23      A. One-stop shopping, yes.
24      Q. One-stop shopping.  The pouches that may have
25      metal snaps are already attached?
```

1507
Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      A. Yes.
 2      Q. Because, as you pointed out, that that screening
 3      site's pretty good.  It picks up this tiny little clip
 4      on my belt, and I didn't have a belt on me.
 5      A. That is true.  Yes.  It was the --- it was the
 6      clip on your pants.
 7      Q. Right.
 8      A. On your dress pants, yes.
 9      Q. So it's a ███████████████████████?
10      A. Yes.
11      Q. And it would detect a snap███████████████
12 ███  ██████
13      Correct?
14      A. That's what it's designed to do.
15      Q. Okay.
16      So you --- you did one-stop shopping as did
17      Correctional Officers because they're trying to be as
18      effective as possible.
19      A. Yes.
20      Q. And efficient as possible.
21      Correct?
22      A. Yes.  It's all about speed and efficiency.
23      Q. And you put --- put the belt with all the things
24      on it on the conveyor belt, pass it through the x-ray
25      machine?
```

1508

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1       A. Yes.

2       Q. You clear the upright metal detector?

3       A. Yes.

4       Q. And then you collect your duty belt?

5       A. Yes.

6       Q. And you put it on there?

7       A. Yes.

8       Q. Okay.

9     And you lead by example?

10      A. Yes.

11      Q. And you agree that an officer could not do his

12      job on his post without having his duty belt with all

13      of the chits, clips, keepers, the ████████ that the

14      institution issued to him.  He needs those things

15      attached to his belt in order to do his job safely and

16      effective on the post --- on his post.

17    Correct?

18      A. The duty belt in question?

19      Q. All --- the whole one-stop shop we were talking

20      about.

21      A. Yes.

22      Q. The whole thing.

23      A. Yes, that's --- that's easy.  It's not required

24      that they have a duty belt.  It's easy.  That's why

25      most people do it.  It's fast.

1509

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Q. It's fast and it works.  It holds up that heavy
2    equipment, doesn't it?
3    A. The equipment's not that heavy.
4    Q. It holds up the equipment.
5 Right?
6    A. Yes.
7    Q. All right.
8 And sometimes officers can have 20 to 30 keys on
9    them?
10   A. Yes.
11   Q. Some of those, how many of those are Folger
12 Adams, if any?
13   A. I would say 15 of them are Folger Adams keys.
14   Q. They even have a radio on them with a body alarm?
15   A. Yes.
16   Q. And an OC spray?
17   A. Yes.
18   Q. And holsters and pouches?
19   A. Yes.
20   Q. And they also carry the MK-9 on their leg?
21   A. Yes.
22   Q. Is that also to attach the belt somehow?
23   A. Yes.
24   Q. And it's your testimony that it's not very heavy?
25   A. It's not.  I've been wearing it for the last

1510

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    17-and-a-half years.

2    Q. Have you ever weighed it?

3    A. No, I have not.

4    Q. You would agree that all those things are the

5    specific post orders that they do during their shift?

6    Whether it's on the SHU, the patrol, compound, the

7    housing, general housing units?  All of those things

8    are to ensure the safety and security of institutions

9    back end.

10   Correct?

11   A. No.  The --- not every --- the post orders are

12   designed just as that last paragraph states that it

13   can't foresee every single circumstance that they

14   could be faced with.  The tools that are given to

15   them, i.e., the equipment, meaning the radio, the

16   keys, the OC, that's --- that's what they are is their

17   tools, their equipment that they have to use

18   throughout their duties in that post.

19   Q. Okay.

20   And I was talking about something a little bit

21   different.  The things that they have to do throughout

22   the day on the posts that are set forth in the

23   specific post orders as well as the special

24   instructions.

25   A. Yes.

1511

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

```
 1     Q. No matter which post it is, those things are to
 2     ensure the safety and the security of the institution,
 3     staff and inmates.
 4     Correct?
 5     A. Hopefully, yes.  It will achieve that goal of
 6     having a safe and secure institution.
 7     Q. So you would agree their job is to ensure the
 8     safety, security of the staff, inmates and
 9     institution.
10     Correct?
11     A. No.  Their duties achieve that goal.  As a
12     Correctional Officer, your --- if you're a
13     Correctional Officer for a housing unit, you would
14     have different activities or different duties that you
15     would do in that housing unit.  The Special Housing
16     Unit has different activities that they do.  It's ---
17     there's no one ---.
18     Q. And all of those other duties together are
19     maintaining, their job is to maintain the safety and
20     security of the institution, staff and inmates.
21     Correct?
22     A. No, that is the goal.
23     Q. Okay.
24     A. Is to provide a safe and secure institution for
25     staff, inmates and the general public.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1       Q. You agree that the purpose of the screening site
2       is to prevent the introduction of contraband into an
3       institution.
4    Right?
5       A. Yes.  By everyone.
6       Q. And you agree that that having that screening
7       site there makes Otisville a safer place.
8    Correct?
9       A. Yes.
10      Q. And if staff refused to go through the screening
11      site, they would be disciplined.
12   Right?
13      A. They would not be allowed entry into the
14      institution.
15      Q. And then they ---?
16      A. I can't say if they would be disciplined.
17      Q. Well at that point, would they be AWOL from their
18      post?
19      A. If they were assigned to post?  If they showed up
20      30 minutes early, then no.
21      Q. Do you recall testifying on June 23rd at FCI
22      Danbury?
23   Right?
24      A. Yes.
25      Q. Okay.

1513

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     FCI Danbury is a low institution?
 2       A. That is true.
 3       Q. And at FCI Danbury, and you would agree that if
 4       the staff did not compete with security screen
 5       process, they cannot enter the institution.
 6     Right?
 7       A. That is true.
 8       Q. And if they refuse to complete the process, they
 9       would be subject to discipline.
10     Correct?
11       A. Yes, that's --- they would be subject to it.
12       That's not saying that they would be disciplined.
13       Q. Okay.
14     So the same thing here.
15     In Otisville, they would be subject to discipline
16       at Otisville?
17       A. Yes.  If they were AWOL, they would be subject to
18       discipline.
19       Q. Okay.
20     And contraband is something, it could be a piece
21       of trach, a wire.
22     Right?
23       A. There's different levels of contraband.
24       Q. But you would agree?
25       A. Contraband that we identify to the inmates is any
```

1514

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    item that the inmate does not receive through normal
2    channels, i.e., the Commissary or issued by the
3    institution.  Contraband coming in from the outside
4    could be any number of things.
5    Q. Cell phones?
6    A. Cell phone?  Absolutely, yes.
7    Q. A knife and a gun?
8    A. If it's not authorized.
9    Q. A knife and a gun would be contraband?
10   A. Yes.  That would absolutely be hard contraband.
11   Q. And you're familiar with the SIS Lieutenant's job
12   duties with respect to logging contraband.
13   Right?
14   A. Yes.
15   Q. Okay.
16   And the types of things that have been found
17   within the institution, I mean, you would agree that
18   inmates can make a shiv out of about pretty much
19   anything or shank?
20   A. Yes, an inmate can.  I mean, depending on what
21   inmate.  There are usually certain inmates that have a
22   propensity to making knives.  You usually find those
23   inmates in a USP.
24   Q. And at FCI Otisville, you would agree that there
25   have been shivs and shanks and knives and all sorts of

1515

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    different types of hard contraband found that inmates

2    were creative enough to make from things they found

3    within the institution.

4    Correct?

5        A. Yes.

6        Q. And you would agree that if a Correctional

7    Officer saw some kind of contraband on the compound as

8    he's walking to his post, they can't ignore it.

9    Right?

10       A. I would hope that they wouldn't.

11       Q. And you would agree your expectation is that they

12    wouldn't ignore it.

13    Right?

14       A. My expectation would be no.  If they found hard

15    contraband, they should absolutely secure it and turn

16    it into the Lieutenant's Office.

17       Q. You would agree that the officers cannot do their

18    jobs on the post without their metal chits.

19    Right?

20       A. That is not true.

21       Q. They can do their jobs on their post without

22    their chits?

23       A. Yes.

24       Q. How do they account for equipment?

25       A. The Lieutenant's Office has a cage in the

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1     Lieutenant's Office that has ████████████ for the
 2     times that staff forget their chits.  And they will
 3     have to go and ████████████████ from the
 4     Lieutenant's Office.  ████████████████████████
 5     ████████████████████████████████████████████████
 6     ██████████     And they're issued to that staff member at
 7     that time.
 8     Q. Okay.
 9     So chits are so important that you even have an
10     extra set of them in the event that an officer does
11     fail to bring his chits into the institution.
12     Correct?
13     A. That's how we ████████████████████████,
14     yes.
15     Q. So --- so you would agree that an officer has to
16     have his chits or the chits that he had to stop by the
17     Lieutenant's Office to pick up prior to his shift?  He
18     has to have all --- he has to have chits on him in
19     order to safely and effectively do his job on his
20     post.
21     Correct?
22     A. In a perfect world, yes.
23     Q. Not a perfect world.
24     In this world?
25     A. In this world, in this world I have officers that
```

1517
Trial
Kathy Aitken, et al. v. USA                                      3/16/2023

    1      put their car keys on the hook ---
    2      Q. Okay.
    3      A. --- and remove handcuffs.
    4      Q. And that's not acceptable?
    5      A. No, it is not.
    6      Q. Okay.
    7    So in --- in the world that we live in, where you
    8      expect these officers to follow rules.
    9    Right?
   10      A. Yes.
   11      Q. Do you put chits on --- on ███████████ and
   12      other things when you get equipment?
   13      A. I do, yes.  Yes, I do.
   14      Q. And you lead by example.
   15    Correct?
   16      A. Yes.
   17      Q. So your expectation is that the officers will use
   18      the chits that they brought in to them.  That's the
   19      expectation that they bring them in,
   20    Correct?
   21      A. Yes, ideally.
   22      Q. Okay.
   23    And so they will use those █████ in order to
   24      ████████████████  If they're not doing that,
   25      then safety and security is at risk.

1518

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1   Correct?
2     A. Accountability is at risk.
3     Q. And accountability is one of the most important
4     things in an institution.
5   Correct?
6     A. Accountability, yes.
7     Q. Okay.
8   And accountability is undermined if the officers
9     are not following the rules and putting their █████
10    ████████████████████████████████████ when they're
11    taking out a ██████████████████.
12  Correct?
13    A. Yes.  We don't have accountability if they don't
14    have their chit on that item.
15    Q. And that would undermine the safety and security
16    of the institution.
17  Correct?
18    A. It could, yes.
19    Q. Do you agree that the place that the Correctional
20    Officers must collect and pick up their duty belts
21    with the metal chit attachments is in the A1 lobby?
22    That's where they grab them.
23  Correct?
24    A. That they get their duty belts?
25    Q. Yes.

1519
Trial
Kathy Aitken, et al. v. USA                          3/16/2023

```
 1      A. Yes.
 2      Q. And you would agree that since at least
 3      September 10th, 2020, supervisors have had access to
 4      view the ███████████████████ in the A1 sally
 5      port at all times of the day.
 6   Correct?
 7      A. Sorry, say again?
 8      Q. Since you arrived in the institution, ---
 9      A. Yes.
10      Q. --- you would agree that supervisors have access
11      to view the ████████████████████ in the A1 sally
12      port at any time of the day.
13   Correct?
14      A. Any staff entering or exiting --- any person
15      entering or exiting can look at the board.
16      Q. Okay.
17   And, but any person is not going to have the key
18      to figure out what number is assigned to which
19      Correctional Officer.
20   Correct?
21      A. It's actually in the lobby and the control center
22      and in the Lieutenant's Office.
23      Q. Okay.
24   So it's very accessible, then.
25   Correct?
```

1520

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes.

2    Q. Okay.

3    So a Lieutenant at any time can grab that key,

4        and at 7:30 in the morning, look at that chit board at

5        the section where the Correctional Services' employees

6        are and say, oh, Maxwell's already inside?

7    A. Theoretically.

8    Q. Okay.

9    But you have never, since you became Captain,

10       directed anybody to do any kind of audit of that chit

11       off board during, you know, prior to the shift change

12       times or after shifting change times to see, see if

13       people are coming in early?

14   A. No.

15   Q. You would agree that it is important to correct

16       inmate behavior whenever a Correctional Officer sees

17       something that is a violation of a rule.

18   Correct?

19   A. Yeah.

20   Q. And that's because it's very important to enforce

21       the rules in a Correctional environment at all times?

22   A. Yes.

23   Q. And that would be, that would include prior to

24       getting to the post and after leaving the post.

25   Correct?

1521

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1      A. Yes.
2      Q. And even if it's a relatively small violation,
3         that rule needs to be enforced.
4   Correct?
5      A. Yes, it should.
6      Q. And that's because small violations can become
7         large violations later.
8   Correct?
9      A. That is true.
10     Q. Were the --- you have Exhibit 28 or 58, the
11        Whinnery post orders?  You can look at that if you
12        want to.
13     A. From what binder?
14     Q. Joint.
15     A. You said five eight, 58?
16     Q. And the question I'm going to ask you is that
17        these were in effect when you issued your post orders?
18     A. Standby, please.  So Julia x-ray five eight?
19     Q. Yes.
20     A. Okay.
21     Q. I think you'll find it on page 43.
22     A. I'm sorry, it's all backwards and I don't know if
23        this is the one that got dropped.  It's all --- I
24        think I got it.  I think it was put in here a little
25        bit backwards, maybe.
```

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

1       Q. Okay.

2   So you're at 43, 43 of Joint Exhibit 58?

3       A. Yes.

4   Where it says Matt Whinnery Captain,

5       January 30th, 2019?

6       Q. Yes.

7       A. Yes.

8       Q. And so is it fair to say that these was set forth

9       at Joint Exhibit 58 were the post orders that were in

10      effect until you issued your general post orders?

11      A. Yes, that is correct.

12      Q. ███████████████████████████████████

13      ████████████████████████████████████████████

14      A. I don't understand what you mean why?

15      Q. ██████  ████████████████████████████████

16      ███████████████████████████████  ████████████

17      ███████████████████████████████████

18      A. ███████████████████████████████  .

19      ████████████████████████████████████████

20      ████████████████████

21      Q. And is that for safety and security purposes?

22      A. ████████████████████████████████████

23      Q. █████████████████████████████████

24      ███████████████████████

25  Right?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1523

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. That is true.
2      Q. And so --- and you want it to be accessible to
3      the officer, in case it's needed.
4   Correct?
5      A. Yes, that is true.
6      Q. So since you've been a Captain at FCI Otisville,
7      you agree that the COs have to be on the post by the
8      start of their scheduled shift to be on time?
9      A. Yes.
10     Q. With all their equipment and whatever information
11     that is being passed down that's been done by the
12     start of the scheduled shift?
13  Correct?
14     A. Yes, that is correct.
15     Q. And you agree that to be on the 24-hour post at
16     issue in this case --- the let's say general
17     population housing unit, a Correctional Officer would
18     have to clear the metal detector.
19  Correct?
20     A. Yes.
21     Q. Clear the --- collect his duty belt?
22     A. Yes.
23     Q. Put it on with the chits and the chains and
24     everything secured.
25  Correct?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Yes.

2    Q. Clear the sally ports of A1 and control?

3    A. Compound, yes.

4    Q. Compound sally port?

5    A. Yes.

6    Q. Walk across the compound to the post of the

7    housing unit?

8    A. Yes.  Yes.

9    Q. And engage in an information and equipment

10   exchange.

11   Correct?

12   A. The equipment exchange, yes.

13   Q. And the expectation is that they pass on

14   pertinent information as well.

15   Correct?

16   A. Yes.

17   Q. Okay.

18   And you agree that during this overlap where,

19   let's say it's EA.  EA is the post that we're talking

20   about.

21   Okay?

22   A. Okay.

23   Q. And we have an EA officer who's on the day watch

24   shift, and he's on his post.  It's ███.  The EA

25   Evening Officer for the evening watch is coming

1525

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
1      through the control --- or the screen process, doing
2      all those things, making his way up to the EA to
3      relieve the day watch officer.
4   Okay?
5      A. Yes.
6      Q. During that time, between ███ and ███, does the
7      prison have two officers assigned to the EA post on
8      the agency premises?
9      A. No, there's one officer that's assigned to the
10     post.
11     Q. Well, one officer is on the post, the other
12     officer is assigned to the post, but he's not there
13     yet.
14  Correct?
15     A. There's one officer on the post, yes.
16     Q. Right.  But the oncoming EA ---.
17     A. The oncoming officer is technically inside the
18     prison.
19     Q. Okay.
20  So there's two officers that during the course of
21     the 24-hour day, there's two officers that will be on
22     that post during the 24 hours.  But they're there at
23     the same time during this overlap of the Evening Watch
24     Officer getting to his post and doing the exchange and
25     then there's still an overlap as that Day Watch
```

1526

Trial

Kathy Aitken, et al. v. USA                                  3/16/2023

1    Officer leaves the institution?
2    A. No, there is no overlap.
3    Q. There's no overlap?
4    A. No.
5    Q. I mean, there's no scheduled overlap.  I
6    understand that.
7    A. No, there's no overlap.
8    Q. There's no overlap?
9    A. The oncoming officer doesn't have any
10   responsibilities for --- if he's on the compound, his
11   assigned post is EA.
12   Q. I understand that, but ---.
13   A. He's not in EA.  He doesn't have the EA radio, he
14   doesn't have the EA keys.
15   Q. Right.
16   A. He doesn't have the ██████
17   Q. That wasn't my question.  My question --- my
18   question was on agency premises, there are two
19   officers that will, during that course of that day,
20   either they're assigned on EA or they're about to be
21   on EA.  There's two officers for that there at the
22   same time.
23   Correct?
24   A. By that virtue, what if somebody's working out in
25   the training center?

1527

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2      A. If they're on the agency premises.

3      Q. I'm talking about inside, inside the institution.

4      That are available to respond to emergencies if one

5      should ---?

6      A. Yes.

7      Q. Okay.

8      A. If there's an emergency, yes.

9      Q. Okay.

10     So you would agree that during that sort of

11     overlapping time, when the EA Evening Watch Officer is

12     making his way to the post and the EA Day Watch

13     Officer is closing out the day, there are two

14     officers, but only one of them is getting paid?

15     A. Yes.

16     Q. Okay.

17     Now I understand Mr. Vallacher visited the

18     institution and did a tour prior to our tour.

19     Is that --- were you present for that?

20     A. Yes.

21     Q. Okay.

22     And you took him on the tour?

23     A. Yes, I believe so.

24     Q. Okay.

25     And you issued him a vest for the tour.

1528

Trial

Kathy Aitken, et al. v. USA                                   3/16/2023

```
1    Correct?
2    A. He had asked to see one and if it would be okay
3       if he wore a vest, yes.
4    Q. Okay.
5    So he wore a vest on the first tour?
6    A. Yes.
7    Q. And you would agree that none of us visitors wore
8       a vest on the tour with His Honor?
9    A. Yes.
10   Q. You would also agree that all of the staff, the
11      Correctional Officers who are Lieutenants U, AW, they
12      all have that inside the secured premises.
13   Correct?
14   A. Yes, it's required by policy for BOP staff.  All
15      staff.
16   Q. Isn't it true that on our tour, Mr. Shemanski
17      asked you if we can have vests?
18   A. No.  I don't --- he said, do you need vests?  And
19      I said, no, they're not BOP staff.
20   Q. When did FCI Otisville stop being a drop yard?
21   A. Stop being a drop yard?
22   Q. Is that what it's called?  Or dropout yard?
23   A. It's gone through several mission changes over
24      the years.  It became a drop yard in 2014, I believe.
25   Q. I, well I want you to talk about your time since
```

1529

Trial

Kathy Aitken, et al. v. USA                          3/16/2023

1      you've been a Captain.
2    Is it still a drop yard?
3      A. No, it wasn't a drop yard when I got there.
4      Q. So it already was no longer --- and that means
5      that there are gang members?
6      A. No.
7      Q. There's no more gang members there?
8      A. Now there are.  As of October 2022, it became an
9      active medium.  Previous to that, I don't know exactly
10     what time frame it changed, but in 2014, it went to a
11     drop yard, and then that mission was given to FCI
12     Ferris Fairton and Otisville was reclassified as an
13     active yard.  And then after it was classified as
14     inactive yard, then in October of 2022, it was
15     reclassified as an active yard.
16     Q. Did you notice two employees coming through with
17     us on our tour?  That were not on --- that were not on
18     the tour?
19     A. Ms. Santiago, I believe, and I don't remember who
20     the other one was.
21     Q. Okay.
22     A. Did I speak to them?
23     Q. I don't remember.
24     A. I don't remember.
25     Q. But because I was paying a lot of attention.  So

1530

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Ms. Santiago, did she --- she's a non-custody worker.
2    Correct?
3    A. That is true.
4    Q. She's in charge of training?
5    A. No, she is not in charge of training.  She is the
6    Employee Development Specialist.
7    Q. Okay.
8    A. So she's not the supervisor.  She's one of the
9    augmentable staff that we use.
10   Q. Okay.
11   So she would have picked up whatever equipment
12      she needed at the control center.
13   Is that right?
14   A. Yes.
15   Q. And then the other person and we were going
16      through that security 9915, that would also be
17      somebody who's non-custody because custody would
18      already be on their post.
19   Correct?
20   A. Yes, ordinarily.
21   Q. And so that person who did not put his cell phone
22      in that --- right there in the lobby where we all
23      were, he would have had to have his belt on by the
24      time he got through the control window to draw
25      equipment.

1531

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

1    Correct?
2        A. He would have to put it on before he drew
3        equipment.
4        Q. Okay.
5    And he would have drawn equipment if he's not
6        custody at the control center window.
7    Correct?
8        A. Depending on where he worked.  I don't know who
9        it was.  I don't know where they worked.  If he had
10       24-hour keys, he may not be going inside the compound.
11       He may have gone up to the Business Office if it was
12       one of the Business Office staff.
13       Q. Okay.
14   So he might not even need to withdraw any kind of
15       equipment at all?  All right.  And so --- but can you
16       say with certainty today that that person who was not
17       Ms. Santiago, who was a Correctional worker of some
18       kind, was not a custody worker?
19       A. I cannot say with any certainty because I don't
20       even --- I don't even remember a second person.  I
21       remember Ms. Santiago.  I don't remember a second
22       person.
23       Q. Okay.
24   But there would not be a Correctional Officer
25       coming on post at ███████████

1532

Trial

Kathy Aitken, et al. v. USA                           3/16/2023

```
 1     A. No.  They would not.
 2     Q. So by deduction, can you say that with reasonable
 3     certainty that it was somebody in non-custody?
 4     A. If there was a second person, yes.  Absolutely.
 5     Q. Okay.
 6  I'd like to move to --- I'm sorry.  Can you look
 7     at JX-69?
 8                          ---
 9  (Whereupon, Joint Exhibit JX-69,
10  Hagenburg Assignment Cards 2016 - 2019,
11  was marked for identification.)
12                          ---
13  THE WITNESS:
14  Is it 69?
15     BY ATTORNEY ELKIN:
16     Q. Yes.
17     A. Okay, JX-69.
18     Q. Okay.
19  And as you flip through it, does this appear to
20     be Hagenburg's daily assignments from April 9th, 2016
21     to October 8th, 2019?
22     A. Sorry, April 9th, 2016 to October 8th, 2019?
23     Q. Correct.
24     A. Yes, that's what they appear to be.
25  ATTORNEY ELKIN:
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1    Your Honor, I'd like to move to admit
2      JX-69.
3    ATTORNEY VALLACHER:
4    No objection.
5    JUDGE:
6    Admitted.
7                              ---
8    (Whereupon, Joint Exhibit JX-69,
9    Hagenburg Assignment Cards 2016-2019,
10   was admitted.)
11                             ---
12   ATTORNEY ELKIN:
13   And then, if you could turn to JX-70.
14                             ---
15   (Whereupon, Joint Exhibit JX-70,
16   Hagenburg Assignment Cards 2019-2022,
17   was marked for identification.)
18                             ---
19   THE WITNESS:
20   Okay.
21     BY ATTORNEY ELKIN:
22     Q. Do these appear to be Hagenburg's assignment
23     cards from 10 --- sorry, 10/9/2019 through October
24     10th, 2022?
25     A. Yes, they appear to be.

1534

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      Q. Okay.

2    You were here when Mr. Dumont testified?

3    JUDGE:

4    Is there a motion?

5    ATTORNEY ELKIN:

6    Sorry.  I'd like to move to admit that.

7    ATTORNEY VALLACHER:

8    NO objection.

9    JUDGE:

10   Admitted.

11                           ---

12   (Whereupon, Joint Exhibit JX-70,

13   Hagenburg Assignment Cards 2019-2022,

14   was admitted.)

15                           ---

16   ATTORNEY ELKIN:

17   And that was 70?

18   JUDGE:

19   Yes.

20     BY ATTORNEY ELKIN:

21     Q. Okay.

22   Captain O'Kane, you were here when Mr. Dumont

23     testified?

24     A. Yes.

25     Q. Okay.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1535

Trial

Kathy Aitken, et al. v. USA                                   3/16/2023

1    And you saw the different video, and I think it
2    came up also when the Lieutenant testified?
3    A. I didn't --- I didn't have a binder.  I didn't
4    see them.
5    Q. Okay.
6    Well, let me ask you this.  Is there currently a
7    lobby in the front site? ████████████████████████
8    ████████████████████████████████████████████████
9    site?
10   A. ████████████████████
11   Q. ████████████████████████████████
12   A. ████████████████████████    ████████
13   Q. ████████████████████████████
14   A. Yes.
15   Q. ███████████████████████████████████████
16   ████████████████████████████████████████████
17   ████████████████████████████████████████
18   ████████████████████
19   A. No.
20   Q. And what is that camera being used for?
21   A. ██████████████████████████████████████
22   ██████████████████████████████████████████████████
23   ██████████████████████████████████
24   Q. ███████████████████████████████████████
25   ████████████████    ████████████████

1536

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    A. Security isn't just one --- it's not just a
2    singular focus.  It's --- security is overlapping,
3    just like you had stated earlier about we have
4    multiple fences.  Yes.  We also have razor wire.  We
5    also have fence alarms.  We also have a perimeter
6    patrol.  Each one of those is a security element.
7    Q. ████████████████████████████████████
8    ████████████████████████████████████████
9    █████
10   A. No, it was not.
11   Q. Where did that come from?
12   A. The office of the Inspector General.
13   Q. Okay.
14   ███████████████████████████████
15   ████████████████████████████████████
16   ███████████████████
17   A. ███
18   Q. What was it to ensure?
19   A. To ensure that no contraband is being introduced
20   and the security procedures that are in place are
21   being followed, and we identify any breakdown in that
22   security coverage.
23   Q. ████████████████████████████
24   ████████████████████████████████████
25   ████████████████████████████████████

1537

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   ████████████████████████████

2   A. Yes.

3   Q. Okay.

4   Can you tell us about that?

5   A. ████   ████████████████████████

6   ████████████████████████████

7   ████████████████████████  ████████

8   ████████████████████████████

9   ████████████████████████████████

10  ██████████████████  ████████████████

11  ████████████████████████

12  ██████████

13  Q. Okay.

14  ████████████████████████████████

15  ██████████████████  ████████████████

16  ████████████████████████████

17  ████████████████████████████████

18  ████████

19  A. I'm required to monitor two hours of video

20  footage per week as directed by the regional office,

21  which has to report to Congress about this

22  implementation.

23  Q. Okay.

24  I asked a question.  Did you know about this

25  security breach based on the footage from the security

1538

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

    1    camera ████████████████████████████████████
    2    A. Yes.  Yes, that is when I became aware of it.
    3    Q. Okay.
    4    Is that the only instance you can think of?
    5    A. ██████████████████████████████████████████
    6    ████████████████████████████
    7    Q. Okay.
    8    And you made them aware that that's not ---
    9    that's not appropriate?
    10   A. Yes.
    11   Q. And that could lead to even further discipline if
    12   they don't follow those procedures?
    13   A. Yes.
    14   Q. And so staff are subject to the rules of the
    15   agency the minute they start going through that
    16   screening site.
    17   Correct?
    18   A. They're subject to the rules by the employee's
    19   conduct on and off duty.
    20   Q. Okay, and so that would ---?
    21   A. That would be introduction of contraband which is
    22   found in the element of standards of employee conduct.
    23   Q. Okay.
    24   I'm going to ask the question again.  The
    25   employees are subject to the rules, and the employee's

1539

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      conduct, standards of conduct the minute that they
2      walk through that screening size?
3      A. No, they're already subject to them.
4      Q. Well, they're not going to be disciplined for
5      failing to go through a screening site at an airport?
6      Like, or failing to ---?
7      A. That is not true.
8      Q. Okay.
9    They're not going to be disciplined for going
10     through a stop sign?
11     A. They may.
12     Q. All right.
13   Has that ever happened?
14     A. Which instance?
15     Q. The stop sign.
16     A. The stop sign if it led to an arrest, yes, it
17     would.
18     Q. Did that ever happen at FCI Otisville?
19     A. No.
20     Q. Okay.
21   And that --- you would agree that the officers
22     are subject to orders in the chain of command, so
23     Lieutenants and you, the minute they come onto that
24     property.
25   Correct?

1540

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      A. Yes.
 2      Q. Okay.
 3    And they are subject to those orders and the
 4      chain of command until they exit out?
 5    ATTORNEY VALLACHER:
 6    Objection.  Vague as to what orders.
 7    ATTORNEY ELKIN:
 8    Any order, like a Lieutenant can say,
 9      hey, Bunting, take this up to ---.
10    JUDGE:
11    Overruled.
12    ATTORNEY ELKIN:
13    Oh, sorry Judge.  I didn't mean to ---.
14    JUDGE:
15    You didn't.
16    ATTORNEY ELKIN:
17    Okay.
18    JUDGE:
19    So it's resolved.
20    ATTORNEY ELKIN:
21    Okay.
22    JUDGE:
23    So you can ask your question.
24    ATTORNEY ELKIN:
25    Okay.
```

1541

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1    BY ATTORNEY ELKIN:
 2    Q. So for example, as funding is coming through the
 3    A1 sally port, an LT could say, hey, I need you to
 4    take something up to the housing unit flippity flip.
 5    He would have you do that even if it's prior to the
 6    start of his shift, correct?  You would have to follow
 7    that order?
 8    A. Yes.  They even have to do it when they're home.
 9    I called Officer Bunting in on his day off to come in
10    to be the post.
11    Q. Okay.
12    And so is it your testimony that you can order
13    bunting at home not to eat French fries because he's
14    gaining too much weight?
15    ATTORNEY VALLACHER:
16    Objection, misstates the testimony.
17    JUDGE:
18    Sustained.
19    BY ATTORNEY ELKIN:
20    Q. Can you order Bunting around and ---?
21    A. Why would I say that?
22    Q. No, can you order --- give him orders at home
23    other than work?  You need to come to work kind of
24    orders?
25    A. No.
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      Q. Okay.

2      A. And --- I'm sorry.  Are we still looking at this

3      binder before I put it away?

4      Q. No.  Captain, you don't need to put it away.

5      Captain O'Kane.

6      A. Yes ma'am.

7      Q. The video that you are currently reviewing, is

8      that still timestamped?

9      A. Yes.

10     Q. And with the date on it as well?

11     A. Yes.

12     Q. Okay.

13     ATTORNEY ELKIN:

14     One moment, Your Honor.

15     JUDGE:

16     Of course.

17     ATTORNEY ELKIN:

18     Okay.

19     Your Honor, I pass the witness.

20     JUDGE:

21     Mr. Vallacher, any redirect?

22     ATTORNEY VALLACHER:

23     Of course, Your Honor.

24                           ---

25                           REDIRECT EXAMINATION

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                              ---
 2      BY ATTORNEY VALLACHER:
 3      Q. Captain, first and foremost, I want to apologize
 4      to my oversight.  In my question to you, I said I did
 5      not see passing on pertinent information to post
 6      orders at FCI Otisville.  And apparently, I did not do
 7      as good review a review as I thought I did.
 8      A. Same.
 9      Q. So I want to apologize for that.  But while we're
10      talking about it, let's talk about how SHU works.  And
11      if you can do that, let's pull up JX-92.
12      A. Hold on a sec, let me put this other binder away.
13      You said Julia x-ray 92?
14      Q. That's right.
15      A. Yes, sir.  I'm there.
16      Q. Okay.
17   So what is JX-92?
18      A. JX-92 is the special post orders or special
19      instructions for Special Housing Unit Officers and the
20      Property Officer.
21      Q. Okay.
22   And so you see the SHU 1 paragraph there?
23      A. Yes, sir.
24      Q. Do you see that?  It looks like to me, and
25      correct me if I'm wrong, one of their obligations is
```

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      to ensure that ██████████ you know, the ability to
 2      maintain ███████████
 3   Do you see that?
 4      A. That is true.
 5      Q. And then if I look on the second page for SHU 2,
 6      I don't see anything about ██████████ in a SHU 2 post.
 7      A. That is true.  SHU 2, 3, 4 do not have ██████████
 8      Q. So why?  You know, can you tell us more about how
 9      the influence between SHU 1 and the rest of the SHU
10      officers work?
11      A. So SHU 1 is typically considered the SHU OSC, or
12      the SHU Officer in Charge.  They're the ones that when
13      we went to the ████████████████████████████████
14      ███████ They have to remain in that area due to
15      security precautions ██████████████████████████████
16      ████████████.  They're not allowed to go down range to
17      near the inmate cells.  They have to stay in that
18      area.  And they're also responsible for monitoring,
19      tracking all incoming and outgoing inmates to the
20      Special Housing Unit.
21   So it is, it's identified that the SHU Number 1
22      is responsible for d██████████████████████████████
23      ██████████████████████████.  And they're there 24 hours
24      a day.  They're responsible for pretty much everything
25      that the two, three, four rep property
```

Trial
Kathy Aitken, et al. v. USA                                3/16/2023

1       Q. Okay.

2     So the SHU 1 Officer is mostly just in, I think,

3        what's called the bubble?

4       A. Yes.

5       Q. And SHU 2 would be down range?

6       A. Yes.  SHU 2, SHU 3, SHU 4, and the rep property

7        officer are all down range.

8       Q. So SHU 2 during that officer shift wouldn't

9        really be having █████████████████████████████

10      A. No.  He doesn't even ───███████████████████

11      ████████████████████████          That's the

12       responsibility of the SHU Number 1.

13      Q. Okay.

14     As the officer in charge?

15      A. Yes.

16      Q. Okay.

17     And you were asked a number of questions with ───

18       regarding verbal exchange being required versus

19       expected?

20      A. Yes.

21      Q. Remember that?

22      A. Yes.

23      Q. And I think that you said that you would expect

24       it?

25      A. I would expect it.  Me personally holding myself

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    to a higher standard, I would expect it.  However, my
2    expectations are not always met on everything that I
3    expect.
4    Q. Okay.
5    A. It also doesn't reflect that those staff, if they
6    don't meet my expectations, are going to be
7    disciplined in any way, shape, or form.  They just not
8    --- they have not fulfilled that best practice.
9    Q. Best practice.  So have you disciplined anyone
10   for not doing those verbal pass downs?
11   A. Absolutely not.
12   Q. Have you ever admonished anyone for not doing a
13   verbal pass down?
14   A. No.
15   Q. Have you ever instructed anyone that, hey, if you
16   don't do this verbal pass down, that makes you
17   unhappy?
18   A. No.
19   Q. So in your experience, through many years of the
20   Bureau, eight years as a Correctional Officer,
21   Lieutenant for six, and approximately three as a
22   Captain, sometimes officers, you --- I would assume
23   sometimes Housing Officers pass down verbal
24   information?
25   A. Yes.

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      Q. And when information is passed on, how long does
 2      that conversation typically last?
 3      A. It's seconds.  There's no --- there's not that
 4      much that happens definitely in Otisville that they
 5      have to talk about.
 6      Q. Okay.
 7   And why do you say definitely Otisville?  How
 8      does Otisville compare to the other institutions
 9      you've been at?
10      A. Otisville is --- I know --- I always refer to it.
11      I refer to it to the inmates as a Cupcake yard.  It's
12      more --- it's more akin to a country club or a college
13      campus than it is an actual prison.  It's --- that's
14      just the nature of the inmates that are there.
15      Q. Okay.
16   When you said there, what way?
17      A. So being as when it was a drop or inactive yard,
18      there were, as Captain Whinnery had previously
19      testified, that there were gang members.  However, the
20      other half of that is they have the --- they have the
21      sensory assignment of gang drop or gang inactive,
22      meaning that they disassociate from the gang.  They
23      don't want to be involved with the gang.  So that's
24      what Otisville was.
25   Now it's referred to as what is an active medium.
```

1548

Trial

Kathy Aitken, et al. v. USA                              3/16/2023

```
1    And before they could turn it into an active medium,
2    they actually had to shift all of the inactive and the
3    drop inmates out of Otisville before we could receive
4    any active inmates to the yard.
5    Q. And why is that?
6    A. Because in order to be a drop, in order to be
7    classified as a sensory gang drop, you actually have
8    to give evidence against your gang.  And by doing so,
9    that puts their safety in jeopardy with their gang
10   because they're giving own --- they're giving their
11   own internal secrets, so to say, to the Bureau of
12   Prisons.  So that way we can better track gang
13   activity.
14 So once they do that, they can't ever go back to
15   an active yard.  And the inactive inmates, they're the
16   ones who may not give the, sell the secrets to the
17   Bureau, but they don't go along with the gang culture.
18    So then they become inactive, and they're viewed as
19   no good by the gang.
20   Q. Okay.
21 So this is a weird one because I was part of the
22   questioning, but you remember that I wore a vest when
23   I first visited?
24   A. That is true.
25   Q. Do you remember the circumstances of that on that
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1549

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

1    day?

2    A. Yes.  Yes, you ---.

3    Q. Go ahead.  I'm not, you know, go ahead.  Explain.

4    A. So you asked to see a vest.  And I brought a vest

5    up and said, here's --- here's a representative vest.

6    They're essentially all the same.  The only difference

7    is the one that I presented to you didn't have your

8    name on it.  You had asked this, you had stated, this

9    is so cool, can I wear it?  And I said, yes, yeah, I

10   don't have any objections to you wearing it, and you

11   were delighted to wear the vest.

12   Q. Let the record reflect that I'm a nerd.  All

13   right.

14   So you said that the conversation, when the

15   information is passed down, the conversation doesn't

16   last very long?

17   A. No, no.  It's a matter of seconds.  I would say

18   30 seconds to a minute and a half.

19   Q. Okay.

20   A. Is at most, and like I said there's not much that

21   happens at Otisville.

22   Q. Okay.

23   And in your experience, Lieutenant, Correctional

24   Officer, and a Captain, does the equipment exchange

25   need to be sequential with the information exchange?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      A. No, absolutely not.  It occurs at the same time.
2      I can, I mean I would hope most people would be able
3      to walk and chew bubble gum at the same time.
4      Q. Okay.
5      A. If I handed you a radio and told you, hey, the
6      sky is blue as I'm handing you the radio, would you be
7      able to retain that the sky is blue and receive the
8      radio at the same time?
9      Q. Okay
10    And I think you were asked a question about, I
11     guess, a string of events coming into the institution,
12     going through screening, making you wait at post,
13     picking up the duty belt in the A1 lobby before going,
14     leaving the A1?
15     A. Yes.
16     Q. Do you recall a question that kind of had a
17     string like that?
18     A. Yeah.
19     Q. And I'm not sure if I heard it correctly, but did
20     you hear that as picking up the duty belt?
21     A. I heard it as picking up.  I took it as
22     retrieving the duty belt after it was screened in.
23     Q. Okay.  Okay.
24    And you were asked a lot of questions about your
25     expectations.

Trial
Kathy Aitken, et al. v. USA                                           3/16/2023

1    Do you recall that?
2      A. Yes.
3      Q. And so let's be clear.  You would want officers
4      to stop inmate misbehavior on their way to posts.
5    Correct?
6      A. Yes.
7      Q. And I think regardless of whether they did, would
8      they be able to do the actual activities outlined in
9      the post orders?
10     A. Yes.
11     Q. They would regardless?
12     A. Yeah.  If they did or didn't, it's not going to
13     stop them from assuming their post.
14     Q. Okay.
15   And you were asked a few questions about chits?
16     A. Yes.
17     Q. Chits, what are they used for?
18     A. ███████████████████████████████████████
   ██   ███████████████████████████████████████
20     Q. Okay, so ---.
21     A. Or that are retrieved by staff.
22     Q. So what --- okay.
23   How are they used by the Correctional Officer for
24     the Correctional Officer's activity?
25     A. For the Correctional Officer's activities on a 24

1552

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1      hours post?
 2      Q. Yeah.
 3      A. They're not.
 4      Q. Okay.
 5   Is it safe to say that the ████ are just used
 6      for them to get equipment that they then use for this
 7      activities?
 8      A. Yes.
 9      Q. You were also asked about Captain --- whether
10      Captain Whinnery's general post orders were in effect
11      until you issued yours.
12   Do you recall that?
13      A. Yes.
14      Q. And I think that you were looking at JX-58.  But
15      I now want to go on to another topic.  Can you go to
16      JX-59?
17                              ---
18   (Whereupon, Joint Exhibit JX-59,
19   General Post Orders 2021, was
20   marked for identification.)
21                              ---
22   THE WITNESS:
23   Yes, sir, I'm there.
24      BY ATTORNEY VALLACHER:
25      Q. Okay.
```

Trial
Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1   And what do these appear to be?
 2     A. These are the general post orders for FCI
 3     Otisville.
 4     Q. And did you execute these?
 5     A. I did.
 6     Q. Do you know when?
 7     A. I signed the day --- May 10th, 2021.
 8     Q. Okay.
 9   So these would be the general post orders after
10     10th and ---.
11     A. Yes.
12     Q. Okay.
13   And so these became effective on May 10, 2021?
14     A. Yes, sir.
15   ATTORNEY VALLACHER:
16   Okay.
17   And Defendant moves to admit JX-59.
18   ATTORNEY ELKIN:
19   No objection.
20   JUDGE:
21   Admitted.
22                              ---
23   (Whereupon, Joint Exhibit JX-59,
24   General Post Orders 2021, was
25   admitted.)
```

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1                          ---
 2    ATTORNEY VALLACHER:
 3    And could you please turn to JX-60?
 4                          ---
 5    (Whereupon, Joint Exhibit JX-60,
 6    General Post Orders 2022, was
 7    marked for identification.)
 8                          ---
 9    THE WITNESS:
10    Yes, sir.
11      BY ATTORNEY VALLACHER:
12      Q. What is JX-60?  Well, are you familiar with
13    JX-60?
14      A. Yes, sir, I am.
15      Q. What is it?
16      A. It is the updated general post orders from May
17    23rd of 2022.
18      Q. Okay.
19    ATTORNEY VALLACHER:
20    Defendant moves to admit JX-59.
21    ATTORNEY ELKIN:
22    No objection.
23    JUDGE:
24    You're talking about 60.
25    ATTORNEY VALLACHER:
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    Yeah, 69.

2    THE WITNESS:

3    No, 60.

4    JUDGE:

5    JX-60's admitted.

6                              ---

7    (Whereupon, Joint Exhibit JX-60,

8    General Post Orders 2022, was

9    admitted.)

10                             ---

11    BY ATTORNEY VALLACHER:

12    Q. And were these the proposed orders in place when

13    you signed them in May 23rd, 2022?

14    A. Yes, sir.

15    Q. Okay.

16   On Cross you were asked a question that at least

17    confused about when a pass down has to occur.  Do you

18    remember being asked about when a pass down has to

19    occur?

20    A. You mean pass down pertinent information?

21    Q. The word --- the phrase was passed down.  The

22    question.

23    A. I don't recall passed down.

24    Q. Okay.

25   But let's be clear.  When does equipment have to

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1556

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1    be passed on to the relieving officer?
2    A. When that relieving officer arrives for their
3    post.
4    Q. When must the relieving officer arrive?
5    A. They have to be there by the start of their
6    shift.
7    Q. So that would be midnight for morning watch?
8    A. Yes.
9    Q. 4:00 p.m. for evening watch?
10    A. Yes, sir.
11    Q. And 8:00 a.m. for day watch?
12    A. Yes, sir.
13    Q. And they would not have to put on equipment for
14    that moment?
15    A. No.
16    ATTORNEY ELKIN:
17    Objection.  That mischaracterizes his
18    earlier testimony.
19    JUDGE:
20    Well, he said --- overruled.  Counsel,
21    has asked the question, he's answered.  If there's a
22    contradiction, there's a contradiction.
23    BY ATTORNEY VALLACHER:
24    Q. On Cross, you were asked about an exchange you
25    had Officer Bunting?

1557

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

```
 1      A. Yes, sir.
 2      Q. And on Direct, you testified that, I think, you
 3      relieved him 15 minutes early, thereabouts?
 4      A. Yes.
 5      Q. But you yourself were only relieved about one or
 6      two minutes early?
 7      A. Yes.
 8      Q. Is it fair to say that you were a better relief
 9      than the officer who relieved you?
10      A. That happens.
11      Q. Okay.
12  And is it --- when you say that happens, what do
13      you mean by that?
14      A. Like I said, the officer forgot his belt in his
15      car and going back to the one stop shopping, he had a
16      duty belt because it's easy and fast once you get
17      through the screening site.  So he got to the
18      screening site, realized he forgot his belt in the car
19      and went back with the car, got his belt, came back
20      and ---.
21      Q. So sometimes do you relieve --- when you were at
22      a correct officer, when would you typically relieve
23      people?
24      A. I would usually relieve people about 30 minutes
25      early.
```

1558

Trial

Kathy Aitken, et al. v. USA                                          3/16/2023

1     Q. And would you also be relieved?

2     A. Yes.

3     Q. Would it always be 30 minutes early?

4     A. Usually the officers will discuss, since the

5     officers are on the post for the quarter, meaning that

6     they bid for SHU 1, so they're on the SHU 1 post for

7     the quarter.  All of the officers assigned to SHU 1 on

8     mornings, days and evenings will talk amongst

9     themselves and be like, hey, you want to do like, 15,

10    20 minutes early?  And they understand, yeah, they're

11    all going to take care of each other to get each other

12    out a little bit early.  It's something nice that they

13    do for each other.

14    Q. Okay.

15    Is that kind of like an informal arrangement?

16    A. Absolutely.  Absolutely.  It's 100 percent

17    informal.  It's not anywhere written.  They usually

18    discuss it amongst themselves.  They said it was

19    something nice for each other.

20    Q. And is that the case at FCI Otisville as well?

21    A. Yes, it's the case at every single prison that

22    I've worked at.

23    Q. Okay.

24    And so when we --- we were looking at DX-14.  Can

25    you pull that out?

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1559

Trial

Kathy Aitken, et al. v. USA                                3/16/2023

1      A. Delta x-ray 14?

2      Q. Yes, sir.

3      A. Okay.

4      Q. So I think that you were directed to June 26,

5      2019 for Buckingham.

6      A. Yes, sir.

7      Q. And that's on the first page.

8  Right?

9      A. Yes, sir.

10     Q. Okay.

11 And so I think it was pointed out to you that he

12     came in at ████████

13     A. Yes, sir.

14     Q. And so he --- then it looks --- because he was

15     working at control center, it looks like he arrived at

16     his post at █████

17 Do you see that?

18     A. Yes, sir.

19     Q. And the officer that relieves appeared to be

20     █████

21     A. Yes, sir.

22     Q. But then, it seems that he wasn't able to leave

23     his post until █████

24     A. Yes, sir.

25     Q. Would this be a circumstance similar to you and

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1560

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
1    Mr. Bunting?
2    A. Yes, absolutely.
3    Q. Where you arrived earlier than the person?
4    A. Yes.
5    Q. After you?
6    A. Absolutely.
7    Q. Okay.
8    Does the agency benefit from this informal
9    arrangement?
10   A. No.
11   Q. Why not?
12   A. Because there's only 24 hours in a day.  Only one
13   person in that instance can be on post at a time,
14   because, as I stated earlier, that there's ███████
15   ████████████████████████████████████, there's only
16   marked for that person that has those items is the one
17   that's on post.  That's when they're on duty, when
18   they have those items.
19   So the whole because there's two people there
20   doesn't make sense.  They're not actually on post.
21   Once they're on post, they're on post for eight hours.
22   If they want to have, let's say, a gentleman's
23   agreement, to show up 15, 20 minutes early, okay, they
24   still show up 15, 20 minutes early, but they also get
25   out 15, 20 minutes early, which still equates to an
```

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1     eight-hour period of time.  And three shifts, they're

2     all standing eight hours, you only have 24 hours in a

3     day.

4       Q. Understood.  Okay.

5   ATTORNEY VALLACHER:

6   Well, thank you very much for your time.

7       I have no further questions.

8   JUDGE:

9   Thank you very much for your time.

10  THE WITNESS:

11  Thank you, sir.

12  JUDGE:

13  So Mr. Vallacher, with that are we done?

14  ATTORNEY VALLACHER:

15  The United States rests.

16  JUDGE:

17  Goodness, we got through everything the

18    first day, fantastic.  Okay.

19  Let's talk about the exhibits.  Let's do

20    that before we forget about it.  So what I have for

21    today is JX-59, JX-60, JX-69, JX-70, JX-71 and JX-72,

22    JX-77, JX-78, JX-82, JX-83, JX-85, JX-90, JX-91, JX-

23    92, JX-95, JX-96, JX-97, JX-98, JX-108.  DX-16.  And

24    that's it.

25  Am I leaving anything out?

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   ATTORNEY ELKIN:
2   I believe that's all.
3   ATTORNEY VALLACHER:
4   I think that sounds good, Your Honor.
5   JUDGE:
6   Great.  Okay.  Let's see.
7   So we need to talk about how we're going
8     to do the post-trial briefing.  So I assume --- I want
9     to know what you two have talked about.  I assume
10    we're going to do Proposed Findings of Fact and
11    Conclusions of Law based on the trial evidence?
12  ATTORNEY ELKIN:
13  I think that's right, Your Honor.
14  ATTORNEY VALLACHER:
15  I'm sorry, could you repeat that?
16  JUDGE:
17  I assume the way it goes for all of us
18    to digest the trial evidence and you two put together
19    your receptive Proposed Findings of Fact and
20    Conclusions of Law?
21  ATTORNEY VALLACHER:
22  Yes, Your Honor.
23  JUDGE:
24  Okay.
25  But I take it you two haven't talked

1563

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1      about a schedule for that or anything like that?
2    ATTORNEY ELKIN:
3    We have not, Your Honor.
4    JUDGE:
5    Okay.
6    Would you be amenable to conferring on
7      that and then --- I want to give you a little bit of
8      time since you've all been working very hard.  Maybe a
9      week from today you'd be --- do you think you'd be
10     able to have a --- send a proposal to the Court?
11   ATTORNEY ELKIN:
12   Yes, that would be fine.
13   JUDGE:
14   Okay.
15   So I'll wait for --- I'll wait for your
16     proposal a week from today on the schedule for doing
17     post-trial briefing.
18   Is there anything else that it would be
19     helpful to --- helpful to talk about since I have you
20     both here?
21   ATTORNEY ELKIN:
22   How do you want --- I was just going to
23     say, how do you want to handle the exhibits that were
24     admitted?  Do you want --- do you want all these
25     binders to go home with you, or do you want to just

1564

Trial

Kathy Aitken, et al. v. USA                                   3/16/2023

1     --- do you want to take --- do you want the binders
2     back and maybe the court reporter to give you the
3     exhibits that were admitted?
4  JUDGE:
5  So let's see.  I was planning on taking
6     all the binders just so --- I marked some of them up,
7     so I guess I'll have my notes.
8  ATTORNEY ELKIN:
9  That's fine.
10  JUDGE:
11  Yeah.  So if the court reporter --- I
12     actually haven't thought this this far ahead.  I know
13     that sometimes the parties do a joint filing of
14     electronic copies of all of the exhibits, just so all
15     the exhibits are on the docket.  But I mean, there are
16     other ways to --- other ways to do that.
17  What do you two suggest?
18  ATTORNEY ELKIN:
19  I mean ---.
20  ATTORNEY VALLACHER:
21  Your Honor, we can do that, but I think
22     they're under seal.
23  ATTORNEY ELKIN:
24  Under seal.
25  JUDGE:

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   Yeah.  Well, I mean, you would want them
2     filed as part of the case record --- case record
3     anyway.
4   ATTORNEY ELKIN:
5   Yeah.
6   JUDGE:
7   So they will be sealed and a redacted
8     version.
9   ATTORNEY VALLACHER:
10  Yes, Your Honor.  Although I think
11    redactions would be very, very time consuming
12    given ---.
13  ATTORNEY ELKIN:
14  A lot of post orders.
15  ATTORNEY VALLACHER:
16  Yeah.  Many hundred-page documents.
17  JUDGE:
18  Okay.
19  Well, remember one of the things we
20    talked about with sealing this this is a special
21    government and --- okay, you can have this under seal,
22    but we need to protect the public's interest of access
23    somehow, and that means --- that means, you know,
24    putting out a redacted version of what's under seal.
25    I mean, I can give you a lot of time to do it maybe,

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1    so we can get the exhibits on file so they're part of
2    the electronic record, and then give you enough ---
3    give you all the time you need to get them redacted.
4    ATTORNEY VALLACHER:
5    I understand that, Your Honor.  I guess
6    just one point that I'd have to obviously speak with
7    people who are knowledgeable about the prison
8    environment, but I can see just the existence of post
9    orders posing a threat that there's these changed
10   times, and maybe that could be a time where something
11   could happen.  I'm not sure.  I'm just speculating.
12   I'm going to have to ask.
13   JUDGE:
14   Okay.  Okay.
15   In that case, how about if we do --- it
16   seems this all can bear more thought.  How about if I
17   give you two actually a little bit more time, like
18   maybe a week from Monday and you can give me a
19   proposal on the covers, the post-trial brief, and also
20   maybe the procedure for, you know, for filing the
21   exhibits and for redactions of the exhibits and
22   transcript?
23   ATTORNEY VALLACHER:
24   That would be great.
25   JUDGE:

1567

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

1   Can you do that?

2   ATTORNEY ELKIN:

3   I mean, Your Honor, we can do it.  But

4       I'm on spring break with one of my daughters, and I

5       think Sarah is going with her husband somewhere.

6   MS. BLOCKS:

7   Well, I actually, on the 27th will

8       be ---.

9   ATTORNEY ELKIN:

10  So Monday would be very hard.

11  JUDGE:

12  Okay.

13  ATTORNEY ELKIN:

14  If it would be two weeks from today.

15  JUDGE:

16  Two weeks.  Take two weeks.

17  ATTORNEY ELKIN:

18  Two weeks from today.

19  JUDGE:

20  Yes, two weeks from today.  So we've got

21      a couple of weeks to figure out the post-trial,

22      post-trial briefing and how to get the --- how to get

23      the get a good --- to sealed and redacted version of

24      the record on file.  We can figure all that out in two

25      weeks.

1568

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

1   ATTORNEY VALLACHER:
2   Yes, sir.
3   JUDGE:
4   Yeah, I'll put out an order reflecting
5     that tomorrow, but that sounds like a good way to do
6     it.
7   Anything else that we should talk about
8     before we adjourn?
9   ATTORNEY VALLACHER:
10  I guess, Your Honor, one possibility for
11    you would be to just take home the admitted exhibits,
12    not the full binders, if you want.
13  JUDGE:
14  It would be hard for me to at this stage
15    to sort out what's admitted and what's not.  The
16    easiest for me is just to plug it all into a card and
17    go home.
18  ATTORNEY VALLACHER:
19  Understood, Your Honor.
20  JUDGE:
21  It's probably easier if your all can do
22    the same.  You can all figure out the fastest way for
23    you.  Okay.
24  Anything else?
25  ATTORNEY ELKIN:

1569

Trial

Kathy Aitken, et al. v. USA                    3/16/2023

1    No, Judge.

2    JUDGE:

3    All right.

4    Case is under advisement.  Thank you

5      very much.

6    COURT CRIER:

7    All rise.

8

9                    * * * * * * * *

10              HEARING CONCLUDED AT 4:43 P.M.

11                    * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1570

Trial

Kathy Aitken, et al. v. USA                                        3/16/2023

```
 1                    CERTIFICATE
 2
 3    I hereby certify, as the stenographic
 4      reporter, that the foregoing proceedings were taken
 5      stenographically by me, and thereafter reduced to
 6      typewriting by me or under my direction; and that this
 7      transcript is a true and accurate record to the best
 8      of my ability.
 9      Dated the 5th day of April, 2023
10
11
12    s/Kayla Marie Keating
13    Kayla Marie Keating,
14    Court Reporter
15
16
17
18
19
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1571

Trial

Kathy Aitken, et al. v. USA                                    3/16/2023

```
 1                    ADMITTED EXHIBITS

 2

 3

 4    JX      PAGE     DESCRIPTION

 5    JX-1             Position Description Correctional

 6                     Officer (GS 0007-08)

 7    JX-55            General Post Orders 2015

 8    JX-58            General Post Orders 2019

 9    JX-59            General Post Orders 2021

10    JX-60            General Post Orders 2022

11    JX-69            Hagenburg Assignment Cards 2016 -

12                     2019

13    JX-70            Hagenburg Assignment Cards 2019 -

14                     2022

15    JX-71            Leimkuhler Assignment Cards 2016 -

16                     2019

17    JX-72            Leimkuhler Assignment Cards 2019 -

18                     2022

19    JX-77            Control Center #1 (2021)

20    JX-78            Control Officers Special (2021)

21    JX-82            Compound Specific 1 (2021)

22    JX-83            Compound Special (2021)

23    JX-84            Housing A-side Specific (2021)

24    JX-85            Housing A-side Special (2021)

25    JX-90            SHU#1 (2021)
```

1572

Trial

Kathy Aitken, et al. v. USA                                      3/16/2023

```
 1    JX-91              SHU#2 (2021)
 2    JX-92              SHU Special (2021)
 3    JX-95              ███████ Specific (2022)
 4    JX-96              ███████ Special (2022)
 5    JX-97              ███████ Specific (2021)
 6    JX-98              ███████ Special (2021)
 7    JX-108             Full Human Resources Manual
 8
 9
10    DX      PAGE       DESCRIPTION
11    DX-14              FRE 1006 Summary of Video Footage
12                       Review
13    DX-16              LMR Meeting Minutes Excerpts
14
15
16
17
18
19
20
21
22
23
24
25
```