# In the United States Court of Federal Claims

No. 19-520C
(Filed Under Seal: May 23, 2024)
(Reissued: July 18, 2024)*
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KATHY AITKEN, *et al.*, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Molly A. Elkin*, McGillivary Steele Elkin LLP, Washington, D.C., for Plaintiffs. With her on briefs were *T. Reid Coploff* and *Sarah M. Block*, McGillivary Steele Elkin LLP, Washington, D.C.

*Bret R. Vallacher*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant, United States. With him on briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Reginald T. Blades, Jr*., Assistant Director, *David M. Kerr*, Trial Attorney, and *Joshua W. Moore*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., as well *Nathan M. Atkinson*, Assistant General Counsel, Employment Law Branch, Federal Bureau of Prisons, United States Department of Justice, Kansas City, KS.

## FINDINGS OF FACT & CONCLUSIONS OF LAW

Plaintiffs, current and former Federal Bureau of Prisons employees at Federal Correctional Institution Otisville ("FCI Otisville" or "the Prison"), seek overtime pay

---

* Pursuant to the protective order in this case (ECF 15), the Court initially filed these findings of fact and conclusions of law under seal on May 23, 2024, for the parties to propose redactions of confidential information. *See* (ECF 136). The parties were directed to propose redactions by July 8, 2024. Proposed redactions were received from the Defendant (ECF 139); no redactions were received from the Plaintiffs. Per the Court's order of July 9, 2024 (ECF 140), the Defendant was ordered to provide an additional memorandum by July 16, 2024, in further support of its proposed redactions. Defendant provided an additional memorandum that explained and modified its proposed redactions. *See* (ECF 141). The Court has incorporated Defendant's proposed redactions, as modified, with bracketed ellipses ("[. . .]") below.

and related forms of relief under the Fair Labor Standards Act ("FLSA"). They are paid to work eight-hour shifts at designated posts, but they claim that they are also legally entitled to payment for certain activities before and after their shifts. The following are my findings of fact and conclusions of law.[1] *See* RCFC 52(a).

In a nutshell, I conclude that while some of the activities at issue are part of Plaintiffs' hours of work, Plaintiffs have not shown that the time they spend on those activities exceeds the FLSA *de minimis* threshold.

## FINDINGS OF FACT

This Court held a four-day trial at which the parties introduced the testimony of thirteen witnesses. Plaintiffs presented Officer Christian Conklin, Michelle Juenger, Officer Richard McPhillips, Officer Matthew Bunting, Lieutenant Eric Christensen, Officer Michael Buckingham, Jeremy Dumont, Officer Willie Shemanski, Supervisory Intelligence Officer Joseph Meyers, and Captain Matthew Whinnery. The government presented Lieutenant Jean Leimkuhler, Lieutenant Joseph Nalepa, and Captain Patrick O'Kane. *See* Transcripts (ECF 111, 112, 113, 114). The parties stipulated to a set of undisputed facts. *See* Joint Stipulation of Facts ("Stip.") (ECF 96). In addition, I read my observations from a site visit into the record at the beginning of trial and gave the parties the opportunity to correct my observations at the time or through the testimony of witnesses. Tr. at 9–14. The trial therefore centered on (1) describing the nature of the pre- and post-shift activities at issue, in the context of the Prison environment, and (2) measuring how long those activities took.

After trial, the parties filed a collection of admitted exhibits under seal, *see* Notice (ECF 115), and submitted post-trial briefs.[2] I make the following findings of fact in light of all the evidence presented, including my evaluation of the demeanor and credibility of the witnesses.[3]

---

[1] If any finding of fact would be better treated as a conclusion of law, or any conclusion of law treated as a finding of fact, it should be so construed.

[2] Pls.' Post-Trial Br. (ECF 118); Def.'s Post-Trial Br. (ECF 121); Pls.' Post-Trial Resp. & Reply (ECF 123); Def.'s Post-Trial Reply (ECF 130); Pls.' Supp. Br. (ECF 133); Def.'s Supp. Br. (ECF 134).

[3] When I cite any witness to support a finding of fact, I have found that witness credible as to that fact. Some witnesses are credible as to some facts but not others; several adverse findings of credibility are discussed and explained below.

I note at the outset that I have given limited weight to aspects of the testimony of Michelle Juenger, the Prison's former human resources manager. Tr. at 207. Ms. Juenger has worked in FCI Otisville and elsewhere in various administrative capacities, but not as a correctional officer. Tr. at 207–09. She has worked at correctional posts only on occasion. Tr. at 300. Because of that limitation in her personal experience, I do not rely on her testimony about the activities of correctional officers. Ms. Juenger's understanding of correctional officers' duties may be relevant to establish the

## I. __The Prison__

Plaintiffs are 195 individuals who have worked as Senior Officer or Senior Officer Specialist correctional officers, or who have been augmented[4] to work custody roles in those positions, at FCI Otisville from April 9, 2016 to the present. Stip. ¶ 3. Correctional officers like Plaintiffs are supervised by lieutenants, who are in turn supervised by the Prison's captain. Tr. at 560 (Bunting).

FCI Otisville consists of a medium-security federal correctional institution, a [. . .], and a minimum-security satellite camp. Stip. ¶ 2. This case concerns the medium-security facility and the [. . .], which are organized as follows.

### A. The Post System

Work at the Prison is divided into shifts at designated posts. Some posts, referred to as 24-hour posts, are manned around the clock; others are manned for 16 hours a day. Plaintiffs' claims relate to time before and after specific 24-hour posts at the medium-security facility and [. . .]: Control #1, Compound #1, Compound #2,[5] Housing Units A-Side,[6] SHU #1, SHU #2,[7] and [. . .] Officer. Stip. ¶ 2, 7–8.[8]

The Prison's 24-hour posts are staffed in three 8-hour shifts, with one officer per shift. Stip. ¶ 8. The shifts are Day Watch (scheduled from 8:00 a.m. to 4:00 p.m.), Evening Watch (scheduled from 4:00 p.m. to 12:00 a.m.), and Morning Watch (scheduled from 12:00 a.m. to 8:00 a.m.), except that shifts on the SHU #2 post are scheduled from 6:00 a.m. to 2:00 p.m., 2:00 p.m. to 10:00 p.m., and 10:00 p.m. to 6:00 a.m. _Id._ During the time period relevant to the case, there was never a scheduled overlap between shifts. Tr. at 25–26 (Conklin); Tr. at 1078 (Whinnery).

The shift changes for 24-hour posts are offset from the Prison's schedule for inmate movements and counts. Inmate movements occur on the half hour and take approximately five minutes. Tr. at 177–78 (Conklin). Between scheduled moves, inmates are usually confined to whatever location they are in. Tr. at 177 (Conklin). Inmates are confined to housing units between 3:30 p.m. and 5:00 p.m., the time

---

government's good faith, reasonableness, or willfulness, but because I determine that the government is not liable, those questions are moot. I do not question her candor in any way.

[4] _See_ Compl. ¶ 26 (ECF 1).

[5] Compound #2 was a 24-hour post until June 10, 2018, when it became a 16-hour post. Compound #2 is only at issue for the period when it was a 24-hour post. Stip. ¶ 7 n.1.

[6] Housing Unit EB was a 24-hour post at some times when the A Side was not operational. Stip. ¶ 7 n.2. Because Housing Unit E had one 24-hour post at all relevant times, the distinction makes no substantive difference.

[7] SHU #2 was a 16-hour post until June 10, 2018. It then became a 24-hour post. Stip. ¶ 7 n.3.

[8] There are other posts for which Plaintiffs do not claim overtime compensation. Some facts about other posts are nonetheless relevant to understanding Plaintiffs' claims and will be discussed as necessary.

during which the evening watch relieves the day watch. Tr. at 139–40 (Conklin). They are also locked in their cells from 10:00 p.m. until shortly after 6:00 a.m., by which time the morning watch has taken over. Tr. at 184 (Conklin); Tr. at 537 (Bunting); Tr. at 1144–45 (O'Kane). Prisoners are supposed to be counted at 12:00 a.m., 3:00 a.m., 5:00 a.m., 4:00 p.m., and 10:00 p.m., though counts do not always begin exactly on time. JX 58 at 43; Tr. at 978 (Shemanski); Tr. at 1129–30 (Whinnery). The 12:00 a.m. and 4:00 p.m. counts coincide with shift changes.

Each post is governed by "post orders," *i.e.*, a document describing what the officer at that post is responsible for doing during his shift. Tr. at 1184 (Whinnery); Tr. at 135 (Conklin); Tr. at 1398–1400, 1403, 1414, 1423 (O'Kane). The parties dispute whether the post orders describe Plaintiffs' duties comprehensively. Briefly, Plaintiffs contend that their job is to "maintain the safety and security of the inmates, staff, and Institution" at all times on Prison grounds, whether they are on post or not. Pls.' Post-Trial Br. at 6. The government responds that a correctional officer's duties are essentially limited to the post orders for the particular post to which he is assigned. Def.'s Post-Trial Br. at 6.

Defendant has shown, I conclude, that Plaintiffs do not execute responsibilities specific to their posts when they are not on-post. *See, e.g.*, Tr. at 815–18 (Buckingham); Tr. at 1405–07 (O'Kane); Def.'s Post-Trial Br. at 6–7. But Plaintiffs have established as a factual matter that their duties in the Prison go beyond their post orders. The evidence shows that Plaintiffs are expected to perform security-related tasks not only in connection to their posts, but whenever necessary from the moment they arrive at the Prison until they leave. Tr. at 31 (Conklin); Tr. at 314–15 (McPhillips); Tr. at 497–98 (Bunting); Tr. at 530 (Bunting); Tr. at 653–54 (Christensen); Tr. at 756, 768 (Buckingham); Tr. at 951 (Shemanski); Tr. at 1485–86, 1539–40 (O'Kane). Besides the post orders describing particular posts, there are general post orders describing Prison operations as a whole. *See, e.g.*, JX 58. Correctional officers also have position descriptions that mention certain job activities independent of any particular post. *See* JX 1; JX 2. To take two examples — discussed further below — Plaintiffs might be called upon to correct inmate behavior and respond to emergencies at any time, even when they are not at their posts. Tr. at 36, 41–42, 57, 59–60, 93–95, 122–24 (Conklin); Tr. at 324–29, 357–58, 394–95 (McPhillips); Tr. at 527–30, 537 (Bunting); Tr. at 657–58, 666–68, 695–96 (Christensen); Tr. at 766–68, 791–92 (Buckingham); Tr. at 1063–64 (Meyers); Tr. at 1086–87, 1113–14, 1128, 1148–49, 1151 (Whinnery); Tr. at 1418, 1471 (O'Kane); JX 3 at 1; JX 55 at 8; JX 58 at 6 (General Post Orders 2019). Officers' responsibilities are therefore broader than the post orders alone.

Pre- and post-shift officers do not have *primary* responsibility for Prison management. There is always an on-post correctional officer (or other Prison employee) responsible for each inmate and each part of the Prison environment. Tr. at 136–38, 176–78, 182–83 (Conklin); Tr. at 434 (McPhillips) Tr. at 527–28, 620 (Bunting); Tr. at 815–18 (Buckingham). The work officers perform on-post is thus independent in some ways from the activities they engage in beforehand and afterward. Tr. at 815–18 (Buckingham); Tr. at 1058 (Meyers); Tr. at 1406–09, 1413–14, 1417–18, 1424, 1427–29, 1551 (O'Kane). Officers carry items before and after their shifts that they would not carry while doing their jobs, suggesting that they do not expect to work at those times. Tr. at 1059, 1061 (Meyers).

But it does not follow that correctional officers heading to or from their posts are allowed to simply treat security issues as someone else's job. The Prison environment is at least potentially dangerous at all times. JX 1 at 4–5; JX 2 at 4; Tr. at 30 (Conklin); Tr. at 324 (McPhillips); Tr. at 658 (Christensen); Tr. at 1071–72, 1074–75, 1115–16 (Whinnery); *see also* Tr. at 510 (Bunting).[9] Supervision of inmates therefore has overlapping and mutually reinforcing layers, Tr. at 724 (Christensen), and all Prison employees play their part. If uniformed correctional officers[10] do not enforce rules whenever the need presents itself, the Prison could expect progressively bigger infractions that would make it more difficult to maintain control. Tr. at 57–58 (Conklin); Tr. at 358 (McPhillips); Tr. at 530 (Bunting); Tr. at 768 (Buckingham); Tr. at 1086–87 (Whinnery); Tr. at 1366 (Nalepa); Tr. at 1485–86, 1520–21 (O'Kane). When one of the government's witnesses testified that officers are not required to correct inmates or respond to inmate questions on their walk to post, Tr. at 1329, 1364–67, 1369 (Nalepa), the government made a point of correcting the error with testimony from Captain O'Kane. Tr. at 1418–19 (O'Kane).

Nor can off-duty officers count on getting to and from posts around the Prison compound without meeting inmates. Although inmates are often confined indoors or under an on-duty officer's immediate supervision during shift changes, *see, e.g.*, Tr. at 26, 139–40, 177, 183 (Conklin), that is not always the case. As discussed below, scheduled inmate moves overlap with the day and evening shift changes. Sometimes inmates are not where they are supposed to be, or they might have permission to be somewhere without immediate supervision. Tr. at 52, 92–94, 179–81 (Conklin). The compound is large enough that the two officers posted at Compound #1 and

---

[9] Specific risks include riots, assaults, and escape attempts. JX 1 at 3–4; JX 2 at 3; Tr. at 31–33 (Conklin); Tr. at 325, 328–29 (McPhillips); Tr. at 657–58 (Christensen); Tr. at 1076–77, 1121–24 (Whinnery).

[10] When in the Prison, Plaintiffs are required to wear a uniform identifying them as correctional officers. Tr. at 44 (Conklin); Tr. at 319, 334–35 (McPhillips); Tr. at 506 (Bunting); Tr. at 655 (Christensen); Tr. at 758 (Buckingham); JX 58 at 5.

Compound #2 — who are responsible for many tasks already — cannot be everywhere at once. *Cf.* Tr. at 620–21 (Bunting). An unsupervised inmate, besides, might be just the kind of unusual situation that officers are expected to look for and handle, in which case an officer walking to or from his post might be in the best position to correct the inmate on the spot.

In short, Plaintiffs must maintain control and discipline of inmates at all times they are inside the institution, even away from their posts and outside of their scheduled shift hours. JX 1 at 3; JX 2 at 3; Tr. at 32 (Conklin); Tr. at 326–27 (McPhillips).

## B. The Medium-Security Facility

For ease of reference, I will describe the medium-security facility as it might appear to someone walking through it on a tour, noting the locations of the posts at issue in the case.

The entrance to the medium-security facility is in a structure called the A1 building, or the A1 front lobby. Stip. ¶ 5; Tr. at 10; Tr. at 839–40 (Dumont); PLX 26. The main entrance of the A1 building leads to a lobby, where a guard sits in a booth. Tr. at 10. To the left of the booth is the Prison exit. *Id.* To the right is a screening site consisting of a walk-through metal detector next to a conveyor belt that feeds into an x-ray scanner. *Id.*; Stip. ¶ 11. All persons entering the Prison must pass through the metal detector while their personal items move through the scanner. Tr. at 10; Stip. ¶ 11. Beyond the screening site, there is a small seating area. Tr. at 10.

Just past the seating area is the A1 sally port, the first door into the Prison's secure areas. *Id.*; Tr. at 836–37 (Dumont); PLX 25. The Prison's fence runs through the A1 sally port, confining everything inside. Stip. ¶ 6. The A1 sally port (like other sally ports described below) has an outer door and inner door, with a space for several people in between. Tr. at 10. A wooden board between the doors of the A1 sally port has numbered pegs or nails for "accountability chits," which are metal disks engraved with numbers. *Id.*; Tr. at 837–38 (Dumont). Accountability chit numbers correspond with given Prison employees. Tr. at 53–54 (Conklin). Employees "flip" their chit on entry, making it possible — by cross-referencing chit numbers with an employee list — to determine who is in or out of the Prison at any given time. Tr. at 53–55 (Conklin); Tr. at 354 (McPhillips); Tr. at 526, 586–89 (Bunting); Tr. at 1108–09 (Whinnery); Tr. at 1519–20 (O'Kane). When individuals enter the sally port's outer door, an officer identifies each person and contacts another officer to open the inner door. Tr. at 10–11. When passing through sally ports on the site visit, the inner door was opened

within a few seconds after the tour members were identified. Tr. at 11; Tr. at 951 (Shemanski).[11]

Once through the A1 sally port, there is a short outdoor sidewalk leading to the administration building. Tr. at 11. Inside the administration building there is another lobby. *Id.*; Tr. at 847, 851 (Dumont); PLX 28; PLX 29. A window to the Prison control center — where the Control #1 post is based — faces the lobby. Tr. at 11, 14. To the left, a short flight of stairs leads to administrative offices and to the control center sally port, which is controlled from within the control center. Tr. at 11; Tr. at 688 (Christensen); Tr. at 786 (Buckingham); Tr. at 1292 (Nalepa). To the right, there is another sally port leading into the compound yard. Tr. at 11.

Inside the control center, the Control #1 officer monitors cameras and performs other tasks. *Id.*; *see also* Tr. at 167–70 (Conklin). Another officer, designated as Control #2, assists Control #1 at certain hours. Tr. at 11; *see also* Tr. at 167–70 (Conklin). The control center houses Prison equipment mounted on pegs on shadow boards, allowing the control officers to see what items belong where (and which items are absent) by looking for the item's shape on the board. Tr. at 11. Equipment was stored in a similar way at other locations in the Prison, except that at posts other than the control center the shadow boxes were behind locked grates. *Id.* In the control center and elsewhere, when an officer wishes to check out equipment from a shadow board, he places a "chit" [. . .] on the item's peg. *Id.*; Tr. at 517–18 (Bunting).

Passing through the sally port next to the control center, one reaches the compound yard: a roughly oblong area surrounded by buildings and fences, crossed by sidewalks. Tr. at 12; Tr. at 861, 870–71 (Dumont); PLX 31; PLX 34. Imagine proceeding counterclockwise around the yard. Immediately inside the sally port, a covered sidewalk leads straight forward, with a wall to the right. At the end of the sidewalk is the wall of a building, extending to the left, containing the Prison's indoor recreation and education facilities, the lieutenant's office, and the cafeteria. The sidewalk turns left to run alongside that building. Tr. at 12.

---

[11] The parties dispute whether the sally port doors were opened more quickly than usual for the site visit group, with Plaintiffs' witness suggesting that it was faster on the tour and Defendant's witness disagreeing. Tr. at 954–57 (Shemanski); Tr. at 1450–52 (O'Kane). Both sides testified against their interest, considering that — as discussed below — time in a sally port is not work and cannot be included in potentially compensable pre- and post-shift time. MSJ Tr. at 53 (ECF 50). If Plaintiffs are right that the usual time for sally port operation is longer, more time would have to be deducted from their in-Prison time in order to calculate the time they spend on other tasks. The government's position carries the opposite problem. No evidence apart from the testimony resolves the dispute one way or another, so I will simply assume that sally ports doors generally open quickly, as they did during the site visit, but with some variation.

The lieutenant's office is a room with two desks. *Id.* Behind the desks, a hallway leads to interior offices. *Id.* A window gives it a view of the sidewalk and the compound yard. *Id.* The cafeteria is just past the lieutenant's office on the covered sidewalk, at the corner of the building. *Id.*; Tr. at 841 (Dumont); PLX 27.

Around the corner to the right, there is a fenced-in enclosure containing the small standalone building that houses the compound office, home for the posts designated Compound #1 and Compound #2. Tr. at 12–13; PLX 27.[12] The housing units are arranged in a semicircle starting to the left of the compound office. Tr. at 13; PLX 31, PLX 34.

The general housing units are identified by letters: Units D, E, F, and G. Except for the D Unit, the housing units have an "A Side" and a "B Side," Stip. ¶ 4, each of which houses approximately 130 inmates. Tr. at 22 (Conklin); Tr. at 1077–78 (Whinnery). The housing unit observed on the site visit is secured by two sets of locked doors, where the inner door is controlled by the on-post housing unit officer. Tr. at 364–65 (McPhillips); Tr. at 769 (Buckingham); Tr. at 853–54 (Dumont); PLX 30; PLX 33. The doors open into a common area where inmates congregate. Tr. at 13; Tr. at 21–22 (Conklin). The housing unit officer's post is on a hallway off the common area. Tr. at 13; Tr. at 22 (Conklin); Tr. at 854 (Dumont); PLX 30.

Each housing unit's A Side post is staffed around the clock by a single correctional officer. The posts are designated Housing Unit EA, Housing Unit FA, and so forth. The B Side is staffed only during certain hours. When the B Side is not staffed, the A Side officer is responsible for both sides, Tr. at 24–25 (Conklin); *see also* Tr. at 1078 (Whinnery), although the inmates are typically confined to their cells during those times, *see* Tr. at 1195 (Whinnery).

In addition to the general housing units, the medium-security facility has a special housing unit ("SHU") where inmates are locked in their cells 23 hours per day and must be restrained when they leave their cells. Tr. at 13; Tr. at 176–77 (Conklin). The SHU is accessed through a sally port. Tr. at 111 (Conklin); Tr. at 376 (McPhillips); Tr. at 544 (Bunting); Tr. at 776 (Buckingham); Tr. at 873 (Dumont); Tr. at 1449–50 (O'Kane); PLX 35; PLX 36. The room inside the sally port adjoins the office for posts SHU # 1 and SHU #2 (plus SHU #3, not at issue in the case), and leads to hallways to inmate cells. Tr. at 13; Tr. at 873–75 (Dumont); PLX 36. The compound also has a medical building near the SHU. Tr. at 13.

---

[12] At one point the Compound Office was in the lieutenant's office, *see* Tr. at 118 (Conklin); Tr. at 362 (McPhillips); Tr. at 841–42 (Dumont), but the move makes little practical difference for this case.

**C.  [. . .]**

[. . .]. Tr. at 174 (Conklin); Tr. at 385–86 (McPhillips); Tr. at 554 (Bunting); Tr. at 683 (Christensen); Tr. at 1082 (Whinnery); Tr. at 1436–37 (O'Kane). [. . .].

[. . .]. Tr. at 385 (McPhillips); Tr. at 684 (Christensen). [. . .]. Tr. at 174–75 (Conklin); Tr. at 1437 (O'Kane); Tr. at 386 (McPhillips); Tr. at 555 (Bunting); Tr. at 782 (Buckingham); Tr. at 1083 (Whinnery). [. . .]. Tr. at 386–87, 471–72 (McPhillips); Tr. at 555 (Bunting); Tr. at 782–83 (Buckingham); Tr. at 1083 (Whinnery); Tr. at 1437–38 (O'Kane). [. . .]. Tr. at 175 (Conklin); Tr. at 1438 (O'Kane).

## II.  Plaintiffs' Pre- and Post-Shift Activities

For any given shift, the assigned officer is paid for only the shift's eight-hour scheduled duration unless he or she is approved for overtime. Stip. ¶ 8; Tr. at 1041 (Meyers). Correctional officers assigned to 24-hour posts are expected to be on their assigned post, with relief complete, at the start time of their scheduled shift. Stip. ¶ 10; *see also, e.g.*, Tr. at 58–59 (Conklin); Tr. at 318–19 (McPhillips); Tr. at 498 (Bunting); Tr. at 757 (Buckingham); Tr. at 1126 (Whinnery); Tr. at 1523 (O'Kane). For example, if a correctional officer's scheduled shift at SHU #1 starts at 8:00 a.m., the correctional officer is expected to be physically at the SHU and to have properly relieved the outgoing officer by 8:00 a.m. Stip. ¶ 10.

That means an incoming officer must arrive at the Prison before his shift, pass through a security screening, Stip. ¶ 11,[13] then engage in a series of activities that culminate when he assumes the duties of his assigned post. When relieved, an officer performs those same activities in reverse and exits the Prison.

### A.  Entry Process and Donning the Duty Belt

The first activity at issue is donning a "duty belt," which Plaintiffs wear at post assignments other than the control center. The parties have argued at great length about whether a "duty belt" is specifically required by name, whether an ordinary belt is adequate, where duty belts can be acquired, and related issues. *See* Pls.' Post-Trial Br. at 7–9; Def.'s Post-Trial Br. at 16–18. But those questions are ultimately of little consequence. There are three things about the belt itself that matter.

---

[13] I have already determined at summary judgment — construing the evidence in Plaintiffs' favor — that time spent in screening is not compensable as a matter of law. *See Aitken v. United States*, 162 Fed. Cl. 356, 368 (2022) ("*Aitken I*"). To the extent the evidence at trial relates to the screening process and its function, *see, e.g.*, Tr. at 523–25 (Bunting); Tr. at 1088–89, 1094–96, 1232 (Whinnery); Tr. at 1511–13 (O'Kane), I find that it is consistent with the summary judgment record. Because the trial record underscores my reading of the summary judgment record, it gives no reason to disturb or revisit the reasoning or holding of *Aitken I*.

First, officers must wear a belt to secure things they need to do their jobs. JX 58 at 43; Tr. at 1100 (Whinnery). Except for the control center, posts at the Prison require officers to carry specific equipment on their persons. Tr. at 105 (Conklin). Because maintaining control of equipment is essential to the Prison's security, officers attach items to their persons in two places while they work. Tr. at 50, 145 (Conklin); Tr. at 510–11 (Bunting); Tr. at 1099 (Whinnery). Officers who are assigned outside the control center therefore use their belt to attach and organize devices — e.g., clips, rings, chains, and holders — that secure equipment they use at their posts. Tr. at 50–51, 70–71, 75–77 (Conklin); Tr. at 336–38, 341 (McPhillips); Tr. at 509, 517 (Bunting); Tr. at 658–59 (Christensen); Tr. at 760–61, 796 (Buckingham); Tr. at 1187 (Whinnery). Officers' belts also attach the personalized chits that they use to check out and track additional equipment. Tr. at 72–73 (Conklin); Tr. at 338 (McPhillips); Tr. at 509–10 (Bunting); Tr. at 762 (Buckingham); Tr. at 1096–97 (Whinnery); Tr. at 1515–16 (O'Kane). Officers are required to don their belts before they receive their equipment. Tr. at 894 (Dumont); Tr. at 1100 (Whinnery); Tr. at 1406 (O'Kane).

Second, although it is technically possible for officers to attach items to the belt they use to hold their uniform in place, see Tr. at 1187–88 (Whinnery); Tr. at 1440–42 (O'Kane), officers often have a separate belt that they identify as their duty belt. Tr. at 335 (McPhillips); Tr. at 578 (Bunting). Having a specific duty belt helps organize the items that must be attached to a belt. In addition, officers find that having a separate duty belt makes their pre- and post-shift processes more efficient: They can keep metal items attached to the belt, pass the belt through the x-ray machine, and then fasten the belt around their bodies after walking through the metal detector. Tr. at 521–22 (Bunting); Tr. at 1441, 1506–07 (O'Kane). Duty belts, in other words, are the belts officers use for their duties. Tr. at 1442 (O'Kane).

Third, although no party introduced a duty belt into evidence or presented one as a demonstrative, see Tr. at 1331–33, ultimately I find that it is just a belt. Duty belts are not issued to correctional officers, but officers buy their own belts from commercial sources with an allowance issued by the Prison. Tr. at 71, 144 (Conklin); Tr. at 337 (McPhillips); Tr. at 508 (Bunting); Tr. at 760 (Buckingham). Witnesses described their duty belts as a heavy, strong belt suitable for carrying equipment. Tr. at 335 (McPhillips); Tr. at 507–08, 580 (Bunting); Tr. at 657 (Christensen). Duty belts often fasten with a clip to make them faster to put on and take off. Tr. at 1188 (Whinnery); Tr. at 1441–42 (O'Kane). There is little, if anything, special about them otherwise.

When officers arrive at the Prison for posts outside the control center, they bring their duty belts, but they do not yet have most of the equipment that they use on post. As mentioned, because the chits and connecting devices attached to the belt

are made of metal, Plaintiffs pass the belt and its attachments through the x-ray machine while they walk through the metal detector. Tr. at 71–72, 78, 145 (Conklin); Tr. at 351 (McPhillips); Tr. at 508–09 (Bunting); Tr. at 662–63 (Christensen); Tr. at 763 (Buckingham); Tr. at 1092, 1095–96 (Whinnery); Tr. at 1507–08 (O'Kane).

Inmates are occasionally — albeit rarely — present in the front lobby when officers put on their duty belts. Tr. at 35, 137 (Conklin); Tr. at 664 (Christensen). Any inmates in the front lobby are under the immediate supervision and responsibility of an escort or the officers posted in the front lobby. Tr. at 664 (Christensen). Given the unlikelihood that inmates will be present, that they would require supervision from incoming officers if they are there at all, or that incoming officers would need to divert from their entry process to do so, *see* Tr. at 142 (Conklin); Tr. at 700–01 (Christensen); Tr. at 595, 635–36 (Bunting), I find that the theoretical presence of inmates has little practical effect on the entry process.

Officers are not formally required to put on their belts anywhere in particular. Tr. at 144–45 (Conklin); Tr. at 706 (Christensen); Tr. at 796, 799 (Buckingham); Tr. at 893–94 (Dumont); Tr. at 1329 (Nalepa); Tr. at 1406, 1443 (O'Kane). Plaintiffs find that they are better prepared to relieve the outgoing officer when the belt is already fastened, so they report that their practice is to put the belt on as soon as they pick it up, rather than carrying it to their posts. Tr. at 79 (Conklin); Tr. at 351–52 (McPhillips); Tr. at 520, 523 (Bunting); Tr. at 663 (Christensen); Tr. at 763, 782, 799 (Buckingham); Tr. at 1442–43 (O'Kane). But officers also carry their belts through the yard without being corrected, *see* Tr. at 624–25 (Bunting); Tr. at 705–06 (Christensen); Tr. at 1059, 1061 (Meyers), even though it would not be appropriate for an officer to carry his belt when at his post. Tr. at 1061–62 (Meyers). I therefore conclude that the belt need not be donned immediately.

## B. Walking to and from the Duty Post

After the initial entry process, an officer assigned to the medium-security facility proceeds through the A1 sally port and [. . .] the Prison.[14] Tr. at 354 (McPhillips); Tr. at 526 (Bunting); Tr. at 665 (Christensen); Tr. at 765 (Buckingham). Then he walks to the administration building. Tr. at 355 (McPhillips); Tr. at 525 (Bunting); Tr. at 665 (Christensen); Tr. at 765 (Buckingham); Tr. at 1250–51 (Leimkuhler). Although it is unusual, Plaintiffs might encounter inmates on work details, performing tasks such as landscaping, in the space between the A1 front lobby and the control center lobby. *See* Tr. at 35–36 (Conklin). Any inmates in that

---

[14] Plaintiffs do not argue that their time passing through a sally port is itself compensable work. *See* MSJ Tr. at 53. Instead they argue — as discussed in detail below — that the time is compensable as part of the "continuous workday" between their first and last compensable activities. *Id.*

area would be under immediate supervision, though in theory an incoming officer might be called upon to address issues arising with those inmates while he walks by. Tr. at 35–36, 138 (Conklin); Tr. at 527–28 (Bunting); Tr. at 664 (Christensen). As with the front lobby, I find that the possible presence of inmates between the buildings has little practical significance.

Officers staffing the control center walk directly to the control center sally port, a few steps to the left. Tr. at 688 (Christensen).[15] Other officers proceed to the compound sally port and onto the compound yard. Tr. at 525 (Bunting); Tr. at 665 (Christensen); Tr. at 1251 (Leimkuhler).

Officers maintain general vigilance as soon as they turn onto the road to the Prison, and they maintain it all the way to the compound. Tr. at 794–95 (Buckingham). But once on the compound yard, the level of vigilance increases. *Id.*; Tr. at 1111–12 (Whinnery). Plaintiffs must remain alert, scanning the yard for anything out of the ordinary, such as inmates where they should not be. Tr. at 52, 92 (Conklin); Tr. at 357 (McPhillips); Tr. at 528, 607 (Bunting); Tr. at 666–67, 701 (Christensen); Tr. at 767 (Buckingham); Tr. at 1112 (Whinnery). Although the compound is formally supervised by the compound officer post, the Prison also relies, at least to some extent, on officers walking across the yard to help ensure compound security. Tr. at 1204 (Whinnery). That regularly means correcting inmate behavior while walking to posts. An officer walking across the compound yard might, for example, have to correct an inmate's uniform, order an inmate to stay on the sidewalk, or stop an inmate and bring him to the compound officer. Tr. at 34, 52, 56–57, 93–95 (Conklin); Tr. at 357–58 (McPhillips); Tr. at 529–30, 561–62 (Bunting); Tr. at 766–68 (Buckingham); Tr. at 1124 (Whinnery); Tr. at 1485–86, 1520–21 (O'Kane).

Plaintiffs can typically observe their surroundings and handle any issues while continuing their walks, without stopping. Tr. at 142 (Conklin); Tr. at 595, 635–36 (Bunting); Tr. at 700–01 (Christensen). There are some unusual exceptions. Plaintiffs sometimes must search inmates while on their way to post. Tr. at 34 (Conklin); Tr. at 328 (McPhillips); Tr. at 561–62 (Bunting); Tr. at 696 (Christensen); Tr. at 767

---

[15] One witness — Officer McPhillips — testified that the compound officer picks up a set of keys, or exchanges a set of chits, in the control center if there is an inmate on suicide watch. Tr. at 338–39, 355–56, 448. The witness may have been confusing the compound post with another post not at issue in the litigation. Tr. at 446–49. More generally, although I have no reason to question Officer McPhillips's truthfulness, he appeared to have difficulty understanding questions, following the examinations, and recalling events and details from memory. *See, e.g.*, Tr. at 317, 320–21, 333, 339–41, 343, 347–49, 363, 374–75, 383–84, 420–21, 425, 435–36, 439, 462, 465–66. I therefore find him credible to the extent that other witnesses or documents corroborate his testimony but give his testimony little weight otherwise.

(Buckingham).[16] In addition, Plaintiffs would in theory be expected to divert from their walks to post and respond immediately to an emergency. Tr. at 122–24 (Conklin); Tr. at 394, 425–26, 428–29 (McPhillips); Tr. at 628 (Bunting); Tr. at 658, 695–96, 706–07 (Christensen); Tr. at 791 (Buckingham); Tr. at 1113–14, 1148–49, 1151, 1205 (Whinnery); Tr. at 1418, 1471 (O'Kane); JX 3 at 1; JX 55 at 8. The government agrees that Plaintiffs are entitled to compensation if they take more than seven and a half minutes from their walk to handle such situations, Tr. at 1185–86, 1190–91 (Whinnery); Tr. at 1471–72 (O'Kane); Def.'s Post-Trial Br. at 14, but such situations have rarely arisen, if ever, Tr. at 142–43 (Conklin); Tr. at 596 (Bunting); Tr. at 1205 (Whinnery), and officers — including Plaintiffs — might not request overtime in such a situation even when entitled to it, Tr. at 701–02 (Christensen); Tr. at 809 (Buckingham).

Defendant counters that inmates are generally not on the compound during shift changes. Def.'s Post-Tr. Br. at 12. I find Plaintiffs' testimony credible. There is a scheduled move at 7:30 a.m., before the day watch takes over, which often overlaps with incoming officers taking their posts. Tr. at 468–69 (McPhillips); Tr. at 666 (Christensen). The 3:30 p.m. recall of prisoners to their housing units can overlap with the arrival of incoming officers as well. Tr. at 489 (McPhillips); Tr. at 528 (Bunting).[17] The presence of inmates on the compound during shift changes is thus more than a theoretical possibility, and one officers in fact need to be alert for as they come and go.

When incoming officers arrive, they are required to make their presence known to the supervising lieutenant for the shift. JX 58 at 4; Tr. at 1127 (Whinnery). Plaintiffs sometimes stop in the lieutenant's office to receive instructions or briefings

---

[16] Witnesses differ on whether it is advisable to search an inmate before receiving post equipment such as a radio and protective gear. Tr. at 34, 55–56 (Conklin); Tr. at 633–34 (Bunting).

[17] Plaintiffs argue that officers assigned to a 16-hour post are compensated for walking from the control center to their post for the first shift or from their post back to the control center from the second shift. Pls.' Post-Tr. Br. at 28; DX 5; Tr. at 1135–37, 1142–46 (Whinnery). Post orders for 16-hour posts seem to allow paid time for officers going to and from posts. Tr. at 502–06 (Bunting); Tr. at 1146 (Whinnery); DX5, DX7; *see also* Tr. at 1240–42 (Whinnery). But there is not much to be inferred from those facts, for purposes of this case. Equipment for 16-hour posts is kept at the control center when the posts are not staffed, so the officers at those posts either pick it up at the control center when they arrive or leave it there when they depart. The officers thus have their post equipment when they are paid to walk. Tr. at 1198–99 (Whinnery). Plaintiffs do not argue that the incoming officer is paid for his walking time when he arrives for the second 8-hour shift, nor that the outgoing officer is paid for his time walking out — just like officers assigned to 24-hour posts who head to their posts without their equipment. The Prison thus seems to treat like cases alike. Besides, officers are considered on time for 16-hour posts even if they are just in line for their equipment at the control center, Tr. at 572–73 (Bunting); Tr. at 1198 (Whinnery), and the time allowance may or may not be consistent with the time the walk actually involves, Tr. at 576–77 (Bunting). I therefore can draw no reliable conclusions from those post orders about the length or compensability of walking time.

from supervisors, check staff mailboxes, and complete overtime slips. Tr. at 200–01 (Conklin); Tr. at 395–96 (McPhillips); Tr. at 562–63 (Bunting); Tr. at 696–97 (Christensen); Tr. at 766, 799–800 (Buckingham); Tr. at 843–44 (Dumont). Most of those functions are separate from officers' security-related activities. Tr. at 800–01 (Buckingham).

Witnesses seem to agree that a pre-shift, in-person visit to the lieutenant's office is neither common, Tr. at 150 (Conklin), Tr. at 474 (McPhillips), Tr. at 628–29 (Bunting); Tr. at 1461, 1464 (O'Kane), nor officially required, Tr. at 709 (Christensen); Tr. at 897 (Dumont); Tr. at 1330 (Nalepa); Tr. at 1462–63 (O'Kane). Officers can accomplish the same functions if they go directly to their posts and call the lieutenant's office from there. Tr. at 141–42 (Conklin); Tr. at 474 (McPhillips) Tr. at 799–801 (Buckingham); Tr. at 1461–64 (O'Kane). Lieutenants are also expected to hold a "threes call" for each shift to pass on any important information to the officers on duty. Tr. at 790 (Buckingham); Tr. at 1463–64, 1490–91 (O'Kane). At the time of the site visit, many of the officers' mailboxes had the same package, placed there three months earlier, that the officers had not yet retrieved. Tr. at 12; Tr. at 1461, 1487–88 (O'Kane). I therefore conclude that the lieutenant's office visit is not necessary, and that Plaintiffs do not visit consistently on the way to their posts.

[. . .]. Tr. at 386–87, 471–72, 488 (McPhillips); Tr. at 555 (Bunting); Tr. at 683–84 (Christensen); Tr. at 782 (Buckingham). [. . .]. Tr. at 386–87 (McPhillips); Tr. at 1083 (Whinnery). [. . .]. Tr. at 1438 (O'Kane). [. . .]. Tr. at 175 (Conklin).

### C. Equipment and Information Exchanges

Once correctional officers arrive at their posts, they go through the process for relieving the outgoing officer. The exchanges vary slightly from post to post, but they generally involve an exchange of equipment and information. Stip. ¶ 13; PLX 9; Tr. at 45–48, 100–01, 117–19 (Conklin); Tr. at 345, 360 (McPhillips); Tr. at 531, 551, 556, 568 (Bunting); Tr. at 668, 684–85, 689 (Christensen); Tr. at 769, 776–77, 780, 782–83 (Buckingham).[18] During the exchange, one officer is on duty, and the other is off duty.

Equipment for 24-hour posts is maintained at the post, so — except at the control center, where officers carry no equipment[19] — it is transferred directly from the outgoing officer to the incoming officer. Tr. at 105, 152, 164 (Conklin); Tr. at 345 (McPhillips); Tr. at 515, 547 (Bunting); Tr. at 668, 675 (Christensen); Tr. at 1330–31 (Nalepa). Equipment includes [. . .], all of which must be counted and inspected. Tr.

---

[18] The post orders require a proper relief. PLX 13 at 3; JX 82 at 2, 5, 7; JX 84 at 3, 6, 9; JX 90 at 2, 3, 5; JX 91 at 1–3; JX 95 at 3, 6, 8; JX 97 at 3, 6, 8; PLX 5 (discussing the exchanges); PLX 7; PLX 9 at 1.
[19] In the control center, the incoming officer performs certain administrative tasks before the outgoing officer leaves. Tr. at 690 (Christensen).

at 45–48, 51, 102–03 (Conklin); Tr. at 345–48, 369 (McPhillips); Tr. at 516, 531, 534–35, 551–52 (Bunting); Tr. at 668 (Christensen); Tr. at 761 (Buckingham); Tr. at 1221–22 (Whinnery); Tr. at 1509 (O'Kane); JX 58 at 10. The equipment exchange is required by all post orders in this case. *See* PLX 5 at 1, 3, 5, 7, 11, 13; PLX 7 at 1, 7, 9, 11; PLX 9 at 1, 7, 9, 13, 19, 25; PLX 13 at 1, 3, 5, 7, 9; JX 82 at 1, 4, 6; JX 84 at 1, 3–4, 6–7, 9; JX 90 at 2–3, 5; JX 91 at 1–3; JX 95 at 3, 6, 8; JX 97 at 3, 6, 8. The incoming officer also conducts an inventory of on-post equipment by, for example, scanning the post's shadow board. Doing so takes very little time. Tr. at 109 (Conklin); Tr. at 365, 370–71 (McPhillips); Tr. at 531, 545, 600–01 (Bunting); Tr. at 668, 676, 690–91 (Christensen); Tr. at 772 (Buckingham).

The officers engage in a verbal exchange, during which the outgoing officer describes security or safety issues observed during his shift to the oncoming officer. Tr. at 101–02, 108 (Conklin); Tr. at 365–66 (McPhillips); Tr. at 531, 533 (Bunting); Tr. at 669, 675, 689–90 (Christensen); Tr. at 770 (Buckingham). The content of the exchange varies from post to post. *See also* Tr. at 112–13 (Conklin); Tr. at 376 (McPhillips); Tr. at 546–47 (Bunting); Tr. at 689–90 (Christensen). The information exchange is not mentioned in the post orders, Tr. at 1458–60, 1546 (O'Kane); *see also* Tr. at 1330 (Nalepa),[20] but Captain O'Kane conceded that although the verbal exchange is not "required," it is "expected." Tr. at 1476–77, 1545–46 (O'Kane).[21] I find that a verbal exchange is necessary for an orderly relief process.

The government argued that the verbal exchange is unnecessary for Prison security because correctional officers can use a database called TruScope to share information with each other. Tr. at 1454–56, 1458, 1475 (O'Kane); *see also* Tr. at 154–58 (Conklin); Tr. at 897–98 (Dumont). However, not all correctional officers have access to TruScope, Tr. at 367–68 (McPhillips); the compound and control center officers do not typically use it at all, Tr. at 120 (Conklin); Tr. at 689 (Christensen);

---

[20] Defendant argues that because an information exchange is mentioned in the orders for the "Outside Hospital Officer" post — which is not one of the posts at issue in this case — it cannot be part of the requirements for any other post. Def.'s Post-Trial Br. at 20 n.9; Tr. at 192–93 (Conklin); Tr. at 814 (Buckingham); DX 46 at 6 (Outside Hospital post orders). I specifically decline to draw that inference. First, even crediting testimony that there are special security reasons for requiring the verbal exchange at that post, which is outside the Prison's confines, Tr. at 1459–60 (O'Kane), the government has not established that the process of preparing the post orders is comprehensive enough to justify applying a presumption resembling the *expressio unius exclusio alterius* canon applicable to statutes. *Cf. United Dominion Indus. v. United States*, 532 U.S. 822, 836–37 (2001). One post inside the Prison (also not at issue in the case) has a verbal exchange requirement too. Tr. at 1480 (O'Kane); JX 91 at 1. Second, as discussed below, even if it were not expressed in the post orders, the FLSA obligates employers to pay for work that is "suffered or permitted." *See infra* Conclusions of Law I.A.2. The question is whether the exchange is a form of work, not whether it is in the post orders.

[21] I give no weight to Captain O'Kane's distinction between "require[ments]" and "expect[ations]" of Prison management.

and incoming officers cannot always access it immediately on taking a post, Tr. at 201–02 (Conklin); Tr. at 366 (McPhillips); Tr. at 533–34 (Bunting); Tr. at 670 (Christensen); Tr. at 770–71 (Buckingham). Saving the incoming officer from having to look at TruScope is not merely a "professional courtesy," Tr. at 1458 (O'Kane), but a measure to ensure that the incoming officer is fully prepared from the moment the outgoing officer leaves.

Not all information the officers might want to share with each other, moreover, is entered in TruScope. An outgoing officer might have forgotten to enter something; an incoming officer might want more detail than a log entry contains; and officers typically do not enter certain kinds of information, such as their hunches and suspicions. Tr. at 102–03 (Conklin); Tr. at 368–69 (McPhillips); Tr. at 602–04 (Bunting); Tr. at 669 (Christensen); Tr. at 820 (Buckingham).

Captain O'Kane testified that he dispensed with the verbal exchange on one occasion when relieving one of the representative Plaintiffs at SHU #1.[22] Tr. at 1447–50, 1453–54 (O'Kane). He explained that because the shifts of the two 24-hour SHU posts had been staggered since 2018, he would overlap for two hours with the SHU #2 officer, making a verbal exchange with the outgoing SHU #1 officer unnecessary. Tr. at 1453–54 (O'Kane). But the outgoing officer seemed to expect that there would be a verbal exchange, Tr. at 1454, 1475 (O'Kane), suggesting that an exchange is the norm even when there is another officer at the unit. In any event, the relief in question occurred no more than two months before trial and involved the Prison's captain, who was trying to let the outgoing officer leave as quickly as possible. Tr. at 1453 (O'Kane). Although I do not question Captain O'Kane's account of what happened on that occasion, nor that Captain O'Kane believed he could safely relieve the officer without an exchange, I decline to infer that the relief he described was the typical best practice at FCI Otisville.

The exchanges take time, for several reasons. For one thing, the officers transfer equipment one item at a time so that the oncoming officer can account for, inspect, and verify it, and so that if there is an emergency during the exchange, all equipment would still be secured. Tr. at 103–04 (Conklin); Tr. at 369–70 (McPhillips); Tr. at 531 (Bunting); Tr. at 670 (Christensen); Tr. at 771 (Buckingham). Even at the control center, the incoming officer briefly checks at least some of the post's equipment to make sure everything is accounted for. Tr. at 109 (Conklin); Tr. at 459 (McPhillips); Tr. at 691 (Christensen). Although a joint inventory of equipment is not required in the post orders either, *e.g.*, Tr. at 159–60, 162–63 (Conklin), the officers

---

[22] Several representative plaintiffs were selected by the parties for the purposes of discovery and determining liability. Stip. ¶ 1.

similarly appear to consider it necessary. The incoming officer typically completes the exchanges and at least some of the inventory before the outgoing officer leaves, to ensure that everything is accounted for and that any questions about the equipment can be answered. Tr. at 109 (Conklin); Tr. at 371, 459 (McPhillips); Tr. at 532, 536, 546–47 (Bunting); Tr. at 671–72, 691 (Christensen); Tr. at 771–72 (Buckingham).

Plaintiffs also explain that they complete the equipment exchange and their verbal discussion in sequence, rather than at the same time. They testified, plausibly, that it is difficult to retain information while doing more than one thing at a time. Tr. at 598 (Bunting). Although some officers do the exchanges concurrently, and although Captain O'Kane believes that the officers should be able to do so, Tr. at 1549–50 (O'Kane), the witnesses established that it is not the best practice. Tr. at 173 (Conklin); Tr. at 598 (Bunting).

It is possible that verbal exchanges sometimes include non-work-related talk. Tr. at 713, 723 (Christensen). That goes to the length of the exchange, discussed below.

### D. Post-Shift Activities

Officers are not allowed to leave a 24-hour post until they are properly relieved or are given explicit permission to leave by a lieutenant. JX 84; Tr. at 360 (McPhillips); Tr. at 568 (Bunting); Tr. at 668 (Christensen); Tr. at 768 (Buckingham); Tr. at 1125–26 (Whinnery); Tr. at 1489 (O'Kane).

At the end of their scheduled shifts, officers engage in the same tasks they perform before the start of their scheduled shifts but in reverse order. Tr. at 537, 548, 553 (Bunting); Tr. at 672, 677, 680–81, 685–86, 692 (Christensen); Tr. at 773–74, 787 (Buckingham). The post orders provide that after the relieved officer transfers his equipment, his "tour of duty ends" and he is to "proceed directly out of the institution." JX 84 at 3; *see also* JX 90 at 2, 3, 5; JX 91 at 1–3; JX 95 at 3, 6, 8; JX 97 at 3, 6, 8. After the verbal information and equipment exchange with the oncoming officer, the outgoing officer walks back to the exit. Tr. at 372–73, 387 (McPhillips); Tr. at 537 (Bunting); Tr. at 672–73 (Christensen); Tr. at 773, 777 (Buckingham). Officers' responsibilities during their walk out of the compound are essentially the same as during their walk in. *See also* Tr. at 549, 607 (Bunting).

## III. <u>Timing</u>

The parties sought to prove how much time Plaintiffs' pre- and post-shift activities require. There are no time clocks at FCI Otisville, and there never have been. Stip. ¶ 9. Outside of litigation, the Prison does not track when a given correctional officer enters the front lobby to be screened, arrives at his post, leaves

his post, or exits the Prison. *Id.* ¶ 12. The parties presented two forms of evidence to prove timing: testimony on the timing and duration of different activities, and competing video analyses of officers' comings and goings.

### A. Testimony About Time

Although shifts are scheduled to begin and end at the top of the hour, Stip. ¶ 8, and although officers are not required to receive their equipment on post before that hour, *see, e.g.*, JX 84 at 1, officers' actual arrival and departure practices are different. Officers usually arrive and leave early. Tr. at 483 (McPhillips); PLX 23, Exh. A at 1–9; DX 14. That practice is in part a courtesy that officers pay each other. Tr. at 1456–57, 1464–65, 1558 (O'Kane). It also seems to have the practical effect of shifting the relief process away from the 4:00 p.m. and 12:00 a.m. prisoner counts — thus ensuring that the incoming evening- and morning-shift officers are generally ready for the counts on time — while keeping all three shifts roughly even. JX 58 at 40–42; Tr. at 978 (Shemanski); Tr. at 1130–32 (Whinnery).

The witnesses who testified about how long pre- and post-shift activities take had never actually timed those activities. Tr. at 189 (Conklin); Tr. at 565 (Bunting); Tr. at 711–12 (Christensen); Tr. at 804–05 (Buckingham); Tr. at 900–01 (Dumont); Tr. at 1234 (Whinnery); Tr. at 1271 (Leimkuhler).[23] When they testified how much time they thought different activities took, their estimates varied widely and are difficult to reconcile mathematically.

#### 1. Entry Process

Officer Conklin testified that clearing security can take anywhere from one to four minutes. Tr. at 83, 149 (Conklin). He testified at different times that donning the duty belt takes an additional one to two minutes, or possibly less than a minute. Tr. at 126, 146 (Conklin). The "belt keepers" that some officers use to hold their belts in place may make the process longer. Tr. at 146–47 (Conklin); *see also* Tr. at 627 (Bunting). It then takes another one to two minutes to get through the A1 sally port, and another one to two minutes to pass through the control center and the compound sally port. Tr. at 138 (Conklin).[24] That adds up to anywhere from four to ten minutes.

But four to ten minutes is a wider range than he described at his deposition, when he seems to have testified that it takes five to seven minutes to reach the

---

[23] One witness testified that he had timed one minute, 48 seconds from the A1 lobby to the control center lobby. Tr. at 900–01 (Dumont). But it was not clear whether he began timing before or after security. Because of the ambiguity, I give no weight to that testimony.

[24] Plaintiffs implied the sally port process on the site visit was slightly faster than usual, while the government claimed it was the same as always. Tr. at 954 (Shemanski); Tr. at 1450–52 (O'Kane). Nothing gives me confidence that I can resolve that dispute one way or another, so I make no assumptions about sally port time based on the site visit.

compound. Tr. at 174 (Conklin). At trial, he also testified that it takes one to two minutes "[f]rom walking into the A1 lobby to get all the way to having foot on the compound," Tr. 173 (Conklin), much shorter than the sum of his time estimates for the different stages of the process.

Officer McPhillips testified that he begins his security screening between 12 and 20 minutes before his shift is scheduled to start. Tr. at 348–49 (McPhillips). But he also testified that he clears the A1 sally port during that same timeframe, Tr. at 355 (McPhillips), making it hard to isolate the time he spends in screening. He testified that the duty belt usually takes ten seconds to don, or up to 30 seconds with belt keepers. Tr. at 441 (McPhillips).

Officer Bunting testified that he arrives about half an hour early for his shifts and [. . .] in the A1 sally port three to five minutes later. Tr, 518–19, 527 (Bunting). Putting on his duty belt takes one to two minutes, Tr. at 564 (Bunting), so security screening must take between one and four minutes. It takes him another two or three minutes from putting on his belt, he said, to reach the compound sally port. *Id.* That leads to a total of five to eight minutes from the A1 lobby to the compound.

Officer Christensen did not testify directly about the length of the security screening, but he testified that his belt takes thirty seconds to a minute to don, Tr. at 705 (Christensen), and that it takes him three minutes after screening to reach the compound, Tr. at 665–66, 703 (Christensen). Yet he also testified that it takes three to five minutes to walk to the housing units, Tr. at 705 (Christensen), and that it takes seven to ten minutes after arriving at the Prison screening to reach the housing units, Tr. at 668–69, 704 (Christensen). If it takes up to a minute to put on a belt, another three minutes to reach the compound, and three to five minutes to reach the housing unit — a total of seven to nine minutes — then it is not clear how one could add some amount of screening time and still reach the same total of seven to ten minutes from the A1 lobby to arrival on post. But one way or another, he seems to say that it takes at least four minutes to reach the compound after arrival.

Officer Buckingham testified that it takes him two to three minutes to clear security, put on his duty belt, and reach the A1 sally port door. Tr. at 763 (Buckingham). ([. . .]. Tr. at 783 (Buckingham).) It then takes three to five minutes to clear the A1 sally port, walk to the control center, and clear the compound sally port, Tr. at 765 (Buckingham), totaling five to eight minutes from arrival to the compound.

Officer Dumont gave relatively little testimony on timing the entry process but said that the duty belt can take only "a couple seconds" to put on, though it can be thirty seconds or more depending on the kind of belt. Tr. at 896–97 (Dumont).

Officer Leimkuhler did not testify about time in screening or donning, but he testified that it takes five to ten seconds each to clear the A1 sally port, reach the compound sally port, and clear that sally port, Tr. at 1250–51 (Leimkuhler), for a total of 15 to 30 seconds to reach the compound after security.

Lieutenant Nalepa testified that the duty belt can be donned in less than ten seconds. Tr. at 1328 (Nalepa). Captain O'Kane testified that the belt can be donned in seconds, Tr. at 1444 (O'Kane), and that security takes less than a minute, Tr. at 1439 (O'Kane).

To sum up. [. . .]. But as to the medium-security facility, the witness testimony about the initial entry process varied considerably, even setting aside the witnesses' internal inconsistencies. Estimates for security ranged from less than a minute to four minutes. Estimates for the belt ranged from a few seconds to two minutes. Estimates for the time to reach the compound after putting on the belt ranged from 15 to 30 seconds to five minutes. Adding up the high and low estimates, the time to reach the compound after arrival might range from roughly two to eleven minutes.

### 2.  Walk to and from Posts

Because the posts at issue are located in different parts of the medium-security facility ([. . .]), the time needed to reach the posts from security varies.[25]

Start with the medium-security facility, where the control center is the easiest post to reach. Officers at the control center do not wear duty belts, Tr. at 105 (Conklin), so the time to get there from the Prison entrance is simply the security screening plus time walking from the screening to the control center and through the control center sally port. Estimates for that time vary. Some witnesses testified it could be anywhere from three to seven or eight minutes. Tr. at 126, 138, 146 (Conklin); Tr. at 564 (Bunting); Tr. at 665–66, 703 (Christensen); Tr. at 765 (Buckingham). Other testimony seems to imply that it takes less than two minutes. Tr. at 1250–51 (Leimkuhler); Tr. at 1439 (O'Kane).

The housing unit posts are the farthest from the compound sally port. To reach housing units, Officer McPhillips testified to a two- to five-minute walk, Tr. at 361 (McPhillips), and Officer Christensen testified to three to five minutes, Tr. at 705 (Christensen). Officer Buckingham testified that he reaches the housing units between 15 and 20 minutes before the hour. Tr. at 769 (Buckingham). Given that he reaches the A1 lobby between 25 and 30 minutes early, Tr. at 763, 775, 783

---

[25] Some witnesses suggested that the walk in and walk out take different amounts of time on average. *Compare* Tr. at 564–65 (Bunting) (two to three minutes to enter but three to five minutes to exit); Tr. at 1317 (Nalepa). Because the expectations for the ingoing and outgoing walks are the same, I assume the entry and exit times are — or at least could be — equal.

(Buckingham), and, per his testimony discussed above, that it takes five to eight minutes to reach the compound, he likely also meant that it takes two to five minutes to walk to the housing units. On the shorter end, Officer Dumont testified that it would take no more than two minutes to reach the most distant housing units, Tr. at 895 (Dumont), Officer Leimkuhler testified that it takes 45 seconds to one minute, Tr. at 1251 (Leimkuhler), and Captain O'Kane estimated a minute and a half, Tr. at 1445 (O'Kane). Estimates thus range from less than a minute to five minutes.

The SHU and compound posts are the in-between distances. To reach the SHU, Officer Conklin testified that it takes four to six minutes. Tr. at 126 (Conklin). Officer McPhillips and Officer Christensen, though, testified that it takes two to three minutes to reach the SHU. Tr. at 362 (McPhillips); Tr. at 674, 705 (Christensen). Officer Buckingham's estimate falls in the middle, at three to four minutes. Tr. at 776 (Buckingham). But Officer Dumont and Captain O'Kane testified that it only takes about one minute. Tr. at 894 (Dumont); Tr. at 1445 (O'Kane). The estimates thus range from one minute, possibly less, to six minutes.

To reach the compound post, Officer McPhillips testified that it took two to three minutes to reach the post when it was in the lieutenant's office, but three to six minutes — two or three times as long, improbably — when the post moved around the corner to the side gate. Tr. at 364 (McPhillips). Officer Christensen testified that it takes three to five minutes to reach the side gate location. Tr. at 679 (Christensen). Officer Buckingham estimated four to seven minutes, possibly even more. Tr. at 779–80 (Buckingham). Officer Dumont estimated one minute when the post was in the lieutenant's office, and now about a minute and a half, Tr. at 896 (Dumont), with Captain O'Kane in agreement, Tr. at 1445 (O'Kane). Estimates thus range from a minute or less to seven minutes.

At a higher level, some officers did not differentiate as to posts or testify how long it takes them to reach their posts after arrival. Officer Conklin testified that he reaches his post about fifteen minutes after arrival, Tr. at 149 (Conklin), suggesting — in conjunction with his four- to ten-minute estimate for reaching the compound — that the walk to posts takes between five and eleven minutes. Officer Bunting, though, testified that it takes two to three minutes to pass through the control center and reach a post on the compound, perhaps more for more distant posts. Tr. at 564–65 (Bunting).

[. . .]. Tr. at 174–75 (Conklin). [. . .]. Tr. at 686–87 (Christensen). [. . .], Tr. at 389 (McPhillips) [. . .].

### 3. Equipment and Information Exchanges

Estimates for the exchange times vary by post. But once again, the estimates also vary by witness.

Most witnesses agreed that the control center and SHU exchanges were longest. In the control center, Officer Conklin testified that exchanges take ten minutes or more. Tr. at 105, 111 (Conklin). Officer McPhillips suggested five to eight minutes. Tr. at 391–92 (McPhillips). Officer Christensen testified that it takes seven to ten minutes, though closer to five minutes for day and evening watch because a second officer is present. Tr. at 691–93, 709–12 (Christensen). Officer Buckingham testified to five to ten minutes. Tr. at 786–87 (Buckingham). Officer Leimkuhler estimated two to three minutes. Tr. at 1253 (Leimkuhler).

In the SHU, Officer Conklin testified that exchanges take close to ten minutes. Tr. at 104–05, 111 (Conklin). Officer McPhillips testified that the exchange takes four to ten minutes. Tr. at 377 (McPhillips). Officer Bunting estimated three to six. Tr. at 548, 565 (Bunting). Other estimates hovered at three to five minutes, Tr. at 674–75 (Christensen); Tr. at 777 (Buckingham), except for Officer Leimkuhler, who again estimated two to three. Tr. at 1252 (Leimkuhler).

In housing units, Officer Conklin appeared to estimate that the exchanges take about five minutes. Tr. at 104–05, 111 (Conklin). McPhillips testified that the exchange takes two to five minutes, and others estimated three to five, Tr. at 371 (McPhillips); Tr. at 536, 565 (Bunting); Tr. at 672 (Christensen); Tr. at 772–73 (Buckingham). Officer Leimkuhler estimated one to two minutes. Tr. at 1253 (Leimkuhler).

At the compound post, Officer McPhillips testified that the exchange takes three to six minutes. Tr. at 382–83 (McPhillips). Others estimated three to five. Tr. at 680 (Christensen); Tr. at 780 (Buckingham). Officer Leimkuhler estimated one to two minutes. Tr. at 1252 (Leimkuhler).

[. . .]. Tr. at 388 (McPhillips). [. . .]. Tr. at 680 (Christensen); Tr. at 784 (Buckingham). [. . .]. Tr. at 556 (Bunting). [. . .].

On top of all of that, Officer Dumont testified that exchanges take no more than a minute, apparently regardless of the post, Tr. at 898 (Dumont), and Captain O'Kane testified that it takes between 30 and 90 seconds. Tr. at 1549 (O'Kane). Estimates thus range from less than a minute to ten minutes or more for the control center and SHU, and five or six minutes for other posts.

### 4. Total Time

Some witnesses testified about their total time inside the Prison on a given eight-hour shift. Officer Conklin estimates that he spends an extra 28 minutes in the Prison per shift. Tr. at 116–17 (Conklin). But that estimate is at the outer edge of his estimates for the time he spends in particular activities: If he spends five to eight minutes in reaching the compound, four to six minutes reaching a middle-distance post like the SHU, five to ten minutes in pre-shift exchanges,[26] and then another four to six minutes leaving, his pre- and post-shift activities add up to 18 to 30 minutes. Tr. at 83, 104, 126 (Conklin). The self-reported numbers are hard to reconcile, unless his activities are longer than he estimated, or he overestimated his total time, or he spends time on other activities in the Prison.

Officer McPhillips testified that he spends an extra half hour in the Prison when he works a housing unit post. Tr. at 375 (McPhillips). But he testified that it takes two to five minutes to walk each direction between the housing posts and the compound sally port, and another two to five minutes on the exchanges — a fifteen-minute process at most. Tr. at 361, 371 (McPhillips). He testified that he spends an extra half-hour in the Prison when assigned to the SHU, Tr. at 380 (McPhillips), but he said it only takes two to three minutes to walk there and four to ten minutes to complete the exchange, totaling no more than 16 minutes. Tr. at 362, 377 (McPhillips). He testified that he spends an extra half hour in the Prison when assigned to the compound post, Tr. at 385 (McPhillips), but he testified that it takes no more than six minutes to walk there now and no more than six minutes to complete the exchange, Tr. at 364, 382–83 (McPhillips), or no more than 18 minutes. He testified that he spends an extra 20 to 30 minutes in the Prison when assigned to the control center, but that it takes no more than eight minutes to complete the exchange. Tr. at 391–92 (McPhillips). He testified that he spends an extra fifteen minutes in the Prison when he is assigned [. . .], Tr. at 389 (McPhillips), which — giving him the benefit of the doubt, for the moment, as to his walking time estimates — is roughly consistent with his other testimony. Tr. at 388–89 (McPhillips). But even taking into account that Officer McPhillips did not testify about the length of the security screening, the rest of his testimony about time is hard to make sense of mathematically.

Officer Bunting testified that he arrives about half an hour early and leaves five to ten minutes early, for an extra 20 to 25 minutes in the Prison. Tr. at 518–19, 538, 553–54 (Bunting). It takes him five to eight minutes to reach the compound

[26] Because one officer is on duty during the exchanges, the time is only pre- or post-shift time for the other officer.

(including screening and donning), two or three minutes to reach a post, and three to six minutes to complete an exchange, Tr. at 518–19, 527, 536, 548, 564–65 (Bunting), for a total of about 20 minutes.

Officer Christensen testified that when he is assigned to a housing unit, he spends an extra ten minutes in the Prison. Tr. at 673 (Christensen). But he also testified that he arrives roughly half an hour early and leaves the A1 sally port between ten and 15 minutes early, which amounts to approximately 15 to 25 minutes of extra time in the Prison. Tr. at 661, 673, 678–79, 682, 687, 698, 704 (Christensen). He testified that it takes four minutes to reach the compound, three to five minutes to walk there, and another three to five minutes to complete the exchange, Tr. at 665–66, 672, 703, 705 (Christensen), which is more consistent with the latter estimate.

Officer Buckingham testified that he arrives 25 to 30 minutes early and leaves ten to 15 minutes early, for an extra in-Prison time of ten to 20 minutes. Tr. at 763, 773, 775, 778, 781, 783, 787 (Buckingham). He testified that it takes five to eight minutes after arrival to reach the compound, Tr. at 763, 765, 783 (Buckingham), two to five minutes to reach the housing units, Tr. at 769 (Buckingham), and three to five minutes to complete the exchanges there, Tr. at 772–73 (Buckingham). At the lower end, that is roughly internally consistent with his overall time estimate.

In common experience, people are not good at guessing lengths of time they have not specifically timed. The testimony in this case bears that out. The witnesses' estimates of the time they spend in the Prison, and on particular activities before and after their shifts, are mutually and internally contradictory. The more detail the witnesses gave, moreover, the more contradictions appeared. For that reason — regardless of the results of the video analysis discussed below — I give little independent weight to their testimony about time.

**B. Video Analysis**

In addition to direct testimony, the parties analyzed time-stamped footage from FCI Otisville video cameras. The individuals who did the analysis noted officers' arrivals and departures on select dates from May 1, 2019 through December 31, 2019. Stip. ¶ 15; Tr. at 847–48 (Nalepa); Tr. at 919–20, 924 (Shemanski); PLX 23 (Plaintiffs' analysis); DX 14 (Defendant's analysis). [. . .], only the medium-security facility. Tr. at 927 (Shemanski).

*1. Plaintiffs' Analysis*

Plaintiffs' analysis was done by Willie Shemanski, who chose several weeks of video data at random. Tr. at 924 (Shemanski). Officer Shemanski marked when given Prison officers entered the front door of the A1 lobby, Tr. at 928–29 (Shemanski); PLX

26, and when they left the control center lobby, Tr. at 928, 930, 951 (Shemanski); PLX 29, rounding time stamps up or down to the nearest minute. Tr. at 941–42 (Shemanski). He was able to identify officers from personal knowledge. Tr. at 931 (Shemanski). He focused his review on the 40 minutes before each shift change and the 20 to 30 minutes after, and disregarded occasions when he could not identify both an arrival and a departure for a given officer working a given shift. Tr. at 930–31, 934–35 (Shemanski). He then determined, based on daily rosters, to which post the officers he observed were assigned. Tr. at 931 (Shemanski). I find Officer Shemanski credible as to his identification of officers and as to the officers' arrival and departure times.

The product of his analysis was tabular data showing the arrival and departure times for officers assigned to each post for given shifts, plus the total time between the officer's arrival and departure. Tr. at 933–34 (Shemanski); PLX 23 Exh. A, Exh. B. Calculations of time were done automatically by spreadsheet software, with no human mathematics involved. Tr. at 944 (Shemanski).

Officer Shemanski's analysis showed that officers assigned to the covered 24-hour posts spent the following amounts of time in the Prison.

| Average Time in Prison Per Shift: Posts[27] | |
|---|---|
| Location | Time (Hours) |
| Housing | 8:17.27 |
| Compound 1 | 8:12.02 |
| Control 1 | 8:10.02 |
| SHU 1 | 8:14.61 |
| Overall Average | 8:15.01 |

---

[27] Although the record is not perfectly clear, Officer Shemanski's initial analysis seems to have expressed times less than a minute in decimals rather than seconds. *See* Tr. at 956 (Shemanski).

The representative Plaintiffs — excepting ones who did not work at the posts at issue in the case — spent, on average, the following amounts of time in the Prison when they worked at covered posts. *See* Tr. at 945–51 (Shemanski).

| Average Time in Prison Per Shift: Officers | |
|---|---|
| Officer | Time (Hours) |
| Buckingham | 8:20.89 |
| Hackett | 8:10.67 |
| McPhillips | 8:14.50 |
| Smith | 8:3.88 |
| Tufano | 8:14.50 |
| Overall Average | 8:15.19 |

Additionally, in response to the government's video analysis, Officer Shemanski reviewed how long it took three Plaintiffs to reach the compound sally port after arriving at the A1 lobby. PLX 23 Response Analysis; Tr. at 954–56 (Shemanski).

| Time from Lobby to Compound | |
|---|---|
| Officer | Time (Minutes) |
| Buckingham | 4:51 |
| Christensen | 6:27 |
| Hagenburg | 4:23 |
| McPhillips | 3:55 |
| Overall Average | 4:54 |

I find that Officer Shemanski's figures are overestimates. For one thing, the average times include occasions when officers arrived at the Prison far earlier than usual. The video evidence bears out Plaintiffs' testimony that the entire arrival, relief, and departure process is usually over by the time the shifts are scheduled to change. PLX 23 Exh. A, Exh. B. In Officer Shemanski's analysis of certain Plaintiffs' arrivals and departures, every single arrival time, and all but one departure, occurred before the scheduled shift change. PLX 23 Exh. B. Most incoming officers arrive between 15

and 30 minutes early. But some individuals habitually arrive much earlier than their peers, sometimes nearly an hour early, and so spend more time in the Prison when their relief arrives at a more usual time. *See* Tr. at 989–93, 995–96 (Shemanski). The average figures, furthermore, include the time Plaintiffs spent in security screening, which is not compensable work time. *Aitken I*, 162 Fed. Cl. at 368. Although Officer Shemanski reviewed how long it took several officers to reach the compound sally port from the A1 lobby, *see* PLX 23 Response Analysis; PLX 25; PLX 29, he did not isolate the time between the A1 lobby and the A1 sally port. *See* PLX 25; PLX 26.

Officer Shemanski's video analysis is also limited by the absence of more detailed information about when officers arrived and left particular locations. The Prison's cameras could have shown the time officers take to walk from the compound sally port to their posts and back, as well as how long both officers are at given posts before the outgoing officer leaves. *See* Tr. at 975–76 (Shemanski); PLX 27; PLX 30; PLX 33; PLX 35. As discussed below, the government's video analysis includes that level of detail, but Plaintiffs' did not. Tr. at 990–91, 1005–06, 1009 (Shemanski).

Even with those limitations, a close reading of Officer Shemanski's video analysis shows that the relief process takes considerably less time than Plaintiffs' witnesses claimed.

<u>Lobby to Compound</u>. As shown by the table above, the average time an individual needs to get from the A1 lobby, through security, to the compound is as little as four minutes. Those averages, in addition, include a certain amount of variation. Officer Christensen, with the longest average, reached the compound in five minutes and one second on July 9, 2019. Officer Hagenburg reached it in three minutes, two seconds on May 9. Officer McPhillips reached the compound in two minutes, nine seconds on July 7. PLX 23 Response Analysis.

<u>Compound 1</u>. On May 11, 2019, Officer Hurn arrived at the A1 lobby at 3:42 p.m. to relieve Officer Hoehmann. PLX 23 Exh. A at 1. Officer Hoehmann entered the control lobby at 3:50 p.m., eight minutes later. *Id.* On July 9, Officer Hoehmann arrived at 7:35 a.m. to relieve Officer O'Connor. *Id.* Officer O'Connor left at 7:44 a.m., nine minutes later. *Id.* On July 12, Officer Galoso arrived at 7:34 a.m. to relieve Officer O'Connor. *Id.* Officer O'Connor left at 7:43 a.m., nine minutes later. *Id.* Other reliefs that took 10 minutes or less occurred on July 10, July 12 (twice), July 13, August 12, October 7, October 9, and October 12. *Id.* at 1–2. Especially considering that Officer Shemanski's analysis includes screening time in the A1 building, it appears that the entire pre- and post-shift process of walking to the compound post, completing relief, and walking from the compound post can be completed in less than ten minutes.

Control 1. On May 5, 2019, Officer Shemanski arrived at 3:38 p.m. to relieve Officer Rivera. PLX 23 Exh. A at 2. Officer Rivera entered the control lobby at 3:42 p.m., four minutes later. *Id.*; Tr. at 976–79 (Shemanski). On May 6, Officer Hackett arrived at 3:39 p.m. to relieve Officer Cavalli. PLX 23 Exh. A at 2. Officer Cavalli entered the control lobby at 3:46 p.m., seven minutes later. *Id.* On June 15, Officer Macgregor arrived at 7:50 a.m. to relieve Officer Ferry. *Id.* Officer Ferry entered the control lobby at 7:54 a.m., four minutes later. *Id.* On July 7, Officer Shemanski arrived at 4:01 p.m. to relieve Officer Macgregor. *Id.* Officer Macgregor entered the control lobby at 4:05 p.m., four minutes later. *Id.*; Tr. at 980–81 (Shemanski). On July 8, Officer Smith arrived at 7:40 a.m. to relieve Officer Mclean. PLX 23 Exh. A at 2. Officer Macgregor entered the control lobby six minutes later. *Id.* Other reliefs taking 10 minutes or less occurred on August 11, August 12, August 16, October 7, October 8, October 9, October 10, October 11, and October 12. *Id.* at 3. Especially considering that Officer Shemanski's analysis includes screening time, it appears that the pre- and post-shift process of walking to the control center and completing relief can be completed in less than ten minutes.

SHU 1. On May 5, 2019, Officer McPhillips arrived at 3:38 p.m. to relieve Officer Macgregor. PLX 23 Exh. A at 3. Officer Macgregor entered the control lobby at 3:46 p.m., eight minutes later. *Id.*; Tr. at 999–1000 (Shemanski). On July 7, Officer McPhillips arrived at 3:33 p.m. to relieve Officer Hanna. PLX 23 Exh. A at 4. Officer Hanna entered the control lobby at 3:42 p.m., nine minutes later. *Id.* On July 11, Officer Tufano arrived at 3:33 p.m. to relieve Officer Cavalli. *Id.* Officer Cavalli entered the control lobby at 3:37 p.m., four minutes later. *Id.* On July 13, Officer Hanna arrived at 7:39 a.m. to relieve Officer O'Connor. *Id.* Officer O'Connor entered the control lobby at 7:48 a.m., nine minutes later. *Id.* Other reliefs taking 10 minutes or less occurred on August 17 (twice), October 7, and October 12. *Id.* at 4–5. Considering that Officer Shemanski's analysis includes screening time, it appears that the pre- and post-shift process of walking to the SHU, completing relief, and walking from the SHU can be completed in less than ten minutes.

Housing Unit D. On May 11, 2019, Officer Macgregor arrived at 7:45 a.m. to relieve Officer Cocilvo. *Id.* at 5. Officer Cocilvo entered the control lobby at 7:55 a.m., ten minutes later. *Id.* August 11, Officer Quartarone arrived at 3:42 p.m. to relieve Officer Cronin. *Id.* at 5. Officer Cronin entered the control lobby at 3:52 p.m., ten minutes later. *Id.*

Housing Unit E. On May 7, Officer Velez arrived at 3:47 p.m. to relieve Officer Conklin. *Id.* Officer Conklin left at 3:57 p.m., ten minutes later. *Id.* On July 7, Officer Salmon arrived at 11:38 p.m. to relieve Officer Hager for the July 8 morning shift. *Id.* at 9. Officer Hager left at 11:48 p.m., ten minutes later. *Id.*

Housing Unit F. On July 11, Officer Carey arrived at 11:40 p.m. to relieve Officer Christensen for the July 12 morning shift. *Id.* at 6. Officer Christensen entered the control lobby at 11:51, eleven minutes later. *Id.*; Tr. at 1006–07 (Shemanski). Later on July 12, Officer Witkowski arrived at 3:45 p.m. to relieve Officer Reuthe. *Id.* Officer Reuthe left at 3:56 p.m., eleven minutes later. *Id.* On October 7, Officer Melendez arrived at 7:37 a.m. to relieve Officer Salmon. *Id.* at 7. Officer Salmon left at 7:48 a.m., eleven minutes later. *Id.*

Housing Unit G. On May 6, Officer Cavalli arrived at 3:46 p.m. to relieve Officer Tice. *Id.* at 7. Officer Tice left at 3:55 p.m., nine minutes later. *Id.* On May 7, Officer Scheu arrived at 11:42 p.m. to relieve Officer Van Wyckhouse for the May 8 morning shift. *Id.* Officer Van Wyckhouse left at 11:51 p.m., nine minutes later. *Id.* On October 8, Officer Dalessandro arrived at 3:46 p.m. to relieve Officer Melendez. *Id.* at 8. Officer Melendez left at 3:54 p.m., eight minutes later. *Id.* Considering that Officer Shemanski's analysis includes screening time, it appears that the pre- and post-shift process of walking to the housing units, completing relief, and walking from the housing units can be completed in less than ten minutes.

Officer Shemanski's analysis also conflicts with the testimony of certain witnesses about how long they are in the Prison for their shifts. The video analysis shows Officer McPhillips spends about an extra 14 to 15 minutes in the Prison on each shift he works in the medium-security facility. PLX 23, Exh B Summary. That directly contradicts Officer McPhillips's testimony that he spends an extra 20 to 30 minutes in the Prison on each shift. Tr. at 375, 380, 385, 392 (McPhillips). The video shows that Officer Buckingham spends an extra 20 or 21 minutes in the Prison, PLX 23, Exh B Summary, which is more consistent with Officer Buckingham's estimates, Tr. at 763, 773, 775, 778, 781, 783, 787 (Buckingham), though — again — the analysis does not show what he was doing during that time. Yet the video analysis also shows that Officer Buckingham (and Officer Hagenburg, who did not testify) were outliers. The other four officers spent no more than an extra 15 minutes in the Prison per shift, and one less than four minutes.

In one respect, Officer Shemanski's analysis can be compared directly to witness testimony about how long a particular activity takes: the time from arrival at the A1 lobby to the Prison compound. Officer Shemanski found that Officer Buckingham reaches the compound, on average, less than five minutes after entering the lobby; Officer Buckingham testified to five to eight minutes. Officer Christensen and Officer McPhillips reach the compound in about six and a half minutes and less

than four minutes, respectively.[28] Officer Hagenburg reaches the compound in less than four and a half minutes. Testimony that going through security to the compound requires five minutes or more thus contradicts the objective video evidence.

### 2. Government's Analysis

The government's video analysis was done by Lieutenant Nalepa. Lieutenant Nalepa's method was similar to Officer Shemanski's, *see* Tr. at 1376, 1378 (Nalepa), with three main exceptions.

First, while Officer Shemanski's analysis was based on capturing all officers' comings and goings on particular days, Lieutenant Nalepa's focused on only some of the representative Plaintiffs — Buckingham, Bunting, Conklin, Hagenburg, McPhillips, and Christiansen. Tr. at 1286, 1342–43 (Nalepa). That had the effect of reducing the sample size of shifts at posts — especially the housing posts — where few of the representative Plaintiffs worked during the time period covered by the video. But because Plaintiffs do not argue that the representative Plaintiffs were unrepresentative of officers generally or that Lieutenant Nalepa's selection of dates was not random, the difference does not appear to undermine his analysis in any other way.[29]

Second, Lieutenant Nalepa used a different set of cameras to identify arrivals and departures. He marked arrival time by when an officer reached the compound (or the control center, when posted there) instead of the camera on the A1 lobby door. Tr. at 940 (Shemanski); Tr. at 1287 (Nalepa); PLX 28. The difference reflects Defendant's disagreement with Plaintiffs' view that officers are on duty when they arrive for security screening. Tr. at 940 (Shemanski). Lieutenant Nalepa used a control center lobby camera to mark an officer's departure. Tr. at 1290–92 (Nalepa);

---

[28] Their testimony did not allow a firm computation of screening time, so a direct comparison is not possible.

[29] Plaintiffs objected at trial that Lieutenant Nalepa's averages omitted various dates when officers were in the Prison for especially long times. Tr. at 1356–63, 1378–79 (Nalepa). That argument is meaningless from a statistical perspective. Whenever an investigator analyzes data by sampling, some data will be excluded. *See* National Academy of Sciences, *Reference Manual on Scientific Evidence* 377–78 (2011). The question is not whether the range reflected in the sample is as wide as the range in the data as a whole but how representative the sample is of the entire body of data. The answer to that question depends on the randomness of the sample, measures of statistical significance, and so forth. Without a sustained statistical critique of Lieutenant Nalepa's data, in other words, merely pointing to other time figures is too crude and superficial to cast doubt on the averages. Besides, although Lieutenant Nalepa did not try to justify his analysis as a statistical matter, Officer Shemanski did not either. And in any event, as explained below, I give little weight to the parties' calculations of the total time that officers spent in the Prison, and I find only some averages helpful.

Plaintiffs also object that Lieutenant Nalepa's analysis does not include Officer Leimkuhler. Pls.' Post-Tr. Br. at 48; Pls.' Post-Trial Resp. & Reply at 26. It is unclear what difference that makes, and it matters little because I ultimately decline to rely on any witness's personal time estimates.

PLX 28. Officer Shemanski used another control center lobby camera, but there is no practical difference between what the cameras show. Tr. at 930, 940 (Shemanski); PLX 29.

Third, Lieutenant Nalepa used additional cameras to make a more detailed analysis of when officers arrived and left their posts. Tr. at 1289, 1292–97 (Nalepa); PLX 27; PLX 30; PLX 31; PLX 33; PLX 34; PLX 35; PLX 36. That allowed him to estimate, shift-by-shift, how long walks and exchanges took. Tr. at 1297–99 (Nalepa).

I find Lieutenant Nalepa credible as to time-marking and as to identification of officers. As with Officer Shemanski's testimony, though, the limitations of his analysis are important to note. For example, Lieutenant Nalepa did not review footage from [. . .] either. In addition, his time-marking probably overestimates some figures and underestimates others. He did not try to determine when (or for how long) officers visited the lieutenant's office on their walks, so at least some of his walk-time measurements may include extra time for the visit. He also acknowledged that his figures for the on-post exchanges are an upper limit on the actual time because he could not be sure what the incoming and outgoing officers were doing when they were inside a post together. Tr. at 1298 (Nalepa). But at least one calculation leads to an underestimate. Lieutenant Nalepa calculated the average time for officers' walks, but he appears to have included zero-minute measurements for occasions when officers were posted to the control center. DX 14. Because the posts are in different places in the Prison, average walk times mean very little when post-by-post data are available.

The most useful part of Lieutenant Nalepa's analysis is the summary table showing average times (which again, are possible overestimates) for walking and the on-post exchange. That table — adapted below — and its underlying raw data points to several important facts.

| Average Time Per Task | | | | | |
|---|---|---|---|---|---|
| Post | Walk to Post | Exchange | Walk from Post | Sum | Door to Door |
| Compound | 0:02:24 | 0:03:18 | 0:01:42 | 0:07:24 | 8:18:50 |
| Control Center | 0:00:00 | 0:03:48 | 0:00:00 | 0:03:48 | 8:08:05 |
| Housing | 0:05:24 | 0:04:47 | 0:05:42 | 0:15:53 | 8:15:52 |
| SHU | 0:03:09 | 0:04:04 | 0:02:32 | 0:09:45 | 8:09:55 |

First, Lieutenant Nalepa's analysis shows that the average total time spent walking on the compound and exchanging information equipment is almost always less than ten minutes. The only exceptions are the housing units.

Second, the amounts of time officers spend on their walks and exchanges varies widely. The data set for the housing units is the most limited: only ten walks and six exchanges. *See* DX 14 at 13. Yet even in the limited data collected by Lieutenant Nalepa, it appears that the walk can be completed in as little as four minutes, and that the exchange has been completed in less than a minute. Just two outliers involving relief by Officer Buckingham — on May 6 and July 13 — raise the average exchange time by roughly two minutes.

Similar variation appears elsewhere. Most exchanges at the compound post, for example, take four minutes or less, and sometimes as little as one minute. *Id.* But the exchange took five minutes twice and seven minutes once. Officers can walk between the compound post and the compound sally port in as little as one minute, and usually in two minutes or less, but the walk has taken as long as four minutes. Most exchanges at the SHU take four minutes or less, but three took ten minutes or more. *Id.* at 13–14. The walk to and from the SHU has taken as little as one minute, but as long as nine minutes. There is no evidence explaining why the outlier times were so long.

Third, officers seem to spend a substantial amount of pre- and post-shift time at the Prison other than walking and exchanging information and equipment. The record has limited evidence about why that might be, other than the likelihood that officers do not proceed directly to and from their posts, and instead perform other activities that Plaintiffs have not claimed as compensable. *See* Tr. at 1327–28, 1352–53, 1372 (Nalepa).

Fourth, the video evidence does not support most witnesses' testimony about how much time different activities take. For most activities at most posts, the video evidence shows witnesses overestimated or underestimated the usual time for given activities. At best, the witnesses testified to wide time ranges that the observed time happens to fall within.

The differences are especially significant at the low end, because short observed times for given pre- and post-shift activities imply that those activities have shorter minimum times than Plaintiffs claimed. Officer Buckingham testified that it takes him three or four minutes to reach the SHU from the compound sally port, Tr. at 776 (Buckingham), but he completed the walk in two minutes on October 6, 2019. DX 14 at 1. He testified that the on-post exchange at the control center takes five to ten minutes, Tr. at 786–87 (Buckingham), but he completed it in less than a minute

and a half on May 7. DX 14 at 1. Officer Bunting testified that exchanges at the SHU take approximately four to six minutes, Tr. at 548, 565 (Bunting), but he completed it in less than a minute on September 27, and less than two minutes on December 19. DX 14 at 3. Officer Christensen testified that exchanges at the housing units take three to five minutes, Tr. at 672 (Christensen), but on July 10 he completed it in less than one minute, and in just under two minutes the next day. DX 14 at 4. Officer McPhillips testified that exchanges in the SHU take four to ten minutes, Tr. at 377 (McPhillips), but only one of his observed exchanges took as much as four and a half minutes (on May 11), and two exchanges (on May 5 and June 23) took less than two minutes. DX 14 at 7. That provides another reason, apart from Officer Shemanski's analysis and the witnesses' inconsistencies and contradictions, to give more weight to the video analyses than to the witnesses' estimates.

## C. Time Conclusions

In order to draw conclusions about time, a few more pieces of irrelevant or unreliable information need to be discarded.

At the threshold, as should be clear by now, the recollections of witnesses are not a reliable guide to time. The video evidence contradicts the testimony of most witnesses in at least some way. Even passing over the differences between Plaintiffs' witnesses and the government's witnesses, the witnesses Plaintiffs chose to present contradict both each other and themselves. Even where the video evidence is consistent with an aspect of a witness's testimony, I ascribe the agreement to chance rather than the accuracy of the testimony — especially given that the witnesses typically spoke in terms of wide time ranges.

Plaintiffs' witnesses had the opportunity to explain themselves at trial. Setting aside the fact that they did not have their stories straight individually or collectively, they had access to the video analyses in advance, and so were on notice that the video contradicted what they had to say. But they had nothing to say about the difference at trial. Officer Shemanski had to admit on cross-examination that his analysis showed several relief processes much shorter than aspects of his analysis and the testimony of other witnesses suggested, *see* Tr. at 994–99 (Shemanski), and offered no explanation on redirect.

Put simply, if a witness testifies that properly doing a given activity requires a certain amount of time, but objective evidence shows that he has completed the task much more quickly, he should plan to explain himself on the stand if he wants to be believed. I must therefore conclude that no good explanation exists. *Adams v. Dep't of Transp., F.A.A.*, 735 F.2d 488, 492 (Fed. Cir. 1984) ("Silence is often evidence of the

most persuasive character.") (quoting *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923)). What matters is the objective evidence of the video analysis.

Turning then to the video analysis, it is important to discard measurements of the total time that officers spend in the Prison. The total time includes time that officers spend other than at their posts or engaged in the pre- and post-shift activities at issue. Plaintiffs do not appear to allege that the additional time counts as work, so including it only inflates time measurements.

The total measured in-Prison time also confuses pre- and post-shift time with variations in shift length. Officers are, as mentioned above, paid for an eight-hour shift. Across *all* officers at any given 24-hour post, shifts will (by definition) average eight hours each, plus pre- and post-shift time, regardless of exactly when reliefs take place. But a *particular* officer's *actual* time on post depends on exactly when he arrives and when his relief arrives. Tr. at 1458 (O'Kane). An officer who shows up later, relative to his shift start time, than the officer who relieves him might be paid for an eight-hour shift but spend less than eight hours on post. The converse is true too: An officer who shows up early relative to his relief might spend more than eight hours on post. Tr. at 1503–04 (O'Kane).[30] Shift time thus varies independently of pre- and post-shift time.

Shift time variation, though, is irrelevant to the case. If officers relieve each other about the same amount of time before scheduled shift changes, the time differences for particular shifts cancel out: A given shift might be longer or shorter, but everyone will average eight hours on-post. More likely, even if all officers arrive early, some show up earlier or later than others. If that is so, then officers who show up later (on average) than the overall Prison norm might free-ride on others by getting paid for shifts that average less than eight hours. Plaintiffs, though, have not based any claims on that possibility.[31] In addition, because the parties agree that the appropriate standard in this case is not the *actual* time spent by specific officers performing the work, but the time it would *reasonably* take an officer to perform the work, I do not consider variations in shift length due to an officer's personal choice. *See infra* Conclusions of Law I.A.4. What matters, then, is not the total time an officer spends in the Prison, but the time he spends on given activities before and after his time at his post.

---

[30] Officers can be paid overtime if they are relieved significantly later than their shifts are scheduled to end. Tr. at 540, 592–94, 634 (Bunting); Tr. at 1062 (Meyers). There was no evidence that an officer was ever relieved late and was not paid after properly requesting overtime.

[31] They have not argued that any officers in fact arrive earlier or later than others on average, nor that any officers are due overtime pay for that reason. The Prison's officers seem to have chosen to mutually assume the risk of equal pay for unequal time. Tr. at 590–92 (Bunting).

Relatedly, it is also helpful to discard Plaintiffs' framing of the facts in terms of which officer is or is not paid at particular times. Pls.' Post-Tr. Br. at 23, 24; Tr. at 532 (Bunting). Because there are no time clocks in FCI Otisville and officers are paid in increments corresponding to eight-hour shifts regardless of when they actually show up and leave, it makes no sense to talk about who is paid for which times of day. Tr. at 1496–97 (O'Kane). Speaking in those terms leads to absurdities, like saying that an officer on-post before his scheduled shift time is not getting paid yet, or that the outgoing officer relieved early is still being paid when he gets into his car and drives away.

The more accurate characterization focuses on how the government allocates payment for given *uses* of time. Officers are paid for time on post, on the assumption that each shift lasts eight hours. Officers are not paid for the process of going through security and making their way to their posts. The relief process occurs while the outgoing officer is still on duty at his post, so officers are in effect paid to pass down their equipment and information to the incoming officer, but not to receive it. And officers are not paid for the process of exiting the Prison.

That leads to the major factual question about timing: How long do the relevant activities take? As explained below, I answer that question based on a "reasonableness" standard. *See infra* Conclusions of Law Section I.A.4.

### 1. Entry Process

The process from the A1 lobby to the compound has several components — security, donning the duty belt, the A1 sally port, the walk to the administration building, the compound sally port — that the witnesses and video analyses do not satisfyingly disaggregate. But they did provide an estimate of the total time: Officer Shemanski found that officers averaged between just under four minutes and six and a half minutes to complete the whole process. PLX 23 Response Analysis.

On any given day, random factors outside officers' control — say, differences in the security line length or in the time it takes for the control center to operate the sally ports — might make that time longer or shorter. Tr. at 149 (Conklin); Tr. at 349 (McPhillips); Tr. 665 (Christensen). But it is unlikely, for the reasons mentioned above, that the length of the entry process would vary for any reason related to inmate management or Prison security. The record gives no reason to think that given *officers* need to spend more or less time reaching the compound for any reason other than their own habits and choices. And in fact, each officer's observed entry times cluster around the officer's personal average.

I therefore conclude that the time reasonably necessary to reach the compound is roughly the same as the average time of the fastest officer: Officer McPhillips, who

averages just under four minutes to the compound.[32] That time is split between screening, donning, walking, and passing through sally ports.

I also conclude that donning the duty belt takes a very short amount of time, likely only a few seconds. Several witnesses testified that a duty belt that already has its clips, rings, chains, and holders can be clipped on very quickly. Tr. at 441 (McPhillips); Tr. at 896–97 (Dumont); Tr. at 1444 (O'Kane). Some belts fasten in other ways, and some officers choose to hold their belts in place with belt keepers, but those differences seem to be a matter of personal choice.

[. . .].

2. *Walk to and from Posts*

The next relevant activity is the walk to the posts. The walk to the control center is the simplest because it is essentially a version of the entry process, *i.e.*, security, the A1 sally port, the walk to the administration building, and another sally port. Measuring the walk to posts on the compound — the compound, housing, and SHU posts — is more complicated, with less predictability, more freedom of movement, and more choices to make. Unlike with the entry process, the parties have not provided average walk times for different officers on a post-by-post basis. The government's analysis, though, does provide average times for walks to given posts.

Walks to and from the housing posts take the longest: about five and a half minutes on average, according to Lieutenant Nalepa's analysis. DX 14. Yet those data — albeit with a small sample size — also included a four-minute walk. *Id.* at 13. In addition, Officer Shemanski's analysis showed that after an incoming officer arrives in the A1 lobby for a shift at a housing unit, the outgoing officer returns to the compound sally port in as little as eight to ten minutes — a time that also includes the incoming officer's entry process. The only way to make sense of that is to find that the minimum time needed for the walk is less than the shortest time Lieutenant Nalepa observed.

The time reasonably necessary for a walk to or from a post cannot be much longer than the minimum time. The baseline is a direct, brisk walk between the compound sally port and the post. Nobody argues that officers should get work credit merely for the habit of walking more slowly. If an officer detours, then the question is the reason for the detour and how long it took — a question often resolved through the Prison's internal overtime processes. *See* Tr. at 248–52 (Juenger); Tr. at 701, 708

---

[32] If I were to adopt a longer estimate of the entry process time, I would deduct more time from overall estimates of officers' time on the compound and at their posts. That would reduce the total time Plaintiffs claim as compensable.

(Christensen). Witnesses agree, moreover, that security-related detours and delays are rare. *See* Tr. at 357–58 (McPhillips); Tr. at 767–68 (Buckingham); Tr. at 1330 (Nalepa). Although officers perform various functions while walking, several witnesses testified that they can maintain vigilance and address any ordinary issues without stopping on the way to their posts. Tr. at 142 (Conklin); Tr. at 595, 635–36 (Bunting); Tr. at 700–701 (Christensen). Officers do not commonly stop in the lieutenant's office on their way to their posts either, and they need to do so for job-related reasons even more rarely. *See* Tr. at 696–97 (Christensen); Tr. at 1460–61 (O'Kane). It is therefore unlikely that longer walk times can be explained by officers' job functions alone.

I therefore start with the shortest housing unit relief times Officer Shemanski measured — eight or nine minutes at Unit G. *See* PLX 23 Exh. A at 7. Start by assuming that those days involved an unusually short entry process and on-post exchange: If the stars align, the entry process can be completed in as little as two minutes, PLX 23 Response Analysis, and the housing unit exchange in as little as one minute, DX 14 at 13. That leaves no more than five or six minutes of walking, or two and a half to three minutes each way. Even with other housing units, the walk for the shortest reliefs Officer Shemanski observed could not have been more than four minutes.

I find a three-minute estimate to be reasonable, and likely even generous to Plaintiffs. The foregoing calculation assumes that the entry and exchange processes on the days of unusually short relief were both exceptionally fast. But that assumption is not supported by any evidence specific to the days in question. Just as likely, the entry and exchange processes were simply a little faster than usual. If, for example, the entry process took three minutes and the exchanges took two minutes on the days of the fastest reliefs observed by Officer Shemanski, then the walks would only have been two minutes or less.

The housing unit posts are farthest from the compound sally port, so walks to the other posts are proportionately shorter. Repeating the same analysis for the shortest reliefs at the compound post, where Officer Shemanski measured the fastest relief processes at just under eight minutes, PLX 23 Exh. A at 1, and where the fastest exchange took one minute, DX 14 at 13, suggests a walk of no more than two and a half minutes, and likely less. Lieutenant Nalepa observed walks as short as one minute. *Id.* at 13. At the SHU, where Officer Shemanski observed a four-minute relief, PLX 23 Exh. A at 4, and where the shortest exchange was less than one minute, DX 14 at 13, the walk must be as little as thirty seconds each way — not implausible, given that the SHU is the closest unit to the compound sally port. [. . .].

### 3. Equipment and Information Exchanges

Lieutenant Nalepa measured the average exchanges at three minutes, 18 seconds for Compound #1; three minutes, 48 seconds for Control #1; four minutes, 47 seconds for housing units; and four minutes, four seconds for SHU #1. DX 14 at 15. Those averages are close together, within about a minute and a half. The objective evidence thus does not bear out witness testimony claiming that the control center and SHU posts involve significantly longer exchanges.

Those averages mask wide variation even among the Plaintiffs themselves, especially at the long end. At the compound post, Plaintiffs' own exchanges range from one minute to seven minutes. *Id.* at 15. At the control center, they range from one minute to over six and a half minutes. At the housing units, they range from less than one minute to nine and a half minutes. At the SHU, they range from less than one minute to almost 13 minutes. *Id.* at 15–16.

That raises the question of how to address the variation. It would not be appropriate to take the average times at face value. Because (as discussed below) non-work time cannot count toward the time reasonably necessary to complete the exchange, accepting the average time would in effect assume that all the variation is explained by the needs of Prison security. But that assumption is contrary to human nature and evidence in the record. *See* Tr. at 713 (Christensen).

I assume instead, to the testifying officers' credit, that their shortest reliefs are still proper and complete, to the satisfaction of both officers and consistent with their understanding of best practices for the Prison's security. There is no evidence in the record of Plaintiffs performing incomplete or unreasonably short reliefs. The shortest reliefs, then, are presumably ones where the equipment checks out straightforwardly and there is no salient information to report to the incoming officer. In those circumstances, relief can be completed in about a minute, regardless of post.

Most exchanges took longer than that, but the large majority were complete in four minutes or less. (To the extent the averages were higher, especially for the housing units, it appears to be largely because of the small sample size and a few outliers. *See* DX 14 at 15.) If an uneventful equipment exchange takes about a minute, that leaves up to three minutes for resolving questions and the information exchange. Three minutes — a period roughly equal to Hamlet's 'To be or not to be" soliloquy or King Henry's St. Crispin's Day speech in Shakespeare, Monty Python's "Galaxy Song," the Gettysburg Address, the opening song of Meredith Wilson's "The Music Man," and the Major General's patter song in Gilbert and Sullivan's "Pirates of Penzance" — is a vast time for one person to convey information to another.

I therefore conclude that the exchanges reasonably take between one and four minutes on average, with some longer departures that the evidence does not directly explain. [. . .].

## CONCLUSIONS OF LAW

The main legal issues briefed by the parties are as follows:[33] (1) which activities at issue count as compensable work under the FLSA, (2) how long those activities take, and (3) whether Plaintiffs, if entitled to overtime payment, are entitled to liquidated damages and a lengthened statute of limitations. Because I conclude Plaintiffs are not entitled to any payment, I do not reach the third question.

## I. Work

The first question is whether the pre- and post-shift activities described by the evidence are compensable hours of work. I conclude that some are and some are not. Officers are working when they are on the Prison compound heading directly to and from their posts, and when they are exchanging equipment and information at their posts. They are not working when they go through the entry process. Although the time needed for pre-and post-shift tasks varies, not all of the variation is attributable to differences in compensable time alone.

### A. Legal Standards

Under the FLSA, employees are entitled to compensation for hours worked, including work "suffer[ed] or permit[ted]" by their employer. *See* 29 U.S.C. §§ 203(g), 207(a)(1); *see also* 5 C.F.R. § 551.401(a). The Portal-to-Portal Act clarifies that compensable hours do not include travel and other "activities which are preliminary to or postliminary to [the employee's] principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a). But if an employee performs his principal activities, including tasks integral and indispensable to his work, before or after his shift — and if the time he spends is more than *de minimis* — compensation is generally required.[34]

---

[33] This Court has jurisdiction for the reasons explained in *Aitken I*, 162 Fed. Cl. at 362.

[34] *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29–30 (2005) (itself quoting *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956))); *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998); 5 C.F.R. § 551.412(a)(1) (requiring compensation for activities taking more than ten minutes per workday that are "closely related to an employee's principal activities, and … indispensable to the performance of the principal activities").

### 1. Principal Activities

"Principal activities" include the work an employee is "employed to perform," 29 U.S.C. § 254(a)(1), plus "all activities which are an 'integral and indispensable part of the principal activities.'" *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (quoting *IBP*, 546 U.S. at 29–30). An activity is integral and indispensable to the employee's principal activities — and thus *part* of the principal activities, *see IBP*, 546 U.S. at 33 — "if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 33.

To count as work, it is not enough that a given pre- or postliminary activity is required by the employer or done for the employer's benefit. *Id.* at 36. Rather, the question is whether the activity is "tied to" — that is, integral and indispensable to — "the productive work that the employee is *employed to perform.*" *Id.* (emphasis added). An employee's principal activities thus comprise a subset of the broader realm of activities furthering the goals and purposes of his employment. Def.'s Post-Trial Br. at 8; *Alkire v. United States*, 158 Fed. Cl. 380, 389 (2022).

Here, when Plaintiffs described their duties, they typically referred to maintaining the safety and security of the Prison, or some similar formulation. Tr. at 26 (Conklin); Tr. at 314 (McPhillips); Tr. at 650 (Christensen); Tr. at 753 (Buckingham). Similarly, the correctional officers' position description says that officers are "concerned with" — *i.e.*, occupied with pursuing — Prison security. *See* JX 1 at 1; JX 2 at 1. Defendant argues that those terms describe the goals of Plaintiffs' employment, not their principal activities. Def.'s Post-Trial Br. at 25–26; *see* Tr. at 1084 (Whinnery); Tr. at 1398–99 (O'Kane). But the difference between the parties' positions is ultimately minor. Although safety and security might not be a "duty," strictly speaking, Plaintiffs appeared to mean those terms as a shorthand or umbrella designation for collections of specific activities they are employed to perform. Tr. at 26, 135 (Conklin); Tr. at 718–20 (Christensen). I will interpret Plaintiffs' evidence in that way. To the extent there are any activities that further the Prison's security but that do not otherwise count as work, as the Supreme Court has defined it, I will not count that time in Plaintiffs' favor. *See Aitken I*, 162 Fed. Cl. at 365–68 (security screening not work even though it advances security).

The foregoing legal principles point to a few categories of activity that are generally not considered hours of work when they are preliminary and postliminary to an employee's principal activities. Most obviously, the Portal-to-Portal Act provides that time spent traveling to a location of work is generally separate from an employee's hours of work. 29 U.S.C. § 254(a)(1); *IBP*, 546 U.S. at 40–41. Time spent

in the workplace's check-in and check-out process is generally not part of an employee's principal activities either, even when aspects of that process are important to the functioning of the workplace. *Integrity Staffing*, 574 U.S. at 34 (citing Department of Labor regulations); *id.* at 39 (Sotomayor, J., concurring) (reasoning that "checking in and out and waiting in line to do so" are "activities that Congress clearly deemed to be preliminary or postliminary").

Changing into work clothes and gathering generic equipment is typically not work. *Steiner*, 350 U.S. at 249; *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 594 (2d Cir. 2007); *Reich*, 38 F.3d at 1125; *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009); *but see Alvarez v. IBP, Inc.*, 339 F.3d 894, 903 (9th Cir. 2003). Those uses of time are thus noncompensable unless something about the activity is closely connected to a given employee's personal duties under the facts of his specific workplace. *See Perez v. City of New York*, 832 F.3d 120, 127 (2d Cir. 2016) (donning generic equipment may be compensable if it "guards against 'workplace dangers' that accompany the employee's principal activities and 'transcend ordinary risks'") (quoting *Gorman*, 488 F.3d at 593).

It does not matter that Prison employees other than officers covered by this case perform some of the same functions and are subject to the same standards. Different employees or categories of employees can have the same principal activities at the same time. The question is what activities come within a given employee's duties, not how widely the duties are shared.

### 2. "Suffered or Permitted"

Activities meeting the above test count as hours of work even if they are not specifically ordered by the employer and are only "suffer[ed] or permit[ted]." *See* 29 U.S.C. § 203(g). That has a few implications in this case.

For one thing, it confirms that the post orders do not define a comprehensive universe of compensable activities. Some of the activities at issue are not directly described in the post orders. The post orders do not always require that particular tasks, like the exchanges and equipment inventory, take place before shifts begin. Tr. at 151–52, 159, 163 (Conklin); Tr. at 453–59 (McPhillips). Some post orders contemplate that certain parts of assuming a post take place during an officer's shift. Tr. at 159–60 (Conklin); PLX 13 at 1 (SHU #1 Post Orders). The question, though, is not how activities are described in the post orders, but whether they meet the definition of "work" and are permitted by the Prison.

Conversely, the fact that an employer allows a certain activity to take place does not make that activity work. Plaintiffs emphasize, for example, that the Prison does not discipline officers for engaging in certain activities or uses of time. Pls.' Post-

Trial Br. at 42–45. That might be evidence that those activities are suffered or permitted, but it cannot make them compensable unless they independently satisfy the standard for work. *See Bull v. United States*, 68 Fed. Cl. 212, 220 ("*Bull I*"), *decision clarified,* 68 Fed. Cl. 276 (2005) ("*Bull II*"), *aff'd,* 479 F.3d 1365 (Fed. Cir. 2007) ("To prevail on a FLSA claim for an overtime activity suffered or permitted to be performed, … plaintiffs must establish that each activity for which overtime compensation is sought constitutes 'work.'"). The Prison may allow officers to show up early but compensate them only for time that qualifies as work. Tr. at 1526 (O'Kane).

### 3. The "Continuous Workday" Rule

Another aspect of "work" relevant to the case is that only time federal employees spend on their principal activities is compensable. Plaintiffs claim that under the "continuous workday rule," they are entitled to compensation for all time between the first and last compensable activities in their workdays. Pls.' Post-Trial Br. at 30–32. They rely mainly on *Bridges v. United States*, 54 F.4th 703 (Fed. Cir. 2022), which purportedly holds that employees "must be paid from the moment they begin performing their first principal activity or integral and indispensable activity of the … until they finish performing their last principal or integral and indispensable activity of the day," even if the time in between includes activities that would not otherwise be compensable. Pls.' Post-Trial Br. at 32.

That contradicts the relevant Office of Personnel Management ("OPM") regulation, which precludes compensation for "[t]ime spent in preliminary or postliminary activities … even if it occurs between periods of activity that are compensable as hours of work." 5 C.F.R. § 551.412(b). Plaintiffs also misread *Bridges*.

In *Bridges*, the Federal Circuit held that "[t]ravel during a 'continuous workday' must … be compensated under the FLSA." 54 F.4th at 706–07. The *Bridges* court held that the "continuous workday" is "defined … by the start and stop of 'principal activities.'" *Id.* at 707. But the court rejected the inference — pressed by the *Bridges* plaintiffs as well — that the "continuous workday" includes everything between the first and last principal activity in some generally work-related period. *Id.*

Instead, the *Bridges* court held that Section 551.412(b) permits "noncontinuous workdays: it recognizes that two blocks of 'compensable … hours of work,' like those book-ended by principal activities, may nonetheless be separated by a noncompensable activity." *Id.* On the facts presented in *Bridges*, that meant that because employees' travel from a shift at one location to a shift at another location was neither itself a "principal activity" nor part of the scheduled workday, it was also

not part of the employees' "continuous workday" for purposes of compensation. *Id.* at 708.[35]

The facts in this case are of course different from those in *Bridges*: This case does not involve travel between different shifts at different locations. But the reasoning is no less applicable. The activities at issue are outside Plaintiffs' scheduled shifts. Thus, if any of those activities are not independently compensable as principal activities, they do not become compensable merely because they are "book-ended by principal activities." *Id.* at 707 (citing 5 C.F.R. § 551.412(b)).

### 4. "Reasonably Necessary"

The next question is what standard to apply in determining the length of given pre- and post-shift activities. The activities at issue in this case vary in length from day to day; evidence of actual time for every employee and every shift is unavailable, and so Plaintiffs seek compensation for aggregations of time based on representative evidence. The parties agree — and I therefore assume — that the correct measure for a given activity in this case is the time reasonably necessary to perform the activity.[36] *See* Pls.' Supp. Br. at 1; Def.'s Supp. Br. at 2; *see also Amos v. United States*, 13 Cl. Ct. 442, 450 (1987); *Bull II*, 68 Fed. Cl. at 279–80; *Bull I*, 68 Fed. Cl. at 227–28; *Reich v. IBP, Inc.*, 38 F.3d 1123, 1127 (10th Cir. 1994); *Alvarez*, 339 F.3d at 914. As shown above, I have determined reasonable times (including time ranges where appropriate) based on my review of all the evidence in the record. *Bull II*, 68 Fed. Cl. at 280.

Plaintiffs argue that the time reasonably necessary for an activity is the average time it actually takes employees to complete it. Pls.' Supp. Br. at 3. But that does not follow. Pre- and post-shift time is only compensable when it is spent on compensable activities. *See* 5 C.F.R. § 551.412(b). Yet officers' pre-shift and post-shift time might mix different kinds of work and non-work activities in ways that are difficult to separate after the fact. The record contains at least some evidence that

---

[35] Plaintiffs cite several pre-*Bridges* cases from this Court discussing the continuous workday rule. *See* Pl.'s Post-Trial Br. at 32 (citing *Adair v. United States*, 2021 WL 6163407 (Fed. Cl. Dec. 30, 2021); *Alexander v. United States*, 156 Fed. Cl. 512, 531 (2021); *Adegbite v. United States*, 156 Fed. Cl. 495, 502 (2021)). I agree that those cases could be read to support Plaintiffs' position. But none of them cites 5 C.F.R. § 551.412(b), the controlling regulation. To the extent the cases conflict with *Bridges*, they are no longer good law.

[36] Some courts have held that employees must be compensated for all time spent in compensable preliminary and postliminary activities, even if the employees spend more than a reasonable amount of time on them. *See Brock v. City of Cincinnati*, 236 F.3d 793, 803 (6th Cir. 2001); *Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 524 (2d Cir. 1998); *Walsh v. E. Penn Mfg. Co.*, 555 F. Supp. 3d 89, 109 (E.D. Pa. 2021). Because of the parties' agreement, I need not reach this issue. I note, however, that a preliminary or postliminary activity is not compensable unless it is an "intrinsic element of [principal] activities and one with which the employee cannot dispense if he is to perform his principal activities." *Integrity Staffing*, 574 U.S. at 33. Time spent in excess of a reasonable amount cannot be either intrinsic or indispensable to the employee's work.

non-work or personal activity inflates the time officers spend on pre- and post-shift tasks. *See* Tr. at 713, 723 (Christensen); Tr. at 1327–28, 1352–53, 1372 (Nalepa). Pegging compensation to average time would thus compensate officers for time that is noncompensable by law.

Add to that the likelihood that "there are individual variations in efficiency, skill, attention to detail, work ethic, schedule, and numerous other relevant circumstances that affect the amount of time required to perform" a given preliminary or postliminary task. *Bull II*, 68 Fed. Cl. at 279. Those factors would stretch the average time officers spend in potentially compensable pre- and post-shift activity beyond the reasonably necessary time. Because an average that includes both reasonable and unreasonable times is longer by definition than a reasonable time,[37] it fails the test the parties have themselves proposed.

It might be that time sometimes varies because of work-related needs. Plaintiffs suggest several things incoming or outgoing officers might have to handle that would necessarily slow the relief process: fights, inmate questions, security breaches, contraband seizures, unusually long information exchanges, and so forth. Pls.' Supp. Br. at 2. The problem for Plaintiffs is that the record shows those kinds of events are very rare. Tr. at 142–43 (Conklin); Tr. at 595–96, 635–36 (Bunting); Tr. at 700–01 (Christensen); Tr. at 1205 (Whinnery). Most relief processes appear to be routine, uneventful, and linear.

Even assuming that *some* variation in time arises from work-related security needs, the record does not show that *all* variations are work related. Although Plaintiffs had access to video evidence showing wide ranges in the time spent on given activities, they presented no testimony or other evidence about why any given relief process was unusually long. Officer Buckingham could have explained why it took him over nine minutes to walk to the SHU on October 6, 2019, but he did not. DX 14 at 1. Nor did Officer Bunting explain why it took him almost 14 minutes to perform an on-post relief at the SHU on October 22, especially given that he completed his exchanges in less than a minute on December 19. DX 14 at 14. Combined with the inconsistencies between officers' testimony and the objective video evidence, the evidence does not prove that times were unusually long because of work needs alone.

---

[37] The exception would be if some employees spend unreasonably *short* times on their activities, in which case too-long and too-short times might cancel out. But with the possible exception of Captain O'Kane's relief of Officer Bunting at the SHU, Tr. at 1447–48, 1453–54 (O'Kane), which does not seem to have been included in any of the video analyses, there is no evidence that any pre- or post-shift activities are ever too short. No officer testified to cutting corners to save time, or even to knowledge of other officers doing so. Any unreasonable uses of time would be on the long end, not the short end.

One way or another, the time reasonably necessary for an activity is less than the average.

In the abstract, average time might be a helpful yardstick, especially for simple and repetitive tasks involving little discretion on the employee's part. *Cf. Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016) (holding that the trier of fact can consider whether average times for donning and doffing are probative of actual time). The entry process, for example, varies based on the length of the security line and the speed of opening the sally ports. For that reason, I have found the average times helpful in evaluating the entry process. But I do not adopt Plaintiffs' average-time standard. Instead, "[a] reasonable time [is] the time the court determines to be reasonable for the work involved based on the preponderance of the credible evidence presented at trial." *Bull II*, 68 Fed. Cl. at 280.

## B. Plaintiffs' Pre- and Post-Shift Activities

That brings us to the question of which activities at issue are part of Plaintiffs' principal activities and potentially compensable. Briefly, the entry process is not, but the walk to the post and the on-post exchanges are.

### 1. Entry Process

Several aspects of the entry process are not hours of work as a matter of law. The security screening has been removed from the case at summary judgment, and Plaintiffs do not argue that time spent traversing the sally ports counts. *See* Pls.' Post-Trial Br. at 48. That leaves, essentially, two contested uses of time: putting on the duty belt, and walking from the A1 building to the administration building and the outer door of the compound sally port.

I conclude that donning the duty belt does not count as work. As explained above, the duty belt is just a big belt that officers use for their jobs. The evidence shows that such a belt is indispensable for Prison security work at certain posts. But as many courts have held, such concerns do not make an item *intrinsic* to Prison security. *Llorca v. Sheriff, Collier Cnty., Fla.*, 893 F.3d 1319, 1324–25 (11th Cir. 2018). The items attached to a duty belt — personalized chits, clips, rings, chains, and pouches — are generic items, unlike the keys, radios, and defensive weapons officers receive on post. *See Steiner*, 350 U.S. at 249; *Gorman*, 488 F.3d at 594; *Reich*, 38 F.3d at 1125. Putting on and taking off generic work-related items is not compensable hours of work. *See Aitken I*, 162 Fed. Cl. at 368–69.

Even if time donning protective gear can be compensable, as some courts have held, *Perez*, 832 F.3d at 127; *Alvarez*, 339 F.3d at 903, the duty belt and the items donned with it are not even useful in themselves, but only in relation to other pieces

of equipment that officers do not have yet when they pass security. The belt and its attachments are therefore several steps removed from the officers' actual work. *See IBP*, 546 U.S. at 42.

The location where officers put on the duty belt, a subject of considerable debate at trial, ends up mattering very little. The only significance of the issue is whether it marks the beginning of the continuous workday, which in Plaintiffs' view makes subsequent activities compensable. But non-work preliminary and postliminary activities are not compensable under *Bridges* and OPM regulation no matter where they fall in the sequence of events. Putting on the duty belt thus does not bear on the compensability of later activities even if — as seems likely — most officers choose to put it on promptly after security.

The walk from security to the compound sally port is not work time either.[38] As mentioned, travel to a work location is not work time unless something about it is integral and indispensable to "the productive work that the employee is employed to perform." *Integrity Staffing*, 574 U.S. at 36 (emphasis omitted). Walking to the sally port, though, is unlike the officers' work. Outside the compound, officers rarely encounter inmates. In the unlikely event that inmates are there, they are under the direct supervision of other officers. None of the officers testified that they have had to take any security-related action outside the Prison compound. The state of vigilance they maintain while outside the compound is thus remote from the actual Prison environment, more like the vigilance they exercise before they even get to the Prison parking lot. Tr. at 138–39 (Conklin); Tr. at 527–28 (Bunting); Tr. at 794–95 (Buckingham). That makes the walk analogous to ordinary travel from place to place, and therefore excluded from hours of work by the Portal-to-Portal Act. 29 U.S.C. § 254(a)(1) (excluding from compensable hours time spent "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform").

### 2. *Walk to and from Posts*

The walk from the compound sally port to the compound, housing, and SHU posts is a different matter. Officers emerge in an area where prisoners are housed

---

[38] Officer Shemanski's video analysis did not include officers' post-shift time after exiting the compound sally port. Tr. at 936–40 (Shemanski). Plaintiffs presumably intended to organize their video analysis around their understanding of the continuous workday, *i.e.*, all the time between an officer's first and last principal activities. Although they belatedly changed course at trial, *see* Tr. at 951 (Shemanski), that implies Plaintiffs considered their first principal activity to be the security screening, and their last principal activity to be exiting the compound. That in turn suggests that Plaintiffs themselves did not consider the walk between the A1 building and the administration building to be hours of work or compensable time, except as part of a continuous workday when sandwiched between other compensable activities.

and move from place to place, sometimes without direct supervision. That elevates officers' alertness from the general awareness of people who might theoretically be called to action to the more specific vigilance of people who are personally responsible at every moment for maintaining order. I credit testimony that officers regularly interact with inmates on the way. Officers thus engage in some of their principal activities — maintaining order, observing and correcting prisoner behavior — during the walk. That makes the walk more than a simple act of traveling to a place of work.

In *Llorca*, the Eleventh Circuit held that time off-duty sheriff's deputies spent commuting in marked cars was not compensable even though the deputies might be obligated to "observ[e] the roads for traffic violations and other incidents" and respond if necessary. 893 F.3d at 1326–27. That decision rested in part on a provision of the Portal-to-Portal Act providing that "activities … incidental to the use of [an employer's] vehicle for commuting shall not be considered part of the employee's principal activities." 29 U.S.C. § 254(a)(2). The Eleventh Circuit also held that "monitoring the roads for traffic violations" during a commute is not "indispensable" to a deputy's principal activities because it "could be dispensed with without affecting at all the deputies' performance of their law enforcement duties during their shifts." 893 F.3d at 1327. But even if that is true for deputies driving in the world at large, this case involves the closed environment of a Prison. It seems unlikely that officers could maintain security at their posts if they ignored security concerns at other times. Tr. at 57–58 (Conklin); Tr. at 358 (McPhillips); Tr. at 530 (Bunting); Tr. at 768 (Buckingham); Tr. at 1086–87 (Whinnery); Tr. at 1366 (Nalepa); Tr. at 1485–86, 1520–21 (O'Kane).

The government emphasizes that Plaintiffs typically can address any inmate issues between the compound sally port and their posts without stopping their walk. Def.'s Post-Trial Br. at 13–14. That argument is consistent with trial testimony too. But what matters is not whether officers happen to be walking to where they are assigned to be, but whether they are doing work.

That being said, some aspects of the walk are not work. As mentioned, there are variations in the walk time that the record does not fully explain. If an officer happens to walk more slowly than normal, or if he diverts from his walk for reasons other than addressing a matter of Prison security, the extra time is not reasonably necessary for his work.

Officers sometimes stop at the lieutenant's office on the way to their posts. That time cannot be credited as work time either. Checking into work is ordinarily not compensable time. *See Aitken I*, 162 Fed. Cl. at 369. Officers stop in the lieutenant's office largely for administrative purposes — like completing paperwork

— that are not part of their principal activities. Officers are paid to guard prisoners, not to fill out overtime slips or check their mail. *See* JX 1 at 1–2; JX 2 at 1–2. The visit has two functions that might be connected to officers' duties, namely, announcing the incoming officer's presence and getting information from the lieutenant. JX 58 at 4; Tr. at 697 (Christiansen). But the former can be accomplished by a phone call from post, and the second can wait for the shift's "threes call." *See* Tr. at 141–42 (Conklin); Tr. at 474 (McPhillips); Tr. at 800 (Buckingham); Tr. at 1462–64 (O'Kane). The fact that pre-shift visits to the lieutenant's office are uncommon attests to the fact that they are unnecessary.

### 3. Equipment and Information Exchanges

Defendant concedes that the equipment exchange is integral and indispensable to Plaintiffs' principal activities. Def.'s Post-Trial Br. at 34. That leaves no dispute that the exchange is part of Plaintiffs' principal activities, and therefore counts as work. *See IBP*, 546 U.S. at 37.

Defendant argues that the exchange is noncompensable because Plaintiffs must make the exchange at the beginning of their shifts and not before. Def.'s Post-Trial Br. at 34. That misses the point. Work is compensable when it is "suffered or permitted" by the employer. 5 C.F.R. § 551.412(a). This Court has held that work is "suffered or permitted" when (1) the work benefits the employer, and (2) the employer is aware of the work. *Bull I*, 68 Fed. Cl. at 223–24. Defendant concedes that the equipment exchange benefits the Prison, *see* Def.'s Post-Trial Br. at 34, and the Prison is aware that officers come in early and relieve outgoing officers early. *See, e.g.*, Tr. at 84, 201 (Conklin); Tr. at 519–20 (Bunting). The time that officers spend conducting the equipment exchange is therefore suffered and permitted even if it occurs early.

The parties disagree about whether the information exchange is integral and indispensable. *See* Pl.'s Post-Tr. Br. at 14–16; Def.'s Post-Tr. Br. at 20–22. But I conclude that the information exchange is likewise part of Plaintiffs' principal duties. Plaintiffs have established — and the government does not seriously dispute — that incoming officers need a pass-down of information to do their jobs. Although at least some information is on TruScope, I also credit the testimony of witnesses who explained why TruScope alone is not enough to ensure that an incoming officer is adequately informed for the beginning of his shift. Some officers cannot access TruScope right away, and some information might not be on TruScope at all. *See* Tr. at 157, 172, 201 (Conklin); Tr. at 366–67 (McPhillips). That leaves no substitute for an in-person, face-to-face exchange.

## II.  De Minimis

Even pre- and post-shift time spent on principal activities must be more than *de minimis* to be compensable. *See Aitken I*, 162 Fed. Cl. at 364. I conclude that although there are likely instances when officers need more than *de minimis* time to complete their pre- and post-shift activities, they generally do not.[39]

The parties disagree about the standard for determining whether time is *de minimis* under the FLSA. Pls.' Supp. Br. at 1; Def.'s Supp. Br. at 2.[40] The applicable OPM regulation, though, expressly provides that periods of time adding up to less than ten minutes per workday are *de minimis*. 5 C.F.R. § 551.412(a)(1); *see Bull I*, 68 Fed. Cl. at 244 n.25; *Riggs v. United States*, 21 Cl. Ct. 664, 682 (1990). The Federal Circuit has also indicated that in some circumstances, periods of time *longer* than ten minutes can be *de minimis* too. *See Carlsen v. United States*, 521 F.3d 1371, 1380 (Fed. Cir. 2008), *as corrected on reh'g* (Apr. 29, 2008) ("While it is true that the period that is normally regarded as the cut-off for *de minimis* overtime is 10 minutes, that number has not been treated as a rigid maximum.") (citation omitted).

Here, the time reasonably necessary for the pre- and post-shift activities at issue is less than ten minutes. I address the time post-by-post.

Housing, Compound, and SHU Posts. Given the shortest relief times Officer Shemanski observed, even assuming shorter-than-usual entry processes and on-post exchanges on those occasions, the time reasonably needed to walk to and from the housing units cannot be more than three minutes each way. Officers working at those posts reasonably need to spend no more than six minutes walking in and out.

---

[39] Because I conclude that Plaintiffs have not established that they are entitled to overtime, I do not need to resolve questions about the government's good faith, reasonableness, or willfulness. *See* 29 U.S.C. §§ 216, 255(a), 260. I do, however, make one more factual finding relevant to those issues. Plaintiffs' argument that the government acted in bad faith, unreasonably, and willfully rests on the testimony of Michelle Juenger, the former human resources manager. Plaintiffs claim that her lack of familiarity with aspects of labor law like OPM regulations, Department of Labor memoranda, and court decisions interpreting the FLSA shows that Defendant acted willfully and not in good faith. *See* Pls.' Post-Trial Br. at 25–28. Plaintiffs, however, overstate Ms. Juenger's role. Ms. Juenger was responsible for making sure Prison employees were paid what they were entitled to receive, but she had no role in deciding what those entitlements were, much less in evaluating the government's legal obligation to count particular activities as work. Tr. at 284–85 (Juenger). Her testimony therefore is not probative of the government's good faith, reasonableness, or willfulness.

[40] The parties have also mentioned Bureau of Prisons guidelines under which employees are compensated for overtime past seven and a half minutes. Tr. at 263–64, 289–90 (Juenger); Tr. at 1347 (Nalepa); JX 4 at 38. The parties have not clearly explained how that policy interacts with the FLSA *de minimis* standard. On its face, it may conflict with the ordinary ten-minute threshold appearing in the OPM rules. *See* 5 C.F.R. § 551.412. If the policy was intended to implement the FLSA, the conflict raises questions about its legal basis and force. If it rests on some other statutory basis, Plaintiffs do not specify what that basis might be.

Because the housing units are the posts farthest from the compound sally port, the walks to and from the SHU and compound posts are shorter. The evidence suggests that officers can reach the compound post in one minute and the SHU in even less time. Those posts require approximately two minutes of walking.

On-post exchanges can be completed in as little as one minute, and typically in four minutes or less. That time, which does not seem to vary significantly from post to post, allows about a minute to exchange equipment and up to about three minutes for the outgoing officer to share any germane information.

That adds up to seven to ten minutes reasonably needed for pre- and post-shift activity for the housing posts and three to six minutes for the compound and SHU posts.

Control Center. No walking time needs to be counted to reach the control center post, which officers pass on their way to the compound sally port. The only potentially compensable pre-shift time for the control center post is the on-post exchange, which again appears to be one to four minutes.

[. . .]. [. . .][41]

Although I cannot conclude that any post ordinarily requires more than ten minutes of pre- and post-shift work, it is possible that more time is sometimes required by the particular circumstances of given days. But the record in this case is not sufficient for me to make any findings about whether that has happened during the period covered by this case, how often it has happened, on which days it happened, or how much time was involved. Because the parties have not adequately briefed the issue, I also do not address whether or how such instances might be resolved under the Prison's overtime accounting policies. JX 4 at 38.

Finally, even if Plaintiffs' pre- and post-shift time does exceed ten minutes, time periods over that threshold "have been regarded as *de minimis* depending on the circumstances, such as the practical administrative difficulty of recording additional time, the aggregate amount of compensable time, and the regularity of the work." *Carlsen*, 521 F.3d at 1380–81. Identifying the occasions when work, and not other factors, pushes pre- and post-shift time over ten minutes would be administratively difficult, especially because the aggregate time involved is likely small and

---

[41] Even if any of the time passing through security or walking to the compound or the control center were integral and indispensable to Plaintiffs' work, it would not be enough to push any post's pre- and post-shift time over ten minutes, with the possible exception of some housing unit posts. *See infra* Findings of Fact III.B.2. And that would still not necessarily be enough to make it more than *de minimis*. *See Carlsen*, 521 F.3d at 1380–81.

unpredictable. *Id.* Plaintiffs' main proposal for tracking time is to install time clocks in the Prison. Pls.' Post-Trial Br. at 27, 32 n.6, 45, 50. But while time clocks could be used to record an officer's aggregate time in the Prison, that is not the relevant measure for purposes of compensation. *See* Findings of Fact III.C; Conclusions of Law I.A.4. Plaintiffs have therefore failed to prove a feasible way of tracking the amount of pre- and post-shift work time.

## CONCLUSION

Although Plaintiffs have proven that some of the uncompensated preliminary and postliminary activities at issue are integral and indispensable to their principal activities, they have not proven that the time they spend on those activities exceeds the FLSA *de minimis* threshold. Plaintiffs therefore have not proven that they are entitled to monetary relief under the FLSA.

If the parties wish to propose further proceedings, they may file a joint status report no later than **June 24, 2024**. If no further proceedings are necessary, the Court will enter judgment.

Pursuant to the Court's October 31, 2019 Protective Order (ECF 15), these findings of fact and conclusions of law have been issued under seal. The parties shall have 45 days to propose redactions and, accordingly, shall file notice of their proposed redactions no later than **July 8, 2024**. To aid the Court's evaluation of the proposed redactions and in light of the "presumption of public access to judicial records," *Baystate Techs., Inc. v. Bowers*, 283 F. App'x 808, 810 (Fed. Cir. 2008) (per curiam), each party shall file a memorandum explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge